```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,                :
                                                   Civil Action
                    Plaintiff,           :         No. 41-1395 (WCC)

        - against -                      :

AMERICAN SOCIETY OF COMPOSERS, AUTHORS   :
AND PUBLISHERS, et al.,                            OPINION
                                         :         AND ORDER
                    Defendants.
- - - - - - - - - - - - - - - - - - - - X
In the Matter of the Application of      :
AMERICA ONLINE, INC.,
                                         :

                    Applicant,
                                         :
for the Determination of Reasonable
License Fees                             :
- - - - - - - - - - - - - - - - - - - - X
In the Matter of the Application of      :
REALNETWORKS, INC.,
                                         :

                    Applicant,
                                         :
for the Determination of Reasonable
License Fees.                            :
- - - - - - - - - - - - - - - - - - - - X
In the Matter of the Application of      :
YAHOO! INC.,
                                         :

                    Applicant,
                                         :
for the Determination of Reasonable
License Fees.                            :
- - - - - - - - - - - - - - - - - - - - X
```

**A P P E A R A N C E S :**

                                        WHITE & CASE LLP
                                        1155 Avenue of the Americas
                                        New York, New York  10036

I. FRED KOENIGSBERG, ESQ.
CAROL A. WITSCHEL, ESQ.
ADAM GAHTAN, ESQ.                                          **- and -**
    Of Counsel

**A P P E A R A N C E S :   (continued)**

|  |  |
|---|---|
|  | AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS |
|  | One Lincoln Plaza |
|  | New York, New York  10023 |
| RICHARD H. REIMER, ESQ. |  |
|     Of Counsel | **Attorneys for Defendant American Society of Composers, Authors and Publishers** |

|  |  |
|---|---|
|  | WEIL, GOTSHAL & MANGES LLP |
|  | **Attorneys for Applicants AOL LLC (f/k/a America Online, Inc.), RealNetworks, Inc. and Yahoo! Inc.** |
|  | 767 Fifth Avenue |
|  | New York, New York  10153 |
| R. BRUCE RICH, ESQ. |  |
| KENNETH L. STEINTHAL, ESQ. |  |
| JONATHAN T. WEISS, ESQ. |  |
| JONATHAN BLOOM, ESQ. |  |
| SAMANTHA G. FISHERMAN, ESQ. |  |
|     Of Counsel |  |

|  |  |
|---|---|
|  | MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C. |
|  | **Attorneys for *Amicus Curiae* The Digital Media Association** |
|  | 701 Pennsylvania Ave., NW, Suite 900 |
|  | Washington, D.C. 20004 |
| FERNANDO R. LAGUARDA, ESQ. |  |
| CHRISTOPHER J. HARVIE, ESQ. |  |
| MICHAEL T. HAAS, ESQ. |  |
| JENNIFER C. ELLIS, ESQ. |  |
|     Of Counsel |  |

|  |  |
|---|---|
|  | INTERACTION LAW |
|  | **Attorneys for *Amicus Curiae* Entertainment Merchants Association and National Association of Recording Merchandisers** |
|  | 1717 K Street, NW, Suite 600 |
|  | Washington, D.C.  20036 |
| JOHN T. MITCHELL, ESQ. |  |
|     Of Counsel |  |

**A P P E A R A N C E S :   (continued)**

|  |  |
|---|---|
|  | CONSUMER ELECTRONICS ASSOCIATION<br>**Attorneys for *Amicus Curiae* Consumer Electronics Association**<br>2500 Wilson Boulevard<br>Arlington, Virginia 22201 |
| JULIE M. KEARNEY, ESQ.<br>Senior Director and Regulatory Counsel<br>        Of Counsel |  |
|  | ARNOLD & PORTER LLP<br>555 12th Street, NW<br>Washington, D.C.  20004 |
| STEVEN R. ENGLUND, ESQ.<br>        Of Counsel | **- and -** |
|  | ARNOLD & PORTER LLP<br>399 Park Avenue<br>New York, New York  10022 |
| ANTHONY D. BOCCANFUSO, ESQ.<br>        Of Counsel | **- and -** |
| Of Counsel: | STEVEN M. MARKS, ESQ.<br>Recording Industry Association of America, Inc.<br>1025 F Street, NW<br>Washington, D.C. 20004<br>**Attorneys for *Amicus Curiae* Recording Industry Association of America, Inc.** |
|  | WILEY REIN LLP<br>1776 K Street, NW<br>Washington, D.C.  20006 |
| BRUCE G. JOSEPH, ESQ.<br>JOHN E. BARRY, ESQ.<br>KARYN K. ABLIN, ESQ.<br>        Of Counsel | **- and -** |
|  | CTIA-The Wireless Association<br>1400 Sixteenth Street, NW, Suite 600<br>Washington, D.C. 20036 |
| MICHAEL F. ALTSCHUL, ESQ.<br>ANDREA D. WILLIAMS, ESQ.<br>        Of Counsel | **Attorneys for *Amicus Curiae* CTIA-The Wireless Association** |

**A P P E A R A N C E S :   (continued)**

|  |  |
|---|---|
|  | HUGHES HUBBARD & REED LLP<br>One Battery Park Plaza<br>New York, New York  10004 |
| MICHAEL E. SALZMAN, ESQ.<br>JASON C. BENTON, ESQ.<br>JASON A. MASIMORE, ESQ.<br>CHRISTINE M. STECURA, ESQ.<br>       Of Counsel | - **and** - |
|  | MARVIN L. BERENSON, ESQ.<br>JOSEPH J. DiMONA, ESQ.<br>JOHN COLETTA, ESQ.<br>320 West 57 Street<br>New York, New York 10019<br>**Attorneys for *Amicus Curiae* Broadcast<br>  Music, Inc.** |
|  | BAKER & McKENZIE, LLP<br>1114 Avenue of the Americas<br>New York, New York  10036 |
| JAMES BAILEY, ESQ.<br>       Of Counsel | - **and** - |
|  | CHARLES J. SANDERS, P.C.<br>29 Kings Grant Way<br>Briarcliff Manor, New York 10510 |
| CHARLES J. SANDERS, ESQ.<br>       Of Counsel | - **and** - |
| Of Counsel: | CARL W. HAMPE, ESQ.<br>BAKER & McKENZIE, LLP<br>815 Connecticut Avenue, NW<br>Washington, D.C. 20006<br>**Attorneys for *Amicus Curiae* The<br>  Songwriter's Guild of America and The<br>  Nashville Songwriters Association<br>  International** |
|  | LOEB & LOEB, LLP<br>345 Park Avenue<br>New York, New York 10154 |
| MICHAEL P. ZWEIG, ESQ.<br>       Of Counsel | - **and** - |

**A P P E A R A N C E S :   (continued)**

|  |  |
|---|---|
|  | LOEB & LOEB, LLP |
|  | 1906 Acklen Avenue |
|  | Nashville, Tennessee 37212 |
| JOHN C. BEITER, ESQ. |  |
|     Of Counsel | **Attorneys for *Amicus Curiae* SESAC, Inc.** |

|  |  |
|---|---|
|  | MOSES & SINGER LLP |
|  | 405 Lexington Avenue |
|  | New York, New York  10174 |
| ROSS J. CHARAP, ESQ. |  |
|     Of Counsel | **- and -** |
|  |  |
| Of Counsel: | C. Paul Spurgeon, Esq. |
|  | Vice President Legal Services & General |
|  |   Counsel |
|  | Society of Composers, Authors and |
|  |   Publishers of Canada |
|  | Toronto, Ontario |
|  | Canada M3B 2S6 |
|  | **Attorneys for *Amicus Curiae* The Society** |
|  |   **of Composers, Authors and Publishers** |
|  |   **of Canada** |

|  |  |
|---|---|
|  | PAUL, WEISS, RIFKIND, WHARTON |
|  |   & GARRISON LLP |
|  | **Attorneys for *Amicus Curiae* Association** |
|  |   **of Independent Music Publishers,** |
|  |   **Church Music Publishers Association** |
|  |   **and National Music Publishers'** |
|  |   **Association, Inc.** |
|  | 1285 Avenue of the Americas |
|  | New York, New York  10019 |
| JAY COHEN, ESQ. |  |
| LYNN B. BAYARD, ESQ. |  |
|     Of Counsel |  |

**CONNER, Senior D.J.:**

In 1941, the United States' civil action against the American Society of Composers, Authors and Publishers ("ASCAP") for alleged violations of the Sherman Antitrust Act was settled by the entry of a consent decree. *See United States v. Am. Soc'y of Composers, Authors & Publishers*, No. 13-95, 1941 U.S. Dist. LEXIS 3944 (S.D.N.Y. Mar. 4, 1941). The 1941 consent decree was amended on March 14, 1950 to form the Amended Final Judgment (the "AFJ"), and again on January 7, 1960. The terms of these orders regulated the manner in which ASCAP could operate within the music industry and provided this Court exclusive jurisdiction under Section XVII of the AFJ to oversee the implementation of these provisions. The AFJ was again amended on June 11, 2001 to create the AFJ2, familiarity with which is presumed. *See United States v. Am. Soc'y of Composers, Authors & Publishers*, No. 41-1395, 2001 U.S. Dist. LEXIS 23707 (S.D.N.Y. June 11, 2001) (Conner, J.).

The AFJ2 became effective on September 11, 2001 and, subsequently, Applicants AOL LLC ("AOL"),[1] Yahoo! Inc. ("Yahoo!"), and RealNetworks, Inc. ("RealNetworks") (collectively, the "Applicants") applied to ASCAP for a license to publicly perform the musical works of the ASCAP repertoire by means of their respective internet services. Because the parties were unable to agree on a licensing fee, ASCAP applied to this Court, pursuant to section IX of the AFJ2 for a determination of a reasonable fee for the use of its media in Applicants' online services. Following extensive discovery, the parties cross-moved for partial summary judgment on the issue of whether the downloading of a digital music file embodying a particular song constitutes a "public performance" of that song within the meaning the United States Copyright Act, 17 U.S.C. § 101, *et*

---

[1] Applicant AOL LLC was formerly known as America Online, Inc.

*seq*. Having reviewed the materials submitted by the parties, as well as the numerous briefs of the *amici curiae*,[2] we conclude that it does not. Accordingly, ASCAP's motion for partial summary judgment is denied, and Applicants' motion for partial summary judgment is granted.

## BACKGROUND

ASCAP is an unincorporated membership association that aggregates the licensing authority of thousands of composers, authors, lyricists and music publishers, and issues licenses affording users access to its amassed collection of several million musical works. Each member has granted ASCAP a non-exclusive right to license the public performance rights to his or her compositions. ASCAP serves as licensing agent and collects royalties. Applicants are large, global internet service companies engaged in the provision of numerous media services—including the online distribution of music—to their subscribers. (Applicants' Mem. Supp. Partial Summ. J. at 2.) As part of their service packages, Applicants engage in the distribution of music over the internet through two mechanisms: streaming and downloading. (*Id*. at 4.)

Downloading is the transmission of a digital file over the internet from a server computer, which hosts the file, to a client computer, which receives a copy of the file during the download. (ASCAP Mem. Supp. Partial Summ. J. at 3.) To begin the downloading process, the client establishes a connection to the server, which transmits the file over the internet to the client, where

---

[2] The Court received briefs from The Digital Media Association, Entertainment Merchants Association, National Association of Recording Merchandisers, Consumer Electronics Association, Recording Industry Association of America, Inc., CTIA–The Wireless Association, Broadcast Music, Inc., The Songwriter's Guild of America, The Nashville Songwriters Association International, SESAC, Inc., The Society of Composers, Authors and Publishers of Canada, Association of Independent Music Publishers, Church Music Publishers Association and National Music Publishers' Association, Inc. as *amici curiae*.

the file is saved—generally stored on the client's hard drive—for future use. (*Id*.) Once saved, the file can be audibly played by the client and copied to various portable devices. (*Id*.) Providers sometimes attach conditions to the download and playback of a song, such as the maintenance of a current subscription to the provider or a limitation of the number of times the audio file may be reproduced. (*Id*. at 3-4.)

Streaming, by contrast, allows the real-time (or near real-time) playing of the song and does not result in the creation of a permanent audio file on the client computer. (Lippman Decl. ¶¶ 15-17; Martel Decl. ¶ 12 (detailing RealNetworks' streaming process); McIntyre Decl. ¶ 13 (detailing AOL's streaming process); Roback Decl. ¶ 12 (detailing Yahoo!'s streaming process).) Rather, a constant link is maintained between the server and the client until playing of the song is completed, at which time replay of the song is not possible without streaming it again. (Lippman Decl. ¶¶ 15-17; Martel Decl. ¶ 12 (detailing RealNetworks' streaming process); McIntyre Decl. ¶ 13 (detailing AOL's streaming process); Roback Decl. ¶ 12 (detailing Yahoo!'s streaming process).)

Following the initiation of a rate proceeding before this Court, Applicants and ASCAP each moved for partial summary judgment on the issue of whether the downloading of a digital music file constitutes a public performance of the downloaded song within the meaning of the United States Copyright Act (the "Act"), 17 U.S.C. § 101, *et seq*. Although, as Applicants concede, the streaming of a musical work does constitute a public performance, we conclude that the downloading of a digital music file, in and of itself, does not.

## DISCUSSION

**I.     Standard**

Under FED R. CIV. P. 56, summary judgment may be granted where there are no genuine

3

issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *See Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255. However, to defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**II.   Analysis**

In the present case, the material facts are essentially undisputed,[3] and the issue before the Court is thus purely one of statutory construction. It is axiomatic that "[s]tatutory interpretation starts with the language of the statute itself, and we read a statute applying the ordinary, contemporary, common meaning of the words used. . . . When the language of the statute is clear and does not contradict a clearly expressed legislative intent, our inquiry is complete and the language controls." *United States v. Kinzler*, 55 F.3d 70, 72 (2d Cir. 1995) (internal quotation marks

---

[3] To the extent that the parties disagree on the relevant facts, we construe them, as we must, in favor of ASCAP.

4

omitted; citations omitted); *see also Ardestani v. Immigration & Naturalization Serv.*, 502 U.S. 129, 135-36 (1991) ("The strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances . . . when a contrary legislative intent is clearly expressed.") (internal quotation marks omitted; citations omitted). Accordingly, we begin our inquiry by examining the Act's relevant language.

17 U.S.C. § 106(4) affords the owner of a copyright in a musical work the exclusive right to perform the copyrighted work publicly.  *See* 17 U.S.C. § 106(4) ("[T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following: . . . (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly . . . .")

> To perform or display a work "publicly" means . . . (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101.  Of course, as the statutory language indicates, in order to constitute a public performance, an event must first satisfy the definition of "performance" under the Act.  "To 'perform' a work means to recite, render, play, dance, or act it, either directly or by means of any device or process . . . ." *Id*.  The terms "recite," "render" and "play" are not defined within the Act and, indeed, the precise question of whether the downloading of a music file constitutes a performance of the song embodied in that file is one of first impression.  Nevertheless, principles of statutory construction, as well as analogous case law and secondary authorities, dictate that, in order for a song to be performed, it must be transmitted in a manner designed for contemporaneous

5

perception.

"When words in a statute are not otherwise defined, it is fundamental that they will be interpreted as taking their ordinary, contemporary, common meaning." *Morse v. Republican Party of Va.*, 517 U.S. 186, 254 (1996) (internal quotation marks omitted; citations omitted). Merriam-Webster's Dictionary defines "recite" as "to repeat from memory or read aloud publicly." Merriam-Webster Online Dictionary, *available at* http://m-w.com. Similarly, in the present context, the term "render" and is defined as "to reproduce or represent by artistic or verbal means[,] depict . . . to give a performance of . . . to produce a copy or version of (the documents are *rendered* in the original French) . . . to execute the motions of (*render* a salute)" and "play" is defined as "to perform music (*play* on a violin) . . . to sound in performance (the organ is *playing*) . . . to emit sounds (the radio is *playing*) . . . to reproduce recorded sounds (a record is *playing*) . . . to act in a dramatic production." *See id.* All three terms require contemporaneous perceptibility.

Although we acknowledge that the term "perform" should be broadly construed, *see United States v. Am. Soc'y of Composers Authors & Publishers*, 870 F. Supp. 1211, 1218 (S.D.N.Y. 1995) (Conner, J.), we can conceive of no construction that extends it to the copying of a digital file from one computer to another in the absence of any perceptible rendition. Rather, the downloading of a music file is more accurately characterized as a method of *reproducing* that file. *See* 17 U.S.C. § 106(1) ("[T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following:. . . (1) to reproduce the copyrighted work in copies or phonorecords . . . .").

Our characterization of a download as a reproduction of a musical work is consistent with the holdings of those courts that have addressed copyright infringement suits in the context of the unlicensed downloading of music over the internet using peer-to-peer file transfer programs such as

6

Napster.  *See, e.g., A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who download files containing copyrighted music violate plaintiffs' *reproduction rights*.") (emphasis added); *Maverick Recording Co. v. Goldshteyn*, No. CV-05-4523, 2006 U.S. Dist. LEXIS 52422, at *8 (E.D.N.Y. July 31, 2006) ("Downloading and uploading copyrighted files from a peer-to-peer network constitutes, respectively, *reproducing and distributing* copyrighted material in violation of 17 U.S.C. § 106.") (emphasis added); *London-Sire Records v. Armstrong*, No. 05cv1771, 2006 U.S. Dist. LEXIS 60458, at *3 (D. Conn. July 28, 2006) (unauthorized downloading of music infringed plaintiff's reproduction rights in the copyrighted works).

Moreover, it is also supported by responsible authorities.  For example, the United States Copyright Office, in its 2001 report to Congress on the effect of new and developing technologies on United States copyright law stated:

> Although we recognize that it is an unsettled point of law that is subject to debate, we do not endorse the proposition that a digital download constitutes a public performance even when no contemporaneous performance takes place.  If a court were to find that such a download can be considered a public performance within the language of the Copyright Act, we believe [that the] arguments concerning fair use and the making of buffer copies are applicable to this performance issue as well.  It is our view that no liability should result from a technical "performance" that takes place in the course of a download.

U. S. Copyright Office, *Digital Millennium Copyright Act Section 104 Report to the United States Congress* (Marybeth Peters, Register of Copyrights), at xxvii-xxviii (Aug. 29, 2001) (the "DCMA Section 104 Report").  The DCMA Section 104 Report further provides:

> Just as webcasters[4] appear to be facing demands for royalty payments for incidental exercise of the reproduction right in the course of licensed public performances, it appears that companies that sell digital downloads of music . . . are facing demands

---

[4] The term "webcasting" is synonymous with "streaming" as it is used in this Opinion.  *See* the DCMA Section 104 Report, at xxii-xxiv.

7

>for public performance royalties for a technical "performance" of the underlying musical work that allegedly occurs in the course of transmitting it from the vendor's server to the consumer's PC. . . .
>
>[T]his appears to be an issue driven as much by the structure of the administration of copyright rights in the music industry as by technology. The issue simply would not seem to arise in other industries where the public performance and reproduction rights are exercised by the same entity. . . .
>
>[T]o the extent that such a download can be considered a public performance, the performance is merely a technical by-product of the transmission process that has no value separate from the value of the download. . . . [I]t is our view that no liability should result under U.S. law from a technical "performance" that takes place in the course of a download.

*Id.* at 147-48 (footnote omitted).

Similarly, the United States Department of Commerce's Information Infrastructure Task Force stated, in a 1995 report:

>A distinction must be made between transmissions of *copies* of works and transmissions of *performances* or *displays* of works. When a copy of a work is transmitted over wires, fiber optics, satellite signals or other modes in digital form so that it may be captured in a user's computer without the capability of simultaneous "rendering" or "showing," it has rather clearly not been performed. Thus, for example, a file comprising the digitized version of a motion picture might be transferred from a copyright owner to an end user via the Internet without the public performance right being implicated. When, however, the motion picture is "rendered" – by showing its images in sequence – so that users with the requisite hardware and software might watch it *with or without copying the performance*, then, under the current law, a "performance" has occurred.

Information Infrastructure Task Force, *The Report of the Working Group on Intellectual Property Rights* (Bruce A. Lehman), at 71 (Sept. 1995) (emphasis in original; footnote omitted).

Turning to the applicable legislative history, we note that the House of Representatives Report issued in connection with the Act in 1976 states: "To 'perform' a work, under the definition in section 101, includes reading a literary work aloud, singing or playing music, dancing a ballet or other choreographic work, and acting out a dramatic work or pantomime." H.R. REP. No. 94-1476, at 63 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5677. ASCAP notes, however, that other

8

portions of House Report 94 state that a performance can be effectuated "'either directly or by means of any device or process,' including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques and systems not yet in use or even invented," and

> [T]he definition of "publicly" in section 101 makes clear that the concepts of public performance and public display include not only performances and displays that occur initially in a public place, but also acts that transmit or otherwise communicate a performance or display of the work to the public by means of any device or process. The definition of "transmit"—to communicate a performance or display "by any device or process whereby images or sound are received beyond the place from which they are sent"—is broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a "transmission," and if the transmission reaches the public in my form, the case comes within the scope of clauses (4) or (5) of section 106.

H.R. REP. No. 94-1476, at 63-64.  The statutory language itself, however, makes clear that *the transmission of a performance*, rather than just the transmission of data constituting a media file, is required in order to implicate the public performance right in a copyrighted work.  *See* 17 U.S.C. § 101 ("To perform or display a work 'publicly' means . . . to transmit or otherwise communicate *a performance or display of the work* . . . to the public, by means of any device or process . . . .") (emphasis added); 17 U.S.C. § 101 ("To 'transmit' a performance or display is to communicate it by any device or process whereby *images or sounds* are received beyond the place from which they are sent.") (emphasis added).  Accordingly, House Report 94, which speaks in terms of the transmission and communication of performances, confirms the requirement of a "performance" to trigger the copyright owner's right of exclusive performance under the Act.

The cases cited by ASCAP are not to the contrary.  In *David v. Showtime/The Movie*

*Channel, Inc.*, 697 F. Supp. 752, 758 (S.D.N.Y. 1988), for example, the court held that the broadcasting of ASCAP-licensed musical compositions to home viewers via local cable companies constituted a public performance of that music within the meaning of the Act. At issue in *David* was the question of whether Showtime/The Movie Channel, Inc.'s broadcast constituted the public performance of ASCAP-licensed music even though its signal was sent solely to other broadcasters, who in turn re-transmitted the signal to consumers. *Id.* at 758-59. The broadcasting of television signals is closely analogous to the streaming of music over the internet. In each case, the digital data are transmitted in a form designed to permit real-time perception of the subject performance and, absent some type of recording device, results in the recipient obtaining no physical or digital copy of the data. The *David* court addressed not the nature of the broadcast, but the fact that it was accomplished through an intermediary, and it is thus not instructive on the question presently before the Court, namely whether downloading of a music file, *i.e.*, the transmission of a signal not capable of contemporaneous perception, but designed to deliver a digital file that the recipient can later play at his pleasure, constitutes a performance.[5]

Moreover, we are not persuaded by ASCAP's argument that downloaded music files are indistinguishable from streamed performances because, after a certain amount of digital data has been transmitted to the client computer, the *purchaser* can begin listening to the transmitted portion of the music file. However, the mere fact that a customer's online purchase is conveyed to him in a piecemeal manner, each segment of which is capable of playback as soon as the transmission is completed, does not change the fact that the transaction is a data transmission rather than a musical

---

[5] We do not mean to foreclose the possibility, however, that a transmission might, under certain circumstances, constitute both a stream *and* a download, each of which implicates a different right of the copyright holder.

broadcast. Surely ASCAP would not contend that if a retail purchaser of musical records begins audibly playing each tape or disc as soon as he receives it the *vendor* is engaging in a public performance. Neither does a performance occur in the situation at issue herein, for it is not the availability of prompt replay but the simultaneously perceptible nature of a transmission that renders it a performance under the Act.

Accordingly, we agree with the position set forth in the brief of the Recording Industry Association of America, Inc. ("RIAA") as *amicus curiae*, which contends that the delivery of a music file to a purchaser via a download constitutes a mechanical reproduction of the copyrighted work in the form of a "digital phonorecord delivery"[6] as set forth in 17 U.S.C. § 115(d). (*See* RIAA Br. as *Amicus Curiae* at 6-7.) 17 U.S.C. § 115, which provides for the imposition of compulsory licenses of non-dramatic musical works, states, in relevant part:

> A "digital phonorecord delivery" is each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording . . . . A digital phonorecord delivery does not result from a real-time, non-interactive subscription transmission of a sound recording where no reproduction of the sound recording or the musical work embodied therein is made . . . .

Although the Act's classification provisions are non-exclusive and it is thus theoretically possible for the same transmission to constitute both a public performance and a reproduction, as the foregoing demonstrates, we can discern no basis for ASCAP's sweeping construction of § 101.

---

[6] "Phonorecords," such as records and compact discs, are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.
17 U.S.C. § 101.

Moreover, in light of the distinct classification and treatment of performances and reproductions under the Act, we agree with the Applicants and the *amici* writing in support of their position that Congress did not intend the two uses to overlap to the extent proposed by ASCAP in the present case.

## CONCLUSION

For all of the foregoing reasons, the motion of defendant American Society of Composers, Authors and Publishers for partial summary judgment is denied. The motion of Applicants AOL LLC, Yahoo! Inc. and RealNetworks, Inc. for partial summary judgment is granted.

SO ORDERED.

Dated: White Plains, New York
       April 25, 2007

_____
Sr. United States District Judge