UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,               :
                                                    Civil Action
                    Plaintiff,          :        No. 41-1395 (WCC)

           - against -                  :

AMERICAN SOCIETY OF COMPOSERS, AUTHORS  :
AND PUBLISHERS, et al.,                            **OPINION**
                                        :          **AND ORDER**
                    Defendants.
- - - - - - - - - - - - - - - - - - - X
In the Matter of the Application of     :
AMERICA ONLINE, INC.,

                                        :

                    Applicant,          :

                                        :
for the Determination of Reasonable
License Fees                            :
- - - - - - - - - - - - - - - - - - - X
In the Matter of the Application of     :
REALNETWORKS, INC.,

                                        :

                    Applicant,          :

                                        :
for the Determination of Reasonable
License Fees.                           :
- - - - - - - - - - - - - - - - - - - X
In the Matter of the Application of     :
YAHOO! INC.,

                                        :

                    Applicant,          :

                                        :
for the Determination of Reasonable
License Fees.                           :
- - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                         WHITE & CASE LLP
                         1155 Avenue of the Americas
                         New York, New York  10036

CAROL A. WITSCHEL, ESQ.
I. FRED KOENIGSBERG, ESQ.
CHRISTOPHER J. GLANCY, ESQ.
MEGHAN MCCURDY, ESQ.
STEFAN MENTZER, ESQ.                        **- and -**

**A P P E A R A N C E S :   (continued)**

        Of Counsel

                            AMERICAN SOCIETY OF COMPOSERS, AUTHORS
                              AND PUBLISHERS
                            One Lincoln Plaza
                            New York, New York  10023

RICHARD H. REIMER, ESQ.
        Of Counsel         **Attorneys for Defendant American
                              Society of Composers, Authors and
                              Publishers**


                            WEIL, GOTSHAL & MANGES LLP
                            767 Fifth Avenue
                            New York, New York  10153

                            **Attorneys for Applicants AOL LLC (f/k/a
                              America Online, Inc.), RealNetworks,
                              Inc. and Yahoo! Inc.**

KENNETH L. STEINTHAL, ESQ.
SAMANTHA G. FISHERMAN, ESQ.
DANIEL B. HODES
        Of Counsel

**Conner, Sr. D.J.:**

This decision is the culmination of a hearing conducted by this Court in its capacity as the "rate court" pursuant to Section IX of the Second Amended Final Judgment ("AFJ2") entered June 11, 2001 in *United States v. American Society of Composers, Authors and Publishers* ("ASCAP"), Civ. Action 41-1395 (WCC), 2001 WL 1589999 (S.D.N.Y. Jun. 11, 2001), to determine reasonable fees for blanket licensees for the performance of ASCAP-repertory music by AOL LLC f/k/a America Online, Inc. ("AOL"), RealNetworks, Inc. ("RealNetworks") and Yahoo! Inc. ("Yahoo"), three internet service providers who have applied to ASCAP for such licenses but have been unable to reach agreement on such fees.

The rate hearing was conducted for 13 days during the period from October 25, 2007 to November 15, 2007. Testimony was heard from 12 witnesses, and depositions of 12 additional witnesses were designated for inclusion in the record. The Court received in evidence 203 exhibits. The parties' post-hearing proposed findings and briefs totaled over 600 pages, not counting the affidavits and supporting documents submitted with them. After due consideration of all the evidence and arguments and weighing the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law, pursuant to FED. R. CIV. P. 52(a).

## FINDINGS OF FACT[1]

### I.     The Development of the Online Industry

---

[1] Citations to "SF" refer to the Amended Stipulation of Facts. Citations to "Tr." refer to the trial transcript in these proceedings. Each citation to the transcript includes the last name of the testifying witness. Citations to "[name] Dep. Tr." refer to the deposition transcripts of witnesses whose testimonies were designated for inclusion in the record of these proceedings.

### A.     Growth of the Internet and Broadband

1. The Internet is a worldwide, publicly accessible network of interconnected computer networks that transmit data.  (SF ¶ 1.)  In just over a decade, the Internet has grown from its relatively obscure roots to become a major information and entertainment medium that rivals television and radio.  It has transformed our culture in innumerable ways, changing how we shop, how we watch television and movies, and how we listen to music.

2. Several technological developments facilitated the Internet's rapid and widespread adoption as a new medium. Personal computers have grown in popularity and are now in most homes.  The percentage of households with a computer increased from 15.0% in 1989 to 51.0% a decade later.  (SF ¶ 7.)  By 2006, some 77% of homes had at least one personal computer, and 32% had more than one.  (*Id.*)  During this time, computers grew increasingly powerful, and their ability to receive, process, and store an ever-larger volume of information increased correspondingly.  (SF ¶ 8.)  In addition, the number of people with connections to the Internet has grown substantially, and today most homes have Internet access.  (SF ¶¶ 5, 8, 9, 12.)  By 1998, more than a quarter of households had an Internet connection, and by 2006, 81% of the population had some form of Internet access.  (SF ¶¶ 12, 29.)

3. By the end of the 1990's, a new technology emerged that enabled the delivery of large files, especially music and audiovisual files, on a widespread basis for commercial gain to a large segment of the public — high-speed Internet access.  (SF ¶¶ 27, 39, 41.)  High-speed Internet connections, often referred to as "broadband" connections, are advanced communications systems capable of providing high-speed transmission of data, audio, and video, and other content over the Internet, often by means of digital subscriber line ("DSL"), fiber optic cable, coaxial cable, or

wireless technology. (SF ¶ 33.) Unlike traditional dial-up Internet access that was carried through telephone lines and modems, broadband connections allow the rapid transmission of large quantities of data, including audio and audiovisual files. (*Id.*)

4. Because music and audiovisual files are far larger than text files, the transmission of such files over dial-up lines or narrow-band was slow and resulted in poor sound quality. (Tr. 17:4-25 (Kohn).) The development and widespread adoption of Internet connections with greater bandwidth meant that large data files could be transmitted at much faster, and commercially practicable, speeds.

5. The number of broadband Internet connections has grown dramatically in the past eight years. (AsX.[2] 365 (Chart), 149 (at ASCAP 009883, 009893).)

6. There were 2.48 million high-speed Internet lines in the U.S. at the end of 1999, but by the middle of 2006, there were 64.61 million high-speed lines. (*Id.*) Only 13% of households with Internet access had high-speed broadband connections in January 2001, but by January 2006, some 58% had broadband access. (SF ¶ 34.) Of those with dial-up access in 2006 who did not yet have a broadband connection, some 25% said they planned to obtain high-speed Internet access in the next twelve months. (SF ¶ 35.) Today, virtually everyone with access to cable television in the home can subscribe to high-speed Internet access. (SF ¶ 36.)

7. In addition, wireless broadband connections, once rare, have become increasingly available. Wireless high-speed connections are now accessible in public locales such as Internet cafes and public parks, and an increasing number of municipalities are undertaking efforts to offer all their residents access to low-cost, or free, wireless broadband connections. (SF ¶ 38.) According

---

[2] "AsX" refers to the numbered ASCAP Exhibit; "ApX" refers to the numbered Applicants' Exhibit.

to one survey, more than 300 U.S. cities have plans underway to provide some form of public wireless broadband access. (*Id*.)

8. At the same time, broadband speeds have increased geometrically, enabling audio and audio/visual content to be transmitted to consumers even faster. (SF ¶ 39.) The larger the "pipe" through which data can be transmitted, the faster those data files will be transmitted. (Tr. 17:4-25 (Kohn).) As a result, with faster broadband speeds, music and video files can be transmitted faster and at a higher quality. (*Id.*)

## B. The Early Years of Online Music Streaming

9. Broadband has transformed the Internet from a text-based medium to an audiovisual medium and has had a material impact on the amount and quality of audio and audiovisual content available online. (Tr. 124:19-125:24 (Amenita).)

10. The first music streaming services emerged in the mid-1990s. (SF ¶ 21.) These early music streaming services were often individual, single-channel webcasts, similar to a radio station broadcast. (SF ¶ 17.) One type of webcasting is "simulcasting," the streaming of a terrestrial radio station's broadcast programming simultaneously with the station's over-the-air broadcast. (SF ¶ 18.) Another type of webcasting is Internet-only webcasting, which offers musical content that is not available anywhere except on the Internet. (SF ¶ 19.) Webcasts differ from on-demand streams, which are transmissions of specific recordings selected by the user. (SF ¶ 20.)

11. In the early years of webcasting, not many music performances were available online, narrow-band Internet connections were choppy and slow, sound quality was poor, users had far fewer music channels available for streaming, and users could not interact with the music. (Tr. 87:22-24;

4

88:9-12; 88:20-90:8 (Amenita).)

12. In the late 1990s, "aggregators" emerged and began to offer, in a single location accessible via a Web browser, listings of simulcast terrestrial radio stations and/or Internet-only webcasts propounded by others. (SF ¶ 23.) A single aggregator might offer hundreds or thousands of available listening channels. (*Id.*) Broadcast.com was an early example of an aggregator that re-transmitted terrestrial broadcast content, usually radio broadcasts. (SF ¶ 24; Tr. 1191:23-1192:5 (Roback); AsX. 39, at 3.) Yahoo! acquired Broadcast.com in 1999 for about $5.4 billion. (AsX. 39, at 33; Tr. 96:21-24 (Amenita).) Aggregators currently active in the marketplace include SHOUTcast, which is owned and operated by AOL.

13. The early streaming services attempted to monetize their offerings in a number of ways, including the sale of advertising. (SF ¶ 25.) For example, Broadcast.com offered, in connection with its streaming music and other content services, "gateway ads with guaranteed click-throughs, channel and sponsorships and multimedia and traditional banner ads," as well as "the ability to insert Internet-only commercials within existing broadcast.com programming." (SF ¶ 26; AsX. 39, at 4.) In 1998, the last year for which it publicly reported financial information, Broadcast.com had about $8.4 million in advertising revenue. (SF ¶ 26.)

## C.    <u>Increased Demand for Online Audio and Video Content</u>

14. As Americans gained more and faster Internet connections, they streamed more music into their homes and workplaces. (SF ¶ 41.) The Internet has experienced significant growth in the number of online music performances. (Tr. 122:19-123:1 (Amenita).) For example, an estimated 8.2 billion music video streams were served in 2005, an increase of nearly 3,000% from the

approximately 270 million music video streams served in 2000.  (SF ¶ 42.)

15. Broadband has fueled this demand for music and video.  Internet users with broadband connections listen to radio online and view programming such as television and movies at twice the rate of Internet users who just have dial-up connections.  (*See e.g.*, AsX. 207, at 1.)  Responding to consumer demand, producers of video programming have begun to make many of their offerings now available on the Internet, rather than only on television.  (SF ¶ 40.)

16. Meanwhile, the last few years have witnessed rapid growth of "user-generated content," consisting of audio and video materials, often with music, created by individuals and uploaded to Internet sites, where they are made available to the public for streaming or downloading.  (SF ¶ 43.)

17. YouTube, which offers streaming video clips, is the most popular site on the Internet for streaming user-generated content.  (SF ¶ 44.)  Google purchased YouTube in 2007 for a reported $1.65 billion.  (*Id.*)  Both AOL and Yahoo! operate Internet sites that stream user-generated content to the public.  (*Id.*)

18. Today, there are a number of ways in which users can experience music that were not available through any medium a decade ago.  The Internet has transformed users' experience of music, as compared to the experience available via traditional analog media like radio or television. (Tr. 124:19-125:24 (Amenita).) Users can interact with the Internet source by selecting the particular songs, recordings, artists, and videos they want to see and hear.  (Tr. 125:11-19 (Amenita).)  For the first time in history, everyone with a device connected to the Internet can play virtually any song, anywhere, at any time, entirely on demand.

### D.    Internet Business Models

19. As the 1990s drew to a close, the public increasingly gained access to the Internet, and the medium moved into the American mainstream.  (SF ¶ 27.)  At the same time, two business models began to emerge for websites offering access to content—the subscription model and the advertising model.  (SF ¶¶ 28, 45.)

### 1.    Subscription Model

20. A number of Internet companies offer their content to the public on a subscription basis—meaning that users receive access to a variety of offerings for a recurring, usually monthly, fee.  (SF ¶ 46.)  An increasingly diverse array of subscription content is available online, including sports, entertainment, and news programming.  (SF ¶¶ 47-48.)

21. Music has become the largest category of online subscription services.  (Tr. 57:19-21 (Kohn).)

### 2.    Advertising Model

#### (a)    Types of Online Advertising

22. Internet companies also generate revenues through various forms of advertising, including display advertising (which includes "banner" advertisements), rich media advertising, and sponsorships, among others.  (SF ¶¶ 50-51.)

23. Banner ads may be displayed in many different forms, including on a selected webpage, in pop-up or pop-under windows, on an interstitial page (an ad page that appears between two content pages), in floating windows (which move across the user's screen or float above the content),

or expanding ads (ads that change in size and may alter the contents of the webpage). (SF ¶ 52.)

24. Rich media advertising, also known as streaming advertising, is advertising that consists of some form of streaming audio or video. (SF ¶ 54; Tr. 56:20-23 (Kohn).) For example, a video clip might be preceded by a 15- or 30-second video streaming advertisement, sometimes referred to as a "pre-roll" or "in-stream" ad. (SF ¶ 55.)

25. Advertisers typically pay for display advertising, in part, based on the number of "impressions" or views of that advertisement by users of the page where the advertising appears. (SF ¶ 53.) Impressions are frequently sold on a cost-per-thousand, or "CPM," basis. (*See, e.g.*, Tr. 979:1-8 (Wan).) In other words, if the CPM for an ad is $5, then the cost to an advertiser to purchase 1,000 impressions is $5. (*Id.*)

26. All of these forms of Internet advertising have an obvious common element— the larger the audience, and the more times they visit the site, the greater the revenue. (Tr. 34:8-12 (Kohn); Tr. 1118:1-3 (Rogers).) Any person or company that sells advertising, therefore, has an incentive to build a large audience that will generate revenue from impressions, click-throughs, sponsorships, and the like. (SF ¶ 59.)

### (b) Online Companies Use of House Ads to Promote Their Own Goods and Services

27. Many Internet companies also run "house ads," which are advertisements for products or services from the company that is operating the website. (SF ¶ 60.) These house ads allow Internet sites to promote additional goods and services, which they offer to online users with the hope of drawing those users. (*Id.*) The house ads generate no revenue and their value to the company is not included in its reported revenues. (SF ¶ 61.)

28. Internet companies use house ads to draw users to other pages on their sites, with paid advertisements that generate more ad impressions and click-throughs, and therefore more revenue. For example, Yahoo! runs house ads that promote other parts of the Yahoo! site and drive traffic to other Yahoo! pages. (Tr. 1116:3-7 (Rogers).) These house ads may draw users into other Yahoo! sites and increase user engagement. (Tr. 1118:11-13 (Rogers).) Yahoo! generates revenue when a user clicks on a house ad that links the user to a page that contains a paid banner ad.

29. Yahoo! also uses house ads to promote its own fee-based services. For example, by clicking on a Yahoo! Small Business house ad that appears on the Yahoo! Music page, a user is taken to the Yahoo! Small Business page where he or she is presented with an offer to buy Yahoo! Internet hosting services, and shown paid advertisements that generate revenue for Yahoo!. (Tr. 1119:3-1120:7 (Rogers).) Yahoo! also runs house ads promoting the Yahoo! Music Unlimited subscription service, a separate fee-based service. (Tr. 1129:9-16 (Rogers).) If Yahoo! ran the same ads for Yahoo! Small Business or Yahoo! Music Unlimited on a non-Yahoo! website, it would have to pay for those advertisements. (Tr. 1120:9-11 (Rogers).)

30. The Yahoo! Music section also contains links that are not house ads, but rather fixed in-house promotions for other parts of the Yahoo! site. (Tr. 1115:11-19 (Rogers).) These promotions, for example, invite Yahoo! Music users to "Flirt on Yahoo! Personals while you listen" and "Play Games while you listen" to music streamed by Yahoo! and are designed to lead traffic from Yahoo! Music to other parts of the Yahoo! portal. (AsX. 118A, at Yahoo! ch. 2, 00:45-00:55.)

### (c)     Unique Advantages of Internet Advertising

31. The Internet affords advertisers the ability to target their advertisements to consumers and

monitor their campaigns more precisely than in traditional media. (SF ¶ 67.) In traditional media, such as radio or television, the potential effectiveness of an ad is difficult to measure, as there is no way to track whether a person viewing the advertisement actually purchases the product. The Internet, in contrast, is highly interactive and trackable with technology, providing the opportunity for an advertiser to know exactly how many users viewed a particular ad, how many expressed interest by clicking on the ad and linking to the advertiser's site, and how many went on to make a purchase. (*See, e.g.*, SF ¶¶ 62-64, 66.)

32. Some Internet advertising generates, for the referring website, a share of the revenue generated from purchases by consumers who bought after viewing the website advertisement and linking to the advertiser's site. (SF ¶ 63.) This is called "affiliate marketing." (*Id.*)

33. Online companies like Yahoo! have developed software to track users' clickstreams. (SF ¶ 64.) A clickstream is the path, or sequence of mouse clicks, that a user has taken in navigating Internet sites. (SF ¶ 65.) Internet companies may use that information to serve up targeted advertisements based on a user's past behavior. (SF ¶ 66; Tr. 1064:21-1065:21 (Rogers).) According to one news article:

> [B]y analyzing "click streams" on its network, Yahoo can spot potential buyers at various stages of the consideration process. In other words, by looking at the billions of user clicks that flow through its servers every day, Yahoo is getting better and better at figuring out that a given pattern—say, a user who's looked up football on Yahoo Sports, checked out adventure movies on Yahoo Entertainment, and compared truck prices on Yahoo Autos— means the browser is interested in buying a Jeep and is just beginning to think about a purchase. Another pattern might mean a user is interested in minivans and is just a few days from buying. Such information is hugely valuable, says [Chrysler's director of marketing communications]: Once Yahoo knows where a potential customer is in the car-buying process, it can serve up the appropriate Chrysler ad.

Fred Vogelstein, *Yahoo's Brilliant Solution*, Fortune (Aug. 19, 2005). (SF ¶ 66.)

**(d)     Increase of Internet Advertising Revenue**

34.  Advertisers have devoted increasing shares of their advertising budgets to Internet advertisements in recent years.  According to PricewaterhouseCoopers, in 1996 spending on Internet advertising stood at about $270 million, and reached about $6 billion in 2002.  (AsX. 363.)  By the end of 2006, Internet advertising expenditures totaled approximately $16.8 billion, representing a 34% increase over 2005 and a nearly 180% increase over 2002.  (SF ¶ 68; AsX. 363.)  Internet advertising expenditures are projected to reach $20 billion by the end of 2007.  (AsX. 113, 363.)

35. The rapid growth of Internet advertising expenditures is graphically portrayed by ASCAP Exhibit 363.  (*See also* AsX. 28.)

36.  The growth in Internet advertising revenue has recently outpaced the growth in advertising on other traditional media. (SF ¶ 70.) Between 2004 and 2005, Internet advertising revenues grew by 29.2%, compared with 19.6% for cable television, 4.8% for radio, and 4.5% for broadcast and syndicated television. (*Id.*)  Not coincidentally, the amounts spent on Internet advertising and the number of high-speed Internet connections have grown in tandem over the past decade.  (AsX. 366 (Sources: AsX. 28, 149.))


**(e)     AOL and Yahoo! Shares of Internet Advertising Revenue**

37. Revenue from online advertising is primarily concentrated among a few top advertising-selling Internet companies.   (AsX. 28, at 7; Tr. 106:19-23 (Amenita).)   According to PricewaterhouseCoopers, in the fourth quarter of 2005, the ten leading advertising-selling companies received about 72% of total Internet advertising dollars, and the top 50 companies commanded about 95% of Internet advertising.  (SF ¶ 71; AsX. 28, at 7; Tr. 106:19-23 (Amenita).)

38. The four largest Internet companies—Google, Yahoo!, AOL, and MSN—commanded two-thirds of the online advertising spending in 2007, according to published estimates.  (SF ¶ 72; AsX. 113.)  Yahoo! was predicted to earn 18.7%, and AOL is predicted to earn 9.1% of all dollars spent on Internet advertising in 2007.  (SF ¶ 73; AsX. 113; Tr. 108:23-109:2 (Amenita).)  Thus, two of the three Applicants here—AOL and Yahoo!—were predicted to earn a combined 27.8% of all Internet advertising revenue, or about $5.56 billion in ad revenue in 2007.

### (f)  Reliance of Internet Companies and Their Advertisers on comScore and/or Nielsen NetRatings to Measure Internet Audience

39. As the use of the Internet — and the amounts spent on the new medium — have rapidly grown, so has the demand for objective measurements of the size and characteristics of online audiences.  Consequently, Internet companies and their advertisers rely on Nielsen//NetRatings ("Nielsen") and comScore Media Metrix ("comScore"), two Internet audience measurement firms that measure the traffic to and time spent on Internet sites and services, including Applicants' Internet properties.  (SF ¶ 85; Tr. 1090:23-1091:5 (Rogers); Tr. 1425:9-12 (Conroy); Tr. 1469:5-12 (Winston).)  Employing proprietary technology, both comScore and Nielsen have devised panels of Internet users in order to determine audience sizes, demographics, activities and habits.  (Tr. 331:21-332:4 (Boyle).)

40. Nielsen and comScore measure such information as the number of unique visitors to, reach of, and the average and total time spent on Internet sites.  (*See, e.g.*, AsX. 65, 170, 306.)  A "unique visitor" is a person who visits an Internet site at least once within a specified period of time.  (SF ¶ 78.)  "Reach" is the percentage of the total Internet population that viewed a particular site at

least once. (SF ¶ 80.) For example, comScore estimated that more than ███ million unique visitors accessed the Yahoo! Site in the month of June 2006, meaning that ███ million individuals visited at least one page of the Yahoo! Site in June 2006. (SF ¶ 79.) In that same month, Yahoo!'s reach was ███% in June 2006, meaning that Yahoo! was visited by ███% of the approximately ███ million total Internet users in the United States that month. (AsX. 306.)

41. The average time spent on a site is the average amount of time— typically expressed in minutes or hours—that a unique visitor spent on a site in a given period of time. (SF ¶ 81.) Total time spent on a site is the total amount of time all unique visitors spent on a particular site. (SF ¶ 82.) For example, in June 2006, each unique visitor to Yahoo! spent, on average, ███ minutes (about ██ hours) on that site, and all the visitors to Yahoo! spent a total of about ███ minutes on the site. (AsX. 306.) These metrics gauge the level of audience engagement with the site. (*See, e.g.*, Tr. 1404:14-17 (Conroy); 1469:5-17; 1559:6-13 (Winston).)

42. Nielsen and comScore function in the Internet industry much as Nielsen Media Research and Arbitron do in the television and terrestrial radio industries, respectively. (SF ¶ 84.) While these services are not without critics, such criticisms are not unlike criticisms of network television ratings, where broadcasters claim that television ratings services undercount network viewers. (Tr. 336:10-12 (Boyle).) Nevertheless, comScore and Nielsen are generally regarded as having the best publicly available Internet audience measurement data on sites and services like AOL and Yahoo!. (Tr. 336:23-337:2 (Boyle).)

43. Both advertisers and Internet companies, including Applicants, purchase and use Nielsen and comScore audience data. (*See, e.g.*, SF ¶ 85; Tr. 1425:9-12 (Conroy); 1469:5-23 (Winston).) Indeed, online companies pay substantial amounts for access to detailed data from comScore and

Nielsen. AOL, for example, paid between ███ and ███████ for comScore data in 2006. (Tr. 1555:3-5 (Winston).)

44. Online companies use these data to attract advertisers. Applicants, in particular, rely on comScore and Nielsen data. Yahoo! subscribes to comScore, and formerly subscribed to Nielsen. (Tr. 1090:21-22, 1091:9-14 (Rogers).) Yahoo! uses such data to market itself to investors, potential advertisers, and the public. (Tr. 1093:8-24; 1094:18-1099:23 (Rogers); AsX. 306.) Yahoo! uses comScore data because it is a publicly available data source that is "trusted." (Tr. 1105:14-18 (Rogers).) Indeed, Yahoo! has called comScore the "global standard in Internet audience measurement." (SF ¶ 83.) Similarly, comScore is the principal data source for AOL's public reporting of traffic and usage. (Tr. 1425:2-12, 21-25 (Conroy).) AOL reports several comScore metrics in its publicly-filed trending schedules, including unique users, page views, and revenue per page. (Tr. 1469:5-17 (Winston).)

## II.   ASCAP

45. The American Society of Composers, Authors and Publishers is an unincorporated membership association. (SF ¶ 89.) ASCAP has more than 295,000 United States members who are composers, songwriters, lyricists, and music publishers on whose behalf ASCAP licenses the non-dramatic public performing rights in copyrighted musical works. (*Id.*; Tr. 80:9-10 (Amenita); AsX. 358 (Articles of Association).) It is the only American performing rights organization wholly owned and managed by and for writers and publishers of music.

46. ASCAP's members own the copyrights to a vast number of musical compositions, and have granted ASCAP a non-exclusive right to license performing rights in these compositions. (SF

¶ 89.) In addition, ASCAP has entered into agreements with foreign performing rights organizations that authorize ASCAP to license United States performances of musical works on their behalf. (*Id.*)

47. The ASCAP repertory of musical works includes millions of musical compositions. (*Id.*) No other performing rights organization licenses the same musical works in its repertory as ASCAP does. (SF ¶ 90.)

48. ASCAP licenses public performing rights to a wide variety of users, including, among others, Internet service providers and sites, local television and radio stations, broadcast and cable/satellite television networks, cable systems operators and direct broadcast satellite services, restaurants, night clubs, universities and colleges, hotels, concert promoters, sports arenas, roller skating rinks and other businesses that perform music publicly. (SF ¶ 91.)

49. The overwhelming majority of online music performances (well over 90%) comprise compositions in either the ASCAP repertory or the repertory of Broadcast Music Inc. ("BMI"). (SF ¶ 92.) ASCAP and BMI have roughly equal shares of these performances. (*Id.*) Most of the remainder of the performances of music online are of compositions in the SESAC repertory, public domain works, and works by copyright owners who are unaffiliated with a performing rights organization. (*Id.*) SESAC's share of the market for music performances on radio is significantly less than 10%. (Tr. 2214:1-7 (Boyle).)

50. By joint motion of the United States and ASCAP, and following a period of notice and public comment, the Amended Final Judgment entered in *United States v. American Society of Composers, Authors and Publishers*, 41-1395, S.D.N.Y., was further amended on June 11, 2001 ("Second Amended Final Judgment" or "AFJ2"). (SF ¶ 93.)

51. AFJ2 permits ASCAP to obtain from its members only a nonexclusive right to issue

licenses for non-dramatic public performance of the members' copyrighted musical works. (SF ¶ 94.) ASCAP's members are free to license their performance rights directly or to assign their rights to another entity. (*Id.*)

### A. ASCAP's Representation of the Interests of Its Members

52. ASCAP was formed in 1914 by and for the benefit of composers and music publishers. (AsX. 358 (Art. I).) Its members are all composers, lyricists and music publishers. (*Id.* (Art II); SF ¶ 89.) Its Board of Directors is comprised of songwriters, composers and music publishers. (Tr. 80:21-23 (Amenita); AsX. 358 (Art. IV, § 1).) ASCAP's Directors are elected by the ASCAP membership, (Tr. 80:24-81:3 (Amenita); AsX. 358 (Art. IV, § 4(g))), and its Officers are in turn elected by ASCAP's Board of Directors (Art. VI, § 2)).

53. ASCAP has a contractual duty to represent the interests of its members – composers, lyricists and publishers – in its license negotiations with third parties. (AsX. 359.) Under ASCAP's membership agreement, which each member signs, ASCAP is obligated "in good faith, to use its best endeavors to promote and carry out the objects for which it was organized." (AsX. 359, § 3.) ASCAP's Articles of Association, which are incorporated by reference in the Membership Agreement, (*id.*) state that ASCAP's objects for which it was organized include "to promote and foster by all lawful means the interest of composers, authors and publishers of musical works." (AsX. 358, Art. I, § 1(f).) Christopher Amenita ("Amenita"), the head of ASCAP's Enterprises Group, which encompasses new media licensing, testified that his goal as part of ASCAP's management is to protect and further the interests of ASCAP's members. (Tr. 81:4-6 (Amenita).)

## B.    ASCAP's Differences From BMI

54. Broadcast Music, Inc. ("BMI") is a New York corporation formed in 1939 by and for the benefit of broadcasters. *See United States v. Am. Soc'y of Composers, Authors and Publishers*, Civ. 13-95 (ELP), 1982 WL 1265, at *3 (S.D.N.Y. May 26, 1982). Its shareholders are comprised exclusively of persons or entities who are or were broadcasters. (Tr. 2000:19-21 (Boyle); AsX. 476.) BMI's Board of Directors is comprised almost entirely of executives of major radio and local television broadcasters. (Tr. 2000:19-21 (Boyle); AsX. 476.) Indeed, the Chairman of BMI's Board of Directors simultaneously serves as the Joint Chairman of the National Association of Broadcasters. (AsX. 476.)

55. BMI's Board members include senior executives from Clear Channel Radio. (AsX. 476.) Clear Channel Radio is one of the largest online music providers. It is frequently listed as one of the top five Internet radio webcasters, along with AOL and Yahoo!. (Tr. 2089:20-2090:1 (Conroy); AsX. 170 at 50.) In 2005 and 2006, Clear Channel Radio was ranked by comScore as first in total unique visitors. (AsX. 169, 170.) As such, Clear Channel is a direct competitor of Applicants. Indeed, AOL's former Vice President Christine Winston testified that the nature and amount of music available on AOL Radio is similar to that of a radio conglomerate like Clear Channel. (Tr. 1529:1-25 (Winston).) Other radio and television broadcasters who own and control BMI also offer their content on the Internet. (AsX. 476.)

56. BMI's agreements with its writers and publishers contain no contractual obligation for BMI to represent the interests of writers and publishers in BMI's license negotiations with third parties. (AsX. 475.) Moreover, the BMI Affiliate Agreement expressly disclaims any fiduciary duty to its contracting composer and publisher affiliates, stating:

You acknowledge that the relationship between you and us which is created by this agreement is one of ordinary contracting parties and is not intended to be a fiduciary relationship with respect to any of the rights or obligations hereunder.

(AsX. 475, § 24.)

57. BMI operates under a separate consent decree that differs from AFJ2 in many respects. Importantly, AFJ2 requires that ASCAP offer to its online licensees the option of a per-segment license, while the BMI consent decree does not give BMI licensees the option of a per-segment license.  (Tr. 1999:22-25 (Boyle).)


## III.    **The Applicants**

### A.      **AOL**

58. Applicant AOL is a global Internet services company that operates a number of Internet sites and services, including the AOL.com portal.  (SF ¶ 95.)  An Internet portal is a website that often serves as a user's gateway to multiple content offerings.  (*Id.*)  From the AOL.com portal, AOL provides users access to email accounts, instant messaging, chat rooms, music, news, shopping, games, real estate, entertainment, autos, sports, money and finance, mobile phone services, jobs, personals, and video, among other features.  (SF ¶¶ 95-96.)

59. During the open period, AOL has streamed music contained in audio and audiovisual performances across its network of subscription- and advertising-supported sites and services, in areas including but not limited to:

- the members-only portion of AOL (*see, e.g.*, Tr. 1477:12-1478:6 (Winston); JX 28, at 3);
- the AOL homepage (*see, e.g.*, Tr. 203:3-12 (DeFilippis); 760:17-25 (Guerin-Calvert); Tr. 1422:23-1423:12 (Conroy); Tr. 1525:19-1526:13 (Winston); AsX. 118A, at AOL ch. 9, 00:18-01:06, 01:10- 01:45);
- AOL Music (*see, e.g.*, SF ¶ 97; Tr. 205:3-8 (DeFilippis); Tr. 1446:7-13 (Winston);

AsX. 118A, at AOL ch. 5);

- AOL Television and In2TV (*see, e.g.*, SF ¶ 95; Tr. 2060:14-16 (Conroy); AsX. 118A, at AOL ch. 6, 02:40-03:15, 03:55-04:15; AsX. 411 at 1, 2);
- AOL Video (*see, e.g.*, SF ¶ 95; Tr. 1415:21-1416:1, 2061:21-25 (Conroy);
- Moviefone (*see, e.g.*, Tr. 1397:9-13, 1435:12-16 (Conroy); AsX. 118A, at AOL ch. 4, 03:33-04:20);
- AOL Kids (*see, e.g.*, Tr. 761:19-25 (Guerin-Calvert); Tr. 1580:1-10, 1582:1-10 (Winston); Tr. 1822:19-25 (Candell); Tr. 2125:4-17, 2126:7-17 (Conroy); AsX. 118A, at AOL ch. 7);
- Red (*see, e.g.*, Tr. 203:14-204:5 (DeFilippis); Tr. 1808:3-12 (Candell));
- SHOUTcast (*see, e.g.*, SF ¶¶ 24, 178);
- AOL Autos (*see, e.g.*, Tr. 1801:18-1802:20, 1802:10-20 (Candell); AsX. 118A, at AOL ch. 9, 08:30-09:00);
- AOL Finance, AOL Food, and AOL Games (*see, e.g.*, Tr. 1382:21-1383:10, 1394:16-1395:2 (Conroy));
- AOL News (*see, e.g.*, Tr. 740:7-10 (Guerin-Calvert); Tr. 1394:16-1395:2 (Conroy));
- Love@AOL (*see, e.g.*, Tr. 200:19-201:4, 202:13-203:1 (DeFilippis); Tr. 1805:2-9 (Candell); AsX. 118A, at AOL ch. 9, 06:56-07:18);
- AOL Weather (*see, e.g.*, AsX. 118A, at AOL ch. 3, 01:15-02:00, 03:20-03:51, 04:28-04:43);
- UnCut Video (*see, e.g.*, AsX. 118A, at AOL ch. 2);
- AOL Search (*see, e.g.*, Tr. 1794:18-20 (Candell));
- AOL Toolbar (*see, e.g.*, Tr. 204:11-25 (DeFilippis); Tr. 2055:18-24 (Conroy));
- AIM (*see, e.g.*, Tr. 205:16-206:8 (DeFilippis); Tr. 765:2-3 (Guerin-Calvert); Tr. 1795:19-24 (Candell); Tr. 2076:7-20, 2135:11-23 (Conroy));
- AOL widgets and third-party sites (*see, e.g.*, Tr. 207:21-208:7 (DeFilippis); Tr. 2070:1-15, 2070:25-2071:10, 2081:4-10, 2083:3-23, 2084:11-18, 2109:6-11, 2148:7-11 (Conroy); AsX. 429); and
- AOL Music Now (*see, e.g.*, SF ¶ 95).

### 1. AOL's Application for an ASCAP License

60. AOL applied for a single blanket license commencing January 1, 2005 and covering the following sites and services: AOL (members only); AOL.com, including all sub-domains, such as AOL Music, AOL Radio, AOL Sessions, AOL Videos, AOL Video-on-Demand, AOL MusicNow, iTunes on AOL, AOL G-Sides, AOL Search Hub, AIM (including AIM "Triton"), AOL CityGuide,

AOL Mobile, and In2TV; Netscape Netcenter; Netscape.com; Radio@Netscape; Moviefone; SHOUTcast; TMZ.com; Compuserve; Compuserve.com; ICQ; Winamp; and Gateway's and Walmart's versions of the AOL subscription service. (SF ¶ 177-78.)

61. ASCAP entered into negotiations with AOL, but the parties were unable to agree on final fees for the open period. (SF ¶ 179.) Consequently, on November 1, 2005, ASCAP applied to the Court for a determination of interim and final license fees for AOL. (SF ¶ 180.) After ASCAP filed its application, AOL agreed to pay to ASCAP interim fees of ████████ in 2005, ████████ in 2006, and ████████ annually after that. (SF ¶ 181.)

62. AOL remains open with regard to final fees for the period January 1, 2005 to the present. (SF ¶ 182.)

## 2. Sites and Services for Which AOL Seeks an ASCAP Blanket License

63. AOL has applied for an ASCAP blanket license that covers a wide array of AOL sites and services containing music performances, not just the so-called "music areas" of AOL.com. (SF ¶ 178.) These sites and service use music to attract users and to enhance the portal experience.

### (a) AOL (Members Only)

64. Until July 2005, AOL was primarily a subscription service that provided AOL members access to both Internet connections and a "walled garden" of exclusive content available only to AOL subscribers. (Tr. 1450:3-14 (Winston).) This exclusive content included streaming audio-only music and audiovisual programming containing music, such as premieres of songs and music videos, AOL Sessions features, and enhanced AOL Radio features, such as more music channels and

streaming music without advertisements. This music content was available only to AOL subscribers and not to the general public. (Tr. 1477:11-1478:6 (Winston).)

65. During the open period, AOL has used such exclusive content, including music, to attract new subscribers and thereby generate subscription revenue. According to AOL's 2005 10-K filing:

> In the first quarter of 2006, AOL entered into a number of agreements with high-speed [Internet] access providers to offer the AOL service along with high-speed Internet access. Members connecting to the AOL service through a high-speed connection such as cable or digital subscriber lines ("DSL") can take advantage of expanded multimedia content, including streaming music, CD-quality radio and other audio, full-motion video, and streaming news clips.

(JX 28, at 3.)

66. AOL's efforts to use music content to sell subscriptions is also evident from its dealings with XM Satellite Radio. At the end of 2005, AOL entered into an arrangement whereby XM agreed to supply a number of streaming music channels to AOL Radio. (ASCAP Ex. 439.) AOL's objective in obtaining such music was to "mitigate operating costs while augmenting the content offerings on its AOL Properties as a marketing effort to increase the number of AOL Members." (*Id.*, at 1.)

67. Indeed, all of AOL's exclusive content—which included music streams and streams of audiovisual programming containing feature, theme, and background music—was obviously designed to serve this function. And it did so; by offering access to content, features, and services, AOL enhanced the sale of its subscriptions. (JX 28, at 3.)

68. AOL's exclusive music content was also a significant factor in satisfying and retaining its members. According to AOL, "AOL for Broadband members cite Radio@AOL as a major contributor to satisfaction and retention." (AsX. 156, at 13.) AOL Radio listeners were far more satisfied with AOL than non-listeners, spent twice as much time as non-listeners on AOL as a whole,

and were less likely to cancel their AOL subscriptions.  (*Id.* at 13.)  According to an AOL survey, AOL Broadband subscribers ranked the "Music Archive" and "Sessions@AOL" parts of AOL as popular areas that made them less likely to cancel their AOL subscriptions.  (AsX. 155, at ASCAP AOL 02416.)

69. AOL has also recognized that the music and other content it made available exclusively to AOL subscribers required an ASCAP license.  As early as 2001, and continuing into the open period, AOL applied to ASCAP for a blanket license.  (Tr. 1952:25-1953:2, 1954:9-11 (Candell); JX 21; SF ¶ 178.)

70. In July 2005, AOL began to transition from a subscription service to an advertising-supported, free-to-the-user service, and started to make all of its content available for free to all Internet users, not just AOL subscribers.  (Tr. 1450:13-14 (Winston).)  By August 2006, the transition was complete and all of AOL's content was available for free.  (Tr. 1450:15-21 (Winston).)  Millions of AOL subscribers, however, continued their AOL subscriptions (Tr. 1450:22-1451:1 (Winston)), having originally signed up with AOL for access to an Internet connection and AOL's exclusive content offerings.

### (b)     AOL.com Portal

71. The AOL.com portal currently offers all Internet users access to AOL's content without charge.  AOL has integrated music into its portal offerings and performs music in many areas of the portal.  (Tr. 2075:13-16 (Conroy); AsX. 118A.)  AOL streams music and audiovisual content containing music on such site sections as the AOL homepage, AOL Music, AOL Television, In2TV, AOL Video, AOL Kids, Red, AOL Autos, AOL Finance, AOL Games, AOL News, Love@AOL,

and AOL Search, to name only a few. A sampling of this music use is demonstrated on AsX. 118A, a DVD that shows some of the myriad uses of music made by Applicants as of March 14, 2007. AOL's portal is also publicly accessible on the Internet at http://www.aol.com.

### (i)    **AOL Homepage**

72. The AOL homepage is a hub from which users can access all of AOL's offerings and content. (AsX. 118A.) The AOL homepage is a popular destination. At the end of 2006, it was the fourth-most visited homepage on the Internet, with more than 46 million monthly unique visitors. (AsX. 170, at 34.)

73. AOL users can launch music streams directly from the AOL homepage, where this feature is prominently displayed. (*See, e.g.*, AsX. 118A, at AOL ch. 9, 00:18-01:06, 01:10-01:45.) The homepage highlights four "super tabs" for Mail, Weather, AOL Radio with XM, and Video. (Tr. 1422:23-1423:2 (Conroy).) Super tabs are links that let users instantly access, preview, and launch popular AOL features without leaving the homepage. (Tr. 1402:12-19 (Conroy).)

74. Users can click the "AOL Radio with XM" super tab to launch a streaming music channel player that appears on top of the AOL portal homepage. (Tr. 1422:23-1423:12 (Conroy); Tr. 1525:19-1526:13 (Winston).) After launching music from the AOL Radio with XM super tab, users are free to explore the rest of the AOL homepage and the entire AOL portal while AOL continuously streams music.

75. AOL users can also stream videos on the AOL homepage by moving the cursor over the Video super tab and clicking on the "Clip of the Day." (Tr. 203:3-12 (DeFilippis); Tr. 1422:23-1423:2 (Conroy).) The "Clip of the Day" video is frequently a movie trailer that contains theme and

background music, a music video or some other audiovisual content that contains music. (Tr. 203:3-12 (DeFilippis); Tr. 760:17-25 (Guerin-Calvert).)

76. AOL has also enabled users to launch music performances from elsewhere on the AOL homepage. For example, the AOL homepage has featured a section called "Watch and Listen" under which AOL has offered streams of music videos directly from the homepage. (AsX. 118A, at AOL ch. 9, 00:18-01:06 (stream of Lily Allen music video "Smile").) AOL also has a button on the homepage, "Launch AOL Radio," that, when clicked, will cause a streaming music channel to launch. (AsX. 118A, at AOL ch. 9, 01:10-01:45.)

77. The AOL homepage also provides links to other sections of the AOL portal and other AOL services such as movies, television, instant messaging, and search, most if not all of which contain music performances. (*See, e.g.*, AsX. 118A, at AOL ch.1, 03:05-03:20; AOL ch. 4, 00:05-00:20; AOL ch. 6, 00:05-00:25.)

### (ii)     AOL Music

78. AOL Music offers a wide selection of "free," advertising-supported, streaming webcasting and on-demand music services, including AOL Radio, Top 11 video countdown, AOL Sessions, live concerts, music videos and performances of full CDs. (SF ¶ 97.) AOL Music users can stream music webcasts, music videos, and individual songs on demand. (Tr. 205:3-8 (DeFilippis); Tr. 1446:7-13 (Winston); AsX. 118A, at AOL ch. 5.)

79. AOL Music has a separate AOL Radio section that features a directory of webcast music channels and music categories. (Tr. 204:20-25 (DeFilippis).) AOL Radio streams 200 music channels that are preprogrammed by AOL and twenty music channels that are preprogrammed by

24

XM Satellite Radio.  (Tr. 1487:7-10 (Winston); AsX. 118B, at 02:38-02:50.)  AOL's streams of the XM stations are re-broadcasts of XM's satellite programming, and do not contain in-stream advertising. (Tr. 1487:11-17 (Winston).)  AOL apparently requires and seeks an ASCAP license for its re-broadcasts of XM radio programming.

80. AOL Music also offers streams of music videos.  AOL boasts that it has the "world's largest music video archive, featuring thousands of videos and artists from nearly every genre." (AsX. 118B, at 02:52-03:20.)  As of November 8, 2007, AOL offered 15,580 music videos at AOL Music.  (Tr. 1570:14-20 (Winston).)

81. AOL Music also offers AOL Sessions, which features exclusive music videos of performances by popular artists recorded in AOL's studios.  (Tr. 205:8-9 (DeFilippis); AsX. 118B, at 02:52-03:20; AsX. 118A, at AOL ch. 5, 02:43-03:30 (AOL Sessions music video featuring a performance by Carrie Underwood).)

82. Users of AOL Music can also access "Full CD Listening Parties," a feature that lets users listen to entire music albums.  (Tr. 1423:21-1424:9 (Conroy).)  For example, at trial ASCAP demonstrated how a user could stream, on demand, a newly-released full-length CD by Celine Dion, entitled "Taking Chances," or choose to play individual songs from the CD.  (Tr. 1562:12-23 (Winston).)  After initiating the CD performance, a user could visit other parts of the AOL portal, such as e-mail, AIM, or news, while the CD continues to play in its entirety.  (Tr. 1562:24-1563:2 (Winston).)

83. AOL Music also offers other features with many music performances, such as the PopEater music blog and Spinner, where users can listen to free music and watch free music videos, concerts, and live performances.  (Tr. 205:9-13 (DeFilippis); AsX. 118A, at AOL ch. 8.)  On

Spinner's "3x3" section, for example, users can stream videos of concert performances. (AsX. 118A, at AOL ch. 8, 01:45-02:15 (concert video of the band Silversun Pickups).)

84. Song downloads are not available on AOL Music (Tr. 1454:20-21 (Winston)), and AOL does not offer downloads of music videos. (Tr. 2156:16-18 (Conroy).)

### (iii) AOL Television and In2TV

85. AOL also offers a substantial amount of streaming television programming on the AOL Television and In2TV parts of the AOL portal. In 2006, AOL transmitted ███████ streams of videos in its "TV" category of video streams. (AsX. 207, at 31-70.)

86. AOL offers streams of thousands of full-length television shows. (Tr. 2060:14-16 (Conroy); AsX. 411, at 1.) These television shows include thousands of episodes on AOL's In2TV feature. (Tr. 2060:17-21 (Conroy); Tr. 1806:24-1807:1 (Candell).)

87. AOL has described In2TV as a visitor's "own personal network." (AsX. 411, at 2.) According to Kevin Conroy, AOL's Executive Vice President, "[w]ith In2TV, we are enabling Web users to experience and interact with television programming in an entirely new way, and creating a new distribution platform for TV content." (AsX. 411, at 1.) In2TV is "yet another demonstration of our commitment to making our next-generation AOL.com portal the best destination for video on the Web." (AsX. 411, at 1.)

88. In addition to full-length television episodes, In2TV offers a variety of audiovisual programming where music is the primary focus of attention. In2TV streams "TV Karaoke," sing-alongs with favorite television show themes. (AsX. 411, at 2.) In2TV also offers "Rock 'n Flix," videos of notable music performances. (AsX. 118A, at AOL ch. 6, 02:40-03:15 (Whitney Houston's

performance of "I Will Always Love You" from the film, "The Bodyguard"); AsX. 118A, at AOL ch. 6, 03:55-04:15 (Fats Domino's performance of "Wait and See").)

89. AOL is responsible for securing the performance rights for music in all In2TV programming. (Tr. 2060:17-2061:5 (Conroy).)

### (iv)     AOL Video

90. AOL offers audiovisual content on AOL Video, a "hub" page where users can stream and watch any video that is available elsewhere on the AOL portal. (Tr. 1415:21-1416:6, 2061:21-25 (Conroy); AsX. 118A, at AOL ch. 1, 04:50-04:53.) On AOL Video, users can, among other things, browse videos by subject, source, or by what people are watching the most. (AsX. 118B, at 01:53-02:01.)

91. AOL Video categorizes all its videos, and users can select "music" among the categories. (Tr. 1416:13-20 (Conroy).) A user need not visit an AOL Music page to launch a music video performance on AOL. At trial, ASCAP demonstrated how a user can stream Carrie Underwood and Bobby Darin music videos from AOL Video. (Tr. 1417:21-1418:3 (Conroy); Tr. 1575:8-17 (Winston).) The videos available on AOL Video include user-uploaded videos, as well. (Tr. 1439:7-18 (Conroy).)

### (v)     Moviefone

92. AOL also operates a popular movie site called Moviefone, where users can access streams of movie trailers and clips. At the end of 2006, Moviefone was the second most visited movie site on the Internet. (AsX. 170, at 42.)

93. In addition to providing information about movies, including reviews and timetables, AOL allows users to watch hundreds of movie trailers, most of which contain music. (AsX. 118A, at AOL ch. 4, 03:33-03:49; Tr. 1397:9-13, 1435:12-16 (Conroy).)

94. AOL streams a significant number of movie clips and trailers. In all of 2006, AOL transmitted ████████ such streams in its "Movies - Trailers & Clips" category of video streams. (AsX. 207, at 28-70.)

### (vi) AOL Kids

95. AOL Kids is a part of the AOL portal that offers a variety of music and other programming, including cartoons, movie and television clips. (AsX. 118A, at AOL ch. 7.) As part of its music offerings, AOL Kids streams music features such as "Radio KOL," an Internet radio station. (Tr. 2126:7-10 (Conroy).) Music is instantly available on AOL Kids: when users visit the AOL Kids homepage, music automatically starts playing from a Radio KOL player. (Tr. 761:19-25 (Guerin-Calvert); Tr. 1582:1-10 (Winston); Tr. 2125:4-17 (Conroy).)

96. AOL Kids also offers "Listening Parties," which are on-demand streams of audio-only songs (Tr. 2126:7-2127:17 (Conroy)) and of music videos. (Tr. 1823:13-18 (Candell)). Once a user selects a song or video, the player on AOL Kids "Listening Parties" will automatically continue streaming additional songs or videos without any user input. (Tr. 1825:16-25 (Candell).)

97. AOL Kids also streams audiovisual programming that contains music. For example, at trial ASCAP streamed video clips from the film "High School Musical 2" available on AOL Kids. (Tr. 1580:1-10 (Winston).)

### (vii) AOL Red

98. Red is a section of the AOL portal aimed at teenagers. It, too, provides users with audio and audiovisual content that contains music. Users can launch a streaming AOL Radio station directly from Red. (Tr. 203:14-22 (DeFilippis).)

99. ASCAP demonstrated at trial that Red hosts a segment called "Project Freshman"—an AOL-produced show about college students—whose episodes contain theme music. (Tr. 203:23-204:5 (DeFilippis); Tr. 1809:10-12 (Candell).)

### (viii) SHOUTcast

100. SHOUTcast is an aggregator of streaming music channels that AOL operates, and for which AOL has applied to ASCAP for a license. (SF ¶¶ 24, 178.) SHOUTcast webcasts are accessible at http://www.shoutcast.com.

### (ix) Audiovisual Programming Containing Music across the AOL Network

101. Millions of videos that contain music are accessible through AOL's portal and network of sites. (Tr. 2058:4-24 (Conroy).) According to AOL, "you bring an Internet connection, and we'll bring millions of high-quality videos, including music videos, on-demand news clips, full-length TV shows, movie trailers, and videos people create on their own." (AsX. 118B, at 01:15-01:40). Of these videos, thousands are streamed directly from AOL. (Tr. 2058:4-24 (Conroy).)

102. As ASCAP demonstrated at trial, video streams are available throughout the AOL portal, including in AOL Autos, AOL Finance, AOL Food, AOL Games (Tr. 1382:18-1383:4 (Conroy)), AOL News (Tr. 740:7-10 (Guerin-Calvert)), and as described above, on the AOL

homepage, AOL Television, In2TV, AOL Video, Moviefone, AOL Kids, and Red.

103. In fact, there is video in most, if not all, of the categories of content offered by AOL. (Tr. 1383:4-10 (Conroy).) Video on AOL often includes theme music or background music. (Tr. 1394:16-1395:2 (Conroy).)

104. For example, as ASCAP demonstrated at trial, the AOL Autos site can stream hundreds of videos that contain music, including professional car reviews that contain theme and background music. (Tr. 1801:19-1802:16 (Candell); AsX. 118A, at AOL ch. 9, 08:30- 09:00.)

105. Love@AOL, which is devoted to people seeking mates or information about dating, is another part of the AOL portal that features audiovisual programming that contains music. (Tr. 200:19-201:4 (DeFilippis).) Love@AOL is "one of the big breakout hits of AOL." (Tr. 1304:21-22 (Conroy).) For example, at trial ASCAP streamed episodes of "Pulse" that contain theme and background music. (Tr. 202:13-203:1 (DeFilippis); Tr. 1806:15-22 (Candell); AsX. 118A, at AOL ch. 9, 06:56-07:18.)

106. AOL also offers an array of user-generated videos that contain music. (AsX. 118A, at AOL ch. 2.) For example, AOL allows users to upload their own videos that incorporate music to the UnCut Video part of the portal. From UnCut Video, AOL streams user-generated content including videos about news, sports, pets, music, personals, short films, and autos. (AsX. 118A, at AOL ch. 2.) According to AOL, such user-generated, or "viral," videos are "funny," "bizarre," and "fascinating," and "you just can't stop yourself from watching them." (AsX. 118B, at 05:12-05:46.) AOL promotes itself as the "best place to look" on the Internet for such viral videos. (AsX. 118B, at 05:12-05:46.)

107. AOL produced little information on the amount of audiovisual streams that occur

outside of the music areas of its site. One AOL document, however, indicates that almost ███████ videos streamed by AOL in the month of December 2006 (████████████) were streamed through areas outside of AOL Music, including the areas Movies, TV, TMZ, Living, Community and Kids On Line (KOL).  (AsX. 207; 445.)  In the same month, about ███████ streams were streamed from AOL Music (or were music video streams from AOL Latino and KOL).  (AsX. 207, at 26-70.)

### (x)    AOL Search

108. AOL has integrated music into its search features, as well.  If a user searches the web for a performer or musician using AOL Search, the search results page will often provide links to streaming music and music videos on AOL, in addition to the search results and sponsored links.  (Tr. 1794:8-1795:11 (Candell).)

109. For example, ASCAP demonstrated at trial that a search for "Bruce Springsteen" on AOL Search produces links to music videos and audio-only song streams on AOL.  (*Id.*)  When a user clicks on one of those links, a music player appears on top of the search results page, and plays the song or video.  (*Id.*)

110. In addition, if a user searches for a movie title, the AOL Search results page will often include links to clips and trailers from the movie.  Users, for example, can search for "Bee Movie" and then access the movie's clips and trailers.  (AOL Search results for "Bee Movie," at http://search.aol.com/aol/search?invocationType=comsearch30&query=bee+movie&do=Search.)

111. AOL also offers a specialized video search feature, which AOL touts as "the most powerful video search on the Web."  (Tr. AsX. 118B, at 01:43-01:52.)  AOL promotes its video

search feature as allowing users to "[s]earch now for millions of high-quality videos" including music videos, news clips, movie trailers, "viral videos," and full-length television shows. (AsX. 427.)

112. In addition, AOL operates a search feature and webpage known as Truveo, which allows users to search for, browse through, and play different kinds of videos. (Tr. 1354:10-19, Tr. 1430:12-1431:3 (Conroy).) Users can stream AOL music videos on Truveo, and at trial, ASCAP demonstrated an example of such a stream with the music video, "Crank That Soulja Boy." (Tr. 1431:25-1432:4 (Conroy).) To the extent AOL provides video programming streamed on Truveo, AOL is responsible for securing the performing rights. (Tr. 1432:5-9 (Conroy).)

### (xi)  AOL's Use of Music to Promote Other AOL Features

113. AOL uses music audiovisual programming that contains music to promote the entire AOL portal and AOL's other offerings. AOL Music directs traffic to other areas of the AOL network. (Tr. 1457:12-17 (Winston).) For example, when it streams music content, AOL Music invites users to send music to others via AOL's instant messenger and e-mail features. AOL prompts users to "IM This" performance (AsX. 118A, at AOL ch. 5, 03:15-03:25), "IM to a Friend" or "E-mail to a Friend" a music video (AsX. 118A, at AOL ch. 5, 04:46- 05:00), and to"IM to a Friend" and "E-mail to a Friend" an audio on-demand stream. (AsX. 118A, at AOL ch. 5, 06:13-06:26). AOL offers similar links to AOL instant messaging and e-mail in streaming audiovisual content as well. (AsX. 118A, at AOL ch. 6, 01:25-01:40.) In this way, AOL uses music and music videos to promote its instant messaging and e-mail services.

114. Users can listen to AOL webcasts, on-demand songs, and music videos while they are

using other AOL features, such as instant messaging, sending and receiving e-mails, reading news, shopping, looking at job listings, or checking stock quotes. (Tr. 1525:9-12 (Winston); Tr. 2066:18-2067:3 (Conroy); AsX. 118A, at AOL chs. 1, 9.) AOL encourages users to "surf," or browse, AOL and other Internet sites while listening to music streamed by AOL. Indeed, AOL promotes its AOL Radio with XM feature by touting that "you'll never have to surf in silence again." (AsX. 118B, at 02:38-02:50.)

115. AOL also prominently features music in its advertisements for the AOL.com portal. When AOL marketed the launch of the new, free AOL, one of the features that AOL promoted was the availability of music on the site. (Tr. 2051:8-12 (Conroy).) AOL also highlights music in its own paid sponsored links on third-party search sites. One such sponsored link on Google states: "The New AOL.com – Now Free Online Radio, Free Video & More." (Tr. 2052:4-25 (Conroy).) AOL has also used its music offerings to promote the entire AOL site on billboards. (AsX. 165A; Tr. 2053:9-15 (Conroy).)

### (c) AOL Toolbar

116. AOL offers a toolbar application that users can install into their browsers and that offers shortcuts to a variety of AOL features, including video and radio. (Tr. 204:11-25 (DeFilippis).) The AOL toolbar offers the ability to launch AOL Radio quickly and easily from any place on the web. (Tr. 2055:18-24 (Conroy).)

### (d) AIM Instant Messenger

117. AOL offers an instant messenger application known as AIM. AIM users install the

application on their computers and use it to communicate with each other instantaneously over the Internet. (Tr. 205:14-20 (DeFilippis).) AIM is used by millions of people and is one of the most popular areas on AOL. (Tr. 2078:15-20 (Conroy).)

118. The AIM application comes with a pre-installed button that allows users to stream music channels and video directly from the AIM window. (Tr. 205:21-206:8 (DeFilippis); Tr. 1795:19-24 (Candell).) AOL Radio is integrated into the AIM Instant Messenger buddy list (Tr. 2076:7-20 (Conroy)), and AIM users can listen to music while sending and receiving instant messages. (Tr. 765:2-3 (Guerin-Calvert); Tr. 2135:11-23 (Conroy)). The AOL Radio player in the AIM application does not have any space for any banner ads, but the AIM application window displays ads above the AOL Radio button. (Tr. 2079:22-2080:10 (Conroy).)

119. AIM also offers a feature known as AIM Tunes, which is a downloadable plug-in that allows two users on each other's buddy lists to share their favorite music with each other. (Tr. 2077:24-2078:11 (Conroy).) Using AIM Tunes, a user can stream music directly to his or her "buddies." (Tr. 2079:3-12 (Conroy).) AOL does not currently monetize AIM Tunes. (Tr. 2079:17-21 (Conroy).) However, when users install the AIM Tunes upgrade—which streams music to and from a user's AIM buddies—they are automatically prompted to install the AOL Toolbar for AIM and QQ Games applications, as well as to make AOL.com the browser's default homepage and to use AOL Search as the default search application for the browser. (AsX. 423; Tr. 2081:16-2082:12 (Conroy).) In this way, AOL uses music to promote customer adoption of its other services.

120. On the AIM.com webpage, music is the first product highlight presented, and AOL invites users to try the feature with the following text: "Hey music lovers, time to tune in, stream your favorite tunes to and from your buddies on AIM." (Tr. 207:6-15 (DeFilippis).) AOL offers

users the ability to send others, via instant messenger and e-mail, links to songs and music videos on AOL.  (Tr. 206:15-24 (DeFilippis).)

### (e)    AOL music on widgets and third-party sites

121. AOL offers "widgets" that stream AOL music programming.  (Tr. 207:16-19 (DeFilippis).)  A widget is a software application that gives users access to featured content.  (Tr. 207:20-24 (DeFilippis).)

122. The "AOL Music Top 100 Videos" is a widget that appears on the computer's desktop and allows users to stream any one of AOL's 100 most popular music videos directly to a player on the user's desktop, without having to visit the AOL website.  ( Tr. 208:2-14 (DeFilippis); Tr. 2081:4-10 (Conroy); Tr. 1800:12-18 (Candell).)  The user can also continuously stream all 100 videos in sequence automatically.  (Tr. 208:15-21 (DeFilippis); Tr. 754:19-22 (Guerin-Calvert); Tr. 1800:19-22 (Candell).)  Users of the "AOL Music Top 100 Videos" widget can send links to particular AOL music videos to others via AIM or e-mail.  (Tr. 209:8-14 (DeFilippis).)  There are no pre-roll or banner advertisements on the "AOL Music Top 100 Videos" widget. (Tr. 208:22-209:1 (DeFilippis).)

123. AOL offers a similar widget for users of Facebook, one of the largest social networking sites on the Internet.  (Tr. 2083:14-2084:21 (Conroy); AsX. 429.)  AOL's "My Favorite Artists Facebook Widget" allows Facebook users to stream music videos from AOL directly to the user's Facebook profile page.  (Tr. 2084:2-18, Tr. 2109:6-11 (Conroy).)  AOL is responsible for performance rights fees associated with such streaming music videos.  (Tr. 2084:19-21 (Conroy).)  Facebook is not owned by or affiliated with AOL or Time Warner.  (Tr. 2083:24-2084:1 (Conroy).)

124. AOL also allows users to "snag," or stream, AOL music videos on other social networking sites like MySpace or any other webpage controlled by the user. (Tr. 2070:1-15 (Conroy).) Like Facebook, MySpace is one of the most popular social networking sites on the Internet and allows users to post information about themselves and view information posted by others. (Tr. 2069:15-25 (Conroy).) At the end of 2006, MySpace was the fourth-most-visited Internet portal. (AsX. 170, at 49.)

### (f)  AOL Music Now

125. AOL owned and operated AOL Music Now between November 2005 and March 2007. (Tr. 1455:25-1456:6 (Winston); Tr. 1935:18-19 (Candell); SF ¶ 98.) At that time, AOL Music Now was a subscription service. (Tr. 1455:25-1456:3 (Winston).) For one flat monthly fee, an AOL Music Now subscriber had unlimited access to streaming on-demand audio music and music videos, webcasts, and conditional downloads. (Smith Dep. Tr. 35:2-24.) Users did not pay separate fees for access to the on-demand streaming, music video, and webcasting features of AOL Music Now. (*Id.*)

126. In January 2007, AOL entered into an agreement with Napster, Inc. to transfer AOL Music Now subscribers to Napster, a transition that was complete by March 31, 2007. (SF ¶ 98.) AOL, however, is responsible for securing performance rights for the AOL Music Now services from November 2005 through March 2007. (*Id.*)

### 3.  AOL's Streams of Music and Music Videos

127. AOL generally tracks the number and duration of audio-only on-demand streams, audio-only webcast streams, and music video streams on its sites and services. (SF ¶ 109.) AOL generally

does not track the number or duration of feature, theme, and background music performances contained in audiovisual programming such as television programs and movies, or the number or duration of music performances contained in promotional advertisements or streaming advertisements, on its sites and services.  (SF ¶ 110.)

### (a)    Hours of Music Streaming

128. AOL provided ASCAP with music streaming data for all of its audio-only webcasts (except for streams from its SHOUTcast webcasting service), audio-only on-demand streams, and music video streams.  (Tr. 121:22-122:7 (Amenita).)

129. In 2003, AOL streamed ████████ hours of audio-only music webcasts (excluding SHOUTcast) and ████████ hours of on-demand audio-only and music video streams, for a total of ████████ streaming hours.  (SF ¶ 111; AsX. 344.)

130. In 2004, AOL streamed ████████ hours of audio-only music webcasts (excluding SHOUTcast) and ████████ hours of on-demand audio-only and music video streams, for a total of ████████ streaming hours.  (SF ¶ 112; AsX. 344.)

131. In 2005, AOL streamed ████████ hours of audio-only music webcasts (excluding SHOUTcast) and ████████ hours of on-demand audio-only music and music video streams, for a total of ████████ streaming hours.  (SF ¶ 113; AsX. 344.)

132. In 2006, AOL streamed ████████ hours of audio-only music webcasts (excluding SHOUTcast) and ████████ hours of on-demand audio-only music and music video streams, for a total of ████████ streaming hours.  (SF ¶ 114; AsX. 344.)

### 4. AOL's Audience Visits to AOL Music

133. According to Nielsen, the total time users spent on all AOL sites and services in 2005 was ███████ hours. (AsX. 65.)

134. According to Nielsen, the total time users spent on all AOL sites and services in 2006 was ███████ hours. (AsX. 65.)

135. According to comScore, the total time spent on all AOL sites and services in 2005 was ███████ hours. (AsX. 168.)

136. According to comScore, the total time spent on all AOL sites and services in 2006 was ███████ hours. (AsX. 168.)

137. A significant percentage of all unique visitors to the AOL portal visit AOL Music pages, as reflected in the comScore data provided by AOL. (AsX. 350.) According to comScore, for the month of December 2003, the number of unique visitors to AOL Music was ███████, and the number of unique visitors to the AOL portal was ███████. (*Id.*) Thus, roughly ███████ people visited the AOL portal in December 2003, and ███% of them (███████ people per month) also visited AOL Music. (*Id.*)

138. The popularity of AOL Music continued to increase in 2004 through 2006. According to comScore, in 2004, the average number of monthly unique visitors to AOL Music was ███████ per month, and the average number of monthly unique visitors to the AOL portal was ███████ per month. (SF ¶ 106; AsX. 350.) Thus, on average in 2004 approximately ███████ people visited the AOL portal each month, and about ███% of them (███████ people per month) visited AOL Music. (AsX. 350.)

139. According to comScore, in 2005, the average number of monthly unique visitors to AOL

38

Music was ████████, and the average number of monthly unique visitors to the AOL portal was ████████. (SF ¶ 107; AsX. 350.) Thus, on average in 2005, approximately ████████ people visited the AOL portal each month, and about ████% of them (████████ people per month) visited AOL Music. (AsX. 350.)

140. According to comScore, in 2006, the average number of monthly unique visitors to AOL Music was ████████, and the average number of monthly unique visitors to the AOL portal was ████████. (SF ¶ 108; AsX. 350.) Thus, on average in 2006, approximately ████████ people visited the AOL portal each month, and about ████% of them (████████ people per month) visited AOL Music. (AsX. 350.)

### 5. AOL's Revenue

141. In 2005, AOL's domestic United States advertising revenue was $████████, and domestic United States subscription revenue (excluding Music Now) was $████████, for a total of $████████. (SF ¶ 100; AsX. 355.) In November and December 2005, AOL Music Now's revenue was $████████. (AsX. 355.)

142. In 2006, AOL's estimated domestic United States advertising revenue was $████████, and estimated domestic United States subscription revenue (excluding MusicNow) was $████████, for a total of $████████. (SF ¶ 101; AsX. 355.) In 2006, AOL Music Now's revenue was $████████. (AsX. 355.)

### B. RealNetworks

143. Applicant RealNetworks is a provider of media delivery software and services, and is

known for the creation of the RealPlayer, a proprietary media player that it distributes on its website. (SF ¶ 115.)  Among other things, consumers use RealNetworks services and software to find, play, purchase, and/or manage free and subscription content of various forms, including music, games, and video.  (*Id.*)  RealNetworks also offers business-to-business services such as streaming media, media servers, and tools for government agencies, educational institutions, and other industries and enterprises.  (*Id.*)

### 1.  RealNetworks's Application for an ASCAP License

144. RealNetworks applied for a single blanket license commencing January 1, 2004 and covering the following sites and services: RealNetworks.com, Real.com (including its sub-domains such as Real Guide, and affiliated sites such as Rollingstone.com and Film.com), Rhapsody.com, RhapsodyDirect.com, and Listen.com.  (SF ¶ 183-84.)

145. ASCAP entered into negotiations with RealNetworks, but the parties were unable to agree on final fees for the open period.  (SF ¶ 185.)  On November 9, 2005, ASCAP applied to the Court for a determination of interim and final license fees for RealNetworks's performances of music.  (*Id.*)

146. After ASCAP filed its application, RealNetworks agreed in March 2006 to pay ASCAP interim fees of ███████████████for 2004, 2005, 2006, and annually after that.  (SF ¶ 186.)

147. RealNetworks remains open with regard to final fees for the period January 1, 2004 to the present.  (SF ¶ 187.)

## 2. Sites and Services for Which RealNetworks Seeks an ASCAP Blanket License

148. RealNetworks makes audio and audiovisual content embodying musical compositions available to users through a number of subscription services, including Rhapsody, RadioPass, and SuperPass, and through free, advertising-supported sites and services, including Film.com, Rollingstone.com, RealArcade, and Real Guide which offers free music, music videos, movie trailers, celebrity videos, and games. (SF ¶ 118.)

### (a) Rhapsody

149. Rhapsody is an unlimited on-demand music subscription service that offers subscribers access to over four million tracks. (Tr. 846:17-847:12 (Sheeran).) Rhapsody also allows subscribers to create their own playlists, which can be played back on demand. (*Id.*) Rhapsody subscribers can also conditionally download music to a personal computer or transfer music to a portable device, such as an MP3 player. (*Id.*) Rhapsody subscribers can also purchase permanent downloads of music at a discounted price. (Tr. 918:19-21 (Sheeran).)

150. RealNetworks offers different tiers of service under the Rhapsody brand, including: (a) Rhapsody Unlimited, a $12.99 per month subscription service that provides unlimited music streams and conditional downloads of music to the subscriber's computer; and (b) Rhapsody To Go, a $14.99 per month subscription service that, in addition to unlimited music streams and conditional downloads, allows the subscriber to transfer music to a portable device. (SF ¶ 119.)

151. Rhapsody To Go subscribers can, for no additional fee, conditionally download as many tracks of music as can fit on the subscriber's hard drive or portable device. (Tr. 889:15-24 (Sheeran).) A Rhapsody To Go subscriber has access to the conditional download only as long as

his subscription fee has been paid.  (Tr. 890:2-5 (Sheeran).)  If the Rhapsody To Go subscriber fails to pay his subscription fee, the subscriber will no longer have access to the music and the tracks eventually will be deleted.  (Tr. 890:6-12 (Sheeran).)  The Rhapsody To Go subscription service is becoming increasingly popular because most subscribers prefer to listen to music away from their personal computers, such as in the car or in their living room.  (Tr. 847:4-12 (Sheeran).)

152.  A Rhapsody subscriber can play as much or as little music as he or she wants.  (Tr. 903:5-16, Tr. 905:23-906:3 (Sheeran).)  Regardless of the actual amount of music played, however, the Rhapsody subscriber must still pay the full subscription fee.  (*Id.*)  If the subscriber continues to pay the subscription fee, then neither the amount nor the type of music actually played by the subscriber affects the amount of revenue received by RealNetworks.  (Tr. 903:17-904:13 (Sheeran).)

153.  There is a percentage of Rhapsody To Go subscribers who do not take advantage of the portability feature that is offered as part of the subscription.  (Tr. 906:9-13 (Sheeran).)  Those individuals are, in essence, paying an additional $2 (over and above the Rhapsody Unlimited subscription fee) for a portability feature that they do not use.  (Tr. 906:14-18 (Sheeran).)  RealNetworks, however, does not refund any portion of the fee for subscribers who do not use the portability feature.

**(b)     RadioPass**

154.  RadioPass is a subscription-based webcasting service.  RadioPass subscribers can access, currently for a $59.99 yearly fee, more than 90 pre-programmed, advertising-free, Internet-only webcast channels that are programmed and streamed by RealNetworks.  (SF ¶ 120.)  RadioPass subscribers also can access simulcasts of over 3,200 worldwide terrestrial broadcast radio stations.

(*Id.*; Tr. 846:8-11 (Sheeran).)  These radio stations are not programmed by RealNetworks but are, nevertheless, streamed from RealNetworks's servers and made available to subscribers through the RadioPass website.  (Tr. 936:13-937:3 (Sheeran).)

155. RealNetworks does not have any agreement with the radio stations that it streams from its servers in connection with the RadioPass subscription service.  (Tr. 889:4-14 (Sheeran).)

156. These radio stations have not provided RealNetworks with any ASCAP license agreements that license RealNetworks's performance of the stations' programming.  (Tr. 932:10-19 (Sheeran).)

## (c)     SuperPass

157. SuperPass is a subscription service that offers, currently for $14.99 per month, access to news, sports, movies, games, music and other entertainment content; short films, video clips and music; music downloads (at $0.99 per song) and streaming previews of music; access to the majority of RadioPass services; and CD burning and other features for the RealPlayer.  (SF ¶ 121.)  In addition, SuperPass subscribers receive ten free music downloads per month.  (Tr. 842:11-13 (Sheeran).)

158. SuperPass subscribers receive access to Internet radio streaming, music videos, full length movies, television shows, news content, games, and computer software.  (Tr. 908:6-909:15 (Sheeran).)  A SuperPass subscription "lets you listen to millions of songs."  (Tr. 909:18-910:6 (Sheeran).)

159. As with Rhapsody, SuperPass subscribers pay $14.99 per month regardless of the amount of music they play or content they access, and the amount of subscription revenue that

RealNetworks receives does not depend on the subscriber's behavior or actual usage of the subscription's offerings. (Tr. 910:7- 911:6 (Sheeran).)

### (d)    **Rhapsody.com**

160. Rhapsody.com is a free, advertising-supported site that allows users to discover music, learn more about artists, and play music. (Tr. 830:22-831:1 (Sheeran).)  Rhapsody.com offers on-demand audio streaming, Internet radio, and music videos for free. (Tr. 915:25-916:2 (Sheeran).)

161. Rhapsody.com generates revenue through advertising and sponsorships; "up-sells" of subscriptions to Rhapsody, RadioPass and SuperPass; and mini-sites, which is a type of sponsorship created by RealNetworks and devoted to a particular advertiser or event. (Tr. 916:3-13 (Sheeran).) Up-selling is a sales technique by which the salesperson encourages the consumer to buy more expensive items, upgrades or add-ons. (Tr. 849:11-17 (Sheeran).)  Indeed, the principal purpose of Rhapsody.com is to drive subscriptions of the Rhapsody premium services, namely Rhapsody Unlimited and Rhapsody To Go. (Tr. 830:24-831:1 (Sheeran).)

162. Rhapsody.com also generates revenue from Google by offering free downloads of the Google Toolbar.  In 2006, RealNetworks received approximately ███████████ in revenue from the installation of the Google Toolbar. (Tr. 884:15-21 (Sheeran).)  When a user attempts to play a song on demand on Rhapsody.com, RealNetworks prompts the user to download and install the Google Toolbar.  If the user does so, Google pays RealNetworks a fee. (Tr. 885:20-886:5 (Sheeran).)  Thus, some of this revenue is generated by the performance of music.

### (e)     RealGuide.com

163. RealGuide, RealNetworks's version of an advertising-supported entertainment portal, offers access to music, music videos, and movie trailers and clips for free. (Tr. 850:8-24, 916:20-917:7 (Sheeran).) From RealGuide, a user can access all of RealNetworks's Internet offerings. *(See, e.g.*, AsX. 118A, at RealNetworks ch 1.) For example, a user can link to free music offerings on Rhapsody.com; free Internet radio streaming on Real Radio; free audiovisual entertainment content on Film.com; the online music magazine Rollingstone.com; and RealNetworks's Music Store, where non-subscribers can stream song previews and purchase individual tracks of music and full albums. (*Id.*) RealGuide also provides links to "mobile" or cellular phone-based subscription services, such as Rhapsody Radio on Sprint and Real rTV. (*Id.*)

164. Furthermore, RealGuide functions as a promotional vehicle for RealNetworks's three consumer business units – music, audio/video entertainment and services, and games. (Tr. 849:2-4 (Sheeran).) RealGuide is monetized through a combination of advertising and up-sells of consumers to one of RealNetworks's premium services, such as SuperPass and Rhapsody. (Tr. 849:11-850:3, 917:8-13 (Sheeran).) RealGuide promotes free RealPlayer, free games, and free Rhapsody, but the promotion also includes an offer to sign up for the subscription service. (*Id.*) As one of RealNetworks's corporate representatives noted at trial, RealGuide "serves an important purpose in driving subscriptions to all of our product categories." (Tr. 917:12-13 (Sheeran).)

### (f)     RealArcade

165. In addition to its music services and other programming, RealNetworks offers access to hundreds of games that users can play online or download through RealArcade. These games are

delivered over the Internet, much like the streaming of music. (Tr. 834:16-20 (Sheeran).) These games often contain performances of music (SF ¶ 122; Tr. 837:19-21 (Sheeran); Martel Dep. Tr. 71:7-13, 71:25-73:3) and in-stream or pre-roll advertisements. (Tr. 915:12-14 (Sheeran).)

166. From the RealGuide homepage, a user can link to a "Games" page, where one can get an overview of the games offered by RealNetworks as well as those featured by RealNetworks on that particular day. (*See* RealArcade – Play the Best Games Free, at http://www.realarcade.com/gameguide?tps=guide_.) RealNetworks offers "download games," "online games," and "cash games." (*Id.*) The games-related pages are advertising supported. (*Id.*)

167. A GamePass subscription, which costs $9.99 per month, gives the user one free game per month as well as discounts on the purchase of other games. (*See* GamePass for RealArcade – Your Ultimate Game Subscription, at http://www.realarcade.com/gamepass?src=ggpg&tps=guide_&init_term=1.)


### (g)    Film.com

168. Film.com, another advertising-supported website, provides free audio and audio-visual programming, including on-demand audio streaming, movie trailers and clips, and access to full-length movies. (AsX. 118A, at RealNetworks ch. 1.) Film.com also provides a variety of entertainment-related content, such as celebrity news and gossip, photo galleries, movie reviews, and information about upcoming television shows, movies, and DVDs. (*Id.*) The site also has a section called "Music on TV," which features articles that discuss the music played during television programs and provides the ability to play those songs on demand for free. (*Id.*)

169. Film.com is integrated with Rhapsody. When a user clicks on a link to an on-demand

song on Film.com, such as in a "Music on TV" article, the song is played on a Rhapsody-branded player. (AsX. 118A, at RealNetworks ch. 1.)

### (h)     Rollingstone.com

170. Rollingstone.com is an advertising-supported website with music-content programming. It is the online version of *Rolling Stone*, a magazine about popular culture. (Tr. 917:14-20 (Sheeran).)

171. Rollingstone.com offers on-demand audio streaming and music videos for free. (Tr. 917:21-918:15, 978:15-18 (Sheeran).) The website also offers news articles, movie reviews, and political content. (*Id.*; AsX. 118A, at RealNetworks ch. 1.) Rollingstone.com is considered part of RealNetworks's music business unit. (Tr. 879:2-3 (Sheeran).)

172. As with RealNetworks's other advertising-supported sites, Rollingstone.com functions as a promotional vehicle for Rhapsody, to increase sales of Rhapsody subscriptions. For example, when a Rollingstone.com user clicks on a link for on demand music, the player that pops up is co-branded by Rollingstone.com and Rhapsody. (Tr. 917:21-918:4 (Sheeran).)

### (i)     Music Subscription Offerings for Cellular Phones

173. RealNetworks also provides at least two music streaming subscription services to cell phone users. For $4.95 per month, anyone can subscribe to the Real rTV service, which streams on-demand music and music videos to the subscriber's cell phone. (Tr. 914:25-915:8 (Sheeran).) As of March 2006, there were approximately ███ Real rTV subscribers. (AsX. 253.)

174. For $6 per month, Sprint cell phone subscribers can receive Internet radio streaming and

music videos streamed directly to their cell phones via the Rhapsody Radio on Sprint service. (Tr. 913:25-914:8 (Sheeran).) There are approximately ███████████ subscribers to Rhapsody Radio on Sprint. (Tr. 914:9-13 (Sheeran).)

### (j)    **Rhapsody Radio on Comcast**

175. The cable company and Internet service provider Comcast pays RealNetworks between ███████████████ per year to provide Rhapsody Radio to Comcast subscribers. (Tr. 912:15-20 (Sheeran).) As of 2006, approximately 800,000 Comcast subscribers had access to Rhapsody Radio. (Tr. 913:5-7 (Sheeran).)

### (k)    **RealNetworks' Agreements For Distribution of Rhapsody Service**

176. In the past year, RealNetworks has entered into agreements with Nokia, TiVo, and Logitech that will permit users to stream music on demand and Internet radio from their Rhapsody subscriptions via products manufactured by Nokia, TiVo, and Logitech. (Tr. 923:22- 924:19 (Sheeran).) These deals will generate substantial revenue for RealNetworks. Nokia is the largest manufacturer of cellular phones in the world, and TiVo is the largest independent provider of digital video recording systems in the United States. (Tr. 927:8-15 (Sheeran).)

### 3.    **Additional Services for Which RealNetworks Requires an ASCAP License**

177. As noted above, RealNetworks has applied for a single blanket license covering RealNetworks.com, Real.com (including certain sub-domains), Rhapsody.com, RhapsodyDirect.com, and Listen.com. (SF ¶ 184.) RealNetworks did not apply for a license,

however, for any services that fall within its Technology Products and Solutions ("TPS") business unit, even though certain TPS services involve music performances.

178. As stated in its 2006 Form-10K, under its TPS umbrella, RealNetworks "develop[s] and market[s] software products and services that enable wireless carriers, cable companies and other media and communications companies to distribute digital media content to PCs, mobile phones, and other non-PC devices." (AsX. 385 at 6.)  Specifically, the TPS business segment includes server application products and services, which RealNetworks calls "application services." (Tr. 827:17-22 (Sheeran).)  Through its application service provider model, RealNetworks "enables media companies and communication service providers to deliver digital entertainment offerings." (AsX. 380.)  Its "Application Service Provider Solutions" includes Music On Demand, ringback tones, multimedia ringback services, multi-screen video, and mobile games, all of which include performances of music, as discussed below.  (AsX. 380.)

### (a)    <u>Music On Demand</u>

179. The Music On Demand service is defined as "full function services that provide downloads of full music tracks over-the-air or Internet." (AsX. 380.)  RealNetworks's Form 10K for 2006 further describes Music On Demand as a service that "allows carriers to enable their subscribers to listen to a wide range of song titles by downloading or streaming to a PC, certain MP3-enabled mobile phones, and certain portable audio players." (AsX. 385, at 7.)

180. RealNetworks provides Music On Demand services to Verizon Wireless.  (Tr. 832:15-21 (Sheeran).)  Through this service, Verizon Wireless consumers are able to access music via their cell phones.  (Tr. 832:22-833:4 (Sheeran).)  To make that happen, Verizon Wireless first loads its

music content onto the RealNetworks servers and RealNetworks operates its servers as an application service for Verizon Wireless. (*Id.*) The music that Music On Demand subscribers receive on their cell phones is streamed from RealNetworks's servers. (Tr. 880:16-17, 929:7-16 (Sheeran).)

181. Verizon Wireless has not provided RealNetworks with an ASCAP license agreement demonstrating that Verizon Wireless is licensed by ASCAP to perform the music that RealNetworks streams on its behalf. (Tr. 881:2-11 (Sheeran).) Rather, Verizon Wireless has indemnified RealNetworks for any intellectual property claims associated with any content that Verizon Wireless asks RealNetworks to deliver. (*Id.*)

182. Verizon Wireless pays RealNetworks for the streaming of music to its customers through a combination of a consulting fee and a per-subscriber served fee. (Tr. 881:16-882:20 (Sheeran).) As part of the per-subscriber served fee, RealNetworks receives one percent of the retail price paid by the Verizon Wireless customer. (*Id.*) There is also a minimum guarantee payment. (*Id.*)

183. RealNetworks has stated publicly that it believes its relationship with Verizon Wireless, among other entities, "will drive our Rhapsody music business forward very significantly." (ApX. 118.)

### (b) Other Application Services

184. In addition to its Music On Demand services, RealNetworks offers several other services as part of its Applications Services business. RealNetworks provides a ringback tone service, a multimedia ringback tones service, and a multi-screen video service, all of which stream music and

are booked to TPS.

185. The ringback tone service is an "end-to-end service for mobile service providers that enable their subscribers to personalize the 'ring ring' sound that callers hear while waiting for an answer with music and other audio content." (AsX. 380.)

186. The multimedia ringback tone service is a "service allowing subscribers to incorporate audio, images and video to deliver a unique, customized experience for callers before they are connected." (AsX. 380.)

187. The multi-screen video service is "a comprehensive service providing encoding, management and delivery of video to a wide range of devices." (AsX. 380.)

### 4. RealNetworks Subscriber Data

188. Between 2003 and 2005, the number of RealNetworks's subscribers to the RadioPass and Rhapsody services in North America grew more than ███, from approximately ████ to ████. (SF ¶ 127; AsX. 347.) As of the first quarter of 2006, RealNetworks had ████ North American subscribers to its music services. (AsX. 347.)

189. In addition to these direct subscribers to RealNetworks's services, as of the third quarter of 2007, ████Comcast subscribers had registered to use the Rhapsody Radio service (Tr. 990:6-9 (Wan)), ████ people subscribe to Verizon Wireless Music On Demand (Tr. 927:21-22 (Sheeran)), and between████ people subscribe to Rhapsody Radio on Sprint. (Tr. 914:9-13 (Sheeran).)

190. At the end of 2006, RealNetworks had approximately ████worldwide subscribers to its music services. (Tr. 927:23-25 (Sheeran).) According to RealNetworks's publicly-disclosed

financial information, as of the third quarter of 2007, RealNetworks had approximately 2.75 million worldwide subscribers to its music services.  (Tr. 928:1-3 (Sheeran).)

### 5. RealNetworks Music Streaming

191. RealNetworks generally tracks the number and duration of audio-only on-demand streams, audio-only webcast streams, and music video streams on its sites and services.  (SF ¶ 129.) RealNetworks generally does not track the number or duration of feature, theme, and background music performances contained in audiovisual programming such as television programs and movies, or the number or duration of music performances contained in promotional advertisements or streaming advertisements, on its sites and services.  (SF ¶ 130.)

#### (a) Number of Song Titles

192. In 2004, RealNetworks had 1,047,330 unique music tracks encoded in its network available for on-demand streaming.  (SF ¶ 131.)  That number grew to 1,794,219 unique music tracks in 2005.  (*Id.*)  By 2006, RealNetworks projected that it would have 3,357,087 unique music tracks encoded in its network available for on-demand streaming.  (*Id.*)

#### (b) Hours of Music Streams

193. RealNetworks streamed ▮▮▮▮▮ hours of audio-only music in 2003; ▮▮▮▮▮ hours of audio-only music in 2004; and ▮▮▮▮▮ hours of audio-only music in 2005.  (AsX. 346.) RealNetworks did not disclose to ASCAP during discovery the total number of hours of music it streamed in 2006.  (AsX. 235; Tr. 984:3-13 (Wan).)  Nor did RealNetworks disclose the number of

hours of music videos it streamed in any year.  (Tr. 984:3-16 (Wan).)

6.      **RealNetworks's Revenue**

(a)      **Overview of RealNetworks's Business Units**

194. RealNetworks is smaller and less diversified than Yahoo! and AOL.  (SF ¶ 117.)  The main functional business units of the company are: Consumer Products and Services ("CPS"), and Technology Products and Solutions ("TPS").  (SF ¶ 117; AsX. 385 at 4-8; ApX. 120.)

195. The Consumer Products and Services segment houses three further subunits – music, media software and services, and games.  (AsX. 385 at 4-8.)  The revenue from the following sites and services is booked to the music unit: Rhapsody Unlimited, Rhapsody To Go, RadioPass, Rhapsody Radio on Comcast, Rhapsody Radio on Sprint, Rollingstone.com, and the Google Toolbar.  (Tr. 878:10-879:19 (Sheeran).)  The revenue from SuperPass, Real rTV, Real Guide and Film.com is booked to the media software and services unit.  (*Id.*)

196. Revenue generated by RealPlayer products is also booked to the CPS business unit.  (ApX. 120.)  RealNetworks, however, generally gives these players away for free.  (Tr. 884:1-14 (Sheeran).)  It provided no data on whether any RealPlayers were sold, or how much revenue, if any, was generated from such sales, and its corporate representative could not provide that information at trial.  (Tr. 883:24-884:14 (Sheeran).)

(b)      **Overview of RealNetworks's Revenue**

197. In 2004, RealNetworks's net domestic United States revenue was $202,574,000.  (SF ¶ 123.)  Excluding the company's TPS business segment, in 2004 RealNetworks's estimated net

domestic United States revenue was $███████. (*Id.*)

198. In 2005, RealNetworks's net domestic revenue was $249,855,000. (SF ¶ 124.) Excluding the company's TPS business segment, in 2005 RealNetworks's estimated net domestic revenue was $███████. (*Id.*)

199. In 2006, RealNetworks's net domestic revenue was $283,433,000. (SF ¶ 125.) Excluding the company's TPS business segment, in 2006 RealNetworks's estimated net domestic revenue was $███████. (*Id.*)

### (i)  Consumer Products and Services Unit's Share of RealNetworks' Revenue

200. In 2004 through 2006, the Consumer Products and Services business unit accounted for approximately ████ percent of RealNetworks's revenue, and TPS accounted for only ████ percent. (Tr. 901:2-17 (Sheeran); AsX. 385.)

201. Certain developments in the final quarter of 2006 caused an increase in TPS's share of RealNetworks's total revenue. (AsX. 385 at 6-7.) In late 2006, RealNetworks acquired WiderThan, "a global leader for delivering integrated digital entertainment solutions to communications service providers." (*Id.* at 6-7.) "WiderThan's applications, content, and services enable wireless carriers to provide a broad range of mobile entertainment to their subscribers, including ringback tones, music-on-demand, mobile games, ringtones, messaging, and information services." (*Id.* at 7; *see also* Tr. 854:18-855:6 (Sheeran).)

202. Due to the acquisition of WiderThan, the TPS business unit revenue grew to approximately ████ of RealNetworks's total revenue in the first three quarters of 2007. (ApX.

54

149.)[3]  This figure includes revenue generated from RealNetworks's application services business, including Music On Demand, which offers music performances.  (*Id.*)

(ii) <u>RealNetworks' Music Subscription Revenue</u>

203. In 2004, RealNetworks generated  in revenue from RadioPass subscriptions, ███████████ in revenue from Rhapsody subscriptions, ███████████ in revenue from SuperPass subscriptions, and ████████ in revenue from Real rTv subscriptions.  (JX 29.) This subscription revenue accounted for over ████ of the company's Consumer Product and Services revenue and approximately ████ of the company's total revenue.  (*Id.*)

204. In 2005, RealNetworks generated ███████████ in revenue from RadioPass subscriptions, ███████████ in revenue from Rhapsody subscriptions, ███████████ in revenue from SuperPass subscriptions, ███████████ in revenue from Real rTV subscriptions, and ███████████ in revenue from Comcast Rhapsody Radio subscriptions.  (*Id.*) This subscription revenue accounted for over ████ of the company's Consumer Product and Services revenue and over ████ of the company's total revenue.  (*Id.*)

205. In 2006, RealNetworks generated ███████████ in revenue from RadioPass subscriptions, ███████████ in revenue from Rhapsody subscriptions, ███████████ in revenue from SuperPass subscriptions, ███████████ in revenue from Real rTV subscriptions, and ███████ in revenue from Comcast Rhapsody Radio subscriptions.  (ApX. 149.) This subscription revenue accounted for over ████ of the company's Consumer Product and Services revenue and ████

---

[3]  A copy of this exhibit, RealNetworks Financial Report, was furnished to the Court but apparently the parties inadvertently omitted to offer it into evidence.

of the company's total revenue.  (*Id.*)

206. In the first three quarters of 2007, RealNetworks generated ███████████in revenue from RadioPass subscriptions, ███████████in revenue from Rhapsody subscriptions, ███████████ in revenue from SuperPass subscriptions,███████████ in revenue from Real rTV subscriptions, and ███████████in revenue from Comcast Rhapsody Radio subscriptions.  (*Id.*)  This subscription revenue accounted for █████ of the company's Consumer Product and Services revenue and █████ of the company's total revenue.  (*Id.*)

### (iii)    **RealNetworks Does Not Internally Allocate Revenue According to Type or Amount of Music**

207. For each subscription service, a RealNetworks's subscriber pays one amount per period and receives access to a bundle of content offerings.  (Tr. 902:3-903:4 (Sheeran).)  For its normal accounting and financial reporting purposes, RealNetworks does not divide up or otherwise allocate the revenue from its Rhapsody or SuperPass subscribers' monthly subscription fees according to the type (i.e., on-demand audio streaming, Internet radio streaming, or music video streaming) or amount of music that the subscriber actually plays, and does so only for the purpose of computing the fees due under certain license agreements.  (Tr. 904:25-905:22, 911:7-912:11 (Sheeran).)  Indeed, a RealNetworks corporate representative testified that "[t]here's no point in breaking apart the revenue.  I don't see what objective that would serve."  (Tr. 905:14-22 (Sheeran).)

### (iv)    **The Effect of Streaming of Music on Sales of Downloads**

208. RealNetworks has conducted a study that concluded that streaming music performances contribute to the sale of permanent downloads.  (AsX. 272.)  Testifying before the Copyright Royalty

Board, Timothy Quirk, RealNetworks's Vice President of Music Content and Programming, stated:

> Our own experience has shown that the availability of an artist's work to be played on-demand within our subscription service drives more purchases of that same music. . . . When an artist's tracks that were once available only for purchase suddenly become available for on-demand listening, that artist's download sales dramatically increase. We have seen such increases by a factor of 2X up to 10X.

(*Id.*, ¶ 42.)

209. Mr. Quirk illustrated the trend:

> [W]e observed that Madonna was selling less than 2,000 tracks a month before we obtained on-demand playback rights to her music. Track sales doubled when we were able to make her music available for subscription playbacks, and when she released a new album, track sales tripled.

(*Id.*)

210. Furthermore, RealNetworks observed that "60 percent of our permanent downloaders are not impulse buyers–they purchase after listening to a track an average of five times. Making works available through a subscription service allows users to experience new music without risking buyer's remorse, ultimately leading to more sales." (*Id.*)

### (v)  RealNetworks' Tracking of Usage Data and Reports to ASCAP

211. Under its interim fee agreement with ASCAP, RealNetworks is required to provide ASCAP with reports of music use licensed pursuant to the agreement. (JX 16, ¶ 3.) Despite ASCAP's repeated requests, RealNetworks has not consistently provided ASCAP with such data. (Tr. 186:1-17 (DeFilippis); Tr. 301:23-302:2 (Boyle).)

212. In addition, RealNetworks tracks music usage data so that it can make license payments to the record labels and to BMI. (Tr. 970:9-21 (Wan).) RealNetworks tracks plays of conditional

downloads so that it can pay the record companies for the performance of sound recordings. (Tr. 984:17-20 (Wan).)

213. With respect to the Rhapsody subscription service, RealNetworks tracks the number of on-demand streams, the hours of on-demand streams, the hours of Internet radio streams, the number of downloads, and the number of downloads transferred to a portable device. (Tr. 970:25-971:20 (Wan).) With respect to the SuperPass subscription service, RealNetworks tracks sign-ups, churn, new subscribers, content accesses, Internet radio plays, and the number of software downloads. (Tr. 984:21-985:7 (Wan).) With respect to RealGuide and Film.com, RealNetworks tracks "content accesses," which is the number of times a user clicks on a particular link on the page and initiates a video. (Tr. 985:15-25 (Wan).)

214. Even though RealNetworks tracks such music use data, a RealNetworks corporate representative could not explain why the company had not provided music use reports to ASCAP in the past two years. (Tr. 987:15-20 (Wan).)

## C.     Yahoo!

215. Applicant Yahoo! is a global Internet services company that operates the Yahoo! Internet portal. (SF ¶ 132.)

216. Yahoo! performs music in audio and audiovisual content throughout its site in free, advertising-supported webpages and services, including:

- the Yahoo! homepage (*see, e.g.*, Tr. 1021:23-1022:3, 1024:2-7, 1150:17- 1151:6 (Rogers); Tr. 1867:20-25, 1868:4-10 (Candell));
- Yahoo! Music (*see, e.g.*, SF ¶¶ 133, 135; AsX. 118A, at Yahoo! chs. 2, 3);
- My Yahoo! (*see, e.g.*, Halley Dep. Tr. 101:21-102:3; Tr. 211:6-22 (DeFilippis));
- Yahoo! Movies (*see, e.g.*, SF ¶ 133; Tr. 1888:3-8 (Candell); AsX. 118A, at Yahoo! ch. 10, 07:05-07:37, 08:30-09:06));

58

- Yahoo! Video (*see, e.g.*, SF ¶¶ 140, 146; AsX. 118A, at Yahoo! ch. 10);
- Bix (*see, e.g.*, Tr. 1879:25-1880:8 (Candell));
- Yahoo! Kids (*see, e.g.*, SF ¶ 133; AsX. 118A, at Yahoo! ch. 8);
- Yahoo! TV (*see, e.g.*, SF ¶ 133; Tr. 1260:20-1261:12 (Roback));
- Yahoo! Games (*see, e.g.*, Tr. 1882:4-18 (Candell); AsX. 118A, at Yahoo! ch. 6);
- Yahoo! Tech (*see, e.g.*, Tr. 1259:20-1260:15 (Roback));
- Yahoo! Autos (*see, e.g.*, Tr. 1885:16-24 (Candell));
- Yahoo! Finance (*see, e.g.*, AsX. 118A, at Yahoo! ch. 1, 01:08-01:31, 02:06-02:36);
- Broadway on Yahoo! (*see, e.g.*, AsX. 118A, at Yahoo! ch. 10, 02:38- 03:30);
- Yahoo! Food (*see, e.g.*, AsX. 118A, at Yahoo! ch. 10, 05:42-06:08);
- Yahoo! Search (*see, e.g.*, Tr. 1009:19-1010:12, 1010:21-1011:7, 1154:25-1155:24, 1159:13-25, 1168:11-20 (Rogers); AsX. 389);
- Yahoo! Toolbar (*see, e.g.*, Tr. 1168:11-20 (Rogers); AsX. 118A, at Yahoo! ch. 7);
- Yahoo! Messenger (*see, e.g.*, Tr. 1166:18-21 (Rogers); Tr. 1878:15-23 (Candell); AsX. 118A, at Yahoo! ch. 5); and
- the Yahoo! music widget (*see, e.g.*, Tr. 212:7-12 (DeFilippis)).

217. Yahoo! also performs music through subscription-based offerings including LAUNCHcast Plus, Musicmatch, and bundled offerings by AT&T and Verizon. (SF ¶ 133; Tr. 1168:24-1169:10 (Rogers); Tr. 1217:16-1218:4 (Roback).)

218. Yahoo!'s music offerings have advanced significantly from its early years as a portal. (SF ¶ 134.) The former co-head of the company's music group was once quoted as stating that "Yahoo! has moved away from being an 'agent,' that is a site that sends people to other sites; and has become a 'principal,' a destination itself." (*Id.*)

219. In making music and other content available to the public, the company attempts to extend its audience, deepen users' engagement, and increase advertising and subscription revenue. According to Yahoo!:

> We focus on expanding our audience of users and deepening their engagement on the Yahoo! Properties to enhance the value of our audience of users to advertisers and to increase the spending of these advertisers. We believe that we can expand our audience of users by offering compelling Internet services and effectively integrating search, community, personalization, and content to create a powerful user experience. These user relationships and the social community they create enable us to leverage

our online advertising as well as our fee based services.

(SF ¶ 147.)

### 1. Yahoo!'s Application for an ASCAP License

220. Yahoo! applied for a single blanket license commencing July 1, 2002 and covering all Internet or online uses of music in the ASCAP repertory made by Yahoo!. (SF ¶¶ 188-89.)

221. ASCAP and Yahoo! signed a letter agreement dated June 25, 2002 setting interim license fees of ███████████ on a going-forward basis, which is still in effect. (SF ¶¶ 190, 207; JX 17.)

222. Yahoo!, however, has been consistently late in its license fee payments, despite ASCAP's requests. (Tr. 186:1-17 (DeFilippis).) The interim agreement also requires Yahoo! to provide quarterly music use reports for the music licensed pursuant to the agreement. (JX 17, ¶ 3.) Despite ASCAP's repeated requests, Yahoo! has never provided ASCAP with such data. (Tr. 186:1-17 (DeFilippis).)

223. ASCAP entered into negotiations with Yahoo!, but the parties were unable to agree on final fees for the open period. (SF ¶ 191.) On November 1, 2005, ASCAP applied to the Court for determination of final fees for Yahoo!. (*Id.*)

224. Yahoo! remains open with regard to final fees for the period July 1, 2002 to the present. (SF ¶ 192.)

### 2. Sites and Services for Which Yahoo! Seeks an ASCAP Blanket License

#### (a) Yahoo! Portal

### (i)      **Yahoo! Music**

225. Yahoo! Music is a site within Yahoo.com that offers a wide selection of free, advertising-supported services, including audio webcasting streamed through its LAUNCHcast service, one of the Internet's largest collections of music videos, exclusive artist features, and music news. (SF ¶ 135.)

226. LAUNCHcast offers dozens of advertising-supported music channels that are available for streaming without charge to any user of the Yahoo! site. (SF ¶ 136.) These channels span all genres—including pop, urban, rock, country, dance/electronic, indie/folk, jazz/blues, Latin, Christian, and oldies—and the LAUNCHcast channel lineup both offers the most popular types of music (like the "Today's Big Hits" channel) and appeals to particular niche tastes (like the "Show Tunes" and "Merengue" channels). (*Id.*; Tr. 1236:15-21 (Roback); AsX. 118A, at Yahoo! ch. 2, 00:54-01:27.) LAUNCHcast offers a greater choice of music than any terrestrial radio market. (Tr. 1236:22-1237:3 (Roback).)

227. Yahoo! offers a number of features that allow users to interact with the music they experience. LAUNCHcast users can tune in to webcasts and let the music stream continuously, or can skip songs in a pre-programmed playlist a limited number of times, going to the next song in the playlist. (SF ¶ 137.)

228. In addition, LAUNCHcast offers each user a "customizable" station. (SF ¶ 139.) A user can specify his or her favorite artists, albums, songs, and genres, and also choose among different "moods"—and the station will generate playlists according to the user's individual preferences. (*Id.*) While music is playing, listeners can also "rate" individual songs, artists, and albums, and even rate a song never to play again. (*Id.*) Through Yahoo!'s proprietary algorithms, these ratings influence

what music will play on the custom station (though without advance notice of the songs to be played)—hence the LAUNCHcast slogan, "music that listens to you." (*Id.*; AsX. 118A, at Yahoo! ch. 2, 03:19-05:35; Tr. 1206:11-16 (Roback).)

229. LAUNCHcast offers a number of other features not available on a terrestrial radio station, such as music without interruptions by disk jockeys, news, weather, or traffic reports, (Tr. 1237:4-1238:5 (Roback)), allowing LAUNCHcast to stream more music per hour. In addition, the typical LAUNCHcast music channel offers more songs in its rotation than a terrestrial radio station. (Tr. 1238:23-1239:1 (Roback).) A LAUNCHcast music channel has about a hundred songs in its rotation, as compared to a terrestrial radio station, which has about twenty. (Tr. 1239:2-1240:20 (Roback).)

230. Yahoo! also has one of the largest collections of music videos available on the Internet. (SF ¶ 140.) Without charge, users can browse videos by genre or artist, stream individual music videos on demand, and tune into a "Video Lineup" of recommended videos that play in sequence. (*Id.*) As with LAUNCHcast, users can skip songs, and rate videos and artists. (*Id.*) Users can also create and manage custom playlists of streaming music videos that match their particular tastes and preferences. (Video Playlist Manager on Yahoo! Music, at http://new.music.yahoo.com/videos/playlistmanager.)

231. Yahoo! also streams user-generated content through programs such as "Get Your Freak On," where users submit videos featuring music from their favorite artists and Yahoo! edits together the best clips. (SF ¶ 141.)

232. Yahoo! has also entered into deals with major corporate sponsors like Pepsi and Saturn to present branded portions of the Yahoo! music section. (SF ¶ 142.) Nissan Live Sets offers

exclusive, original performances from such artists as Christina Aguilera, Beck, and Tony Bennett, interspersed with Nissan logos and banner and streaming advertisements. (*Id.*)

233. In addition to its advertising-supported features, Yahoo! also sells subscriptions to three music services: LAUNCHcast Plus, Musicmatch and Yahoo! Music Unlimited. (SF ¶ 143.) The LAUNCHcast Plus service costs $3.99 a month, or $35.88 a year, and gives subscribers access to 70 commercial-free radio stations, the ability to skip songs within a pre-programmed playlist an unlimited number of times, and CD-quality sound. (SF ¶ 138.) Musicmatch subscribers can, for a monthly fee, stream audio on demand, stream audio webcasts of music channels, and conditionally download tracks from a large catalog of songs. (SF ¶ 144.) Yahoo! acquired Musicmatch in October 2004 for $158 million. (*Id.*)

234. Yahoo! more recently launched its Yahoo! Music Unlimited subscription service, which is powered by MusicNet. (SF ¶ 145.) For $8.99 a month (or $5.99 a month for a one-year subscription), subscribers have access to some 2,000,000 tracks and can stream full-length songs on demand, make conditional downloads, build personalized music libraries, transfer tracks to portable devices, purchase digital songs and albums, access all the commercial-free Internet radio stations available to LAUNCHcast Plus subscribers, develop personalized music recommendations based on ratings and musical tastes, and share and discover music with friends through Yahoo! Messenger. (*Id.*)

235. Portions of Yahoo! Music Unlimited's music streaming service are made available by MusicNet, a business-to-business provider of music content which is responsible for clearing all rights and making all necessary licensing payments associated with its affiliates' performance of such content. (SF ¶ 148.) Yahoo! does not seek a license from ASCAP for those music

performances that are or have been powered by MusicNet during their respective open periods. (*Id.*)

236. MusicNet supplies the LAUNCHcast Plus "custom" channel that is accessible only to Yahoo! Music Unlimited subscribers, but not the 70 preprogrammed channels that are likewise accessible to Yahoo! Music Unlimited subscribers. Yahoo! Music supplies these pre-programmed channels (Tr. 1241:1-18 (Roback)), which do not fall under the ASCAP-MusicNet license and thus are subject to the ASCAP-Yahoo! license.

### (ii)  Webcasting throughout the Yahoo! Portal

237. Yahoo! makes the LAUNCHcast webcasting service available to users from a number of locations within Yahoo!, not just Yahoo! Music. Users can launch streaming LAUNCHcast music channels directly from the Yahoo! homepage. (Tr. 1023:2-1024:7, 1150:17-20 (Rogers); Tr. 1868:4-10 (Candell).) Users who set up a customized My Yahoo! webpage can play streaming LAUNCHcast music channels directly from that page, (Tr. 211:2-9 (DeFilippis); Tr. 1071:22-25 (Rogers); Halley Dep. Tr. 101:21-102:3), as well as music videos, albums, songs, and music stations (Tr. 211:16-22 (DeFilippis)). Users can also access streaming LAUNCHcast music channels from within Yahoo! Games. (AsX. 118A, at Yahoo! ch. 6, 01:20-02:15.) As discussed below, users can also launch the LAUNCHcast service from Yahoo! Messenger and the Yahoo! Toolbar. Yahoo! also makes its streaming music features accessible through links on different pages of the Yahoo! portal. (AsX. 118A.)

### (iii)  Yahoo! on AT&T and Verizon

238. Yahoo! also makes its streaming LAUNCHcast music channels available to subscribers

64

of AT&T and Verizon high-speed Internet connection services. Through AT&T's arrangement with Yahoo!, AT&T high-speed Internet subscribers receive a bundle of Yahoo! features, including LAUNCHcast Plus, virus protection, privacy filters, and e-mail (Tr. 1168:24-1169:10 (Rogers); Tr. 1217:16-1218:4 (Roback)), as well as a version of the Yahoo! homepage that is tailored to those subscribers. (Tr. 1073:2-7 (Rogers).) Yahoo! transmits a substantial number of music streams to AT&T and Verizon subscribers—more than ████████ streams in 2005. (Tr. 1243:17-1244:12 (Roback); JX 33.)

### (iv)  Yahoo! homepage

239. Yahoo! performs music on its homepage—sometimes referred to as the Yahoo! "front door"—which is an access point to the rest of the information and content offerings on the Yahoo! portal.

240. The Yahoo! homepage is heavily trafficked. At the end of 2006, the Yahoo! front door was the most visited homepage on the Internet. (AsX. 170, at 34.) Users of the Yahoo! Music homepage frequently start at and arrive from the Yahoo! portal homepage. About 65% of visitors to the Yahoo! Music homepage come through the Yahoo! portal homepage. (Tr. 1041:8-18 (Rogers).)

241. On the Yahoo! homepage, users can launch and play LAUNCHcast audio music channels. (Tr. 1024:2-7, 1150:17-20 (Rogers); Tr. 1868:4-10 (Candell).) When users click on the LAUNCHcast "Listen" link on the homepage, the music player launches and then automatically minimizes, leaving the homepage in the foreground. (Tr. 1868:4-10 (Candell); Halley Dep. Tr. 131:10-132:14.)

242. On the Yahoo! homepage, users can also launch and play videos in which music is performed, including music videos and movie trailers in a player that is embedded in the homepage. (Tr. 1021:23-1022:3, 1150:21-1151:6 (Rogers); Tr. 1867:20-25 (Candell).)  For example, at trial ASCAP demonstrated how Yahoo! has streamed, on the portal homepage, a video of the Blue Angels aerial demonstration team, a video that was scored to music.  (Tr. 712:3-7 (Guerin-Calvert).) Yahoo!'s streaming video feature on the homepage has been available since the middle of 2007.  (Tr. 1022:3-5 (Rogers).)

### (v)      Yahoo! Movies

243. Yahoo! Movies provides audiovisual clips and trailers from hundreds of movies.  (Tr. 1886:20-25 (Candell).)   These movie clips and trailers frequently contain music.   ASCAP demonstrated at trial streams of movie clips and trailers from the films "Ray" (Tr. 1888:3-8 (Candell)), "Bobby" (AsX. 118A, at Yahoo! ch. 10, 07:05-07:37), and "Walk the Line" (*Id.* at 08:30-09:06)—which contained feature and theme performances of music.

244. Yahoo! Movies is a popular area on the Internet.  According to comScore, Yahoo! Movies was the third-most visited movie site on the Internet at the end of 2006 (AsX. 170, at 42), and averaged 13.0 million unique visitors per month that year.  (AsX. 306.)  An average of 7.6% of the total Internet audience (not just Yahoo!'s audience, but all Internet users) visited the Yahoo! Movies site in 2006.  (AsX. 306.)

### (vi)      Yahoo! Video

245. Yahoo! Video allows users to upload to Yahoo! videos that incorporate music.  (SF ¶¶

140, 146.) Yahoo! Video streams a variety of user-uploaded content, including videos about animals and pets, autos, entertainment, family and children, movies, music, news, sports, and travel (SF ¶ 146; Tr. 1268:22-24 (Roback)), as well as television clips and karaoke videos. (Tr. 1074:17-1075:15 (Rogers); AsX. 118A, at Yahoo! ch. 10, 01:20-01:55; Halley Dep. Tr. 160:10-161:18.)

246. Yahoo! Video is not limited to user-generated programming. Users also upload music videos and clips from television programs that the user separately recorded or acquired. For example, Yahoo! Video offers and streams a music video of a concert performance of Bruce Springsteen's "Born to Run" (Tr. 1911:14-23 (Candell)) and a video scored to a Louis Armstrong performance (AsX. 118A, at Yahoo! ch. 1, 03:49-04:30), both of which users uploaded. Yahoo! Video also offers streams of television programming, like the Fox show "Cops." (Tr. 1074:20-1075:2 (Rogers).)

### (vii)   **Bix**

247. Yahoo! operates a part of its site called Bix, which is a contest site in which contestants upload videos of themselves in various types of performances including comedy routines, singing karaoke or lipsynching to popular songs. (Tr. 1879:21-1880:1 (Candell).) Thus, a predominant feature of Bix is the performance of music. At trial, ASCAP demonstrated that a Bix user can visit a karaoke contest and click a link that will start a stream of a karaoke performance, uploaded by a user. (Tr. 1880:2-8 (Candell).)

### (viii)   **Yahoo! Kids**

248. Yahoo! Kids is a part of the Yahoo! portal that features a variety of children's

programming that contains music.  (AsX. 118A, at Yahoo! ch. 8; Tr. 1892:7-17 (Candell).)  For example, Yahoo! Kids streams videos that are scored to music.  (Tr. 1892:18-1893:4, 1895:13-1896:1 (Candell); AsX. 118A, at Yahoo! ch. 8, 01:36-2:10 (video of "Pieces of Me," produced by Kidz Bop LLC).)

249. Yahoo! Kids also streams movie clips and trailers that contain music.  (Tr. 1899:1-12 (Candell); AsX. 118A, at Yahoo! ch. 8, 00:45-01:22 (trailer of movie "The Astronaut Farmer").)  Yahoo! Kids offers dozens, if not hundreds, of such movie trailers and clips.  (Tr. 1900:25-1901:3 (Candell).)

250. Moreover, Yahoo! Kids offers other categories of videos, such as "Holiday Gifts 2007," "TV," "Sports," and "Specials," which contain dozens of audiovisual programs.  (Tr. 1901:4-15 (Candell).)

### (ix)  Audiovisual Programming Containing Music Across The Yahoo! Network

251. Yahoo! Movies, Yahoo! Video, Bix, and Yahoo! Kids are just some of the areas of the Yahoo! portal where users can access and stream audiovisual content that contains music.  Performances of videos that contain feature, theme, and background music are available throughout the Yahoo! portal, including on Yahoo! TV, Yahoo! Games, Yahoo! Tech, Yahoo! Autos, Yahoo! Finance, and Yahoo! Food.

252. Yahoo! TV features streams of video clips from television shows that contain music.  (Tr. 1260:20-1261:12 (Roback).)  Yahoo! TV is a heavily trafficked part of the Yahoo! Portal, averaging ▮▮▮▮▮▮▮ monthly unique visitors in 2006.  (AsX. 306.)  An average of ▮▮% of the total Internet (not just Yahoo!) audience visited the Yahoo! TV site in 2006.  (AsX. 306.)

253. Audiovisual programming containing music is also available on the Yahoo! Games part of Yahoo!. For example, Yahoo! offers a video player that is located on the Yahoo! Games homepage that streams audiovisual programming containing music. (Tr. 1882:4-10 (Candell); AsX. 118A, at Yahoo! ch. 6, 00:17-00:47.) On this video player, users can stream video clips that demonstrate and promote current video games like "Guitar Hero." These clips contain music. (Tr. 1882:11-15 (Candell).) Users can also watch music video-like clips on the player, for example "Lily Allen sings Smile in Simlish." (AsX. 118A, at Yahoo! ch. 6, 00:17-00:47.)

254. Yahoo! Tech offers streams of audiovisual programs such as "Tech Shows" that contain performances of music. (Tr. 1259:20-1260:15 (Roback).)

255. Yahoo! Autos provides audiovisual programs about cars, such as "Auto Shows." These programs also contain music performances. (Tr. 1885:16-24 (Candell).)

256. Music performances also occur on Yahoo! Finance, for example as background music in "Fox Business Now" news segments. (AsX. 118A, at Yahoo! ch. 1, 01:08-0:1:31, 02:06-02:36.)

257. Another example of music contained in audiovisual performances is on the Broadway on Yahoo! part of the Yahoo! site. Here, users can access and stream video clips from a number of Broadway musicals. (AsX. 118A, at Yahoo! ch. 10, 02:38-03:30.)

258. Yahoo! Food also offers a variety of audiovisual programming that contains music. (AsX. 118A, at Yahoo! ch. 10, 05:42-06:08.)

259. While Applicants do not track the number or duration of music performances contained in audiovisual programming, Applicants do track the performances of the audiovisual programming itself. (SF ¶¶ 86, 167; AsX. 207 (AOL video stream data).) Yahoo!, however, has not produced any such data to ASCAP in this proceeding, so it is impossible for ASCAP, the Court, or the Applicants

to estimate the total number of audiovisual programs streamed by Yahoo!.

### (x)    Yahoo! Search

260. Music performances are accessible at Yahoo! Search through enhanced search features that allow users to stream videos and song clips directly from Yahoo!'s search results pages.  (Tr. 1168:11-20 (Rogers).)  These enhanced search features have been available since the middle of 2007.  (Tr. 1012:18-21 (Rogers).)

261. For example, when a user searches for an artist such as "Bruce Springsteen," Yahoo! will return results that include sponsored links on the right and top of the page; a module that allows a user to stream Bruce Springsteen music videos and several 30-second clips of Bruce Springsteen songs, and to access Yahoo! Music; and below that, links to Internet sites that are relevant to the search term.  (Tr. 209:23-210:23 (DeFilippis); Tr. 1009:22-1010:12, 1010:21-1011:7 (Rogers).)

262. Clicking on one of the music video links in the module causes a music video to stream in a player located at the center of the search results page.  (Tr. 210:19-23 (DeFilippis); Tr. 756:21-757:3 (Guerin-Calvert); Tr. 1014:4-8 (Rogers).)  At trial, ASCAP demonstrated that a user can stream a full-length video of "Dancing in the Dark" and a 30-second song clip directly on the search results page.  (Tr. 1870:16-1871:5, Tr. 1872:7-24 (Candell).)  While the video plays, the sponsored links remain visible, shaded and in the background.  Clicking anywhere outside of the video box makes the video player disappear and returns the user to the search results page.  (Tr. 758:5-759:1 (Guerin-Calvert); Tr. 1153:10-1154:1 (Rogers).)  Users are also invited to "share" videos that play in the search results page, by sending a link to the video via Yahoo!'s e-mail and instant messaging features.  (Tr. 210:23-211:1 (DeFilippis).)

263. Yahoo! Search also streams user-generated videos containing music. (Tr. 1154:25-1155:24 (Rogers).) For example, ASCAP demonstrated at trial that Yahoo! streams the popular user-generated video "Ready Set Bumbo"—which is scored entirely to music—directly on the search results page. (Tr. 1154:25-1155:20 (Rogers).) Such user-generated videos stream from Yahoo! Video, not Yahoo! Music. (Tr. 1155:25-1156:4 (Rogers).)

264. Users can also link to Yahoo! movie trailers from Yahoo! search results pages. (Tr. 1159:13-25 (Rogers).) For example, if a user searches for the film "Bee Movie," a module appears in the search results page that gives the user an opportunity to stream a theatrical trailer of the movie. (Tr. 1874:16-19 (Candell).)

265. Yahoo! introduced these enhanced search features to make search easier for users, to keep users happy with Yahoo!, and to improve Yahoo! search. (Tr. 1161:15-1162:1 (Rogers).) According to Yahoo!, Yahoo! Search offers this "integration of audio, video and photos directly into the search results to help make Web search effortless for consumers. The new Yahoo! Search was designed to better understand user intent and get consumers to the results that they are looking for in one search." (AsX 389.) Yahoo! Search "introduced multimedia integration including video, audio and photos . . . directly into the search results, allowing consumers to get their answer—whether it's a Web link, photo, video or music clip—without leaving the page." (*Id.*)

266. Yahoo! also uses these enhanced search features to distinguish its search service from that of its competitor, Google. Yahoo! has the second largest market share for search on the Internet. (Tr. 1007:20 (Rogers).) Google is Yahoo!'s number one competitor for search. (Tr. 760:3-5 (Guerin-Calvert); Tr. 1007:19-22 (Rogers).) Yahoo! Search is competing with Google to be the number one search engine on the Internet, and in order to do that, Yahoo! needs to give the most

relevant search results to users. (Tr. 1009:1-5, Tr. 1017:24-1018:5 (Rogers).) Yahoo!'s goal is to make its search results more relevant to users, so that Yahoo! can generate more revenue. (Tr. 1017:24-1019:4 (Rogers).)

### (b)    Yahoo! Toolbar

267. The Yahoo! Toolbar is software users download to their computers and install on their web browsers that allows users, among other things, to launch streaming music performances. The Yahoo! Toolbar appears as a bar that is between the top of the browser and the Webpage. (Tr. 1027:2-4 (Rogers).) The Yahoo! Toolbar contains links to Yahoo! Music and music stations (Tr. 1164:14-1165:6 (Rogers)), and users can launch music streams from the Yahoo! Toolbar. (Tr. 1168:11-20 (Rogers); AsX. 118A, at Yahoo! ch. 7, 00:05-01:20.)

### (c)    Yahoo! Messenger

268. Yahoo! Messenger is an instant messaging program that allows users in the Yahoo! network to communicate in realtime with each other. (Tr. 1027:20-1028:5 (Rogers).) Yahoo! Messenger is extremely popular, with about 27 million users. (Tr. 1165:10-14 (Rogers).)

269. The Yahoo! Messenger program contains plug-ins, which provide access to various features. (Tr. 1030:8-10 (Rogers).) LAUNCHcast is one of the default plug-ins on the Yahoo! Messenger, meaning that the option to launch a LAUNCHcast player will automatically appear for every user that installs Yahoo! Messenger. (Tr. 1029:3-4, Tr. 1166:4-11 (Rogers).) Using this feature, a user can click on a LAUNCHcast station, causing Yahoo! to stream music through the Yahoo! Messenger window. (Tr. 1878:5-6,18-23 (Candell).) LAUNCHcast is a popular feature of

Yahoo! Messenger.  (Tr. 1166:15-21 (Rogers).)

270. Both the Yahoo! Toolbar and Yahoo! Messenger are ways for Yahoo! to be "persistently involved in your online life."  (Tr. 1029:1-2 (Rogers).)

### (d)  Yahoo! Widget

271. Like AOL, Yahoo! offers a music widget.  (Tr. 212:7-12 (DeFilippis).)  The Yahoo! music widget resides on a computer user's desktop—not on the Yahoo! website—and is sponsored by Honda.  (*Id.*)

### 3.  Yahoo!'s Music Streaming

272. Yahoo! generally tracks the number and duration of audio-only on-demand streams, audio-only webcast streams, and music video streams on its sites and services.  (SF ¶ 166.) However, Yahoo! generally does not track the number or duration of feature, theme, and background music performances contained in audiovisual programming such as television programs and movies, or the number or duration of music performances contained in promotional advertisements or streaming advertisements, on its sites and services.  (SF ¶ 167.)

### (a)  Number of Song Titles

273. During the open period, Yahoo! has dramatically increased the repertory of songs that it streams.  In July 2002, Yahoo! offered more than 203,000 song titles on its site for streaming.  By 2006, that number increased to more than two million.  (SF ¶ 168.)

## (b)    Hours of Streaming Music

274. During the open period, Yahoo! streamed music for the hours specified below, which do not include any hours of feature, theme, background, and jingle music that Yahoo! transmitted in its streams of audiovisual programming (other than music videos) and commercials, as Yahoo! generally does not track such information.  (SF ¶ 167.)

275. Between July 1, 2002 and December 31, 2002, Yahoo! streamed ███████ hours of audio-only music, and did not track the duration of music video streams.  (AsX. 349.)

276. In 2003, Yahoo! streamed ███████ hours of audio-only music webcasts, and ███████ hours of music videos, for a total of ███████ streaming hours. (SF ¶ 169; AsX. 349.)

277. In 2004, Yahoo! streamed ███████ hours of audio-only music webcasts, and ███████ hours of music videos, for a total of ███████ streaming hours.  (SF ¶ 170; AsX. 349.)

278. In 2005, Yahoo! streamed ███████ hours of audio-only music webcasts, ███████ hours of music videos, and ███████ hours of Musicmatch audio-only music webcasts and on-demand streams, for a total of ███████ streaming hours. (SF ¶ 171; AsX. 349.)

279. In 2006, Yahoo! streamed ███████ hours of audio-only music webcasts, ███████ hours of music video streams, and ███████ hours of Musicmatch streams, for a total of ███████ streaming hours.  (SF ¶ 172; AsX. 349.)

## (c)    Number of Music Video and Audio Streams

280. The number of music and music video streams transmitted by Yahoo! during the open period, as given below, do not include any music contained in audiovisual programming (other than

music videos) and commercials, as Yahoo! generally does not track such information.  (SF ¶ 167.)

281. In 2002, Yahoo! transmitted ████████ streams of music videos and audio-only music.  (AsX. 348.)

282. In 2003, Yahoo! transmitted ████████ streams of music videos and audio-only music.  (AsX. 348; JXs 33-34.)

283. In 2004, Yahoo! transmitted ████████ streams of music videos and audio-only music.  (AsX. 348; JXs 33-34.)

284. In 2005, Yahoo! transmitted ████████ streams of music videos and audio-only music.  (AsX. 348; JXs 33-34.)  This figure excludes Musicmatch streams, for which Yahoo! did not provide data for 2005.

285. In 2006, Yahoo! transmitted ████████ streams of music videos and audio-only music.  (AsX. 348; JX 44.)  This figure excludes Musicmatch streams, for which Yahoo! did not provide data for 2006.

286. Music video streams make up a significant proportion of Yahoo!'s music streams.  In seven months in 2003, Yahoo! transmitted approximately ████████ music video streams.  In 2004, Yahoo! transmitted approximately ████████ music video streams.  In 2005, Yahoo! transmitted approximately ████████ music video streams.  In 2006, Yahoo! transmitted approximately ████████ music video streams.  (AsX. 348.)

### 4.    Yahoo!'s Site Traffic

287. According to Nielsen, the total time users spent on all Yahoo! sites and services was ████████ hours from July 1, 2002 (the start of Yahoo!'s open period) to December 31, 2002;

█████████ hours in 2003; █████████ hours in 2004; █████████ hours in 2005; and █████████ hours in 2006.  (AsX. 65.)

288. According to comScore, the total time users spent on all Yahoo! sites and services was █████████ hours in 2003; █████████ hours in 2004; █████████ hours in 2005; and █████████ hours in 2006.  (SF ¶¶ 158-161.)

289. A significant share of all unique visitors to the Yahoo! portal visit Yahoo! Music webpages, as specified below.

290. According to comScore, in 2003, the average number of monthly unique visitors to Yahoo! Music was █████████, and the average number of monthly unique visitors to all Yahoo! Sites was █████████.  Thus, in 2003 approximately ████% of all unique visitors to Yahoo! visited the Yahoo! Music section.  (AsX. 306, 351.)

291. The percentage of Yahoo! unique visitors who were attracted to the Yahoo! Music section continued to grow, demonstrating a rise in popularity of the Yahoo! Music section. According to comScore, in 2004, the average number of monthly unique visitors to Yahoo! Music was █████████, and the average number of monthly unique visitors to all Yahoo! Sites was █████████.  (SF ¶ 163; AsX. 306, 351.)  Accordingly, in 2004 approximately ████% of all unique visitors to Yahoo! visited the Yahoo! Music section.  (AsX. 306, 351.)

292. In 2005, the average number of monthly unique visitors to Yahoo! Music was █████████, and the average number of monthly unique visitors to all Yahoo! Sites was █████████. (SF ¶ 164; AsX. 306, 351.)  Accordingly, in 2005 approximately ████% of all unique visitors to Yahoo! visited the Yahoo! Music section.  (AsX. 306, 351.)

293. In 2006, the average number of monthly unique visitors to Yahoo! Music was

████████, and the average number of monthly unique visitors to all Yahoo! Sites was ████████. (SF ¶ 165.) Accordingly, in 2006 approximately ███% of all unique visitors to Yahoo! visited the Yahoo! Music section. (AsX. 306, 351, 393; Tr. 1150:11-15 (Rogers).)

294. Yahoo! Music is one of the most heavily visited areas of the Yahoo! portal. (*See* AsX. 306, 352.)

### 5.    Yahoo!'s Revenues

295. Yahoo!'s domestic United States revenue, less traffic acquisition costs, was $████████ for the period July 1, 2002 (the start of Yahoo!'s open period) to December 31, 2002; $████████ in 2003; $████████ in 2004; $████████ in 2005; and $████████ in 2006. (SF ¶¶ 149-153.)

296. In the ordinary course of its business, Yahoo! allocates, or "books," its revenues to various business units and sub-units. (AsX. 314.) Yahoo! books revenues from the Yahoo! homepage and My Yahoo! to the Front Doors business unit. (Tr. 1021:19-20, 1071:20-21 (Rogers); AsX. 314.) Yahoo! books revenues from Yahoo! Search to the Search business unit. (AsX. 314.) Yahoo! books to its Connected Life business unit the revenues from its provision of bundled offerings to AT&T and Verizon. (Tr. 1072:12-1073:1 (Rogers).) In 2006, Yahoo! booked revenues from Yahoo! Video to the Entertainment business unit. (Tr. 1069:18-23 (Rogers); AsX. 314.)

297. Yahoo! books certain advertising, sponsorship, and subscription revenues to the Music business unit. (Tr. 1068:6-1069:4 (Rogers).) However, not all revenues associated with music performances are allocated to the Music business unit. For example, none of the revenue generated by homepage banner ads or listings that appear when users stream LAUNCHcast or audiovisual

programming on the homepage is allocated to the Music business unit. (Tr. 1150:17-1152:4 (Rogers).) None of the revenue generated by sponsored search results that are visible when users stream, on a search results page, music videos or other audiovisual content containing music is booked to the Music business unit. (Tr. 1152:13-1153:4, 1158:1-5 (Rogers).) None of the revenue generated from Yahoo!'s arrangements with AT&T and Verizon—which includes access to streaming LAUNCHcast Plus music channels—is allocated to the Music business unit. (Tr. 1169:21-1170:3 (Rogers); Mickeal Dep. Tr. 29:15-31:16 (Dec. 6, 2006).) None of the revenue generated by banner ads appearing on Yahoo! Messenger outside of the LAUNCHcast plug-in is allocated to the Music business unit. (Tr. 1167:4-20 (Rogers).) House ads that run in Yahoo! Music pages and players—and that have value to the company because they direct users elsewhere in Yahoo! where they are exposed to paid ads (Tr. 450:25- 451:3 (Greene))—do not generate revenue booked to the Music business unit. Banner ads that run on non-Yahoo! Music pages are treated as separate ad buys and booked to different business units. (Tr. 1113:12-1114:4 (Rogers).)

298. Indeed, there is no revenue from any other business unit, which is allocated back to Yahoo! Music (Mickeal Dep. Tr. 36:22-37:3 (Dec. 6, 2006)), despite the music performances that occur across the Yahoo! site and services.

IV. **ASCAP'S Fee Proposal**

299. Applicants have applied to ASCAP under AFJ2 for blanket licenses to the ASCAP repertory. (SF ¶ 173.) These proceedings under Section IX of AFJ2 are to determine the reasonable blanket license fees that each of AOL, RealNetworks, and Yahoo! are to pay ASCAP for the open periods of each Applicant for which final license fees were not previously agreed upon. (SF ¶ 174.)

300. AOL's open period began January 1, 2005; RealNetworks's open period began January 1, 2004; Yahoo!'s open period began July 1, 2002.  (*Id.*)  Accordingly, ASCAP has proposed fees to each AOL, RealNetworks, and Yahoo! for blanket licenses to cover all of their performances of ASCAP music on the Internet.  (Tr. 244:22-245:2 (Boyle).)

301. ASCAP proposes that the Court determine reasonable fees for the Applicants' respective open periods through December 31, 2009.

## A.     The Structure of ASCAP's Fee Proposals to Applicants

302. In developing its fee proposals, ASCAP considered the Applicants' desire for blanket licenses, revenue-related formulas, and fees that take into account all of Applicants' services.  (Tr. 248:17-25 (Boyle).)  ASCAP also considered the Applicants' revenues and music uses, ASCAP's existing Internet license agreements, and ASCAP's agreements with licensees in other industries. (Tr. 248:25-249:6 (Boyle).)  ASCAP also considered that the presence of music performances on AOL and Yahoo! contributes significantly to these companies' abilities to attract users, and, in turn, advertisers and advertising revenue.  (Tr. 123:17-124:2 (Amenita).)

303. For AOL and Yahoo!, which integrate a range of music and non-music offerings across their sites, ASCAP's proposal calculates the Applicants' license fees in three steps.  (Tr. 245: 11-17 (Boyle).)  ASCAP first determines each Applicant's total domestic revenue derived from the licensed services, less deductions ASCAP typically allows such as advertising sales commissions and traffic acquisition costs.  (*Id.*)

304. Second, ASCAP adjusts the total domestic revenues to reflect the amount of music use on their respective sites.  ASCAP multiplies total domestic revenue of the licensed services by a

music use adjustment factor that is a ratio of total music hours to total site hours. (Tr. 245:11-17 (Boyle).) For purposes of these proceedings, ASCAP has defined "total music hours" to mean the total amount of time users of AOL and Yahoo!, respectively, spent streaming music audio webcasting, on-demand audio streaming, and streams of music videos, as tracked internally by the companies. (Tr. 251:11-252:10 (Boyle).) Total music hours does not include performances of feature, theme or background music in audiovisual programming such as full-length television programs, movie trailers, and user-generated videos, or commercials. (Tr. 251:25-252:10, 314:20-315:17 (Boyle).) Likewise, the number of "music hours" does not include performances of music videos that users upload on to the AOL or Yahoo! sites. (Tr. 2014:12-24 (Boyle).) The "music hours" measure also does not include the hours of music streamed by AOL Music Now, a music subscription service. (Tr. 253:11-13 (Boyle).) Nor does it include hours of music streamed by SHOUTcast, an AOL property for which ASCAP requested, but did not receive, music hours data. (Tr. 122:6-9 (Amenita); AsX. 355.) For purposes of these proceedings, "total site hours" is the total amount of time users of AOL and Yahoo!, respectively, spent on the company's websites, as measured by comScore and Nielsen.

305. Third, ASCAP applies a rate of 3.0% to the music-adjusted revenues of each of AOL and Yahoo!. (Tr. 245:13-17 (Boyle); AsX. 355, 356.) With regard to RealNetworks and AOL Music Now—which are predominately subscription music services—ASCAP applies the 3.0% rate to all domestic revenue with no music use adjustment factor. (Tr. 245:18-248:16; 252:20-253:24 (Boyle); AsX. 354, 355.)

**B.    ASCAP's Asserted Basis for the 3.0% Rate**

306. ASCAP proposed a 3.0% rate in claimed reliance on the existing ASCAP form Internet license agreements, as well as other industry agreements.  (Tr. 255:7-256:25 (Boyle).)  ASCAP offers online music users a number of "experimental" form license agreements, including ASCAP's Experimental License Agreement for Internet Sites and Services (Release 5.0) ("Non-Interactive License") and ASCAP's Experimental License Agreement for Interactive Sites and Services (Release 2.0) ("Interactive License").  (JX 4, 6; Tr. 172:21-173:3, 175:20-176:13 (DeFilippis); AsX. 353 (Summary of ASCAP Form Internet Agreements).)  A number of Internet sites are currently licensed under freely-entered ASCAP form Internet licenses.  (Tr. 177:3-7 (DeFilippis).)

307. The Non-Interactive License is for online service providers that offer only pre-programmed music performances (i.e., webcasting) over which the listener has no control.  (Tr. 174:8-10 (DeFilippis); JX 4.)  The Interactive License is for online service providers that allow their customers to select the music they hear, and include "on-demand" audio and music videos, and customizable playlists.  (Tr. 174:8-16 (DeFilippis); JX 6.)  Licensees eligible for an ASCAP Interactive License may also offer pre-programmed music performances.

308. Each of these Internet licenses is, and has historically been expressly denominated as, "experimental."  ASCAP has offered its Internet licenses on an "experimental" basis because the online music industry is relatively immature and is still rapidly changing.  (JX 4, 6; Tr. 175:22-176:3 (DeFilippis).)

309. Each of these Internet licenses offers the licensee a choice among three alternative Rate Schedules to compute the license fee, Rate Schedules A, B and C.  Each of these Rate Schedules, in turn, includes a revenue-based license fee calculation and a "session-based" license fee

calculation, with the licensee paying the greater of the two, or the minimum fee. (*See* AsX. 353; Tr. 178:6-179:13, 180:10-19 (DeFilippis).)

310. The revenue-based rate under Rate Schedule A of ASCAP's Interactive License is 3.0% of the licensee's total domestic gross revenue derived from the license service (less agency commissions up to 15%). The revenue-based rate under Rate Schedule A of ASCAP's Non-Interactive License is 1.85%. (JX 4, 6; AsX. 353; 178:6-18 (DeFilippis).)

311. In its Schedule B rate schedules, ASCAP adjusts the revenue base by applying the ratio of Music Sessions to overall Site/Service Sessions. A "Site/Service Session" is an individual visitor access to the site or service by a user of up to one hour in duration, and a "Music Session" is a Site/Service Session in which the user receives any music performance. (JX 4, 6; Tr. 180:10-15 (DeFilippis).) The adjustment ratio is similar to the ratio in ASCAP's proposals to Yahoo! and AOL of music hours to site hours. (Tr. 255:20-257:17 (Boyle).)

312. The revenue-based rate under Rate Schedule B of ASCAP's Interactive License is 4.95%, multiplied by the ratio of music sessions to total site sessions, then multiplied by the licensee's total revenue derived from the licensed service. The revenue-based rate under Rate Schedule B of ASCAP's Non-Interactive License is 2.76%, multiplied by the ratio of music sessions to total site sessions, then multiplied by the licensee's total revenue derived from the licensed service. (AsX. 353; JX 4, 6; Tr. 179:1-5, Tr. 184:11-16 (DeFilippis); Tr. 257:4-17 (Boyle).)

313. The purpose of ASCAP's Schedule B rates is to allow licensees who do more than perform music to employ a different revenue base in calculating their license fees, in proportion to their music use. (Tr. 255:20-256:14 (Boyle).)

314. ASCAP requested, but did not receive, data on Applicants' sessions. (Tr. 182:12-16

(DeFilippis); 336:15-20 (Boyle).)  Because Applicants did not produce session data, ASCAP formulated its proposals based on the ratio of music hours, which Applicants track, to total hours spent on the sites and services.  This reduces the revenue base on which ASCAP proposes that AOL and Yahoo! pay license fees, in proportion to their music use.  (Tr. 255:20-256:9 (Boyle).)

315. ASCAP's proposed 3.0% rate, as applied to RealNetworks's revenue and AOL's and Yahoo!'s revenue adjusted for music usage, falls between the 2.76% and 4.95% rates that are contained in Rate Schedule B of the ASCAP form Non-Interactive and Interactive Internet license agreements, respectively.  (AsX. 353; JX 4 at ASCAP000255; JX 6 at ASCAP000270; Tr. 256:21-257:17 (Boyle).)  It is closer to the lower, Non-Interactive Rate Schedule B rate, 2.76%, notwithstanding the volume of interactive music plays on AOL's and Yahoo!'s respective services. (AsX. 353; JX 4; Tr. 184:11-24 (DeFilippis).)

316. Applicants would not qualify for the Non-Interactive License at all, because their services combine interactive and non-interactive offerings.  (Tr. 174:8-16, 176:4-13 (DeFilippis); JX 4.)  Applicants would not qualify for Rate Schedule B of the Interactive License because they do not keep track of music sessions.  (Tr. 256:15-18 (Boyle); JX 6.)  Applicants would qualify only for Rate Schedule A of the form Interactive License, which is 3.0% of Applicants' total revenue derived from the licensed service.  (Tr. 176:4-13 (DeFilippis); JX 6.)

317. Applicants assert that they do not keep track of music use in a manner that would make them eligible for the revenue-base-reduction mechanisms of Rate Schedule B or C.  ASCAP acknowledges, however, that AOL's and Yahoo!'s fees should reflect the relative intensity of music use by each of those sites.

318. Accordingly, for AOL and Yahoo!, ASCAP has proposed an alternative method for

adjusting the rate base — multiplying total revenue by the ratio of music hours to total site hours. (Tr. 184:11-185:6 (DeFilippis).) This method is similar to the method used to calculate royalties under Rate Schedule B of the ASCAP form licenses. (Tr. 255:20-257:17 (Boyle).) ASCAP also recognizes that certain RealNetworks revenue may properly be excludable, because it is not derived from the licensed services, but RealNetworks did not produce accounting data sufficient for ASCAP to make that determination. (Tr. 233:7-234:2 (DeFilippis).)

319. The prior terrestrial radio rate of 1.615% of station revenue also was a basis for the proposed 3.0% rate to Applicants, as Applicants webcast about twice the music per hour compared to a typical terrestrial radio broadcaster. (Tr. 258:18-259:13 (Boyle).) Terrestrial radio stations typically perform eleven or twelve songs per hour, compared to about twenty songs performed per hour by webcasters like AOL and Yahoo!. (Tr. 259:4-10 (Boyle).)

### C. The Calculation of Fees Payable to ASCAP

#### 1. ASCAP's Fee Proposal for AOL

320. ASCAP initially proposed a range of AOL fees for the years 2005 and 2006. (AsX. 355 (Summary of ASCAP's Proposed AOL License Fees).) For AOL's diverse sites and services that incorporate music, ASCAP first determined AOL's domestic United States revenue, and then calculated a share of that revenue that reflects the relative music use on AOL's sites. (AsX. 355; Tr. 250:23-255:6 (Boyle).) ASCAP made this revenue allocation by determining the share of music use on AOL to all uses on AOL. Specifically, this calculation is the ratio of total music hours to total site hours. (Tr. 250:23-251:17, 252:11-255:6 (Boyle).)

321. Total site hours is the total amount of time users spent on all of AOL's sites and

services, as tracked by Nielsen and comScore, respectively. (Tr. 250:23-251:17, 253:25-255:6 (Boyle).) Because Nielsen and comScore use different methodologies, they reach different conclusions regarding total AOL site hours. (*See, e.g.*, Tr. 215:4-7 (DeFilippis).) AOL, in particular, relies primarily upon comScore data, and Internet companies and advertisers rely on both Nielsen and comScore data in the marketplace. (SF ¶ 83; Tr. 1425:2-12, 21-25 (Conroy); Tr. 1469:5-17 (Winston).) Accordingly, ASCAP calculated total hours using both commercial monitoring services, and proposes a license fee range based on those results. (Tr. 254:19-255:6 (Boyle).)

322. ASCAP then applied the 3.0% rate to the ratio of total music hours to total site hours, multiplied by AOL's total domestic revenue. (Tr. 252:11-254:18 (Boyle).) ASCAP separately applied the 3.0% rate to AOL's reported revenue from its music subscription service, AOL Music Now, since the date of its acquisition by AOL in November 2005. (Tr. 252:20-253:24 (Boyle).)

323. Using Nielsen total site hours, ASCAP calculated total AOL fees of $6,863,859 for 2005 and $9,771,156 for 2006. (AsX. 355; Tr. 253:25-254:18 (Boyle).) Using comScore total site hours, ASCAP calculated total AOL fees of $5,297,025 for 2005 and $7,831,188 for 2006. (AsX. 355; Tr. 253:25-254:18 (Boyle).) ASCAP submits that these fees—based on both Nielsen and comScore data—are reasonable. (Tr. 253:25-254:18 (Boyle).)

324. ASCAP contends that these fees are conservative measures of the value of music on AOL's sites and services, for three reasons.

325. First, AOL did not report, and therefore ASCAP could not count, hours of music performed in other parts of its services, such as feature, theme, background, underscore, or jingle uses contained in film and movies, television, news, sports, user-generated content, children's programming, autos, research and learn, health and weather video content, and advertisements with

music.  (Tr. 251:18-252:10 (Boyle).)  AOL streams significant amounts of such content.

326. Second, comScore's computation of total AOL network site hours may be overstated because it includes sites not included within the AOL sites and services to be licensed in this proceeding (e.g., Internet sites for Time, Inc. and the Roadrunner broadband access service).  (Tr. 332:1-9 (Boyle); AsX. 170, at 7.)

327. Third, AOL has not disclosed the hours spent listening to music on SHOUTcast (Tr. 122:6-9 (Amenita)), an all-audio webcasting service that falls within AOL's request to ASCAP for a license (SF ¶ 178) and that may account for significant music hours.  Accordingly, SHOUTcast music hours are not included in the numerator of the rate adjustment ratio.  (AsX. 355.)

328. Based on the evidence adduced in discovery and at trial, ASCAP proposes that, for AOL, the Court order the fee calculated using comScore data, which is at the lower end of the range of fees proposed by ASCAP.  As AOL witnesses testified at trial, AOL relies primarily on comScore data, for which it pays between ███████████████████, and AOL has a team of employees dedicated to ensuring the accuracy of comScore data.  (Tr. 1425:2-12, 21-25 (Conroy); Tr. 1555:3-5 (Winston).)  AOL has a "strong partnership" with comScore, and uses its data "regularly both to understand the audience size and engagement of the audience on [AOL] sites and to understand how that related to [AOL's] competition. . . ."  (Tr. 1469:5-11 (Winston).)  AOL has also used comScore data in Time Warner's public filings, reporting on a number of different metrics, including unique users, in the company's financial trending schedules.  (Tr. 1469:13-17 (Winston).)

329. Accordingly, ASCAP proposes that AOL pay license fees based on the third-party Internet audience measurement data that AOL primarily relies upon.  The following table illustrates ASCAP's fee proposal to AOL for 2005 and 2006:

|  | 2005 | 2006 |
|---|---|---|
| Site hours | ████████ | ████████ |
| Music hours | ███████ | ███████ |
| Music hours as % of site hours | ████ | ████ |
| AOL domestic revenue less chargebacks and credits | $ ██████ | $ ██████ |
| Revenue subject to fee | $ █████ | $█████ |
| AOL rate | 3.00% | 3.00% |
| AOL license fee | $ █████ | $█████ |
| Music Now revenue | $ ████ | $████ |
| Music Now rate | 3.00% | 3.00% |
| Music Now license fee | $███ | $ ████ |
| Total license fee | $ 5,297,025 | $ 7,831,188 |

Fees based on comScore Media Metrix site hours.  *See* AsX. 168.

330. ASCAP contends that these fees are a conservative measure of the full value to AOL of the ASCAP blanket license.

### 2.    ASCAP's Fee Proposal for RealNetworks

331. For RealNetworks, ASCAP applied a rate of 3.0% to the total revenue base of the company.  (Tr. 245:18-22 (Boyle).)

332. Because RealNetworks has provided incomplete information regarding its revenue, ASCAP could not determine with reasonable accuracy RealNetworks revenue derived from the licensed services.  Accordingly, ASCAP proposed two alternative sets of fees for RealNetworks for each of 2004, 2005, and 2006.  (Tr. 245:18-22, 246:7-17 (Boyle).)

333. Initially, ASCAP excluded from the revenue base revenue allocated to RealNetworks's TPS business segment, based on RealNetworks's representation that TPS does not include any licensable music-related services or offerings.  (Tr. 246:18–247:17 (Boyle).)  ASCAP then applied

a rate of 3.0% to the remaining revenue base. (Tr. 247:5-13 (Boyle).) Thus, excluding TPS, ASCAP proposed fees of $██████ for 2004, $██████ for 2005, and $██████ for 2006. (AsX. 354.)

334. After making this initial calculation, ASCAP learned from publicly available sources that some of the TPS revenue was derived from the performance of on-demand music. (Tr. 247:19-23 (Boyle).) On February 14, 2007, RealNetworks publicly disclosed certain revenue data in connection with its 2006 earnings report, specifically that its TPS business segment does, in fact, include revenue generated from music services. (Tr. 247:18-248:16 (Boyle).)

335. Thus, ASCAP concluded that some TPS revenue is earned from the performance of music for which RealNetworks requires an ASCAP license. Because RealNetworks did not provide ASCAP with sufficient detail to enable ASCAP to discern which TPS revenue is from licensable services and which is from other business activities, ASCAP made a second calculation that included all TPS revenue in the rate base. (Tr. 247:24-248:5, 248:14-16 (Boyle).)

336. ASCAP proposed a second, higher set of fees equal to 3.0% of "United States Net Revenue," which includes revenue from both business segments—Consumer Products and Services and TPS—as the revenue base for the years 2005 and 2006. For 2004, ASCAP applied the same methodology (including revenue from both business segments) and used the RealNetworks's "North America Revenue" figure because RealNetworks did not disclose a 2004 "United States Revenue" figure during discovery. (Tr. 247:18-248:16 (Boyle).) Under this calculation, ASCAP proposes RealNetworks fees of $6,077,220 for 2004, $7,495,650 for 2005, and $8,502,990 for 2006. (AsX. 354; Tr. 247:18-248:16 (Boyle).)

337. ASCAP contends that both calculations—the initial proposal that included only the Consumer Products and Services business segment, and the subsequent calculation that included

both Consumer Products and Services and TPS segments—are reasonable. Based on the evidence adduced in discovery and at trial, both Consumer Products and Services and TPS generate revenue from services that ASCAP has licensed, and accordingly ASCAP proposes the higher end of the range as the reasonable fees to be paid by RealNetworks during the open period. The following table illustrates ASCAP's proposal to RealNetworks for 2004, 2005, and 2006:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| RealNetworks net domestic revenue | $ 202,574,00 | $ 249,855,000 | $ 283,433,000 |
| Rate | 3.00% | 3.00% | 3.00% |
| License Fee | $ 6,077,220 | $ 7,495,650 | $ 8,502,990 |

(AsX. 354; *see* JX 29.)

### 3. ASCAP's Fee Proposal for Yahoo!

338. ASCAP initially proposed a range of Yahoo! fees for half-year 2002 and full-year 2003, 2004, 2005, and 2006. (AsX. 356; Tr. 263:15-20 (Boyle).)

339. As with AOL, ASCAP first determined Yahoo!'s domestic United States revenue, and then calculated a share of that revenue that reflects the relative use of music on Yahoo! sites. (AsX. 356; Tr. 261:18-263:14 (Boyle).) Also, as with AOL, ASCAP made this revenue allocation by determining the share of music use on Yahoo!, as reported by the company, to all uses on Yahoo!, as reported by Nielsen and comScore. (*Id.*) ASCAP calculated the ratio of the total hours Yahoo! streamed audio webcasts, on-demand music and music videos, to the total hours spent on all Yahoo! sites and services, and applied that ratio to Yahoo!'s total domestic revenue to determine Yahoo!'s adjusted revenue base. (*Id.*) ASCAP then applied the 3.0% fee rate to the adjusted revenue base. (AsX. 356.)

340. Using Nielsen total site hours, ASCAP calculated fees of $576,530 for July 1 -

December 31, 2002; $3,009,407 for 2003; $9,207,811 for 2004; $16,631,851 for 2005; and $13,868,219 for 2006. (AsX. 356.) Using comScore total site hours, ASCAP calculated fees of $1,273,254 for 2003, $4,493,618 for 2004; $9,394,707 for 2005; and $7,376,887 for 2006. (AsX. 356.) ASCAP contends that both calculations—based on Nielsen and comScore data—are reasonable. (Tr. 263:15-20 (Boyle).)

341. ASCAP further contends that, as with AOL, the music use adjustment factor for ASCAP's fee proposal is conservative, because it does not factor in the hours of music contained in Yahoo!'s various audiovisual content and advertisements, which Yahoo! does not track and which are performed throughout Yahoo!'s sites. (Tr. 261:20-262:2 (Boyle).) ASCAP was not able to segregate the revenue and music use associated with Yahoo!'s LAUNCHcast subscription music service based on the information supplied by Yahoo!. (AsX. 356.)

342. ASCAP proposes that Yahoo! pay the license fees calculated using comScore data that is at the lower end of the fee range. Like AOL, Yahoo! primarily relies on comScore, rather than Nielsen, data. Yahoo! subscribes to comScore and relies upon its data for internal business purposes (including in monthly audience reports and in quarterly business reviews that measure the health of the company) and in press releases and communications with the media, annual reports, and communications with advertisers. (SF ¶¶ 154-57; Tr. 1090:21-22, 1091:6-8, 1091:15-20, 1095:13-17, 1097:1-13, 1098:11-1099:2, 1104:1-17 (Rogers); AsX. 342, 388.) Yahoo has also called comScore data "trusted," (Tr. 1105:14-18 (Rogers)), and referred to comScore as the "global standard in Internet audience measurement." (SF ¶ 83).

343. Therefore, ASCAP proposes that Yahoo! pay fees based on the third-party Internet audience measurement data that Yahoo! primarily relies upon. The following table illustrates

ASCAP's proposal to Yahoo! for the period of 2003 through 2006:

| | Jul-Dec 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| Site hours | ■ | ■■■ | ■■■ | ■■■ | ■■■ |
| Music hours | ■■■ | ■■■ | ■■ | ■■ | ■■■ |
| Music hours as % of site hours | ■ | ■■ | ■■ | ■■ | ■■ |
| Domestic revenue less TAC | $ ■■■ | $ ■■■ | $ ■■■ | $ ■■■ | $ ■■■ |
| Revenues subject to fee | ■ | $ ■■■ | $ ■■■ | $ ■■■ | $ ■■■ |
| Rate | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| License fee | n/a | $ 1,273,254 | $ 4,493,618 | $ 9,394,707 | $ 7,376,887 |

Fees based on comScore Media Metrix site hours. (AsX. 356; *see* AsX. 306; JX 33, 34, 36.)

344. Because Yahoo! did not provide comScore site hours for July through December 2002 (Tr. 263:8-14 (Boyle)), ASCAP proposes fees of $576,530 for that period based on the site hours provided by Nielsen.

345. ASCAP contends that, as with AOL, the Nielsen data in fact suggest that ASCAP's fee proposal conservatively values the blanket license for Yahoo!. Nielsen continues to be a leading third-party Internet audience measurement firm upon which advertisers, online companies, and others rely. Yahoo! has in the past relied on Nielsen data to measure unique audience and engagement (AsX. 310, at 6-7), it has relied on Nielsen data measuring the size of the Yahoo! audience and the average time spent by users on the Yahoo! network (SF ¶ 155), it has used Nielsen audience measurements in its press releases (together with comScore data) (SF ¶ 156), and it has referred to Nielsen audience data in presentations to potential corporate advertisers and sponsors. (SF ¶ 157). While Yahoo! primarily relies on comScore, Nielsen is an alternative, and widely relied upon source of audience measurement.

## 4. Summary of ASCAP's Proposed Fees for the Three Applicants

346. The following table summarizes the fee amounts that ASCAP proposes for each of the three Applicants through 2006:

|  | AOL | RealNetworks | Yahoo! |
|---|---|---|---|
| Jul-Dec 2002 | -- | -- | $ 576,530 |
| 2003 | -- | -- | $ 1,273,254 |
| 2004 | -- | $ 6,077,220 | $ 4,493,618 |
| 2005 | $ 5,297,025 | $ 7,495,650 | $ 9,394,707 |
| 2006 | $ 7,831,188 | $ 8,502,990 | $ 7,376,887 |

(AsX. 354, 355, 356.)

ASCAP proposes that Applicants pay fees for the years 2007, 2008, and 2009 calculated by the same methodology.

## D. ASCAP's Proposed Benchmark Agreements

347. ASCAP has proposed several benchmark agreements between ASCAP and other licensees that support the reasonableness of ASCAP's proposals. Those agreements are: (a) an agreement between ASCAP and Music Choice; (b) three agreements between ASCAP and the major television networks, ABC, NBC, and CBS; (c) ASCAP's agreement with the radio industry; (d) ASCAP's form license for general entertainment cable television networks; and (e) ASCAP's form license for music intensive cable television networks.

## 1. ASCAP's Agreement with Music Choice

348. Music Choice is a partnership whose partners (or their corporate parents) include AOL Time Warner (the corporate parent of Applicant AOL), AT&T, Cox Communications, Comcast,

Sony, Microsoft and EMI Group. (SF ¶ 194.) Music Choice was the first entrant into the so-called residential music service industry, consisting of companies providing music to cable and satellite TV subscribers. (SF ¶ 195.)

349. Music Choice provides channels of music that subscribers of digital cable television services such as RCN and Comcast obtain with their subscriptions. (SF ¶ 196.) Music Choice transmits more than 50 different music channels to listeners' televisions via cable and satellite, and to their computers via the Internet. (SF ¶ 197.) Music Choice's channels are organized around genres of music (e.g., country or classical) and provide commercial-free, CD-quality broadcasts around the clock. (SF ¶ 199.) Information about the musical composition being played on Music Choice is displayed in text form on the listener's television (or computer) screen. (SF ¶ 200.)

350. Music Choice has an audience of over 17 million listeners per month. (SF ¶ 198.) For its cable and satellite customers, Music Choice beams its channels to its own satellite, which transmits to the cable systems of various cable operators or to the proprietary satellites of satellite TV operators. (SF ¶ 201.) The channels are ultimately broadcast to the listening public in the same form as they are originally transmitted by Music Choice. (*Id.*)

351. Music Choice also transmits music performances over the Internet, providing its customers access to 52 channels of music, as well as daily music news, artist interviews and performances, and the option to create up to ten personalized audio channels. (SF ¶ 202.)

352. ASCAP's current agreement with Music Choice, for the period January 1, 2006 through December 31, 2010, calls for payment of a license fee that is 2.5% of Music Choice's gross revenues. (SF ¶ 203; AsX. 24, § IV(A)(1).) "Gross revenues" is defined as all revenues derived from the licensed service. (AsX. 24, § IV(A)(2); Tr. 1908:12-14 (Candell).)

93

353. In exchange, ASCAP has granted Music Choice a blanket license to perform ASCAP music, on a through-to-the audience basis, by means of, *inter alia*, cable television systems, satellite direct to home systems, and the Internet. (SF ¶ 204; AsX. 24, § II..)

### 2. ASCAP's Agreements with Television Networks ABC, CBS, and NBC

354. The ABC, CBS, and NBC television networks perform music in a variety of ways. *See United States v. Am. Soc'y of Composers, Authors and Publishers (Applications of Capital Cities/ABC, Inc. and CBS, Inc.)*, 831 F. Supp. 137, 142 (S.D.N.Y. 1993). Their music performances may generally be classified as either feature, theme, or background music. *Id.* Feature music is the principal focus of audience attention, such as a song sung on a variety show. *Id.* Theme music is played at the start or conclusion of a program and serves to enhance the identification of the program. *Id.* Music that is neither feature nor theme music is generally considered background music. *Id.*

355. Each of the three major television networks receives a blanket license to perform ASCAP music in all of the network's programming. (SF ¶ 211; AsX. 12, 19, 20.) ASCAP's license agreements with the major networks are, and have been for many years, for flat dollar amounts. (SF ¶¶ 211-12; Tr. 268:5-11 (Boyle).)

356. ABC, CBS, and NBC have revenues similar to those of AOL and Yahoo!, and pay fees similar to those ASCAP has proposed for AOL and Yahoo!. (Tr. 266:25-267:5 (Boyle).) The three television networks ABC, CBS, and NBC have revenues in the range of $3 to $4 billion, and pay approximately ███████████████ in fees to ASCAP every year. (SF ¶¶ 212-14; Tr. 266:21-23 (Boyle).)

357. ABC has paid the following license fees to ASCAP: ▇▇▇▇▇▇ in 2003, ▇▇▇▇▇ in 2004, ▇▇▇▇▇▇ in 2005, ▇▇▇▇▇▇ in 2006, ▇▇▇▇▇▇ in 2007, and ▇▇▇▇ in 2008. (SF ¶ 212.) ABC is estimated to have had revenues of approximately $3,190,000,000 in 2003, $3,514,000,000 in 2004, and $3,911,000,000 in 2005. (*Id.*)

358. CBS has paid the following license fees to ASCAP: ▇▇▇▇▇▇ in 2003, ▇▇▇▇▇ in 2004, ▇▇▇▇▇ in 2005, ▇▇▇▇▇ in 2006, ▇▇▇▇▇ in 2007, and for 2008 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (SF ¶ 213.) CBS is estimated to have had revenues of approximately $4,050,000,000 in 2003, $4,449,999,000 in 2004, and $4,671,000,000 in 2005. (*Id.*)

359. NBC has paid the following license fees to ASCAP: ▇▇▇▇▇▇ in 2003, ▇▇▇▇▇ in 2004, ▇▇▇▇▇ in 2005, ▇▇▇▇▇ in 2006, and ▇▇▇▇▇ in 2007 (the fees beginning with those for 2005 are interim fees, subject to retroactive adjustment). (SF ¶ 214.) NBC is estimated to have had revenues of approximately $4,461,000,000 in 2003, $5,062,000,000 in 2004, and $3,900,000,000 in 2005. (*Id.*)

360. As a percentage of each network's gross revenues, the networks paid ASCAP ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇ for the ASCAP blanket license. (AsX. 451.)


### 3. ASCAP's Prior Agreement with the Radio Industry

361. For decades through the end of 2001, ASCAP licensed most broadcast radio stations on a percentage of revenue basis through agreements negotiated with the Radio Music License Committee. (SF ¶ 209.) The last such agreement called for the payment of blanket license fees by commercial broadcast radio stations at the rate of 1.615% of a station's total net revenues (i.e.,

revenues exclusive of advertising agency commissions and less specified deductions). (*Id.*; ApX. 30; Tr. 258:25-259:3; 267:24-268:4 (Boyle).)

362. ASCAP currently licenses commercial radio stations represented by the Radio Music License Committee on a flat-fee, industry-wide basis, with fees allocated to each station as set forth in the license agreement. (SF ¶ 210.) The agreement provides for final rates through the end of 2009. (*Id.*)

363. Currently, Clear Channel, which operates about 1,050 terrestrial radio stations, pays approximately ███████████ in license fees to ASCAP. (Tr. 265:2-11 (Boyle).) Infinity Broadcasting, which operates about 150 terrestrial radio stations, pays approximately ██████████ in license fees to ASCAP. (Tr. 265:17-21 (Boyle).) These sums greatly exceed the total of the amounts that ASCAP seeks from AOL, Yahoo! and RealNetworks.

## 4. ASCAP's Form General Entertainment Cable Television License Agreement

364. ASCAP currently offers a form blanket license agreement for general entertainment cable television networks that calls for payment of a license fee of 0.375% of a network's gross revenues. (SF ¶ 218; JX 10, § IV(A).). "Gross revenues" are all monies derived from the operation of the licensed service. (JX 10, §§ I©, I(H).)

365. In exchange, ASCAP grants the network a blanket license to perform ASCAP music on the network distributed by means of, *inter alia*, cable television systems and satellite direct to home systems. The network is also granted a limited license to perform ASCAP music on Internet sites, provided such Internet sites are used primarily to promote the network and/or distribute the network's programming. (JX 10 §§ 1(B), III(E).) All revenue received by the licensee from the

operation of such Internet sites is included within the definition of "Gross Revenues" and subject to fee.  (JX 10, § I(H).)

366. A general entertainment cable television network is characterized by its wide variety of programming such as full-length films, syndicated dramas and situation comedies.  (SF ¶ 219.)  They perform a variety of feature, theme and background music.  Examples of general entertainment cable television networks include Turner Network Television and Turner Broadcasting System.  (Tr. 372:25-373:2 (Boyle).)  General entertainment networks pre-program the material they transmit, and viewers experience such programming in a passive, non-interactive manner.

## 5. ASCAP's Form Music-Intensive Cable Television License Agreement

367. ASCAP currently offers a form blanket license agreement for music-intensive cable television networks that calls for payment of a license fee of 0.9% of a network's gross revenues. (SF ¶ 215; JX 11, § IV(A).)  "Gross revenues" are all monies derived from the operation of the licensed service.  (JX 10, §§ I©, I(H).)

368. In exchange, ASCAP grants the network a blanket license to perform ASCAP music on the network distributed by means of, *inter alia*, cable television systems and satellite direct to home systems.  As with general entertainment television networks, music-intensive cable television networks are granted a limited license to perform ASCAP music on Internet sites, provided such Internet sites are used primarily to promote the network and/or distribute the network's programming.  (JX 10, §§ 1(B), III(E).)  All revenue received by the licensee from the operation of such Internet sites is included within the definition of "Gross Revenues" and subject to fee.  (JX 10, § I(H).)

369. A music-intensive cable television network performs a variety of music-oriented programming, which need not be exclusively music videos. (SF ¶ 216.) ████████████ is the only music-intensive cable television network that currently pays ASCAP the 0.9% rate under the form music-intensive cable television agreement. (SF ¶ 217.) Its programming includes music videos and music variety-type shows. (Tr. 430:18-25 (Greene).) Music-intensive cable networks pre-program the material they transmit, and viewers experience such programming in a passive, non-interactive manner.

### E.    Applicants' Music Video Agreements with Record Companies

370. In addition to the proposed benchmark agreements, ASCAP submits other indicia to support the reasonableness of its fee proposals, namely the amounts that Applicants pay to the major record companies for rights to perform music videos online. These amounts indicate the value of music performances to the Applicants. (Tr. 2011:7-20 (Boyle).)

371. Each Applicant holds licenses with record companies authorizing them to publicly perform music videos, which are audiovisual works in which the record companies own the copyright. Under these arm's-length agreements freely entered into by AOL and Yahoo!, AOL and Yahoo! pay the major record companies – EMI, Sony BMG, Universal Music Group, and Warner Music Group – substantial fees each year for licenses to perform music videos. (AsX. 357 (Summary of AOL and Yahoo! Music Video License Fees to the Record Companies).)

372. The Applicants negotiate in the open marketplace with record companies for music video rights. (Tr. 1276:18-22 (Roback).) The record companies are not subject to a consent decree, and are not required to sell rights in music videos to the Applicants. (Tr. 1276:15-17, 1276:23-25

(Roback).)

### 1.   AOL's Payments to the Major Record Companies for the Right to Perform Music Videos

373. AOL and Sony BMG entered into a Memorandum of Understanding dated April 18, 2005 which granted AOL the exclusive right to perform all Sony BMG music videos of the nature customarily exhibited on television broadcast channels.  (SF ¶ 240; AsX. 178, Ex. A § 6.)  The parties entered into an Amended & Restated Memorandum of Understanding on December 22, 2005 which grants AOL the non-exclusive right to perform all Sony BMG music videos through December 22, 2007.  (SF ¶ 240; AsX. 177, Ex. A § 6.)  Separately, AOL Music Now entered into a Letter Amendment to a Memorandum of Understanding to license rights in Sony BMG music videos for the term October 31, 2005 through December 31, 2006.  (SF ¶ 240; AsX. 161.)

374. These agreements grant AOL and AOL Music Now a license under the rights owned by Sony BMG in its catalog of music videos for the sole purpose of publicly performing those videos online.  (AsX. 161; 177, Ex. A § 6; 178, Ex. A § 6.)  In exchange for these rights, AOL paid Sony BMG roughly ▇▇▇▇▇▇▇ in 2005, and ▇▇▇▇▇▇▇ in 2006.  (SF ¶ 240.)

375. On June 6, 2006, AOL and EMI entered into an agreement that grants AOL the non-exclusive right to perform online EMI music videos for the term June 6, 2006 through June 6, 2008.  (SF ¶ 241; AsX. 179 (EMI Music Marketing Video On-Demand Service Agreement).)

376. As with the Sony BMG-AOL agreements, the EMI-AOL agreement grants AOL a license under EMI's rights in its music video catalog for the sole purpose of publicly performing those videos online.  (AsX. 179, § 4.1.)  AOL refused to disclose to ASCAP during discovery the amounts AOL has paid to EMI for rights in music videos under this agreement.  (AsX. 357B

(Summary of AOL Music Video License Fees to the Record Companies).)

377. AOL and Universal Music Group entered into an agreement on April 15, 2005 that grants AOL rights in Universal Music Group music videos for the term April 15, 2005 through December 31, 2006. (SF ¶ 242; AsX. 153 (Video License Agreement for Video Service Providers).)

378. This agreement grants AOL a license under Universal Music Group's rights in its catalog of music videos. (AsX. 153, § 1(a).) In exchange for these rights, AOL paid Universal Music Group ███████ in 2005, and ███████ in 2006. (SF ¶ 242.)

379. AOL and Warner Music Group entered into a License Agreement on April 18, 2005 that grants AOL a license under Warner Music Group's rights in its catalog of music videos for the sole purpose of performing those videos online, for the term April 18, 2005 through April 18, 2007. (SF ¶ 243; AsX. 184.) AOL paid Warner Music Group ███████ in 2005, and ███████ in 2006, for rights in music videos under that agreement. (SF ¶ 243.)

380. To summarize, AOL paid the major record companies at least ███████ in 2005 and at least ███████ in 2006 for non-exclusive rights to publicly perform music videos, for a total of ███████. (AsX. 357.)


## 2. RealNetworks's Payments to the Major Record Companies for the Right to Perform Music Videos

381. On July 1, 2004, RealNetworks and Universal Music Group entered an agreement that grants RealNetworks the nonexclusive right to stream Universal Music Group's music videos on the Rhapsody subscription service for the term July 1, 2004 through July 31, 2007. (SF ¶ 244; AsX. 237, § 1(a).)

382. The agreement grants only the limited license for RealNetworks to publicly perform Universal Music Group's music videos by means of streaming and conditional downloads, and to make such copies as are incidental and necessary to perform music videos online. (AsX. 237, § 1(a).) The agreement also grants RealNetworks the right to display album artwork, but only in connection with the performance of music videos. (*Id.*)

383. The agreement requires RealNetworks to pay an advance of ███████, and fees of the greater of (a) ███████████ per performance, (b) ████ of gross revenues (from the performance of music videos), and (c) ████ per non-portable subscriber and larger fees for portable subscribers. (*Id.* § 2.)

384. Although RealNetworks publicly performs music videos on the Internet (Tr. 915:25-916:2 (Sheeran)), RealNetworks did not disclose to ASCAP during discovery the amounts RealNetworks has paid to Universal Music Group or any other major record company for rights in music videos.

### 3.    Yahoo!'s Payments to the Major Record Companies for the Right to Perform Music Videos

385. Yahoo! entered into a "Short Form" Agreement with Sony BMG for the term June 16, 2005 through June 15, 2007 (the "Yahoo!/Sony BMG Agreement"). (SF ¶ 245.) Under that agreement, Yahoo! paid ███████████ in 2005, and ███████████ in 2006, for a license to Sony BMG's rights in its music video catalog. (*Id.*)

386. Yahoo! entered into a similar agreement with EMI in late 2006 for a license to EMI's rights in its catalog of music videos. (SF ¶ 246.) Yahoo! refused to disclose to ASCAP during discovery the amounts it paid to EMI for music video rights under this agreement.

387. Yahoo! entered into the Video License Agreement for Video Service Providers to license rights in Universal Music Group music videos for the term April 2005 through December 31, 2006. Yahoo! paid Universal Music Group ██████████ in 2005, and ██████████ in 2006, for rights in music videos under that agreement. (SF ¶ 247; AsX. 357.) After the agreement expired, Yahoo! signed a new agreement with Universal Music Group for rights to perform music videos online. (Tr. 1171:16-20 (Rogers).)

388. Yahoo! entered into a similar agreement with Warner Music Group to license rights in music videos for the term April 1, 2005 through December 31, 2006. (SF ¶ 248.) Yahoo! paid Warner Music Group ██████████ in 2005, and ██████████ in 2006, for rights in music videos under that agreement. (*Id.*; AsX. 357.) Warner terminated its agreement with Yahoo!, asserting that Yahoo! materially breached the agreement by not performing enough Warner music videos. (Tr. 1273:17-19 (Roback).) Although the Yahoo!-Warner agreement was terminable only for cause, (AsX. 277, at 17), and Yahoo! disputed Warner's contention that it had breached, Yahoo! did not seek to compel Warner's continued performance under the agreement. (Tr. 1273:19-1274:3 (Roback)).

389. The purpose of Yahoo!'s agreements with the four major record companies is to permit Yahoo! to stream music videos online. (Tr. 1172:18-20 (Rogers).) These agreements license to Yahoo! all the rights that Yahoo! needs in order to distribute music videos via streaming on the Internet. (Tr. 1231:14-19 (Roback).) They do not authorize Yahoo! to offer downloads of music videos, and Yahoo! does not do so. (AsX. 275, 276, 277, 279; Tr. 1039:5-6 (Rogers).)

390. Thus, Yahoo! paid the major record companies at least ██████████ in 2005 and at least ██████████ in 2006 for non-exclusive rights to publicly perform music videos, for a total of at least

██████. (SF ¶ 250; AsX. 357.) Yahoo! has transmitted ████ of music video streams since the agreements with the record companies came into effect. (SF ¶ 249.) In all of 2006, Yahoo! transmitted approximately █████ music video streams (*id.*), and paid the record companies the equivalent of at least █████ per music video stream.

## V.    Applicants' Fee Proposals

### A.    Structure of Applicants' Fee Proposals to ASCAP

391. Applicants have requested that the Court order ASCAP to enter into license agreements that apply specified rates to narrow categories of revenue from particular segments of Applicants' businesses. (ApX. 63, 104, 141.)

392. Applicants propose paying ASCAP out of five revenue categories, or "buckets." (ApX. 143.) Each revenue category has its own applicable rate, most but not all of which are applied to a narrowly defined royalty base of "net revenue" that is "directly attributable" to different types of music uses throughout their sites and services. (ApX. 63, 104, 141; Tr. 769:17-23 (Guerin-Calvert).) Tallying the fees due in each of the revenue categories results in the total fees Applicants propose are due to ASCAP. (ApX. 63, 104, 141.)

393. Applicants propose paying ASCAP as follows: (a) 2.5% of net revenue "directly attributable" to on-demand audio streaming content; (b) 1.615% of net revenue "directly attributable" to audio webcasting services; (c) 0.9% of revenue "directly attributable" to streaming music videos; (d) 0.375% of revenue "directly attributable" to performances of music in audiovisual programming, such as movie trailers and television programming; and (e) 0.1375% of revenue "directly attributable" to non-entertainment audio-visual programming such as sports and news. (ApX. 143.)

394. Revenue that Applicants contend is "directly attributable" to a particular type of music performance is limited to the revenue generated from the sale of advertising and sponsorships that appear on the music player through which the music is streamed, as well as a pro rata share of revenue from subscription services that include music performances. (Tr. 1619:23-1620:15 (Candell).) It excludes all revenue from advertising placed off the player, including ads on webpages behind the player or anywhere else on the Applicants' websites, and it excludes the value of any house ads and promotions of the Applicants' sites and services.

395. Applicants do not define what revenues are "indirectly attributable" to music performances.

### B. Fees Payable to ASCAP under Applicants' Proposals

396. Under Applicants' proposed structure, AOL would pay ASCAP fees of $151,836 for 2005; and $632,879 for 2006. (ApX. 63.) Under the terms of the interim license agreement between ASCAP and AOL, the interim license fees are subject to retroactive adjustment. Accordingly, AOL's fee proposal, if accepted by the Court, would give rise to a claim by AOL for a refund from ASCAP of $773,164 for 2005 and $367,121 for 2006.

397. Under Applicants' proposed structure, RealNetworks would pay ASCAP fees of $1,055,733 for 2004; $1,459,359 for 2005; and $1,487,758 for 2006. (ApX. 141.)

398. Under Applicants' proposed structure, Yahoo! would pay ASCAP fees of $26,900 for July 1, 2002 to December 31, 2002; $76,101 for 2003; $180,351 for 2004; $763,321 for 2005; and $889,402 for 2006. (ApX. 104.) Under the terms of the interim license agreement between ASCAP and Yahoo!, the interim license fees are subject to retroactive adjustment. Accordingly, Yahoo!'s

fee proposal, if accepted by the Court, would give rise to a claim by Yahoo! for a refund from ASCAP of $83,100 for the second half of 2002; $143,899 for 2003; and $39,649 for 2004.

### C.    Applicants' Proposed Benchmark Agreements

399. Applicants have proposed as benchmark agreements for consideration by the Court three of the same license agreements that ASCAP has proposed as benchmarks: the ASCAP agreement with the radio industry; the ASCAP form music-intensive cable television agreement; and the ASCAP form general entertainment cable television agreement. In addition, Applicants have proposed as benchmark agreements three BMI license agreements, which are addressed below: an agreement between BMI and Yahoo!; an agreement between BMI and RealNetworks; and an agreement between BMI and MusicNet. (*See, e.g.*, Tr. 1605:7-16, 1606:12-14 (Candell).)

### 1.    The BMI-Yahoo! Agreement

400. In March 2007, BMI and Yahoo! entered into a license agreement covering the time period April 2004 to December 2011 (the "BMI-Yahoo! Agreement"). (ApX. 90; SF ¶ 231.) The agreement was negotiated over a period of several years and was concluded shortly before the parties in the ASCAP proceeding exchanged expert reports. (Halley Dep. Tr. 14:14-21; ApX. 90.) Although the agreement is incomplete, and a substantial portion of Yahoo!'s music use remains the subject of continuing negotiations with BMI, Yahoo! pressed for at least a partial agreement for purposes of this rate proceeding. (Halley Dep. Tr. 83:15-19.)

401. In 2006, Yahoo! paid approximately █████████ in license fees to BMI. (JX 39-42.) For the first quarter of 2007, Yahoo! had paid approximately ████████ in license fees to BMI. (JX

43.) BMI expects to receive in 2007 ████████████████████ in license fees from Yahoo!. (Conlon Dep. Tr. 165:10-17.)

### (a)     Scope of the License

402. The BMI-Yahoo! Agreement is not a blanket license, a fact confirmed by BMI's representative, Richard Conlon ("Conlon"). (Conlon Dep. Tr. 114:9-15.) The agreement grants Yahoo! a license to publicly perform works in the BMI repertory only in certain defined "Programming Services" which are made available on Yahoo! Music and MusicMatch, and which may also simultaneously be available through specifically identified sections of the Yahoo! site or third-party sites. (ApX. 90, §§ 2, 3(a).) According to Mr. Conlon, the agreement essentially licenses Yahoo! Music and not the other parts of the Yahoo! site. (Conlon Dep. Tr. 164:23-165:9.)

403. The BMI-Yahoo! Agreement expressly excludes and does not grant Yahoo! a license to publicly perform "Non-Incidental Uses" of music. (ApX. 90, § 2(I); Tr. 1251:15-19 (Roback).) Such Non-Incidental Uses of music include all feature, theme, and background performances of music in audiovisual programming on Yahoo!, such as movie clips and trailers, television shows, user-generated video, user-uploaded video, and general entertainment programming. (ApX. 90, § 2(I); Tr. 1254:2-20, 1259:13-19, 1269:17-21, 1270:23-1271:7 (Roback).) Yahoo! TV, Yahoo! Movies, Yahoo! Sports, Yahoo! News, Yahoo! Tech, Yahoo! Video, and Bix, for example, are not licensed. (Conlon Dep. Tr. 137:12-24; Tr. 446:21-447:6 (Greene).)

404. Nor does it grant a license for Yahoo! to provide music services exclusively outside of Yahoo! Music and Musicmatch. (ApX. 90, § 2(p) ("'Programming Services' shall mean the following services made available to the public through Yahoo! Music Services (and which may also

be made available through Other Yahoo! Services and Third Party Services while simultaneously being made available through Yahoo! Music Services) . . . .").)

405. Yahoo! streams a significant amount of audiovisual programming that constitutes Non-Incidental Uses. Although Yahoo! did not produce data showing the number and duration of streams of audiovisual programming, much of which involves Non-Incidental Uses, there are several indicators of the amount of such performances. Users can, for example, stream movie trailers and clips from Yahoo! Movies (Tr. 1270:1-3 (Roback)) and Yahoo! Kids (Tr. 1254:21-1255:6, 1258:10-1259:12 (Roback)), news clips from Yahoo! Finance (AsX. 118A, at Yahoo! ch. 1, 01:08-01:31, 02:06-02:36), television program clips from Yahoo! TV (SF ¶ 133; Tr. 1260:20-1261:12 (Roback)), and game previews and music video-like videos from Yahoo! Games (Tr. 1882:4-10 (Candell); AsX. 118A, at Yahoo! ch. 6)—all of which contain music. These pages are highly trafficked parts of the Yahoo! site. (AsX. 306, 352.) Users can also stream user-uploaded videos containing music on Yahoo! Video (Tr. 1911:14-23 (Candell); AsX. 118A, at Yahoo! ch. 1, 03:49-04:30) and video clips of karaoke-style and lip-synched music performances on the Bix page. (Tr. 1266:25-1267:21 (Roback)). These user-generated videos are not classified as "music videos" and are therefore not covered by the BMI-Yahoo! Agreement. (Tr. 1266:25-1267:21 (Roback).)

406. In addition, the BMI-Yahoo! Agreement licenses music performances in certain contexts on an experimental and non-precedential basis only, namely "Incidental Uses," which include music in display advertisements and logos, and music launched from the Yahoo! Messenger player. (ApX., 90 §§ 2(I), 2(z).)

### (b)    Complexity of Applicant's "Bucket" Structure

407. The BMI-Yahoo! Agreement is quite complex. It establishes at least seventeen separate revenue categories, which Applicants characterize as "buckets," and applies different royalty rates or formulas to the revenue in each. (AsX. 369; Tr. 438:18-439:6 (Greene); ApX. 90, § 4(b).)

408. The Agreement establishes five categories of "Programming Services offered through Yahoo! Music Service(s) licensed hereunder other than Music Subscription Services" and applies a separate license rate to revenue "directly attributable" to each category of service. "Yahoo Music Services" are Yahoo! Music and MusicMatch. (ApX. 90, § 2(z).)

409. The Agreement provides for payment of (a) 1.75% of "Direct Revenue" from "Preprogrammed Radio"; (b) 2.5% of "Direct Revenue" from "On-Demand Streams"; (c) 2.15% of "Direct Revenue" from "User-Influenced Programming"; (d) 1.0% of "Direct Revenue" from "Audio-Visual Programming"; and (e) 0.6875% of "Yahoo! Music Advertising Revenue and Yahoo! Music Run of Site Allocation . . . ." (AsX. 369; ApX. 90, §4(b)(I).)

410. Direct Revenue is defined as "that portion of Yahoo!'s Gross Revenue that can be directly attributed to a particular Programming Service . . . ." (ApX. 90, § 2(g).) Examples of "directly attributable revenue" are revenue from in-stream ads and banner ads on the radio or music video player, and sponsorship of a particular Programming Service. (*Id.*)

411. The Agreement establishes a separate category for "Programming Services (other than Music Subscription Services) directly launched from Other Yahoo! Services licensed hereunder . . . ." (SF ¶ 233.) "Other Yahoo! Services" are specifically identified as Yahoo! Kids and the Yahoo! homepage only. (ApX. 90, Ex. B.) When such programming services are launched from the Yahoo! homepage or Yahoo! Kids, Yahoo! compensates BMI by multiplying the "Effective ATH Rate" by

the total aggregate streaming hours of music streamed from Other Yahoo! Services. The Effective ATH (aggregate tuning hour) Rate is calculated by dividing the BMI fees associated with "Yahoo! Music Advertising and Run-Of-Site Advertising Revenue" by the total "Aggregate Stream Hours of Programming Services launched from Yahoo! Music Services." (JX 39, at YAH088245.)

412. The Effective ATH rate calculation was purportedly devised as a so-called "uplift" to compensate BMI for the value of streaming music from the Yahoo! homepage or Yahoo! Kids site. (Tr. 1624:5-13 (Candell).) In 2006, this "uplift" resulted in Yahoo! paying BMI a total of ███ for the right to stream ███ hours of music from its homepage and Yahoo! Kids. (JX 39-42.) In the first quarter of 2007, Yahoo! paid BMI only ███ for the right to stream ███ hours of music from its homepage and Yahoo! Kids. (JX 43.)

413. The Agreement establishes four revenue categories for "Music Subscription Services" to which different license rates are applied: (a) 1.75% of "Music Subscription Net Revenue attributable to Pre-Programmed Radio"; (b) 2.5% of "Music Subscription Net Revenue attributable to On-Demand Streams"; (c) 2.15% of "Music Subscription Net Revenue attributable to User-Influenced Programming"; and (d) 1% of "Music Subscription Net Revenue attributable to Audio-Visual Programming." (ApX. 90, § 4(b)(iii).)

414. The Agreement establishes a separate revenue category for "Third Party Services," which are websites owned and/or operated by third-parties through which one or more of the Programming Services are made available. (ApX. 90, §§ 2(s), 4(b)(iv); SF ¶ 235.) The Agreement provides that Yahoo! will pay BMI the Effective ATH Rate multiplied by the aggregate stream hours provided through the Third Party Services. (ApX. 90, § 4(b)(iv).)

415. In the event that such Third Party Service itself earns revenue from in-stream ads, on-

player banner ads or sponsorships of the Programming Service, then BMI and Yahoo! agree to negotiate further to determine how Yahoo! will compensate BMI. If the parties fail to reach agreement, then the parties may take the matter to the BMI rate court.  (ApX. 90, §4(b)(iv).)

416. The Agreement also establishes separate revenue categories for "Bundled Third Party Offerings, where Yahoo! makes a particular Programming Service(s) (other than Music Subscription Services) available to third parties for distribution as part of other services where the third party does not charge a differentiated amount for the Programming Service(s) offered . . . ."  (ApX. 90, § 4(b)(v); SF ¶ 236.)

417. License fees for Bundled Third Party Offerings are made in accordance with a series of defined calculations based on unique users of the Programming Service offered by the third party. (ApX. 90, § 4(b)(v), Ex. E (Form IV).)  Those calculations and the resulting fees paid to BMI, however, do not take into account the actual fees paid to Yahoo! by AT&T and Verizon Wireless for the service, or the number of streams of music delivered by Yahoo! to AT&T and Verizon, or the mutual benefit received by the parties by providing the bundled offering.

418. Yahoo! currently has agreements with AT&T and Verizon that fall within the definition of Bundled Third Party Offerings.  (Tr. 1758:20-1759:6 (Candell).)  In 2006, Yahoo! paid BMI a total of ▮▮▮▮ for the right to stream music to AT&T and Verizon customers as part of these bundled offerings.  Meanwhile, Yahoo! earned ▮▮▮▮▮ from its Connected Life Business, mostly from its deals with AT&T and Verizon (AsX. 314), and Yahoo! streamed ▮▮▮▮music performances to AT&T's customers and over ▮▮▮▮music performances to Verizon's customers.  (JX 38.)  Thus, Yahoo! paid BMI the equivalent of ▮▮▮▮ per stream.

419. To report license fees under all of these revenue categories, Yahoo! must collect what

110

ASCAP describes as "at least 50 separate data points," including but not limited to the following: (a) for each Programming Service, the in-stream ad revenue, on-player banner ad revenue, sponsorship revenue, and other revenue that might be deemed "directly attributable" to each service; (b) total music subscription revenue; (c) hours of Pre-programmed Radio and User-Influenced Programming; (d) Yahoo! Music advertising revenue; (e) Yahoo! Music sponsorship revenue; (f) revenue from run-of-site advertising; (g) revenue from run-of-site sponsorships; (h) total run-of-site banner ad impressions; (I) number of run-of-site ad impressions on Yahoo! Music; (j) aggregate stream hours of Programming Services launched from Yahoo! Music Services; (k) aggregate stream hours of Programming Services launched from Other Yahoo! Services; (l) revenue from music subscription services; (m) revenue from advertising, promotion and sponsorships on music subscription webpages; (n) commissions on third party transactions; (o) revenue from music product placement; (p) revenue from sales of proprietary software; (q) number of plays of streamed transmissions from subscription service; (r) number of plays of conditional downloads from music subscription service; (s) aggregate tuning hours of pre-programmed radio from music subscription services; (t) aggregate tuning hours of user-influenced programming from music subscription services; (u) aggregate tuning hours of on-demand streams from music subscription services; (v) aggregate tuning hours of audiovisual programming from music subscription services; (w) for each bundled third-party offering, the average number of monthly unique users of the third-party's offering and the average number of monthly unique users of the equivalent offering on Yahoo! Music; (x) total aggregate stream hours provided through third-party services; (y) third-party direct revenue from programming services.  (AsX. 370; Tr. 444:11-15 (Greene); ApX. 90, § 4.)

420. The foregoing partial list of the types of data required to construct the BMI license fee

demonstrates the extreme complexity of the BMI-Yahoo! agreement.

421. These data points are generally not publicly available, and are apparently not generally collected by Yahoo! in the ordinary course of its business for any purpose other than reporting to BMI. (*See* Tr. 444:25-445:5 (Greene).)

422. The BMI-Yahoo! Agreement requires Yahoo! to submit quarterly reports that contain dozens of data points and calculations. (ApX. 90, Ex. E.) These reports are at least six pages long. (JX 39-43.)

423. Conlon "absolutely" agreed that the BMI-Yahoo! Agreement is "very complex." (Conlon Dep. Tr. 110:22-25.)


## 2.     The BMI-RealNetworks Agreement

424. BMI and RealNetworks entered into a license agreement on December 22, 2004, covering the period October 2004 through December 2006 and containing an automatic renewal provision, terminable at either party's option (the "BMI-RealNetworks Agreement"). (SF ¶ 227; ApX. 74.) Neither party opted to terminate in December 2006, and the agreement remains in effect. (SF ¶ 227; ApX. 74.)

425. Since December 2004, RealNetworks has paid BMI approximately ███████ pursuant to the BMI-RealNetworks agreement. (Tr. 897:8-14 (Sheeran).)

426. The BMI-RealNetworks Agreement is not a blanket license, as also confirmed by Conlon. (Conlon Dep. Tr. 102:10-18.) The BMI-RealNetworks Agreement licenses only the Rhapsody subscription service and the RadioPass subscription service. It does not license any music performances on RealNetworks's other services, including RealGuide, Rollingstone.com, Film.com,

and SuperPass.  (SF ¶ 228; Tr. 874:18-20, 892:10-893:16 (Sheeran).)  Nor does it cover any music performances on the free, advertising-supported Rhapsody.com.  (SF ¶ 228.)

427. In addition, the BMI-RealNetworks Agreement does not cover music performances contained in music videos, movie trailers or clips that may appear on Rhapsody.com or RadioPass.  (Tr. 896:11-15, 897:1-4 (Sheeran).)

428. The BMI-RealNetworks Agreement expressly excludes conditional downloads and permanent downloads from the scope of the license.  (ApX. 74, § 3(b))  If the Court determines that conditional downloads implicate the public performance right, BMI will seek additional payment from such performances.  (Conlon Dep. Tr. 98:16-99:4.)

429. Under the BMI-RealNetworks Agreement, all revenue derived from the Rhapsody subscription service is subject to fee.  No revenue is excluded.  This was confirmed by Applicants' expert, Dr. Amy Bertin Candell ("Candell").  (Tr. 1741:9-1742:14 (Candell).)  For the Rhapsody subscription service, RealNetworks pays BMI: (a) 1.75% of net revenue attributable to radio-style programming; and (b) 2.5% of net revenue attributable to on-demand streaming.  (ApX. 74, § 4(a).)  For the RadioPass subscription service, RealNetworks pays BMI 1.75% of total gross revenue from the service.  (*Id.*, § 4(b).)

430. "Gross revenue" is defined as "all retail and other revenue and payments collected by, or on behalf of, or due to, [RealNetworks] or its Affiliates" in connection with the licensed Programming Services, including revenue from subscription fees, commissions on third-party transactions, third-party advertising and sponsorships, product placement and promotions, and sales of proprietary software used to access the Programming Services.  (*Id.*, § 2(f).)  "Net revenue" is defined as gross revenue minus revenue attributable to performances of conditional downloaded

music, performances which are not covered by the license.  (*Id.*, § 2(h).)

431. The BMI-RealNetworks Agreement does not distinguish between revenue "directly attributable" to the RadioPass or Rhapsody service and other revenue.  Thus, advertising and sponsorship revenue subject to fee is not limited to ads that appear on a player.

### 3. The BMI-MusicNet Agreement

432. BMI and MusicNet entered an agreement in December 2006 setting final license fees for the period September 20, 2001 through December 31, 2009.  (Conlon Dep. Tr. 20:6-13; ApX. 33.)

433. MusicNet is a "white-label" supplier of music to third-parties.  (SF ¶ 237.)  MusicNet is a wholesaler that provides "back-end" services—such as technology and rights licenses—associated with subscription music offerings for music transmitted to consumers through and with the branding of a third-party distributor, which in turn has the direct relationship with the end-user.  (*Id.*)  MusicNet supplies music to a number of digital companies, including Yahoo! for the Yahoo! Music Unlimited service.  (*Id.*)  MusicNet has not supplied music to RealNetworks during its open period.

434. The BMI-MusicNet Agreement calls for MusicNet to pay BMI fees on the basis of three revenue categories to which are applied different license rates: (a) 1.75% of "Net Revenue attributable to streams of DMCA-Compliant Programming"; (b) 2.15% of "Net Revenue attributable to Interactive Stream Transmissions"; and (c) 2.5% of "Net Revenue attributable to On-Demand Stream Transmissions."  (ApX. 33, § 4(a).)

435. While "DMCA-Compliant Programming" and "On-Demand Stream Transmissions"

appear to refer to, respectively, audio-only webcasting and audio-only on-demand streaming, "Interactive Stream Transmissions" appears to be a catch-all category of music performances. Interactive Stream Transmissions are "the transmissions (if any) over the Internet of all or a portion of a musical work or works and all other streamed transmissions of musical works other than those made available as part of DMCA-Compliant Programming or On-Demand Stream Transmissions," and also exclude conditional and permanent downloads. (ApX. 33, § 2(h).)

436. The term "Interactive Stream Transmissions" would appear to include streams of music videos. However, it is unclear what, if any, Interactive Stream Transmissions MusicNet actually provides to its distribution partners, and whether any such transmissions include music videos. BMI and MusicNet did not negotiate or discuss music video transmissions under the BMI-MusicNet Agreement. (Conlon Dep. Tr. 223:16-25.)

437. Applicants have introduced no evidence showing the number or duration of transmissions of MusicNet-supplied "DMCA-Compliant Programming," "On-Demand Stream Transmissions," or "Interactive Stream Transmissions."

438. MusicNet supplies back-end music services primarily to subscription music services. (SF ¶ 237.) The agreement defines licensed "Programming Services" as "any or all of the Internet-based subscription music services supplied exclusively by LICENSEE through its Distribution Partners to be offered to consumers . . . ." (ApX. 33, § 2(l).) Thus, the BMI-MusicNet Agreement contemplates that the vast bulk of revenues generated by MusicNet will be from subscriptions, and not advertising. Indeed, MusicNet represented and warranted to BMI that "although Distribution Partners may have the ability to sell advertising availabilities and/or sponsorship opportunities in connection with the Distribution Partners' offering of the Programming Service, the amount of Gross

Revenue generated in connection with any such activity will be *de minimis* during the Term of this Agreement." (ApX. 33, § 2(e).)

439. Under the Agreement, "Gross Revenue" is defined as all revenue from subscription fees, commissions on third-party transactions, third-party advertising, and monies from music product placement or promotion of music. (ApX. 33, § 2(g).) "Net Revenue" attributable to a programming service is defined as "Gross Revenue minus (1) Distribution Partner Advertising Revenue; and (2) revenue attributable to Conditional Downloaded Music Transmissions made through the Programming Service." (ApX. 33, § 2(I).) The BMI-MusicNet Agreement expressly excludes conditional downloads and permanent downloads from the scope of the license. (ApX. 33, § 3(b).) Thus, all revenue derived from the licensed services is subject to fee.

440. The BMI-MusicNet Agreement also contemplates that MusicNet may offer free-to-the-consumer, advertiser-supported webcasting, provided that MusicNet "reports and pays license fees to BMI on all Gross Revenue generated in connection therewith (including revenue, if any, generated by Distribution Partners, even if such revenue is generated solely by a Distribution Partner)." (ApX. 33, § 2(l).) The BMI-MusicNet Agreement does not draw a distinction between advertising revenue "directly attributable" to a licensed service and other advertising revenue.

## CONCLUSIONS OF LAW

This Court has jurisdiction to determine reasonable fees for Applicants' ASCAP licenses in its capacity as "rate court" under Section IX of AFJ2, entered on June 11, 2001, in *United States v. American Society of Composers, Authors and Publishers*, Civ. Action No. 41-1395 (WCC). *See United States v. Am. Soc'y of Composers, Authors and Publishers (Applications of Capital*

*Cities/ABC, Inc. and CBS, Inc.)*, 831 F. Supp. 137, 140 (S.D.N.Y. 1993) ("*Capital Cities I*"). AFJ2

is the most recent version of the original consent decree between the United States and ASCAP,

entered in 1941 and amended from time to time since then, which settled the United States's antitrust

action against ASCAP. *Capital Cities I*, 831 F. Supp. at 140. The terms of AFJ2 largely regulate

the manner in which ASCAP licenses the public performance right in the musical compositions in

its repertory.

When ASCAP receives a written request for a license, ASCAP must advise the music user

of the fee that it deems "reasonable for the license requested or the information that it reasonably

requires in order to quote a reasonable fee." AFJ2 § IX(A). If the parties are unable to agree on a

reasonable fee within sixty days from ASCAP's receipt of the license request or of the additional

information, the party requesting a license may apply to this Court "for a determination of []

reasonable fee[s]." *Id.* If the parties cannot agree within ninety days, and the music user has not

applied to this Court, then ASCAP may apply for a determination of reasonable fees. *Id.*

Applicants sought, and ASCAP proposed, license fees based on a percentage of Applicants'

revenues. Because the Applicants and ASCAP were unable to agree on fees within the prescribed

periods, ASCAP applied to this Court for the determination of reasonable fees.

Like its predecessor, the 1950 Amended Final Judgment, AFJ2 provides no guidance as to

how the Court should arrive at a reasonable fee, and it specifies no criteria by which to determine

the reasonableness of a fee. *See Capital Cities I*, 831 F. Supp. at 143. Certain general principles

apply, however, in determining a reasonable fee for a blanket license. The task "necessitates an

appraisal of 'fair market value' – an appraisal based essentially on an estimation of 'the price that

a willing buyer and a willing seller would agree to in an arms-length transaction.'" *Id.* (quoting *Am.*

*Soc'y of Composers, Authors and Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir. 1990) ("*Showtime*")).

Such an appraisal is difficult because "the market for blanket licenses appears to be one whose natural consequence is the lack of broad-based competition." *Capital Cities*, 831 F. Supp. at 144. Attempts to fix a reasonable fee for a blanket license based on an approximation of the fee that a competitive market would yield "is perplexing in theory, impractical in practice, and dubious in outcome given the efficiencies obtained due to the aggregating nature of the service rendered." *Id.* Indeed, "there exists minimal evidence as to what that market would look like, much less the prices it would yield." *Id.*

As a useful starting point, the Court has often considered previous agreements voluntarily entered into between the parties, or those similarly situated, for the same or a comparable license. *Id.* Such comparable agreements, sometimes called "benchmarks," are often "very imperfect surrogates," *id.* (quoting *Showtime*, 912 F.2d at 577) but they provide a "tangible foundation from which to commence this inquiry." *Id.*

Even when reliable benchmarks are available, the Court will not merely endorse them as appropriate for purposes of setting the present rate. *Id.* at 145. The Court will determine whether adjustments are necessary and appropriate to reflect the different circumstances of the parties to the rate-setting proceeding. *Id.* In analyzing suggested benchmarks and determining whether and how they might be adjusted for rate setting purposes, the Court examines several factors, including "the degree of comparability of the negotiating parties to the parties contending in the rate proceeding, the comparability of the rights in question, and the similarity of the economic circumstances affecting the earlier negotiators and the current litigants." *United States v. Am. Soc'y of Composers,*

118

*Authors and Publishers (Application of Buffalo Broad. Co.)*, No. 13-95 (WCC), 1993 WL 60687,

at *18 (S.D.N.Y. Mar. 1, 1993) (Dolinger, M.J.) ("*Buffalo Broadcasting*").

An ASCAP blanket license is a unique transaction. In addition to conveying the right to

perform the ASCAP musical works publicly, a blanket license offers the flexibility of immediate and

unlimited access to a vast and ever-growing repertory of compositions, without the cost and delay

of consummating individual agreements, and without the concern of exposure to liability for

copyright infringement. With regard to ASCAP members, the blanket license achieves efficiencies

in the monitoring and enforcement of individual copyrights; its absence would significantly raise the

cost of licensing and the cost of performing the desired compositions. *Capital Cities I*, 831 F. Supp.

at 144.

> The Supreme Court has recognized the inherent benefits of the blanket license:
>
> This substantial lowering of costs, which is of course potentially beneficial to both
> sellers and buyers, differentiates the blanket license from individual use licenses.
> The blanket license is composed of the individual compositions plus the aggregating
> service. Here, the whole is truly greater than the sum of its parts; it is, to some
> extent, a different product. The blanket license has certain unique characteristics: It
> allows the licensee immediate use of covered compositions, without the delay of
> prior individual negotiations and great flexibility in the choice of musical material.
> Many consumers clearly prefer the characteristics and cost advantages of this
> marketable package . . . .

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 21-22 (1979) ("*BMI v. CBS*"). The

efficiency and cost saving features are even more valuable to Internet companies like Applicants that

stream millions of works online. Unlike traditional broadcast media, who could seek direct and

source licenses for the ASCAP music they perform (*see Capital Cities I*, 831 F. Supp. at 152-53),

Applicants could not perform the millions of works they offer without the blanket license

mechanism. Because the benefits of a blanket license exceed the value of the right to perform the

music in the repertory, the blanket license fee must reflect these extra benefits. *Buffalo Broadcasting*, 1993 WL 60687, at *36 ("Since we are valuing the license itself, and not merely the particular music used in the stations' syndicated and local programming . . . pricing the license for the stations based purely on the amount of music used may understate the appropriate fee for the license") (internal citation omitted); *United States v. Am. Soc'y of Composers, Authors and Publishers (Application of Showtime/The Movie Channel, Inc.)*, 1989 WL 222654, *20 (S.D.N.Y. Oct. 12, 1989 ) ("full value" of blanket license includes "market value of the aggregative function of the license").

A fee for a blanket license that is based on a percentage of an applicant's gross revenue must take into account the extent and value of the licensee's music use. *Capital Cities I*, 831 F. Supp. at 158. As the Court has explained:

> [I]t is appropriate to rely on the change in the amounts of music actually used as a measure of the change in the value to the network of all the rights conveyed by the blanket license. This decision is based on the belief that the 'access' and 'indemnification' components of the blanket license—comprising, essentially, an option to use with impunity as much ASCAP music as desired—must themselves be wholly dependent on the amount of music a licensee expects to use. Indeed, it is obvious that the option to use even an unlimited amount of ASCAP music has no value to an entity that uses no ASCAP music. It also seems clear that the value of the 'option' feature of the blanket license is directly proportional to the amount of music the licensee uses. Thus, on a prospective fee-setting basis, one who expects to use large amounts of ASCAP music may be expected to accede to higher prices than those agreed to by one who expects to use lesser amounts.

*Id.* at 162.

In proceedings to determine reasonable ASCAP license fees, the burden is on ASCAP to establish the reasonableness of the fee it seeks. AFJ2 § IX(B). Should the Court determine that ASCAP's fee proposal is reasonable, the Court will adopt it. AFJ2 §§ IX(B), (D). If the Court finds that ASCAP's proposal is not reasonable, then it must determine a reasonable fee based on all of the

evidence. *Id*. § IX(D). In this context, the Court may consider, but need not adopt, the applicant's counter-proposal. The Court may also make adjustments to ASCAP's proposal to bring it within the range of reasonableness. *See United States v. Am. Soc'y of Composers, Authors and Publishers (Applications of Salem Media of Calif. Inc.)*, 981 F. Supp. 199, 222 (S.D.N.Y. 1997) (finding ASCAP's proposal reasonable and nondiscriminatory with three modifications).

The determination of whether ASCAP's fee proposals are reasonable has two elements: first, whether the structure of each proposal is reasonable, and second, whether the amount payable by each Applicant is reasonable. As discussed below, this Court concludes that ASCAP's proposal to use a percentage-of-total-revenue formula, which is adjusted to reflect the amount of music use, is basically fair and reasonable, although the fee rate ASCAP proposes to apply to the revenue attributed to the performance of music is not. However, the Court concludes that the evidentiary record is sufficient to permit the Court to set a reasonable fee.

ASCAP's proposal for a blanket license that allows each Applicant to use the entire repertory of ASCAP music, as much as they like, for a specified license fee that is a percentage of the Applicant's gross revenue derived from the licensed services is structurally reasonable. In the case of AOL and Yahoo!, the Applicant's gross revenue is adjusted by a factor designed to reflect the extent and value of the Applicant's music use, which is likewise a reasonable approach.

The percentage-of-total-revenue formula has been used by ASCAP and approved by the courts for decades. *See, e.g., BMI v. CBS*, 441 U.S. at 5 ("Fees for blanket licenses are ordinarily a percentage of total revenues or a flat dollar amount. . . ."); *Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 922 (2d Cir. 1984) (blanket license to local television stations is "conveyed for a fee normally set as a percentage of the station's revenue"). Indeed, all of ASCAP's final licenses introduced at

trial use the percentage-of-total-revenue structure, with the exception of the flat-fee arrangements with television networks and the radio industry. *See, e.g.*, JX 10, § H; 11, § H; 12, § H; AsX. 24, § IV(A). In each of these license agreements, the licensee's gross revenue — defined as all revenue derived from the licensed service — is the starting point for calculating the license fee.

This formula has been widely used and accepted for several reasons. First, it is economically efficient because it does not tax performances of music at the margin. That is, it does not charge a positive price for each additional performance of music, thereby creating a disincentive for Applicants and their customers to perform music. (Tr. 409:1-413:9 (Greene).) Second, it yields a fee that adapts to changes in the economic conditions confronting the licensee. *See Capital Cities*, 831 F. Supp. at 158; *see also United States v. Am. Soc'y of Composers, Authors and Publishers (Application of Capital Cities/ABC, Inc.)*, 157 F.R.D. 173, 194 (S.D.N.Y. 1994) ("*Capital Cities II*"). As the Court explained in *Capital Cities*, a license formula based on gross revenue:

> adjusts automatically for changes in the economy—primarily inflation—as well as changes in the financial fortunes of the network, such as the consequences of competition from other sources of home entertainment. . . . It accounts for the financial effect on the network of variations in viewership or audience share. . . . On a forward-looking basis, it allows for a complex of changing circumstances that cannot be anticipated and shares between the parties the risk therefrom. . . . Finally it facilitates even-handed treatment among licensees to the extent that it self-adjusts for variations in the relative financial fortunes of each network. . . . *See* Consent Decree, Sec. IV© (encouraging even-handed treatment between licensees similarly situated). In short, gauging the changes in gross revenue provides a practical proxy by which to incorporate a range of considerations.

831 F. Supp. at 158.

Third, the percentage-of-total-revenue formula relies on financial data that are easy to determine, and simple for ASCAP to verify. Gross revenue is a figure that companies commonly collect in the ordinary course of business for purposes other than reporting to ASCAP, including for

income tax purposes and financial auditing purposes. Thus, companies have every incentive to report the figure accurately, and individual parties to a percentage-of-total- revenue license can have greater confidence in the accuracy of the reported number.

Fourth, the percentage-of-total-revenue formula provides all of the efficiencies of a true blanket license. Under ASCAP's proposal, Applicants will have the right to perform all of the millions of works in the ASCAP repertory throughout their sites and services without limitation or restriction. Applicants will also be free to alter their services, add new services that use music, and employ new strategies to monetize their services, without requiring the parties to determine how or whether ASCAP will be compensated under the license agreement. Thus, the parties will not need to reexamine or renegotiate the terms of the agreement or litigate in the rate court. Indeed, this feature is particularly valuable given the dynamic nature of Applicants' businesses. Applicants have frequently changed or added to their music services, for example by adding the AOL Top 100 Music Video Widget, by offering music and music videos on AOL's and Yahoo!'s search services, and by AOL's recent change from a subscription-based business to an advertising-supported business. (FF ¶ 70.) Accordingly, ASCAP's proposal achieves administrative efficiencies that benefit both ASCAP and Applicants. *See Capital Cities I*, 831 F. Supp. at 144.

This Court has cautioned that a fee for a blanket license that is based on a percentage of an applicant's gross revenue must also take into account changes in the licensee's music use. *Capital Cities I*, 831 F. Supp. at 158. In *Capital Cities I*, the Court declined to order a fee for the ABC and CBS television networks based solely on calculating a percentage of each network's respective gross revenue. *Id.* Instead, the Court adjusted the fees based on changes in both gross revenues and music use. *Id.* at 164. In so holding, the Court explained that, "for the purposes of a rate-setting inquiry,

we think it appropriate to assume that the value of the blanket license to a network will vary in direct proportion to the amounts of music used by that network, all other factors remaining equal." *Id.* at 162.

Following the Court's instruction in *Capital Cities I*, ASCAP proposed a music-use-adjustment factor that properly takes into account the possibility that "the amounts of music used" by Applicants may vary, and thus "the value of the blanket license" should also vary. *See Capital Cities I*, 831 F. Supp. at 162. The adjustment results in a license fee that is responsive to changes in the applicant's use of music, and not just the company's gross revenues. (Tr. 414:22-415:7 (Greene).) That is, if AOL's gross revenues and site hours remain the same ("all other factors remaining equal"), the AOL fee payable to ASCAP will rise or fall proportionally to the change in music streaming hours.

By applying a ratio of music hours to total site hours, ASCAP's formula for AOL and Yahoo! takes into account the relative importance of music to the overall entertainment enterprise and the evolving nature of Applicants' businesses.

The music-use-adjustment factor also has the effect of substantially reducing the rate base to which the royalty rate is applied. For Yahoo!, the rate is applied to only ███ of the total 2006 revenue from the licensed services. (AsX. 356.) For AOL, the rate is applied to only ███ of the total 2006 revenue from the licensed services. (AsX. 355.)

The number of unique visitors to Yahoo! and AOL, as reported by comScore, further demonstrates the reasonableness of ASCAP's adjustment ratio. Between 2003 and 2006, the number of unique visitors to Yahoo! Music webpages (where not all performances of music occur) made up about 10% to 20% of the unique visitors to all of Yahoo!. (Tr. 2018:2-12 (Boyle); AsX. 351.)

Likewise, in 2005 and 2006, more than 23% of all unique visitors to the AOL network of sites visited AOL Music. (AsX. 350.) Thus, putting aside all other portions of their Internet properties that perform audio and audiovisual content, AOL's and Yahoo!'s respective music-oriented site sections are popular destinations that generate substantial audience interest and, in turn, revenue.

ASCAP's proposal does not apply a music-use-adjustment factor to RealNetworks revenues because it considers that the vast majority of RealNetworks's revenue subject to fee is generated from subscription music services and advertising-supported sites where music is the central theme. RealNetworks did not produce comprehensive data on total time spent (or total music listening hours) on its network of properties and services, so ASCAP could not propose the same formula for RealNetworks. (Tr. 233:7-9; 233:25-234:2 (DeFilippis).)

The amounts that music users such as Music Choice, terrestrial radio stations, and the major television networks ABC, CBS, and NBC pay for an ASCAP blanket license, as well as the amounts that Applicants themselves willingly pay to the major record companies for rights in music videos alone, are the best indicators of "the price that a willing buyer and a willing seller would agree to in an arms-length transaction" for a blanket license to perform ASCAP music. *See Capital Cities I*, 831 F. Supp. at 143 (quoting *Showtime*, 912 F.2d at 569).

In this novel proceeding, there are no perfect comparables. No other ASCAP licensee offers the full panoply of music uses and options available to each of the Applicants or the myriad ways in which they use music to generate revenue. No other ASCAP licensee performs the number and variety of songs in the ASCAP repertory that Applicants perform. Indeed, the ASCAP blanket license is uniquely valuable to Applicants and other Internet music users. With the widespread and growing adoption of broadband, high speed Internet access and increasingly powerful home

computers, for the first time in history, Applicants can and do make the vast selection of popular musical works in the ASCAP repertory available to virtually anyone, anywhere, at any time, entirely on-demand, on any device capable of an Internet connection, quickly and with high-quality sound and video. This unprecedented capability to make millions of songs available to the entire nation all at once far outstrips the music distribution capabilities of all other, passive media such as radio or television.

The current license agreement between ASCAP and Music Choice, which is a freely agreed upon, voluntary, and non-experimental license that reflects the price that a willing buyer is paying to ASCAP, a willing seller, for the ASCAP blanket license. It provides a fee rate of 2.5% of the licensee's total revenues. (FF ¶ 352.) Music Choice is in many respects comparable to RealNetworks. Both companies are music-oriented companies, both offer numerous channels of music programming, and both perform music via the Internet. Music Choice derives all of its revenue from offering music performances. (FF ¶ 349-51.) Similarly, RealNetworks derives a substantial portion of its revenue – more than half of its Consumer Products and Services revenue – from selling its music-oriented subscription services, such as Rhapsody and RadioPass. (FF ¶¶ 203-06.)

Application of the Music Choice rate to the use of music by RealNetworks's would be reasonable, if not an undervaluation of the importance of music to RealNetworks. Music Choice is mostly music-focused, but it does not give listeners access, as RealNetworks does, to on-demand audio-only music and music videos, and a broad selection of music-containing streams such as movies, television programming, and other audiovisual content. (FF ¶¶ 148, 349.)

Applicants have themselves suggested that 2.5% is an appropriate ASCAP license rate for

revenue "directly" generated from on-demand audio music performances. (FF ¶ 393.) This tends to confirm that the on-demand nature of Applicants' services warrants a license fee no less than that which has been agreed to between ASCAP and Music Choice, which offers only pre-programmed content.

A fee of 2.5% of music-derived revenue is also reasonable in comparison to the fees paid to ASCAP under the blanket license agreements in effect for three of the major television networks, ABC, CBS, and NBC. These agreements are particularly relevant to AOL and Yahoo!. Like AOL and Yahoo!, ABC, NBC and CBS offer a variety of entertainment and information programming that varies in intensity of music use (*e.g.*, from network news and sports, to dramatic series, to music variety shows). These music performances by ABC, CBS, and NBC are similar to Applicants' music uses, as the networks and Applicants all perform feature, theme, and background music in audiovisual programming. (FF ¶ 354.) But unlike ABC, CBS, and NBC programming, which the networks transmit into homes and workplaces for viewers to experience passively, much of the audiovisual programming offered by Applicants is streamed "on-demand" to users who determine what programming is streamed and when.

Moreover, the gross domestic revenues for these networks are comparable to those for AOL and Yahoo!. (FF ¶ 356.) Applicants criticize a comparison of their gross income to that of the TV networks as an improper "ability to pay" consideration. (ApRS ¶¶ 13, 56.)[4] The Court believes otherwise, that it further confirms the reasonableness of its tentative fee determination.

Comparison of the major television networks with RealNetworks is not appropriate because, unlike the networks' programming, RealNetworks's services are largely subscription-based and

---

[4] "ApRS." refers to Applicants' Reply Submission.

dedicated to offering music performances.  (FF ¶ 143.)

The flat-fee structure of ASCAP's network licenses is appropriate in the context of the broadcast television industry which is mature, and where the lump sum arrangements reflect a long history of negotiations between the parties and the comparatively settled nature of that industry.  A flat-fee structure is unsuitable for the online music industry, which is new and very dynamic, and Applicants' business models and modes of delivering music are evolving constantly.  Moreover, the networks do not have extensive programming akin to Applicants' wall-to-wall audio webcasting features and on-demand music and music video performances.

For comparison purposes, however, the license fees paid are useful to gauge the reasonableness of the fee range ASCAP seeks from AOL and Yahoo!, and these Applicants' ability to pay the blanket fees rather than resorting to less efficient licensing options or foregoing the use of ASCAP music altogether.

The three television networks, ABC, CBS, and NBC, have annual revenues in the range of $3 to $4 billion—comparable to current AOL and Yahoo! revenues—and pay approximately ███ ██████ in fees to ASCAP every year.  (Tr. 266:21-24 (Boyle); SF ¶¶ 212-14.)  These amounts are significantly greater than the amounts AOL and Yahoo! would pay, as shown in the table below:

|       | Yahoo!   | AOL      | ABC      | CBS      | NBC      |
|-------|----------|----------|----------|----------|----------|
| 2003  | $ 1.0 m  | --       | ████     | ████     | ████     |
| 2004  | $ 3.7 m  | --       | ████     | ████     | ████     |
| 2005  | $ 7.8 m  | $ 4.4 m  | ████     | ████     | ████     |
| 2006  | $ 6.1 m  | $ 5.9 m  | ████     | ████     | ████     |

(AsX. 12, 19, 20; SF ¶¶ 212-14.)

A fee rate of 2.5% is also reasonable when compared to the fees paid by the major television networks as a percentage of revenue of the licensed services.  *See Capital Cities I*, 831 F. Supp. at

165 (determining that ABC and CBS fees payable to ASCAP were substantially similar to the rate paid by NBC, when viewed as a percentage of total revenue). Expressed as a percentage of total domestic revenue, the tentative fees for the Applicants are substantially less than the fees paid to ASCAP by the three networks:

| | Yahoo! | AOL | ABC | CBS | NBC |
|---|---|---|---|---|---|
| 2003 | ▪% | ▪ | ▬ | ▬ | ▬ |
| 2004 | ▪% | ▪ | ▬ | ▬ | ▬ |
| 2005 | ▪% | ▬ | ▬ | ▬ | ▬ |
| 2006 | ▪% | ▬ | ▪ | ▪ | ▪ |

(AsX. 12, 19, 20; SF ¶¶ 212-14; Tr. 280:7-11 (Boyle).)

Thus, AOL would pay ███████████ what each television network pays for an ASCAP blanket license. For Yahoo!, which has a higher ratio of music listening hours to overall site hours, the range of fees would be less than each of the major television networks pays.

A fee rate of 2.5% of music-use-adjusted revenue is also reasonable compared to the rate of 1.615% of total revenue (less allowed deductions) that applied to the terrestrial broadcast radio industry under a freely-negotiated agreement that ended a number of years ago. Indeed, for AOL and Yahoo!, the adjusted rates – 0.12% to 0.18% of total revenue derived from the licensed services – are roughly one tenth of what the radio broadcasters paid for similar ASCAP blanket license rights.

For RealNetworks, an upward adjustment from 1.615% to 2.5% is warranted because RealNetworks' services are vastly broader than those offered by any terrestrial radio station. RealNetworks webcasts about 25% more music per hour than a typical terrestrial radio broadcaster. (ApRS. ¶ 50.) Terrestrial radio stations typically perform eleven or twelve songs per hour, compared to about fifteen songs performed per hour by online webcasters. (*Id*.) Increasing 1.615% by 25% would result in a fee rate of 2.02% for non-interactive streaming.

129

Moreover, each Applicant has the ability to perform ASCAP music in ways that are impossible on terrestrial radio. Each Applicant can offer its customers the ability to stream virtually any selected song, music video or individually designed playlist, at any time on-demand. Furthermore, terrestrial radio stations cannot offer the audiovisual programs with feature, theme and background music, which are available on-demand throughout Applicants' sites. Nor can they offer customizable radio broadcasting, the ability to skip songs, or the ability to stream entire CDs on demand without commercial interruption. Nor do they offer any of the integrated features found on Applicants' sites, such as the ability to IM (instant message) or e-mail a song to a friend, or "snag" a music video and place it on one's personal webpage. (FF ¶¶ 120, 122, 124.) Furthermore, terrestrial radio stations use only a small percentage of the entire ASCAP repertory in any given year; Applicants offer millions of works.

The tentative fees are also reasonable when compared to the fees currently paid by the major terrestrial broadcast radio station conglomerates, which, although based on a flat industry-wide fee, are equivalent to a higher percentage than the 1.615% of a radio station's gross revenue under the former broadcast radio license. (FF ¶ 361.) Currently, Clear Channel, which operates about 1,050 terrestrial radio stations, pays approximately ███████████ in license fees to ASCAP. (Tr. 265:2-11 (Boyle).) Infinity Broadcasting, which operates about 150 terrestrial radio stations, pays approximately ██████████ in license fees to ASCAP. (Tr. 265:17-21 (Boyle).) These sums greatly exceed the amounts that ASCAP would receive from AOL, Yahoo!, and RealNetworks, which have been described as the online equivalents of Clear Channel and Infinity. (Tr. 1529:8-25 (Winston).)

The tentative fee rate of 2.5% of music-use-adjusted revenue is also reasonable when compared to the rate that ASCAP's general entertainment cable television licensees pay for an

ASCAP blanket license, 0.375% of total revenue derived from the licensed service. Indeed, the ASCAP general entertainment cable television rate ████████████████████████ and more than ██████████ for AOL ███████ (FF ¶ 364.), despite the fact that the general entertainment television networks cannot offer the range of music services, on-demand features, and customizability that Applicants offer.

The tentative fees, amounting to 0.12% to 0.18% of Applicants' net revenue, are even further below the rate that ASCAP's music intensive cable television licensee, ████, pays for an ASCAP blanket license, 0.9% of total revenue derived from the licensed service. (FF ¶ 369.)

The tentative fees are also well below the rate paid by Applicants to the record companies for the right to perform their music videos. Those licenses, which resulted from arms-length negotiation in a free market, are compelling evidence of the value Applicants place on music, and the price they should pay ASCAP for an even broader set of rights.

The Copyright Act has long granted to creators of music and audiovisual works the exclusive right to perform their copyrighted musical works publicly. 17 U.S.C. § 106(4). In 1995, Congress passed a new law (the Digital Millennium Copyright Act or "DMCA") granting the right to perform copyrighted sound recordings publicly by means of digital audio transmissions. 17 U.S.C. § 106(6). Thus, there are two separate copyrights implicated in Applicants' digital audio performances of songs through their Internet properties: (a) the right in the musical works, which comprises the melodies and/or lyrics that underlie all songs, and which are written by songwriters and generally licensed in the United States by performing rights organizations (ASCAP, BMI and SESAC); and (b) the right in the sound recordings, which is the particular recording of the work by a particular artist or band, the copyright in which is typically owned by record companies.

Similarly, all of Applicants' performances of music videos require licenses of two copyrights: (a) the performance right in the musical work, generally licensed by performing rights organizations; and (b) the performance right in the audiovisual work, generally licensed by the record companies. *See* 17 U.S.C. § 106(4).

Ordinarily, where a right exists, the copyright owner is free to choose to license that right to others or not. Under AFJ2, however, ASCAP must grant a blanket license to any music user that makes a written request, and if the parties cannot agree on license fees, this Court will determine the appropriate license fee for the applicant's music use. AFJ2 §§ VI, IX. Similarly, the record companies must grant licenses to perform non-interactive digital sound recordings (so-called DMCA-compliant audio webcasting), the fee for which, if the parties cannot agree, is set by the Copyright Royalty Board in Washington, DC. 17 U.S.C. § 114(d)(2), (f). Their rights in music videos, however, are not subject to compulsory licensing.

For the right to digitally perform the record companies' sound recordings, each of the Applicants makes a series of payments to the record companies. AOL, Yahoo! and RealNetworks pay a collective organization called SoundExchange for their performances through their non-interactive, non-subscription Internet properties (i.e., free internet radio programming that is not interactive). (Tr. 1992:10-16 (Boyle).) For free, interactive programming, and all subscription services performances (such as RealNetworks's Rhapsody, AOL's Music Now, and AOL's free on-demand audio performances (e.g. Free CD Listening Parties)), Applicants must separately negotiate with and arrange to pay the record companies. Separately, each of the Applicants has contracted with and pays the major record labels for the right to perform music videos.

For all of the performances for which Applicants pay the record companies, they also need

the rights to perform the underlying musical works, and their ASCAP blanket licenses must account for the value of those performances, including those in music videos that the record companies may allow to be performed at no charge. Furthermore, Applicants' ASCAP license must take into account the value of the significant number of performances that Applicants make in all of their other audio and audiovisual programming, such as RealNetworks' SuperPass and free television programs; movies, trailers and clips; user-generated video; children's programming; and videos in all other areas of their sites, such as news, health, sports, teen, personals, autos, etc.; and the still growing number of performances of audio and video advertising throughout Applicants' properties. Applicants apparently do not currently count these music performances, but they have developed systems to track music performances for the record companies, and they have the technology to properly track and account for all other music performances. (*See, e.g.*, Tr. 974:8-10; 976:7-18; 982:9-16 (Wan); AsX. 207.)

By statute, license fees payable for public performances of sound recordings may not be taken into account in this judicial proceeding to set the royalties payable to the copyright owners of musical works (through ASCAP) for the public performance of their works. 17 U.S.C. § 114(I). It was, however, the expressed "intent of Congress that royalties payable to copyright owners of musical works for the public performance of their works shall not be diminished in any respect as a result of the rights granted by section 106(6)" (the digital performance right in sound recordings). *Id.* But while the Court cannot consider the fees paid by Applicants for the performance of sound recordings, it may consider the fees paid by Applicants for the performance of music videos. Music videos are not "sound recordings," but are "audiovisual works" that are not subject to the statutory prohibition against using sound recordings as a benchmark. 17 U.S.C. §§ 101, 102(a)(6), 114(I).

Each Applicant holds licenses with record companies authorizing them to publicly perform music videos. Under arms-length agreements freely entered into by AOL and Yahoo!, these Applicants have paid a number of major record companies – including Sony BMG, Universal Music Group, and Warner Music Group – substantial fees each year, for the right to perform music videos. (FF ¶¶ 373-80, 385-90.) The Applicants negotiated these agreements in the open marketplace. (Tr. 1276:18-22 (Roback).) The record companies are not subject to a consent decree, and are not required to sell rights in music videos to the Applicants. (Tr. 1276:15-17; 1276:23-25 (Roback).)

Applicants have argued that music videos cannot be reliable benchmarks because an audiovisual work—which is made up of both sound and visual components—is arguably different from the musical work embodied in the video. The difference, however, is immaterial. The copyright law does not divide an audiovisual work into separate sound and visual components. The work is treated as a single, unitary "audiovisual work." 17 U.S.C. § 101 ("'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work . . . ."). Moreover, the main point of a music video is the music. Without the music, the visual component has little value, but the music is valuable with or without the visual component.

Applicants have also asserted that the rights granted for music videos do not correspond to the rights granted in this proceeding for musical works because a number of the license agreements between the record companies and Applicants also include rights to reproduce the videos. The reproduction rights granted, however, are limited to making such copies as are necessary to perform the music videos online; Applicants are not authorized to sell copies or downloads of the videos. (FF ¶ 373-90.) Yahoo! concedes that the purpose of its music video agreements with the record

companies is to permit Yahoo! to stream music videos. (Tr. 1172:18-20 (Rogers).) The fees Applicants agreed to pay the record companies for the right to stream music videos thus fairly represent the value of the performance right in the music video work.

In 2005 and 2006, AOL and Yahoo! paid the major record companies the following amounts for the right to perform music videos:

| | AOL 2005 | AOL 2006 | Yahoo! 2005 | Yahoo! 2006 |
|---|---|---|---|---|
| Sony BMG | ■■■ | ■■■ | ■■■ | ■■■ |
| Universal Music Group (UMG) | ■■■ | ■■■ | ■■■ | ■■■ |
| Warner Music Group (WMG) | ■■■ | ■■■ | ■■■ | ■■■ |
| EMI | ■ | ■ | ■ | ■ |
| Total | ■■■ | ■■■ | ■■■ | ■■■ |

(AsX. 357 (chart).)

Assuming that ASCAP has a 50% share of all the music in all the music videos performed suggests that it would be reasonable for Applicants to pay to ASCAP— for the right to perform the ASCAP music in those music videos — half of what they pay to the major record companies for the rights to perform the videos.

The amounts paid by AOL and Yahoo! to record companies for performance rights in music videos reflect only a fraction of the total value of Applicants' music performances. These amounts do not reflect the full value of the rights to perform music through their audio webcasting, on-demand audio, movies, television shows, clips, trailers, user-generated videos, user-uploaded videos, and other audiovisual programming that use feature, theme, and background performances of music. Moreover, Applicants stream far more hours of audio webcasting and on-demand audio than of music videos. For example, in 2005, Yahoo! streamed ■■■■ hours of music videos, about ■■ of the total ■■■■ hours of music streamed on Yahoo! (which does not include all of

Yahoo!'s hours of feature, theme, and background performances in audiovisual programming).  (FF ¶ 278.)

Although ASCAP has not met its burden of proving its fee proposals are reasonable exactly as proposed, the Court concludes that its proposed formula for computing the fees is basically sound.  *See* AFJ2 § IX(B) (burden is on ASCAP to establish reasonableness of the fee it seeks); AFJ2 § IX(D) (court determines reasonable fee if it finds ASCAP proposal unreasonable).  The Court further concludes that ASCAP's proposal is reasonable with two previously discussed modifications: (1) reduction of the fee rate to 2.5% of the music-use-adjusted revenue; and (2) elimination of the revenue of RealNetworks' TPS segment from the rate base.

Despite having reached this conclusion, the Court will nevertheless briefly discuss some of the inappropriate aspects of Applicants' fee proposal.  Although Applicants are eligible to seek per-segment licenses (AFJ2 § VII), they each requested a blanket license from ASCAP to make unrestricted uses of the ASCAP repertory across all of their internet properties, free and subscription-based.  (FF ¶¶ 60, 144, 220.)  They have not requested a license for only certain subsections of their sites denominated "Music" (i.e., AOL Music and Yahoo! Music), nor have they requested a license for only specific types of music performances (such as on-demand streaming or music videos).  They each seek a license for all uses of ASCAP music, in any manner whatsoever, in any and all parts of their sites, including music uses that they may develop in the future.  However, they propose to pay for the blanket license fees based only on discrete categories of revenue that they "attribute" to delineated types of music performances.  Applicants' proposal resembles a per-segment license payment structure without the higher license fee rate, and with none of the music use restrictions, or the reporting, administrative fee, and burden-shifting elements, of a per-segment license.  This

Court has consistently rejected past efforts by music users to minimize their license fees by constructing their own forms of blanket or per-segment licenses. *See United States v. Am. Soc'y of Composers, Authors and Publishers (Applications of Muzak, LLC and DMX Music, Inc.)*, 309 F. Supp. 2d 566, 572-74 (S.D.N.Y. 2004) ("*Muzak I*"); *United States v. Am. Soc'y of Composers, Authors and Publishers (Applications of Muzak, LLC and DMX Music, Inc.)*, 323 F. Supp. 2d 588, 590-93 (S.D.N.Y. 2004) ("*Muzak II*"); *Capital Cities II*, 157 F.R.D. at 204-05; *United States v. Am. Soc'y of Composers, Authors and Publishers (Application of Shenandoah Valley Broad., Inc., Columbia Broad. Sys., Inc. and National Broad. Co., Inc.)*, 208 F. Supp. 896, 897 (S.D.N.Y. 1962) ("*Shenandoah*").

Under AFJ2, Internet music users, such as Applicants, have a choice between two different types of bulk performing rights licenses available from ASCAP, the blanket license and the per-segment license. AFJ2 §§ VI, VII. An ASCAP blanket license is a "non-exclusive license that authorizes a music user to perform ASCAP music, the fee for which does not vary depending on the extent to which the music user in fact performs ASCAP music." AFJ2 § II(E). Blanket licenses give the licensees the right to perform any and all of the compositions in the ASCAP repertory as often as the licensees desire for a stated term. *See BMI v. CBS*, 441 U.S. at 5; *Capital Cities I*, 831 F. Supp. at 144.

A per-segment license from ASCAP is a "non-exclusive license that authorizes a music user to perform any or all works in the ASCAP repertory in all segments of the music user's activities in a single industry, the fee for which varies depending upon which segments contain ASCAP music not otherwise licensed for public performance." AFJ2 § II(K). The per-segment license is analogous to the per-program license ASCAP offers to television and radio broadcasters. AFJ2 §§ II(J), II(K),

VII; *Muzak I*, 309 F. Supp. 2d at 573-74.

ASCAP must use its best efforts to provide a "genuine choice among the various types of licenses offered." AFJ2 § VIII(A).

The blanket license and per-segment license differ in several respects. The license fee rate for a per-segment license is applied to a different rate base than the rate for a blanket license. The rate for a per-segment license is applied only to revenue "attributable to each . . . segment that contains works in the ASCAP repertory not otherwise licensed for public performance," AFJ2 § VII(D)(2), whereas the rate for a blanket license is applied to the applicant's gross total revenues. *See Buffalo Broadcasting*, 744 F.2d at 925-27. Because a per-segment license fee rate is applied to a narrow rate base, the rate for a per-segment license is typically a multiple of the rate for a blanket license. (Tr. 2010:9-13 (Boyle).) ASCAP is also entitled to charge a separate fee to recover its costs of administering a per-segment license, but not a blanket license. AFJ2 § VII(B). A per-segment license, unlike a blanket license, requires the user to report music use so that ASCAP can determine which segments trigger a fee. *See Capital Cities II*, 157 F.R.D. at 205 (discussing analogous per-program license); *see also* AFJ2 § VII(A)(2).

Moreover, in rate proceedings, a music user that seeks a per-segment license from ASCAP has the burden of "demonstrating that its performances of music can be tracked and monitored to determine with reasonable accuracy which segments of the music user's activity are subject to an ASCAP fee and of demonstrating that the music user's performances of music can be attributed to segments commonly recognized within the music user's industry for which a license fee can be assessed." AFJ2 § IX(B). No such burden applies to an applicant for a blanket license.

In *Shenandoah*, the Court refused to order ASCAP to offer the local television stations a

blanket license to cover only locally produced programs while excluding syndicated programs. The Court found that:

> The type of license sought is neither the blanket nor per program license described in the judgment. Petitioners would have a composite sort of license, containing a little bit of both, which would grant them the right to use any, some or all of the compositions of ASCAP's repertory on all their locally-originated broadcasts, while excluding from such license music performing rights for network programs and prerecorded material produced after February 28, 1962 by persons other than petitioners; as to these, petitioners would demand that the rights be secured, cleared and paid for at the source.

*Shenandoah*, 208 F. Supp. at 897.

Similarly, in *Capital Cities II*, the Court refused to order, under ASCAP's per-program license, an incidental use fee for advertisements, promotions, public service announcements, and producers' logos, where the licensee would not have to report music use to ASCAP. The court explained the boundaries between the blanket and per-segment licenses:

> A blanket license is a license which enables the music user, for a pre-determined fee, to use as much or as little ASCAP music in its programming as it wishes without incurring copyright liability, without reporting or even keeping track of such music use. A per-program license, on the other hand, enables a music user to use as much ASCAP music as it wishes, but requires the user to report music use so that ASCAP can determine which programs trigger a fee. The incidental-use fee at issue is neither of the above.

*Capital Cities II*, 157 F.R.D. at 204-05.

Furthermore, in the ordinary course of business, none of the Applicants categorize their revenue in the manner they propose. (FF ¶¶ 207, 421.) Applicants' proposals each require a complex series of calculations that depend on information that Applicants have not regularly kept or maintained in the course of their businesses. (FF ¶¶ 419, 421.)

Moreover, Applicants' differentiated rate structure is distortionary, as the revenue categories they propose create incentives for Applicants to shift revenues and music uses to the lowest-cost

options. (Tr. 448:6-449:21 (Greene).) As ASCAP demonstrated at trial, Applicants can substantially reduce their fees payable to ASCAP by, for example, shifting paid ads from the player to the page behind the player, placing more house ads on the player, or launching music services outside of the "music areas" of their sites (where revenue is generated for ASCAP from paid ads on the page) – all without any change in their music use or their customers' experience of the music.

Applicants' fee proposals also fail to account for all revenues attributable to, and value derived from, Applicants' performances of music. Applicants' proposal bases fees only on revenues purportedly "directly" attributable to music performances. The proposal thus implicitly acknowledges that revenue is "indirectly" attributable to music, but excludes that revenue from its fee base.

This Court has cautioned against adopting a license fee structure that is likely to lead to disputes between ASCAP and licensees. *See Muzak II*, 323 F. Supp. 2d at 592 ("[W]e need not adopt immediately applicants' proposed flexible fee structure, which we view as likely to spawn expensive and time-consuming litigation every time that applicants enter into a new direct licensing arrangement during the license term."). Applicants' proposals rely on terms that have no precise definition and are susceptible of different interpretations. These ambiguities will inevitably lead to disputes, further negotiations, and possibly rate court litigation, or could lead to a substantial underpayment to ASCAP.

Applicants' proposal draws a sharp distinction between revenue from banner ads on a music "player" and revenue from banner ads off the player. As ASCAP demonstrated at trial, however, Applicants and their experts could not provide a precise definition of "player" and gave inconsistent descriptions of what constitutes a "player" for purposes of determining revenue "directly

attributable" to the performance. (Tr. 1814:19-1816:9; 1822:17-1824:4 (Candell).)

When asked how ASCAP would know whether AOL treated particular ad revenue as "on-player" ad revenue (assessed at the 0.9% rate) or off-player ad revenue (for which ASCAP gets no money), Candell responded that short of doing an audit of AOL, ASCAP would have to trust that AOL was reporting revenue accurately. (Tr. 1826:2-13 (Candell).)

The only "benchmark" agreement proffered by Applicants that applies differential rates to rate bases that are narrowly defined as revenue "directly attributable" to a type of music performance – the so-called "bottom-up" approach (ApC. ¶ 46) – is the BMI-Yahoo! Agreement. (FF ¶¶ 407-10.) However, that agreement is not a blanket license. A reliable benchmark agreement must convey the same or comparable rights. *See Capital Cities I*, 831 F. Supp. at 144. An agreement that is not a blanket license cannot serve as a benchmark for determining a blanket license fee because it does not reflect the value of the blanket license. *See BMI v. CBS*, 441 U.S. at 21-22 (a blanket license is "truly greater than the sum of its parts; it is, to some extent, a different product"); *Showtime*, 912 F.2d at 591 (the blanket license fee must reflect the extra benefits of a blanket license); *Buffalo Broadcasting*, 1993 WL 60687, at *36 ("Since we are valuing the license itself, and not merely the particular music used in the stations' syndicated and local programming . . . pricing the license for the stations based purely on the amount of music used may understate the appropriate fee for the license.").

BMI itself conceded that the BMI-Yahoo! Agreement is not a blanket license. (Conlon Dep. Tr. 114:9-15.) And Yahoo! admitted that, after three years of negotiations, it struck a partial deal with BMI in March 2007 for purposes of this proceeding. (Halley Dep. Tr. 83:15-19.) In reaching that deal, BMI expressly excluded from the license all of Yahoo!'s audiovisual programming that

contains feature, theme, and background music—so-called "Non-Incidental Uses"—which are found throughout Yahoo!'s site. (ApX. 90, § 2(I).) BMI also licensed music performances on Yahoo! Messenger and in advertisements on an experimental and non-precedential basis only. (ApX. 90, § 2(I), (z).) A license to cover the remainder of Yahoo! sites and services was left subject to further negotiations, which had not resulted in a final agreement eight months after the first deal was struck.


## SUMMARY

In its role as the "rate court" pursuant to AFJ2, this Court is charged with the daunting responsibility of placing a precise monetary value on an intangible asset – the right to unlimited public performance of any of the millions of musical compositions in ASCAP's repertory through an Internet medium that is growing explosively and evolving constantly. Such an evaluation obviously should not be based on inherently subjective estimates or mere speculation as to what imaginary buyers and sellers would do, but on such pragmatic considerations as the extent to which the availability of music performances on a website attracts visitors and thereby enhances the subscription and advertising revenues of its proprietor, and the fees which other media providers have agreed, through arms-length bargaining, to pay for similar blanket licenses.

Although many of the relevant facts, such as the revenue of the Applicants, the number of musical compositions they stream and the total music streaming time, are undisputed, the parties have widely divergent views as to how such data should be used in determining a reasonable blanket licensing fee for Applicants' performances of ASCAP-repertory music.

For each of the three Applicants, ASCAP proposes a relatively simple formula that begins with the Applicant's total domestic revenue from the licensed services, less customary deductions

for advertising sales commissions and traffic acquisition costs. Because AOL and Yahoo! provide their users with many services and features other than music, ASCAP reduces their net revenue figures by a "music-use-adjustment factor" – multiplying it by a fraction whose numerator is the total number of hours of music streamed from the Applicant's website and whose denominator is the total number of hours the Applicant's website is visited. Because ASCAP considers RealNetworks to be substantially a music-only service, ASCAP does not apply a music-use-adjustment factor to reduce its net revenues. In each case, ASCAP, having thus determined what it considers to be the portion of the Applicant's net revenue attributable to music streaming, then applies to this music-streaming revenue figure a fee rate of 3.0%. Application of this formula to the 2006 revenues of the respective Applicants would result in annual fees of $7,831,188 for AOL (FF ¶ 329), $7,376,887 for Yahoo! (FF ¶ 343) and $8,502,990 for RealNetworks (FF ¶ 337).

Contending that ASCAP has not sustained its burden of establishing that its fee proposal is reasonable, Applicants present their own proposal – a much more complex formula in which their revenue "directly attributable" to music streaming is broken down into five categories or "buckets," with different fee rates depending on the nature of the stream: (1) on-demand audio (2.5%); (2) internet radio (1.615%); (3) music video (0.9%); (4) general entertainment audio-visual (0.375%); and (5) non-entertainment audio-visual, such as news and sports (0.1375%). (ApC. ¶¶ 175-185.)[5] "Non-streaming" revenue, i.e. revenue not "directly attributable" to streaming, is broken down into two additional categories or "buckets," with different fee rates depending on the area of the website from which music is performed: the Music Area (0.6875%) or one of the General Entertainment areas (0.1875%). (ApC. ¶¶ 186-190.) In addition, to compensate for music streaming launched from

---

[5] "ApC." refers to Applicants' Post-Hearing Contentions.

outside the Music Area, for example from the Home Page or a Search page, Applicants propose a supplemental fee "uplift" calculated by multiplying the number of hours of streaming from players launched outside the Music Area by an Effective ATH rate derived by dividing the total General Music Area (i.e., non-streaming Music Area) revenue by the total music streaming hours in categories 1, 2 and 3 above. (ApC. ¶¶ 85, 191.) Applying this formula to the 2006 revenues of the respective Applicants would result in annual fees of approximately $872,000 for AOL, $1,125,000 for Yahoo! and $1,570,000 for RealNetworks. (ApC. ¶ 204.)

Although ASCAP and Applicants thus agree that the license fees should be based on an Applicant's revenue, they are in sharp disagreement as to the proper formula to apply to that starting revenue figure in calculating a reasonable fee for a blanket license to perform unlimited amounts of ASCAP-repertory music on their respective Internet sites. Applicants contend that what they term ASCAP's "top down" formula is fatally flawed in three principal respects. First, they contend that, by starting with Applicants' "gross revenues from all sources," it captures revenue having nothing to do with the performance of music, including revenue derived from the sale of connectivity to the internet, software and downloads. (ApC. ¶¶ 138-41.) This much-repeated contention stubbornly ignores the fact that ASCAP starts with the net revenue of only the business units that perform music and greatly reduces that net revenue to an amount designed to reflect the value of music in attracting visitors to an Applicant's website. ASCAP's employment of a music use adjustment factor based on the fraction of the time visitors to a website are actually streaming music appears to be a reasonable measure of the importance of music in generating advertising and subscription revenue for the Applicant.

Second, Applicants contend that the use of time spent streaming music as a measure of the

relative value of music to the website is "hopelessly flawed" because advertising rates are not computed on the basis of time spent but on the basis of page views. (ApC. ¶¶ 141-44.) This argument is unpersuasive for several reasons: (1) if page views rather than time spent were used in the numerator and denominator of the fraction, the music-use-adjusted revenue would be substantially greater, not less,[6] and (2) the revenue of AOL and RealNetworks has been based more on subscriptions than on advertising.[7]

Third, Applicants point out that, for the numerator of the fraction, ASCAP uses the total hours of music streaming measured by Applicants' own servers but, for the denominator, uses the total site hours "estimated" by comScore. (ApC. ¶ 151.) The Applicants suggest that it would have been more appropriate to use instead, for both the numerator and the denominator, data from a single source, such as comScore. (ApRS. ¶ 103.) However there is no doubt about the accuracy of the streaming hours figure used in the numerator; that number is measured by AOL and Yahoo! themselves and its accuracy is stipulated (SF ¶¶ 111-114, 169-172). For the denominator of the fraction, ASCAP cannot use the total site hours as measured by Applicants because none of the Applicants measure site hours. Instead, they rely on outside services such as comScore and Nielsen to do so. Applicants disparage the data supplied by these services as mere "estimates" that they use only for "comparative" purposes. But Applicants and many others in the Internet industry obviously regard such metrics as sufficiently accurate to justify their substantial cost and rely on them for a

---

[6] For example, in 2006, 23.7% of AOL's and 18.3% of Yahoo!'s unique site visitors went to their respective music pages (FF ¶¶ 140, 293), whereas they spent on average, only ▮▮▮▮ (FF 132, 136) and ▮▮▮▮ (FF ¶¶ 279, 288) respectively, of their onsite time streaming music.

[7] In 2006, ▮▮▮▮ of AOL's revenue came from subscriptions and ▮▮▮▮ from advertising (FF ¶ 142), while ▮▮▮▮ of the revenue of RealNetworks' Consumer Products and Services unit came from subscriptions. (FF ¶ 205.)

multitude of business purposes, including the determination of advertising rates. No more accurate figure for Applicants' total site hours is known. If Applicants can establish in a supplemental rate proceeding that such a figure is available, it may be used in computing the license fees. Applicants' suggestion of the use of comScore data for the numerator as well as the denominator is clearly inappropriate; comScore's measurement of Applicants' music streaming time is substantially understated because comScore does not count streaming time when the music player is minimized. (Tr. 1766:13-1768:14 (Candell).)

Applicants also fault ASCAP's proposal for failure to reduce RealNetworks' revenues by a music-use-adjustment factor before applying the 3.0% fee rate, as it did in computing the fee proposal for AOL and Yahoo!, asserting that RealNetworks' TPS division, which sells business solutions, derives no revenue from the performance of music. (ApC. ¶ 157.) ASCAP responds that in its initial proposal to RealNetworks, it excluded all revenue from the TPS division but, when RealNetworks publicly disclosed its 2006 earnings report, ASCAP learned that the TPS division does receive "revenue generated from music-oriented services." (AsOp. at 24.)[8] ASCAP therefore argues that it is "more than reasonable" to include TPS revenue in the rate base. (AsOp. at 26.) But ASCAP has the burden of establishing the fairness of a proposal that includes TPS revenue in the rate base. This it has failed to do, because it has not specified to what extent these "music-oriented services" involve the streaming of music requiring a license. In a substantial portion of its music streaming, the TPS unit is serving as a "back end" or wholesale supplier to a retailer, such as Verizon, who publicly relays the music to its subscribers and, by applying to ASCAP (*see* Fisherman Decl., Ex. C at ASCAP002116-21), may have obtained its own license for at least a substantial

---

[8] "AsOp." refers to ASCAP's Opposition to Applicants' Contentions.

portion of such performances. The Court therefore concludes that TPS revenues should be excluded from the rate base unless and until ASCAP can establish, in a supplement rate proceeding, that such exclusion is unwarranted.

ASCAP attacks Applicants' fee proposal with equal vigor, concentrating on its complexity, difficulty of verification, and susceptibility to manipulation. ASCAP points out that the license agreement between BMI and Yahoo!, which Applicants would use as the prototype for ASCAP's licenses to them, divides the licensee's revenue into "seventeen buckets" with different fee rates (AsX. 369), and uses "fifty data points" (AsX. 370) in making "dozens of calculations." (AsRM. at 30-31.)[9] Because most of these data are not ordinarily collected for other business purposes (*id.*), their accuracy would be suspect and auditing Applicants' reports would be difficult and expensive. Moreover, under the BMI-model license proposed by Applicants, royalties are payable only on revenue "directly attributable" to the streaming of music. Applicants interpret this ambiguous term as limited to revenue from the sale of advertising directly associated with the music stream, for example appearing within the outline of the virtual music player or in a video pre-roll. (FF ¶ 394.) This creates uncertainty because of the difficulty in determining the boundaries of the player. (Tr. 1814:19-1816:9; 1822:17-1824:4 (Candell).) It also gives the licensee a strong incentive to reduce the fee by moving advertisements off the player, perhaps to an even more prominent place on the same web page.

Furthermore, Applicants' proposed "uplift" to compensate for the streaming of music from locations off the Music page is almost ridiculously trivial. Under the BMI-Yahoo! license, this "uplift" payment amounted to only ▮▮▮▮ for almost ▮▮▮▮▮▮▮▮▮▮▮▮ hours of music

---

[9] "AsRM." refers to ASCAP's Reply Memorandum.

streaming (FF ¶ 412), which amounts to only ████████████████████ per hour of streaming or about ████████████████████████ per song .

This Court does not find that the licensing fee proposed by either ASCAP or the Applicants is reasonable, but believes that the record is sufficient to enable the setting of a reasonable fee for a blanket license for Applicants' performances of ASCAP-repertory music.

The Court finds no fundamental fault with the formula proposed by ASCAP for computing the fee, which begins with the net revenue of the proprietor of the website that performs the music and applies to it a music-use-adjustment factor which reduces the revenue to a level intended to represent the portion attributable to the value of music on the website and computes the licensing fee as a percentage of that music-generated revenue.

The Court also believes that it is reasonable to use, for this music-use-adjustment factor, a fraction whose numerator is the number of hours music is streamed from the site and whose denominator is the total hours that visitors are using the site. This seems an appropriate way of gauging the drawing power of music in attracting visitors to the site and thereby increasing subscription and advertising revenue. Although the streaming time is increased by visitors who stream music as a "background" while they are engaged in other activities on the website, such as searches or e-mailing, that effect is largely if not wholly offset by the myriad incidental performances of music in movies, advertisements, user-uploads and elsewhere, which are not counted as music streaming time. The Court further believes that it is not improper to use, as the numerator of the music-use-adjustment fraction, the stipulated total music streaming hours as measured by Applicants and, as the denominator of that fraction, the total onsite hours as measured by comScore, because

both represent the most accurate data available.[10]  On this basis, the 2006 music-use-adjustment factor for AOL is approximately ███ (████████ hours of music streaming (FF ¶ 132) divided by ████████ total onsite hours (FF ¶ 136)) and for Yahoo! is approximately ███ (████████ hours of music streaming (FF ¶ 279) divided by ████████ total onsite hours (FF ¶ 288)) . Applying these factors to the respective 2006 net revenues of these two Applicants ($████████ for AOL (FF ¶ 142) and $████████ for Yahoo! (FF ¶ 295)) results in revenue attributed to music performances of approximately ████████ for AOL and ████████ for Yahoo!.

ASCAP has proposed that a license fee of 3.0% of this music-use-adjusted revenue is appropriate.  But its only precedent for a 3.0% rate is its "experimental" form internet license agreements, which set such a rate for interactive streaming.  (FF ¶ 310.)   However, much of Applicants' music streaming is non-interactive.  Moreover, as Applicants point out (ApC. ¶¶ 134-37), these agreements were unilaterally developed and have been accepted by only a limited number of relatively small licensees whose annual fees thereunder were not so great as to justify the substantial expense of a rate proceeding to challenge their reasonableness.

There are other ASCAP blanket license agreements that more clearly resulted from arms-length negotiation between parties with comparable bargaining power and incentive.  These include ASCAP's license to Music Choice, which sets a fee rate of 2.5% of gross revenue for non-interactive streaming. (FF ¶ 352.)  This agreement provides strong support for a fee rate no less than 2.5% for Applicants, much of whose music streaming is on-demand.

There are also ASCAP's terrestrial radio licenses which set a fee rate of 1.615% of total net

---

[10]  The use of comScore data is also conservative.  Using Neilsen data instead of comScore data for the denominator would increase the 2006 music-use-adjustment factor for AOL to ████ and for Yahoo! to ████.

revenue. (FF ¶ 361.) ASCAP relies on the testimony of its in-house economist Peter Boyle that Applicants webcast about twice as much music per hour as a typical radio broadcaster to argue that the 1.615% rate, when doubled, supports their 3.0% proposal. (FF ¶ 319.) But, as Applicants point out (ApRS ¶ 50), the Copyright Arbitration Royalty Panel found that the intensity of music use on internet radio was only 25% greater than on terrestrial radio. Increasing the 1.615% rate by 25% would raise it to only 2.02%, which is clearly within the range of reasonableness for non-interactive webcasting.

BMI's licenses to RealNetworks and MusicNet set a fee rate of 2.5% of revenue from on-demand music streaming and 1.75% of revenue from internet radio. (ApC ¶¶ 94,98.) Because Applicants provide on-demand music streaming and a substantial fraction of their users avail themselves of this option, these BMI licenses provide additional support for a fee rate of 2.5% for Applicants' ASCAP blanket licenses.

After consideration of all the factors discussed above, the Court finds that a fee rate of 2.5% of Applicants' music-use-adjusted revenue is reasonable. Such a rate would result in 2006 fees of approximately $5.95 million for AOL and $6.76 million for Yahoo!

These license fees respectively represent only ███ of AOL's net revenues and ███% of Yahoo's net revenues in 2006. The reasonableness of such fees is confirmed by comparison with those paid by the television networks for their ASCAP blanket licenses. In 2005, the most recent year for which revenue data are available, ABC's fee of ████████ was ███% of its $3.911 billion revenue (FF ¶ 357); CBS's fee of █████████ was ███% of its $4.671 billion revenue (FF ¶ 358); and NBC's fee of ████████ was ███% of its $3.9 billion revenue (FF ¶ 359). Thus, if the license fees for AOL and Yahoo! are fixed as set forth above, they would pay, as a

percentage of revenue, roughly ███████ of the fees paid by the television networks. It is difficult to believe that music is that much less important to Applicants, whose visitors spend ███████ of their onsite time streaming music, and who can select the music that is streamed, than it is to the television networks, whose viewers surely hear music for no greater percentage of their viewing time and have no choice of that music.

The reasonableness of the above fees is further confirmed by comparing them with those that Applicants agreed to pay to the major record companies for the right to publicly perform their respective music videos. In 2006, AOL paid ███████ to Sony BMG (FF ¶ 374), ███████ to Universal (FF ¶ 378) and ███████ to Warner (FF ¶ 379) for a total of ███████. That same year, Yahoo! paid ███████ to Sony BMG (FF ¶ 385), ███████ to Universal (FF ¶ 387) and ███████ to Warner (FF ¶ 388), for a total of ███████. These video-performance fees are as great as the music-performance fees discussed above, even when the latter are increased by the music-performance fees Applicants paid to BMI and SESAC. Surely the music in a music video is at least as important to the audience as its visual content. Few would want to watch a music video with the sound turned off, but many listen to audio-only music. Applicants attempt to distinguish the rights granted to them by the record companies from those sought from ASCAP in this proceeding by arguing that the former rights include not only the rights of public performance but "the separate and valuable rights of reproduction." (ApRS ¶ 65.) However, any implication that Applicants are licensed to compete with the record companies in the reproduction and distribution of DVDs is false. All Applicants are licensed to do is to publicly perform the videos, but not to duplicate them except to the extent required for such performances. (AsX 179, §4.1.) ASCAP's licenses to Applicants are broader in that they grant the right to publicly perform any musical

selection in ASCAP's much larger repertory not only in videos but throughout the Applicants' website. Applicants further attempt to diminish the importance of their video-performance licenses as benchmarks for determining fees in this proceeding by characterizing them as "aberrational" and their fees as a "king's ransom." (ApC ¶ 173.) But even extravagant rhetoric cannot alter the fact that the licenses were arrived at by arms-length bargaining in a free market.

Applicants urge the Court instead to use, as a benchmark, the fee rates provided in BMI's license to Yahoo! (ApC ¶¶ 82-91), pointing out that, in a letter denying ASCAP's motion *in limine* to exclude that license from evidence at the rate hearing, this Court stated, "Indeed, it is difficult to imagine any evidence more probative of the reasonable value to Applicants of a license to perform the ASCAP-repertory music than the royalties they agreed, in arms-length negotiations, to pay for the performance of the BMI-repertory music." However, that letter was written before the Court knew anything about the terms of the BMI license. Unlike the ASCAP license sought by Applicants, it is not a blanket license and does not convey the right to perform BMI-repertory music in many settings, such as television shows, movies, movie clips and trailers, user-uploaded videos, advertising, general entertainment programming and a myriad of other audio-visual performances. The parties are still engaged in negotiations with respect to the rights for such performances. (FF ¶ 400.) The Court therefore finds that the BMI license to Yahoo! is a less reliable benchmark for use in determining reasonable fees for blanket licenses for unlimited performance of ASCAP-repertory music than the other licenses discussed above.

After thorough consideration of the evidence submitted at the rate hearing and the post-hearing arguments of the parties, the Court concludes that the above-described formula for determining fees for ASCAP's licenses to Applicants will result in fees which are reasonable in all

respects. Although exemplary fees only for 2006 and only for AOL and Yahoo! are presented, the same formula should be used in computing the fees for all open periods and for all Applicants, even though the record does not contain sufficient data to permit the Court to apply the formula in computing the fees for RealNetworks.

## CONCLUSION

For each of the three Applicants, the fee for a blanket license for unlimited performance of all music in the ASCAP repertory for all open periods to December 31, 2009 shall be determined by multiplying the total revenue of the licensed business unit (in the case of RealNetworks excluding the revenue of its TPS unit until otherwise ordered by the Court), less customary deductions for advertising sales commissions and traffic acquisition costs, by a music-use-adjustment fraction whose numerator is the total number of hours music is streamed to users by the licensee (as currently measured by the Applicant) and whose denominator is the total number of hours of use of the licensee's website (as measured by comScore or other means approved by the Court) and applying to the resulting music-use-adjusted revenue a fee rate of 2.5%.

The parties are directed to cooperate in computing the royalties due to ASCAP from each Applicant for all open periods to date and in the preparation of a proposed final judgment order effectuating this decision.

SO ORDERED.

Dated: White Plains, New York
      April 30, 2008

                                    *William C. Conner*
                                 Sr. United States District Judge