UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                 :
                                                    Civil Action
                        Plaintiff,        :         No. 41-1395 (WCC)


            - against -                    :

AMERICAN SOCIETY OF COMPOSERS, AUTHORS    :
AND PUBLISHERS, et al.,                                **OPINION**
                                          :         <u>**AND ORDER**</u>
                        Defendants.

- - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application for      :
the Determination of Reasonable License
Fees for Performances via Wireless        :
Transmissions and Internet Transmissions  :
by                                        :

AT&T WIRELESS f/k/a CINGULAR WIRELESS.    :

- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                              LOVELLS LLP
                              590 Madison Avenue
                              New York, New York  10022

DAVID LEICHTMAN, ESQ.
HILLEL I. PARNESS, ESQ.               **- and -**
AVIVA J. HALPERN, ESQ.
        Of Counsel
                              AMERICAN SOCIETY OF COMPOSERS, AUTHORS
                                AND PUBLISHERS
                              One Lincoln Plaza
                              New York, New York  10023


RICHARD H. REIMER, ESQ.
        Of Counsel           **Attorneys for Defendant American
                                Society of Composers, Authors and
                                Publishers**

**A P P E A R A N C E S :   (continued)**

KILPATRICK STOCKTON LLP
31 West 52nd Street, 14th Floor
New York, New York 10019

JOSEPH PETERSON, ESQ.
      Of Counsel

         **- and -**

JOSEPH M. BECK, ESQ.
JAMES A. TRIGG, ESQ.
W. ANDREW PEQUIGNOT, ESQ.
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309

**Attorneys for Applicant AT&T**
  **Mobility LLC**


HARRIS, WILTSHIRE & GRANNIS LLP
**Attorneys for *Amicus Curiae* The**
  **Digital Media Association and The**
  **National Association of Recording**
  **Merchandisers**
1200 Eighteenth Street, NW
Washington, D.C. 20036

MARK A. GRANNIS, ESQ.
FERNANDO R. LAGUARDA, ESQ.
S. ROBERTS CARTER, ESQ.
KELLEY A. SHIELDS, ESQ.
      Of Counsel


HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York  10004

MICHAEL E. SALZMAN, ESQ.
JESSICA A. FELDMAN, ESQ.
      Of Counsel

         **- and -**

MARVIN L. BERENSON, ESQ.
JOSEPH J. DiMONA, ESQ.
320 West 57TH Street
New York, New York 10019
**Attorneys for *Amicus Curiae* Broadcast**
  **Music, Inc.**
LOEB & LOEB, LLP

-ii-

**A P P E A R A N C E S :   (continued)**

                                        **Attorneys for *Amicus Curiae* SESAC, Inc.**
                                        1906 Acklen Avenue
                                        Nashville, Tennessee 37212

JOHN C. BEITER, ESQ.
          Of Counsel

**CONNER, Senior D.J.:**

In 1941, the United States' civil action against the American Society of Composers, Authors and Publishers ("ASCAP") for alleged violations of the Sherman Antitrust Act was settled by the entry of a consent decree. *See United States v. Am. Soc'y of Composers, Authors & Publishers*, 1941 U.S. Dist. LEXIS 3944 (S.D.N.Y. Mar. 4, 1941). The 1941 consent decree was amended on March 14, 1950 to form the Amended Final Judgment (as again amended on January 7, 1960, the "AFJ"). The terms of these orders regulated the manner in which ASCAP could operate within the music industry and provided this Court with exclusive jurisdiction under Section XVII of the AFJ to oversee the implementation of these provisions. The AFJ was again amended on June 11, 2001 (the "AFJ2"), familiarity with which is presumed. *See United States v. Am. Soc'y of Composers, Authors & Publishers*, 2001 WL 1589999, 2001 U.S. Dist. LEXIS 23707 (S.D.N.Y. June 11, 2001) (Conner, J.).

The AFJ2 became effective on September 11, 2001 and, subsequently, applicant AT&T Mobility LLC, incorrectly named AT&T Wireless in the case caption, ("applicant") made a request to ASCAP for a blanket license for the public performance of ASCAP music via wireless and internet transmissions for a period commencing October 28, 2004. (ASCAP Applic. Deter. Reasonable Lic. Fees ¶ 5.) Because the parties were unable to agree on licensing fees, ASCAP applied to this Court, pursuant to Section IX of the AFJ2, for a determination of interim blanket license fees and reasonable final blanket license fees "for public performances of ASCAP music by [applicant] by way of wireless transmissions and through [applicant's] websites, including but not limited to wireless transmissions by way of ringback tones . . . and other streaming audio and audio-visual content." (*Id*. ¶¶ 7-8.) Applicant now moves for summary judgment on the issue of whether

1

its use of ASCAP music in its "ringtone" and "ringback tone" previews constitute fair use within the meaning of the United States Copyright Act, 17 U.S.C. §§ 101, *et seq*. (2000) such that licensing fees are not required for applicant's use of these previews. ASCAP cross moves for discovery pursuant to Fed. R. Civ. P. 56(f). The Court, having reviewed the materials submitted by the parties, as well as the briefs of *amici curiae*,[1] denies applicant's motion for summary judgment in its entirety. The Court declines to decide ASCAP's motion for discovery because there is sufficient evidence in the record already before the Court to decide applicant's motion.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed. ASCAP is "a membership association of more than 320,000 songwriters, composers, lyricists and music publishers on whose behalf ASCAP licenses the nondramatic public performances of their copyrighted works in the United States." (ASCAP Applic. Deter. Reasonable Lic. Fees ¶ 1.) ASCAP also licenses in the United States the nondramatic public performances of the copyrighted musical works of certain members of affiliated foreign performing rights organizations around the world. (*Id*.) Applicant is a wireless company in the United States with more than 70 million subscribers "who use the nation's largest digital voice and data network." (*Id*. ¶ 2.) Applicant makes ringtones and ringback tones available for purchase and offers previews of each to its customers prior to purchase. (AT&T Mem. Supp. Summ. J. at 1.) A ringtone is a tune that plays when an individual who has purchased a

---

[1] The Court received briefs from Broadcast Music, Inc., the Digital Media Association and the National Association of Recording Merchandisers, and SESAC, Inc. as *amici curiae*.

2

ringtone receives a telephone call.[2]  (AT&T R. 56.1 Stmt. ¶ 1.)  Ringback tones (applicant calls them "Answer Tones"[3]) substitute a tune for the sound a caller normally hears while waiting for the person called to answer the phone.  (*Id.* ¶ 6.)

According to applicant, the ringtones that it offers can be purchased in one of two ways: either through its "MEdia Mall" website or through its MEdia Mall mobile application.  (*Id.* ¶ 2.) However, ASCAP contends that it may be possible for ringtones to be played on AT&T phones through other methods and directs the Court to internet websites that provide instructions as to the conversion of music files into ringtones without first purchasing them from applicant.[4]  (ASCAP R. 56.1 Counterstmt. ¶ 2.)  Before purchasing a particular ringtone, a customer may listen to a preview, which, applicant states, plays for ten to thirty seconds.  (AT&T R. 56.1 Stmt. ¶ 3.)  ASCAP contends that it lacks sufficient discovery to determine the duration of applicant's previews.  (ASCAP R. 56.1 Counterstmt. ¶ 4.)  Sometimes multiple versions of a particular composition are available as a ringtone.[5]  (AT&T R. 56.1 Stmt. ¶ 4.)  For example, if a user who wants to purchase a ringtone of "Somewhere Over the Rainbow" visits the MEdia Mall website and enters the search term

---

[2] ASCAP concedes only that a ringtone "reasonably includes, but is not necessarily limited to" this definition. (ASCAP R. 56.1 Counterstmt. ¶ 1.)  However, ASCAP does not provide an example of a ringtone that does not fall within this definition.  The Court accepts this definition for the purposes of this motion.

[3] The Court adopts the more generic term "ringback tones" for purposes of this Opinion.

[4] While the Court accepts as fact the existence of these instructions, there is no evidence in the record indicating that by following these instructions, music files are indeed converted to ringtones.

[5] Applicant states that this happens "often," however, ASCAP states that while it admits that "ringtones of [a] particular composition are sometimes available by more than one artist . . . ASCAP lacks sufficient discovery to admit or deny whether such ringtones are 'often' available." (AT&T R. 56.1 Stmt. ¶ 4; ASCAP R. 56.1 Counterstmt. ¶ 4.)

"somewhere over the rainbow," the search results may yield a list of up to seven versions of the song by various artists.  (*Id*.)  According to applicant, the only way for a user to listen to a preview is to click on an icon symbolized by a speaker illustration that appears next to each song listed in the search results next to the word "BUY."  (*Id*. ¶ 5.)  After a customer clicks on the "BUY" icon, another window opens and the preview, which, applicant contends, "is transitory and not stored," is streamed.  (*Id*.)  ASCAP admits that applicant performs previews in this manner, but contends that it may be possible for previews to be played in other ways, again directing the Court to the internet websites that provide instructions on how to convert music files into ringtones without purchasing them from applicant.  (ASCAP R. 56.1 Counterstmt. ¶ 5.)

According to applicant, like its ringtones, ringback tones can be purchased in one of two ways: either through the MEdia Mall website or through the MEdia Mall mobile application. (AT&T R. 56.1 Stmt. ¶ 7.)  ASCAP admits that ringback tones can be purchased in these two ways, but contends that it lacks sufficient discovery to determine whether these are the only ways in which ringback tones can be purchased.  (ASCAP R. 56.1 Counterstmt. ¶ 7.)  Furthermore, according to applicant, like ringtones, ringback tones can be previewed before purchase; however, unlike ringtones, ringback tone previews are currently available only on the MEdia Mall website.  (AT&T R. 56.1 Stmt. ¶ 8.)[6]  Applicant states that ringback tone previews play for up to 30 seconds, although, while ASCAP admits that applicant performs previews, it contends that it lacks sufficient discovery to determine their duration.  (*Id*. ¶ 9; ASCAP R. 56.1 Counterstmt. ¶ 9.)

Applicant states that previews allow customers to listen to "brief excerpts of tunes and select

---

[6] ASCAP admits that applicant performs ringback tone previews, but again contends that it lacks sufficient discovery to confirm that these previews are only available via the methods related by applicant. (ASCAP R. 56.1 Counterstmt. ¶ 8.)

4

a particular track for purchase." (AT&T R. 56.1 Stmt. ¶ 10.)  ASCAP "admits that [applicant] performs previews to encourage purchases," but contends that it lacks sufficient discovery to determine whether these excerpts are "brief." (ASCAP R. 56.1 Counterstmt. ¶ 10.) Rather, ASCAP contends that previews may be "rather close approximations of the ringtones and [ringback tones] for purchase, and sometimes actually longer in length than the product they are promoting." (*Id.*) Applicant states further that it neither charges for previews nor generates any revenue from them "aside from the possibility of indirect revenue from an eventual sale of a ringtone or ringback tone track." (AT&T R. 56.1 Stmt. ¶ 11.)  ASCAP states that it lacks sufficient discovery to determine the accuracy of this statement, adding that applicant "receives commercial benefits from previews in a variety of ways, including, at minimum, the sale of ringtones and [ringback tones], e-commerce revenue from advertising on the MEdia Mall website, and other e-commerce revenues." (ASCAP R. 56.1 Counterstmt. ¶ 11.)  Applicant states that there are no third-party advertisements on the MEdia Mall website, however, ASCAP disagrees, asserting that there are advertisements on the site that direct access to other sites and "at a minimum, promote services offered by third parties such as The Weather Channel." (AT&T R. 56.1 Stmt. ¶ 12; ASCAP R. 56.1 Counterstmt. ¶ 12.) Applicant also states that the previews cannot be downloaded or distributed, although ASCAP contends that it may be possible for previews to be copied to other locations, and directs the Court to a website that sets forth instructions on how to copy a streaming ringtone preview to a computer and then use it on a cellular phone.[7] (AT&T R. 56.1 Stmt. ¶ 13; ASCAP R. 56.1 Counterstmt. ¶ 13.)

ASCAP, in opposition to applicant's Rule 56.1 Statement and in support of its Rule 56(f)

---

[7] While the Court accepts as fact the existence of these instructions, there is no evidence in the record that when these instructions are followed streaming ringtone previews are indeed copied to a computer for use on a cellular phone.

cross-motion for discovery, contends that there are a number of additional material facts as to which there exist genuine issues to be tried.  (ASCAP R. 56.1 Counterstmt. at 6.)[8]  As to all of these facts, which are as follows, applicant states that it does not have sufficient knowledge to comment on their accuracy and contends that they are immaterial and irrelevant to a determination of the issues raised in this motion.   (AT&T Ans. R. 56.1 Stmt. ¶¶ 8, 9, 10, 11, 13, 15, 16, 20, 21, 22.)

ASCAP sets forth examples of third parties other than applicant that make previews of music available over the internet.  ASCAP states that "production music library companies" maintain internet websites that allow visitors to search their libraries, which contain pre-recorded music for various media, and "listen to streams of the music they offer, or samples or previews of their music." (ASCAP R. 56.1 Stmt. ¶ 8.)  The samples are provided "to attract new customers and to encourage existing customers to license or use more of their music."  (*Id*.)  ASCAP also contends that its major music publisher members similarly offer streaming samples of their music over the internet "to encourage people to purchase the synchronization rights of their music for use in film, television, advertising commercials and other media."  (*Id*. ¶ 9.)  In addition, ASCAP's writer members make samples of their work available on their websites for promotional purposes, and ASCAP provides space on its own website for members to promote their music "through various types of musical performances."   (*Id*. ¶¶ 10, 16.)

ASCAP also describes the demand for licensing of "short forms of music."  (*Id*. ¶¶ 11-17.) ASCAP states that "[i]n many areas of music licensing, the licensee will specifically seek a license for a limited-duration excerpt from the longer musical work," and that "[i]n license agreements

---

[8] Not all of the facts set forth in ASCAP's statement of additional facts are necessary to decide this motion, therefore, we recount only the facts from the statement upon which this Opinion relies.

across different areas of the music business, it is often standard industry practice to expressly grant the right to make . . . limited use of 'samples' or 'previews' of longer musical compositions for promotional purposes." (*Id*. ¶¶ 11, 13.)  Even contracts addressing the use of music in video games "will typically include a grant of the right to use the music for limited-duration . . . promotional trailers . . . on the Internet, and/or a grant to place limited duration . . . streaming clips of the music . . . on the game's website."  (*Id*. ¶ 15.)

ASCAP also provides information on its own licenses with third parties for short-form music. (*Id*. ¶¶ 20-23.)  According to ASCAP, it has 54 licensees under its "standard wireless agreement for ringtones and ringback tones," pursuant to which ASCAP receives a certain percentage of the "revenue rate" for the tones, and ASCAP "is in negotiations with other parties that have yet to be licensed." (*Id*. ¶ 20.)  ASCAP licenses 18 "sampling" services and is negotiating two additional agreements.  (*Id*. ¶ 22.)  One company is licensed "to perform music 'samples' of between 30-60 seconds in length" and ASCAP receives a set percentage of the company's revenues under the agreement.  (*Id*. ¶ 21.)  In March 2007, ASCAP received two requests from a company for licenses for ringtones and "ringback tunes" that specifically included "clip samples" of the tunes.  (*Id*. ¶ 22.)

Following the initiation of a rate proceeding before this Court, applicant moved for summary judgment on the issue of whether ringtone and ringback tone previews (collectively, "previews") constitute fair use within the meaning of the United States Copyright Act, 17 U.S.C. § 101.  We conclude that they do not constitute fair use and, therefore, deny the motion in its entirety.

## DISCUSSION

### I.      Standard of Review

Under Fed. R. Civ. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based on that fact, a reasonable jury could find in favor of the non-moving party.  *See Anderson*, 477 U.S. at 248.  The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant.  *See Anderson*, 477 U.S. at 255.  However, to defeat summary judgment, the non-movant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist.  *See Gallo v. Prudential Residential Servs. L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### II.     Fair Use

"ASCAP has no right to demand royalty payments for the use of music that is exempt from copyright liability." *United States v. Am. Soc'y of Composers, Authors & Publishers*, 157 F.R.D. 173, 207 (S.D.N.Y. 1994) (Conner, J.).  Applicant argues that its use of ASCAP music in previews is exempt from copyright liability under the fair use exception of the Copyright Act and, therefore, it does not owe ASCAP royalty payments for the previews. (AT&T Mem. Supp. Summ. J. at 2.)

8

ASCAP contends that applicant's previews do not constitute fair use and that it is entitled to royalty payments from applicant for the previews under the blanket license that applicant seeks from ASCAP. (ASCAP Mem. Opp. Summ. J. at 2, 10.)

The fair use doctrine is codified in the Copyright Act , which sets forth four factors that must be considered in determining whether a given use of copyrighted material falls under the fair use exception. *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006). The statutory preamble states that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The Act then provides that

> [i]n determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include - (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id*. "This listing was not intended to be exhaustive . . . or to single out any particular use as presumptively a 'fair' use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (internal citation omitted). Rather, courts must undertake a case-by-case analysis to determine whether a given secondary use of a copyrighted work is a fair use. *Id*; *see also Blanch*, 467 F.3d at 251 ("[D]etermination of fair use is an open-ended and context-sensitive inquiry."). No single factor is outcome-determinative and courts must analyze each factor and weigh the results together "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). "The ultimate test of fair use . . . is whether the copyright law's goal of promoting the

9

Progress of Science and the useful Arts, U.S. Const., art I, § 8, cl. 8, would be better served by allowing the use than by preventing it." *Blanch*, 467 U.S. at 251 (internal quotation marks and citations omitted; alteration in original).  Furthermore, "[s]ince fair use is an affirmative defense to a claim of infringement, the burden of proof is on its proponent," which, in the case at bar, is applicant.  *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998).

A.      **Factor One: The Purpose and Character of the Use**

"The heart of the fair use inquiry is into the first specified statutory factor identified as 'the purpose and character of the use.'" *On Davis v. The GAP, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001). In *Campbell*, the Supreme Court instructed that "[t]he enquiry here may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like."  510 U.S. at 578-79 (citing 17 U.S.C. § 107).  The Court explained that "[t]he central purpose of this investigation is to see . . . whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks . . . whether and to what extent the new work is 'transformative.'" *Id*. at 579 (internal quotation marks and citations omitted).

Furthermore, the statute specifies that in analyzing this factor, courts should consider whether the new use "is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  *Harper & Row*, 471 U.S. at 562.

10

Applicant's use of previews is not transformative.   It is undisputed that the music segments used in applicant's previews are exact copies of ASCAP music.   As applicant correctly notes, in some cases, courts have found that a work is transformative even though no expressive changes were made to the original work because the new work has an "entirely different purpose and meaning." *Blanch*, 467 F.3d at 253; *see* AT&T Mem. Supp. Summ. J. at 5-6.   Applicant, directing the Court to the "new purpose and meaning" line of fair use cases, argues that its use of ASCAP music in previews is transformative because the previews serve the purpose of "inform[ing] customers," which is "entirely different" from the entertainment purpose of the original works.   (AT&T Mem. Supp. Summ. J. at 1.)   To support this argument, applicant relies on *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006), and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003).

In *Bill Graham Archives*, the Second Circuit held that the use of "artistic concert posters reproduced in reduced size in a biography of the musical group [whose concerts the posters advertised]" constituted fair use.   448 F.3d at 606-07.   Applicant argues that just as the *Bill Graham Archives* defendants' use of the posters (to illustrate the history of the band) was found to be "transformatively different from the original expressive purpose" of the copyrighted posters (to inform concert-goers of the times and places for the band's performances), applicant's "informational use of snippets of songs is 'transformatively different from the original expressive purpose' of the recorded compositions." (AT&T Mem. Supp. Summ. J. at 6, 8.)  However, in *Bill Graham Archives* the Circuit relied on the fact that the copyrighted works (the poster images) were used as "historical artifacts" to illustrate a biographical work, a use that fell within the scope of the statutory preamble of 17 U.S.C. § 107.   448 F.3d at 609 (noting that "courts have frequently afforded

11

fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that requires incorporation of original source material for optimum treatment of their subjects" (citing 17 U.S.C. § 107)).  By contrast, applicant's use of previews, for the purpose of allowing its customers to sample a ringtone or ringback tone before purchasing it, cannot fairly be described as "criticism, comment, news reporting, teaching . . . scholarship, or research."  17 U.S.C. § 107.

Moreover, the *Bill Graham Archives* court reasoned that, because the defendants had significantly reduced the size of the posters so that they served only to "enrich the presentation of the cultural history of the [band]" rather than "to exploit copyrighted artwork for commercial gain," and because these images constituted "an inconsequential portion" of the book in which they were reproduced, the first factor weighed in favor of finding fair use.  448 F.3d at 611.  By contrast, although applicant's previews are comprised of shortened versions of the musical works from which they are copied, they do not "enrich" a separate work protected by the Copyright Act, but rather serve only to facilitate applicant's sales of ringtones and ringback tones from applicant's website and wireless device application "for commercial gain."[9]  *Id.*  Furthermore, ASCAP music is not an inconsequential portion of the previews but rather each preview at issue here is made up *entirely* of

---

[9] We address the commercial nature of applicant's use of previews below.  Regarding the exploitation of copyrighted works for commercial gain, applicant asserts that "the fact that [applicant] does not charge for previews is further evidence that [applicant]'s use is not exploitive of the copyrighted works as would be the case, for instance, if [applicant] were in the business of selling previews to others for *direct* financial gain." (AT&T Reply Mem. Supp. Summ. J. at 2 (emphasis added).)  However, while applicant may not receive a direct financial gain by providing previews to its customers free of charge, "[applicant] admits that its use is indirectly commercial." (*Id.* at 1.)  This Court does not find the distinction between *direct* and *indirect* financial gain dispositive of a determination of whether applicant's deliberate use of copyrighted ASCAP music is exploitive.

ASCAP music.  Because of these significant factual distinctions, *Bill Graham Archives* does not govern the outcome of our inquiry into whether applicant's use of previews is transformative.

*Kelly* can also be distinguished.  That case involved an internet search engine that displayed its results "in the form of small pictures rather than the more usual form of text." 336 F.3d at 815. The computer program "crawl[ed]" the internet "looking for images to index," downloaded these images, and generated "smaller, lower-resolution thumbnails of the images," which appeared as search results.  336 F.3d at 815.  The plaintiff photographer discovered that his copyrighted photographs had been reproduced as thumbnail images without his consent and sued for copyright infringement. 336 F.3d at 816.  The Ninth Circuit, finding for the defendant, Arriba, held that the "creation and use of the thumbnails in the search engine is a fair use" and that the use of the copyrighted images was transformative because it was "unrelated to any aesthetic purpose" but rather served to facilitate access to images on the internet. 336 F.3d at 815, 818.  Applicant argues that, similarly, its use of ASCAP music in its previews "serves an entirely different purpose than the entertainment purpose of the original works," and that, "[j]ust as Arriba offered its thumbnails in effect as an advertisement enabling customers to shop for, select and purchase a particular photograph from the copyright proprietor, so [applicant]'s previews permit its customers to shop for, select and purchase ringtones and ringback tones." (AT&T Mem. Supp. Summ. J. at 7-8 (internal quotation marks omitted).)

Applicant's analogy is misplaced.  Applicant mischaracterizes the "thumbnails" in *Kelly* as "advertisements."  Unlike applicant's deliberate use of ASCAP music, all of which is copyrighted, to sell applicant's own product, the thumbnails produced by the search engine in *Kelly*, only some of which incidentally were copyrighted images, did not serve to advertise the defendant's product.

13

Rather, it served the useful purpose of assisting users in navigation of the multitude of information on the world wide web.  The Ninth Circuit, emphasizing the purpose of the Copyright Act "to promote creativity, thereby benefitting the artist and the public alike," reasoned that the thumbnails did not "stifle artistic creativity," and, further, even "benefit[ed] the public by enhancing information-gathering techniques on the internet." 336 F.3d at 820.[10]  The Circuit noted that "Arriba was neither using Kelly's images to directly promote its web site nor trying to profit by selling Kelly's images." *Kelly*, 336 F.3d at 818.  While Arriba's search engine helped users navigate a sea of information including images already publicly available on the internet, applicant's previews merely allow users to sample selections of a database of copyrighted information, collected, organized and provided to users by applicant.  It is difficult to characterize applicant's use of previews as serving a "public benefit" when the previews' purpose is to benefit applicant by facilitating sales of its own product.  Again, applicant fails to establish that its use of ASCAP music serves a transformative use under the fair use doctrine.

Regarding the "transformative" nature of applicant's previews, *Infinity Broadcast Corp.* and *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191 (3d Cir. 2003) provide guidance that is more on point.  In *Infinity Broadcast Corp.*, a radio broadcast company brought a copyright infringement action against the operator of a service that retransmitted its radio broadcasts over the telephone.  150 F.3d at 106.  The defendant did not alter or edit the radio transmissions, which it marketed to "radio stations, advertisers, talent scouts and others in the entertainment and

---

[10] Other courts have also recognized that search engines aid internet users in navigating the world wide web, thereby helping to inform the public.  *See, e.g. Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) ("a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool.")

advertising industry for purposes such as auditioning on-air talent, verifying the broadcast of commercials, and listening to a station's programming format and feel." *Id.* (internal quotation marks omitted). The Second Circuit held that the defendant's retransmissions of the copyrighted broadcasts did not constitute fair use, rejecting the defendant's argument that its use was transformative because its customers used the broadcasts for informative rather than entertainment purposes, an argument similar to that made by applicant in the instant case. *Id.* Although the Circuit acknowledged that the defendant's informational purpose for making the transmissions was different from the original entertainment purpose of the radio broadcasts, it explained that "difference in purpose is not quite the same thing as transformation, and . . . transformativeness is the critical inquiry under this factor." *Id.* at 108. The Circuit reasoned that "[the defendant]'s retransmissions leave the character of the original broadcasts unchanged. There is neither new expression, new meaning nor new message. . . . In short, there is no transformation." *Id.* (internal quotation marks and citation omitted). Similarly, in the case at bar, any difference in applicant's informational purpose in streaming previews of ASCAP music from the original entertainment purpose of the music is insufficient, by itself, to render applicant's use transformative.

The *Infinity Broadcast Corp.* court also emphasized that it was the defendant's "own retransmission of the broadcasts, not the acts of his end-users, that is at issue here and all [the defendant] does is sell access to unaltered radio broadcasts. Also, it is not clear that all of [the defendant's] target audience 'transforms' the broadcasts as he suggests." *Id.* The Circuit noted that, for example, "[t]alent scouts, who admittedly would not be listening in order to be entertained themselves, would nevertheless be listening for the entertainment value of the broadcasts rather than the factual content." *Id.* Similarly, here, applicant provides access to unaltered clips of ASCAP

music.  Although the clips are shorter than the full-length versions of the musical works from which they are copied, applicant has not demonstrated that its customers use previews solely for informational purposes, and not also to assess the musical quality and entertainment value of the ringtones and ringback tones before making purchases.[11]  Following the reasoning of the Second Circuit in *Infinity Broadcast Corp.*, applicant's previews are not transformative.

In *Video Pipeline*, the Third Circuit affirmed a decision that held that the plaintiff had failed to show that it would likely prevail on its claim that its use of the copyrighted films of subsidiaries of The Walt Disney Co. ("Disney") in its  "clip previews" was fair use.  342 F.3d at 194, 196.  A "clip preview" was defined as "an approximately two-minute segment of a movie, copied without authorization from the film's copyright holder, and used in the same way as an authorized movie 'trailer.'"  *Id*. at 194.  The plaintiff sold clip previews to retail websites that sold home videos; visitors to these websites could click on a "preview" button for a particular film, and plaintiff's clip preview would be streamed.  *Id*. at 195.  The plaintiff made a similar argument to that of applicant in the case at bar that its previews were transformative because "the original works have an aesthetic and entertainment purpose while the clip previews serve only to provide information about the movies to internet users or as advertisements for the company's retail web site clients."  *Id*. at 198. In rejecting this argument and finding that the clip previews "lack[ed] any significant transformative quality," the Circuit reasoned that the preview clips "share the same character and purpose as Disney's derivative trailers," explaining that the preview clips were "part of - not information about -

---

[11] Applicant contends that "[o]nly an unusual person would be primarily entertained rather than informed by repetitively clicking [applicant]'s music preview icons." (AT&T Mem. Supp. Summ. J. at 8.)  However, if the user did not find the preview entertaining, he or she would not purchase and use the tune as a ringtone or ringback tone.  Thus, applicant's objective in making the preview available must be not merely to inform but to entertain.

Disney's expressive creations" and noting that "it is not clear to us that the use of a copy - not accompanied by any creative expression on the part of the copier - as an advertisement for the original would qualify as a type of use intended to be recognized by the fair use doctrine." *Id.* at 199, 199 n.5, 200.  The Circuit distinguished *Kelly*, noting that the *Video Pipeline* plaintiff's database of preview clips "[did] not improve access to authorized previews located on other web sites.  Rather, it indexe[d] and display[ed] unauthorized copies of copyrighted works." *Id.* at 199.  Finally, the Circuit noted that the clip previews "[did] not add significantly to Disney's original expression," and that "it is dubious what 'new expression, meaning, or message' [the plaintiff] has brought to its copies." *Id.* at 199-200 (citing *Campbell*, 510 U.S. at 579).  Following *Video Pipeline*'s reasoning, applicant's previews are not transformative.

Courts must also consider whether a use is commercial in determining whether the first factor weighs in favor of finding fair use.  To be sure, "commerciality has only limited usefulness to a fair use inquiry; most secondary uses of copyrighted material, including nearly all of the uses listed in the statutory preamble, are commercial." *Infinity Broad. Corp.*, 150 F.3d at 109.  However, the Second Circuit has held that if the secondary use made of the underlying work is not transformative, the issue of whether it is commercial takes on a heightened importance. *On Davis*, 246 F.3d at 175.  In analyzing whether a use is commercial, the Second Circuit has examined whether the secondary user had a "genuine creative rationale" for copying the original work, or whether the secondary user was using the original work "merely to get attention or to avoid the drudgery in working up something fresh." *Blanch*, 467 F.3d at 255.  When the work is an advertisement, it is "at the outer limit of commercialism." *On Davis*, 246 F.3d at 175.  And the Supreme Court has suggested, in dicta, that using a copyrighted work for advertising purposes may be less likely to be fair use than

using the work for other purposes more reflective of the statutory preamble. *Campbell*, 510 U.S. at 585 ("use . . . of a copyrighted work to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use enquiry than the sale of a parody for its own sake.").

Applicant concedes that its use of previews is "not strictly non-commercial,"[12] but relies on the Supreme Court's proposition that "'the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.'" (AT&T Mem. Supp. Summ. J. at 8-9 (quoting *Campbell*, 510 U.S. at 579).)  As noted above, however, applicant's use of previews is not transformative, and, thus, the significance of its commercial use is not reduced, but instead takes on greater importance. *On Davis*, 246 F.3d at 175. Because the previews constitute a form of advertisement for applicant's ringtones and ringback tones (*see* AT&T Mem. Supp. Summ. J. at 7 (analogizing applicant's use of previews to the *Kelly* defendant's use of thumbnails "in effect as an advertisement")), applicant's use of ASCAP music to increase revenues from sales of ringtones and ringback tones is commercial. *On Davis*, 246 F.3d

_____

[12] Applicant notes that its use of previews is commercial "in the sense that it may aid sales of the original work," but argues that "it is also consistent with the public interest to the extent that it provides information that allows consumers to make educated purchasing decisions," citing *Consumers Union of U.S., Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) for the proposition that "consumer product reviews [are] of significant public interest" and, therefore, have been found to be fair use (AT&T Mem. Supp. Summ. J. at 8 n.3).  However, product reviews must be distinguished from previews.  While product reviews offer a critique or further information about a consumer good and, thus, are creative in that they add to the public body of knowledge about that good, samples are just copies of something that already exists. Applicant has not set forth a "creative" (as opposed to commercial) reason for using previews. *See UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) (rejecting defendant's argument that providing plaintiff's music in MP3 format was fair use because it "provides a useful service to consumers," stating that "[c]opyright, however, is not designed to afford consumer protection or convenience but, rather, to protect the copyrighters' property interests. . . . Stripped to its essence, defendant's 'consumer protection' argument amounts to nothing more than a bald claim that defendant should be able to misappropriate plaintiffs' property simply because there is a consumer demand for it.")

at 175; *Campbell*, 510 U.S. at 585.[13]  In addition, although applicant contends that there are no third-party advertisements on its MEdia Mall website, ASCAP introduces computer printouts of the website with advertisements that direct access to other sites and promote services offered by third parties such as The Weather Channel and various pop artists. Viewing the evidence in the light most favorable to the non-moving party, ASCAP, as we must on a motion for summary judgment, we infer that applicant is compensated for these advertisements; the previews, by attracting consumers to the MEdia Mall website, in effect serve to advertise these advertisements.  The Court finds that applicant's use of previews is not transformative and that it is commercial.  Therefore, the first factor weighs against a finding of fair use.

### B.     Factor Two: The Nature of the Copyrighted Work

The second factor in the fair use inquiry, the "nature of the copyrighted work," § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.  When analyzing this factor, courts consider "'(1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being

---

[13] Applicant also emphasizes to the Court that it does not charge its users for accessing its previews.  (AT&T Mem. Supp. Summ. J. at 8.)  However, "[d]irect economic benefit is not required to demonstrate a commercial use.  Rather, repeated and exploitative copying of copyrighted works, even if the copies are not offered for sale, may constitute a commercial use." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) (finding that internet service that facilitated transmission and retention of digital audio files by its users had a commercial purpose even though service did not charge users for these files).  Thus, in the case at bar, the indirect commercial benefits applicant receives by providing free previews, in the form of sales of ringtones and ringback tones, render the use commercial for purposes of the first fair use factor.

allowed to a claim for fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower.'" *Blanch*, 467 F.3d at 256 (citing 2 Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006)).

Applicant dismisses the importance of the second factor, citing legal authority for the proposition that this factor "may be of limited usefulness where the creative work of art is being used for a transformative purpose." (AT&T Mem. Supp. Summ. J. at 9 (internal quotation marks and citation omitted).) However, as discussed above, applicant's use of previews is not transformative. The ASCAP music used in applicant's previews is undisputably creative. *See id.* at 9 (referring to "the creative nature of the musical compositions" while arguing that this factor is "largely irrelevant"); *see also Campbell*, 510 U.S. at 573, 586 (a rap song was "creative expression" that fell "within the core of the copyright's protective purposes"); *UMG Recordings*, 92 F. Supp. 2d at 351 (creative recordings copied from "popular CDs" were "close to the core of intended copyright protection") (internal quotation marks and citations omitted). Thus, although most of the ASCAP music in applicant's previews[14] is published, a fact that favors applicant, the expressive and creative nature of the music favors ASCAP. We find the creative nature of ASCAP's music more significant to our inquiry than the fact that the music is published, given that the use that applicant makes of the music is not transformative. *See UMG Recordings*, 92 F. Supp. 2d at 352 (No discussion of published nature of copies of music recordings, which were not transformative, in finding that music

---

[14] Although neither party addresses the issue of whether the ASCAP music in applicant's previews is published before it is streamed as a preview, the record suggests that in some instances, applicant's previews may contain music that has not yet been released to the public. (Vanderhart Decl.¶ 17.)

recordings were creative and, therefore, factor weighed against finding of fair use.).  Therefore, this factor weighs against a finding of fair use.  We note, however, that "[t]he second statutory factor . . . is rarely found to be determinative." *On Davis*, 246 F.3d at 175 (citing 17 U.S.C. § 107(2)).


### C.      Factor Three: The Amount and Substantiality of the Portion Used

The third factor in the fair use inquiry, the amount and substantiality of the portion used, § 107(3),  "recognizes that the more of a copyrighted work that is taken, the less likely the use is to be fair, and that even a less substantial taking may be unfair if it captures the essence of the copyrighted work."  *Infinity Broad. Corp.*, 150 F.3d at 109.  The factor "calls for thought not only about the quantity of the materials used, but about their quality and importance, too."  *Campbell*, 510 U.S. at 587.  Applicant asserts that its previews last 10 to 30 seconds, however, ASCAP contends that it does not have sufficient discovery to assess this contention.  Applicant "concedes that the duration of the previews may be approximately the same as the associated [ringback tone] or ringtone." (AT&T Reply Mem. Supp. Summ. J. at 15.)  Assuming, without making any finding of fact, that applicant's asserted 10-to-30-second range is accurate, and that, thus, the previews only copy segments of ASCAP songs that are short in relation to the entire length of the song, applicant has still failed to establish that its previews do not copy the "essence" of the songs, that is, the most readily identifiable parts of the songs.  Rather, applicant admits that its previews typically incorporate "repetitive portions of songs, which are sometimes deemed the most significant," indicating that applicant intentionally copies qualitatively substantial portions of ASCAP music.

(AT&T Mem. Supp. Summ. J. at 11.)[15]  Even though these segments might be short, they are of high "quality and importance." *Campbell*, 510 U.S. at 587.  *See Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*, 621 F.2d 57, 61-62 (2d Cir. 1980) (holding that copying two-and-one-half-minute segment of 28-minute copyrighted film, amounting to 8% of the film, was not fair use, and noting that "[o]bviously [the defendant] found this footage essential, or at least of some importance.").

Furthermore, the Supreme Court instructs that "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." *Harper & Row*, 471 U.S. at 565.  Here, each preview was comprised entirely of ASCAP music.  Thus, a substantial portion of the infringing work (the previews) was "copied verbatim," which is "evidence of the qualitative value of the copied material" (the copied ASCAP music). *Id.*  Because the expressive value of the music was copied and because that expressive value constitutes the previews in their entirety, we find that applicant copied a substantial amount of ASCAP music, and, therefore, the third factor weighs in favor of ASCAP.  *See Harper & Row*, 471 U.S. at 566.

---

[15] Applicant asserts that "[i]n some cases, it may be 'necessary' to copy an entire work in order to make a transformative use; in such a case, the third factor is neutral." (AT&T Mem. Supp. Summ. J. at 10 citing *Bill Graham Archives*, 448 F.3d at 609-11, *Kelly*, 336 F.3d at 821, *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 724 (9th Cir. 2007), *Nunez v. Caribbean Int'l News Corp*, 235 F.3d 18, 24 (1st Cir. 2000).  In the cases that applicant cites, the new use made of the copyrighted work was found to be transformative.  *See Bill Graham Archives*, 228 F.3d at 610; *Kelly*, 336 F.3d at 818; *Perfect 10*, 487 F.3d at 721; *Nunez*, 235 F.3d at 23.  Since in this case applicant's use is not transformative, applicant's argument for the necessity of copying a substantial portion of ASCAP music to make a transformative use of that music is not applicable.

### D.   Factor Four: Market Effects

The fourth factor in the fair use inquiry, the effect of the use upon the potential market for or value of the copyrighted work, § 107(4), "is aimed at the copier who attempts to usurp the demand for the original work." *Consumers Union,* 724 F.2d at 1050.  The Second Circuit explains:

> when secondary uses harm the market for, or value of, the original, courts must examine the source of the harm.  If the harm resulted from a transformative secondary use that lowered the public's estimation of the original (such as a devastating review of a book that quotes liberally from the original to show how silly and poorly written it is), this transformative use will be found to be a fair use, notwithstanding the harm.  If, on the other hand, the secondary use, by copying the first, offers itself as a market substitute and in that fashion harms the market value of the original, this factor argues strongly against a finding of fair use.

*On Davis,* 246 F.3d at 175-76.   Thus, this factor must be analyzed in light of whether the new use is "transformative" or merely "supersedes the original."  *Id*. at 176.  "[W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur."  *Campbell*, 510 U.S. at 591 (internal quotation marks and citation omitted).  Furthermore, "to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work. . . . This inquiry must take account not only of harm to the original but also of harm to the market for derivative works."  *Harper & Row*, 471 U.S. at 568  (internal quotation marks and citations omitted; emphasis in original).  But, "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's 'effect upon the potential market for or value of the copyrighted work.'" *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).

23

In this case, as discussed above, applicant's use is not transformative.  Rather, it supersedes and, therefore, "it [is] likely that cognizable market harm to the original will occur."  *Campbell*, 510 U.S. at 591.   By using ASCAP music without compensating ASCAP, applicant avoids paying the "customary price" ASCAP is entitled to charge for the use of its songs.  *See On Davis*, 246 F.3d at 176 ("By taking for free [plaintiff]'s design for its ad, [defendant] avoided paying 'the customary price' [plaintiff] was entitled to charge for the use of his design.")[16]

Furthermore, ASCAP has established the existence of markets for licenses of preview performances and other short segments of its music.  Nineteen companies pay ASCAP for the right to deliver short segments of ASCAP music to their customers, and ASCAP's members use preview-like clips for promotional purposes. (ASCAP Mem. Opp. Summ. J. at 21.)  Furthermore, ASCAP requires other businesses to pay licensing fees to use previews to sell music purchases.  (*Id*. at 22.)  Thus, there is a market for, or other value in, short segments of ASCAP music which could be adversely impacted by applicant's free use of such segments.  *See Video Pipeline*, 342 F.3d at 202

---

[16] Applicant again relies on the erroneous conclusion that its previews are a transformative use of ASCAP music, making the bald assertion that its "transformative, non-substitutional use of previews results in no harm to the market for musical compositions," but rather that "previews sell ringtones and ringback tones for which composers are compensated and may increase sales of CDs for which composers are also compensated."  (AT&T Mem. Supp. Summ. J. at 14.)  Applicant's use of previews is not transformative.  Moreover, even if applicant's use of ASCAP music were transformative, applicant does not support its assertion with any evidence as to the effect of previews on the market for ASCAP music, whether in the form of the full song from which the previews are taken or a segment of that song. In addition, the suggestion that previews may increase sales of ringtones, ringback tones and CDs, for which artists are compensated as holders of the reproduction right of their music, is irrelevant to an analysis of the effect on the market for the public performance of ASCAP music; ASCAP is not compensated for any increase in sales of the recordings of its members.  *See UMG Recordings*, 92 F. Supp. 2d at 352 ("Any allegedly positive impact of defendant's activities on plaintiff's prior market in no way frees defendant to usurp a further market that directly derives from reproduction of the plaintiffs' copyrighted works.")

(recognizing market for movie previews on which use of infringing clip previews could have a harmful effect).

These markets are "traditional" and "reasonable" markets for derivative works of original ASCAP music and, therefore, the impact of applicant's use on the potential licensing revenues from these markets is legally cognizable in weighing the fourth factor. *Am. Geophysical Union*, 60 F.3d at 930. The existence of these markets militates against a finding of fair use. *Id*. at 931. ("[A] particular unauthorized use should be considered 'more fair' when there is no ready market or means to pay for the use, while such an unauthorized use should be considered 'less fair' when there is a ready market or means to pay for the use."). We recognize the strong possibility that ASCAP and its members lose current and future revenue when consumers access free previews from a website or wireless application to listen to, and possibly copy, previews of ASCAP music in lieu of accessing music segments from sources that pay licensing fees to ASCAP. However, there is insufficient evidence in the record to determine the actual effect of applicant's previews on ASCAP's markets for licenses of preview performances and other short segments of its music. Applicant, as the party arguing for fair use here, has the burden of proving that its use of ASCAP music will not harm these markets. *Infinity Broad. Corp.*, 150 F.3d at 107. Applicant has failed to meet this burden. Therefore, from ASCAP's standpoint, at worst, this factor is neutral.

### E.   Aggregate Assessment

At least three of the statutory factors point toward infringement and lack of fair use. However, the statutory factors are not exclusive, *Harper & Row*, 471 U.S. at 560, and the parties raise another point that we now consider. Applicant directs the Court to section 110(7) of the

25

Copyright Act, which provides a limited exemption from copyright liability for the public performance of "nondramatic musical work[s]" in "vending establishment[s] open to the public" (or what applicant refers to as "'brick-and-mortar' record stores") so long as the performance "is not transmitted beyond the place where the establishment is located and is within the immediate area where the sale is occurring."  17 U.S.C. § 110(7).  (AT&T Mem. Supp. Summ. J. at 13.)  Applicant argues that although it does not qualify for this exemption, "Congress's conclusion that previews in a traditional record store are a fair, non-substitutional use supports a finding that [applicant]'s use of previews is similarly fair." (*Id*. at 14.)  In response, ASCAP points out that this statutory provision "only applies to physical stores and does not extend to virtual points-of-purchase such as [applicant]'s MEdia Mall," and argues that "if Congress had intended to except Internet sites from this type of use, it knew how to do so and could have done so, yet it chose to decline such an invitation," noting that "amicus DiMA argued *unsuccessfully* for the extension of Section 110(7) to the Internet" in a report submitted to Congress in 2000.  (ASCAP Mem. Opp. Summ. J. at 25 (citing Comments of Digital Media Association, U.S. Copyright Office Report to Congress Pursuant to Section 104 of the Digital Millennium Copyright Act, Docket No. 000522150-0150-01 (Aug. 4, 2000) at 21).)

We agree with ASCAP that § 110(7) does not weigh in favor of finding fair use here.  The statutory language unequivocally indicates that the exemption was intended only for previews of music in physical record stores.  Congress may have had many reasons for limiting the provision in this way and we will not endeavor to divine the Congressional intent behind it.  We see no reason to override Congress's intentionally restrictive wording.  Moreover, the statutory provision governs a situation that differs in a significant way from the facts of this case: while live music in a record

store can be enjoyed only while the customer is in the store, music streamed over the internet can

be accessed from practically anywhere in the world.[17]  This distinction implicates the fourth fair use

factor, since the easier it is for a user to access an infringing work, the greater the likelihood of

market harm to the original, as a public performance played from a computer or mobile device could

potentially reach a much greater number of people than a public performance in a record store.  *See*

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1380 (N.D. Cal.

1995) (noting plaintiff's argument that "the Internet's extremely widespread distribution . . .

multiplies the effects of market substitution").

Because all four fair use factors favor a finding against fair use, and there are no other factors

that weigh in favor of fair use, applicant's motion for summary judgment is denied.[18]

### CONCLUSION

For all of the foregoing reasons, applicant's motion for summary judgment is denied in its

---

[17] Applicant argues that "consumers cannot listen to [its] ringtone and ringback tone previews anywhere other than the MEdia Mall website or, in the case of ringtone preview, the MEdia Mall . . . application on consumers' wireless devices." (AT&T Mem. Supp. Summ. J. at 14.)  While we recognize that in a virtual, technical sense applicant's previews can only be listened to in these two "places," in a physical sense applicant's previews can be listened to just about anywhere.  While a website and wireless device application are portable, a record store is not.

[18] ASCAP also argues that applicant's motion should be denied because it is non-dispositive, "since it does not even address all the performances available on the MEdia Mall service." (ASCAP Mem. Summ. J. at 2.)  ASCAP contends that the motion "would resolve absolutely nothing of consequence in the larger context of this proceeding," because it fails to address the several other internet websites for which applicant seeks a blanket license and "does not even mention the videos (which include music) that are also residing on the very same MEdia Mall website at issue here." (*Id.* at 26-27.)  Since the Court denies applicant's motion on the merits, we do not address this argument set forth by ASCAP.

entirety.  Because the parties submitted enough evidence for this Court to decide applicant's motion for summary judgment, it is not necessary for us to decide ASCAP's cross motion for discovery. The parties may proceed with discovery as this rate court proceeding moves forward.


SO ORDERED.

Dated:  White Plains, New York
        January 30, 2009

                                            _William C. Conner____
                                            Sr. United States District Judge

28