UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                 :
                                                      Civil Action
                        Plaintiff,        :           No. 41-1395 (WCC)

        - against -                       :

AMERICAN SOCIETY OF COMPOSERS, AUTHORS    :
AND PUBLISHERS, et al.,
                                          :           **OPINION
                                                      AND ORDER**
                        Defendants.       :

- - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application for      :
the Determination of Reasonable License               **REDACTED
Fees for Performances via Wireless        :           VERSION**
Transmissions and Internet Transmissions
by                                        :

AT&T WIRELESS f/k/a CINGULAR WIRELESS.    :

- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                                LOVELLS LLP
                                590 Madison Avenue
                                New York, New York  10022

DAVID LEICHTMAN, ESQ.
HILLEL I. PARNESS, ESQ.                 **- and -**
AVIVA J. HALPERN, ESQ.
        Of Counsel
                                AMERICAN SOCIETY OF COMPOSERS, AUTHORS
                                  AND PUBLISHERS
                                One Lincoln Plaza
                                New York, New York  10023

RICHARD H. REIMER, ESQ.
        Of Counsel              **Attorneys for Defendant American
                                  Society of Composers, Authors and
                                  Publishers**

**A P P E A R A N C E S :   (continued)**

                                    KILPATRICK STOCKTON LLP
                                    31 West 52nd Street, 14th Floor
                                    New York, New York 10019

JOSEPH PETERSON, ESQ.
        Of Counsel                          **- and -**

                                    JOSEPH M. BECK, ESQ.
                                    JAMES A. TRIGG, ESQ.
                                    W. ANDREW PEQUIGNOT, ESQ.
                                    1100 Peachtree Street, Suite 2800
                                    Atlanta, Georgia 30309

                                    **Attorneys for Applicant AT&T
                                       Mobility LLC**

**CONNER, Senior District Judge:**

This proceeding is before the Court for the setting of interim fees for a blanket license for the public performance of any of the more than two million musical compositions in the repertory of the American Society of Composers, Authors and Publishers ("ASCAP") on the wireless telephones and other handheld devices powered by AT&T Mobility, f/k/a Cingular Wireless, ("AT&T"), ("AT&T devices") and on three Internet websites now or formerly operated by AT&T.

## BACKGROUND

The Second Amended Final Judgment entered in the United States' civil antitrust action against ASCAP ("AFJ2") provides in Section IX that anyone desiring a license for the public performance of any ASCAP musical composition may apply to ASCAP therefor and, upon such application, may perform the music for fees to be determined later. *See United States v. Am. Soc'y of Composers, Authors & Publishers*, 2001 WL 1589999, at *6 (S.D.N.Y. June 11, 2001) (Conner, J.) Section IX further provides that if the parties cannot agree on the fee for such license, either party may apply to this Court to set reasonable interim and final fees. *Id*. Between October 2004 and January 2006, AT&T made four applications to ASCAP for blanket licenses for three Internet websites and for AT&T's wireless telephone service. After protracted negotiations, during which ASCAP unsuccessfully sought additional information about the licensed services and AT&T's revenues therefrom, the parties were unable to agree on the license fees and on August 19, 2008 ASCAP applied to this Court for the setting of reasonable interim and final fees for the open period commencing October 28, 2004.

On September 2, 2008, based on the incomplete information then available to it, ASCAP

1

submitted to AT&T and this Court its Interim Fee Proposal and on September 16, 2008 AT&T submitted its Response and counterproposal.  The parties continued to submit legal memoranda and evidentiary submissions supporting and opposing their respective proposals until January 8, 2009. After the Court had completed preparation of and was about to issue an Opinion and Order setting interim fees, ASCAP notified the Court that, based on additional information obtained during discovery, it had presented to AT&T and would soon file an amended Interim Fee Proposal.  That amended proposal was contained in a letter dated January 15, 2009 from ASCAP's counsel ("Leichtman Ltr.").  AT&T's counsel responded in a letter dated February 13, 2009, presenting its amended counterproposal ("Beck Ltr.").

The following recitation of facts is based upon the representations of the parties, in some instances unverified, and does not constitute findings of fact, which must await an evidentiary hearing.

I.    **Services For Which AT&T Seeks an ASCAP License**

A.    **Cellular Video ("CV")**

AT&T provides to all of its wireless telephone subscribers and to its business subscribers whose blackberries or other handheld devices have third generation ("3G") data-handling capability two classes of CV service: Basic and Premium.  Basic CV is not sold as a stand-alone service, but is bundled in the MEdia Net Unlimited data plan, for which AT&T currently charges $15.00 per month, together with a number of other data services, which plan "allows subscribers to send and receive emails, check sports scores, stock quotes, news headlines, movie times, and weather, and access the Internet." (Beck Ltr. at 2.)  Premium CV, which offers additional video content, is sold

2

on a pay-per-view basis or on a monthly subscription basis as part of the "MEdia Max" data bundle for which AT&T currently charges $35.00 per month. Because the "MEdia Max" package also includes unlimited text messaging, which is offered as a stand-alone service for $20.00 per month, AT&T allocates $15.00 of the $35.00 monthly "MEdia Max" subscription charge to CV services. (Beck Ltr. at 2-3.)

### B.   Non-Ericsson Answer Tones

Answer Tones, which ASCAP sometimes refers to as "ringback tones," are musical compositions that are downloaded onto an AT&T subscriber's wireless telephone and which a caller hears instead of the traditional ringing sound when a call is made to that subscriber. For this service, AT&T receives an initial charge of $1.99 per tone plus a monthly recurring charge ("MRC"). AT&T asserts that it obtains [REDACTED] of the Answer Tones it sells from Ericsson, Inc. (Beck Ltr. at 3.) AT&T provides on its Internet website previews of the Answer Tones to assist its subscribers in selecting tones for purchase. Because Ericsson has applied to ASCAP for a license covering its distribution of Answer Tones, AT&T seeks an ASCAP license for only the [REDACTED] of the Answer Tones that it obtains from sources other than Ericsson.

### C.   Previews

AT&T presents on its Internet websites promotional advertising for various AT&T services including previews of Ringtones, Answer Tones and video clips. AT&T asserts that "virtually all performances of music on [these] websites are previews." (Wolfson Decl. ¶ 19.) On August 18, 2009, AT&T moved for a partial summary judgment ruling that previews are a fair use of

3

copyrighted music and therefore do not require a license.  However, that motion was denied in an Opinion and Order dated January 30, 2009, in which this Court ruled that previews, because they are not transformative and are performed for sales promotional purposes, are not a fair use.  *United States v. Am. Soc'y of Composers, Authors & Publishers*, __ F. Supp. 2d __, 2009 WL 484449, at *5-9 (S.D.N.Y. Jan. 30, 2009) (Conner, J.).  In view of that ruling, AT&T has stated that its request for an ASCAP license "should be deemed to include the roughly [REDACTED] of previews offered by AT&T [] in connection with non-Ericsson ringback tones and should be deemed to include previews offered in connection with [R]ingtones for which AT&T [] bears clearance responsibility." (Beck Ltr. at 4-5.)

Thus, regardless of whether the Ringtones themselves are publicly performed, AT&T apparently does not dispute that Ringtone previews, which are streamed on demand to anyone accessing an AT&T Internet website, are publicly performed.  Although AT&T does not charge for these previews, they undeniably increase AT&T's sales of Ringtones, an important source of revenue for AT&T.  AT&T obtains most if not all of its Ringtones and Ringtone previews from sources other than Ericsson.  At a Court conference on March 20, 2009, AT&T's counsel indicated that he did not know which of those suppliers have been granted or have applied for through-to-the-listener ASCAP licenses.  (3/20/09 Tr. 2:11-24.)  It thus appears that AT&T will require an ASCAP license for at least some of its Ringtone previews, whether or not it requires one for Ringtones.

## II.   **Other Music Performances For Which AT&T Does Not Seek a License**

### A.   **Streaming Services**

AT&T also makes available to its wireless telephone subscribers a number of other types of

4

content which involve performances of music, including MobiTV, Inc. ("MobiTV"), eMusic, Mobile TV, XM Satellite Radio ("XM Radio" or "XM"), Pandora and video clips, all of which AT&T asserts are supplied by others effectively having through-to-the-listener licenses from ASCAP. (Beck Ltr. at 1-2.)  ASCAP initially responded that, although those suppliers have applied for ASCAP licenses, only two of them (XM Radio and Pandora) have actually been granted a license; moreover, the license to XM Radio expressly excludes the right of any receiver of XM's transmissions to "further transmit any of the musical compositions licensed hereunder" (Parness Decl., Ex. EE ¶ 2(c)) and the license to Pandora "extends only to [Pandora] and [its] Internet Site or Service and is limited to performances presented by means of Internet Transmissions, and by no other means." (Parness Suppl. Decl., Ex. G ¶ 6(a).)  After that initial response, ASCAP granted  an interim license to MobiTV in which it asserts that the "fee was based not on a 'through to the audience' basis" and that "AT&T would still have to pay fees based on its share of the revenue for the service that it does not 'split' with Mobi."  (Leichtman 2/17/09 Ltr. at 3.)

**B.**   **Downloads**

AT&T also allows subscribers to download onto their wireless telephones audio-only music and music videos from various sources, but correctly points out that this Court ruled in *United States v. ASCAP in re AOL, RealNetworks and Yahoo! Inc.,* 485 F. Supp. 2d 438 (S.D.N.Y. 2007) that music downloads, which are performed at high speeds and cannot be contemporaneously enjoyed, are not public performances requiring an ASCAP license.

C.    **Ringtones**

AT&T, for an initial charge and presumably an MRC, also provides musical Ringtones that are downloaded onto its subscribers' wireless telephones, and which they hear instead of a ringing sound when they receive a call.  Because AT&T has indicated its intention to file a motion for partial summary judgment declaring that these Ringtones are not publicly performed, it has not applied for an ASCAP license to cover this service.

III.    **ASCAP's Interim Fee Proposals**

ASCAP's initial proposal was based on AT&T's report of the number of subscribers to its CV service (*see* Parness Decl., Ex. K at 20) and AT&T's computation of average revenue per user (*see id.* at 21), from which ASCAP reckoned that AT&T received a total of at least [REDACTED] in revenue during the period from March 2006 through June 2008.   ASCAP proposed a license fee of 3.0% of the total revenue, or [REDACTED] through June 2008 and [REDACTED] per quarter thereafter, computed at the same monthly rate as for the earlier period.

ASCAP's amended proposal is much more complicated.

A.    **Fee Rate**

ASCAP repeated its proposal of a 3% fee rate for most services but, recognizing that in *United States v. ASCAP in re AOL, RealNetworks and Yahoo! Inc.,* 562 F. Supp. 2d 413 (S.D.N.Y. 2008) ("*In re AOL, et al.*") the Court rejected that rate and found a rate of 2.5% of music-use-adjusted revenue to be reasonable, added alternative computations based on a 2.5% rate on revenue from all services except Ringtones.  Having granted a number of licenses  to Ringtone providers at a fee rate of 2% of revenue, ASCAP proposes a 2% rate for Ringtones.

6

B.       **Rate Base and Adjustment Factor**

1.       **For Basic CV**

Although ASCAP persists in its contention that the fee rate should be applied to AT&T's total revenue, without reduction by a music-use adjustment factor, considering that the Court in *In re AOL, et al.* applied such a factor to the revenue of RealNetworks Inc., ASCAP now proposes to apply to AT&T's Basic CV revenue an adjustment fraction wherein the numerator is the total of 100% of the minutes spent viewing "Music Video" content and 50% of the minutes spent viewing "General Entertainment" and "Sports and News" content and the denominator is the total minutes spent viewing Basic CV.  This results in a music-use adjustment factor ranging between 51% and 74% for the 32-month period from March 2006 through October 2008 (the "open period"). (Leichtman Ltr., Ex. B.)

ASCAP computes AT&T's CV revenues on two alternative bases.  In its "lower bound" proposal, ASCAP accepts AT&T's allocation of $15 of its $35 monthly Premium CV charge  to video services, while, "[i]n the absence of any evidence that any of AT&T's customers actually purchased the lower priced plans," ASCAP's alternative "upper bound" proposal treats the entire $35 as Basic CV revenue.  (*Id*. at 4.)  ASCAP thus computes AT&T's Basic CV revenue over the open period as [REDACTED] at the lower bound and [REDACTED] at the upper bound.  (*Id.*, Ex. B.)

Applying the aforementioned adjustment factor to those revenues on a month-by-month basis results in total adjusted open-period revenue of [REDACTED] at the lower bound and [REDACTED] at the upper bound.  (*Id.*)  At a fee rate of 3%, the fees for Basic CV would be [REDACTED] at the lower bound and [REDACTED] at the upper bound.  (*Id.*)  At a rate of 2.5%, the Basic CV fees would be [REDACTED] at the lower bound and [REDACTED] at the upper

bound. (*Id.*)

###    2.    For Premium CV

On the assumption that the Premium CV service is offered as an "add on" feature to AT&T

subscribers who already have Basic CV, ASCAP proposes to apply a music-use adjustment factor

of 100% to all revenue for content classified by AT&T as a "Music" offering and 50%  for content

classified by AT&T as "Non-Music."  (*Id*. at 6.)  Applying this formula to AT&T's total Premium

CV revenue of [REDACTED] for the open period would result in adjusted revenue of

[REDACTED] .  (*Id*, Ex. C.)  Thus the Premium CV fees for that period would be [REDACTED]

at a fee rate of 3.0% and [REDACTED] at a rate of 2.5%. (*Id*.)

###    3.    For Streaming Services

As mentioned above, AT&T has not applied for an ASCAP license for performance of any

of its other music streaming services such as XM Radio, MobiTV, MobiRadio, Pandora and others,

taking the position that it requires no license therefor because all of its suppliers of such content have

obtained or applied for an ASCAP through-to-the-listener license.  ASCAP contends that a license

is required for all of those streaming services because no license has yet been issued to most of those

suppliers and it has received no fees from them and because the three who have ASCAP licenses do

not have through-to-the-listener licenses.  AT&T has furnished data showing that it has received total

revenue of [REDACTED] for these streaming services.  Applying the same adjustment factor as for

Premium CV revenue (100% for music-focused content and 50% for general content) results in

music-adjusted revenue of [REDACTED].  (*Id.*, Ex. D.)  ASCAP, thus, proposes fees of

[REDACTED]  at a fee rate of 3.0% or [REDACTED] at a rate of 2.5%.  (*Id*.)

### 4.      For Answer Tones and Previews Thereof

ASCAP proposes a fee rate of 3.0% (or 2.5% if the Court's ruling in *In re AOL, et al.* is affirmed) of AT&T's revenue from the sales of Answer Tones and from the MRCs therefor.  As previously noted, AT&T asserts that [REDACTED] of the Answer Tones it sells are supplied by Ericsson, which has applied for an ASCAP license thereon, so that AT&T has applied for a license for the sale of only the [REDACTED] supplied by others.  However, AT&T has produced data showing that, during the period from January 2006 through October 2008, it received total revenue of [REDACTED] from the sale of Answer Tones and from MRCs.  ASCAP's proposed fee thereon would be [REDACTED] at a fee rate of 3.0% and [REDACTED] a rate of 2.5%. (*Id*., Ex. E.)

### 5.      For Ringtones and Previews Thereof

As noted above, AT&T has consistently contended that Ringtones are not publicly performed and do not require an ASCAP license and has indicated its intention to file a motion for partial summary judgment to that effect.  ASCAP contends otherwise and also points out that, for the period from January 2007 through October 2008 (the only period for which AT&T has supplied such data), for every Ringtone AT&T sold, it performed an average of [REDACTED] previews (*id*. at 10) and contends that these previews are clearly public performances.   AT&T has produced data showing that during the period from September 2005 through October 2008, it received a total of [REDACTED] in Ringtone revenue.  Because ASCAP has granted a number of Ringtone licenses at a fee rate of 2.0%, it proposes such a fee for AT&T, which would result in fees of [REDACTED]

for Ringtones.  (*Id*., Ex. F.)

      6.    **For Other Specific Services**

      a.    **eMusic, Napster and Billboard**

During the open period, AT&T received [REDACTED] in revenue for performing previews to promote sales of content that these suppliers deliver directly to consumers.  Because ASCAP has no information from which it can determine the amount of music contained therein, it proposes a license fee of [REDACTED] therefor. (*Id*. at 11.)

      b.    **Audiovisual Content**

During the open period, AT&T sold [REDACTED] units of videos through its MediaMall Internet website, for which it received revenue of [REDACTED].  (*Id.*)  AT&T performed [REDACTED] previews in promoting such sales, or an average of [REDACTED] previews per video. (*Id.*) Because ASCAP has no information about the music content of such videos, it proposes a fee of [REDACTED] for the open period. (*Id.*)

      c.    **Other AT&T Music Services**

AT&T has requested an ASCAP license for a number of Internet websites on which it makes available audio and audiovisual content, but has provided no revenue or usage information thereon. (*Id*. at 11-12.)  Lacking such information, ASCAP has tentatively proposed a license fee of $100,000 for such performances during the open period. (*Id*. at 12.)

C.      **Summary**

ASCAP's amended proposal thus calls for fees for the open period totaling between a low of [REDACTED] and a high of [REDACTED]. (*Id*., Ex. A.)


IV.     **AT&T's Counter-proposal**

A.      **For Basic CV**

AT&T computes its Basic CV revenue each calendar month by multiplying the number of Basic CV subscribers it had that month by its Average Revenue Per User ("ARPU").   For example, for June 2008, it computes an ARPU of [REDACTED], which is less than the aforementioned charge of $15.00 per month because many users started or terminated their subscriptions during the month. (Wolfson Decl. ¶ 12.)  It thus determines its total Basic CV revenue as [REDACTED] during the 32-month open period.  (Wolfson Suppl. Decl., Ex. B.)  To each monthly revenue figure, AT&T applies a music-use adjustment fraction whose numerator is the total number of minutes that its subscribers spent streaming Basic CV content during that month and whose denominator is the number of billable minutes those subscribers spent browsing the Internet from their AT&T-powered devices during the month.   This results in monthly adjustment factors ranging between [REDACTED] and [REDACTED] during the period from March 2006 through October 2008.  (*Id.*) Because AT&T does not have reliable data on browsing time for the earlier period from March 2006 through August 2007, it has used for each of those months an adjustment factor of [REDACTED], which is the average factor during the later period.  (Beck Ltr. at 9, n.16.)  Multiplying each month's Basic CV revenue by the factor for that month results in total music-use-adjusted revenue of [REDACTED] for the open period. (Wolfson Suppl. Decl., Ex. B.)  To this revenue figure, AT&T

11

applies a "blended" royalty rate of 0.5%, which is purportedly derived from ASCAP's standard cable television licenses (0.9% for music video, 0.375% for general entertainment and 0.1375% for news/sports/weather).  (Beck Ltr. at 9-10.)  This results in proposed Basic CV license fees of [REDACTED] for the open period.  (Wolfson Suppl. Decl, Ex. B.)

### B.   For Premium CV

Because its subscribers pay separately for Premium CV, AT&T does not propose to apply a music-use adjustment factor to its revenue for this service but to apply the same "blended" royalty rate of 0.5% to its total Premium CV revenue.  (Beck Ltr. at 11.)  AT&T reports its total Premium CV revenue during the 28-month period from March 2006 through June 2008 as [REDACTED]. (*Id.*, Ex. C.)  Applying the blended rate of 0.5% to this revenue results in proposed license fees of [REDACTED] for that period.  (*Id.*)  However, more recent data covering the 32-month open period shows that AT&T had total Premium CV revenue of [REDACTED] through October 2008. (Leichtman Ltr., Ex. C.)  Applying AT&T's proposed 0.5% rate to that revenue would result in interim fees of [REDACTED] for Premium CV.

### C.   For Non-Ericsson Answer Tones

Although AT&T has not abandoned its contention that Answer Tones are not publicly performed, it has proposed to compensate ASCAP for the [REDACTED] of the Answer Tones it receives from suppliers other than Ericsson. (Beck Ltr. at 3, n.8 and accompanying text.)  AT&T earlier reported that its gross revenue from the sale of non-Ericsson Answer Tones was [REDACTED] during the period from March 2006 through May 2008.  (Wolfson Decl., Ex. E.)

AT&T proposes to pay thereon an interim license fee of [REDACTED], (Beck Ltr. at 12), although

application of a fee rate of 0.5% to this revenue would result in a fee of only [REDACTED].

### D.   Summary

AT&T's interim fee proposal thus totals [REDACTED] for the open period.


## DISCUSSION

### I.   Purpose of Interim Fees

The assessment of interim fees is "intended as a temporary measure to ensure a reasonable

flow of funds to ASCAP . . . while the parties negotiate or litigate a binding fee." *United States v.*

*Am. Soc'y of Composers, Authors & Publishers (Application of the Nat'l Cable Television Ass'n)*,

1999 WL 335376, at *3 (S.D.N.Y. May 26, 1999).  An interim fee "is to be set promptly, as a rough,

tentative and temporary determination, subject to retroactive adjustment when the final fee is

determined, and may bear little resemblance to the final fee." *Broadcast Music, Inc. v. DMX, Inc.,*

2008 WL 5429884, at *1 (S.D.N.Y. Dec. 29, 2008) (internal citation omitted).

AFJ2 provides in Section IX(B) that ASCAP has the burden of proof to establish the

reasonableness of the fee it seeks for a blanket license and in Section IX(D) that "[s]hould ASCAP

not establish that the fee it requested is reasonable, then the Court shall determine a reasonable fee

based upon all the evidence."  *ASCAP*, 2001 WL 1589999, at *7.


### II.   Analysis of the Interim Fees Proposed in this Case

It would be an understatement to describe as a yawning chasm the gap between ASCAP's

proposal of an interim license fee of [REDACTED] for the open period and AT&T's counter-

proposal of [REDACTED], which is less than one-half of one percent of ASCAP's proposal.  Not surprisingly, the Court finds neither proposal reasonable.


A.      **Flaws in ASCAP's Proposal**

The principal error made by ASCAP is to include in the rate base revenue received by AT&T for re-transmitting content provided by suppliers who have applied for an ASCAP license and, therefore, have the right to perform ASCAP music for fees to be determined later.  ASCAP's position is that, even though many of AT&T's content suppliers have applied for an ASCAP license, in most cases, the licenses agreements have never been concluded and neither interim nor final license fees have ever been paid; indeed, the license applications could even be withdrawn.  However, withdrawal of a license application would not necessarily mean that the applicant's right to perform ASCAP music during the pendency of its application would be retroactively nullified or that the erstwhile applicant would not owe reasonable license fees for such performances prior to withdrawal.

ASCAP correctly points out that Section V of AFJ2 provides that the fee for a through-to-the-listener license "shall take into account the value of all performances made pursuant to the license." *ASCAP*, 2001 WL 1589999, at *4.  But many of AT&T's music content suppliers have applied to ASCAP for through-to-the-listener licenses and there is no reason to assume that ASCAP will not grant such licenses and in doing so will take into account the fact that AT&T is re-transmitting that content to its subscribers and deriving substantial revenue for doing so.  If any of AT&T's suppliers does not obtain such a license, either AT&T or its supplier, or both of them, will be subject to a copyright infringement action in this or another court.  But, because AT&T has not applied for a

14

license for public performances of music content it obtains from suppliers who have applied for an ASCAP license, this Court has no authority for setting a reasonable royalty for such performances.

Another major flaw in ASCAP's interim fee proposal is its computation of AT&T's revenue for Basic CV services.  The $15 monthly charge for Basic CV covers many services not involving music, including sending and receiving e-mails, checking news headlines, stock prices, sports scores, weather and so on, so that fairness requires application of a use-based adjustment factor to reduce the $15 to a level which fairly represents the value of music in attracting CV subscribers.  But, in a stunningly illogical assumption, in its "upper bound" proposal, ASCAP treats, as Basic CV revenue, not merely the whole $15 charged for Basic CV but the $35 charged for the MEdia Max Unlimited bundle.

Another flaw in ASCAP's proposal concerns its content-based music-use adjustment factor.  In *In re AOL, et al.,* ASCAP proposed an adjustment fraction whose numerator is the time visitors to a website spent streaming music and whose denominator is the total time they spent on the website.  The Court adopted that use-based proposal as a fair measure of the importance of music in attracting visitors to a website and thus producing subscription and advertising revenue for the website proprietor.  562 F. Supp. 2d at 481, 495.  In its present interim fee proposal, ASCAP has shifted to a content-based adjustment factor of 100% for music-focused content and 50% for general entertainment, sports and news content.  Obviously, ASCAP made this switch because application of a use-based adjustment factor would result in much lower fees.  But the Court sees no reason why in the wireless telephone context a use-based factor is not likewise a fair measure of the importance of music in attracting subscribers to AT&T's CV service.

Yet another flaw in ASCAP's  proposal is that it persists in seeking a fee rate of 3.0%, the

15

same percentage of the licensee's music-use-adjusted revenue ASCAP proposed in *In re AOL, et al*. In that rate proceeding, ASCAP based the 3.0% rate proposal on its "experimental" form license to Internet proprietors. *Id*. at 495. However, those licenses were rejected as "benchmarks" by the Court because they were for interactive music streaming and because they were unilaterally drawn and accepted by "a limited number of relatively small licensees whose annual fees were not so great as to justify the substantial expense of a rate proceeding to challenge their reasonableness." *Id.* In that proceeding, the Court, after considering many factors, including the most comparable prior blanket licenses, determined that a license fee of 2.5% of music-use-adjusted revenue is reasonable for performances of ASCAP music on the Internet. *Id.* at 477-85, 495-97. We see no reason why such fees would not also be reasonable for music performances on wireless telephones. ASCAP's argument that the performance of music on wireless telephones justifies a premium over the fees for performance on the Internet because of "portability" and "convenience" is not persuasive. (ASCAP Interim License Fee Proposal at 12, 14.)

### B.      Flaws in AT&T's Proposal

AT&T erred in assuming that the performance of previews of music compositions on its Internet website would be ruled a fair use of the copyrighted material and, therefore, did not include such previews in its license fee proposal. Although AT&T does not charge for previews, they clearly increase the revenue from sales of Ringtones and Answer Tones, which are made after an average of between three and four previews for each sale. Thus, a fee should be paid for these performances of music to generate revenue. ASCAP has proposed fee rates of 2.0% on Ringtone revenue and 2.5% on Answer Tone revenue. (Leichtman Ltr. at 8-10.) This rate is clearly reasonable as applied

to the revenue from the sale of content that is 100% music and which is not covered by an ASCAP through-to-the-listener license.  Even considering that the ASCAP fees may be only one-half of the total music license fees paid to performing rights societies, any retailer would be delighted to pay a producer of goods only 5.0% of his share of the retail selling price for the goods, particularly where, as here, the retailer pays nothing unless and until the goods are sold and does not have to store them, insure them, or assume the risks of their deterioration or obsolescence.

AT&T also erred in using a fee rate of 0.5% based on a "blend" of rates taken from ASCAP licenses in which the rates were applied to the licensees' gross revenues.   Such rates are unreasonably low for application to revenues which have been substantially reduced by a music-use adjustment factor, as AT&T proposes.  As stated above, the Court sees no reason to change its determination that a rate of 2.5% of music-use-adjusted revenue is reasonable.

ASCAP criticizes AT&T's proposal for its use of a music-use adjustment factor because "AT&T sells its data packages for fixed monthly fees, which do not vary based on the amount of music the subscriber uses."  (ASCAP Reply Interim License Fee Proposal at 7.)  But that does not mean that, in determining reasonable license fees, the Court should not weigh, as accurately as it can, the value of music in generating revenue for the licensee.  AT&T has submitted data showing that in an average month no more than about [REDACTED] of its data subscribers access Basic CV at all and only about [REDACTED] of their billable browsing time is spent streaming Basic CV content.  (Wolfson Decl. ¶¶ 13, 14, Exs. A, B.)  Assuming the accuracy of these figures, it is clear that a music-use adjustment factor must be applied to AT&T's total revenues from its unlimited data services to fairly reflect the value of music in attracting subscribers to those services.  In *In re AOL, et al.*, the Court found that the ratio between the time spent streaming music and the total time spent

on a website is a fair approximation of the value of music in generating both subscription and advertising revenue for the website proprietor.  562 F. Supp. 2d at 495.  That approach appears equally appropriate in the wireless telephone context.

### C.       AT&T's License From BMI

On December 17, 2008,  after AT&T had submitted its interim fee proposal in this proceeding, AT&T entered into a license agreement with Broadcast Music, Inc. ("BMI"), ASCAP's rival performing rights society, which the Court has recognized as roughly comparable to ASCAP in terms of the size and importance of their respective repertoires.  *Id*. at 424.  AT&T's counsel, in a letter to the Court dated January 7, 2009, sought leave to submit, in support of AT&T's interim fee proposal, a supplemental declaration of Gary Wolfson, to which a copy of the BMI agreement was attached as Exhibit A.  (*See* Wolfson Suppl. Decl.)  The agreement, which conveys a blanket license for the performance of any BMI composition on all of the AT&T services for which it seeks an ASCAP license, was obviously drawn with a view toward creating a "benchmark" for use in this proceeding.  Its term begins October 28, 2004 – the same beginning date as the ASCAP licenses involved in this proceeding – and ends December 31, 2008.  (*Id.*, Ex. A ¶ 1.)  Moreover, it contains a most favored nation ("MFN") clause which provides that if ASCAP, by settlement agreement or by a final judgment in this proceeding, obtains more favorable terms than BMI has obtained in its license to AT&T, the terms of that license will be amended to give BMI the benefit of ASCAP's more favorable terms.  (*Id.* ¶ 7.)  Thus, the BMI agreement is nothing more than an agreement on interim fees which will be revised when final fees are set in this proceeding.  In effect, it gives BMI the benefit of a "floor" under its interim fees from AT&T, without depriving BMI of the benefit of

whatever higher fees ASCAP manages to obtain, while saving the parties the substantial cost of litigation.  In return, AT&T gets what it can present to this court as a benchmark agreement. However, the agreement's MFN provision renders it of only illusory value as a precedent.


### III.   Determination of Reasonable Interim Fees

Without deciding that it is the appropriate way to determine reasonable final fees for the public performance of ASCAP music on AT&T devices, and only for the purpose of verifying the reasonableness of the interim fees being set by the Court, we will first consider what the fees for the open period would be if they were computed at a rate of 2.5% of AT&T's revenue from the licensed services, with the Basic CV and Premium CV revenues reduced by a music-use adjustment fraction in which the numerator is the number of minutes subscribers spent receiving that service and the denominator is the number of minutes they spent browsing the Internet on their AT&T devices. Computed on that basis, the interim fees for the respective services would be as follows:

For Basic CV: [REDACTED] (2.5% of [REDACTED]).

For Premium CV: [REDACTED] (2.5% of [REDACTED]).

For non-Ericsson Answer Tones: [REDACTED] (2.5% of [REDACTED] of [REDACTED]).


In requesting an ASCAP license for its Internet websites, AT&T asserts that "virtually all" of the music performances thereon were previews.  In response, ASCAP points out that many of these previews promote the sale of content by services such as eMusic, Napster and Billboard, which deliver the content directly to the customer.  (Leichtman Ltr. at 10.)  Other previews promote the sale of videos.  AT&T has received a total of roughly [REDACTED] in commissions on such sales over

the open period.  (*Id.* at 11.)   Lacking adequate information about the music content of these previews, ASCAP proposes interim fees totaling $340,000 therefor.  (*Id.* at 11-12.)  That would represent [REDACTED] of AT&T's revenues from these previews, which seems excessive, although a definite evaluation of its reasonableness requires further information.

AT&T received over [REDACTED] as its share of the revenues from a number of streaming services, such as XM Radio, MobiTV, MobiRadio, Pandora and others during the open period.  (*Id.*, Ex. D.)  AT&T did not apply for an ASCAP license for those services, for the stated reason that its suppliers of the services all have through-to-the-listener licenses from ASCAP.  However, ASCAP has submitted a copy of the license it issued to XM Radio and, in a letter to the Court dated February 17, 2009, its counsel has represented that neither that license nor those issued to Pandora and MobiTV are through-to-the-listener licenses.  (Leichtman 2/17/09 Ltr. at 3.)  In a responsive letter to the Court dated February 25, 2009 AT&T's counsel did not contend that they are through-to-the-listener licenses but merely stated that "AT&T expressly reserves its right to amend its license requests to the extent the Court rules that a particular service requires a license."  (Petersen Ltr. at 3.)  In setting reasonable interim fees, the Court therefore must consider the apparent likelihood that AT&T will require an ASCAP license for at least some of these streaming services.  During the open period, AT&T received [REDACTED] in revenue from XM Radio, [REDACTED] from MobiRadio and [REDACTED] from Pandora, for a total of [REDACTED] from these three alone.  (Leichtman Ltr., Ex. D.)  ASCAP proposes an interim fee of either 2.5% or 3.0% of that revenue.  Without knowing more about the music content of those services, the Court cannot judge the reasonableness of that proposal.  But it appears that, at the minimum, license fees no less than those charged to radio broadcasters would be appropriate.  Even applying AT&T's proposed "blended" rate of 0.5% to the

20

aforementioned revenue of [REDACTED] would result in an interim fee of [REDACTED] for these streaming services.

As noted above, AT&T will apparently require an ASCAP license for at least some of the Ringtone previews it streams on demand to visitors to one of its Internet websites and which undoubtedly increase the sales of Ringtones from which AT&T derived over [REDACTED] in revenue during the open period. ASCAP seeks a license fee of 2.0% of such revenue, to conform to the fee rate provided in a number of licenses it has granted to Ringtone providers. This would result in fees of roughly [REDACTED] for the open period. At the Court conference on March 20, 2009, AT&T's counsel stated that AT&T had a license from BMI which sets a fee rate of [REDACTED] previews. (3/20/09 Tr. 17:6-16.) Although AT&T has not disclosed how many previews it has performed (Wolfson Decl. ¶¶ 19-22), it is obvious that the gap between these two proposals is the "yawning chasm" redux. Lacking information about the number of Ringtone previews AT&T has performed and which, if any, of its Ringtone suppliers have ASCAP through-to-the-listener licenses, the Court is not presently enabled to set a reasonable interim fee for AT&T's Ringtone previews. Thus, it will set interim fees for AT&T's other public performances of ASCAP music and, unless and until it is satisfied that all the necessary information has been given to it, the Court will defer determination of interim fees for Ringtone previews until the setting of final fees.

After consideration of all the evidence now before it, the Court finds that, for AT&T's performance of ASCAP music in the specific services for which it has requested an ASCAP license, excepting Ringtone previews, an interim fee of $1,500,000 for the period from October 2004 through October 2008 is reasonable and that ongoing interim fees at the rate of $60,000 per month for the period commencing November 1, 2008 and continuing until the setting of final fees are likewise

reasonable.

## CONCLUSION

It is therefore HEREBY ORDERED that within 30 days of this Opinion and Order, AT&T shall pay to ASCAP the amount of $1,800,000 for the interim fees specified above accrued through March 2009 and, within 10 days after the end of each calendar month thereafter until the setting of final fees in this proceeding, shall pay the interim fees of $60,000 accruing during that month.

SO ORDERED.

Dated: White Plains, N. Y.
     April 3, 2009

                                    WILLIAM C. CONNER, Senior U.S.D.J.