ORIGINAL

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,              :
                                                Civil Action
                    Plaintiff,         :        No. 41-1395 (WCC)

       - against -                     :

AMERICAN SOCIETY OF COMPOSERS, AUTHORS :
AND PUBLISHERS, et al.,                         OPINION
                                       :        AND ORDER
                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - X
In the Matter of the Application of    :
YOUTUBE, LLC f/k/a YOUTUBE, INC.,
                                       :
                    Applicant,
                                       :        REDACTED
for the Determination of Reasonable             VERSION
License Fees.                          :
- - - - - - - - - - - - - - - - - - - - - - - X
```

A P P E A R A N C E S :

        WHITE & CASE LLP
        1155 Avenue of the Americas
        New York, New York  10036

I. FRED KOENIGSBERG, ESQ.
CHRISTOPHER J. GLANCY, ESQ.
STEFAN M. MENTZER, ESQ.        - and -
CATHERINE GRATTON, ESQ.

    Of Counsel

        AMERICAN SOCIETY OF COMPOSERS, AUTHORS
          AND PUBLISHERS
        One Lincoln Plaza
        New York, New York  10023

RICHARD H. REIMER, ESQ.
CHRISTINE A. PEPE, ESQ.

    Of Counsel        Attorneys for Defendant American
          Society of Composers, Authors and
          Publishers

COPIES MAILED TO COUNSEL OF RECORD 5/13/09

**A P P E A R A N C E S :**  (continued)

                                              WEIL, GOTSHAL & MANGES LLP
                                              767 Fifth Avenue
                                              New York, New York  10153

KENNETH L. STEINTHAL, ESQ.

      Of Counsel

                                              WEIL, GOTSHAL & MANGES LLP
                                              201 Redwood Shores Parkway
                                              Redwood Shores, California 94065

JOSEPH R. WETZEL, ESQ.
DANA K. POWERS, ESQ.
  (*pro hac vice pending*)

      Of Counsel                    **Attorneys for Applicant YouTube, LLC**

**CONNER, Senior District Judge:**

This proceeding is before the Court for the setting of interim fees for a blanket license for the public performance of any of the more than two million musical compositions in the repertory of the American Society of Composers, Authors and Publishers ("ASCAP") on the streaming video service provided on the Internet by YouTube, LLC f/k/a YouTube, Inc. ("YouTube").

**BACKGROUND**

The Second Amended Final Judgment entered in the United States' civil antitrust action against ASCAP ("AFJ2") provides in Section IX that anyone desiring a license for the public performance of any ASCAP musical composition may apply to ASCAP therefor and, upon such application, may perform the music for fees to be determined later. *See United States v. Am. Soc'y of Composers, Authors & Publishers*, 2001 WL 1589999, at *6 (S.D.N.Y. June 11, 2001) (Conner, J.) Section IX further provides that if the parties cannot agree on the fee for such license, either party may apply to this Court to set reasonable interim and final fees. *Id*.

On September 25, 2006, YouTube applied to ASCAP for a blanket through-to-the-listener license for a two-year period commencing in May 2004. (Glancy 1/20/09 Decl., Ex. C.) On January 5, 2007, YouTube amended its application to seek a license for the period May 1, 2005 through April 30, 2007. (*Id*., Ex. D.) On January 9, 2007, ASCAP responded by sending to YouTube a copy of its *Experimental License Agreement for Interactive Sites & Services - Release 2.0*, stating that ASCAP believes it to be "the appropriate form of ASCAP license for YouTube" and proposing that if this form license is not acceptable to YouTube that "we agree upon interim fees to be paid until we can arrive at final license terms." (*Id*.) When the parties were unable to agree on either interim

1

or final license fees, on May 23, 2008, ASCAP commenced this rate proceeding by filing in this Court an application pursuant to Section IX of AFJ2 for the setting of interim and final fees through April 30, 2010.  ("ASCAP Applic." ¶¶ 13-14.)

After unproductive efforts to obtain desired discovery and on the basis of the incomplete information then available to it, on January 21, 2009, ASCAP submitted to YouTube and this Court its Interim Fee Proposal ("ASCAP Prop."). On March 16, 2009, YouTube submitted its Opposition and Counterproposal ("YouTube Opp.").  On March 31, 2009, ASCAP submitted its Reply Memorandum ("ASCAP Reply") and YouTube submitted a surreply letter on April 10, 2009 ("YouTube Surreply").

The following recitation of facts is based upon the representations of the parties, mostly unverified, and does not constitute findings of fact, which must await an evidentiary hearing.

I.      **YouTube's Public Performances of Music**

YouTube, which was launched in 2005, has rapidly grown to become the leading provider of streaming video service on the Internet. (*See* Maxcy Aff.) In July 2008 almost 91 million unique visitors to its website watched five billion videos, constituting 44% of all videos viewed on the Internet in the United States during that month. (ASCAP Prop. at 1.) These videos are streamed on demand and without charge. (Maxcy Aff. ¶¶ 6, 9.) YouTube is supported entirely by advertising revenues. (*Id*. ¶ 9.)

In addition to viewing streaming video, the YouTube website provides users with a number of non-viewing activities including "posting comments and messages, searching, uploading content, designing their homepage 'channels,' and otherwise interacting with text web pages." (YouTube

Opp. at 7.) However, most if not all of these non-viewing activities are available free on other websites such as Yahoo! and therefore add little to the unique drawing power of YouTube which is almost wholly attributable to its broad and varied store of streaming videos.

The parties sharply dispute the percentage of the YouTube videos that are music-centered. ASCAP cites industry surveys showing that 27% of all videos viewed online once a week or more are music videos and seven of the top ten YouTube channels are music channels, with Universal Music Group ("Universal") and Sony BMG operating the top two channels. (ASCAP Prop. at 4 n.11, 5.) Based on a review of YouTube's 100 "Most Viewed (All Time)" videos, ASCAP asserts that "88% of YouTube's most popular videos are music videos or videos scored to music." (ASCAP Prop. at 1, 4; Wilders Aff. ¶¶ 2-5, Exs. A-B.) YouTube, without a supporting citation, represents that "only a tiny portion of [YouTube videos] consist of what are typically known as 'music videos' – and the vast majority of which are *not* focused on music at all." (YouTube Opp. at 3 (emphasis in original).) But the Court's own count of Wilders's data shows that 66 of the top 100 YouTube videos are music videos, which is definitely not a "tiny portion" of the "most viewed" videos. Moreover, many of the audio-visual offerings on YouTube, although not classified as "music videos," contain substantial amounts of music; these include movies, TV shows and user-uploaded videos showing amateur music groups and performers. In the Court's own visits to the YouTube website, every one of the commercially-produced "non-music" videos that it saw and heard contained continuous background music.

Apparently YouTube's computation of the music-video-to-total-video fraction was distorted by including in the denominator the millions of user-uploaded personal videos that attract only limited viewings. Without a precise count of the total time users spend viewing music videos and

3

other videos scored to music versus the total viewing time for all videos, the Court cannot reliably determine the value of music in attracting visitors to YouTube and thereby increasing its advertising revenue. However, it is clear that music-centered videos represent a very significant part of YouTube's drawing power.

**II.     YouTube's Revenue**

In its interim fee proposal, ASCAP states that it "has not had the benefit of meaningful discovery that would show all of [YouTube's] revenue sources," explaining that, although YouTube produced a one-page document summarizing the company's revenues, it "has not produced any supporting documentation that would enable ASCAP to understand this summary." (ASCAP Prop. at 13, 18 n.49.) In its opposing submission, YouTube reported "global revenue" of [REDACTED] from its launching in 2005 through 2006, [REDACTED] in 2007 and [REDACTED] in 2008. (Thomas Aff. ¶ 6.) YouTube represents that "[REDACTED]." (*Id*. ¶ 4.) YouTube therefore proposes, "as a reasonable means of calculating [its] domestic revenue," to reduce its global revenue to levels proportional to "the percentage of global video views, or 'traffic,' attributable to users in the U.S." (YouTube Opp. at 10.) YouTube computes these U.S.-user percentages as [REDACTED] in September through December 2006, [REDACTED] in 2007 and [REDACTED] in 2008. (*Id*. at 11.) Applying such percentages to the respective global revenues listed above results in estimated U.S. revenues of [REDACTED] in 2005-2006, [REDACTED] in 2007 and [REDACTED] in 2008. (*Id*.)

**III.     ASCAP's Interim Fee Proposal**

ASCAP proposes interim fees of $1.5 million for 2005-2006, $3.5 million for 2007, $7.0 million for 2008 and $7.0 million for 2009.  (ASCAP Prop. at 24.)  ASCAP does not explain how it arrived at these figures, but merely argues that they are "conservative" when compared to the fees paid to ASCAP by Yahoo! Inc. as set by this Court in *United States v. ASCAP in re AOL, RealNetworks and Yahoo! Inc.*, 562 F. Supp. 2d 413 (S.D.N.Y. 2008) ("*In re AOL, et al.*") and the fees YouTube has agreed to pay to the record companies for the right to stream their music videos.  (ASCAP Prop. at 25.)

**IV.     YouTube's Interim Fee Proposal**

YouTube proposes an interim fee of $79,500 for the period from its launch in 2005 through the end of 2008 and $20,000 per quarter thereafter.  (YouTube Opp. at 8.)  This fee is based on applying a rate of 2.5% to YouTube's U.S. revenues after their reduction by a music-use-adjustment fraction whose numerator is the number of U.S.-user views of music videos (whether label-supplied videos or user-uploaded matches with label-supplied videos) and whose denominator is the number of U.S.-user views of all videos.  (*Id*. at 9-15.)  YouTube computes the music-use-adjustment percentage as [REDACTED] in 2007 and [REDACTED] in 2008.  (*Id*. at 16.) [REDACTED], it has applied the 2007 percentage to the 2005-2006 U.S. revenues.  (*Id*.)  Applying these percentages to YouTube's U.S. revenues, estimated as described above, results in music-use-adjusted U.S. revenue of [REDACTED] in 2005-2006, [REDACTED] in 2007 and [REDACTED] in 2008 and a total of [REDACTED] for 2005-2008.  (*Id.* at 18.)  At a rate of 2.5%, the license fee on that total would be $79,459, which YouTube has rounded up to $79,500.  (*Id*.)  Applying the 2.5% rate to YouTube's

5

estimated 2008 U.S. revenue, after a music-use adjustment as described above, would result in 2008 license fees of $58,563, or $14,641 per quarter. However, apparently in recognition of the fact that the music-use-adjustment factor increased by almost [REDACTED] from 2007 to 2008, YouTube has proposed ongoing interim fees of $20,000 per quarter. (*Id*. at 8.)

## DISCUSSION

**I.    Purpose of Interim Fees**

The assessment of interim fees is "intended as a temporary measure to ensure a reasonable flow of funds to ASCAP . . . while the parties negotiate or litigate a binding fee." *United States v. Am. Soc'y of Composers, Authors & Publishers (Application of the Nat'l Cable Television Ass'n)*, 1999 WL 335376, at *3 (S.D.N.Y. May 26, 1999). An interim fee "is to be set promptly, as a rough, tentative and temporary determination, subject to retroactive adjustment when the final fee is determined, and may bear little resemblance to the final fee." *Broadcast Music, Inc. v. DMX, Inc.,* 2008 WL 5429884, at *1 (S.D.N.Y. Dec. 29, 2008) (internal citation omitted).

AFJ2 provides in Section IX(B) that ASCAP has the burden to establish the reasonableness of the fee it seeks and in Section IX(D) that "[s]hould ASCAP not establish that the fee it requested is reasonable, then the Court shall determine a reasonable fee based upon all the evidence." *ASCAP*, 2001 WL 1589999, at *7.

**II.   Analysis of the Parties' Interim Fees Proposals**

The ratio between ASCAP's proposal of interim fees of $12.0 million for the period from 2005 through 2008 and YouTube's counterproposal of $79,500 is more than 150 to 1. The Court

6

finds neither proposal reasonable.

### A.     Flaws in ASCAP's Proposal

In *In re AOL, et al.,* ASCAP proposed and the Court accepted as reasonable in principle a formula for determining reasonable license fees which began with the licensee's total revenue from the licensed service and reduced it by a music-use-adjustment factor designed to reflect the extent to which users are attracted to that service by the performance of music thereon. 562 F. Supp. 2d at 457, 479-81. The Court found that a music-use-adjustment fraction whose numerator is the time visitors to a website spent streaming music and whose denominator is the total time they spent on the website was a fair measure of the importance of music in attracting visitors to the website and thus generating revenue for the website proprietor. *Id*. at 481, 493. ASCAP has now abandoned that formula for the apparent reason that it would result in fees for YouTube lower than those to which ASCAP believes it is entitled.

ASCAP attempts to justify this shift in its position by complaining that YouTube's revenues have been limited by a policy according to which it "sells advertising against only 4% of its content and gives away 96% of its content ad-free – deliberately foregoing substantial revenue opportunities in favor of building its audience and brand over the long term." (ASCAP Reply at 1.) Even if YouTube has followed such a policy, ASCAP must accept its licensees as they are and not cavil about how they choose to conduct their business. YouTube has so far achieved admirable success. And if its assumed policy of postponing revenues succeeds in the long run, ASCAP will share in the benefits.

The interim fees proposed by ASCAP represent roughly [REDACTED]% of YouTube's

estimate of its U.S. revenues in 2007 and 2008.  Recognizing that such a rate is considerably higher than the 2.5% of total revenue provided in its license to Music Choice, ASCAP attempts to justify the difference by pointing out that Music Choice is a streaming service that is "non-interactive, offering just 50 linear, pre-programmed music channels to the public," whereas "YouTube, in contrast, is entirely interactive."  (ASCAP Prop. at 24.)  But the Court believes that a five-to-one multiplier is too great a premium to pay for giving the user the ability to select the music streamed.  Moreover, when  music videos are streamed to a YouTube user, the user is getting much more than music alone and it is clearly unreasonable to regard YouTube's advertising revenue as though it were, like the revenue of Music Choice, entirely attributable to music audio.

### B.      Flaws in YouTube's Proposal

In estimating its U.S. revenues, YouTube has multiplied its global revenues by the percentage of its global views attributable to users in the U.S.  However because YouTube's revenue is derived entirely from the sale of advertising, the propriety of YouTube's proposed geographical allocation of revenues on the basis of the location of the users depends on the questionable assumption that advertisers are willing to pay as much per view for exposure to foreign users as they pay for exposure to U.S. users.  It is not inconceivable that many of YouTube's advertisers have little or no foreign sales of their goods or services and scant incentive to pay for access to foreign users.  This may explain why, apparently for its own business purposes, YouTube [REDACTED]. (Glancy 3/30/09 Decl., Ex. K.)  On this more logical basis, YouTube computes its U.S. revenues as [REDACTED] in 2005-2006, [REDACTED] in 2007, [REDACTED] in 2008, and a total of [REDACTED] for 2005-2008.  (*Id.*)  Estimated in this manner, YouTube's U.S. revenues are almost [REDACTED]

8

times those on which YouTube based its interim fee proposal.

Another flaw is that, in determining its 2008 music-use-adjustment fraction, for example, YouTube took, as the numerator, only the roughly [REDACTED] U.S. views of music videos that were label-supplied or were matched with label-supplied videos, rather than the roughly [REDACTED] U.S. views of all videos in the "music" category. (Peker Aff. ¶¶ 11, 15.) Apparently many if not all of the latter are also music videos even though they did not originate from a record company and undoubtedly many of them feature ASCAP music. This correction alone could increase the adjustment fraction to as much as five times [REDACTED]%.

Still another flaw was computing the adjustment fraction on the basis of the number of views of videos without distinguishing between different types of videos. This ignores the fact that music videos typically last for at least three minutes and, because they are streamed on demand, are typically viewed from beginning to end. Many non-music videos, even those professionally produced, last for much less than three minutes. And, no matter how long they last, user-uploaded, amateur-produced personal videos are almost certainly viewed for even shorter average times because many users browse the myriad of personal videos available, glancing briefly at each until they find one that deserves a longer look. For this reason, viewing time is a much more reliable indicator of the drawing power of videos than the number of views, as the Court found in *In re AOL, et al.* 562 F. Supp. 2d at 481, 493. Even if YouTube tracks only the number of views and not the viewing time, it should clearly have given greater weight to views of music videos than to views of other videos, especially personal videos.

**III.     Determination of Reasonable Interim Fees for YouTube**

The Court sees no reason why the basic formula that ASCAP proposed and the Court adopted in *In re AOL, et al.* is not equally appropriate in the present context.  Indeed, YouTube concedes that the similarity between it and the three applicants in the *AOL* case "argues overwhelmingly in favor of applying the *AOL* formula as the best benchmark at the interim-fee-setting stage." (YouTube Opp. at 9.)

As noted above, YouTube's own estimate of its U.S. revenue, [REDACTED], is [REDACTED] from its launch in 2005 through 2008.  YouTube proposes to reduce its revenues by music-use-adjustment factors of [REDACTED]% for launch through 2007 and [REDACTED]% for 2008.  (*Id*. at 16.)  But these adjustment factors are based on the number of views of music videos as compared to the number of views of all videos, improperly giving equal weight to all types of videos.  Although a more accurate valuation of the average viewing times of music videos as compared to other videos, including amateur-produced personal videos, must await an evidentiary hearing, music videos, which are pre-selected by the user, are typically viewed for their full length of three minutes, while other videos are almost surely viewed, on average, for much shorter times, probably no more than 30 seconds or roughly one-fifth of the average viewing time for music videos.  As previously discussed, YouTube's music-use-adjustment factor was substantially understated by treating as music videos only those which were label-supplied or user-uploaded and matched with label-supplied videos.  However, even overlooking this discrepancy and accepting YouTube's 2008 adjustment factor of [REDACTED]% and multiplying it by 5 to convert it to one based on viewing time rather than number of views would result in an adjustment factor of [REDACTED]%.

This figure appears reasonable in view of YouTube's own survey showing that its users

spend approximately [REDACTED] of their time on the website streaming videos. It would appear reasonable to assume that at least half of that time, or [REDACTED] of their total onsite time, is spent streaming music videos, even without taking into consideration the music content in other videos including film clips and TV shows and the background music scored in videos of all kinds. If these assumptions are wrong, they can be corrected when final fees are determined.

Applying a [REDACTED]% music-use-adjustment factor to YouTube's estimated U.S. revenues, allocated on the basis of the geographical location of the advertisers, would result in music-use-adjusted revenues of approximately [REDACTED] for 2005-2008. At a fee rate of 2.5%, the fee thereon would be approximately $1.425 million for the 2005-2008 period. Applying the same formula to YouTube's 2008 U.S. revenues would result in annual fees of approximately $800,000 a year.

Such fees appear reasonable when judged by the customary standards, including comparison with the fees in "benchmark" license agreements entered into as a result of arms-length free-market bargaining between comparable parties. They represent approximately [REDACTED]% of YouTube's estimated U.S. revenues. This percentage of revenue is only [REDACTED]% of that paid to ASCAP by Music Choice, but, as YouTube points out, Music Choice is a "wall-to-wall, audio-only music service." (YouTube Opp. at 13.) As noted above, we have made what we believe to be the reasonable assumption that YouTube's users spend at least [REDACTED] of their time on the website streaming music videos and another [REDACTED] streaming other videos with significant music content. Thus, it appears reasonable that YouTube should pay ASCAP interim fees that, as a percentage of total U.S. revenue, are [REDACTED]% of those paid by Music Choice.

These tentative fees are also reasonable compared to the flat fee of [REDACTED] that

11

YouTube agreed to pay for the right to perform SESAC music in the United States from [REDACTED] to [REDACTED], considering that SESAC's music repertory is only a small fraction of that of ASCAP. (Glancy 3/30/09 Decl., Ex. J.) Even assuming the accuracy of YouTube's assertion that SESAC has a 10% share of the television market and assuming further that it has an equal share of the Internet market, ASCAP has roughly five times that share and the tentative fees discussed above are less than five times the SESAC fees. (YouTube Surreply at 9-12.) YouTube argues that its SESAC license is not a proper benchmark for determining reasonable fees in this proceeding because, unlike ASCAP, SESAC is not subject to a court decree compelling it to grant an "automatic" license to any applicant. (*Id.* at 9.) But AFJ2 does not (and constitutionally cannot) take the intellectual property of ASCAP's members without fair compensation. It requires this Court to set reasonable license fees which are traditionally based on what a willing buyer (like YouTube) and a willing seller (like SESAC) would agree to in arms-length negotiations in a free (non-compulsory) market.

The tentative fees are modest in comparison to those paid by YouTube to the major record companies for the right to stream their music videos. Although ASCAP has not yet been able to obtain discovery as to the exact amount of those payments, it reports that Universal has disclosed that it is receiving "tens of millions of dollars" from YouTube's performance of Universal videos. (ASCAP Prop. at 2, 25.) YouTube's license from Sony BMG, entered into on October 6, 2006 for a [REDACTED] term, provided for [REDACTED] for performance of videos in the U.S. (Glancy 3/30/09 Decl., Ex. B.) YouTube's license from EMI Music Marketing, entered into as of March 30, 2007, provides for royalties of [REDACTED]. (*Id.*, Ex. C ¶¶ 5.1, 4.3.)

Although the record before the Court does not reflect the total amount YouTube pays to all

the record companies for the right to perform their music videos, it is obviously many times greater than the ASCAP interim fees presently contemplated. Multiplying the [REDACTED] royalties called for in YouTube's licenses from the record companies by the [REDACTED] reported by YouTube, ASCAP estimates that YouTube paid the record companies a total of [REDACTED] in 2007 and [REDACTED] in 2008 for the right to perform their music videos. (ASCAP Reply at 3.)

YouTube devotes much of its surreply letter to attempts to explain why its licenses from the record companies are not comparable benchmarks for the present fee determination. It argues that, "some of the most unfavorable terms in the Major Label agreements . . . were negotiated under direct threats of copyright infringement litigation that jeopardized YouTube's acquisition by Google in 2006." (YouTube Surreply at 6.) But every intellectual property license is negotiated under the pressure of potential infringement litigation. If an infringer were sure it would not be sued, there would be no economic incentive for it to pay substantial royalties for immunity from suit.

YouTube further argues that its licenses from Universal and Sony BMG, both effective in October 2006, were negotiated before YouTube had the technical capability to "match" user-uploaded music videos with label-supplied music videos and "shut off" unlicensed videos. (*Id*.) But YouTube's March 30, 2007 license from EMI was negotiated long after its acquisition by Google and apparently after it acquired the ability to "match" and "shut off" replays of unlicensed music videos. Moreover, YouTube's license from Sony BMG was effectively extended by an agreement between YouTube and Sony BMG's successor, Sony Music Entertainment, signed in January 2009 (Glancy 3/30/09 Decl., Ex. B), and YouTube's license from EMI was extended [REDACTED] by an agreement signed February 24, 2009 (*id*., Ex. C).

Finally, YouTube asserts that its agreements with the record companies "are for ***global***

13

*rights*, not just U.S. rights." (YouTube Surreply at 8 (emphasis in original).)  But its agreement with EMI is for the [REDACTED] only (*see* Glancy 3/30/09 Decl., Ex. C ¶ 3.1), as was its agreement with Warner Music (*see id.*, Ex. D ¶¶ 1(u), 2(a)).

Under the EMI license alone, YouTube is paying many times the interim fees being considered for ASCAP.  For example, for 2008, a fee of $[REDACTED] would amount to roughly [REDACTED] or [REDACTED] of music videos, based on the industry estimate that 27% of the videos viewed online once a week or more are music videos.  These [REDACTED] fees are roughly [REDACTED] of those that YouTube pays to EMI for on-demand plays of its videos, and EMI is only one of the major record companies to whom YouTube pays comparable or greater fees for playing music videos, roughly half of which feature ASCAP music.

In *In re AOL, et al.,* this Court observed:

> Surely the music in a music video is at least as important to the audience as its visual content.  Few would want to watch a music video with the sound turned off, but many listen to audio-only music.

562 F. Supp 2d at 496.  Even considering that the fees paid to ASCAP will represent only about one-half of the total fees that YouTube pays to music performing rights societies, the contemplated interim fees are clearly reasonable, even conservative, in comparison to those called for in other licenses for the performance of copyrighted content on the Internet.

The Court therefore finds and concludes that, for a blanket license for the performance of ASCAP music on all the Internet services of YouTube, interim fees of $1,400,000 for the period from launch in 2005 through 2008 and $70,000 per month for the period commencing January 1, 2009 and continuing to the determination of final fees, are reasonable in all respects.

## CONCLUSION

It is therefore HEREBY ORDERED:

1. Within thirty days of the date hereof, YouTube shall pay to ASCAP the sum of $1,610,000 for interim fees accrued through March 31, 2009; and

2. Within one week after the end of each calendar month after March 2009 until the determination of final fees in this proceeding, YouTube shall pay to ASCAP the sum of $70,000 for interim fees accruing during that month.

3. These interim fees are subject to retroactive adjustment when final fees are determined.

SO ORDERED.

Dated: White Plains, N.Y.
       May 13, 2009

                                                      William C. Conner, Senior U.S.D.J.