# EXHIBIT 4



**LOCAL STATION**

**BLANKET TELEVISION LICENSE**

**TELEVISION STATION:** _WDJT-TV_

**LICENSEE:** _Weigel Broadcasting Co._

**LOCATION:** _Milwaukee, WI_

## LOCAL STATION BLANKET TELEVISION LICENSE

AGREEMENT made between AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS ("SOCIETY") and *Weigel Broadcasting Co.* ("LICENSEE") as follows:

1.      Term and Scope of License

A.      SOCIETY grants to LICENSEE and LICENSEE accepts for a period commencing as of *January 1, 1996*   and ending March 31, 1998, a license to perform publicly by television broadcasting as part of LICENSEE'S Non-Network Television Programs and Non-Network Announcements from television station *WDST-TV* ("STATION") located at *Milwaukee, WI*

non-dramatic performances of the separate musical compositions heretofore copyrighted, composed or written by the members of SOCIETY and now or hereafter during the term hereof in the repertory of SOCIETY, or hereafter during the term hereof copyrighted, composed or written by such members of SOCIETY, or of which SOCIETY shall have the right to license such performing rights.

B.      (1)      This license does not extend to or include the public performance by television broadcasting or otherwise of any rendition or performance of (a) any opera, operetta, musical comedy, play or like production, as such, in whole or in part, or (b) any composition from any opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form) in a manner which recreates the performance of such composition with substantially such distinctive scenery or costume as was used in the presentation of such opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form); provided, however, that the rights granted to LICENSEE under this Agreement shall be deemed to include a grant of the right to make non-dramatic performances of compositions licensed hereunder by the television broadcasting of a motion picture containing such compositions if the rights in such motion picture other than those licensed under this Agreement have been obtained from the parties in interest.

(2)      Nothing herein contained shall be deemed to license the public performance by television broadcasting of dramatic performances.  Any performance of a separate musical composition which is not a dramatic performance, as defined herein, shall be deemed to be a non-dramatic performance.  For purposes of this Agreement, a dramatic performance shall mean a performance of a musical composition as part of a television Program in which there is a definite plot depicted by action and where the performance of the musical composition is woven into and carries forward the plot and its accompanying action.  The use of dialogue to establish a mere Program format or the use of any non-dramatic device merely to introduce a performance of a composition shall not be deemed to make such performance dramatic.  For purposes of this Agreement, performances of compositions in music videos shall be construed as non-dramatic performances.

C.      The performances licensed hereunder may originate at STATION or at any other place whether or not such other place is licensed to perform publicly the compositions licensed hereunder, regardless of the manner, means, or method of such origination; but nothing herein contained shall be deemed to grant a license to such place itself (or to the parties responsible for the performance therein) for the public performance in such place of any such compositions.

1

D.      Except as expressly herein otherwise provided, nothing herein contained shall be construed as authorizing LICENSEE to grant to others any right to reproduce or perform publicly by any means, method or process whatsoever, any of the musical compositions licensed hereunder or as authorizing any receiver of any television broadcast to perform publicly or reproduce the same, by any means, method or process whatsoever.

E.      This Agreement expressly incorporates, and SOCIETY and LICENSEE agree to be bound by, the provisions of the letter agreement, dated August 24, 1995, between SOCIETY and COMMITTEE, a copy of which is attached hereto as Exhibit A.

2.      Definitions

For purposes of this agreement only:

A.      "Affiliated Station" means any television broadcasting station in the United States and its territories that regularly broadcasts Programs transmitted by a television network licensed by SOCIETY during the term hereof.

B.      "Announcement" means any commercial, promotional, or public service announcement (exclusive of program-length "infomercials" of greater duration than 120 seconds), or any producer's or distributor's logo.

C.      "ASCAP Consent Decree" means the Amended Final Judgment in United States v . ASCAP, S.D.N.Y. 13-95 (WCC).

D.      "COMMITTEE" means the Television Music License Committee, an unincorporated membership association organized under the laws of the State of New York, which is duly authorized to represent local television stations in music licensing matters.

E.      "LMA OPERATOR" means any person, firm or corporation not under the same or substantially the same ownership, management or control as LICENSEE with whom LICENSEE has entered into a Local Marketing Agreement.

F.      "Local Marketing Agreement" means any arrangement between LICENSEE and an LMA OPERATOR that:

(1)      authorizes the resale by an LMA OPERATOR of the use of the television broadcasting facilities of STATION;

(2)      permits an LMA OPERATOR to provide Programs for all or substantially all of the time STATION is on the air; and

(3)      provides for the sale by an LMA OPERATOR of all or substantially all Announcements broadcast on STATION.

2

G.    "Network Announcement" means any Announcement transmitted by a television network licensed by SOCIETY at the time such Announcement is broadcast on the network, and broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts (sometimes known as "rebroadcasts") over two or more Affiliated Stations of a network licensed by SOCIETY.

H.    "Network Television Program" means any Program, transmitted by a television network licensed by SOCIETY at the time such Program is broadcast on the network, identified as a Program of the network, and broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts (sometimes known as "rebroadcasts") over two or more Affiliated Stations of a network licensed by SOCIETY.

I.    "Non-Network Announcement" means any Announcement broadcast by STATION other than a Network Announcement.

J.    "Non-Network Television Program" means any Program broadcast by STATION other than a Network Television Program.

K.    "Program" means all material (visual or otherwise) broadcast by STATION other than Announcements.

L.    "Syndicated Television Program" means any Non-Network Television Program supplied to LICENSEE and other television stations by a producer, distributor or television network not licensed by SOCIETY.

3.    Right to Restrict

A.    The members of SOCIETY shall have the right, at any time and from time to time, in good faith, to restrict the television broadcasting of compositions from musical comedies, operas, operettas and motion pictures, or any other composition being excessively broadcast, only for the purpose of preventing harmful effect upon such musical comedies, operas, operettas, motion pictures or compositions, in respect of other interests under the copyrights thereof; provided, however, that the maximum number of compositions which may be at any time thus restricted shall not exceed 750 and moreover that limited licenses will be granted upon application to SOCIETY entirely free of additional charge as to restricted compositions, if and when the copyright owners thereof are unable to show reasonable hazards to their major interests likely to result from such television broadcasting; and provided further that such right to restrict any such composition shall not be exercised for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition; and provided further that in no case shall any charges, "free plugs," or other consideration be required in respect of any permission granted to perform a restricted composition; and provided further that in no event shall any composition, after the initial television broadcast thereof, be restricted for the purpose of confining further television broadcasts thereof to a particular artist, station, network or Program.

B.    SOCIETY reserves the further right, at any time and from time to time, in good faith, to restrict the television broadcasting of any compositions, over and above the number specified in Subparagraph 3.A., only as to which any suit has been brought or threatened on a claim that such composition infringes a composition not contained in the repertory of SOCIETY or on a claim by a non-member of SOCIETY or by a member not listed in any current list of

3

SOCIETY'S members, as the same may be augmented from time to time, that SOCIETY does not have the right to license the public performance of such composition by television broadcasting.

C.     Nothing in Subparagraphs 3.A. and 3.B. shall relieve SOCIETY of its obligation to indemnify LICENSEE, as reflected in Paragraph 8 below, with respect to the performances of any compositions in SOCIETY'S repertory, the performance of which SOCIETY has restricted, prior to such time as LICENSEE receives notice from SOCIETY of any such restriction.

4.     <u>Music Use Information</u>

A.     Subject to the provisions of Subparagraphs 4.B. and 4.C. below, LICENSEE agrees to furnish to SOCIETY upon request during the term of this Agreement a list of all musical compositions broadcast from or through STATION on LICENSEE'S Non-Network Television Programs, showing the title of each composition and the composer and author thereof, provided that LICENSEE shall not be obligated under this Paragraph 4. to furnish such a list covering a period or periods aggregating more than four (4) weeks during any one calendar year. For purposes of this Paragraph 4., music cue sheets containing the aforesaid information shall be deemed to constitute such a list.

B.     With respect to Syndicated Television Programs broadcast from or through STATION, LICENSEE shall be deemed to have complied with its obligations under Subparagraph 4.A. if LICENSEE identifies the Program by its title, including episode title and/or number, the name of the producer where available, and the copyright notice contained therein where available.  If SOCIETY does not have a music cue sheet for such Program, and LICENSEE does have such a cue sheet, LICENSEE shall provide a copy of such music cue sheet to SOCIETY at SOCIETY'S request.

C.     SOCIETY shall make requests pursuant to Subparagraph 4.A. only where reasonably necessary for its purposes and, except where the information is necessary with respect to SOCIETY'S survey of past performances, shall give LICENSEE notice of any request under subparagraph A at least one (1) month prior to the commencement of the period covered by said request.  The provisions of Subparagraph 4.B. shall not limit LICENSEE'S obligation to cooperate with SOCIETY in connection with any claim or demand for action referred to in Paragraph 8 of this Agreement.

5.     <u>Payments</u>

A.     In consideration of the license herein granted, LICENSEE agrees to pay to SOCIETY for each calendar month during the term of this Agreement, no later than the first day of each succeeding month, a fee which is equal to:

(1)     one-third (1/3) of LICENSEE's blanket license fee for the STATION covering the three-month period from October 1, 1995 through December 31, 1995, as calculated pursuant to the methodology prescribed in Exhibit B.

(2)     one-twelfth (1/12) of LICENSEE's blanket license fee for the STATION covering the twelve-month period from January 1, 1996 through December 31, 1996, as calculated pursuant to the methodology prescribed in Exhibit B.

4

       (3)     one-third (1/3) of LICENSEE's blanket license fee for the STATION covering the three-month period from January 1, 1997 through March 31, 1997, as calculated pursuant to the methodology prescribed in Exhibit B.

       B.     In no case shall LICENSEE'S monthly blanket license fee be less than $45.

       C.     If any such blanket license fee payment due under the terms of this Paragraph 5. is not received by SOCIETY by the twentieth (20th) day of the month in which such payment was due, LICENSEE shall pay to SOCIETY a late-payment charge of one percent (1%) per month (simple interest) calculated from the date such payment was due.

6.     **Local Marketing Agreement**

       A.     If LICENSEE is, or becomes, a party to a Local Marketing Agreement, LICENSEE and the LMA OPERATOR shall execute a letter to SOCIETY, in the form attached as Exhibit C and made a part of this Agreement, requesting amendment of this License Agreement to add the LMA OPERATOR as a party. When such a letter has been fully executed by LICENSEE, the LMA OPERATOR and SOCIETY, this Agreement shall be deemed amended accordingly.

       B.     In the event LICENSEE is a party to a Local Marketing Agreement, and a dispute arises between SOCIETY and either the LMA OPERATOR or LICENSEE as to whether LICENSEE or the LMA OPERATOR is responsible for the performance of any of the obligations arising under this Agreement, SOCIETY shall be entitled to receive, upon request, a copy of the portion of such agreement as sets forth the respective obligations of LICENSEE and the LMA OPERATOR regarding the payment of fees, accountings, recordkeeping and administrative responsibilities, or, if LICENSEE so elects, a copy of the entire Local Marketing Agreement.

7.     **Breach or Default**

       Upon LICENSEE'S breach or default of any payment, accounting or substantive reporting obligations required under the terms of this Agreement, SOCIETY may give LICENSEE thirty (30) days' notice in writing to cure such breach or default, and in the event that such breach or default has not been cured within thirty (30) days of said notice, SOCIETY may then terminate this license.

8.     **Indemnity Clause**

       SOCIETY agrees to indemnify, save and hold harmless, and to defend LICENSEE, its sponsors and their advertising agencies, and its and their officers, employees, and artists, and each of them, from and against any claims, demands, or suits that may be made or brought against them or any of them with respect to the performances under this Agreement of any compositions in SOCIETY'S repertory that are written or copyrighted by members of SOCIETY. LICENSEE agrees to give SOCIETY immediate notice of any such claim, demand, or suit and agrees immediately to deliver to SOCIETY all papers pertaining thereto. SOCIETY shall have full charge of the defense of any such claim, demand, or suit and LICENSEE shall cooperate fully with SOCIETY in such defense. LICENSEE, however, shall have the right to engage counsel of its own at its own expense who may participate in the defense of any such action. SOCIETY agrees, at the request of LICENSEE, to cooperate with and assist LICENSEE, its advertisers and their advertising agencies and its and their officers, employees, and artists in the defense of any action or

5

proceeding brought against them or any of them with respect to the performance of any musical compositions contained in SOCIETY'S repertory, but not copyrighted or written by members of SOCIETY. This Paragraph 8 shall not apply to performances of any works that have been designated as restricted under Paragraph 3 of this Agreement.

9.    Rights of Termination

A.    In the event of the termination or suspension of the governmental licenses covering STATION or any substantial alteration or variation of the terms and conditions thereof, or any major interference with the operations of STATION due to governmental measures or restrictions, LICENSEE shall have the right to terminate this Agreement upon seven (7) days' notice. Upon termination, this Agreement shall no longer remain in effect and the parties shall be relieved of all obligations arising hereunder from the date of termination.

B.    In the event of:

(1)    any major interference with the operations of SOCIETY in the state, territory, dependency, possession or political subdivision in which STATION is located, by reason of any law of such state, territory, dependency, possession or political subdivision; or

(2)    any substantial increase in the cost to SOCIETY of operating in such state, territory, dependency, possession or political subdivision, by reason of any law of such state, territory, dependency, possession or political subdivision, which is applicable to the licensing of performing rights.

SOCIETY shall have the right, upon notice to COMMITTEE and upon a showing that the matters referred to in Subparagraphs 9.B.(1) and 9.B.(2) above affect the licensing of performing rights under this Agreement, to apply to the judge with supervisory authority over the ASCAP Consent Decree for whatever relief SOCIETY deems appropriate.

C.    The term of this agreement shall be subject to the provisions in Paragraph 8 of the Letter Agreement which is attached hereto as Exhibit A.

10.    Successors and Assigns

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns, but no assignment shall relieve the parties hereto of their respective obligations hereunder as to performances broadcast, acts done and obligations incurred prior to the effective date of the assignment.

11.    Notices

All notices required or permitted to be given by either of the parties to the other hereunder shall be duly and properly given if: (a) mailed to the other party by registered or certified United States mail; (b) sent by generally recognized same-day or overnight delivery service; (c) mailed by first class United States mail; or (d) sent by electronic transmission (i.e., mailgram, facsimile or similar transmission); provided, however, that notices pursuant to Paragraphs 3, 7, 8

6

and 9 may be sent only by methods (a) or (b), or by method (d) if receipt is acknowledged or confirmed and a copy also is sent by first class U.S. mail.

12. **Per Program License**

The "Local Station Per Program Television License" for the term ending March 31, 1998 is being offered to LICENSEE simultaneously with this Agreement. During the term of this Agreement, LICENSEE may switch from a per program to a blanket license, or from a blanket to a per program license, as of the first day of a month, prospectively on thirty (30) days' written notice to SOCIETY, except that for the months of October, November, and December 1995, the period of written notice to SOCIETY shall be one (1) day. LICENSEE may so elect to change its license status up to twice during each of the following periods: (i) October 1, 1995 through September 30, 1996; (ii) October 1, 1996 through March 31, 1997; and (iii) April 1, 1997 through March 31, 1998.

13. **Without Prejudice**

The parties are entering into this Agreement without prejudice to any arguments or positions they may assert in any future rate proceeding concerning what constitutes reasonable blanket and per program license fees and terms for the local television industry or, in SOCIETY's case, as to any other licensee.

14. **Waiver of Appeal**

SOCIETY and LICENSEE waive any right either party may have to appeal any determination made by Magistrate Judge Michael H. Dolinger (or by the judge with supervisory authority over the ASCAP Consent Decree) pursuant to Paragraphs 2, 7, 10, 11 or 12 of Exhibit A.

15. **Applicable Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.

IN WITNESS WHEREOF, this agreement has been duly executed by SOCIETY and LICENSEE this _1_ day of _January_, 19_96_ as of the _19_ day of _November_, 19_95_.


WDJT -TV
_____
LICENSEE

By: _____

Title: _____


AMERICAN SOCIETY OF COMPOSERS,
AUTHORS AND PUBLISHERS

By: _____

EXHIBIT A

August 24, 1995

Mr. John A. LoFrumento
Managing Director and Chief Operating Officer
American Society of Composers, Authors and Publishers
One Lincoln Plaza
New York, New York  10023

Re:    ASCAP - Local Television Station
       Blanket and Per Program Licenses

Dear John:

This letter sets forth the agreement reached between the American Society of Composers, Authors and Publishers ("ASCAP") and the Television Music License Committee (the "Committee") supplementing the terms of the ASCAP - Local Television Station Blanket and Per Program License Agreements covering the periods October 1, 1995 through March 31, 1997 (Initial License Term) and April 1, 1997 through March 31, 1998 (Extension Term) (herein "Blanket Licenses" and "Per Program Licenses" and collectively "Licenses").  This letter agreement is expressly incorporated in Subparagraph 1.E. of the Blanket and Per Program Licenses, and is binding upon the parties hereto and upon the signatories to the Licenses.

The parties agree as follows:

1.      For the Initial License Term, industry-wide Blanket License fees for all commercial local television stations licensed under the Licenses by ASCAP shall equal:

October 1, 1995 - December 31, 1995 -- $22,100,000 (the pro rata equivalent of an annual industry-wide Blanket License Fee of $88,400,000);

January 1, 1996 - December 31, 1996 -- $91,800,000;

January 1, 1997 - March 31, 1997 -- $22,950,000 (the pro rata equivalent of an annual industry-wide Blanket License Fee of $91,800,000).

2.      For the Extension Term (April 1, 1997 - March 31, 1998), industry-wide Blanket License fees for all commercial local television stations licensed under the Licenses by ASCAP shall be determined on or before February 1, 1997 either by agreement between ASCAP and the Committee or by application of the methodology set forth in Magistrate Judge Michael H. Dolinger's Opinion and Order in United States v. ASCAP: Application of Buffalo Broadcasting Co., Inc., et al., dated February 26, 1993, as subsequently amended (the "February 26, 1993 Order").  Should any dispute arise concerning the Blanket License fees owing pursuant to the methodology set forth in the February 26, 1993 Order, the parties shall jointly refer the matter to Magistrate Dolinger for determination (or, if such application is not possible, to the judge with supervisory authority over the Amended Final Judgment in U.S. v. ASCAP, S.D.N.Y. 13-95 (WCC) (the "ASCAP Consent Decree")).

3.      Each local television station's Blanket License fees shall be determined in accordance with the provisions of the license fee allocation formula attached as Exhibit B to the Blanket License and Exhibit B to the Per Program License.

1

Mr. John A. LoFrumento
August 24, 1995
Page 2

        4.      ASCAP shall provide to Committee or its designated representative for
verification, by no later than forty (40) days before its scheduled dissemination to licensees, a copy
of each list of Syndicated Television Programs prepared pursuant to Subparagraph 5.C. of the Per
Program License.  Committee shall notify ASCAP of any revisions or corrections to this list by no
later than two weeks from the date it was received.

        5.  With respect to the Initial License Term, ASCAP shall be entitled to receive
aggregate license fees from local television stations licensed under the Licenses in an amount
totalling not less than $100 million.  In the event of a shortfall between aggregate fees collected for
the Initial License Term under the Blanket and Per Program Licenses and $100 million, the
difference shall be paid by those stations which operated under the Per Program License during
the Initial License Term.  Each station's proportionate share of such shortfall shall be calculated by
multiplying the station's savings below the blanket license fees it otherwise would have paid by a
factor representing the ratio of the industry-wide shortfall in license fee payments to industry-wide
savings under the Per Program Licenses.  Unless such a station notifies ASCAP to the contrary,
any such additional payment shall be paid to ASCAP by the licensee within thirty (30) days of the
date such additional payment is billed.

        6.      For the Extension Term, ASCAP shall be entitled to receive aggregate
license fees from local television stations licensed under the Licenses in an amount totalling not
less than $65 million.  In the event of a shortfall between aggregate fees collected for the Extension
License Term under the Blanket and Per Program Licenses and $65 million, the difference shall be
paid by those stations which operated under the Per Program License during the Extension License
Term.  Any such shortfall shall be calculated and paid in the same manner as prescribed in
paragraph 5 above.

        7.      In the event of any shortfall pursuant to Paragraphs 5 or 6 above, ASCAP
and the Committee shall confer and attempt to reach agreement concerning the procedures for,
and the timing of, payment by stations of such shortfall.  Any agreement arrived at between ASCAP
and the Committee shall be communicated to each licensee which operated under the Per
Program License during the relevant Term, together with notification as to any additional payments
owing by such licensee, and such agreement shall be binding on all licensees.  If ASCAP and the
Committee shall fail to agree on such procedures, either party may refer the matter for
determination to Magistrate Judge Michael H. Dolinger (or, if such a reference is not possible, to
the judge with supervisory authority over the ASCAP Consent Decree).

        8.      The Licenses shall be terminated, and shall no longer remain in effect, for
the period April 1, 1997 through March 31, 1998, if, by no later than January 31, 1997, either
ASCAP or the Committee informs the other in writing that it is electing to terminate the Licenses.

        9.      In the event either party exercises its termination right pursuant to
Paragraph 8 hereof, in any rate court proceeding thereafter initiated for the period commencing
April 1, 1997 (and extending for a period not to exceed five (5) years), the parties agree that they
jointly shall request a reference of such proceeding, pursuant to 28 U.S.C. 636(c), to Magistrate
Judge Michael Dolinger.  If for any reason such a reference is not possible, the matter will be
assigned to the judge with supervisory authority over the ASCAP Consent Decree.

Mr. John A. LoFrumento
August 24, 1995
Page 3

      10.    Upon ASCAP's review of Per Program License reports submitted for the months of October, November and December, 1995, ASCAP and the Committee shall confer and attempt to reach agreement concerning: (a) whether certain stations' reporting patterns call for penalty provisions; and (b) if so, what those penalty provisions should be. Any such provisions would not be designed to penalize inadvertent mistakes of an occasional nature, but to discourage repeated, persistent failures to submit material information called for by the Per Program License. The parties at such time shall also confer and attempt to reach agreement concerning: (a) the circumstances in which misidentification by ASCAP of music in its repertory would call for penalty provisions; and (b) whether the number of videotapes of locally-produced television programs which ASCAP is permitted to request pursuant to Subparagraph 5.F. of the Per Program License should be adjusted. Any agreement arrived at between ASCAP and the Committee shall be communicated to all licensees, together with notification: (a) as to the future monthly reports to which any such penalty provisions will first pertain; and (b) as to any adjustments to the maximum number of videotapes ASCAP is permitted to request pursuant to Subparagraph 5.F. of the Per Program License. Such agreement shall be binding on all licensees. If ASCAP and the Committee shall fail to agree on any of these matters, either party may refer such matter to Magistrate Judge Michael H. Dolinger for determination (or, if such a reference is not possible, to the judge with supervisory authority over the ASCAP Consent Decree).

      11.    If, during either the Initial or Extension Terms of the Licenses, any dispute arises between ASCAP and any licensee concerning the interpretation of any of the provisions of this letter agreement or the Licenses which, in the judgment of ASCAP and the Committee, either jointly or severally, has or may have industry-wide impact, ASCAP and the Committee shall first endeavor to resolve such dispute, failing which either party may refer the matter to Magistrate Judge Michael H. Dolinger for determination (or, if such a reference is not possible, to the judge with supervisory authority over the ASCAP Consent Decree). In the event of such a reference, either party, as a preliminary matter, shall be entitled to assert that the dispute between them is not properly dealt with under the terms of this provision.

      12.    If, during either the Initial or Extension Terms of the Licenses, ASCAP elects to license an entity agreed or determined to be a broadcast television "network" previously unlicensed by ASCAP, whose network programs are carried by local television stations licensed by ASCAP, such as Fox, appropriate adjustments will be made to the license fees payable by local television station licensees, including the minimum aggregate license fees payable by local television stations pursuant to Paragraphs 5 and 6 above, consistent with the Opinions and Orders of Judge William Conner dated January 3, 1995 and January 27, 1995 in U.S. v. ASCAP: Application of Fox Broadcasting Company and Fox Television Stations, Inc. ASCAP and the Committee shall confer and attempt to reach agreement concerning the amount of any such fee adjustments and such agreement shall be binding on all licensees. If ASCAP and the Committee shall fail to agree on such fee adjustments, either party may refer the matter to Magistrate Judge Michael H. Dolinger for determination (or, if such a reference is not possible, to the judge with supervisory authority over the ASCAP Consent Decree).

      13.    The Committee shall treat as confidential any financial or other proprietary information or documents provided to it by ASCAP pursuant to the Local Television Station Per Program License Agreement ("Confidential Information"). The Committee shall limit access to Confidential Information to the Committee's staff, representatives and counsel, and shall not disclose Confidential Information to any third party or to any Committee member, other than a Committee member who is employed by the station or station group which provided Confidential Information to ASCAP.

Mr. John A. LoFrumento
August 24, 1995
Page 4

14.     ASCAP and the Committee are entering into this agreement without prejudice to any arguments or positions they may assert in any future rate proceeding concerning what constitutes reasonable blanket and per program license fees and terms for the local television industry or, in ASCAP's case, as to any other licensee.

Please indicate your agreement to the above by signing on the line provided below.

Very truly yours,

s/ Dan Ehrman
Dan Ehrman
Co-Chairman
Television Music License Committee

s/ Charles Sennet
Charles Sennet
Co-Chairman
Television Music License Committee

s/ John A. LoFrumento
John A. LoFrumento
Managing Director and Chief Operating Officer
American Society of Composers
Authors and Publishers

EXHIBIT B

## METHODOLOGY FOR BLANKET FEE ALLOCATION FOR THE PERIOD FROM OCTOBER 1, 1995 THROUGH MARCH 1, 1998

**STEP 1:**    <u>Allocation of Industry-Wide Fee Among ADI/DMA Markets</u>

In a given year, each television market is to be assigned its allocable share of the applicable industry-wide blanket license fee[1] based on a weighted, three-year average percentage of the total U.S. television households it represents.

1. For each of the years 1995, 1996, 1997 and, if applicable, 1998, the number of tv households in each of the 209 ADI/DMA markets as measured by Arbitron/Nielsen (as well as in Alaska, Hawaii, Virgin Islands, Guam and Puerto Rico) is to be "weighted" as follows:

| | |
|---|---|
| Markets 1-10 | Multiply by 1.19 |
| Markets 11-25 | Multiply by 1.05 |
| Markets 26-50 | Multiply by 0.92 |
| Markets 51-75 | Multiply by 0.85 |
| Markets 76-100 | Multiply by 0.85 |
| Markets 101-125 | Multiply by 0.85 |
| Markets 126 plus | Multiply by 0.80 |

The purpose of the weighting is to reflect, within broad parameters, that a household in the 150th market does not represent the same value as a household in the New York market.

2. For each calendar year (or portion thereof, as relevant), each market is to be assigned its share of the industry's overall blanket license fee by the following procedure: Each market's three-year households average (based on the three prior years) will be computed. The multiples set forth in Paragraph 1 above will next be applied to these market rankings resulting from computation of the three-year averages to produce a weighted average households figure for each market. Thus, for example, the top ten markets in terms of three-year households average will receive a 1.19 multiple. Each market's weighted average households figure is to be divided by the total U.S. average weighted households to derive a percentage of U.S. weighted tv households for each market. This weighted percentage is then applied to the applicable industry-wide blanket license fee. Thus, if the weighted percentage of total U.S. tv households for market "x" is one percent (1%), market "x's" share of the 1996 $91.8 million industry-wide blanket license fee would be $91.8 million x 1%, or $918,000.

---

1 .    The following industry-wide blanket license fees shall, with respect to the time periods set forth below, be subject to allocation pursuant to the methodology described herein:

January 1, 1996 - December 31, 1996 — $91,800,000;

January 1, 1997 - March 31, 1997 — $22,950,000.

The industry-wide blanket license fee applicable to the extension term of the licenses — April 1, 1997 through March 31, 1998 — has not yet been determined, but will be subject to allocation pursuant to the methodology described herein.

**STEP 2:**     <u>Allocation of Blanket License Fees to Stations Within Each Market</u>

A series of computations will be undertaken to apportion a given market's allocated blanket license fee in relation to each station in that market's viewing households (with an allowance for a portion of the prime-time audience reached by network-affiliated stations).[2]

1. For October-December 1995, the process will begin with Arbitron's Market Ratings Reports for the "sweeps" months assigned for these purposes to each of 1992 and 1993, and with Nielsen Market Ratings Reports for 1994.[3]  Within each market, each station's average ADI/DMA quarter-hour viewing households, Sunday through Saturday, 9 a.m. through midnight, is to be computed for each of the sweeps months for each of 1992, 1993 and 1994.

2. To make allowance for the fact that a portion of a network affiliate's 9 a.m. to midnight schedule constitutes ASCAP-licensed network programming, the following computations, which lead to each station's "qualifying" viewing households, are to be made for each sweeps month for each of the years 1992, 1993 and 1994:

(a)     multiply each station's average ADI/DMA quarter-hour viewing households by 420 (the number of quarter-hour units between 9 a.m. and midnight in one week).  For independent stations, the result of this computation constitutes those stations' qualifying viewing households.

(b)     For network-affiliated stations, arrive at "qualifying" viewing households by subtracting from the totals generated by step (a) 75 percent (75%) of a primetime viewing households figure, which figure (prior to application of the 75 percent (75%) factor) is calculated by taking a station's average ADI/DMA quarter-hour households in prime time, and multiplying this figure by 88 (the number of quarter-hour units in prime time in one week).[4]

3. The nine separate months of ADI/DMA viewing households data thus derived for each independent and affiliated station in a market are next aggregated so as to each station to arrive at its <u>total</u> qualifying viewing households.  This is done for each station in the market.  The qualifying viewing households data for all stations in the market are then aggregated to get a base for the entire market.  Each station's percentage share of the allocated market blanket license fee (derived through the process described in Step 1, above) is computed by dividing its qualifying viewing households number by the base qualifying viewing households number for that market.

---

2.     Network-affiliated stations are defined as those affiliated with the ABC, CBS and NBC television networks.

3.     For 1994, the designated "sweeps" months are November 1993 and February and May 1994; for 1993, November 1992 and February and May 1993; and for 1992, November 1991 and February and May 1992.

4.     E.g., on the East Coast, prime-time occupies Monday-Saturday 8:00-11:00 p.m. and Sunday 7:00-11:00 p.m.

4.  A station's blanket license fee is computed by applying the resulting percentage applicable to that station to the market blanket license fee.

5.  The same methodology is to be utilized for calendar year 1996 and for either the first three months of 1997 or all of 1997 and the first three months of 1998, dependent upon whether the Licenses remain effective for the Extension Term.  Fee allocations for each of these calendar years, or parts thereof, shall be based upon the applicable industry-wide blanket fees (note 1 hereof), employing comparable Arbitron and/or Nielsen viewership data for the preceding three years.  In addition, in computing the prime-time deduction for affiliates (Subparagraph 2(b) above), for part or all of 1997 and, if applicable, the first two months of 1998, 100 percent (100%) (rather than the 75 percent (75%) applicable to the periods from October 1, 1995 through December 31, 1996) of the prime-time viewing households will be deducted.

6.  In those markets having stations which receive no rating in the Arbitron/Nielsen reports and which are not separately licensed by ASCAP, the following methodology will be employed.  Each such station will be assigned a blanket license fee equal to 0.25 percent of the allocable blanket license fee for that market or $540 annually, whichever is higher.  The remaining stations will be allocated blanket license fees based on the methodology set forth in Step 2 hereof, except that the allocable blanket license fee for the market for purposes of those computations shall be reduced by the amount payable by those stations in the market not listed by Arbitron/Nielsen.  If, by way of example, the blanket license fee allocated to market "k" is $300,000, and there are operating in market "k" two stations not listed by Arbitron/Nielsen, each of those stations would be assigned a blanket fee of $750 ($300,000 x .0025).  The remaining stations in market "k" would pay their appropriate percentages, not of $300,000, but of $298,500.

7.  The minimum blanket license fee for a given station shall be the greater of 0.25 percent (0.25%) of the allocable blanket license fee for its market or an annual blanket license fee of $540 (or $45 per month for partial years) ("Minimum Blanket License Fee").

8.  Stations which become newly licensed during a given calendar year, the market shares of which would call for payment of the Minimum Blanket License Fee, shall be assigned blanket license fees at these minimum amounts covering the remainder of the calendar year, without any adjustments being made during the calendar year to the fees allocable to any other stations in their markets.  In the event stations which become newly licensed during a given calendar year have market shares which would call for payment of greater than the Minimum Blanket License Fee, the methodology described above will be utilized to reapportion, for the remainder of that calendar year, the blanket license fees allocated to their markets between the newly-licensed stations and the other stations in the markets.  There shall be no reapportionment of blanket license fees within a given market during a given calendar year if a previously-licensed station becomes unlicensed.

3

EXHIBIT C

## LOCAL MARKETING AGREEMENT AMENDMENT LETTER

Dear ASCAP:

1. _____ ("LICENSEE") has entered into a Local Marketing Agreement with _____ ("LMA OPERATOR") for television station _____ for the period _____ through _____.

2. LICENSEE and LMA OPERATOR wish to add LMA OPERATOR as a party to the Local Television Station License Agreement in effect between LICENSEE and ASCAP ("the License"), and LMA OPERATOR shall assume all of the rights and obligations of LICENSEE as set forth in the License for the full period of the Local Marketing Agreement referred to in Paragraph 1 above.

3. LICENSEE/LMA OPERATOR (circle one) shall be responsible for the payment of any fees owing to ASCAP pursuant to the License.

4. LICENSEE/LMA OPERATOR (circle one) shall be responsible for the submission to ASCAP of any reports, tapes or other information pursuant to the License.

5. LICENSEE and LMA OPERATOR jointly designate the following single address for billing and other regular correspondence, and the following single address for any notices in accordance with the License:

Billing Address:_____        Notice Address: _____
                _____                       _____
                _____  .                    _____

Please indicate your consent to the amendment of the License Agreement in accordance with this letter by countersigning the letter in the space provided below and returning a copy to us.

Very truly yours,

(LICENSEE)

Dated: _____        By: _____

                                   Title:_____

(LMA OPERATOR)

Dated: _____        By: _____

                                   Title:_____

The undersigned, American Society of Composers, Authors and Publishers, hereby consents and agrees to the amendment of the above mentioned License Agreement.

American Society of Composers,
Authors and Publishers

Dated: _____        By: _____