UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE APPLICATION OF CELLCO PARTNERSHIP :        09 Civ. 7074
D/B/A VERIZON WIRELESS                  :          (DLC)(MHD)
                                        :
----------------------------------------:
                                        :
Related to                              :
                                        :
UNITED STATES OF AMERICA,               :        OPINION & ORDER
                         Plaintiff      :
            v.                          :
                                        :
AMERICAN SOCIETY OF COMPOSERS, AUTHORS, :        41 Civ. 1395
AND PUBLISHERS,                         :          (DLC)
                         Defendant.     :
                                        :
----------------------------------------X

Appearances:

For American Society of Composers, Authors, and Publishers:
David Leichtman
Hillel Parness
Eleanor Lackman
Lovells LLP
590 Madison Ave.
New York, NY 10022

Richard Reimer
Christine Pepe
American Society of Composers, Authors, and Publishers
One Lincoln Plaza
New York, NY 10023

For Cellco Partnership d/b/a Verizon Wireless:
Bruce Joseph
Andrew McBride
Michael Sturm
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006

For <u>Amicus Curiae</u> Broadcast Music, Inc.:
Michael Salzman
Jessica Feldman
Hughes Hubbard & Reed LLP
1 Battery Park Plaza
New York, NY 10004

Marvin Berenson
Joseph DiMona
John Coletta
Broadcast Music, Inc.
320 W. 57th St.
New York, NY 10019

For <u>Amicus Curiae</u> CTIA -- The Wireless Association:
Andrea Williams
CTIA – The Wireless Association
1400 16th St., NW, Suite 600
Washington, DC 20036

Bruce Keller
Jeffrey Cunard
Michael Potenza
Richard Lee
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 10022

For <u>Amicus Curiae</u> Consumer Electronics Association:
Gary Shapiro
Consumer Electronics Association
1919 South Eads St.
Arlington, VA 22012

For <u>Amicus Curiae</u> Digital Media Association:
Lee Knife
Digital Media Association
1029 Vermont Ave., NW, Suite 850
Washington, DC 20009

For <u>Amici Curiae</u> Electronic Frontier Foundation, Public
Knowledge, and Center for Democracy and Technology:
Michael Elkin
Thomas Lane
Winston & Strawn
200 Park Ave.
New York, NY 10166

Fred von Lohman
Electronic Frontier Foundation
454 Shotwell St.
San Francisco, CA 94110

For <u>Amicus Curiae</u> Internet Commerce Coalition:
Heidi Salow
DLA Piper
500 Eighth St., NW
Washington, DC 20004

For <u>Amicus Curiae</u> Society of Composers, Authors, and Music
Publishers of Canada:
C. Paul Spurgeon
Society of Composers, Authors, and Music Publishers of Canada
41 Valleybrook Dr.
Toronto, Ontario, Canada M3B 2S6

Al Daniel, Jr.
Toby Butterfield
Christopher Marino
41 Madison Ave., 34th Floor
New York, NY 10010

For <u>Amicus Curiae</u> Society of European Stage Authors & Composers,
Inc.:
Kenan Popwell
Society of European Stage Authors & Composers, Inc.
152 W. 57th St., 57th Floor
New York, NY 10019

John Beiter
Zumwalt, Almon & Hayes PLLC
1014 16th Ave. South
Nashville, TN 37212

For <u>Amicus Curiae</u> United States Telecom Association:
Jonathan Banks
United States Telecom Association
607 14th St., NW, Suite 400
Washington, DC 20005

DENISE COTE, District Judge:

This summary judgment motion presents the question of whether a retail wireless communications company requires a public performance license for musical compositions because it provides ringtones to its customers.  For the following reasons, it does not.

BACKGROUND

Cellco Partnership d/b/a Verizon Wireless ("Verizon") began this proceeding by filing its January 23, 2009 application for a determination of reasonable fees for a blanket license for the public performance of musical compositions in the repertory of the American Society of Composers, Authors, and Publishers ("ASCAP").[1]  Verizon is a retail wireless communications company.  ASCAP is a performing rights organization that licenses on a

---

[1] Pursuant to a consent decree stemming from antitrust litigation filed by the United States Department of Justice against ASCAP in 1941, this Court sits as a rate court to resolve disputes over ASCAP's licensing fees for the public performance of its members' musical works.

> The Second Amended Final Judgment entered in the United States' civil antitrust action against ASCAP ("AFJ2") provides in Section IX that anyone desiring a license for the public performance of any ASCAP musical composition may apply to ASCAP therefor and, upon such application, may perform the music for fees to be determined later.  Section IX further provides that if the parties cannot agree on the fee for such license, either party may apply to this Court to set reasonable interim and final fees.

United States v. Am. Soc'y of Composers, Authors and Publishers, 616 F. Supp. 2d 447, 448 (S.D.N.Y. May 13, 2009) (Conner, J.) (citation omitted).

non-exclusive basis the non-dramatic public performance rights to musical works.[2]

Verizon sells ringtones, amongst other products and services.  A ringtone is "a digital file of a portion of a musical composition or other sound" that is designed to be played by a customer's telephone in order to signal an incoming call in the same manner as would a telephone ring.  A customer can download a ringtone either from the internet or through a Verizon telephone.  To obtain a ringtone from Verizon, a customer must purchase it and download it to a cellular telephone.[3]  Downloading a typical thirty-second ringtone takes a matter of seconds.  A ringtone cannot be played while it is being downloaded.  After a ringtone has been downloaded, a digital file appears on the customer's telephone.  The customer

---

[2] ASCAP is prohibited from "acquiring exclusive music performing rights" from its members and from "interfering with the right of any member to issue to any user a non-exclusive license for music performing rights."  Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors and Publishers, 744 F.2d 917, 923 (2d Cir. 1984).

[3] Pursuant to a ruling by Copyright Royalty Judges, Verizon pays songwriters and music publishers a royalty of 24 cents per each download of a ringtone for the reproduction and distribution of their musical works.  This is more than two times the royalty rate it pays them for permanent downloads of entire songs through programs such as iTunes.  That royalty rate is 9.1 cents per each download of a song.  In the Matter of Mech. & Digital Phonorecord Delivery Rate Adjustment Proceeding, No. RF 2006-3, 74 Fed. Reg. 4510, 4510 & 4526 (C.R.B. Jan. 26, 2009); 37 C.F.R. § 385.3(b).

can listen to the downloaded ringtone by clicking on the digital
file, but only after it has been fully downloaded.

After a ringtone is downloaded, the underlying audio file
is stored on the telephone.  A customer can then set her
telephone to play the ringtone when her telephone receives an
incoming call.  The customer determines whether and where a
ringtone will play when she receives a call by controlling
whether her telephone is on or off, whether the telephone is set
to indicate an incoming call by playing a ringtone or by some
other method (e.g., normal ringing, vibrating), and where the
telephone is at any given point.  When a ringtone rings, the
music or sound clip plays from the file stored on the telephone.

Verizon's role in playing a ringtone is that it sends a
signal to a customer's telephone to indicate an incoming call.
That signal is the same regardless of whether or not the
customer has set her telephone to indicate an incoming call with
a ringtone.  Verizon does not monitor when and where customers'
ringtones play, and it does not earn any money from ringtones
beyond the fee paid for the initial download transaction.

On May 22, 2009, Verizon filed this motion for summary
judgment on the question of whether it must pay public
performance licensing fees for ringtones.[4]  Verizon filed its

---

[4] Verizon's 2009 application to ASCAP for a non-exclusive blanket
license for the public performance of musical works sought a

reply on June 25.  On July 22, this case was reassigned to this Court.  Parties were given leave to file supplemental letters discussing recent developments in the law, which became fully submitted on August 28.

DISCUSSION

ASCAP argues that Verizon engages in public performances of musical works when it downloads ringtones to customers.  In addition, ASCAP argues that Verizon is both directly and secondarily liable for public performances of musical works when customers play ringtones on their telephones.  Verizon seeks summary judgment in its favor on each theory of liability.

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Roe v. City of Waterbury, 542 F.3d 31, 35-36 (2d Cir. 2008).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party

---

license for ringback tones and content streamed over its "VCAST" service.  The application did not identify ringtones.

must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); accord Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Roe, 542 F.3d at 35.

The protection given to copyrights is wholly statutory. Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 431 (1984).  The Copyright Act does not give a copyright owner control over all uses of his work, but instead grants "'exclusive' rights to use and to authorize the use of his work" in the specific ways enumerated in the statute.  Id. at 432-33.

The rights at issue in this litigation constitute only one of the many rights created by the copyright statute.  To begin with, there are separate bundles of rights in a musical composition and in its embodiment in a sound recording. "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression,"

8

including "musical works" and "sound recordings."[5]   17 U.S.C. §
102.   "Sound recordings and their underlying musical
compositions are separate works with their own distinct
copyrights."   Palladium Music, Inc. v. EatSleepMusic, Inc., 398
F.3d 1193, 1197 n.3 (10th Cir. 2005).   Whereas "[t]he author of
a musical composition is generally the composer, and the
lyricist, if any," "[t]he author of a sound recording is the
performer(s) whose performance is fixed, or the record producer
who processes the sounds and fixes them in the final recording,
or both."   Copyright Office Circular 56A at 1 ("Copyright
Registration of Musical Compositions and Sound Recordings")
(available at http://www.copyright.gov/circs/circ56a.pdf); see
also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,
571 F.3d 69, 72-73 (D.C. Cir. 2009) (per curiam).   ASCAP
represents owners of the copyright in the musical composition
only and therefore does not negotiate licenses in sound
recordings.[6]

---

[5] Sound recordings are "works that result from the fixation of a
series of musical, spoken, or other sounds, but not including
the sounds accompanying a motion picture or other audiovisual
work, regardless of the nature of the material objects, such as
disks, tapes, or other phonorecords, in which they are
embodied."   17 U.S.C. § 101.

[6] Sound recordings are "derivative" works of the preexisting
musical composition, and to obtain a copyright in a sound
recording one must secure a license from the copyright owner of
the underlying work.   The mechanical rights for sound recordings
under § 106(1) and (3) are subject to compulsory licensing under

A copyright owner may hold as many as six exclusive rights.
They are the rights

> (1) to reproduce the copyrighted work in copies or
> phonorecords;

> (2) to prepare derivative works based upon the
> copyrighted work;

> (3) to distribute copies or phonorecords of the
> copyrighted work to the public by sale or other
> transfer of ownership, or by rental, lease, or
> lending;

> (4) in the case of literary, musical, dramatic, and
> choreographic works, pantomimes, and motion pictures
> and other audiovisual works, to perform the
> copyrighted work publicly;

> (5) in the case of literary, musical, dramatic, and
> choreographic works, pantomimes, and pictorial,
> graphic, or sculptural works, including the
> individual images of a motion picture or other
> audiovisual work, to display the copyrighted work
> publicly; and

> (6) in the case of sound recordings, to perform the
> copyrighted work publicly by means of a digital
> audio transmission.[7]

17 U.S.C. § 106 (emphasis supplied).

Each of these six rights may be owned and conveyed

separately.  17 U.S.C. § 201.  The rights to reproduce and to

distribute musical works, see 17 U.S.C. § 106(1) and (3), which

---

the regime established in 17 U.S.C. § 115.  See Palladium, 398
F.3d at 1197, 1199.

[7] The sound recording copyright did not include a right of
performance until recently.  See Arista Records v. Launch Media,
Inc., 578 F.3d 148, 152-55 (2d Cir. 2009) (describing statutes
creating public performance rights in sound recordings).

are often referred to as mechanical rights, are governed by 17
U.S.C. § 115.  See 9 Melville B. and David Nimmer, Nimmer on
Copyright Appendix 16 (2009) (Chapter IX of Second Supplementary
Register's Report on the General Revision of the U.S. Copyright
Law (1975), entitled "Compulsory License for Making and
Distributing Phonorecords ('The Mechanical Royalty')").
Disagreements over license fees for mechanical rights in a
musical work are resolved by Copyright Royalty Judges, 17 U.S.C.
§ 115(c)(3)(C), and are not at issue here.  It is only the
fourth right in 17 U.S.C. § 106 that will be addressed in this
Opinion.

ASCAP licenses only the public performance right in musical
works established in 17 U.S.C. § 106(4).  Buffalo Broad. Co.,
Inc. v. Am. Soc'y of Composers, Authors and Publishers, 744 F.2d
917, 920 (2d Cir. 1984).  This Opinion addresses whether 17
U.S.C. § 106(4) requires Verizon to pay ASCAP a public
performance license fee for ringtones.

Several of the terms relevant to a construction of § 106(4)
are defined in 17 U.S.C. § 101.  Under § 101, to "perform" a
work means "to recite, render, play, dance, or act it, either
directly or by means of any device or process or, in the case of
a motion picture or other audiovisual work, to show its images
in any sequence or to make the sounds accompanying it audible."
To perform a work "publicly" means:

11

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) <u>to transmit or otherwise communicate a performance</u> or display of the work to a place specified by clause (1) or <u>to the public, by means of any device or process</u>, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101 (emphasis supplied).  To "transmit" a performance is "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent."  <u>Id.</u>

The Copyright Act includes exemptions for certain public performances of copyrighted music.  Subsection 110(4) of Title 17 provides that the following performances do not constitute a public performance for the purposes of the Copyright Act and therefore do not require a public performance license:

[any] performance of a nondramatic literary or musical work otherwise than in a transmission to the public, without any purpose of direct or indirect commercial advantage and without payment of any fee or other compensation for the performance to any of its performers, promoters, or organizers, if [] there is no direct or indirect admission charge. . . .

17 U.S.C. § 110(4).

To be held liable for direct infringement of the public performance right, a defendant must have engaged in conduct that is volitional or causally related to that purported

infringement.  Cartoon Network LP v. CSC Holdings, Inc., 536
F.3d 121, 130-31 (2d Cir. 2008) (considering infringement under
17 U.S.C. § 106(1)).  In other words, to impose direct
liability, there must be a "nexus sufficiently close and causal
to the illegal [infringement] that one could conclude that the
[defendant] himself trespassed on the exclusive domain of the
copyright owner."  Id. at 130 (citation omitted).

A defendant may also be secondarily liable for another's
public performance of a copyrighted musical work.  While "[t]he
Copyright Act does not expressly render anyone liable for
infringement committed by another," it "does not preclude the
imposition of liability for copyright infringements on certain
parties who have not themselves engaged in the infringing
activity."  Sony, 464 U.S. at 434-35.  Through contributory
infringement, one infringes "by intentionally inducing or
encouraging direct infringement."  Metro-Goldwyn-Mayer Studios
Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005).  Vicarious
infringement exists where one "profit[s] from direct
infringement while declining to exercise a right to stop or
limit it."  Id.  As these definitions suggest, in order to hold
a defendant secondarily liable someone else must have directly
infringed the public performance right.  See id. at 940 ("[T]he
inducement theory of course requires evidence of actual
infringement by recipients of the device."); Faulkner v. Nat'l

13

Geographic Enters. Inc., 409 F.3d 26, 40 (2d Cir. 2005)
("[T]here can be no contributory infringement absent actual
infringement."); Matthew Bender & Co. v. West Publ'g Co., 158
F.3d 693, 706 (2d Cir. 1998) (rejecting plaintiff's contributory
infringement claim, in part, because the plaintiff "has failed
to identify any primary infringer").

1.   Downloading Ringtones

ASCAP contends that Verizon's transmission of a ringtone to
a customer's cellular telephone requires a public performance
license.  While it is undisputed that the act of reproducing and
distributing a ringtone implicates the mechanical rights in a
musical work created by the Copyright Act, ASCAP asserts that
the transmission of a ringtone to a customer's cellular
telephone is also a public performance of a musical work
governed by 17 U.S.C. § 106(4).  Based on undisputed facts,
however, Verizon has shown that its transmission of a ringtone
to a cellular telephone customer does not constitute a
performance of a musical work "publicly," as that term is
defined in 17 U.S.C. § 101.

The parties agree that this question does not implicate the
first clause of the definition of the term "publicly" contained
in § 101, and focus their arguments instead on its second clause
(hereinafter "Transmission Clause"), which reads in pertinent
part:

14

> (2) to transmit or otherwise communicate a
> performance . . . by means of any device or process,
> whether the members of the public capable of
> receiving the performance or display receive it in
> the same place or in separate places and at the same
> time or at different times.

17 U.S.C. § 101.  Boiled down to its essence, the question

becomes whether in downloading a ringtone to a customer's

cellular telephone Verizon transmits a performance of the work

to the public.

In analyzing whether the transmission to a cellular

telephone qualifies as a transmission of the work to the public,

the focus is on the transmission itself and its potential

recipients, and not on the potential audience of the underlying

work or ringtone that rests on Verizon's file servers.[8]  Cartoon

Network, 536 F.3d at 134-35.  As the Second Circuit has

explained, since the Transmission Clause speaks of those

"capable of receiving the performance," instead of those

"capable of receiving the transmission," it is the "transmission

---

[8] In Buffalo Broadcasting, the Court of Appeals observed in
passing, while considering whether local television stations
needed to obtain a public performance license for musical works
contained in syndicated programs, that a producer of a
syndicated program did not need to acquire such a license to
either make or sell the program to the television station.
Buffalo Broad., 744 F.2d at 921-22.  Only the station needed to
obtain such a license, and it usually did so by obtaining a
blanket license from ASCAP and ASCAP's rival BMI.  Id. at 922.
This example illustrates that the distribution and sale of a
musical work and the public performance of the work implicate
separate rights, and it is only the last which requires a public
performance license under § 106(4).

of a performance that is itself a performance" for purposes of §
101. Id. at 134. Because only one subscriber is capable of
receiving this transmission or performance, the transmission is
not made to the public and is not covered by the Transmission
Clause, at least when considered by itself. This transmission
of a "unique copy . . . limit[s] the potential audience of a
transmission and is therefore relevant to whether that
transmission is made 'to the public.'" Id. at 138.

Because the Transmission Clause "directs us to identify the
potential audience of a given transmission, i.e., the person
'capable of receiving' it, to determine whether that
transmission is made 'to the public,'" id. at 139, and because
one may look downstream and consider whether the transmission of
the ringtone to the cellular telephone is but one link in a
chain of transmissions to the public, id. at 137, ASCAP also
urges that the downloading of the ringtone is but the first link
in a chain of transmission to the public. As described below,
however, there is no qualifying public performance under §
106(4) when the customer uses the ringtone to alert her to an
incoming call. Thus, even when the downloading of a ringtone is
considered as the first link in a chain of transmissions, it
does not qualify as a public performance.[9]

_____

[9] ASCAP refers to several decisions for the proposition that
Verizon is liable for each step in the transmission process

16

This analysis flows from the Court of Appeals' recent decision in Cartoon Network, 536 F.3d 121.  There, owners of copyrighted television programs alleged that Cablevision's Remote Storage Digital Video Recorder ("RS-DVR") system infringed their exclusive rights to the reproduction and public performance of the copyrighted works.  The RS-DVR system allowed a Cablevision customer to record cable television programs onto hard drives stored in a remote location, and to receive a playback transmission of the recorded programs from the remote hard drive to his home television.  The Second Circuit considered whether the recording of the program on the RS-DVR

---

leading to a public performance since it has "control over the entirety of the process from server to listening ears."  As discussed infra, Verizon does not control when or where the ringtone will be played and whether it will be heard "publicly." Its lack of control at the point of performance stands in sharp contrast to several of the cases on which ASCAP relies for this proposition; in every instance but one, these courts also found or assumed that a public performance license was necessary at the point at which the performance was displayed to the public. See National Football League v. Primetime 24 Joint Venture, 211 F.3d 10, 13 (2d Cir. 2000)(satellite broadcast to television audience); WGN Cont's Broad. Co. v. United Video, Inc. 693 F.2d 622, 625 (7th Cir. 1982)(delivery of television programs over cable television systems); Columbia Pictures Indus. v. Aveco, 800 F.2d 59, 62 (3d Cir. 1986)(video cassettes shown in individual viewing rooms within video store which rented the rooms and cassettes); David v. Showtime/The Movie Channel, Inc., 697 F. Supp. 752 (S.D.N.Y. 1988)(transmission of programming to cable system operators); Hubbard Broad., Inc. v. Southern Satellite Sys., 593 F. Supp. 808, 813 (D. Minn. 1984) (transmission of television programming to cable television systems).  The sole exception to the requirement of a license at the point of performance is NFL, 211 F.3d 10, which is discussed further infra.

constituted an unauthorized reproduction and whether the
playback of the program constituted an unauthorized public
performance, in violation of §§ 106(1) and (4), respectively.

While Cartoon Network was not required to address the
public performance right in the context of the transmission of
the program to the RS-DVR, the act most analogous to the
downloading of a ringtone,[10] its discussion of the Transmission
Clause has important ramifications for that step in the
transmission to the customer as well.[11]  Indeed, in its
discussion of National Football League v. PrimeTime 24 Joint
Venture, 211 F.3d 10 (2d Cir. 2000) ("NFL"), the Court of
Appeals observed that the transmission to the RS-DVR could only
be considered a transmission "to the public" where it is but one
link in a chain whose "final link was undisputedly a public
performance."  Cartoon Network, 536 F.3d at 137.[12]

_____

[10] It bears noting, however, that Verizon's ringtone is
downloaded to a customer's telephone while the programming at
issue in Cartoon Network resided in Cablevision's hard drives.

[11] Cartoon Network distinguished cases in which the same copy of
a copyrighted work was watched by a succession of individuals.
Cartoon Network, 536 F.3d at 138-39 (distinguishing Columbia
Pictures Industries, Inc. v. Redd Horne, Inc., 749 F.2d 154, 159
(3d Cir. 1984)(video rental store played videotapes in private
booths); On Command Video Corp. v. Columbia Pictures Indus., 777
F. Supp. 787 (N.D. Cal. 1991)(hotel plays videotapes for guests
in their individual hotel rooms in seriatim)).

[12] Cartoon Network, 536 F.3d 121, discussed in passim NFL, 211
F.3d 10, choosing to reconcile its holding with NFL and
declining to revisit NFL's reliability in addressing these

Over a year before the decision in <u>Cartoon Network</u> was issued, the Honorable William C. Conner, who presided over this litigation with distinction for many years, used a different analysis of the Transmission Clause to arrive at a similar result.  He held that downloading music from server computers (operated by AOL LLC and others) to a client computer was not a public performance of a musical work.  <u>United States v. Am. Soc'y of Composers, Authors and Publishers</u>, 485 F. Supp. 2d 438, 441-42 (S.D.N.Y. 2007) (hereinafter "Download Decision").  Judge Conner began with the Transmission Clause's requirement that a "performance" of the work had to be transmitted, then turned to the Copyright Act's definition of "perform," 17 U.S.C. § 101, and concluded that "in order for a song to be <u>performed</u>, it must be transmitted in a manner designed for contemporaneous perception."  <u>Id.</u> at 443 (emphasis supplied).  Since the

complex issues.  In <u>NFL</u>, copyrighted television programming was "uplinked" in the United States to a satellite system and then downlinked to home subscribers of the satellite service in Canada.  The satellite company asserted that it needed no public performance license since there was no public display or performance of the transmission in the United States and American copyright laws have no extraterritorial applicability. The Court of Appeals found an infringement under § 106(4) since "a public performance or display includes each step in the process by which a protected work wends its way to its audience."  <u>NFL</u>, 211 F.3d at 13 (citation omitted).  There is a strong argument to be made that there must be a public performance that infringes rights established by the Copyright Act before an upstream transmission that is a link to that performance can itself be found to infringe § 106(4).  <u>See</u> 2 Melville B. and David Nimmer, <u>Nimmer on Copyright</u> § 8.14[C][2] (2009).

19

downloading of music was effected by copying a digital file
"from one computer to another in the absence of any perceptible
rendition," id. at 444,[13] Judge Conner classified the transaction
as "a data transmission rather than a musical broadcast" or
performance, id. at 446, and an act more properly categorized as
a reproduction of a work governed by § 106(1), id. at 444, or a
digital phonorecord delivery as described in 17 U.S.C. § 115(d).
Id. at 447.

Both the Cartoon Network decision and the Download Decision
required the plaintiff to show a linkage between the
transmission and a public performance.  The application of the
line of analysis used in each case, would have led to the same
finding in both cases, to wit, that the respective transmissions
were not covered by the Transmission Clause because the
transmissions did not cause a public performance to take place.
And, although Cartoon Network relies on the meaning of the
phrase "the public" and the Download Decision explores the
meaning of the term "performance," application of the analysis
used in either decision would result in an identical conclusion
here:  the downloading of a ringtone is not a public performance
encompassed by the Transmission Clause.

---

[13] Streaming, in contrast to downloading, allows the real-time
playing of a work through a constant link maintained between the
provider's server and the client.  A replay is not possible
without streaming the work again.  Download Decision, 485 F.
Supp. 2d at 442.

In sum, where there is a transmission of the performance of a musical work directly to the public, that transmission is governed by § 106(4).  Where the transmission itself does not allow the public to perceive the performance as a work that is being rendered, but is only an intervening transmission in the downstream delivery of the performance to the means by which the public will be capable of receiving the performance, then that transmission may also be governed by § 106(4).[14]  ASCAP has failed to raise a question of fact that the downloading of a ringtone from Verizon to a customer's cellular telephone is a public performance of a musical work under either branch of this analysis.

ASCAP's effort to escape the implications of the foregoing analysis fails.  ASCAP argues that ringtones are "capable of" being heard during the downloading process.  ASCAP does not contend, however, that a Verizon customer can actually listen to a ringtone while she is downloading it; it acknowledges that the ringtone cannot be played before the transmission is concluded because Verizon has constructed the transmitted file "that way."

[14] Where a transmission is of a digital file rather than a performance that can be contemporaneously observed or heard, and where that transmission is but a link in a chain to a downstream public performance, it may be that the transmission is not an act of infringement for which the transmitter is directly liable under § 106(4), but rather an act that may subject the transmitter to contributory liability under § 106(4) for the infringement created by any ultimate public performance.

ASCAP's argument amounts to a claim that Verizon could change or enable its technology to allow a user to listen to a ringtone while downloading it.  This argument is not addressed to the technology at issue in this case and does not present a factual context that is ripe for review.  In any event, the <u>Cartoon Network</u> decision presents an insurmountable impediment to this argument.  Even if the customer could listen to the download as it was being received, and contemporaneously perceive it as the musical work, that would not constitute a <u>public</u> performance.

2.  Playing Ringtones

ASCAP next argues that there is a public performance of musical works when cellular telephones play ringtones to signal incoming calls.  It contends that Verizon is either directly or secondarily liable for copyright infringement for these public performances.  Verizon has shown that it is entitled to summary judgement as well on these claims.  When a ringtone plays on a cellular telephone, even when that occurs in public, the user is exempt from copyright liability, and Verizon is not liable either secondarily or directly.[15]

---

[15] Verizon also contends that any public performance of a ringtone constitutes fair use under the Copyright Act, but does not rely on that argument in seeking summary judgment.

22

a.  Secondary Liability

ASCAP asserts that Verizon is secondarily liable when a ringtone plays.  Secondary liability depends upon a finding that there has been a direct or primary infringement, and Verizon has shown that the cellular telephone user is not liable for copyright infringement even when the telephone rings in a public setting.

As already noted, the Copyright Act exempts from 17 U.S.C. § 106(4) those performances of a musical work that occur within the "normal circle of a family and its social acquaintances," 17 U.S.C. § 101 (definition of "publicly"), and further exempts

> [any] performance of a nondramatic literary or
> musical work otherwise than in a transmission to the
> public, without any purpose of direct or indirect
> commercial advantage and without payment of any fee
> or other compensation for the performance to any of
> its performers, promoters, or organizers, if []
> there is no direct or indirect admission charge . .
> . .

17 U.S.C. § 110(4).

The expectation of profit is important to determining whether a performance fits within the § 110(4) exemption.  If a performance occurs with no expectation of profit, it might qualify for this exemption if all of the statutory requirements are met; if, however, a performance occurs with the expectation of profit, even if no profit is made, the performance may not fall within this exemption.  <u>Herbert v. Shanley Co.</u>, 242 U.S.

23

591, 595 (1917) ("Whether [the performance of music] pays or not, the purpose of employing it is profit, and that is enough."); accord Broadcast Music, Inc. v. 315 West 44th St. Rest. Corp., No. 93 Civ. 8082 (MBM), 1995 WL 408399, *3 (S.D.N.Y. July 11, 1995).

The playing of ringtones fits comfortably within these statutory exemptions.  When a ringtone plays only in the presence of the "normal circle of a family and its social acquaintances" this performance would not count as a public performance under 17 U.S.C. § 101.  On occasions when Verizon customers have activated their ringtones, the telephone rings in the presence of a broader audience, and it rings at a level to be heard by others, that playing of a musical work satisfies all of the requirements of the § 110(4) exemption: Verizon customers are not playing the ringtones for any "commercial advantage;" they do not get paid any fee or compensation for these performances; and they do not charge admission.  In sum, customers do not play ringtones with any expectation of profit. The playing of a ringtone by any Verizon customers in public is thus exempt under 17 U.S.C. § 110(4) and does not require them to obtain a public performance license.

ASCAP argues that the § 110(4) exemption should not apply since "the customer benefits by purchasing a product and service it desires."  This personal, non-monetary benefit does not

24

vitiate the application of the § 110(4) exemption.  The only
commercial advantage that ASCAP identifies as being associated
with the playing of a ringtone is a commercial benefit to
Verizon, specifically, the possibility that others may be
encouraged to purchase ringtones when they hear ringtones.[16]  A
potential commercial advantage to Verizon, however, does not
suggest that its customers may not qualify for the § 110(4)
exemption.  To paraphrase the _Sony_ Court, "[o]ne may search the
Copyright Act in vain for any sign that the elected
representatives of the millions of people" who own cellular
telephones "have made it unlawful" to allow that telephone to
ring in a public setting.  _Sony_, 464 U.S. at 456.

     The fact that cellular telephone users are not infringers
of ASCAP's rights in the public performance of musical works
defeats ASCAP's claim that Verizon is secondarily liable for
their infringement.  "[T]he concept of contributory infringement
is merely a species of the broader problem of identifying the

---

[16] ASCAP's solitary example of customers playing their ringtones
for what it argues was commercial advantage was the audience's
use of their cellular telephones as part of the 2006 Chicago
Sinfonietta "Concerto for Orchestra and Cell Phones."  Even if
ASCAP were able to allege that Verizon customers were in the
audience of that performance, ASCAP does not allege that the
Verizon customers themselves had any "purpose of commercial
advantage," received any fees, or charged admission.  Rather, it
appears the Chicago Sinfonietta is the entity that had the
commercial purpose, received any payment or fees, and charged
admission for the performance of music.  And, as Verizon points
out, the orchestra was licensed by ASCAP at the time of its
performance.

circumstances in which it is just to hold one individual accountable for the actions of another." Id. at 435.  Thus, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." Faulkner, 409 F.3d at 40 (citation omitted); see also Softel, Inc. v. Dragon Med. & Scientific Communc'ns, Inc., 118 F.3d 955, 971 (2d Cir. 1997).  As already described, however, secondary liability depends on a finding that there has been a direct or primary infringement of the rights established under the Copyright Act.  Grokster, 545 U.S. at 940; Faulkner, 409 F.3d at 40; Matthew Bender & Co., 158 F.3d at 706.[17]

ASCAP argues that Verizon is secondarily liable for its customers' public performances because it has failed to show that "each and every customer would be able to meet its burden of proof to show that his or her 'performance' of ringtones would satisfy the § 110(4) exemption."  While a proponent of an affirmative defense ordinarily bears the burden of proving that it applies, Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 107 (2d Cir. 1998), since ASCAP is seeking to impose secondary liability on Verizon for its customers' conduct, it is likely that the burden of proving that that conduct is not exempt from

---

[17] It is therefore unnecessary to discuss whether Verizon meets the criteria for any theory of secondary liability.

liability rests on ASCAP.  It is unnecessary to resolve this issue, however, since if Verizon bears the burden of showing that the § 110(4) exemption applies to its customers, it has carried that burden.  The law does not impose an insurmountable burden on Verizon to show precisely how each of its customers has actually used her telephone, but only requires it to demonstrate that customers as a group do not exhibit any expectation of profit when they permit the telephones to ring in public.  ASCAP having failed to raise a question of fact that Verizon customers do engage in performances that require licenses,[18] Verizon cannot be held secondarily liable for its customers' ringtone "performances."[19]

b.   Direct Liability

The heart of ASCAP's opposition to this motion for summary judgment rests on its contention that Verizon itself engages in a public performance of copyrighted musical works when ringtones play in public on customers' cellular telephones.  ASCAP's

---

[18] ASCAP has not resorted to Rule 56(f), Fed. R. Civ. P., procedures in order to argue that this issue or any other is not ripe for decision.

[19] ASCAP and its amici Broadcast Music, Inc. and Society of European Stage Authors & Composers, Inc. argue that Verizon may not stand in the shoes of its customers when determining whether the § 110(4) exception applies to performances of ringtones. Verizon does no such thing.  Verizon argues only that its customers' performances are exempt under § 110(4), and Verizon therefore cannot be held secondarily liable for these non-infringing public performances.

theory of direct liability for infringement is that Verizon "controls the entire series of steps that allow and trigger" the cellular telephone to perform the musical work in public.  It contends that these actions constitute the performance "publicly" of a musical work under both prongs of § 101's definition of the term "publicly," i.e., that it is both a performance of a musical work "at a place open to the public," see id. at (1), and a communication of a performance to the public, see id. at (2).  Insofar as the second prong is concerned, ASCAP admits that Verizon does not "transmit" a musical work when a cellular telephone rings in public,[20] it relies instead on that prong's alternative requirement that the defendant "transmit or otherwise communicate a performance . . . to the public."  Id. (emphasis supplied).[21]

---

[20] A transmission requires the delivery of images or sounds "beyond the place from which they are sent."  17 U.S.C. § 101 (definition of "transmit").

[21] The parties debate whether any activity by Verizon could be said to "otherwise communicate" a public performance of a musical work under the Transmission Clause.  17 U.S.C. § 101 (definition of "publicly").  ASCAP does not identify any principles that would limit the scope of its broad construction of that phrase.  In any event, Verizon's sending of a signal to alert a customer's telephone to an incoming call is a signal sent to an individual, not to the public, and could not constitute "otherwise communicat[ing] a performance" to the public.  Because ASCAP has failed to raise a question of fact, however, that Verizon engages in conduct that constitutes a sufficient nexus to the public playing of a ringtone it is

ASCAP identifies the following actions by Verizon as constituting the control over the performance process which renders Verizon liable for direct infringement:  Verizon supplies the ringtones; it encourages customers to purchase ringtones for public playback; it transmits the ringtones to the subscribers' telephones; it places a code on the ringtones that prevents customers from forwarding them; it provides and supports a cellular telephone network; it "commands, enables and controls" the playing of ringtones "by triggering the tones when calls are received;" and it is able to terminate a customer's cellular telephone service at any time.

ASCAP has failed to identify an issue of fact which prevents entry of judgment in Verizon's favor on ASCAP's theory that Verizon is directly liable for infringement of § 106(4) when ringtones downloaded from Verizon play in public on a Verizon telephone.[22]  Verizon does not "recite, render, play, dance, or act [the ringtone] either directly or by means of any device," and thus does not "perform" the music, as that term is defined in the Copyright Act.  17 U.S.C. § 101.  Nor does

---

unnecessary to grapple further with ASCAP's creative reading of § 101's definition of the term "publicly."

[22] ASCAP's arguments focus on the playing of ringtones downloaded from Verizon as opposed to those purchased by Verizon cellular telephone subscribers over the internet.  The rulings herein would necessarily govern the latter category of ringtones as well.

Verizon engage in conduct that can be said to cause a ringtone to be played in public.  See Cartoon Network, 536 F.3d 130-31. Verizon's only role in the playing of a ringtone is the sending of a signal to alert a customer's telephone to an incoming call. That signal is the same whether the customer has downloaded a ringtone or not, whether she has set her telephone to play a ringtone when she receives a call or not, whether she is in a public setting or not, and whether she has the ringtone volume turned high or low.  Once the customer has downloaded the ringtone onto her telephone, she controls the telephone and makes the decisions that determine whether that ringtone will be triggered by an incoming call signal.  And, of course, it is someone else entirely -- the caller -- who has initiated this entire process.

The other components of Verizon's putative "control" over the playing of the ringtone in public are too attenuated from that "performance" to render Verizon liable.[23]  These include its operation of a cellular telephone network and its ability to disconnect a customer from that service.  The marketing of ringtones and the transmission of individual unique copies of ringtones to a customer's cellular telephone certainly implicate

---

[23] This Opinion assumes without deciding that a customer's playing of a ringtone "outside of a normal circle of a family and its social acquaintances" is a performance to the public. 17 U.S.C. § 101.

rights protected by the Copyright Act, but they are not sufficiently connected to the public performance of the downloaded ringtone to implicate the right protected by § 106(4).[24]

ASCAP relies heavily on the recent decision in Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124 (S.D.N.Y. 2009), for the proposition that a company's provision of a network and its active encouragement of use of the network provides the nexus supporting direct liability.  In Usenet.com, the defendants ran online bulletin boards on which users posted sound recordings and other messages that could be "read" by others.  Id. at 130.  Users regularly downloaded the sound recordings as music files, a practice that the court found was among "the most popular" of the services provided by the defendants.  Id. at 148.  The court held that the defendants were "actively engaged" in the "exchange of content between users who upload infringing content and users who download such content."  Id. at 149.

---

[24] To the extent that ASCAP argues that Verizon is directly liable because it is jointly and severally liable along with its customers for any public performance that occurs when a ringtone plays, that argument is rejected.  Joint and several liability is not an independent basis for liability, but a means of allocating responsibility for an award of damages where multiple actors have already been found liable.  See, e.g., 17 U.S.C. § 504(c)(1).

ASCAP's reliance on this case fails.  For starters, the
defendant's volitional conduct in Usenet.com rendered them
liable for infringement of the distribution rights protected by
§ 106(3).  Those rights are not at issue here; it is undisputed
that Verizon pays mechanical license fees to ASCAP's members.
Usenet.com simply does not elucidate the degree of volitional
conduct that would render a transmitter of music files liable
for a public performance of musical works.  While it is
undisputed that "Verizon markets ringtones as a way of
expressing one's tastes and personality to the outside world,"
that fact falls far short of showing Verizon's participation in
the customer's playing of ringtones in public.  To find Verizon
directly liable, there must be conduct by Verizon that is
"sufficiently close and causal" to its customer's decision to
activate the ringtone in a public setting.  See Cartoon
Networks, 536 F.3d at 130 (citation omitted).

ASCAP argues that the fact that Verizon takes no particular
step to cause a ringtone to be played in public should not be
determinative of its liability since many infringers like
Napster, Aimster and Grokster rely on automated systems that
require no human intervention by the party enjoying the revenue.
This argument skips over the careful analysis of the statutory
framework and the individual factual settings in each case that
is necessary to determine liability.  The three cases on which

ASCAP relies all imposed secondary liability on the defendants, not direct liability.  Grokster, 545 U.S. 913, 929-31; In re Aimster Copyright Litig., 334 F.3d 643, 645, 651 (7th Cir. 2003); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1011, 1019, 1027 (9th Cir. 2001).  In addition, despite the accusation that Verizon enjoys revenue from publicly played ringtones, Verizon makes no revenue from the playing of ringtones, in public or elsewhere.  It makes revenue from selling ringtones, and it already pays a mechanical licensing fee in connection with those sales.  This litigation will resolve whether it must pay as well for the previewing of ringtones.  While Verizon may theoretically have a duty to pay licensing fees under two separate provisions of § 106 for the same underlying activity, the issue remains whether its conduct creates direct liability for the playing of ringtones in public.  In that connection, its use of an automated system to signal the receipt of an incoming call on a customer's cellular telephone remains highly relevant to an evaluation of whether there is a sufficient nexus between Verizon's conduct and the ringing of that telephone in public to require Verizon to pay as well for a § 106(4) license.  As already described, there is no sufficient nexus.

Finally, ASCAP argues that Verizon exerts sufficient "control" over the playing of the musical works in public because it has the ability to avoid the infringement by simply

33

not including ASCAP ringtones in its library or paying ASCAP for a performance license.  This argument begs the question.  ASCAP has not shown any infringement of its members' rights by the playing of ringtones in public from Verizon's customers' telephones.  The customers are not liable for copyright infringement, and neither is Verizon.

CONCLUSION

Verizon's May 22, 2009 motion for summary judgment is granted.

SO ORDERED:

Dated:    New York, New York
          October 14, 2009

          _____
                  DENISE COTE
          United States District Judge