09-0539-cv(L)
United States v. American Society of Composers, Authors and Publishers et al.

1                UNITED STATES COURT OF APPEALS
2                    FOR THE SECOND CIRCUIT
3
4                        August Term 2009
5
6     (Argued: March 3, 2010        Decided: September 28, 2010)
7
8      Docket Nos. 09-0539-cv (L), 09-0542-cv (con), 09-0666-cv (xap),
9                  09-0692-cv (xap), 09-1572-cv (xap)
10    ---------------------------------------------------x
11
12    UNITED STATES of AMERICA,
13
14               Plaintiff-Appellee,
15
16                      -- v. --
17
18    AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND
19    PUBLISHERS,
20
21               Defendant-Appellant-Cross-Appellee,
22
23    In the matter of Applications of
24    REALNETWORKS, INC., YAHOO! INC.,
25
26               Applicants-Appellees-Cross-Appellants
27
28
29    ---------------------------------------------------x
30
31    B e f o r e :   JACOBS, Chief Judge, WALKER and LIVINGSTON,
                       Circuit Judges.

American Society of Composers, Authors and Publishers

("ASCAP") appeals the district court's ruling that a download of

a digital file containing a musical work does not constitute a

public performance of that work.  Yahoo! Inc. and RealNetworks,

Inc. (collectively, the "Internet Companies") cross-appeal the

district court's assessment of the fees for the blanket licenses

1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/28/2010

CERTIFIED COPY ISSUED ON 09/28/2010.

1    they seek to perform musical works in the ASCAP repertory.

2        We affirm the district court's ruling that a download of a

3    musical work does not constitute a public performance of that

4    work, but we vacate the district court's assessment of fees for

5    the blanket ASCAP licenses sought by the Internet Companies and

6    remand for further proceedings in light of this opinion.

7        AFFIRMED in part, VACATED in part, and REMANDED.

8                              CATHERINE E. STETSON (Joshua D.
9                              Hawley, Hogan & Hartson LLP,
10                             Washington, DC, Ira M. Feinberg,
11                             Chava Brandriss, Hogan & Hartson
12                             LLP, New York, NY, Christopher J.
13                             Glancy, I. Fred Koenigsberg, Stefan
14                             M. Mentzer, White & Case LLP, New
15                             York, NY, Joan M. McGivern, Richard
16                             H. Reimer, Christine A. Pepe,
17                             ASCAP, New York, NY on the brief),
18                             Hogan & Hartson LLP, Washington, DC
19                             for Defendant-Appellant-Cross-
20                             Appellee.
21
22                             THOMAS P. LANE (Michael S. Elkin,
23                             Robert C. Turner on the brief),
24                             Winston & Strawn LLP, New York, NY
25                             for Applicant-Appellee-Cross-
26                             Appellant Yahoo! Inc.
27
28                             KENNETH L. STEINTHAL (Jonathan
29                             Bloom, Gregory Silbert, Harris
30                             Cohen on the brief), Weil, Gotshal
31                             & Manges LLP, New York, NY for
32                             Applicant-Appellee-Cross-Appellant
33                             RealNetworks, Inc.
34
35                             NICHOLAS BAGLEY (Tony West,
36                             Assistant Attorney General, Philip
37                             J. Weiser, Deputy Assistant
38                             Attorney General, Scott R.
39                             McIntosh, Attorney, Appellate
40                             Staff, Civil Division, Department
41                             of Justice, Catherine G.

O'Sullivan, David Seidman,
Attorneys, Appellate Section,
Antitrust Division, Department of
Justice, Washington, DC on the
brief), Attorney, Appellate Staff,
Civil Division, Department of
Justice, Washington, DC for United
States.

MICHAEL E. SALZMAN(Marvin L.
Berenson, Joseph J. DiMona, John
Coletta, Broadcast Music, Inc., New
York, New York on the brief),
Hughes, Hubbard & Reed LLP, New
York, New York for Amicus Curiae
Broadcast Music, Inc.

KEENAN POPWELL (John C. Beiter,
Zumwalt, Almon & Hayes PLLC,
Nashville, Tennessee on the brief),
SESAC, Inc., New York, New York for
Amicus Curiae SESAC, Inc.

DAVID LEICHTMAN (Hillel I. Parness,
Robins, Kaplan, Miller & Ciresi
LLP, New York, New York, W. Edward
Bailey, Eleanor M. Lackman, Lovells
LLP, New York, New York, David
Uwemedimo, Confederation
Internationale des Societes
d'Auteurs et Compositeurs, Neuilly
sur Seine, France on the brief),
Robins, Kaplan, Miller & Ciresi
LLP, New York, New York for Amicus
Curiae Confederation Internationale
des Societes d'Auteurs et
Compositeurs.

JAY COHEN (Lynn B. Bayard, Paul,
Weiss, Rifkind, Wharton & Garrison
LLP, New York, New York, Jay
Rosenthal, Kathryn E. Wagner,
National Music Publishers'
Association, Inc., New York, New
York on the brief), Paul, Weiss,
Rifkind, Wharton & Garrison LLP,
New York, New York for Amici Curiae
Association of Independent Music

3

Publishers, Church Music Publishers
Association, Music Publishers'
Association of the United States,
National Music Publishers'
Association, Inc., and Production
Music Association.

CHARLES CUMMINGS (Carl W. Hampe,
Baker & McKenzie LLP, Washington,
DC, Charles J. Sanders, Attorney at
Law PC, Briarcliff Manor, New York
on the brief), Baker & McKenzie
LLP, New York, New York for Amici
Curiae The Society of Composers and
Lyricists, National Academy of
Recording Arts and Sciences, Inc.,
Ad Hoc Coalition of Production
Music Company Owners, The Game
Audio Network Guild, and
Songwriters Guild of America.

AL J. DANIEL (Toby M.J.
Butterfield, Christopher J. Marino,
Cowan, DeBaets, Abrahams & Sheppard
LLP, New York, New York, C. Paul
Spurgeon, Society of Composers,
Authors, and Music Publishers of
Canada, Toronto, Ontario, Canada on
the brief), Cowan, DeBaets,
Abrahams & Sheppard LLP, New York,
New York for Amicus Curiae The
Society of Composers, Authors, and
Music Publishers of Canada

PAUL M. SMITH (Steven R. Englund,
Carrie F. Apfel on the brief)
Jenner & Block LLP, Washington, DC
for Amici Curiae Digital Media
Association, Entertainment Software
Association, and Motion Picture
Association of America, Inc.

JOHN T. MITCHELL, Interaction Law,
Washington, DC for Amici Curiae
National Association of Recording
Merchandisers, Inc., and
Entertainment Merchants
Association, Inc.

4

1      SUSAN CLEARY, Independent Film and
2      Television Alliance, Los Angeles,
3      California _for_ Amicus Curiae
4      Independent Film and Television
5      Alliance

7      BRUCE G. JOSEPH, Wiley Rein LLP,
8      Washington, DC _for_ Amicus Curiae
9      CTIA – The Wireless Association.

JOHN M. WALKER, JR., <u>Circuit Judge</u>:

This case presents two distinct questions that arise from the transmittal of musical works over the Internet:  First, whether a download of a digital file containing a musical work constitutes a public performance of that musical work; and, second, whether the district court, acting in its capacity as the rate court, was reasonable in its assessment of the blanket license fees of Yahoo! Inc. and RealNetworks, Inc. (collectively, "the Internet Companies") to publicly perform any of the millions of musical compositions in the American Society of Composers, Authors and Publishers ("ASCAP") repertory.

For the reasons set forth below, we affirm the district court's ruling that a download of a musical work does not constitute a public performance of that work, but we vacate the district court's assessment of fees for the blanket ASCAP licenses sought by the Internet Companies and remand for further proceedings.

**BACKGROUND**

I.    **FACTS**

5

1    The Internet Companies seek separate blanket licenses to

2    publicly perform the entirety of the ASCAP repertory for certain

3    of their websites and services.  A blanket license is a license

4    that gives the licensee the right to perform all of the works in

5    the repertory for a single stated fee that does not vary

6    depending on how much music from the repertory the licensee

7    actually uses.  <u>United States v. Am. Soc'y of Composers, Authors</u>

8    <u>& Publishers</u>, No. 41-1395 (WCC), 2001 WL 1589999, at *1 (S.D.N.Y.

9    June 11, 2001).  ASCAP licenses the non-dramatic, public

10   performance rights in copyrighted musical works.  More than

11   295,000 composers, songwriters, lyricists, and music publishers

12   in the United States participate exclusively in licensing their

13   music through ASCAP.  ASCAP licenses approximately 45% of all of

14   the musical works that are played on-line.

15   The Internet Companies perform music in myriad audio and

16   audio-visual contexts.  Yahoo! provides music content in various

17   ways across its website.  For example, a user can enjoy the

18   specific song or music video he desires from an "on-demand"

19   stream in Yahoo! Search, listen to a radio-style webcast in

20   Yahoo! Music, view audio-visual clips from movies and television

21   shows in Yahoo! Movies and Yahoo! TV, or upload and share his own

22   videos using Yahoo! Video.[1]  However, only a small portion of the

---

[1]  Yahoo! provides audio and audio-visual content in the
following areas of its website and through the following
services: the Yahoo! homepage, Yahoo! Music, My Yahoo!, Yahoo!
Movies, Yahoo! Video, Bix, Yahoo! Kids, Yahoo! TV, Yahoo! Games,

1    activity on Yahoo!'s website involves performances of musical

2    works, and not all of the areas on Yahoo!'s website offer audio

3    or audio-visual content.

4        RealNetworks performs music in audio and audio-visual

5    contexts through a number of websites and subscription services.[2]

6    Like Yahoo!, these sites and services publicly perform musical

7    works in numerous formats, including, inter alia, radio,

8    television, movie, game, and music-video formats.  Also like

9    Yahoo!, only a portion of the content on RealNetworks' sites and

10   services consist of performances of musical works.

11       In addition to performing music on websites and through

12   services, the Internet Companies offer to users copies of

13   recordings of musical works through download transmittals.  A

---

Yahoo! Tech, Yahoo! Autos, Yahoo! Finance, Broadway on Yahoo!,
Yahoo! Food, Yahoo! Search, Yahoo! Toolbar, Yahoo! Messenger, and
the Yahoo! music widget.

[2] At the time of oral argument in this case, the
RealNetworks sites and services that publicly performed music
included, inter alia: the following:  RealNetworks.com, Real.com
(including its sub-domains such as Real Guide, and affiliated
sites such as Rollingstone.com and Film.com), Rhapsody,
Rhapsody.com, Rhapsodydirect.com, SuperPass, and Listen.com.
Public filings, of which we take judicial notice, see Kavowras v.
New York Times Co., 328 F.3d 50, 57 (2d Cir. 2003), report that
RealNetworks has since spun off Rhapsody as an independent
venture.  See RealNetworks, Inc., Current Report   (Form 8-K)
(March 31, 2010), available at
http://www.sec.gov/Archives/edgar/data
/1046327/000095012310032214/v55452e8vk.htm.  Because this case
involves the setting of license rates for the period of January
1, 2004 to December 31, 2009, however, Rhapsody's spin-off is not
relevant to our analysis.

1    download is a transmission of an electronic file containing a

2    digital copy of a musical work that is sent from an on-line

3    server to a local hard drive.   See United States v. Am. Soc'y of

4    Composers, Authors & Publishers (Application of Am. Online, Inc.,

5    RealNetworks, Inc., and Yahoo! Inc.) ("RealNetworks and Yahoo!

6    I"), 485 F. Supp. 2d 438, 441 (S.D.N.Y. 2007).   With a download,

7    the song is not audible to the user during the transfer.   Id. at

8    442, 446.   Only after the file has been saved on the user's hard

9    drive can he listen to the song by playing it using a software

10   program on his local computer.   Id.

11       The Internet Companies primarily generate revenue from

12   performances of musical works in two ways.   On their websites,

13   they make available, at no cost to users, performances of music,

14   music videos, television programming, and the like that generate

15   revenue from advertisements on the web page or in the audio or

16   audio-visual player.[3]   The district court found that, in all of

17   the forms of website advertising it considered, one principle is

18   common: the larger the audience and the more times a site is

---

[3] Advertising on websites can take numerous forms,
including, inter alia, display advertising, rich-media
advertising, and sponsorships.   Display advertising may be
displayed, inter alia, as an item on a web page, in a pop-up or
pop-under window, on an interstitial page (an ad page that
appears between two content pages), or in a floating window that
moves across the user's screen.   Rich-media advertising,
consisting of streaming audio or video, is generally played in
the audio and audio-visual players in which the musical works are
performed, either before, during, or after the performances of
the musical works.

1  visited, the greater the revenue generated.  See <u>United States v.</u>

2  <u>Am. Soc'y of Composers, Authors & Publishers (Application of Am.</u>

3  <u>Online, Inc., RealNetworks, Inc., and Yahoo!) ("RealNetworks and</u>

4  <u>Yahoo! II")</u>, 559 F. Supp. 2d 332, 338 (S.D.N.Y. 2008).  For

5  example, advertisers typically pay for display advertising based

6  on the number of "impressions," or views, of the advertisement by

7  users of the page on which an advertisement appears.  The second

8  primary way that the Internet Companies generate revenue from

9  performing musical works is through subscription-based services.

10 **II.  PROCEDURAL BACKGROUND**

11      Acting in its capacity as the rate court,[4] the district

12 court issued rulings in April 2007, April 2008, and January 2009

13 resolving the issues presented on appeal.  In its 2007 decision,

14 the district court held that a download of a digital file

15 containing a musical work does not constitute a public

---

[4]  In 1941, the United States brought a civil action against
ASCAP for alleged violations of the Sherman Antitrust Act based
on the fact that ASCAP's members license their songs
collectively, thereby enhancing their market power.  The action
was settled by the entry of a consent decree, see <u>United States</u>
<u>v. Am. Soc'y of Composers, Authors & Publishers</u>, No. 13-95, 1941
U.S. Dist. LEXIS 3944 (S.D.N.Y. Mar. 4, 1941), which has
subsequently been amended from time to time.  The most recent
version, entered on June 11, 2001, the Second Amended Final
Judgment ("AFJ2"), currently regulates how ASCAP may participate
in the music industry and gives the United States District Court
for the Southern District of New York jurisdiction as the rate
court to oversee the implementation of the AFJ2.  <u>United States</u>
<u>v. Am. Soc'y of Composers, Authors & Publishers</u>, No. 41-1395
(WCC), 2001 WL 1589999 (S.D.N.Y. June 11, 2001).  In its capacity
as the rate court, the district court determines a reasonable fee
for an applicant's ASCAP license.  <u>Id.</u> at *6-*8

1    performance of that work.   In its 2008 decision, the district
2    court determined a method for calculating the fees for the
3    blanket licenses payable to ASCAP for the Internet Companies'
4    performances of musical works in the ASCAP repertory.   In two
5    separate opinions issued in January 2009, the district court,
6    applying the method it determined in 2008, issued Final Fee
7    Determinations for Yahoo! and RealNetworks, respectively.

8         In its second opinion, issued in 2008, the district court
9    arrived at a license fee formula that multiplied a royalty rate
10   by the percentage of revenue attributable to the performance of
11   music.   The district court applied a uniform royalty rate to the
12   Internet Companies' varying music uses that did not fluctuate
13   over the different types of performances on the Internet
14   Companies' sites and services.   In ultimately determining a
15   royalty rate of 2.5% for both of the Internet Companies, the
16   district court relied upon several benchmark agreements,
17   including ASCAP's agreements with Music Choice, terrestrial radio
18   stations, the broadcast television networks, and the cable
19   television networks.

20        For Yahoo!, because only a portion of the revenue generated
21   from its website is attributable to performances of musical
22   works, the district court decided to measure Yahoo!'s music-use
23   revenue by multiplying the company's total revenue from its
24   licensed services – defined as those business units that publicly

1   perform music - less certain customary costs (such as for

2   advertising sales commissions and traffic acquisition expenses)

3   by a music-use-adjustment factor ("MUAF").  The MUAF was a

4   fraction that reflected the amount of time users spent streaming

5   performances of musical works relative to their overall time on

6   the website; its numerator was the number of hours of music

7   streamed from the licensed sites and services, and its

8   denominator was the number of hours that the company's licensed

9   sites and services were utilized.

10      For RealNetworks, the district court at first accepted

11   ASCAP's argument that it was unnecessary to apply a MUAF because,

12   unlike Yahoo!, "the vast majority of RealNetworks's revenue

13   subject to fee is generated from subscription music services and

14   advertising-supported sites where music is the cental theme."

15   RealNetworks and Yahoo! II, 559 F. Supp. 2d at 399; see id. at

16   411.  The district court, however, did reduce RealNetworks'

17   revenue figure by subtracting revenue attributable to

18   RealNetworks' Technology Products and Solutions business unit,

19   which develops and markets software products and services that

20   enable wireless carriers, cable companies, and other media

21   communication companies to distribute media content to PCs,

22   mobile phones, and other non-PC devices.  Id. at 359-60, 411-12.

23   In its 2009 Final Fee Determination, the district court altered

24   course and applied certain MUAFs to RealNetworks' various sites

1    and services, but without explaining how it arrived at these

2    MUAFs.   (RealNetworks Judgment Order 2-4)

3                            DISCUSSION

4    I.    Public Performance Right as Applied to Downloads

5         The Copyright Act confers upon the owner of a copyright "a

6    bundle of discrete exclusive rights," each of which may be

7    transferred or retained separately by the copyright owner.  N.Y.

8    Times Co. v. Tasini, 533 U.S. 483, 495-96 (2001) (internal

9    quotation marks omitted).  Section 106 of the Copyright Act sets

10   forth these various rights, including the right "to reproduce the

11   copyrighted work in copies" and the right "to perform the

12   copyrighted work publicly."  17 U.S.C. § 106(1), (4).  In this

13   case, the Internet Companies offer their customers the ability to

14   download musical works over the Internet.  It is undisputed that

15   these downloads create copies of the musical works, for which the

16   parties agree the copyright owners must be compensated.  However,

17   the parties dispute whether these downloads are also public

18   performances of the musical works, for which the copyright owners

19   must separately and additionally be compensated.  The district

20   court held that these downloads are not public performances, and

21   we agree.[5]

_____

[5] We review a district court's grant of summary judgment
based on its interpretation of the Copyright Act de novo.  See
Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 775 (2d Cir.
1992).

12

1    In answering the question of whether a download is a public

2  performance, we turn to Section 101 of the Copyright Act, which

3  states that "[t]o 'perform' a work means to recite, render, play,

4  dance, or act it, either directly or by means of any device or

5  process."[6]  17 U.S.C. § 101.  A download plainly is neither a

6  "dance" nor an "act."  Thus, we must determine whether a download

7  of a musical work falls within the meaning of the terms "recite,"

8  "render," or "play."

9    "As in all statutory construction cases, we begin with the

10  language of the statute.  The first step is to determine whether

11  the language at issue has a plain and unambiguous meaning with

12  regard to the particular dispute in the case."  Barnhart v.

13  Sigmon Coal Co., 534 U.S. 438, 450 (2002) (internal quotation

14  marks omitted).  "[U]nless otherwise defined, statutory words

15  will be interpreted as taking their ordinary, contemporary,

16  common meaning."  United States v. Piervinanzi, 23 F.3d 670, 677

17  (2d Cir. 1994) (internal quotation marks and alterations

18  omitted).  "When the language of a statute is unambiguous,

19  judicial inquiry is complete."[7]  Marvel Characters, Inc. v.

---

[6] Section 101 of the Copyright Act, its definitional
section, fully defines "[t]o 'perform' a work" as "to recite,
render, play, dance, or act it, either directly or by means of
any device or process or, in the case of a motion picture or
other audiovisual work, to show its images in any sequence or to
make the sounds accompanying it audible."  17 U.S.C. § 101.


[7] Because we see no ambiguity in the language of the
Copyright Act, we need not reach ASCAP's arguments regarding (i)

1    <u>Simon</u>, 310 F.3d 280, 290 (2d Cir. 2002) (internal quotation marks

2    omitted); <u>accord</u> <u>Barnhart</u>, 534 U.S. at 450.

3         The ordinary sense of the words "recite," "render," and

4    "play" refer to actions that can be perceived contemporaneously.

5    To "recite" is "to repeat from memory or read aloud esp[ecially]

6    before an audience," Webster's Third New International Dictionary

7    1895 (1981); to "render" is to "say over: recite, repeat,"[8] <u>id.</u>

8    at 1922; and to "play" is to "perform on a musical instrument,"

9    "sound in performance," "reproduce sound of recorded material" or

10   to "act on a stage or in some other dramatic medium," <u>id.</u> at

11   1737.  All three actions entail contemporaneous perceptibility.

_____

parallel provisions, (ii) legislative history, or (iii) secondary
authorities.

    [8]  The one definition that, if applicable, would support
ASCAP's position is the definition of "to render" that is "to
hand over to another (as the intended recipient): deliver,
transmit."  <u>Id.</u>  We do not, however, find this definition to be
applicable in the context of the Copyright Act's definition of
"to perform."  "To render" does not stand alone in the § 101
definition of "to perform"; it is contained within a list of
words that, by association, give content to the term within the
context of the statute.  <u>See</u> <u>Jarecki v. G.D. Searle & Co.</u>, 367
U.S. 303, 307 (1961) (noting that often "a word is known by the
company it keeps"); <u>see also</u> <u>City of New York v. Beretta U.S.A.
Corp.</u>, 524 F.3d 384, 401 (2d Cir. 2008) (stating that "the
meaning of one term may be determined by reference to the terms
it is associated with" (internal quotation marks and alterations
omitted)); Black's Law Dictionary 1160-61 (9th ed. 2009)
(defining <u>noscitur a sociis</u> as "[a] canon construction holding
that the meaning of an unclear word or phrase should be
determined by the words immediately surrounding it").  In
addition to the fact that "to recite" and "to play" require
contemporaneous perceptibility, the remaining terms in the § 101
definition of "to perform" - "to dance" and "to act" - are also
actions that are necessarily perceptible by sight and sound.

These definitions comport with our common-sense understandings of these words.  Itzakh Perlman gives a "recital" of Beethoven's Violin Concerto in D Major when he performs it aloud before an audience.  Jimmy Hendrix memorably (or not, depending on one's sensibility) offered a "rendition" of the Star-Spangled Banner at Woodstock when he performed it aloud in 1969.  Yo-Yo Ma "plays" the Cello Suite No. 1 when he draws the bow across his cello strings to audibly reproduce the notes that Bach inscribed.  Music is neither recited, rendered, nor played when a recording (electronic or otherwise) is simply delivered to a potential listener.

The final clause of the § 101 definition of "to perform" further confirms our interpretation.  It states that a performance "in the case of a motion picture or other audiovisual work, [is] to show [the work's] images in any sequence or to make the sounds accompanying it audible."  17 U.S.C. § 101.  The fact that the statute defines performance in the audio-visual context as "show[ing]" the work or making it "audible" reinforces the conclusion that "to perform" a musical work entails contemporaneous perceptibility.  ASCAP has provided no reason, and we can surmise none, why the statute would require a contemporaneously perceptible event in the context of an audio-visual work, but not in the context of a musical work.

15

1    The downloads at issue in this appeal are not musical

2    performances that are contemporaneously perceived by the

3    listener.  They are simply transfers of electronic files

4    containing digital copies from an on-line server to a local hard

5    drive.  The downloaded songs are not performed in any perceptible

6    manner during the transfers; the user must take some further

7    action to play the songs after they are downloaded.  Because the

8    electronic download itself involves no recitation, rendering, or

9    playing of the musical work encoded in the digital transmission,

10   we hold that such a download is not a performance of that work,

11   as defined by § 101.

12   ASCAP, pointing to the definition of "publicly" in § 101,

13   argues that a download constitutes a public performance.  Section

14   101 defines "[t]o perform or display a work 'publicly'" as

15   follows:

16   (1) to perform or display it at a place open to the
17   public or at any place where a substantial number of
18   persons outside of a normal circle of a family and its
19   social acquaintances is gathered; or (2) to transmit or
20   otherwise communicate a performance or display of the
21   work to a place specified by clause (1) or to the
22   public, by means of any device or process, whether the
23   members of the public capable of receiving the
24   performance or display receive it in the same place or
25   in separate places and at the same time or at different
26   times.

27   Id. § 101.  ASCAP argues that downloads fall under clause

28   (2) of this definition because downloads "transmit or

otherwise communicate a performance," id., namely the

initial or underlying performance of the copyrighted work,

to the public.  We find this argument unavailing.  The

definition of "publicly" simply defines the circumstances

under which a performance will be considered public; it does

not define the meaning of "performance."      Moreover,

ASCAP's proposed interpretation misreads the definition of

"publicly."  As we concluded in Cartoon Network LP v. CSC

Holdings, Inc., "when Congress speaks of transmitting a

performance to the public, it refers to the performance

created by the act of transmission," not simply to

transmitting a recording of a performance.  536 F.3d 121,

136 (2d Cir. 2008).  ASCAP's alternative interpretation is

flawed because, in disaggregating the "transmission" from

the simultaneous "performance" and treating the transmission

itself as a performance, ASCAP renders superfluous the

subsequent "a performance . . . of the work" as the object

of the transmittal.  See Duncan v. Walker, 533 U.S. 167, 174

(2001) ("It is our duty to give effect, if possible, to

every clause and word of a statute." (internal quotation

marks omitted)).  In contrast, our interpretation in Cartoon

Network recognizes that a "transmittal of a work" is

distinct from a transmittal of "a performance" – the former

being a transmittal of the underlying work and the latter

17

1    being a transmittal that is itself a performance of the

2    underlying work.  See 536 F.3d at 134 ("The fact that the

3    statute says 'capable of receiving the performance,' instead

4    of 'capable of receiving the transmission,' underscores the

5    fact that a transmission of a performance is itself a

6    performance.").

7         The Internet Companies' stream transmissions, which all

8    parties agree constitute public performances, illustrate why

9    a download is not a public performance.  A stream is an

10   electronic transmission that renders the musical work

11   audible as it is received by the client-computer's temporary

12   memory.  This transmission, like a television or radio

13   broadcast, is a performance because there is a playing of

14   the song that is perceived simultaneously with the

15   transmission.  See, e.g., Twentieth Century Music Corp. v.

16   Aiken, 422 U.S. 151, 158 (1975).  In contrast, downloads do

17   not immediately produce sound; only after a file has been

18   downloaded on a user's hard drive can he perceive a

19   performance by playing the downloaded song.[9]  Unlike musical

20   works played during radio broadcasts and stream

21   transmissions, downloaded musical works are transmitted at

---

[9]  Our opinion does not foreclose the possibility,
under certain circumstances not presented in this case, that
a transmission could constitute both a stream and a
download, each of which implicates a different right of the
copyright holder.

18

1   one point in time and performed at another.  Transmittal

2   without a performance does not constitute a "public

3   performance."  Cf. Columbia Pictures Indus., Inc., v. Prof'l

4   Real Estate Investors, Inc., 866 F.2d 278, 282 (9th Cir.

5   1989) (holding that renting videodiscs to a hotel guest for

6   playback in the guest's room does not constitute the

7   "transmission" of a public performance).

8       ASCAP misreads our opinion in NFL v. PrimeTime 24 Joint

9   Venture, 211 F.3d 10, 11-13 (2d Cir. 2000), to hold that the

10  Copyright Act does not, in fact, require a contemporaneously

11  perceptible performance to infringe on the public

12  performance right.  In NFL, defendant PrimeTime, a satellite

13  television provider, captured protected content in the

14  United States from the NFL, transmitted it from the United

15  States to a satellite ("the uplink"), and then transmitted

16  it from the satellite to subscribers in both the United

17  States and Canada ("the downlink").  PrimeTime had a license

18  to transmit NFL games to its subscribers in the United

19  States but not to Canada.  The NFL sought to enjoin the

20  transmissions sent to Canada by arguing that the uplink in

21  the United States constituted unauthorized public

22  performances of the games in the United States.  The

23  relevant issue was whether the uplink transmission was a

24  public performance even though the uplink was only to a

19

1   satellite and could not, itself, be perceived by viewers.

2   Id. at 12.  We determined that PrimeTime's uplink

3   transmission of signals captured in the United States

4   amounted to a public performance because it was an integral

5   part of the larger process by which the NFL's protected work

6   was delivered to a public audience.  Id. at 13.

7       ASCAP seizes on the fact that the uplink to the

8   satellite was not contemporaneously perceptible to argue

9   against a contemporaneous perceptibility requirement in this

10  case.  ASCAP's argument, however, fails to accord

11  controlling significance to the fact that the immediately

12  sequential downlink from the satellite to Canadian PrimeTime

13  subscribers was a public performance of the games.  Id. at

14  11-13; see also David v. Showtime/The Movie Channel, Inc.,

15  697 F. Supp. 752, 758-60 (S.D.N.Y. 1988) (finding that

16  because "Showtime and The Movie Channel both broadcast

17  television programming . . . to cable system operators,"

18  which, in turn, "pass[ed] the signal along to their

19  individual customers," the initial transmissions constituted

20  public performances because they were a "step in the process

21  by which a protected work wends its way to its audience");

22  Melville B. Nimmer & David Nimmer, 2 Nimmer on Copyright §

23  8.14[C][2] at 190.6 & n.63 (2009) (explaining that when a

24  transmission is made "to cable systems that will in turn

1   transmit directly to the public," the earlier transmission

2   is a public performance despite the absence of any

3   contemporaneous perceptibility).  In holding the

4   transmission in <u>Cartoon Network</u> not to be a public

5   performance, we distinguished <u>NFL</u> on the basis that in that

6   case the final act in the sequence of transmissions was a

7   public performance.  <u>See</u> 536 F.3d at 137.  That same

8   distinction applies here.  Just as in <u>Cartoon Network</u>, the

9   Internet Companies transmit a copy of the work to the user,

10  who then plays his unique copy of the song whenever he wants

11  to hear it; because the performance is made by a unique

12  reproduction of the song that was sold to the user, the

13  ultimate performance of the song is not "to the public."

14  <u>See</u> <u>id.</u> at 137, 138; <u>see also</u> <u>United States v. Am. Soc'y of</u>

15  <u>Composers, Authors & Publishers (Application of Cellco</u>

16  <u>P'ship)</u>, 663 F. Supp. 2d 363, 371-74 (S.D.N.Y. 2009).

17      Accordingly, we affirm the district court's grant of

18  partial summary judgment on the basis that downloads do not

19  constitute public performances of the downloaded musical

20  works.[10]

---

[10]  Several <u>amici</u> suggest that our obligations under
the 1997 World Intellectual Property Organization Copyright
Treaty ("WIPO Copyright Treaty") require us to find that
downloads of musical works constitute public performances.
The WIPO Copyright Treaty provides authors with the
following right:

1      **II.  Fee Determination for Using the ASCAP Repertory**

2          We now turn to the district court's determination of

3      the appropriate fees payable by the Internet Companies for

4      blanket licenses to publicly perform any of the millions of

5      musical compositions in the ASCAP repertory.  The district

6      court determined these blanket license fees by applying a

7      uniform royalty rate of 2.5% to the Internet Companies'

8      music-use revenue, which was calculated by multiplying the

9      total revenue from licensed services by a MUAF (music-use-

10     adjustment factor), a fraction that reflected the amount of

11     time users spent streaming performances of musical works

---

> [T]he exclusive right of authorizing any
> communication to the public of their works, by
> wire or wireless means, including the making
> available to the public of their works in such a
> way that members of the public may access these
> works from a place and at a time individually
> chosen by them.

WIPO Copyright Treaty art. 8.

     Congress has recognized that this treaty does not
"require any change in the substance of copyright rights,"
see H.R. Rep. No. 105-551(I), at 9 (1998), in part because
the Copyright Act already permits copyright holders to
control the reproduction and distribution of their musical
works over the Internet.  To the extent that a download
implicates these rights, the conclusion that a download does
not also trigger the public performance right does not
infringe on Article 8 of the WIPO Copyright Treaty.  The
other policy arguments raised by ASCAP and amici – regarding
global harmony of doctrine, and adequate compensation – are
better addressed to Congress, which has the power to amend
the Copyright Act.  See Eldred v. Ashcroft, 537 U.S. 186,
205-07 (2003).

1   relative to their overall time on the website.  We conclude

2   that the district court's analysis was flawed in two major

3   respects.

4           First, the district court did not adequately support

5   the reasonableness of its method for measuring the value of

6   the Internet Companies' music use.  Second, the district

7   court did not adequately support the reasonableness of the

8   2.5% royalty rate applied to the value of the Internet

9   Companies' music use.  Accordingly, we remand to the

10  district court so that it may redetermine reasonable fees

11  for the licenses in light of the following discussion.

12      **A.   Standards of Review**

13          "In order to find that the rate set by the District

14  Court is reasonable, we must find both that the rate is

15  substantively reasonable (that it is not based on any

16  clearly erroneous findings of fact) and that it is

17  procedurally reasonable (that the setting of the rate,

18  including the choice and adjustment of a benchmark, is not

19  based on legal errors)."  United States v. Broad. Music Inc.

20  (Application of Music Choice) ("Music Choice IV"), 426 F.3d

21  91, 96 (2d Cir. 2005).  Fundamental to the concept of

22  "reasonableness" is a determination of what an applicant

23  would pay in a competitive market, taking into account the

23

fact that ASCAP, as a monopolist, "exercise[s] disproportionate power over the market for music rights." Id.

"A rate court's determination of the fair market value of the music is often facilitated by the use of benchmarks – agreements reached after arms' length negotiation between other similar parties in the industry." Id. at 94. Determinations by the district court that particular benchmarks are comparable and particular factors are relevant are questions of law reviewed de novo. Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc. ("Showtime"), 912 F.2d 563, 569-71 (2d Cir. 1990). However, factual findings as to each factor under consideration or those underlying a proposed benchmark agreement, as well as findings with respect to fair market value, are reviewed for clear error. Music Choice IV, 426 F.3d at 96; Showtime, 912 F.3d at 569; United States v. Am. Soc'y of Composers, Authors & Publishers (Application of Capital Cities/ABC, Inc., CBS Inc., & Nat'l Broad. Co.), 157 F.R.D. 173, 195-96 (S.D.N.Y. 1994).

**B.   The District Court's Determination of the Music-Use-Adjustment Factor**

Fundamental to the reasonableness of a fee for music use under a license is the reasonableness of the

24

1    determination of the revenue attributable to the actual uses

2    by the applicant of the music to which the rate percentage

3    is to be applied.  See United States v. Am. Soc'y of

4    Composers, Authors and Publishers (Applications of Capital

5    Cities/ABC, Inc. & CBS, Inc.) ("Capital Cities"), 831 F.

6    Supp. 137, 156-57 (S.D.N.Y. 1993); United States v. Am.

7    Soc'y of Composers, Authors and Publishers (Application of

8    Nat'l Cable Television Ass'n.), No. 41-CV-1395 (WCC) (MHD),

9    1999 WL 335376, at *12 (S.D.N.Y. May 26, 1999).  In this

10   case, the value of the applicants' uses could not be

11   premised on total revenue without an adjustment for the fact

12   that some revenues were not at all attributable to any use

13   of ASCAP music.  The district court decided to make this

14   adjustment by using a MUAF that discounted the total revenue

15   to reflect only those revenues attributable to music use.

16   We have no quarrel with the use of a MUAF here, but we find

17   error in the district court's method of determining its

18   components.

19       The district court began by calculating the total

20   revenue of the licensed sites and services – defined as

21   those business units that publicly perform music – less

22   certain customary deductions, to arrive at the revenue base

23   to which the MUAF was applied.  The Internet Companies argue

24   that total revenue, when used as the revenue base, bears no

1    relation to the value they derive performing musical works

2    on the Internet.  This argument is unavailing because it

3    overlooks the function of the MUAF, which can be understood

4    as accounting for the value of the Internet Companies' music

5    use in relation to their overall revenue.  We find nothing

6    wrong in concept with using a formula that reduces the total

7    revenue of the licensed sites and services by a factor that,

8    with substantial accuracy, accounts for music-use revenue,

1          as the MUAF can be understood to do here.[11]  With respect to

_____

[11]  If designed and calibrated properly, a single
formula incorporating a MUAF should produce a fee reasonably
equivalent to the fee produced by a set of formulae that
applies a different reasonable rate to the revenue derived
from each of Yahoo!'s different music uses, as is attempted
in Yahoo!'s agreement with BMI, _infra_.  (Thus, the single
formula will be sensitive to the different intensities of
Yahoo!'s various music uses.)  The MUAF (if suitably
constructed) calculates and accounts for the contribution
that music makes to the overall service that Yahoo! sells to
its customers, and makes the rate formula sensitive to
relative changes in that contribution over time.

At the same time, the MUAF, because it is a third
factor in a rate-formula structure that usually includes
only two factors (revenue base and rate), complicates any
benchmark analysis.  The MUAF must be grouped with another
of the factors to render the three-factor formula comparable
to the two-factor benchmark formulae:

　　　[Grouping 1]　　　　　　(revenue base  **X**  MUAF)　　**X**  2.5%

　　　[Grouping 2]　　　　　revenue base  **X**  (MUAF　　**X**  2.5%)

In line with our discussion above, the district court at
times grouped the MUAF with the revenue base factor;
however, at other times, the district court grouped the MUAF
with the 2.5% factor.  There is no dollar difference in
result, and which grouping is appropriate depends on what is
being compared.

For instance, if one is benchmarking a formula that
multiplies licensed-services revenue by a rate (as most two-
factor formulae do), one might not group the MUAF with the
revenue base factor (Grouping 1 above).  The benchmark rate
cannot be compared to the 2.5% factor alone if the factors
_not_ being compared are not equivalent:

[Benchmark]　　　　　licensed-services revenue　　　**X**  rate

[Yahoo!]　　　　(licensed-services revenue  **X**  MUAF)  **X**  2.5%

In such an instance, the problem disappears if the MUAF is
grouped with the 2.5% factor (Grouping 2 above):

27

1    the components of the MUAF, however, we find error.

2            1.   Yahoo!

3        The district court's MUAF accounts for the value of

4    Yahoo!'s music use by using the amount of time that music is

5    streamed.  Streaming time, however, neither drives nor

6    correlates with Yahoo!'s advertising revenue.  The record

7    evidence makes plain that Yahoo!'s advertising revenue model

8    more accurately correlates with the number of times a

9    particular page is accessed by users than to the duration of

10   streaming time.  To the extent that the district court's

11   MUAF relied on an imprecise metric for determining

12   advertising revenue attributable to music use when a

13   superior metric was apparently available and practicable,[12]

-------------------------------------------------

[Yahoo!]   licensed-services revenue   **X**   (MUAF **X** 2.5%)

With this grouping, MUAF **X** 2.5% is the rate to which the
benchmark rate is compared.

     As mentioned, the alternative groupings are
mathematically equal.  The reasonableness of the Yahoo!
formula can be established by comparing benchmarks to either
grouping.

     [12]  One reason a district court may use a less precise
metric is because it is impracticable to use a more precise
one, for example if relevant statistics are unobtainable or
unreliable.  See Capital Cities, 831 F. Supp. at 156-57
(using the amount of music use in television programming as
an "adequate proxy" for the value of the music to the
network, "in the absence of any other yardstick").  However,
the district court did not make a sufficient showing that
this was the case.

28

the district court's method for calculating the MUAF was

unreasonable.[13]  E.g., Capital Cities, 831 F. Supp. at 156-

57 (accepting amount of music used in television program as

an adequate measure of the value of the music to the program

because it was the only measure available).

    Display advertising on the Internet is sold on a

cost-per-thousand model that counts the total number of page

impressions, i.e., how many times a particular page is

accessed.  Pages that are accessed a greater number of times

occasion higher advertising rates because the advertisements

on these pages are viewed with greater frequency.  It is,

thus, unreasonable to use streaming time, which has no

necessary correlation with page views, as a proxy for the

number of times a page is viewed; time spent on-line is not

reflective of how a user interacts with a particular page.

    A user may have a page open that he is not viewing at

all, either because he has multiple pages open and is

---

[13] The district court, recognizing the imprecision of its
metric, offered, inter alia, the following rationale for using
it:  "Although the streaming time is increased by visitors who
stream music as a 'background' while they are engaged in other
activities on the website, such as searches or e-mailing, that
effect is largely if not wholly offset by the myriad incidental
performances of music in movies, advertisements, user-uploads and
elsewhere, which are not counted as music streaming time (against
Yahoo!)."  RealNetworks & Yahoo! II, 559 F. Supp. 2d at 413.  We
find this sort of rough estimation, with no basis in the record,
unreasonable because there appears to be a much more precise
metric available to the district court.

1   interacting with another page, website, or computer program,

2   or because he has walked away from the computer altogether

3   but has left that page open.  For example, user A, who is

4   listening to a four-minute song, may view only the page on

5   which the song is playing in that four minutes because his

6   exclusive focus is on the song, while user B, who is

7   listening to the same song on as background music, may be

8   simultaneously clicking on links and reading articles

9   throughout Yahoo!'s website, and thus may be seeing multiple

10  advertisements on multiple pages during that same four-

11  minute period.  The streaming time for users A and B is the

12  same, but the advertising exposure of each differs widely.

13       The advertising marketplace takes account of the

14  foregoing consideration by applying different advertising

15  rates to different areas of the website.  For example,

16  advertising for radio-style webcasts in Yahoo! Music is

17  priced at a rate lower than similarly placed ads on Yahoo!'s

18  homepage, because users normally have the Yahoo! Music

19  window minimized (and thus not viewable) for much of the

20  time the radio-style music is playing, in contrast to other

21  areas on Yahoo!, like the homepage, that command greater

22  viewer attention.[14]  The district court erred by

---

[14]   We are not suggesting that the amount of time music is
played has no correlation to the revenue attributable to music on
Yahoo!'s licensed sites and services.  Streaming time likely

1    constructing a MUAF that failed to take into account these

2    various realities of Internet advertising.[15]

3        In sum, the district court erred by adopting an

4    imprecise metric - music streaming time rather than page

5    views - as the basis of its MUAF, without providing a

6    sufficient rationale for that decision.  We will not specify

7    a particular method of developing a formula for determining

8    music-use revenue on remand; we also leave it to the

9    district court to determine whether it should proceed with a

10   variant of its current formula (revenue multiplied by a

---

bears some relation to the importance of music on Yahoo!.
Furthermore, we recognize that music can enhance a user's
experience on Yahoo! even when he navigates away from the
streaming page to another Yahoo! webpage.  For example, music may
be driving advertising revenue on the non-music page to the
extent that the music is making Yahoo! experience, as a whole,
more appealing.  The district court may take this into account in
the formula it adopts on remand.  We find the district court's
reasoning unreasonable not because streaming time bears no
relation to the value of music to the revenue of the licenses
sites and services, but because there is a more accurate metric
available - page impressions - that the district court chose not
to use without providing a sufficient reason.

[15]  We recognize that revenue is generated from music use by
other methods as well, such as through site sponsorship or
sponsored search results.  However, the district court gave no
rationale supporting the conclusion that streaming time is a
better measure of the value created by these forms of advertising
than it is for display advertising, nor did it indicate that
these alternative forms of advertising were a significant part of
its analysis.  On remand, the district court may wish to address
how its metric for calculating music-use revenue will interact
with these alternative forms of advertising and whether they are
significant in terms of its ultimate fee determination.

1    MUAF) or in some other way altogether, in light of the

2    foregoing discussion.

3         Yahoo! has also faulted the district court for using

4    statistics with differing methodologies in the MUAF's

5    numerator and denominator.  In calculating the numerator,

6    the district court used Yahoo!'s statistics for the number

7    of hours of music streamed, which give no effect to the

8    specific window engaged by the user.  In calculating the

9    denominator, the district court used statistics based on a

10   different methodology provided by comScore Media Metrix for

11   the total hours of use of the licensed sites and services.[16]

12   Unlike Yahoo!, comScore measures hours used only for the

13   specific window that is engaged.  The difference is that, in

14   an instance in which a user has multiple windows open at one

15   time, comScore will count the time for only the single

16   window that is in active use, while Yahoo! will count the

17   time for all the windows open.  Yahoo!'s statistics thus

18   reflect considerably greater use time than comScore's

19   because, anytime a user has multiple windows open, Yahoo! is

20   counting the time use for each of the Yahoo! windows open

21   while comScore is counting the time use for only the single

22   window engaged by the user.  Without addressing whether one

---

[16] ComScore is an Internet audience measurement firm that
measures traffic to, and time spent on, Internet sites and
services.

method is preferable to the other, we conclude that
constructing a MUAF by using Yahoo!'s statistics for the
numerator and comScore's statistics for the denominator is
unreasonable because these statistics are not comparable,
with the result that their comparison overstates music-
streaming time.

The district court's opinion states that, as of the
date of its issuance, Yahoo! had failed to supply any site-
hours data comparable to that supplied by comScore that
could have been used for the denominator, but that Yahoo!
was free to do so before the district court ordered its
Final Fee Determination.  The parties disagree over whether
Yahoo! ultimately furnished adequate total site-hours data.
Because we remand for reconsideration of the MUAF, we refer
this dispute to the district court.  We do, however, note
that in calculating any MUAF, the district court must strive
to use measurements that are as consistent and as precise as
practicable.

2.   **RealNetworks**

Turning to RealNetworks, as noted previously the
district court in 2009 determined and applied differing
MUAFs to RealNetworks' various licensed sites and services
despite its decision not to apply MUAFs in 2008, without any

1    explanation for the basis of these MUAFs.  Accordingly, we

2    remand for explanation (or reconsideration if the current

3    MUAFs cannot be justified) because the district court's

4    rationale was insufficient.

5        The district court applied the following MUAFs to

6    RealNetworks.  For its Rhapsody subscription service,[17] the

7    district court defined the MUAF's numerator as total number

8    of plays of audio-music and music-video streams, and the

9    denominator as the total number of Rhapsody streams plus the

10   number of deliveries of conditionally downloaded music files

11   to subscribers.  (RealNetworks Judgment Order 2-3)  For its

12   SuperPass subscription service,[18] the numerator was fixed as

---

[17]   The district court found that Rhapsody is an unlimited
on-demand music subscription service that offers subscribers
access to over four million songs.  In addition to streaming
music and selling permanent downloads of music, Rhapsody
subscribers can also conditionally download music.  A conditional
download is a download that may be accessed by the user for a
limited duration or number of uses.

    For a monthly fee, a Rhapsody subscriber can play as much or
as little music as he wants.  Regardless of the actual amount of
music played, however, the Rhapsody subscriber must still pay the
full subscription fee.  If the subscriber continues to pay the
subscription fee, then neither the amount nor the type of music
actually played by the subscriber affects the amount of revenue
received by RealNetworks.

[18]   The district court found that SuperPass is a
subscription service that offers, for a monthly fee, access to
news, sports, movies, games, music, and other entertainment
content; short films, video clips, and music; music downloads (at
$0.99 per song) and streaming previews of music; access to the
majority of RadioPass services; and CD burning and other features
for the RealPlayer.  As with Rhapsody, SuperPass subscribers pay

34

the total number of hours of streams to users in each month
by means of the music-radio portion of SuperPass, and the
denominator as the total number of SuperPass music hours
plus the total number of hours of all other streams to users
by means of SuperPass.  (RealNetworks Judgment Order 3)   And
for RealNetworks' Music, and Media Software and Services
groups, the district court used as the numerator the total
number of hours of streams that non-subscription, on-demand,
and radio-music users receive from RealNetworks' licensed
sites, and as the denominator the total number of hours
users spend on RealNetworks' licensed sites.  (RealNetworks
Judgment Order 4)

Because the district court failed to explain the basis
for these MUAFs, and in light of the issues we raised with
respect to the MUAF applied to Yahoo!, we remand for the
district court to explain or reconsider the MUAFs applied to
RealNetworks.  In addition to consideration of any issues
that it deems appropriate, the district court should address
the following: (1) whether its method for calculating the
MUAF for the Rhapsody subscription service is more precise
or practicable than the method used in the benchmark

---

the full monthly fee regardless of the amount of content they
access, and the amount of subscription revenue that RealNetworks
receives does not depend on the subscriber's behavior or actual
usage of the subscription's offerings.

1    agreements in the record; (2) whether there is a more

2    precise way, that is also practicable, to account for the

3    value of the music use for the SuperPass subscription

4    service in light of the fact that some components of the

5    subscription do not involve the streaming of content to

6    users; and (3) whether there is a more precise and still

7    practicable way to measure RealNetworks' advertising

8    revenue, in light of the issues we raised in our discussion

9    of Yahoo!'s MUAF.

10            C.    The Royalty Rate Applied by the District Court

11                  1.    Yahoo!

12        The district court arrived at Yahoo!'s royalty rate by

13    relying on benchmark agreements for blanket licenses that

14    ASCAP entered into with Music Choice, terrestrial radio

15    stations, the broadcast television networks, and cable

16    television providers, as well as the rates that Yahoo!

17    itself pays to the major record companies for music-video

18    rights.  The district court's factual findings that support

19    selecting these benchmarks were not clearly erroneous.

20    After reviewing the district court's analysis of these

21    benchmarks in relation to this case, however, we hold that

22    the district court unreasonably arrived at its decision to

23    apply a uniform 2.5% royalty rate and that, in setting the

36

1    royalty rate, the district court must follow an approach

2    more tailored to the varying nature and scope of Yahoo!'s

3    music use.

4         Beginning with the Music Choice benchmark, the district

5    court found that Music Choice provides channels of music to

6    listeners on a subscription basis via cable and satellite

7    television and the Internet.  Music Choice's channels are

8    organized around genres of music, and, on the Internet,

9    listeners have the option to create up to ten personalized

10   audio channels.  ASCAP's current blanket license with Music

11   Choice, for the period January 1, 2006 through December 31,

12   2010, calls for payment of a royalty rate that is 2.5% of

13   Music Choice's gross revenues, where gross revenue is

14   defined as all revenues derived from the licensed services.

15        We conclude that the royalty rate agreed to by Music

16   Choice provides strong support for applying a 2.5% royalty

17   rate to those Yahoo! sites and services that provide access

18   to music channels organized around music genre, similar to

19   those on Music Choice.  Additionally, it provides a basis

20   for a 2.5% royalty rate, or higher, for Yahoo! sites and

21   services that permit an interactive music experience, in

22   which the user may control the selection of music he is

23   hearing, for example if a user tunes into a more customized

37

1    station or uses Yahoo! Search to listen to songs on-demand.

2    See RealNetworks and Yahoo! II, 559 F. Supp. 2d at 413.

3        However, the Music Choice benchmark does not justify

4    applying a 2.5% royalty rate to all of Yahoo!'s music uses,

5    because Yahoo! offers numerous sites and services that are

6    less music intensive than Music Choice's offerings.   The

7    district court finessed the Music Choice benchmark's limited

8    relevance by concluding that there are other benchmarks in

9    the record that support applying a 2.5% royalty rate to all

10   of Yahoo!'s performances of the ASCAP repertory.   Because we

11   conclude that these other benchmarks do not adequately

12   support an across-the-board 2.5% royalty rate, we remand for

13   reconsideration of a reasonable royalty rate.

14       Turning to the major broadcast television networks'

15   agreements with ASCAP, the district court found that these

16   agreements differed from Yahoo!'s because the major networks

17   pay a flat rate for their ASCAP usage without regard to

18   revenue (as specified in Yahoo!'s application) and that "[a

19   similar] flat-fee structure is unsuitable for the online

20   music industry," RealNetworks and Yahoo! II, 559 F. Supp. 2d

21   at 401.   The district court nevertheless concluded that, by

22   comparing the percentages of broadcast revenue that the

23   television companies pay ASCAP under their flat royalty rate

1    to the percentage of licensed services revenue that Yahoo!

2    would pay if a 2.5% royalty rate (as well as a MUAF) were

3    applied to its license, the networks' agreements could be

4    "useful to gauge the reasonableness of the fee range ASCAP

5    seeks from . . . Yahoo!, and [Yahoo!'s] ability to pay the

6    blanket fees rather than resorting to less efficient

7    licensing options or foregoing the use of ASCAP music

8    altogether."   Id.

9         The district court found that "[t]he three television

10   networks, ABC, CBS, and NBC, have annual revenues in the

11   range of $3 to $4 billion[,] comparable to current . . .

12   Yahoo! revenues" and that the networks pay a percentage of

13   broadcast revenue for their ASCAP license that is comparable

14   to the amount Yahoo! would have paid if a 2.5% royalty rate

15   (as well as a MUAF) was applied to the total domestic

16   revenue from the licensed services for the same period.

17   From this finding, the district concluded that, to the

18   extent that music is not much less important to Yahoo! than

19   it is to the television networks, a 2.5% royalty rate is

20   reasonable.

21        The district court similarly looked to percentage of

22   total revenue when assessing ASCAP's agreements with the

23   general-entertainment and music-intensive cable television

1    networks.   The district court found that the general-

2    entertainment cable television networks pay 0.375% of total

3    revenue derived from licensed services and that the music-

4    intensive cable television networks pay 0.9% of licensed-

5    services revenue derived from licensed services.   As it did

6    with the major broadcast television networks, the district

7    court compared the percentage of total revenue that Yahoo!

8    would pay under the court's formula to the 0.375% and 0.9%

9    paid by the cable television networks to conclude that a

10   flat 2.5% royalty rate, when multiplied by a MUAF, is

11   reasonable for Yahoo!'s license.

12        We are unconvinced that percentage of revenue

13   comparisons between broadcast and cable television networks,

14   and Yahoo! are useful in determining a reasonable fee for

15   Yahoo!'s public performances of the ASCAP repertory.   Nearly

16   every program on a television station somehow utilizes

17   musical works.   In contrast, only a fraction of the traffic

18   on Yahoo!'s website uses music; much of Yahoo!'s website

19   does not implicate any music use whatsoever.   Given that

20   Yahoo!'s revenue base relies far less on ASCAP content than

21   the television networks' revenue base, we believe that

comparing percentages of overall revenue bases is of little

probative value in this benchmark analysis.[19]

These comparisons, moreover, indicate a deeper flaw in
the district court's analysis: its inclination to lump all
of Yahoo!'s varying musical uses together, instead of
looking to the nature and scope of Yahoo!'s different types
of uses and applying a rate that reflects (or rates that
reflect) the varying nature of Yahoo!'s music use.  See
United States v. Am. Soc'y of Composers, Authors &
Publishers (Application of Nat'l Cable Television Ass'n.),
No. 41-CV-1395 (WCC) (MHD), 1999 WL 335376, at *12 (S.D.N.Y.
May 26, 1999).  The district court's finding that cable
television networks pay 0.375% of their revenue for their
ASCAP licences is a good example.  The most direct
conclusion to be drawn from this benchmark is that providers
of cable-style television will pay 0.375% of their revenue,
in a competitive market, to license ASCAP music.[20]  However,
the district court looked past this conclusion in setting
the royalty rate and instead used this benchmark to justify

---

[19]  The district court's analysis of the terrestrial radio
stations's licencing agreements with ASCAP suffers from the same
flaw.

[20]  This conclusion is supported by the fact that the major
broadcast television networks, which perform a blend of cable-
television style programming, as well as less music-intensive
programming such as news and sports, pay between 0.24%-0.34% for
their ASCAP licenses.

1    applying a 2.5% rate to all of Yahoo!'s music use based on

2    an imprecise comparison of the percentages of overall

3    revenue.  We think a better approach would be to attempt, if

4    practicable, to set a royalty rate that requires Yahoo! to

5    pay a rate for its cable-style programming that is similar

6    to that in the cable market.[21]

7         Our view that a reasonable royalty rate should reflect

8    the varying values of Yahoo!'s differing music uses is

9    supported by Yahoo!'s license with BMI.[22]  As previously

10   noted, BMI is ASCAP's principal competitor in licensing the

11   performance rights for musical works.  The two rights

12   organizations control approximately 90% of all on-line music

13   performances, with roughly equal shares of the market.

14   Because these two companies operate in the market in such

15   similar manners, BMI's agreements are instructive.  See

---

[21] The district court's analysis of Yahoo!'s agreement with
the major record companies is erroneous for the same reason.  The
court did not use this benchmark to assess how much Yahoo! should
pay for its right to perform ASCAP musical works in music videos.
It instead used this benchmark to make a far more general
conclusion concerning how much Yahoo! should pay for all of its
various music uses.

[22] The district court concluded that the royalty rates used
in the BMI-Yahoo! license are not probative of what the market
would yield for Yahoo!'s license in this case because, it
concluded, the BMI-Yahoo! license is a "per-segment" license that
confers a different set of rights than the "blanket" license
Yahoo! seeks from ASCAP.  Yahoo! contests this finding.  In light
of our remand, it is not necessary to rule on this issue.  We
leave it open to the district court, however, to revisit this
finding on remand.

1    e.g., <u>United States v. Am. Soc'y of Composers, Authors &</u>

2    <u>Publishers (Application of MobiTV, Inc.)</u>, Nos. 09-Civ-7071

3    (DLC), 41-Civ-1395 (DLC), 2010 WL 1875706, at *38 (S.D.N.Y.

4    May 11, 2010).

5         In its negotiated agreement with BMI, Yahoo! agrees to

6    pay the following license fees: (a) 1.75% of "Direct

7    Revenue" from "Preprogrammed Radio"; (b) 2.5% of "Direct

8    Revenue" from "On-Demand Streams"; (c) 2.15% of "Direct

9    Revenue" from "User-Influenced Programming"; (d) 1.0% of

10   "Direct Revenue" from "Audio-Visual Programming"; and (e)

11   0.6875% of "Yahoo! Music Advertising Revenue and Yahoo!

12   Music Run of Site Allocation."  This agreement, providing

13   for a so-called "bucket" for each different use, supports

14   the conclusion that the other benchmarks also suggest: the

15   market assigns different values to Yahoo!'s different music

16   uses and is capable of yielding a royalty rate that reflects

17   the varying intensity of Yahoo!'s music uses.[23]

---

[23]  ASCAP's licensing agreement with Turner Broadcasting
further supports the conclusion that the market is capable of
yielding a royalty rate that reflects the varying intensity of
Yahoo!'s music uses.  Turner owns numerous types of television
stations that use music differently from one another – including,
by way of example, general entertainment cable television
stations such as TNT and TBS, and a cable news station, CNN – all
of which are covered under a single license with ASCAP.  Similar
to Yahoo!'s agreement with BMI, Turner's license with ASCAP
includes different rates on a per-network basis, thereby
reflecting the economic reality that Turner's different channels
use ASCAP's repertory in manners that the market values
differently.

1        The district court found that effectuating the BMI

2    structure is quite complex, because Yahoo! is required to

3    subdivide its sites and services into 17 separate revenue

4    categories that are apportioned into "5 buckets" and that,

5    to report the revenue under these categories, Yahoo! is

6    required to make dozens of calculations and collect numerous

7    data points.  "Because most of these data [points] are not

8    ordinarily collected for other business purposes," the

9    district court concluded that "their accuracy [i]s suspect

10    and auditing [Yahoo!'s] reports [i]s difficult and

11    expensive."  The district court found that the BMI method is

12    additionally complicated by how the parties decide what

13    revenue is "directly attributable" to the streaming of

14    music.  RealNetworks and Yahoo! II, 559 F. Supp. 2d at 411.

15    We neither endorse nor challenge these conclusions, and we

16    leave it to the district court on remand to decide whether a

17    bucket system is feasible with alterations, or whether

18    another system is preferable in light of our guidance today.

19        We further acknowledge the requirement that fee

20    structures and the proceedings used to arrive at them

21    comport with the provisions of the Second Amended Final

22    Judgment, see, e.g., United States v. BMI (Application of

23    Muzak LLC), 275 F.3d 168, 176-77 (2d Cir. 2001) (assessing

24    whether a rate structure that included "carve outs" for

1    songs licensed by the Applicant directly from the copyright

2    holder was within the rate-setting court's blanket-license

3    authority), and the district court's concern that the

4    setting of different rates for the Internet Companies'

5    various services would be in some tension with prior case

6    law regarding blanket licenses, see RealNetworks & Yahoo!

7    II, 559 F. Supp. 2d at 406-08.  We note, however, that the

8    district court's own proposed MUAF would have involved

9    "reporting or . . . keeping track of . . . music use,"

10   notwithstanding the court's observation that such tracking

11   is generally not a feature of blanket licenses, see id. at

12   407, and that a recent rate-setting opinion has made use of

13   multiple rates as part of a blanket license, see MobiTV,

14   2010 WL 1875706, at *22, *37-38, *43.  Moreover, our own

15   precedent indicates that non-traditional fee structures can

16   be compatible with blanket licenses.  Muzak, 275 F.3d at

17   177.  It is for the district court to consider, in the first

18   instance, what options are available to it in setting a

19   reasonable rate or rates in this case.

20        For the foregoing reasons, we remand to the district

21   court to redetermine the royalty rate (or rates) that Yahoo!

22   must pay ASCAP for its license, in light of our holding that

23   the district court's valuation of Yahoo!'s use of the ASCAP

24   repertory must reflect, as well as practicable, the varying

1    nature and scope of Yahoo!'s music use.  We do not, however,

2    suggest that the specific royalty rates set forth in the

3    BMI-Yahoo! agreement must be accepted by the district court

4    on remand, nor do we suggest that a bucket system is the

5    only method by which a reasonable fee could be calculated.

6    Instead, we believe that there are other ways to proceed,

7    including possibly using a "blended" uniform rate[24] (e.g.,

8    taking a snapshot of Yahoo!'s current music use, valuing the

9    different uses independently, averaging them into a blended,

10   uniform royalty rate, and then revisiting that rate

11   periodically), or perhaps using a modification of the BMI

12   bucket system to avoid some of the reliability problems

13   noted by the district court, or employing some third method

14   not yet discussed.  We leave it to the district court to

15   determine the best way to proceed consistent with the

16   concerns we have discussed.

17         **2.   RealNetworks**

18         The district court applied the Music Choice and radio

19   station benchmarks to RealNetworks.  The court found that

20   Music Choice's 2.5% royalty rate supported applying a 2.5%

---

[24] We also do not mandate that, if the district court were
to use a blended uniform rate, the rate would have to be lower
than 2.5%.  We only hold that the district court's application of
the benchmark agreements in its opinion does not support an
across the board 2.5% rate.

46

1  royalty rate to RealNetworks because, <u>inter alia</u>, many of

2  RealNetworks' music uses are equally or more music intensive

3  than Music Choice's uses, specifically referring to

4  RealNetworks' on-demand, music-video, and music-stream uses.

5  The district court also found that the radio station

6  benchmarks supported a 2.5% royalty rate for RealNetworks.

7       We do not take specific issue with the district court's

8  analysis as it may pertain to uses by RealNetworks that are

9  analogous to those of Music Choice and the radio stations.

10  However, RealNetworks objects to the district court's

11  analysis on the basis that RealNetworks' services include

12  music uses that are less music-oriented than those of Music

13  Choice or the radio stations, such as uses in video games,

14  television shows, and ring tones.  We find this objection

15  persuasive to the extent that it tracks the flaws we have

16  identified in the district court's analysis underlying

17  Yahoo!'s royalty rate, and we remand so that the district

18  court may conduct a more complete analysis of the various

19  uses of ASCAP musical works by RealNetworks and may

20  determine, in light thereof, the appropriate method for

21  determining RealNetworks' royalty rate (or rates).

22       **D.   Download Revenues**

47

1    With respect to the district court's fee calculation,

2    ASCAP cross-appeals one issue: whether download revenue

3    should be included in the revenue base, even though

4    downloads are not public performances, because public

5    performances of music are used to generate the downloads of

6    music.  Although the district court recognized some

7    relationship between the ability to stream music and

8    download revenue, it made no formal factual findings about

9    the extent and implications of that relationship.  In an

10   analogous context, the district court found that the ability

11   to preview ringtones (via streaming) "undeniably

12   increase[d]" the sale of ringtones (via download).  <u>In re</u>

13   <u>United States v. Am. Soc'y of Composers, Authors &</u>

14   <u>Publishers (Application of AT&T Wireless f/k/a Cingular</u>

15   <u>Wireless)</u>, 607 F. Supp. 2d 562, 565 (S.D.N.Y. 2009).  We

16   leave it to the district court on remand to determine the

17   extent of any such relationship in this case.

18   Finally, ASCAP cross-appeals the district court's

19   admission of the Internet Companies' alleged late evidence.

20   This issue is moot in light of our remand to the district

21   court for further proceedings, at which additional evidence

22   may be considered.

23                    **CONCLUSION**

48

1    For the foregoing reasons, we AFFIRM the district

2    court's ruling that downloads of musical works do not

3    constitute public performances of those works, and we VACATE

4    the district court's assessment of reasonable fees for the

5    blanket ASCAP licenses sought by the Internet Companies and

6    REMAND for further proceedings in light of this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit