USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1 20 2011

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Application of CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | Civil Action No. 09-cv-7074 (DLC) |
| Related to | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 41-cv-1395 (DLC) |
| v. | |
| AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, | |
| Defendant. | |

## STIPULATION AND ORDER OF DISMISSAL

WHEREAS, the parties have reached a complete settlement of the issues raised in the above-captioned proceeding:

IT IS HEREBY ORDERED THAT:

1.      The January 23, 2009 Application brought by Cellco Partnership d/b/a Verizon Wireless against the American Society of Composers, Authors and Publishers for the determination of reasonable license fees (the "Verizon Wireless Application") is DISMISSED WITH PREJUDICE, except as set forth in Paragraph 2, below.

2.      The Verizon Wireless Application is DISMISSED WITHOUT PREJUDICE to: (i) the Court's retention of jurisdiction to enforce (a) a license agreement concerning V CAST Video, the MTV Tr3s channel on V CAST Mobile TV and any applicable Alltel audio-visual and music-only audio services, for the period commencing

May 1, 2010, and ending December 31, 2012 (the "V CAST License Agreement"), and

(b) a license agreement concerning Ringback Tones and Previews of Ringback Tones,

Previews of Ringtones and Previews of full track music for the period commencing May

1, 2010 through December 31, 2012 (the "Ringback Tones License Agreement") entered

into by the Parties; and (ii) the Court's retention of jurisdiction concerning setting

reasonable license fees for downloads or ringtones in the event that the April 2007 Court

decision concerning whether downloads constitute public performances is overturned or

remanded on appeal of that decision.

3.      The V CAST License Agreement and the Ringback Tones License

Agreement, attached hereto as Exhibits A and B, respectively, are approved as to the

parties hereto.

4.      Each side is to bear its own attorneys' fees and costs.

5.      This Stipulation and Order can be executed via facsimile and in

counterpart copies.

6.      This proceeding shall be marked CLOSED by the Clerk.


Dated: New York, New York
       January 13, 2011

WILEY REIN LLP

By: _____
        Bruce G. Joseph
1776 K Street NW
Washington, DC  20006
202.719.7000
bjoseph@wileyrein.com

*Attorneys for Cellco Partnership d/b/a Verizon Wireless*


Dated: New York, New York
       January 18, 2011

ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.

So ordered.

Denise Cote

Jan 20, 2011

By: _____
        David Leichtman
        Hillel I. Parness
        Bryan J. Vogel
601 Lexington Avenue
New York, New York  10022
212.980.7400
dleichtman@rkmc.com
hiparness@rkmc.com
bjvogel@rkmc.com

-and-

Richard H. Reimer
Christine A. Pepe
ASCAP
One Lincoln Plaza
New York, New York 10023
212.621.6200

*Attorneys for American Society of Composers,
Authors and Publishers*

SO ORDERED.

Dated: New York, New York
      January ___, 2011

_____
The Honorable Judge Denise Cote
United States District Judge

## V CAST SETTLEMENT, MUTUAL RELEASE AND LICENSE AGREEMENT

This agreement ("Agreement") dated as of January 14, 2011, is entered by and between the American Society of Composers, Authors and Publishers ("ASCAP"), with an address of One Lincoln Plaza, New York, New York 10023, and Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless"), with an address of One Verizon Way, Basking Ridge, New Jersey 07920. ASCAP and Verizon Wireless are sometimes referred to in this Agreement collectively as the "Parties," and individually as a "Party." "Alltel" refers to Alltel Corporation, which was acquired by Verizon Wireless on January 9, 2009.

WHEREAS, the Parties desire fully and finally to resolve amicably the January 23, 2009 Rate Court Proceeding initiated by Verizon Wireless, Civil Action No. 09-7074, for a determination of reasonable license fees (hereinafter referred to as "the Verizon Wireless Proceeding"), in accordance with Section IX(A) of the Second Amended Final Judgment entered in *United States v. ASCAP*, Civ. No. 41-1395 (S.D.N.Y. June 11, 2001) ("AFJ2"), and, accordingly, the Parties have agreed upon final License Fees (as defined herein) for the V CAST Licensed Services (as defined herein) and the Alltel Licensed Services (as defined herein) for the License Term (as defined herein); and

WHEREAS, concurrent with the execution of this Agreement, the Parties are also entering into (i) a Settlement, Mutual Release and License Agreement for the period ending on April 30, 2010 (the "Past Settlement Agreement"); and (ii) a license agreement concerning Ringback Tones and Previews of Ringback Tones, Previews of Ringtones and Previews of full track music (all capitalized terms as defined herein) for the period

commencing May 1, 2010 through December 31, 2012 (the "Ringback Tones License Agreement").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Definitions.

a.    The "Alltel Licensed Services" means (i) Alltel TV On Demand (previously known as Axcess TV On Demand), including without limitation any Premium version thereof; and (ii) the content on Alltel TV (previously known as Axcess TV), Alltel TV Connect (previously known as Axcess TV Connect), Alltel TV en Español (previously known as Axcess TV en Español), and Alltel Radio identified from time to time by Verizon Wireless upon written notice to ASCAP.  For avoidance of doubt, content within the definition of Alltel Licensed Services remains subject to Paragraph 3.c.

b.    "Content Providers" are parties that have entered into license agreements with Verizon Wireless or Alltel, as applicable, granting Verizon Wireless or Alltel, as applicable, the rights to transmit those parties' audiovisual and/or audio content in connection with the V CAST Licensed Services or the Alltel Licensed Services (as defined herein). For avoidance of doubt, MobiTV is not a Content Provider.

c.    The "V CAST Licensed Services" means V CAST Video (excluding content downloads) and the MTV Tr3s channel on V CAST Mobile TV (the "Licensed Mobile TV Channel").

     d.  The "License Term" means the period commencing on May 1, 2010 (the "Effective Date") and ending on December 31, 2012.

     e.  "Non-Dramatic Performance" as used in this Agreement means a performance of a musical composition other than a "Dramatic Performance." The term "Dramatic Performance" as used in this Agreement means a performance of a musical composition in which there is a definite plot depicted by action and where the performance of the musical composition is woven into and carries forward the plot and its accompanying action, including, but not limited to, any opera, operetta, musical comedy, play or like production, as such, in whole or in part, or the performance of any composition from any opera, operetta, musical comedy, play or like production in a manner which recreates the performance of such composition with substantially such distinctive scenery or costume as was used in the presentation of such opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form). The use of dialogue to establish a program format or the use of any non-dramatic device merely to introduce a performance of a composition shall not be deemed to make such performance a Dramatic Performance. Notwithstanding the foregoing, the following shall be considered a "Non-Dramatic Performance" and are deemed licensed hereunder by custom and agreement: televised performances of commercially released motion pictures, television programs, and music videos, regardless of whether such motion pictures, television programs, or music videos are or depict musicals, musical comedies, operas, operettas, plays or like productions.

3

f.      "Payments" means money paid, and the fair market value of other consideration given, to the applicable Content Provider, or to another person or entity at the direction of the Content Provider, on account of a V CAST Licensed Service or an Alltel Licensed Service.

g.      "Advertising Revenue" means the gross revenue earned by Verizon Wireless or Alltel, or by a Content Provider, from advertising inserted by Verizon Wireless or Alltel, or by a Content Provider with the express authorization or express agreement of Verizon Wireless or Alltel, as the case may be, into the applicable V CAST Licensed Service or Alltel Licensed Service, respectively, less advertising agency commissions actually incurred, not to exceed 15%. The Parties acknowledge that, to the best of their knowledge, there is no such Advertising Revenue as of the Effective Date.

2.      ASCAP hereby grants to Verizon Wireless and Alltel for the License Term a non-exclusive license to make Non-Dramatic Performances to the public in connection with the V CAST Licensed Services and Alltel Licensed Services of musical compositions which, during the License Term are in the ASCAP repertory or as to which ASCAP has or shall have the right to grant such license.

3.      The license fees due under this Agreement (the "License Fees") shall be calculated as follows:

a.      The License Fees shall be (i) 0.1375% of Payments made by Verizon Wireless or Alltel or another person or entity at the direction of Verizon Wireless or Alltel, to the applicable Content Provider or another person or entity at the direction of the Content Provider for news, talk, sports and weather audiovisual content transmitted as

4

part of the V CAST Licensed Services or the Alltel Licensed Services plus 0.1375% of

Advertising Revenue earned in connection with advertising on such content; (ii) 0.375%

of Payments made by Verizon Wireless or Alltel or another person or entity at the

direction of Verizon Wireless or Alltel to the applicable Content Provider or another

person or entity at the direction of the Content Provider for general entertainment

audiovisual content transmitted as part of the V CAST Licensed Services or the Alltel

Licensed Services plus 0.375% of Advertising Revenue earned in connection with

advertising on such content; (iii) 0.9% of Payments made by Verizon Wireless or Alltel

or another person or entity at the direction of Verizon Wireless or Alltel to the applicable

Content Provider or another person or entity at the direction of the Content Provider for

music intensive audiovisual content transmitted as part of the V CAST Licensed Services

or the Alltel Licensed Services plus 0.9% of Advertising Revenue earned in connection

with advertising on such content; and (vi) 2.5% of Payments made by Verizon Wireless

or Alltel or another person or entity at the direction of Verizon Wireless or Alltel to the

applicable Content Provider or another person or entity at the direction of the Content

Provider for music-only, audio-only programming that is not otherwise licensed and that

is transmitted as part of the V CAST Licensed Services or the Alltel Licensed Services

plus 2.5% of Advertising Revenue earned in connection with advertising on such

programming.

                b.      It is the Parties' intent that the foregoing rates are being applied to

rate bases reflecting the payments to Content Providers in a position comparable to the

programming services licensed under ASCAP's cable programming service license

agreements (or, in the case of music-only audio, services such as Music Choice).  Should

content be acquired by Verizon Wireless or Alltel from a Content Provider in a different position (such as MobiTV), and should the Parties be unable to resolve a dispute concerning the appropriate revenue base to be applied such content, the Parties shall request that Magistrate Judge Dolinger, in his capacity as the ASCAP settlement judge under AFJ2, mediate any such dispute.

        c.     No license fee shall be payable in respect of content that has been licensed on a final basis through to the audience by the Content Provider, where the Content Provider has made payments under its license for the applicable V CAST Licensed Service or Alltel Licensed Service (or is licensed on a flat-fee basis). The Parties shall work cooperatively to determine what content fitting this description already has been licensed during the License Term as of the Effective Date and thereafter on a going-forward basis. The Parties have agreed on the Content Providers known as of the Effective Date to be subject to this exclusion for the License Term and will work cooperatively to revise their identification of such Content Providers as the facts warrant. ASCAP shall not seek license fees from any Content Provider for content on a V CAST Licensed Service or Alltel Licensed Service for which Verizon Wireless has paid under this Agreement or either the Past Settlement Agreement or Ringback Tones License Agreement, it being the intent of the Parties that the license fees set forth herein are intended to be in full consideration of through to the audience licenses.

        d.     Verizon Wireless will provide with its initial License Fee Reports submitted pursuant to Paragraph 8 a Content Provider Table setting forth the applicable rate pursuant to Paragraph 3.a. to be applied to each Content Provider to the V CAST Licensed Services and the Alltel Licensed Services for the License Term. Verizon

Wireless shall thereafter notify ASCAP with its quarterly License Fee Reports submitted pursuant to Paragraph 8 of any additions to, subtractions from, or other proposed changes to such Content Provider Table relevant to the period to which such License Fee Report applies. If the Parties cannot agree on the applicable rate pursuant to Paragraph 3.a. to be applied to any newly added Content Provider within thirty (30) days following the provision of the Content Provider Table or any other proposed change in the Content Provider Table by Verizon Wireless, the Parties agree to submit the question for decision to Magistrate Judge Dolinger in his capacity as settlement judge under AFJ2.

    e.  The Parties acknowledge that Verizon Wireless likely will make no separate Payments during the License Term to the Content Provider of the Licensed Mobile TV Channel for carriage of the channel on V CAST Mobile TV, and that the Payments to that Content Provider were included in the Payments made to the Content Provider for V CAST Video and are accounted for in connection with that service. The Parties further acknowledge that there likely is no advertising revenue attributable to carriage of the Licensed Mobile TV Channel on V CAST Mobile TV and, in any event, that such advertising revenue likely is accounted for by the Content Provider in its general advertising revenues reported to ASCAP. Accordingly, the Parties anticipate that no incremental license fee shall be assessed for the Licensed Mobile TV Channel under this Agreement. If the facts set forth in this Paragraph 3.e. change in the future and the Parties are unable to resolve any differences concerning the effect of such change, the Parties shall request that Magistrate Judge Dolinger mediate any such dispute, in his capacity as the ASCAP settlement judge under AFJ2.

4.      Pursuant to Paragraph 9 of the Past Settlement Agreement, the Parties have estimated the license fees likely to be due during the License Term under this Agreement and the Ringback Tones License Agreement (the "Estimated License Fees"). The Parties have further agreed that ASCAP may retain, on account on a temporary basis, as an advance payment of license fees through 2012, the Estimated License Fees.  Any License Fees due hereunder shall first be taken from the Estimated License Fees being held by ASCAP.  If actual License Fees due under this Agreement and the Ringback Tones License Agreement during the License Term exceed the Estimated License Fees being held by ASCAP, Verizon Wireless shall pay such License Fees within forty-five (45) days following the receipt of an invoice from ASCAP.  If the Estimated License Fees retained by ASCAP exceed the actual License Fees due under this Agreement and the Ringback Tones License Agreement for the License Term, ASCAP shall refund any such excess to Verizon Wireless on or before March 30, 2013.

5.      This Agreement shall be deemed final and non-appealable, but is experimental and non-precedential in all respects, provided, however, that this Agreement shall become fully precedential and non-experimental for all purposes as to Verizon Wireless and Alltel only, and as to no other person or entity, upon the occurrence of one of the following: (i) the May 6, 2010 Opinion and Order of the Court in *In re Application of MobiTV, Inc.*, 09 Civ. 7071 (DLC)(MHD) (the "MobiTV Proceeding") is reduced to a judgment that becomes final on substantially the same basis as the May 6, 2010 Opinion and Order, and is no longer subject to appeal, or (ii) the MobiTV matter is settled.  For the avoidance of doubt, the Parties agree that under no circumstance shall this Agreement be deemed by any court, party, or other entity to have any precedential

8

effect or impact as it may pertain to an appeal of any judgment of the May 6, 2010

Opinion and Order in the MobiTV Proceeding. ASCAP and Verizon Wireless further

agree that Verizon Wireless has not requested a license for channels of V CAST Mobile

TV other than the Licensed Mobile TV Channel and ASCAP shall withdraw its claim that

such services are part of the Verizon Wireless Proceeding.

      6.    a.    ASCAP hereby does and shall, for itself, its parents, subsidiaries,

divisions, affiliates, predecessors, successors and members, and each of their respective

officers, directors, past and present employees, consultants, agents, representatives,

insurers, attorneys, shareholders and heirs (collectively, the "ASCAP Parties"),

irrevocably and unconditionally release, acquit and forever discharge Verizon Wireless

and Alltel and their respective parents, subsidiaries, divisions, affiliates, predecessors and

successors, and each of their respective officers, directors, past and present employees,

consultants, agents, representatives, insurers, attorneys, shareholders and heirs

(collectively, the "Verizon Wireless Parties"), from all actions, suits, debts, dues, sums of

money, accounts, reckonings, bonds, bills, specialties, covenants, controversies,

agreements, promises, variances, trespasses, damages, judgments, extents, executions,

claims and demands whatsoever, known or unknown, in law or equity, which against

them or any of them, whether jointly or severally, ASCAP or any of the other ASCAP

Parties ever had, now has or hereafter can, shall or may have for, upon, or by reason of

any matter, cause or thing whatsoever arising out of, related to, or regarding (i) the public

performance of music via the V CAST Licensed Services and Alltel Licensed Services

during the License Term, except to the extent of Verizon Wireless' obligations under this

Agreement, including but not limited to its obligation to pay License Fees pursuant to

9

Paragraph 3 above, and (ii) the negotiation of and entry into the May 21, 2010 Binding Term Sheet, this Agreement, the Past Settlement Agreement, and the Ringback Tones License Agreement.

           b.       Verizon Wireless hereby does and shall, for itself and the other Verizon Wireless Parties irrevocably and unconditionally release, acquit and forever discharge ASCAP and the other ASCAP Parties, from all actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, known or unknown, in law or equity, which against them or any of them, whether jointly or severally, Verizon Wireless or any of the other Verizon Wireless Parties ever had, now has or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever arising out of (i) ASCAP's licensing of the public performance of music via the V CAST Licensed Services or Alltel Licensed Services during the License Term, except to the extent of ASCAP's obligations under this Agreement, including but not limited to its obligation to refund and any excess of the Estimated License Fees over actual license fees due, as set forth in Paragraph 4, above, and (ii) the negotiation of and entry into the May 21, 2010 Binding Term Sheet, this Agreement, the Past Settlement Agreement, and the Ringback Tones License Agreement.

       7.      Except as explicitly set forth herein, this Agreement licenses any and all public performances of copyrighted musical works in the ASCAP repertory for which a license is or may be required by Verizon Wireless or Alltel via the V CAST Licensed Services or Alltel Licensed Services during the License Term.  If any content contained

10

on Alltel TV On Demand, Alltel TV, Alltel TV Connect, Alltel TV en Español, Alltel Radio, or XM Radio on Alltel, other than content that constitutes the Alltel Licensed Services, is not licensed by the party with the responsibility for licensing such content, the Parties agree to negotiate in good faith concerning the licensing of such content on the basis of the terms set forth in the Parties' May 21, 2010 Binding Term Sheet. The Parties nonetheless reserve all their rights, positions and defenses in respect of whether particular transmissions of music via the V CAST Licensed Services or Alltel Licensed Services require licensing. This Agreement does not license or release any third parties or affect ASCAP's ability to pursue any license fees from any third party, with respect to any services other than the V CAST Licensed Services and Alltel Licensed Services.

      8.    License Fee Reports. Verizon Wireless shall provide to ASCAP quarterly statements (the "License Fee Reports") setting forth for V CAST Video and the Alltel Licensed Services: (i) the Payments made by Verizon Wireless or Alltel or another person or entity at the direction of Verizon Wireless or Alltel to each applicable Content Provider or other person or entity at the direction of such Content Provider, by calendar month or by calendar quarter (at Verizon Wireless' option), by Content Provider, and (if available) by applicable service; (ii) any Advertising Revenue, by V CAST Licensed Service or Alltel Licensed Service (if available) and by content category; and (iii) the License Fee due pursuant to Paragraph 3 of this Agreement; and (iv) the proposed rate to be applied to any newly added Content Provider or any other change in the Content Provider Table, as provided in Paragraph 3.d., above. License Fee Reports shall be due sixty (60) days following the close of the quarter to which they apply. Information pertaining to May and June, 2010, shall be included in the

License Fee Report for the third quarter of 2010, which shall be due within sixty (60) days following the date set forth in the opening paragraph of this Agreement. Comparable data relating to the License Term provided by Verizon Wireless to    . ASCAP prior to the execution of this Agreement shall be treated as "License Fee Reports" provided pursuant to this Paragraph.  Verizon Wireless shall use reasonable efforts to identify with or as part of its reports Content Providers during the period who received no payments for their content.

      9.      Within sixty (60) days of ASCAP's written request, which may only be made once per calendar quarter for one or more preceding calendar quarters during the License Term, Verizon Wireless shall provide ASCAP with the following usage information (the "Usage Information") in electronic form (e.g., by transmittal of a spreadsheet).  Comparable data relating to the License Term provided by Verizon Wireless to ASCAP prior to the execution of this Agreement shall be treated as "Usage Information" provided pursuant to this Paragraph:

      a.      For V CAST Video, data showing the title of each clip transmitted (as provided by the applicable Content Provider), the identity of the Content Provider, and the number of times each clip was launched for viewing, on a monthly or quarterly basis at Verizon Wireless' option. Titles of clips from television shows often include or are based on the episode's name, but the clip titles are beyond Verizon Wireless' control. If in the future, titles of clips from television shows include episode names materially less frequently than they have prior to the Effective Date, Verizon Wireless will, at ASCAP's written request, request additional episode name information from the relevant content providers, and the Parties will work together to determine whether there is anything else

12

commercially reasonable that Verizon Wireless may be able to do to assist ASCAP in obtaining episode names; and

        b.      For Alltel TV on Demand, data showing the title of each clip transmitted (as provided by the applicable Content Provider), the identity of the Content Provider, and the number of times each clip was launched for viewing, all solely to the extent in the possession of Verizon Wireless or provided by MobiTV to Verizon Wireless, on a monthly or quarterly basis at Verizon Wireless' option. Verizon Wireless has requested this information from MobiTV. In the event that Verizon Wireless is unable to obtain some or all of the requested information from MobiTV, the Parties will work together to determine whether there is anything else commercially reasonable that Verizon Wireless may be able to do to assist ASCAP in obtaining the requested information. As of the date of execution of this Agreement, Verizon Wireless has not identified in writing any content on Alltel TV (previously known as Axcess TV), Alltel TV Connect (previously known as Axcess TV Connect), Alltel TV en Espanol (previously known as Axcess TV en Espanol), or Alltel Radio that is subject to the definition of Alltel Licensed Services in Paragraph 1.a.(ii) of this Agreement. In the event that Verizon Wireless identifies in writing any such content in the future in accordance with Paragraph 1.a. of this Agreement, the Parties will work together to determine whether and the extent to which Verizon Wireless is able with commercially reasonable efforts to provide or obtain music use information associated with such content and to provide such information to ASCAP. If the Parties are unable to agree as to Verizon Wireless' ability with commercially reasonable efforts to provide or obtain such music use information, either Party may bring this issue to the attention of the Rate Court for resolution.

10.     This Agreement shall be filed with the Court as part of the Stipulation of Dismissal attached as Exhibit E to the Past Settlement Agreement.

11.     ASCAP agrees that the amount of Estimated License Fees described in Paragraph 4, the License Fee Reports provided to ASCAP pursuant to Paragraph 8, the Usage Information provided to ASCAP pursuant to Paragraph 9, the Content Provider Table and additions, subtractions and changes thereto, any future identification of content on Alltel TV included within the Alltel Licensed Services pursuant to Paragraph 1.a., and the identification of Content Providers subject to the exclusion set forth in Paragraph 3.c., are the highly confidential and proprietary information of Verizon Wireless (the "VZW Confidential Information").

a.     Disclosure and Use Restrictions. ASCAP acknowledges and agrees that, except as expressly provided in Subparagraph 11(b) below, it shall not: (i) use VZW Confidential Information for any purposes, including its own internal use or commercial benefit, including, by way of example and not limitation, using VZW Confidential Information in connection with negotiations with other ASCAP licensees or potential licensees or in future negotiations with Verizon Wireless; (ii) commercially exploit the VZW Confidential Information, including, by way of example and not limitation, selling or disclosing the VZW Confidential Information for purposes of indicating the popularity of certain genres of copyrighted musical works or individual works; and (iii) disclose or permit disclosure of VZW Confidential Information to any third party without Verizon Wireless' prior written approval. Further, ASCAP shall: (i) not remove any proprietary notice of Verizon Wireless on or in any VZW Confidential Information or remove any trademark, trade name, logo or notice affixed to such VZW Confidential Information

14

other than as may be necessary for ASCAP to process the VZW Confidential Information

electronically as permitted herein; (ii) take all reasonable measures to protect the secrecy

of VZW Confidential Information and to avoid disclosure or use of VZW Confidential

Information to prevent it from falling into the public domain or into the possession of

persons other than those persons authorized under this Paragraph 11 to have such

information; (iii) notify Verizon Wireless in writing of any misuse or misappropriation of

VZW Confidential Information which comes to ASCAP's attention; and (iv) notify

Verizon Wireless if disclosure of VZW Confidential Information by ASCAP is necessary

to comply with the requirements of any law, government order, regulation or legal

process prior to such disclosure and, at Verizon Wireless' request, use best efforts to seek

an appropriate protective order in connection with such legal process and, if unsuccessful,

to use best efforts to assure that confidential treatment will be granted to VZW

Confidential Information.

                b.      Permitted Disclosure. ASCAP shall only have the right to disclose

VZW Confidential Information: (i) in disaggregated form, to its music publisher,

songwriter and composer members and affiliated society members solely in conjunction

with the determination of the applicable royalty payable by ASCAP to such members

based on Verizon Wireless' public performance of the applicable work; (ii) in aggregated

form with other ASCAP licensed Ringback Tone services to prospective members for the

purposes of estimating what royalties might be payable to such persons if they were to

become ASCAP members; (iii) to any ASCAP employees or outside consultants of

ASCAP, such as ASCAP's survey and econometric consultants or outside counsel, who

have a need to access VZW Confidential Information in order to prepare the royalty

disbursements or reports to ASCAP members or affiliated society members as permitted in this Subparagraph 11(b); (iv) to any ASCAP employees or outside consultants of ASCAP who have a need to access VZW Confidential Information in connection with future negotiations with Verizon Wireless; or (v) to any ASCAP employees or outside attorneys or consultants of ASCAP who have a need to access VZW Confidential Information in connection with future legal proceedings before the Rate Court, or to the Rate Court or other parties to such legal proceedings, provided that reasonably prior to disclosure to the Rate Court or to such other parties, ASCAP shall notify Verizon Wireless in order to permit Verizon Wireless to object to such use and to seek protection of such information, and ASCAP shall use its best efforts to seek an appropriate protective order in connection with such legal proceedings to protect the VZW Confidential Information and, if unsuccessful, shall use its best efforts to assure that confidential treatment will be granted to VZW Confidential Information.

c.    Return of VZW Confidential Information. Any VZW Confidential Information which is furnished by Verizon Wireless to ASCAP, or reproduced by ASCAP, will be returned to Verizon Wireless, accompanied by all copies of such VZW Confidential Information within thirty (30) days of receipt of a written request for the return of such VZW Confidential Information by Verizon Wireless.  In the event of any such request, ASCAP shall certify to Verizon Wireless that any and all copies, duplicates, repetitions or excerpts of any VZW Confidential Information received and any written memoranda or notes of VZW Confidential Information have been destroyed. Notwithstanding anything to the contrary in this Paragraph 11, ASCAP may retain the Content Provider Table, the identification of content on Alltel TV included within the

Alltel Licensed Services pursuant to Paragraph 1.a., the identification of Content Providers subject to the exclusion set forth in Paragraph 3.c., and the numbers included in the VZW Confidential Information in the form in which they are maintained for ASCAP's income accounting and survey and distribution purposes in accordance with ASCAP's normal records retention policies, to enable ASCAP to account for its revenues and to verify distributions when questions are raised and make adjustments to distributions, by way of example, necessitated by the receipt of new information.

d.      No Rights Granted. Nothing in this Agreement is intended to grant any patent, copyright, trade secret, trademark service mark or other proprietary rights to ASCAP, nor shall this Agreement grant ASCAP any rights in VZW Confidential Information except the limited right to use such VZW Confidential Information as expressly provided in this Paragraph 11. Verizon Wireless remains the sole and exclusive owner of VZW Confidential Information.

e.      Specific Performance and Injunctive Relief. Each Party agrees that its obligations under this Paragraph 11 are necessary and reasonable in order to protect Verizon Wireless and its business. ASCAP acknowledges that it will be impossible to fully measure in money the damages caused to Verizon Wireless by any failure to comply with, or any breach of, the material terms, promises, agreements and conditions of this Paragraph 11, and that, in the event of any such failure or breach, Verizon Wireless will not have an adequate remedy at law or in damages. ASCAP, therefore, consents to the issuance of an injunction, a decree for specific performance, and the enforcement of other equitable remedies against it by Verizon Wireless without bond or other security to compel the performance of all of the material terms of this Paragraph 11. ASCAP hereby

17

waives the defense of the availability of adequate relief in damages.  If a dispute arises

over what constitutes VZW Confidential Information subject to this Paragraph 11,

ASCAP agrees to treat any information subject to such dispute (the "Disputed

Information") as VZW Confidential Information under this Paragraph 11 until such time

as either the Parties can mutually agree or a court of competent jurisdiction has

determined if the Disputed Information constitutes VZW Confidential Information.

        12.     a.     ASCAP agrees to indemnify, save and hold harmless and defend

Verizon Wireless and the other Verizon Wireless Parties from and against any and all

claims, demands, suits, losses, damages, liabilities, deficiencies, judgments, assessments,

fines, costs and other expenses (including reasonable attorneys' fees and costs of suit)

(each, a "Claim"; collectively, "Claims") that may be made or brought against, or

incurred by, the Verizon Wireless Parties, or any of them, with respect to the

performances licensed under this Agreement of any compositions in ASCAP's repertory

at any time, or from time-to-time, during the License Term.

              b.     Verizon Wireless agrees to give ASCAP prompt notice of any

Claim of the type specified in Paragraph 12(a), above, and agrees promptly to deliver to

ASCAP all papers pertaining thereto.  ASCAP at its own expense shall have full charge

of the defense of any such Claim, and Verizon Wireless shall reasonably cooperate, at

ASCAP's expense, with ASCAP in such defense.  Verizon Wireless also shall have the

right to engage counsel of its own, at its own expense, who may participate in the defense

of any such Claim and with whom counsel for ASCAP shall cooperate.

        13.     Each of the Parties represents and warrants that it has taken all necessary

actions and has secured the consents of all persons necessary to authorize the execution

of this Agreement and performance of all its obligations under this Agreement. Each Party represents that the person executing this Agreement on its behalf is duly authorized to do so and that this Agreement is and shall be during its term a binding obligation of the Party on behalf of which it is executed. Each Party represents to the other that the execution and performance of this Agreement is not barred, prohibited or impaired by any existing law, rule, regulation, court or administrative order, decree, contract or agreement to which it is now a party or by which it is bound.

14.    The Parties agree that the Court that exercised jurisdiction over the Verizon Wireless Proceeding shall retain jurisdiction to enforce the provisions of this Agreement or should a dispute arise between the Parties concerning its meaning or enforcement.

15.    In the event Verizon Wireless fails to pay any license fees due hereunder, or fails to submit to ASCAP any reports required hereunder, ASCAP shall give Verizon Wireless thirty (30) days' notice in writing to cure such breach or default. In the event that any such breach or default is capable of commercially reasonable cure and has not been cured, or cure has not commenced, within said thirty (30) days, then ASCAP may give written notice of its intent to terminate this Agreement with such termination effective upon the passage of thirty (30) days after Verizon Wireless' receipt of such notice. In the event that Verizon Wireless disputes ASCAP's position that the alleged breach justifies termination or is capable of commercially reasonable cure, either Party may make an application to the Rate Court for a ruling as to whether the alleged breach justifies termination of this Agreement or is capable of commercially reasonable cure. If Verizon Wireless makes such an application within thirty (30) days of the date ASCAP

19

provides notice of its intent to terminate this Agreement for breach or default, then

ASCAP may not terminate this Agreement during the pendency of Verizon Wireless'

application. In the event that the Rate Court determines that Verizon Wireless has met its

obligations under this Agreement or that such breach does not justify termination,

ASCAP shall have no right of termination under this Paragraph with respect to the matter

determined by the Court in such proceeding. In the event that the Rate Court determines

that Verizon Wireless has not satisfied its obligations to ASCAP under this Agreement

and that such breach justifies termination, Verizon Wireless shall thereafter have forty-

five (45) days to cure any such default identified by the Rate Court. In the event Verizon

Wireless does not cure such default within such forty-five (45) day period, this

Agreement shall terminate immediately, and ASCAP may pursue any and all other rights

and remedies available to ASCAP. This Paragraph, and the termination rights set forth

herein shall not apply to any breach occurring before such time that the License Fees due

during the License Term under this Agreement and the Ringback Tones License

Agreement exceed the Estimated License Fees as defined in Paragraph 4. ASCAP

acknowledges that it shall have no right to terminate this Agreement other than as

expressly set forth in this Paragraph 15. Verizon Wireless acknowledges that this

Paragraph is non-precedential and is only being agreed to by ASCAP because this

Agreement is a partial settlement of a litigation, and because the Parties do not anticipate

that Verizon Wireless will have to make additional payments to ASCAP for a significant

portion of the License Term.

16.     a.     All notices, statements and other documents required to be given

under this Agreement shall be duly and properly given if: (i) mailed to the other Party by

registered or certified United States mail, return receipt requested; (ii) sent by generally

recognized same-day or overnight delivery service; or (iii) sent by facsimile, with receipt

acknowledged or confirmed.

                b.     All notices, statements and other documents required to be given

under this Agreement shall be mailed or delivered to the Parties at the following

addresses, or such other individuals or addresses as the Parties may by written notice

designate:

             If to ASCAP:

> ASCAP
> One Lincoln Plaza
> New York, New York  10023
> Attention: Matthew DeFilippis, Vice President,
> New Media and Technology
> Fax: (678) 239-3580
>
> Copy to:
>
> Richard H. Reimer, Esq.
> ASCAP
> One Lincoln Plaza
> New York, New York 10023
> Fax: (212) 787-1381
>
> And copy to:
>
> Hillel I. Parness, Esq.
> Robins, Kaplan, Miller & Ciresi L.L.P.
> 601 Lexington Avenue, Suite 3400
> New York, New York 10022
> Fax: (212) 980-7499

          If to Verizon Wireless:

> Brian T. Ashby, Esq.
> Cellco Partnership d/b/a Verizon Wireless
> Associate General Counsel
> Legal Department
> One Verizon Way
> Basking Ridge, New Jersey  07920

Fax:  (908) 766-3691

Copy to:

Bruce G. Joseph, Esq.
Wiley Rein, LLP
1776 K Street NW
Washington, DC  20006
Fax: (202) 719-7049

17.    This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns, but no assignment shall relieve the Parties of their respective obligations under this Agreement as to performances transmitted, acts done and obligations incurred prior to the effective date of the assignment.

18.    This Agreement may be executed in any number of counterparts and by facsimile signature, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

19.    This Agreement, together with all exhibits and schedules, which are incorporated herein by reference, constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, whether oral or written, between the Parties as to the subject matter of this Agreement, except that it does not supersede the Past Settlement Agreement or the Ringback Tones License Agreement.  This Agreement may not be amended, modified or terminated except by a written instrument signed by both of the Parties.  Neither Party has made any representations or promises to the other in connection with this Agreement or its subject matter that are not expressly set forth in this Agreement.

20.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York pertaining to contracts made and fully performed therein, without regard to choice of law rules.

21.    If any term, covenant or condition of this Agreement is held invalid, illegal or unenforceable in any respect, such provision shall be replaced by an enforceable provision that most closely meets the commercial intent of the Parties, and such holding shall not affect any other provision of this Agreement, which shall be and remain effective as though such invalid, illegal or unenforceable provision has not been contained herein.

22.    Each of the Parties has received independent legal advice concerning both the nature of this Agreement and the Parties' May 21, 2010 Term Sheet, and their legal rights and obligations under this Agreement and the Parties' May 21, 2010 Term Sheet. The Parties have entered into this Agreement voluntarily and of their own free will and accord without any threat of force or duress of any kind.  The Parties hereby agree to bear their own costs and attorneys' fees relating to this Agreement.

CELLCO PARTNERSHIP d/b/a/ VERIZON
WIRELESS

By: _____

Name: _____

Title _____

AMERICAN SOCIETY OF
COMPOSERS, AUTHORS &
PUBLISHERS

By: _____

Name: _____

Title: _____

23

20.     This Agreement shall be governed by and construed in accordance with the laws of the State of New York pertaining to contracts made and fully performed therein, without regard to choice of law rules.

21.     If any term, covenant or condition of this Agreement is held invalid, illegal or unenforceable in any respect, such provision shall be replaced by an enforceable provision that most closely meets the commercial intent of the Parties, and such holding shall not affect any other provision of this Agreement, which shall be and remain effective as though such invalid, illegal or unenforceable provision has not been contained herein.

22.     Each of the Parties has received independent legal advice concerning both the nature of this Agreement and the Parties' May 21, 2010 Term Sheet, and their legal rights and obligations under this Agreement and the Parties' May 21, 2010 Term Sheet. The Parties have entered into this Agreement voluntarily and of their own free will and accord without any threat of force or duress of any kind. The Parties hereby agree to bear their own costs and attorneys' fees relating to this Agreement.

CELLCO PARTNERSHIP d/b/a/ VERIZON
WIRELESS

By: _____

Name: _____

Title _____

AMERICAN SOCIETY OF
COMPOSERS, AUTHORS &
PUBLISHERS

By: _____

Name: _Christopher Amenita_

Title: _SVP Broadcast Operations +
       New Media Licensing_

23

## RINGBACK TONES SETTLEMENT, MUTUAL RELEASE AND LICENSE AGREEMENT

This agreement ("Agreement") dated as of January 14, 2011, is entered by and between the American Society of Composers, Authors and Publishers ("ASCAP"), with an address of One Lincoln Plaza, New York, New York 10023, and Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless"), with an address of One Verizon Way, Basking Ridge, New Jersey 07920.  ASCAP and Verizon Wireless are sometimes referred to in this Agreement collectively as the "Parties," and individually as a "Party." "Alltel" refers to Alltel Corporation, which was acquired by Verizon Wireless on January 9, 2009.

WHEREAS, the Parties desire fully and finally to resolve amicably the January 23, 2009 Rate Court Proceeding initiated by Verizon Wireless, Civil Action No. 09-7074, for a determination of reasonable license fees (hereinafter referred to as "the Verizon Wireless Proceeding"), in accordance with Section IX(A) of the Second Amended Final Judgment entered in *United States v. ASCAP*, Civ. No. 41-1395 (S.D.N.Y. June 11, 2001) ("AFJ2"), and, accordingly, the Parties have agreed upon final License Fees (as defined herein) for the Licensed Services (as defined herein); and

WHEREAS, concurrent with the execution of this Agreement, the Parties are also entering into (i) a Settlement, Mutual Release and License Agreement for the period ending on April 30, 2010 (the "Past Settlement Agreement"); and (ii) a license agreement concerning V CAST Video, the MTV Tr3s channel on V CAST Mobile TV and any applicable Alltel audio-visual and music-only audio services, for the period commencing May 1, 2010, and ending December 31, 2012 (the "V CAST License Agreement").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties, intending to be legally bound, agree as follows:

    1.    Definitions.

        a.    "Licensed Services" means Verizon Wireless and Alltel Ringback Tones; Previews of Verizon Wireless and Alltel Ringback Tones; Previews of Verizon Wireless and Alltel Ringtones; and Previews of full track music provided by Verizon Wireless and Alltel (all capitalized terms as defined herein).

        b.    The "License Term" means the period commencing on May 1, 2010 (the "Effective Date") and ending on December 31, 2012.

        c.    "Previews" means audio or audio-visual content transmitted to users in connection with the potential purchase by users of audio or audio-visual content.

        d.    "Ringback Tone" means a musical or other audio work that is sold to, licensed to, or otherwise acquired by a wireless customer to be played to callers, in lieu of the standard "ringing" sound that callers would otherwise hear, when waiting for the customer to answer the phone.

        e.    "Ringtone" means a musical or other audio work that is sold to, licensed to, or otherwise acquired by a wireless customer in lieu of the standard "ring" sound on a customer's wireless phone.

    2.    ASCAP hereby grants to Verizon Wireless and Alltel for the License Term a non-exclusive license to make performances to the public in connection with the Licensed Services of musical compositions which, during the License Term are in the ASCAP repertory or as to which ASCAP has or shall have the right to grant such license.

Notwithstanding the License Term, the license granted hereby with respect to any

Ringback Tone for which a license fee is paid hereunder shall continue in effect for the

period for which the customer continues to have the right to use that Ringback Tone for

the retail selling price that was covered hereunder.

       3.       The license fees due under this Agreement (the "License Fees") shall be

calculated as follows:

            a.       The license fee shall be 2.0% of the Retail Selling Price (as defined

herein) of all Ringback Tones sold by Verizon Wireless and Alltel, except that Ringback

Tones that Verizon Wireless or Alltel sources from (i) a major record company that has

undertaken to obtain public performance rights on a catalog-wide basis (whether directly

or acting as an agent for the applicable music publishers), on behalf of Verizon Wireless

or Alltel, as the case may be, or (ii) an aggregator or other third party that has a license

from ASCAP that covers Ringback Tones sold by Verizon Wireless or Alltel, as the case

may be, shall be excluded from the license set forth in Paragraph 2, from the release set

forth in Paragraph 6, and from the computation of the license fee due under this

Agreement, as to either Verizon Wireless, Alltel or both, as the case may be (the

"Excluded Ringback Tones").  Verizon Wireless shall notify ASCAP of any changes in

the identity of major record companies that have undertaken such obligation and the

period for which such obligation has been undertaken.

            b.       The Ringback Tone "Retail Selling Price" means monies or other

consideration received by Verizon Wireless or Alltel, as the case may be, on a per-tone

basis, or, for Ringback Tones bundled with other products, the Ringback Tone Allocated

Retail Selling Price as determined pursuant to subparagraph 3.c.  "Retail Selling Price"

shall not include monthly recurring charges for access to the Ringback Tone service or

transport fees. This definition of Retail Selling Price is not intended to be, and shall not

be, applicable to any other subscription-based service. In the event the price of an

individual *a la carte* Ringback Tone sold by Verizon Wireless or Alltel, respectively,

falls below 150% of the monthly recurring charge for access to the Ringback Tone

service, the Retail Selling Price for such Ringback Tone shall be deemed to be 150% of

the monthly recurring charge (e.g., if the price of an individual *a la carte* Ringback Tone

is $1.30 and the monthly recurring charge is $0.99, then the Retail Selling Price for the

Ringback Tone shall be deemed to be $1.485). For purposes of the preceding sentence,

the term "individual *a la carte* Ringback Tone" does not include tones sold in bundles or

provided at no charge on a promotional basis.

        c.     If Ringback Tones are sold in a bundle with other products, the

"Ringback Tone Allocated Retail Selling Price" shall be determined by allocating all

amounts paid by the wireless customer for the product package in accordance with the

ratios that the *a la carte* retail prices of individual elements which constitute the package

bear to each other. For example, if a customer is charged a $4 fee for a bundle consisting

of one Ringback Tone, one Ringtone and one item of wallpaper, and the *a la carte* retail

prices for the individual elements are $2.00, $1.00 and $2.00 respectively, then the

Ringback Tone Allocated Retail Selling Price for the Ringback Tone shall be $1.60

($2/$5 * $4). In the event Verizon Wireless or Alltel, as the case may be, has not, within

the past 6 months offered an element of a bundle on an *a la carte* basis, then the

Ringback Tone Allocated Retail Selling Price shall be determined by using the *a la carte*

retail selling price set for such element by other sellers of such element. If the Parties are

4

unable to construct a retail selling price for an element of a bundle that Verizon Wireless
or Alltel has not offered on an a la carte basis, as set forth in the preceding sentence, they
shall negotiate in good faith to determine a Ringback Tone Allocated Retail Selling Price
for the bundle, and failing agreement, may petition ASCAP's Rate Court to request a
determination of the Ringback Tone Allocated Retail Selling Price for the bundle.

      4.      Pursuant to Paragraph 9 of the Past Settlement Agreement, the Parties
have estimated the license fees likely to be due during the License Term under this
Agreement and the V CAST License Agreement (the "Estimated License Fees"). The
Parties have further agreed that ASCAP may retain, on account on a temporary basis, as
an advance payment of license fees through 2012, the Estimated License Fees. Any
License Fees due hereunder shall first be taken from the Estimated License Fees being
held by ASCAP. If actual License Fees due under this Agreement and the V CAST
License Agreement during the License Term exceed the Estimated License Fees being
held by ASCAP, Verizon Wireless shall pay such License Fees within forty-five (45)
days following the receipt of an invoice from ASCAP. If the Estimated License Fees
retained by ASCAP exceed the actual License Fees due under this Agreement and the V
CAST License Agreement for the License Term, ASCAP shall refund any such excess to
Verizon Wireless on or before March 30, 2013.

      5.      This Agreement shall be deemed final and non-appealable. This
Agreement shall be precedential as to Ringback Tones. This Agreement shall be non-
precedential and without prejudice to any Party's position as to whether a license is
necessary for Previews of Ringtones, Ringback Tones or full track music, or as to the
appropriate license fee, if any, for such Previews. ASCAP and Verizon Wireless further

agree that Verizon Wireless has not requested a license for the Rhapsody service offered as part of V CAST Music with Rhapsody and ASCAP shall withdraw its claim that the Rhapsody service is part of the Verizon Wireless Proceeding.

  6. a. ASCAP hereby does and shall, for itself, its parents, subsidiaries, divisions, affiliates, predecessors, successors and members, and each of their respective officers, directors, past and present employees, consultants, agents, representatives, insurers, attorneys, shareholders and heirs (collectively, the "ASCAP Parties"), irrevocably and unconditionally release, acquit and forever discharge Verizon Wireless and Alltel and their respective parents, subsidiaries, divisions, affiliates, predecessors and successors, and each of their respective officers, directors, past and present employees, consultants, agents, representatives, insurers, attorneys, shareholders and heirs (collectively, the "Verizon Wireless Parties"), from all actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, known or unknown, in law or equity, which against them or any of them, whether jointly or severally, ASCAP or any of the other ASCAP Parties ever had, now has or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever arising out of, related to, or regarding (i) the public performance of music via the Licensed Services during the License Term, except to the extent of Verizon Wireless' obligations under this Agreement, including but not limited to its obligation to pay License Fees pursuant to Paragraph 3 above, and (ii) the negotiation of and entry into the May 21, 2010 Binding Term Sheet, this Agreement, the V CAST License Agreement, and the Past Settlement Agreement.

6

b.       Verizon Wireless hereby does and shall, for itself and the other Verizon Wireless Parties irrevocably and unconditionally release, acquit and forever discharge ASCAP and the other ASCAP Parties, from all actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, known or unknown, in law or equity, which against them or any of them, whether jointly or severally, Verizon Wireless or any of the other Verizon Wireless Parties ever had, now has or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever arising out of (i) ASCAP's licensing of the public performance of music via the Licensed Services during the License Term, except to the extent of ASCAP's obligations under this Agreement, including but not limited to its obligation to refund any excess of the Estimated License Fees over actual license fees due, as set forth in Paragraph 4, above, and (ii) the negotiation of and entry into the May 21, 2010 Binding Term Sheet, this Agreement, the V CAST License Agreement, and the Past Settlement Agreement.

7.       Except as explicitly set forth herein, this Agreement licenses any and all public performances of copyrighted musical works in the ASCAP repertory for which a license is or may be required by Verizon Wireless or Alltel via the Licensed Services during the License Term.  The Parties nonetheless reserve all their rights, positions and defenses in respect of whether particular transmissions of music via the Licensed Services require licensing.  This Agreement does not license or release any third parties or affect ASCAP's ability to pursue any license fees from any third party, with respect to any services other than the Licensed Services.

7

8.      License Fee Reports.  Verizon Wireless shall provide to ASCAP quarterly statements (the "License Fee Reports") showing, by calendar quarter, (i) the number of Ringback Tones other than Excluded Ringback Tones sold and the Retail Selling Price received for the sale of such Ringback Tones by Verizon Wireless and Alltel, and (ii) the License Fee due pursuant to Paragraph 3 of this Agreement.  License Fee Reports shall be due sixty (60) days following the close of the quarter to which they apply. Information pertaining to May and June, 2010, shall be included in the License Fee Report for the third quarter of 2010, which shall be due within sixty (60) days following the date set forth in the opening paragraph of this Agreement.  Comparable data relating to the License Term provided by Verizon Wireless to ASCAP prior to the execution of this Agreement shall be treated as "License Fee Reports" provided pursuant to this Paragraph.

9.      Within sixty (60) days of ASCAP's written request, which may only be made once per calendar quarter for one or more preceding calendar quarters during the License Term, Verizon Wireless shall provide ASCAP with the following usage information (the "Usage Information"), quarterly, on a per track basis, (i) the title of each musical work sold via the Verizon Wireless Ringback Tones service and the Alltel Ringback Tones service, respectively, (ii) the featured artist who recorded each such work, (iii) the record label that provided such work to Verizon Wireless or Alltel, (iv) the ISRC code, if available, and (v) the total number of each Ringback Tone sold.  The information provided for the Verizon Wireless Ringback Tones service shall be in form and substance comparable to that provided by Verizon Wireless to ASCAP pursuant to the Settlement Agreement between the Parties dated September 3, 2008.  The information

8

provided for the Alltel Ringback Tones service shall be in form and substance comparable to the example provided by Verizon Wireless to ASCAP on September 17, 2010. Comparable data relating to the License Term provided by Verizon Wireless to ASCAP prior to the execution of this Agreement shall be treated as "Usage Information" provided pursuant to this Paragraph.

10.     This Agreement shall be filed with the Court as part of the Stipulation of Dismissal attached as Exhibit E to the Past Settlement Agreement.

11.     ASCAP agrees that the License Fee Reports provided to ASCAP pursuant to Paragraph 8, and the Usage Information provided to ASCAP pursuant to Paragraph 9, are the highly confidential and proprietary information of Verizon Wireless (the "VZW Confidential Information").

a.     Disclosure and Use Restrictions. ASCAP acknowledges and agrees that, except as expressly provided in Subparagraph 11(b) below, it shall not: (i) use VZW Confidential Information for any purposes, including its own internal use or commercial benefit, including, by way of example and not limitation, using VZW Confidential Information in connection with negotiations with other ASCAP licensees or potential licensees or in future negotiations with Verizon Wireless; (ii) commercially exploit the VZW Confidential Information, including, by way of example and not limitation, selling or disclosing the VZW Confidential Information for purposes of indicating the popularity of certain genres of copyrighted musical works or individual works; and (iii) disclose or permit disclosure of VZW Confidential Information to any third party without Verizon Wireless' prior written approval.  Further, ASCAP shall: (i) not remove any proprietary notice of Verizon Wireless on or in any VZW Confidential Information or remove any

9

trademark, trade name, logo or notice affixed to such VZW Confidential Information

other than as may be necessary for ASCAP to process the VZW Confidential Information

electronically as permitted herein; (ii) take all reasonable measures to protect the secrecy

of VZW Confidential Information and to avoid disclosure or use of VZW Confidential

Information to prevent it from falling into the public domain or into the possession of

persons other than those persons authorized under this Paragraph 11 to have such

information; (iii) notify Verizon Wireless in writing of any misuse or misappropriation of

VZW Confidential Information which comes to ASCAP's attention; and (iv) notify

Verizon Wireless if disclosure of VZW Confidential Information by ASCAP is necessary

to comply with the requirements of any law, government order, regulation or legal

process prior to such disclosure and, at Verizon Wireless' request, use best efforts to seek

an appropriate protective order in connection with such legal process and, if unsuccessful,

to use best efforts to assure that confidential treatment will be granted to VZW

Confidential Information.

           b.     Permitted Disclosure. ASCAP shall only have the right to disclose

VZW Confidential Information: (i) in disaggregated form, to its music publisher,

songwriter and composer members and affiliated society members solely in conjunction

with the determination of the applicable royalty payable by ASCAP to such members

based on Verizon Wireless' public performance of the applicable work; (ii) in aggregated

form with other ASCAP licensed Ringback Tone services to prospective members for the

purposes of estimating what royalties might be payable to such persons if they were to

become ASCAP members; (iii) to any ASCAP employees or outside consultants of

ASCAP, such as ASCAP's survey and econometric consultants or outside counsel, who

have a need to access VZW Confidential Information in order to prepare the royalty

disbursements or reports to ASCAP members or affiliated society members as permitted

in this Subparagraph 11(b); (iv) to any ASCAP employees or outside consultants of

ASCAP who have a need to access VZW Confidential Information in connection with

future negotiations with Verizon Wireless; or (v) to any ASCAP employees or outside

attorneys or consultants of ASCAP who have a need to access VZW Confidential

Information in connection with future legal proceedings before the Rate Court, or to the

Rate Court or other parties to such legal proceedings, provided that reasonably prior to

disclosure to the Rate Court or to such other parties, ASCAP shall notify Verizon

Wireless in order to permit Verizon Wireless to object to such use and to seek protection

of such information, and ASCAP shall use its best efforts to seek an appropriate

protective order in connection with such legal proceedings to protect the VZW

Confidential Information and, if unsuccessful, shall use its best efforts to assure that

confidential treatment will be granted to VZW Confidential Information.

    c.  Return of VZW Confidential Information. Any VZW Confidential

Information which is furnished by Verizon Wireless to ASCAP, or reproduced by

ASCAP, will be returned to Verizon Wireless, accompanied by all copies of such VZW

Confidential Information within thirty (30) days of receipt of a written request for the

return of such VZW Confidential Information by Verizon Wireless.  In the event of any

such request, ASCAP shall certify to Verizon Wireless that any and all copies, duplicates,

repetitions or excerpts of any VZW Confidential Information received and any written

memoranda or notes of VZW Confidential Information have been destroyed.

Notwithstanding anything to the contrary in this Paragraph 11, ASCAP may retain the

11

numbers included in the VZW Confidential Information in the form in which they are maintained for ASCAP's income accounting and survey and distribution purposes in accordance with ASCAP's normal records retention policies, to enable ASCAP to account for its revenues and to verify distributions when questions are raised and make adjustments to distributions, by way of example, necessitated by the receipt of new information.

      d.     No Rights Granted. Nothing in this Agreement is intended to grant any patent, copyright, trade secret, trademark service mark or other proprietary rights to ASCAP, nor shall this Agreement grant ASCAP any rights in VZW Confidential Information except the limited right to use such VZW Confidential Information as expressly provided in this Paragraph 11. Verizon Wireless remains the sole and exclusive owner of VZW Confidential Information.

      e.     Specific Performance and Injunctive Relief. Each Party agrees that its obligations under this Paragraph 11 are necessary and reasonable in order to protect Verizon Wireless and its business. ASCAP acknowledges that it will be impossible to fully measure in money the damages caused to Verizon Wireless by any failure to comply with, or any breach of, the material terms, promises, agreements and conditions of this Paragraph 11, and that, in the event of any such failure or breach, Verizon Wireless will not have an adequate remedy at law or in damages. ASCAP, therefore, consents to the issuance of an injunction, a decree for specific performance, and the enforcement of other equitable remedies against it by Verizon Wireless without bond or other security to compel the performance of all of the material terms of this Paragraph 11. ASCAP hereby waives the defense of the availability of adequate relief in damages. If a dispute arises

over what constitutes VZW Confidential Information subject to this Paragraph 11, ASCAP agrees to treat any information subject to such dispute (the "Disputed Information") as VZW Confidential Information under this Paragraph 11 until such time as either the Parties can mutually agree or a court of competent jurisdiction has determined if the Disputed Information constitutes VZW Confidential Information.

12.    a.    ASCAP agrees to indemnify, save and hold harmless and defend Verizon Wireless and the other Verizon Wireless Parties from and against any and all claims, demands, suits, losses, damages, liabilities, deficiencies, judgments, assessments, fines, costs and other expenses (including reasonable attorneys' fees and costs of suit) (each, a "Claim"; collectively, "Claims") that may be made or brought against, or incurred by, the Verizon Wireless Parties, or any of them, with respect to the performances licensed under this Agreement of any compositions in ASCAP's repertory at any time, or from time-to-time, during the License Term.

b.    Verizon Wireless agrees to give ASCAP prompt notice of any Claim of the type specified in Paragraph 12(a), above, and agrees promptly to deliver to ASCAP all papers pertaining thereto.  ASCAP at its own expense shall have full charge of the defense of any such Claim, and Verizon Wireless shall reasonably cooperate, at ASCAP's expense, with ASCAP in such defense.  Verizon Wireless also shall have the right to engage counsel of its own, at its own expense, who may participate in the defense of any such Claim and with whom counsel for ASCAP shall cooperate.

13.    Each of the Parties represents and warrants that it has taken all necessary actions and has secured the consents of all persons necessary to authorize the execution of this Agreement and performance of all its obligations under this Agreement.  Each

Party represents that the person executing this Agreement on its behalf is duly authorized to do so and that this Agreement is and shall be during its term a binding obligation of the Party on behalf of which it is executed. Each Party represents to the other that the execution and performance of this Agreement is not barred, prohibited or impaired by any existing law, rule, regulation, court or administrative order, decree, contract or agreement to which it is now a party or by which it is bound.

14.     The Parties agree that the Court that exercised jurisdiction over the Verizon Wireless Proceeding shall retain jurisdiction to enforce the provisions of this Agreement or should a dispute arise between the Parties concerning its meaning or enforcement.

15.     In the event Verizon Wireless fails to pay any license fees due hereunder, or fails to submit to ASCAP any reports required hereunder, ASCAP shall give Verizon Wireless thirty (30) days' notice in writing to cure such breach or default. In the event that any such breach or default is capable of commercially reasonable cure and has not been cured, or cure has not commenced, within said thirty (30) days, then ASCAP may give written notice of its intent to terminate this Agreement with such termination effective upon the passage of thirty (30) days after Verizon Wireless' receipt of such notice. In the event that Verizon Wireless disputes ASCAP's position that the alleged breach justifies termination or is capable of commercially reasonable cure, either Party may make an application to the Rate Court for a ruling as to whether the alleged breach justifies termination of this Agreement or is capable of commercially reasonable cure. If Verizon Wireless makes such an application within thirty (30) days of the date ASCAP provides notice of its intent to terminate this Agreement for breach or default, then

14

ASCAP may not terminate this Agreement during the pendency of Verizon Wireless' application. In the event that the Rate Court determines that Verizon Wireless has met its obligations under this Agreement or that such breach does not justify termination, ASCAP shall have no right of termination under this Paragraph with respect to the matter determined by the Court in such proceeding. In the event that the Rate Court determines that Verizon Wireless has not satisfied its obligations to ASCAP under this Agreement and that such breach justifies termination, Verizon Wireless shall thereafter have forty-five (45) days to cure any such default identified by the Rate Court. In the event Verizon Wireless does not cure such default within such forty-five (45) day period, this Agreement shall terminate immediately, and ASCAP may pursue any and all other rights and remedies available to ASCAP. This Paragraph, and the termination rights set forth herein shall not apply to any breach occurring before such time that the License Fees due during the License Term under this Agreement and the V CAST License Agreement exceed the Estimated License Fees as defined in Paragraph 4. ASCAP acknowledges that it shall have no right to terminate this Agreement other than as expressly set forth in this Paragraph 15. Verizon Wireless acknowledges that this Paragraph is non-precedential and is only being agreed to by ASCAP because this Agreement is a partial settlement of a litigation, and because the Parties do not anticipate that Verizon Wireless will have to make additional payments to ASCAP for a significant portion of the License Term.

16.    a.    All notices, statements and other documents required to be given under this Agreement shall be duly and properly given if: (i) mailed to the other Party by registered or certified United States mail, return receipt requested; (ii) sent by generally

15

recognized same-day or overnight delivery service; or (iii) sent by facsimile, with receipt
acknowledged or confirmed.

        b.     All notices, statements and other documents required to be given
under this Agreement shall be mailed or delivered to the Parties at the following
addresses, or such other individuals or addresses as the Parties may by written notice
designate:

        If to ASCAP:

            ASCAP
            One Lincoln Plaza
            New York, New York  10023
            Attention: Matthew DeFilippis, Vice President,
            New Media and Technology
            Fax: (678) 239-3580

        Copy to:

            Richard H. Reimer, Esq.
            ASCAP
            One Lincoln Plaza
            New York, New York 10023
            Fax: (212) 787-1381

            And copy to:

            Hillel I. Parness, Esq.
            Robins, Kaplan, Miller & Ciresi L.L.P.
            601 Lexington Avenue, Suite 3400
            New York, New York 10022
            Fax: (212) 980-7499

        If to Verizon Wireless:

            Brian T. Ashby, Esq.
            Cellco Partnership d/b/a Verizon Wireless
            Associate General Counsel
            Legal Department
            One Verizon Way
            Basking Ridge, New Jersey  07920

Fax:  (908) 766-3691

Copy to:

> Bruce G. Joseph, Esq.
> Wiley Rein, LLP
> 1776 K Street NW
> Washington, DC  20006
> Fax: (202) 719-7049

17.    This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns, but no assignment shall relieve the Parties of their respective obligations under this Agreement as to performances transmitted, acts done and obligations incurred prior to the effective date of the assignment.

18.    This Agreement may be executed in any number of counterparts and by facsimile signature, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

19.    This Agreement, together with all exhibits and schedules, which are incorporated herein by reference, constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, whether oral or written, between the Parties as to the subject matter of this Agreement, except that it does not supersede the Past Settlement Agreement or the V CAST License Agreement.  This Agreement may not be amended, modified or terminated except by a written instrument signed by both of the Parties.  Neither Party has made any representations or promises to the other in connection with this Agreement or its subject matter that are not expressly set forth in this Agreement.

20.     This Agreement shall be governed by and construed in accordance with the laws of the State of New York pertaining to contracts made and fully performed therein, without regard to choice of law rules.

21.     If any term, covenant or condition of this Agreement is held invalid, illegal or unenforceable in any respect, such provision shall be replaced by an enforceable provision that most closely meets the commercial intent of the Parties, and such holding shall not affect any other provision of this Agreement, which shall be and remain effective as though such invalid, illegal or unenforceable provision has not been contained herein.

22.     Each of the Parties has received independent legal advice concerning both the nature of this Agreement and the Parties' May 21, 2010 Term Sheet, and their legal rights and obligations under this Agreement and the Parties' May 21, 2010 Term Sheet. The Parties have entered into this Agreement voluntarily and of their own free will and accord without any threat of force or duress of any kind. The Parties hereby agree to bear their own costs and attorneys' fees relating to this Agreement.

CELLCO PARTNERSHIP d/b/a/          AMERICAN SOCIETY OF COMPOSERS,
VERIZON WIRELESS                   AUTHORS & PUBLISHERS

By: _____      By: _____

Name: _____      Name: _____

Title: _____      Title: _____

18

20.     This Agreement shall be governed by and construed in accordance with the laws of the State of New York pertaining to contracts made and fully performed therein, without regard to choice of law rules.

21.     If any term, covenant or condition of this Agreement is held invalid, illegal or unenforceable in any respect, such provision shall be replaced by an enforceable provision that most closely meets the commercial intent of the Parties, and such holding shall not affect any other provision of this Agreement, which shall be and remain effective as though such invalid, illegal or unenforceable provision has not been contained herein.

22.     Each of the Parties has received independent legal advice concerning both the nature of this Agreement and the Parties' May 21, 2010 Term Sheet, and their legal rights and obligations under this Agreement and the Parties' May 21, 2010 Term Sheet. The Parties have entered into this Agreement voluntarily and of their own free will and accord without any threat of force or duress of any kind. The Parties hereby agree to bear their own costs and attorneys' fees relating to this Agreement.

CELLCO PARTNERSHIP d/b/a/
VERIZON WIRELESS

By: _____

Name: _____

Title: _____

AMERICAN SOCIETY OF COMPOSERS,
AUTHORS & PUBLISHERS

By: _____

Name: _Christopher Amenita_

Title: _SVP Broad Cast Operations +
New Media Licensing_

18