# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------  x
UNITED STATES OF AMERICA,          :
                                   :
                     Plaintiff,    :
                                   :
        - against -                :        Civ. 13-95 (WCC)
                                   :
AMERICAN SOCIETY OF COMPOSERS, AUTHORS   :   ORDER
AND PUBLISHERS, et al.             :
                                   :
                     Defendants,   :       (Magistrate
                                   :        Judge Dolinger)
------------------------------------  
In the Matter of the Application of   :
POST-NEWSWEEK STATIONS, INC., et al.   :
                                   :
                     Applicants,   :
                                   :
For the Determination of Reasonable License Fees.   :
------------------------------------  x

Applicants Post-Newsweek Stations, Inc., et al. ("Applicants") having

applied to the Court for the determination of reasonable license fees pursuant to

Section IX of the Second Amended Final Judgment herein, and the Applicants and

ASCAP, following pretrial proceedings, having negotiated and agreed upon forms of

license agreements, and Applicants and ASCAP having agreed that such forms of license

agreements may be entered into lawfully by each party to this proceeding, and Applicants

and ASCAP having consented to the entry of this order to carry out and consummate the

agreements they have reached, and notice of the settlement of this order having been

given to the United States of America, and Applicants and ASCAP having agreed that

such application shall cover the period April 1, 1998 – December 31, 2009 (the "License

Period");

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

2

1.    The form of Local Station Blanket Television License (and annexed exhibits), appended hereto as Exhibit 1, and the form of Local Station Per Program Television License (and annexed exhibits), appended hereto as Exhibit 2, are the forms of such licenses agreed to by the parties (the "Licenses").

2.    ASCAP shall mail said forms of Local Station Blanket Television License and Local Station Per Program Television License to each Applicant or other local television station owner that has agreed to be bound by the outcome of this proceeding or negotiations on behalf of Applicants by the Television Music License Committee (the "TMLC") (collectively, "Bound Stations"), together with a copy of this order, so that the forms shall be received by the Bound Stations no later than December 17, 2004. Each Bound Station shall sign and return either of such agreements to ASCAP at its office at One Lincoln Plaza, New York, New York 10023, within 60 days of receipt of said forms by such Bound Station. If any Bound Station fails to return either of such agreements to ASCAP, said Applicant shall be deemed to have elected to be licensed under the form of License it operated under as of the date of this Order.

3.    Each Bound Station's license fee shall be determined in accordance with the provisions of the license fee allocation formula developed by the TMLC, attached as Exhibit B to the Licenses. The license fee allocation formula allocates industry-wide license fees to be paid to ASCAP pursuant to the Local Station Blanket Television License in a reasonably equitable manner among the Bound Stations, and each Bound Station is directed to pay such fees pursuant to the allocation formula.

4.    Jurisdiction of this proceeding is retained for the purpose of:

(i)    entering money judgments, on ASCAP's application, against designated Applicants on account of interim license fees due and owing under the interim licenses heretofore in effect in this proceeding; and

3

      (ii)    entering money judgments, on ASCAP's application, against designated Applicants on account of license fees due and owing under the terms of the Licenses.

      Counsel for the Applicants shall have the right to oppose any application by ASCAP in whole or in part.

      5.    The Court retains continuing jurisdiction over this proceeding for the purpose of enforcing this Order and the terms, conditions and obligations of the Licenses.

Dated: November 17, 2004
     New York, New York

Michael H. Dolinger
*United States Magistrate Judge*

4

We consent to the entry of the foregoing:

WEIL, GOTSHAL & MANGES LLP

By: _R. Bruce Rich (RR-0313)_
R. Bruce Rich (RR-0313)
Jonathan T. Weiss (JW-3589)
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Applicants Post-Newsweek
Stations, Inc.

- and -

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

By: _Jay Cohen_
Jay Cohen (JC-0276)
Lesley F. Rosenthal (LR-5637)
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

- and -

RICHARD H. REIMER, ESQ.
ASCAP Building
One Lincoln Plaza
New York, New York 10023

Attorneys for ASCAP

Exhibit 1

## LOCAL STATION BLANKET TELEVISION LICENSE

Agreement made between AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS ("SOCIETY") and _____ ("LICENSEE") as follows:

1.   Term and Scope of License

A.   SOCIETY grants to LICENSEE and LICENSEE accepts for a period commencing as of April 1, 1998 and ending December 31, 2009, a license to perform publicly all musical works heretofore copyrighted, composed or written by the members of SOCIETY and now or hereafter during the term hereof in the repertory of SOCIETY, or hereafter during the term hereof copyrighted, composed or written by such members of SOCIETY, or of which SOCIETY shall have the right to license such performing rights:

(1)   by Television Broadcasting in the United States, and its territories, commonwealth and possessions, as part of LICENSEE's Non-Network Television Programs and Non-Network Announcements from television station _____ ("STATION") located at _____; and

(2)   transmitted or caused to be transmitted either directly or indirectly over the Internet in and as part of a STATION Web Site only in connection with:

(a)   the simultaneous retransmission of any of STATION's Locally-Produced Television Programs;

(b)   the retransmission of all or a portion of any of STATION's Locally-Produced Television Programs that aired during the term of this Agreement; and

(c)   content broadcast, transmitted or retransmitted on any Web Site or portion thereof used primarily to promote STATION and/or the exhibition of any Program.

B.   Notwithstanding the foregoing, the license granted herein shall not include transmissions described in Subparagraphs 1.A.(2)(a) and 1.A.(2)(b) above where such transmissions contain Programs which are nationally or regionally aired regularly scheduled series Programs (e.g., Regis and Kelly, George Michael's Sports Machine, and Major League Baseball). In the event that STATION airs Locally-Produced Television Programs, and such Programs also appear on one or more additional stations (which Programs for purposes of this Agreement would not be considered Locally-Produced Television Programs for the additional station(s)), only the STATION may retransmit music in SOCIETY's repertory contained in such Programs in the manner described in Subparagraphs 1.A.(2)(a) and 1.A.(2)(b) above, while the additional station(s) may not.

C.     The license granted herein does not cover transmissions on a STATION Web Site of music in SOCIETY's repertory where members of the public are charged a fee by STATION for the right to access such transmissions. Such transmissions shall be subject to appropriate separate licensing. Notwithstanding the foregoing, the fact that STATION may charge members of the public for access to discrete areas of a STATION Web Site other than those areas containing performances licensed hereunder shall not limit the scope of coverage of this license.

D.     (1) This license does not extend to or include the public performance by Television Broadcasting or otherwise of any rendition or performance of (a) any opera, operetta, musical comedy, play or like production, as such, in whole or in part, or (b) any composition from any opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form) in a manner which recreates the performance of such composition with substantially such distinctive scenery or costume as was used in the presentation of such opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form); provided, however, that the rights granted to LICENSEE under this Agreement shall be deemed to include a grant of the right to make non-dramatic performances of compositions licensed hereunder by the Television Broadcasting of a motion picture containing such compositions if the rights in such motion picture other than those licensed under this Agreement have been obtained from the parties in interest.

(2)     Nothing herein contained shall be deemed to license the public performance by Television Broadcasting of dramatic performances. Any performance of a separate musical composition which is not a dramatic performance, as defined herein, shall be deemed to be a non-dramatic performance. For purposes of this Agreement, a dramatic performance shall mean a performance of a musical composition as part of a television Program in which there is a definite plot depicted by action and where the performance of the musical composition is woven into and carries forward the plot and its accompanying action. The use of dialogue to establish a mere Program format or the use of any non-dramatic device merely to introduce a performance of a composition shall not be deemed to make such performance dramatic. For purposes of this Agreement, performances of compositions in music videos shall be construed as non-dramatic performances.

E.     The performances licensed hereunder may originate at STATION or at any other place whether or not such other place is licensed to perform publicly the compositions licensed hereunder, regardless of the manner, means, or method of such origination; but nothing herein contained shall be deemed to grant a license to such place itself (or to the parties responsible for the performance therein) for the public performance in such place of any such compositions.

F.     Except as expressly herein otherwise provided, nothing herein contained shall be construed as authorizing LICENSEE to grant to others any right to reproduce or perform publicly by any means, method or process whatsoever, any of the musical compositions licensed

hereunder or as authorizing any receiver of any television broadcast to perform publicly or reproduce the same, by any means, method or process whatsoever.

G.    The license granted herein shall include, on an experimental basis, for no additional fee to SOCIETY, the right to engage in such non-dramatic public performances of musical works in SOCIETY's repertoire as may result from LICENSEE's free, over-the-air digital transmissions occurring within STATION's existing geographic market(s) over FCC-assigned channels.

H.    This Agreement expressly incorporates, and SOCIETY and LICENSEE agree to be bound by, the provisions of the letter agreement, dated November 16, 2004, between SOCIETY and TELEVISION MUSIC LICENSE COMMITTEE ("COMMITTEE"), a copy of which is attached hereto as Exhibit A.

2.    Definitions

For purposes of this Agreement only:

A.    "Affiliated Station" means any Television Broadcasting station in the United States and its territories that regularly broadcasts Programs transmitted by a television network licensed by SOCIETY during the term hereof.

B.    "Announcement" means any commercial, promotional, or public service announcement (exclusive of program-length "infomercials" of greater duration than 120 seconds), or any producer's or distributor's logo.

C.    "ASCAP Consent Decree" means the Second Amended Final Judgment, or any successor decree, in United States v. ASCAP, S.D.N.Y. 41-1395 (WCC).

D.    "COMMITTEE" means the Television Music License Committee, an unincorporated membership association organized under the laws of the State of New York, which is duly authorized to represent local television stations in music licensing matters.

E.    "LMA OPERATOR" means any person, firm or corporation not under the same or substantially the same ownership, management or control as LICENSEE with whom LICENSEE has entered into a Local Marketing Agreement.

F.    "Local Marketing Agreement" means any arrangement between LICENSEE and an LMA OPERATOR that:

(1)    authorizes the resale by an LMA OPERATOR of the use of the Television Broadcasting facilities of STATION;

(2)    permits an LMA OPERATOR to provide Programs for all or substantially all of the time STATION is on the air; and

(3)   provides for the sale by an LMA OPERATOR of all or substantially all Announcements broadcast on STATION.

G.   "Locally-Produced Television Program" means any Non-Network Television Program produced by, or expressly for, LICENSEE.

H.   "Network Announcement" means any Announcement transmitted by a television network licensed by SOCIETY at the time such Announcement is broadcast on the network, and broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts (sometimes known as "rebroadcasts") over two or more Affiliated Stations of that network.

I.   "Network Television Program" means any Program, transmitted by a television network licensed by SOCIETY at the time such Program is broadcast on the network, identified as a Program of the network, and broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts (sometimes known as "rebroadcasts") over two or more Affiliated Stations of that network.

J.   "Non-Network Announcement" means any Announcement broadcast by STATION other than a Network Announcement.

K.   "Non-Network Television Program" means any Program broadcast by STATION other than a Network Television Program.

L.   "Program" means all material (visual or otherwise) broadcast by STATION other than Announcements.

M.   "STATION Web Site" shall mean the Web Site operated by or for STATION as the STATION's Web Site and shall include any Web Site that is shared between two or more stations in the same market, or two or more stations with a common owner.

N.   "Syndicated Television Program" means: (i) any Non-Network Television Program supplied to LICENSEE and other television stations by a producer, distributor or television network not licensed by SOCIETY; or (ii) any other Program that is not a Locally-Produced Television Program.

O.   "Television Broadcasting" shall mean free, unscrambled, point-to-multipoint over-the-air local analog or digital broadcasting by means of television.

P.   "Web Site" shall mean an Internet computer service comprising a series of interrelated web pages registered with a domain name registration service that STATION transmits or causes to be transmitted either directly or indirectly to persons who receive the service over the Internet by means of a personal computer or by means of another device capable of receiving Internet transmissions.

3. Right to Restrict

A.      The members of SOCIETY shall have the right, at any time and from time to time, in good faith, to restrict the Television Broadcasting of compositions from musical comedies, operas, operettas and motion pictures, or any other composition being excessively broadcast, only for the purpose of preventing harmful effect upon such musical comedies, operas, operettas, motion pictures or compositions, in respect of other interests under the copyrights thereof; provided, however, that the maximum number of compositions which may be at any time thus restricted shall not exceed 750 and moreover that limited licenses will be granted upon application to SOCIETY entirely free of additional charge as to restricted compositions, if and when the copyright owners thereof are unable to show reasonable hazards to their major interests likely to result from such Television Broadcasting; and provided further that such right to restrict any such composition shall not be exercised for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition; and provided further that in no case shall any charges, "free plugs," or other consideration be required in respect of any permission granted to perform a restricted composition; and provided further that in no event shall any composition, after the initial television broadcast thereof, be restricted for the purpose of confining further television broadcasts thereof to a particular artist, station, network or Program.

B.      SOCIETY reserves the further right, at any time and from time to time, in good faith, to restrict the Television Broadcasting of any compositions, over and above the number specified in Subparagraph 3.A., only as to which any suit has been brought or threatened on a claim that such composition infringes a composition not contained in the repertory of SOCIETY or on a claim by a non-member of SOCIETY or by a member not listed in any current list of SOCIETY's members, as the same may be augmented from time to time, that SOCIETY does not have the right to license the public performance of such composition by Television Broadcasting.

C.      Nothing in Subparagraphs 3.A. and 3.B. shall relieve SOCIETY of its obligation to indemnify LICENSEE, as reflected in Paragraph 8. below, with respect to the performances of any compositions in SOCIETY's repertory, the performance of which SOCIETY has restricted, prior to such time as LICENSEE receives notice from SOCIETY of any such restriction.

4. Music Use Information

A.      Subject to the provisions of Subparagraphs 4.B. and 4.C. below, LICENSEE agrees to furnish to SOCIETY upon request during the term of this Agreement a list of all musical compositions broadcast from or through STATION on LICENSEE's Non-Network Television Programs, showing the title of each composition and the composer and author thereof, provided that LICENSEE shall not be obligated under this Paragraph 4. to furnish such a list covering a period of more than seven (7) consecutive days or periods aggregating more than four (4) weeks during any one calendar year. For purposes of this Paragraph 4., music cue sheets containing the aforesaid information shall be deemed to constitute such a list.

B.      With respect to Syndicated Television Programs broadcast from or through STATION, LICENSEE shall be deemed to have complied with its obligations under Subparagraph 4.A. if LICENSEE identifies the Program by its title, including episode title and/or number, the name of the producer where available, and the copyright notice contained therein where available. If SOCIETY does not have a music cue sheet for such Program, and LICENSEE does have such a cue sheet, LICENSEE shall provide a copy of such music cue sheet to SOCIETY at SOCIETY's request.

C.      SOCIETY shall make requests pursuant to Subparagraph 4.A. only where reasonably necessary for its purposes and, except where the information is necessary with respect to SOCIETY's survey of past performances, shall give LICENSEE notice of any request under subparagraph 4.A. at least one (1) month prior to the commencement of the period covered by said request. The provisions of Subparagraph 4.B. shall not limit LICENSEE's obligation to cooperate with SOCIETY in connection with any claim or demand for action referred to in Paragraph 8 of this Agreement.

5.      Payments

A.      In consideration of the license herein granted, LICENSEE agrees to pay to SOCIETY for each calendar month during the term of this Agreement a fee that is equal to:

(1)      one-thirteenth (1/13) of LICENSEE's blanket license fee covering the thirteen (13) month period from December 1, 2004 through December 31, 2005, as calculated pursuant to the methodology determined by COMMITTEE and set forth in Exhibit B hereto.

(2)      one-twelfth (1/12) of LICENSEE's blanket license fee covering each subsequent twelve (12) month period during the term of this Agreement, as calculated pursuant to the methodology determined by COMMITTEE and set forth in Exhibit B hereto.

B.      In no case shall LICENSEE's monthly blanket license fee be less than $45.

C.      For all periods following execution of this Agreement, payments attributable to a given month shall be due no later than the first day of each succeeding month. If any such blanket license fee payment due under the terms of this Paragraph 5. is not received by SOCIETY by the twentieth (20th) day of the month in which such payment was due, LICENSEE shall pay to SOCIETY a late-payment charge of one percent (1%) per month (simple interest) calculated from the date such payment was due.  The payment provisions of this Paragraph 5 shall not apply in circumstances in which LICENSEE is unable to submit a payment within the specified time period due to "force majeure" (e.g., earthquake, hurricane, fire, flood, terrorist activities).

6.      Local Marketing Agreement

A.      If LICENSEE is, or becomes, a party to a Local Marketing Agreement, LICENSEE and the LMA OPERATOR shall execute a letter to SOCIETY, in the form attached

as Exhibit C and made a part of this Agreement, requesting amendment of this License Agreement to add the LMA OPERATOR as a party. When such a letter has been fully executed by LICENSEE, the LMA OPERATOR and SOCIETY, this Agreement shall be deemed amended accordingly.

      B.    In the event LICENSEE is a party to a Local Marketing Agreement, and a dispute arises between SOCIETY and either the LMA OPERATOR or LICENSEE as to whether LICENSEE or the LMA OPERATOR is responsible for the performance of any of the obligations arising under this Agreement, SOCIETY shall be entitled to receive, upon request, a copy of the portion of such agreement as sets forth the respective obligations of LICENSEE and the LMA OPERATOR regarding the payment of fees, accountings, recordkeeping and administrative responsibilities, or, if LICENSEE so elects, a copy of the entire Local Marketing Agreement.

7.    <u>Breach or Default</u>

      Upon LICENSEE's breach or default of any payment, accounting or substantive reporting obligations required under the terms of this Agreement, SOCIETY may give LICENSEE thirty (30) days' notice in writing to cure such breach or default, and in the event that such breach or default has not been cured within thirty (30) days of said notice, SOCIETY may then terminate this license.

8.    <u>Indemnity Clause</u>

      SOCIETY agrees to indemnify, save and hold harmless, and to defend LICENSEE, its sponsors and their advertising agencies, and its and their officers, employees, and artists, and each of them, from and against any claims, demands, or suits that may be made or brought against them or any of them with respect to the performances under this Agreement of any compositions in SOCIETY's repertory that are written or copyrighted by members of SOCIETY. LICENSEE agrees to give SOCIETY immediate notice of any such claim, demand, or suit and agrees immediately to deliver to SOCIETY all papers pertaining thereto. SOCIETY shall have full charge of the defense of any such claim, demand, or suit and LICENSEE shall cooperate fully with SOCIETY in such defense. LICENSEE, however, shall have the right to engage counsel of its own at its own expense who may participate in the defense of any such action. SOCIETY agrees, at the request of LICENSEE, to cooperate with and assist LICENSEE, its advertisers and their advertising agencies and its and their officers, employees, and artists in the defense of any action or proceeding brought against them or any of them with respect to the performance of any musical compositions contained in SOCIETY's repertory, but not copyrighted or written by members of SOCIETY. This Paragraph 8. shall not apply to performances of any works that have been designated as restricted under Paragraph 3. of this Agreement.

9.    <u>Rights of Termination</u>

      A.    In the event of the termination or suspension of the governmental licenses covering STATION or any substantial alteration or variation of the terms and conditions thereof,

or any major interference with the operations of STATION due to governmental measures or restrictions, LICENSEE shall have the right to terminate this Agreement upon seven (7) days' notice. Upon termination, this Agreement shall no longer remain in effect and the parties shall be relieved of all obligations arising hereunder from the date of termination.

      B.   In the event of:

      (1)   any major interference with the operations of SOCIETY in the state, territory, dependency, possession or political subdivision in which STATION is located, by reason of any law of such state, territory, dependency, possession or political subdivision; or

      (2)   any substantial increase in the cost to SOCIETY of operating in such state, territory, dependency, possession or political subdivision, by reason of any law of such state, territory, dependency, possession or political subdivision, which is applicable to the licensing of performing rights.

SOCIETY shall have the right, upon notice to COMMITTEE and upon a showing that the matters referred to in Subparagraphs 9.B.(1) and 9.B.(2) above affect the licensing of performing rights under this Agreement, to apply to the judge with supervisory authority over the ASCAP Consent Decree for whatever relief SOCIETY deems appropriate.

### 10.   Successors and Assigns

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns, but no assignment shall relieve the parties hereto of their respective obligations hereunder as to performances broadcast, acts done and obligations incurred prior to the effective date of the assignment.

### 11.   Notices

Any notice filed under this Agreement shall be in written form or in a form mutually agreed upon by SOCIETY and COMMITTEE and shall be sent to LICENSEE (or a designated agent of LICENSEE). All notices required or permitted to be given by either of the parties to the other hereunder shall be duly and properly given if: (a) mailed to the other party by registered or certified United States mail; (b) sent by generally recognized same-day or overnight delivery service; (c) mailed by first class United States mail; or (d) sent by electronic transmission (i.e., electronic mail, facsimile or similar transmission), provided that the electronic transmission is followed by a hard copy and receipt of the notice is acknowledged.

### 12.   Per Program License

The "Local Station Per Program Television License," coterminous with this License, is being offered to LICENSEE simultaneously with this Agreement. During the term of this Agreement, LICENSEE may switch from a per program to a blanket license, or from a blanket to a per program license, as of the first day of a month, prospectively on thirty (30) days'

written notice to SOCIETY. LICENSEE may so elect to change its license status up to twice in any given twelve (12) month period during the term of this License.

13.   Without Prejudice

The parties are entering into this Agreement without prejudice to any arguments or positions they may assert in any future rate proceeding concerning what constitutes reasonable blanket and per program license fees and terms for the local television industry or, in SOCIETY's case, as to any other licensee.

14.   Applicable Law

This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.

IN WITNESS WHEREOF, this Agreement has been duly executed by SOCIETY and LICENSEE this _____ day of _____, 20__, as of the day of _____ 20__.


_____          AMERICAN SOCIETY OF COMPOSERS
            LICENSEE                      AUTHORS AND PUBLISHERS


By: _____         By: _____

Title: _____        Title: _____

EXHIBIT A

November 16, 2004

Mr. John A. LoFrumento
American Society of Composers, Authors and Publishers
One Lincoln Plaza
New York, New York  10023

Re:    ASCAP - Local Television Station
        Blanket and Per Program Licenses

Dear John:

       This letter sets forth the agreement reached between the American Society of Composers, Authors and Publishers ("ASCAP") and the Television Music License Committee (the "Committee") with regard to: (i) settlement of U.S. v. ASCAP: Application of Post-Newsweek Stations, Inc., et al., Civ. 41-1395 (S.D.N.Y.); and (ii) fees and terms under the ASCAP - Local Television Station Blanket and Per Program License Agreements covering the period April 1, 1998 through December 31, 2009 (collectively the "Licenses"). This letter agreement is expressly incorporated in Subparagraph 1.H. of the Licenses, and is binding upon the parties hereto and upon the signatories to the Licenses.

       The parties agree as follows:

       1.    The interim agreement between the parties shall remain in effect through November 30, 2004. All interim fees payable for the period April 1, 1998 through November 30, 2004 shall be final.

       2.    Industry-wide Blanket License fees for all commercial local television stations licensed under the Licenses by ASCAP shall equal:

       December 1, 2004 - December 31, 2005 -- $92,083,333 (or $85 million on an annualized basis);

       January 1, 2006 - December 31, 2006 -- $85 million adjusted by the lesser of the change in the Consumer Price Index ("CPI") or three percent (3%) (the "2006 Blanket Amount");

       January 1, 2007 - December 31, 2007 -- the 2006 Blanket Amount adjusted by the lesser of the change in the CPI or three percent (3%) (the "2007 Blanket Amount");

       January 1, 2008 - December 31, 2008 -- the 2007 Blanket Amount adjusted by the lesser of the change in the CPI or three percent (3%) (the "2008 Blanket Amount");

January 1, 2009 - December 31, 2009 -- the 2008 Blanket Amount adjusted by the lesser of the change in the CPI or three percent (3%) (the "2009 Blanket Amount").

3.      Each local television station's Blanket License fees shall be determined in accordance with the provisions of the license fee allocation formula determined by the Committee and attached as Exhibit B to the Blanket License and Exhibit B to the Per Program License.

4.      Each year during the term of the Licenses, ASCAP shall provide to the Committee a list of current ASCAP-licensed local television stations.  The list of licensees shall be delivered to the Committee, in electronic form, on or before September 15 of each year during the term.  For each licensee, ASCAP shall provide the following information: (i) current station call letters; (ii) designated market area ("DMA"); (iii) state; (iv) FCC identification number; (v) ASCAP account number; (vi) channel position; (vii) station owner; (viii) network affiliation (if any); and (ix) previous call letters (if any) if contained in any database within ASCAP's control. For each newly-licensed station appearing on the list, ASCAP shall also provide: (i) signed status; (ii) date license was signed; (iii) date of first payment; and (iv) effective date of license. Any licensee added to the list between September 16 of any given year and September 15 of the following year will be included in the allocation formula the following year.  In the interim, such stations will be billed at the minimum fee for their respective DMAs.  ASCAP shall clearly identify in each list any licensees added to or deleted from the previous list.  Without limiting ASCAP's right to terminate the Licenses pursuant to Paragraph 9 or the Per Program License and Paragraph 7 of the Blanket License, ASCAP may not delete a station from the list of licensees for failure to make payments under this agreement absent a court order.

5.      In addition to the list of ASCAP-licensed stations described in Paragraph 4 above, ASCAP shall provide to the Committee no less frequently than once per quarter, in electronic form, a list of current per program licensees identified by call letters, DMA, and per program license effective date.

6.      In each of the years 2005, 2007 and 2009, within sixty (60) days of receipt of a written request from the Committee, ASCAP shall provide to the Committee, in electronic form, cue sheets for a statistically significant and representative sample of programs, as selected by an independent third party chosen by the Committee, for use solely in connection with the Committee's study of music use by the local television industry.  The Committee may use the results of any such music use study in connection with any negotiation, arbitration, or litigation with ASCAP, BMI, SESAC, or any other performing rights organization, or for any other reasonable purpose; provided, however, that the Committee shall not otherwise publicly disclose the results of any such study without ASCAP's prior approval.

7.      In the event the Committee and BMI reach a final agreement which, taken as a whole, is materially different from the Committee - ASCAP agreement, either party shall have the right, by no later than September 1, 2007, to commence good faith negotiations concerning what, if any, adjustments to their agreement are appropriate for the period commencing January 1, 2008 through the remainder of the term of the Licenses.  The parties shall submit to Magistrate Judge Dolinger (or if such a reference is not possible, to the judge

with supervisory authority over the ASCAP Consent Decree) all disputes concerning whether there is such a material difference between the provisions of the parties' agreement and the provisions of any final Committee - BMI agreement. If the parties agree, or the Court determines, that there is such a material difference between the Committee - ASCAP and Committee - BMI agreements, and no new agreement has been reached by the parties as a result of their good faith negotiations, either party shall have the right to opt out of the remaining term of the Licenses effective January 1, 2008. In the event either party elects under this paragraph to opt out of the Licenses effective January 1, 2008, stations shall continue to pay interim fees to ASCAP pursuant to the terms of this agreement, subject to retroactive adjustment once final blanket and per program license fees are established by agreement of the parties or determination by the ASCAP rate court.

8.    If neither party has opted out of the Licenses effective January 1, 2008 pursuant to the provisions of Paragraph 7 above, either ASCAP or the Committee shall have the right, by no later than November 1, 2008 to opt out of the remaining term of the Licenses effective January 1, 2009. The parties have not reached any understanding as to the interim fees payable effective January 1, 2009 in the event either party opts out of the agreement pursuant to this paragraph.

9.    At least once every six months, ASCAP and the Committee (or its designated representative) shall meet in good faith to resolve any outstanding billing, payment, or reporting disputes between ASCAP and any Licensee. Any good faith dispute that is not resolved during such meetings may be submitted to arbitration as provided in Paragraph 10 below.

10.    If ASCAP and the Committee (or its designated representative) are unable to resolve one or more good faith disputes pursuant to Paragraph 9 above, and, in the judgment of ASCAP and/or the Committee, such outstanding disputes affect a significant number of Licensees and/or involve a substantial dollar amount, such outstanding disputes shall be finally determined and resolved by a neutral arbitrator. The arbitrator shall be selected jointly by ASCAP and the Committee and appointed for a four (4) year period commencing on January 1, 2006; provided, however, that either party shall have the right to request the appointment of a new arbitrator upon written notice to the other party on or before October 1, 2007. Any such new arbitrator shall be selected jointly by ASCAP and the Committee and appointed for the period January 1, 2008 to December 31, 2009. If the parties are unable to agree upon an arbitrator by December 1, 2005, or December 1, 2007 (if applicable), selection of an arbitrator shall be conducted pursuant to the rules of the American Arbitration Association. If an arbitrator is unable to fulfill his or her term for any reason, the parties shall, within a reasonable time period, jointly select a new arbitrator to complete the term. If either ASCAP or the Committee submits one or more outstanding good faith disputes to arbitration pursuant to this paragraph, it shall so notify the arbitrator and the opposing party. Each party shall have thirty (30) days from the date of such notice to submit a statement of claim, and any supporting documentation, to the arbitrator and to the other party setting forth the party's positions regarding the dispute(s) at issue in the arbitration; provided, however, that the deadline for submission of a statement of claim may be extended up to thirty (30) days at the discretion of the arbitrator upon a showing of good cause by either party. The statements of claim shall not exceed ten double-spaced pages in length (exclusive of any supporting documentation). The arbitrator shall have thirty (30) days from his

or her receipt of the statements of claim to issue a written decision adopting one of the two positions put forth by the parties with respect to each disputed issue under arbitration, and to determine a just division of costs between the parties as the arbitrator may deem appropriate. The arbitrator's decision shall be final. The arbitrator shall not have authority to award punitive damages, attorneys' fees or expenses to either party. In no event shall either party submit to arbitration any good faith dispute that the parties have not yet attempted to resolve themselves pursuant to Paragraph 9 above.

11.     If, during the term of the Licenses, any dispute arises between ASCAP and any licensee concerning the interpretation of any of the provisions of this letter agreement or the Licenses which, in the judgment of ASCAP and/or the Committee, has or may have industry-wide impact, ASCAP and the Committee shall first endeavor to resolve such dispute, failing which either party may refer the matter to Magistrate Judge Michael H. Dolinger for determination (or, if such a reference is not possible, to the judge with supervisory authority over the ASCAP Consent Decree). In the event of such a reference, either party, as a preliminary matter, shall be entitled to assert that the dispute between them is not properly dealt with under the terms of this provision.

12.     If, during the term of the Licenses, ASCAP elects to license an entity agreed or determined to be a broadcast television "network" previously unlicensed by ASCAP, whose network programs are carried by local television stations licensed by ASCAP, such as Fox, appropriate adjustments shall be made to the license fees payable by local television station licensees consistent with the Opinions and Orders of Judge William Conner dated January 3, 1995 and January 27, 1995 in U.S. v. ASCAP: Application of Fox Broadcasting Company and Fox Television Stations, Inc. ASCAP and the Committee shall confer and attempt to reach agreement concerning the amount of any such fee adjustments and such agreement shall be binding on all licensees. If ASCAP and the Committee shall fail to agree on such fee adjustments, either party may refer the matter to Magistrate Judge Michael H. Dolinger for determination (or, if such a reference is not possible, to the judge with supervisory authority over the ASCAP Consent Decree).

13.     The Committee shall treat as confidential any station's financial or other proprietary information or documents provided to it by ASCAP pursuant to the Local Television Station Per Program License Agreement ("Confidential Information"). The Committee shall limit access to Confidential Information to the Committee's staff, representatives and counsel, and shall not disclose Confidential Information to any third party or to any Committee member, other than a Committee member who is employed by the station or station group that provided Confidential Information to ASCAP.

14.     ASCAP and the Committee are entering into this agreement without prejudice to any arguments or positions they may assert in any future rate proceeding concerning what constitutes reasonable blanket and per program license fees and terms for the local television industry or, in ASCAP's case, as to any other licensee.

Please indicate your agreement to the above by signing on the line provided below.

Very truly yours,

s/ Charles Sennet
Charles Sennet
Chairman
Television Music License Committee

s/ John A. LoFrumento
John A. LoFrumento
Chief Executive Officer
American Society of Composers
Authors and Publishers

EXHIBIT B

## Television Music License Committee
## Methodology for ASCAP License Fee Allocation for the Period
## From December 1, 2004 through December 31, 2009

The Industry-wide Blanket License fees for all commercial local television stations licensed under the ASCAP-Local Television Station Blanket License Agreements covering the period December 1, 2004 through December 31, 2009 (the "licensed television stations"), shall be allocated among the licensed television stations as follows (subject to revision pursuant to the provisions of Paragraph 8 below):

### STEP 1: Allocation of Industry-Wide Fee Among DMA Markets

For the period December 1, 2004 through December 31, 2005, and for each of the years 2006, 2007, 2008 and 2009 ("Contract Periods"), each Nielsen DMA television market is to be assigned its gross allocable share of the Industry-wide Blanket License fee (as set forth in Paragraph 2 of the November 16, 2004 letter agreement between the Television Music License Committee and ASCAP) in proportion to its percentage of the total number of weighted Qualified Viewing Households throughout the U.S. in an average quarter-hour during nine sweeps months over the course of the previous three years.

        1.      The number of Qualified Viewing Households will be computed for each licensed television station based upon average quarter hour household viewing data, Sunday through Saturday, 9 a.m. through midnight, compiled by Nielsen during nine sweeps months over the previous three years[1]. The Qualified Viewing Households attributable to each DMA market shall be calculated by multiplying the average quarter hour viewing households for all licensed stations in the market by 420 (the number of quarter hours between 9 a.m. and midnight in one week).

        2.      For each of the Contract Periods, the number of Market Qualified Viewing Households in each of the roughly 210 DMA markets as measured by Nielsen[2] is to be "weighted" as follows:

---

[1]   Qualified Viewing Households for the Contract Period December 1, 2004 through December 31, 2005 will be based upon data compiled by Nielsen for the nine November, February and May sweeps months between the period November 2001 and May 2004; for each subsequent year, Qualifying Viewing Households will be based upon data compiled by Nielsen for the nine November, February and May sweeps months prior to July 1 of the year preceding the Contract Period.

[2]   The number of Market Qualified Viewing Households in Puerto Rico shall be determined based upon data provided by Media Fax, or some other comparable provider of household audience information. The number of Market Qualified Viewing Households in the Virgin Islands and Guam (or in any other market or territory in which household audience information is unavailable) shall be determined by calculating the number of television households in the U.S. as a percentage of the total U.S. population; multiplying that percentage by the population of the market for which audience information is unavailable to derive the number of television households in the market; and multiplying the resulting number by a fraction the numerator of which is the number of licensed stations in the market and the denominator of which is the total number of stations in the market. For purposes of assigning an allocable share of the industry-wide blanket license fee to television markets in the Virgin Islands, Guam and Puerto Rico, the number of Market Qualified Viewing Households in each of these markets is to be given the same weight as the Nielsen DMA that most closely approximates the number of Market Qualified Viewing Households in these markets.

| DMA Markets 1 - 10 | Multiply by 1.21 |
|---|---|
| DMA Markets 11 - 25 | Multiply by 1.05 |
| DMA Markets 26 – 50 | Multiply by 0.92 |
| DMA Markets 51 – 75 | Multiply by 0.85 |
| DMA Markets 76 - 100 | Multiply by 0.85 |
| DMA Markets 101 - 125 | Multiply by 0.80 |
| DMA Markets 126 plus | Multiply by 0.75 |

The purpose of the weighting is to reflect, within broad parameters, that a household in a smaller market does not represent the same value as a household in a larger market.

3.     For each Contract Period, each market is to be assigned its share of the industry's overall blanket license fee by the following procedure:  The Market Qualified Viewing Households in the DMA market will be multiplied by the weight set forth in Paragraph 2 above for that DMA market to determine the weighted number of Market Qualified Viewing Households for the DMA market. Thus, for example, the top ten markets in terms of three-year households average will receive a 1.21 multiple. Each market's weighted Market Qualified Viewing Households number is to be divided by the total U.S. weighted market Qualified Viewing Households to derive a percentage of U.S. weighted Market Qualified Viewing Households for each market. This weighted percentage is then applied to the industry-wide blanket license fee. Thus, if the weighted percentage of total U.S. Market Qualified Viewing Households for DMA market "x" is one percent, DMA market x's share of the industry-wide $92,083,333 fee for the December 1, 2004 through the December 31, 2005 Contract Period would be $92,083,333 x 1%, or $920,833.33.

STEP 2: Allocation of Blanket License Fees to Stations Within Each Market

4.     Each station's percentage share of the DMA market blanket license fee shall be calculated as follows: Station Qualified Viewing Households for stations affiliated with networks licensed by ASCAP (currently the ABC, CBS, NBC and Univision television networks) shall be calculated by multiplying the station's average quarter hour viewing households by 420 (the number of quarter hours between 9 a.m. and midnight in one week); and subtracting one hundred percent (100%) of the station's average prime-time DMA viewing households (which equals the station's average prime-time DMA quarter hour households times 88 (the number of quarter hour units in prime time in one week)).[3] Station Qualified Viewing Households for stations not affiliated with networks licensed by ASCAP shall be calculated by multiplying the station's average quarter hour viewing households by 420.  A station's percentage share of the DMA market blanket fee shall be calculated by dividing its Station Qualified Viewing Households number by the total Station Qualified Viewing Households for all stations in that DMA market and multiplying the resulting percentage by the DMA market blanket license fee (reduced by the amount of any minimum fees assigned to stations in the market pursuant to paragraph 5 below).[4]

5.     Stations whose ratings are not reported by Nielsen during the relevant period shall be assigned a minimum blanket license fee equal to the greater of 0.25 percent of the allocable blanket license fee for its market or an annual blanket license fee of $540 (or $45 per

---

[3]   For example, on the East Coast, prime-time occupies Monday – Saturday 8:00 – 11 p.m. and Sunday 7:00 – 11:00 p.m.

[4]   The fees for each of the licensed stations in the Virgin Islands and Guam shall equal the amount of the industry-wide fee assigned to the market divided by the total number of licensed television stations in that market.

month for partial years) ("Minimum Blanket License Fee"). The fees assigned to a DMA market pursuant to Step 1 above shall be reduced by the amount of any Minimum Blanket License Fees assigned to stations in that DMA market, and the balance of that DMA market's share of the industry-wide fee shall be allocated among the remaining licensed stations in that DMA market based on the methodology set forth in Step 2 hereof. If, by way of example, the blanket license fee allocated to market "k" is $300,000, and there are operating in market "k" two stations whose ratings are not reported by Nielsen, each of those stations would be assigned a blanket fee of $750 ($300,000 x .0025). The remaining stations in market "k" would pay their appropriate percentages, not of $300,000, but of $298,500.

6.      If, during a given Contract Period, ASCAP enters into a license agreement with a television station that was not previously licensed (a "New Television Station"), such station shall pay the minimum monthly fee of forty-five dollars ($45.00) for the remainder of the Contract Period following the effective date of its license agreement. The fees payable by all stations in the New Television Station's market in the following Contract Period shall be reallocated in the manner set forth above without any increase in the total fee amount otherwise allocable to the relevant market.

7.      Once a station's allocated fee has been calculated for a given Contract Period, there shall be no further adjustment to that station's fee for the duration of that Contract Period; provided however that if the station was assigned in error a blanket license fee that was higher or lower than it should have been assigned pursuant to the methodology set forth above, such over-allocation or under-allocation amount shall be factored into the fees allocated to the station for the subsequent Contract Period.

8.      If during the term of the ASCAP-Local Television Station Blanket and Per Program Licenses the Committee determines that there is good cause to revise the allocation methodology set forth above in any manner, the Committee may refer the matter to Magistrate Judge Michael H. Dolinger (or if such reference is not possible, to the judge with supervisory authority over the ASCAP consent decree) to request approval of any proposed revisions to this methodology. The Committee shall make such a request at a public hearing (written notice of which will be provided to ASCAP and to all licensed television stations no less than thirty days in advance of the hearing) at which all interested parties will be given the opportunity to be heard in support of, or in opposition to, the proposed revisions. Any decision by the Court approving or denying the proposed revisions shall be final and shall not be subject to appeal.

EXHIBIT C

## LOCAL MARKETING AGREEMENT AMENDMENT LETTER

Dear ASCAP:

      1.    _____ ("LICENSEE") has entered into a Local Marketing Agreement with _____ ("LMA OPERATOR") for television station _____ for the period _____ through _____.

      2.    LICENSEE and LMA OPERATOR wish to add LMA OPERATOR as a party to the Local Television Station License Agreement in effect between LICENSEE and ASCAP ("the License"), and LMA OPERATOR shall assume all of the rights and obligations of LICENSEE as set forth in the License for the full period of the Local Marketing Agreement referred to in Paragraph 1 above.

      3.    LICENSEE/LMA OPERATOR (circle one) shall be responsible for the payment of any fees owing to ASCAP pursuant to the License.

      4.    LICENSEE/LMA OPERATOR (circle one) shall be responsible for the submission to ASCAP of any reports, tapes or other information pursuant to the License.

      5.    LICENSEE and LMA OPERATOR jointly designate the following single address for billing and other regular correspondence, and the following single address for any notices in accordance with the License:

Billing Address: _____    Notice Address: _____

                _____                    _____

                _____                    _____

      Please indicate your consent to the amendment of the License Agreement in accordance with this letter by countersigning the letter in the space provided below and returning a copy to us.

                Very truly yours,

                LICENSEE

Dated: _____    By: _____

                Title: _____

                LMA OPERATOR

Dated: _____    By: _____

                Title: _____

The undersigned, American Society of Composers, Authors and Publishers, hereby consents and agrees to the amendment of the above mentioned License Agreement.

AMERICAN SOCIETY OF COMPOSERS,
AUTHORS AND PUBLISHERS

Dated: _____   By:_____

Title: _____