# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------
                                                    x

UNITED STATES OF AMERICA,                           :

                         Plaintiff,                 :

          - against -                               :          Civ. 13-95 (WCC)

AMERICAN SOCIETY OF COMPOSERS, AUTHORS              :          ORDER
AND PUBLISHERS, et al.                              :

                         Defendants,                :
                                                    :          (Magistrate
                                                               Judge Dolinger)
------------------------------------                :
In the Matter of the Application of                 :
POST-NEWSWEEK STATIONS, INC., et al.                :

                         Applicants,                :

For the Determination of Reasonable License Fees.   :

------------------------------------                x

       WHEREAS the Court entered an Order on November 17, 2004 requiring

local television stations that are bound by the ASCAP - Local Station Blanket and Per

Program Television Licenses covering the period April 1, 1998 – December 31, 2009

("Bound Stations") to pay license fees pursuant to an allocation formula (the "Allocation

Methodology") developed by the Television Music License Committee ("TMLC"); and

       WHEREAS the Allocation Methodology provided that in the event the

TMLC determines that there is "good cause to revise the [Allocation Methodology] in

any manner," the TMLC "may refer the matter to Magistrate Judge Michael H.

Dolinger…to request approval of any proposed revisions to this methodology"; and

       WHEREAS , following a public hearing on October 27, 2005, the Court

has determined that the TMLC has demonstrated good cause to revise the Allocation

Methodology;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.    For the period commencing in 2007, each Bound Station's license fee shall be determined in accordance with the provisions of the Revised Allocation Methodology developed by the TMLC, attached as Exhibit A to this Order.

2.    The Revised Allocation Methodology allocates industry-wide license fees to be paid to ASCAP pursuant to the Local Station Blanket and Per Program Television Licenses in a reasonably equitable manner among the Bound Stations, and each Bound Station is directed to pay such fees pursuant to the allocation formula.

3.    The TMLC shall mail a copy of the Revised Allocation Methodology to all Bound Stations within thirty (30) days of entry of this Order.

Dated: October 27, 2005
New York, New York

Michael H. Dolinger
United States Magistrate Judge

A

Revised Television Music License Committee Methodology for ASCAP
License Fee Allocation for the Period From December 1, 2004 through
December 31, 2009

The Industry-wide Blanket License fees for all commercial local television stations
licensed under the ASCAP-Local Television Station Blanket License Agreements
covering the period December 1, 2004 through December 31, 2009 (the "licensed
television stations"), shall be allocated among the licensed television stations as follows
(subject to revision pursuant to the provisions of Paragraph 10 below):

STEP 1: Allocation of Industry-Wide Fee Among DMA Markets
For the period December 1, 2004 through December 31, 2005 and for each of the years
2006, 2007, 2008 and 2009 ("Contract Periods"), each Nielsen DMA television market is
to be assigned its gross allocable share of the Industry-wide Blanket License fee (as set
forth in Paragraph 2 of the November 16, 2004 letter agreement between the Television
Music License Committee (the "Committee") and ASCAP) in proportion to its
percentage of the total number of weighted Qualified Viewing Households throughout
the US in an average quarter-hour during nine sweeps months over the course of the
previous three years.

    1.    The number of Qualified Viewing Households will be computed for each
licensed television station based upon average quarter hour household viewing data, Sunday
through Saturday, 9 a.m. through midnight, compiled by Nielsen during nine sweeps months over
the previous three years.[1] The Qualified Viewing Households attributable to each DMA market
shall be calculated by multiplying the average quarter hour viewing households for all licensed
stations in the market by 420 (the number of quarter hours between 9 a.m. and midnight in one
week).

    2.    For each of the Contract Periods, the number of Market Qualified Viewing
Households in each of the roughly 210 DMA markets as measured by Nielsen[2] is to be
"weighted" as follows:

---

[1] Qualified Viewing Households for the Contract Period December 1, 2004 through December 31, 2005
will be based upon data compiled by Nielsen for the nine November, February and May sweeps months
between the period November 2001 and May 2004; for each subsequent year, Qualifying Viewing
Households will be based upon data compiled by Nielsen for the nine November, February and May
sweeps months prior to July 1 of the year preceding the Contract Period.

[2] The number of Market Qualified Viewing Households in Puerto Rico shall be determined based upon data
provided by Media Fax, or some other comparable provider of household audience information. The
number of Market Qualified Viewing Households in the Virgin Islands and Guam (or in any other market
or territory in which household audience information is unavailable) shall be determined by calculating the
number of television households in the U.S. as a percentage of the total U.S. population; multiplying that
percentage by the population of the market for which audience information is unavailable to derive the
number of television households in the market; and multiplying the resulting number by a fraction the
numerator of which is the number of licensed stations in the market and the denominator of which is the
total number of stations in the market. For purposes of assigning an allocable share of the industry-wide
blanket license fee to television markets in the Virgin Islands, Guam and Puerto Rico, the number of

DMA Markets 1 – 10 Multiply by 1.21
DMA Markets 11 – 25 Multiply by 1.05
DMA Markets 26 – 50 Multiply by 0.92
DMA Markets 51 – 75 Multiply by 0.85
DMA Markets 76 – 100 Multiply by 0.85
DMA Markets 101 – 125 Multiply by 0.80
DMA Markets 126 plus Multiply by 0.75

The purpose of the weighting is to reflect, within broad parameters, that a household in a smaller market does not represent the same value as a household in a larger market.

3.      For each Contract Period, each market is to be assigned its share of the industry's overall blanket license fee by the following procedure: The Market Qualified Viewing Households in the DMA market will be multiplied by the weight set forth in Paragraph 2 above for that DMA market to determine the weighted number of Market Qualified Viewing Households for the DMA market. Thus, for example, the top ten markets in terms of three-year households average will receive a 1.21 multiple. Each market's weighted Market Qualified Viewing Households number is to be divided by the total U.S. weighted market Qualified Viewing Households to derive a percentage of U.S. weighted Market Qualified Viewing Households for each market. This weighted percentage is then applied to the industry-wide blanket license fee. Thus, if the weighted percentage of total U.S. Market Qualified Viewing Households for DMA market "x" is one percent, DMA market x's share of the industry-wide $92,083,333 fee for the December 1, 2004 through the December 31, 2005 Contract Period would be $92,083,333 x 1%, or $920,833.33.

STEP 2:  Allocation of Blanket License Fees to Stations Within Each Market

4.      Each station's percentage share of the DMA market blanket license fee shall be calculated as follows: Station Qualified Viewing Households for stations affiliated with networks licensed by ASCAP (currently the ABC, CBS, NBC and Univision television networks) shall be calculated by multiplying the station's average quarter hour viewing households by 420 (the number of quarter hours between 9 a.m. and midnight in one week); and subtracting one hundred percent (100%) of the station's average prime-time DMA viewing households (which equals the station's average prime-time DMA quarter hour households times 88 (the number of quarter hour units in prime time in one week)).[3] Station Qualified Viewing Households for stations not affiliated with networks licensed by ASCAP shall be calculated by multiplying the station's average quarter hour viewing households by 420. A station's percentage share of the DMA market blanket fee shall be calculated by dividing its Station Qualified Viewing Households number by the total Station Qualified Viewing Households for all stations in that DMA market

---

Market Qualified Viewing Households in each of these markets is to be given the same weight as the Nielsen DMA that most closely approximates the number of Market Qualified Viewing Households in these markets.

[3] For example, on the East Coast, prime-time occupies Monday-Saturday, 8:00-11:00 p.m. and Sunday, 7:00-11:00 p.m.

and multiplying the resulting percentage by the DMA market blanket license fee (reduced by the amount of any minimum fees assigned to stations in the market pursuant to paragraph 5 below).[4]

5.     Stations whose ratings are not reported by Nielsen during the relevant period shall be assigned a minimum blanket license fee equal to the greater of 0.25 percent of the allocable blanket license fee for its market or an annual blanket license fee of $540 (or $45 per month for partial years) ("Minimum Blanket License Fee"). The fees assigned to a DMA market pursuant to Step 1 above shall be reduced by the amount of any Minimum Blanket License Fees assigned to stations in that DMA market, and the balance of that DMA market's share of the industry-wide fee shall be allocated among the remaining licensed stations in that DMA market based on the methodology set forth in Step 2 hereof. If, by way of example, the blanket license fee allocated to market "k" is $300,000, and there are operating in market "k" two stations whose ratings are not reported by Nielsen, each of those stations would be assigned a blanket fee of $750 ($300,000 x .0025). The remaining stations in market "k" would pay their appropriate percentages, not of $300,000, but of $298,500.

STEP 3: Adjustment to Reflect an Equitable Distribution of the Administrative Costs Incurred by the Television Music License Committee

6.     For each Contract Year beginning in 2005, the Committee shall determine: a) the total contributions to be requested from the television industry for its costs of administering the ASCAP-Local Television Station Blanket and Per Program License Agreements (the "ASCAP Licenses") and the Committee's ongoing representation of the television industry in regard to music performance licenses; and b) the percentage (the "Contribution Percentage") and amount (the "Contribution Amount") of these total contributions to be requested from each station licensed under the ASCAP Licenses. The contributions requested by the Committee for a given Contract Year shall be payable by stations between April 1 of the relevant Contract Year and March 31 of the subsequent Contract Year (the "Contribution Period").

7.     Upon the expiration of a Contribution Period, the Committee shall calculate a contribution credit for each ASCAP licensed station by: a) multiplying the station's Contribution Percentage for the relevant Contract Year by the total contributions actually received by the Committee during the Contribution Period (the "Adjusted Contribution Amount"); and b) calculating the difference between the actual amount paid by each station during the Contribution Period and the station's Adjusted Contribution Amount (the "Allocation Credit/Debit"). A station's Allocation Credit/Debit for a given Contract Year shall be applied against the station's blanket or per program license fees in the second Contract Year after the Contract Year for which the Allocation Credit/Debit was earned. For example, a station's Allocation Credit/Debit for Contract Year 2005 shall be applied against the station's blanket or per program license fees during Contract Year 2007.

The result of this adjustment is that a station that pays to the Committee for any given Contract Year its full Contribution Amount (or any sum greater than its Adjusted Contribution Amount) will receive a credit against its ASCAP fees on a deferred basis, and any station that does not pay any portion of its Contribution Amount (or pays a sum less than its Adjusted

---

[4] The fees for each of the licensed stations in the Virgin Islands and Guam shall equal the amount of the industry-wide fee assigned to the market divided by the total number of licensed television stations in that market.

Contribution Amount) to the Committee for any given Contract Year will pay additional ASCAP fees on a deferred basis.

8.      If, during a given Contract Year, ASCAP enters into a license agreement with a television station that was not previously licensed (a "New Television Station"), such station shall pay the minimum monthly fee of forty-five dollars ($45.00) for the remainder of the Contract Year following the effective date of its license agreement. The fees payable by all stations in the New Television Station's market in the following Contract Period shall be reallocated in the manner set forth above without any increase in the total fee amount otherwise allocable to the relevant market.

9.      Once a station's allocated fee has been calculated for a given Contract Period, there shall be no further adjustment to that station's fee for the duration of that Contract Period; provided however that if the station was assigned in error a blanket license fee that was higher or lower than it should have been assigned pursuant to the methodology set forth above, such over-allocation or under-allocation amount shall be factored into the fees allocated to the station for the subsequent Contract Period.

10.     If during the term of the ASCAP-Local Television Station Blanket and Per Program Licenses the Committee determines that there is good cause to revise the allocation methodology set forth above in any manner, the Committee may refer the matter to Magistrate Judge Michael H. Dolinger (or if such reference is not possible, to the judge with supervisory authority over the ASCAP consent decree) to request approval of any proposed revisions to this methodology. The Committee shall make such a request at a public hearing (written notice of which will be provided to ASCAP and to all licensed television stations no less than thirty days in advance of the hearing) at which all interested parties will be given the opportunity to be heard in support of, or in opposition to, the proposed revisions. Any decision by the Court approving or denying the proposed revisions shall be final and shall not be subject to appeal.

*Index No.*   Civ. 13-95  (MHD)                    *Year*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
                              Plaintiff,

                    v.

AMERICAN SOCIETY OF COMPOSERS, AUTHORS & PUBLISHERS, et al.
                    Defendant.

-------------------------------------------------------------------

In the Matter of the Application of POST-NEWSWEEK STATIONS, INC., et al.

                    Applicants,

For the Determination of Reasonable License Fees.

## ORDER

### WEIL, GOTSHAL & MANGES LLP

*Attorneys for*   Applicants

767 FIFTH AVENUE
BOROUGH OF MANHATTAN, NEW YORK, N.Y. 10153
(212) 310-8000

*To:*

*Attorney(s) for*

*Service of a copy of the within*                                    *is hereby admitted.*

*Dated:*

                         *Attorney(s) for*

*PLEASE TAKE NOTICE*
Check Applicable Box

☐   *that the within is a true copy of a*
NOTICE OF   *entered in the office of the clerk of the within named court on*
ENTRY

☐   *that an Order of which the within is a true copy will be presented for settlement to the Hon.*
                    *one of the judges of the within named Court,*
NOTICE OF   *at*
SETTLEMENT   *on*

*Dated:*

                    **WEIL, GOTSHAL & MANGES LLP**

          *Attorneys for*

                    767 FIFTH AVENUE
          BOROUGH OF MANHATTAN, NEW YORK, N.Y. 10153