# EXHIBIT 5



A S C A P

Vincent Candilora
Senior Vice President
Director of Licensing

December 15, 2009

Charles Sennet, Esq.
Chairman
Television Music License Committee
9 East 53rd Street, 5th Floor
New York, NY 10022

> Re:    ASCAP Local Television Station Blanket and
>        Per Program Licenses

Dear Mr. Sennet:

The Television Music License Committee ("TMLC") having applied to the American Society of Composers, Authors and Publishers ("ASCAP") for blanket and per program licenses authorizing public performances of copyrighted musical works in the ASCAP repertory for the term beginning January 1, 2010 for the commercial television stations it represents ("the Stations") pursuant to Section IX(A) of the Second Amended Final Judgment entered in *United States v. ASCAP*, 41 Civ. 1395 (S.D.N.Y. 2001) ("AFJ2"), this letter sets forth the terms and conditions we have agreed upon for interim licenses for the Stations. A current list of the Stations is attached to this letter as Exhibit A, which may be amended from time to time.

Specifically, ASCAP and the TMLC agree that (i) the terms and conditions of the Local Station Blanket Television License and the Local Station Per Program Television License in effect for the period April 1, 1999 – December 31, 2009 (collectively, "the Licenses") shall continue in effect for the period January 1, 2010 – December 31, 2010 ("the Interim License Period"); (ii) the Stations shall report and pay license fees for the Interim License Period in accordance with the terms and conditions of the Licenses, subject to retroactive adjustment as determined by agreement of ASCAP and the TMLC, or by the Court in a proceeding under Section IX of AFJ2; (iii) for avoidance of doubt, the interim "Industry-wide Blanket License fee for all commercial local television stations licensed under the Licenses by ASCAP" for the Interim License Period shall be $93,318,340.00 (the "2010 Interim Industry-wide Blanket License Fee"); (iv) the 2010 Interim Industry-wide Blanket License Fee shall be allocated among stations in accordance with the Revised Television Music License Committee Methodology for ASCAP License Fee Allocation for the Period from December 1, 2004 through December 31, 2009, a copy of which is attached to this letter as Exhibit B; and (v) the sixty-day negotiating

AMERICAN SOCIETY OF COMPOSERS, AUTHORS & PUBLISHERS
2 Music Square West, Nashville, TN 37203
615.742.5076  Fax: 615.742.5060  E-Mail: VCandilora@ascap.com
Web Site: http://www.ascap.com

Charles Sennet, Esq.                                                      Page 2
 December 15, 2009

period provided for by Section IX(A) of AFJ2 shall be deemed extended indefinitely, subject to the right of either ASCAP or the TMLC to give a written, thirty-day notice of termination of such period.

        Pursuant to Section IX of AFJ2, the TMLC, on behalf of the Stations, has applied to ASCAP for a broader scope of performance rights than the scope provided for by the Licenses, including (i) through-to-the-viewer licenses covering stations' transmissions of programming on a Video-On-Demand basis; and (ii) through-to-the-viewer licenses to transmit any "non-network" video programming over the Internet and via any other digital platform capable of displaying or disseminating such programming.  ASCAP acknowledges receipt of the TMLC's license applications dated June 7, 2006 and August 13, 2007, and the parties agree that, with respect to these license applications, the sixty-day negotiating period provided for by Section IX((A) of AFJ2 shall be deemed extended in a manner coterminous with the extension described in the preceding paragraph.

        ASCAP and the TMLC are entering into this agreement with respect to the Interim License Period without prejudice to any arguments or positions they may assert in the future as to what constitute appropriate interim license fees or reasonable blanket and per program license fees and terms for the local television industry or, in ASCAP's case, as to any other licensee, or, in the TMLC's case, as to any other licensor.

        Please confirm that the foregoing correctly states our agreement by dating and signing the enclosed copy of this letter and returning it to me at the address indicated above.

                                        Sincerely yours,

                                        Vincent Candilora

Accepted and agreed to this
 17  day of  February , 2010

TELEVISION MUSIC LICENSE COMMITTEE

By: _____
        Charles Sennet, Chairman

EXHIBIT A

**TMLC STATIONS**

| CALL LTR | ADDRESS | CITY | ST | DMA |
|----------|---------|------|----|----|
| WAXN-TV | 1901 N. TRYON ST. | CHARLOTTE | NC | Charlotte, NC |
| WAZE-TV | P. O. BOX 3848 | EVANSVILLE | IN | Evansville |
| WBAL-TV | 3800 HOOPER AVE | BALTIMORE | MD | Baltimore |
| WBBH-TV | PO BOX 7578 | FORT MYERS | FL | Ft. Myers-Naples |
| WBBJ-TV | PO BOX 2387 | JACKSON | TN | Jackson, TN |
| WBBM-TV | 630 N MCCLURG CT | CHICAGO | IL | Chicago |
| WBDT-TV | 2589 CORPORATE PLACE | MIAMISBURG | OH | Dayton |
| WBFF-TV | 2000 W 41ST STREET | BALTIMORE | MD | Baltimore |
| WBFS-TV | 8900 NW 18TH TERRACE | MIAMI | FL | Miami-Ft. Lauderdale |
| WBIF-TV | 1 SHACKLEFORD DRIVE | LITTLE ROCK | AR | PANAMA CITY |
| WBIR-TV | 1513 HUTCHINSON AVE | KNOXVILLE | TN | Knoxville |
| WBKB-TV | 1390 BAGLEY STREET | ALPENA | MI | Alpena |
| WBKI-TV | 1601 ALLIANT AVE | LOUISVILLE | KY | Louisville |
| WBKO-TV | P O BOX 13000 | BOWLING GREEN | KY | Bowling Green |
| WBMM-TV | 1 SHACKLEFORD DRIVE | LITTLE ROCK | AR | MONTGOMERY |
| WBNA-TV | 3701 FERN VALLEY RD | LOUISVILLE | KY | Louisville |
| WBNG-TV | 560 COLUMBIA DR, STE 1 | JOHNSON CITY | NY | Binghamton |
| WBNS-TV | P.O. BOX 1010 | COLUMBUS | OH | Columbus, OH |
| WBNX-TV | P.O. BOX 91660 | CLEVELAND | OH | Cleveland-Akron |
| WBOC-TV | P.O. BOX 2057 | SALISBURY | MD | Salisbury, MD |
| WBOY-TV | 904 W. PIKE ST. | CLARKSBURG | WV | Clarksburg-Weston |
| WBPG-TV | 1 PE1501 SATCHEL PAIGE DR. | MOBILE | AL | Mobile-Pensacola |
| WBPH-TV | 813 NORTH FENWICK ST. | ALLENTOWN | PA | Philadelphia |
| WBPX-TV | 1120 SOLDIERS FIELD RD. | BOSTON | MA | Boston (Manchester) |
| WBRC-TV | P.O. BOX 6 | BIRMINGHAM | AL | Birmingham |
| WBRE-TV | 62 S FRANKLIN ST | WILKES-BARRE | PA | Wilkes Barre-Scranton |
| WBRZ-TV | PO BOX 2906 | BATON ROUGE | LA | Baton Rouge |
| WBTV-TV | 1 JULIAN PRICE PL | CHARLOTTE | NC | Charlotte |
| WBTW-TV | 3430 TV ROAD | FLORENCE | SC | Florence-Myrtle Beach |
| WBUI-TV | 3003 OLD ROCHESTER RD. | SPRINGFIELD | IL | Champaign-Springfield-Decatur |
| WBUP-TV | 2025  US HWY 41 W. | MARQUETTE | MI | Marquette |
| WBUW-TV | 2814 SYENE ROAD | MADISON | WI | MADISON |
| WBUY-TV | 3447 CAZASSA ST. | MEMPHIS | TN | Memphis |
| WBXX-TV | 10427 COGDILL RD., STE. 100 | KNOXVILLE | TN | Knoxville |
| WBZ-TV | 1170 SOLDIERS FIELD RD | BOSTON | MA | Boston |
| WCAU-TV | 10 MONUMENT ROAD | BALA CYNWYD | PA | Philadelphia |
| WCAV-TV | 999 SECOND ST., SE | CHARLOTTESVILLE | VA | Charlottesville |
| WCAX-TV | PO BOX 4508 | BURLINGTON | VT | Burlington-Plattsburgh |
| WCBD-TV | 210 WEST COLEMAN BLVD. | MT. PLEASANT | SC | Charleston, SC |
| WCBI-TV | P.O. BOX 271 | COLUMBUS | MS | Columbus-Tupelo-West Point |
| WCBS-TV | 524 WEST 57TH ST | NEW YORK | NY | New York |
| WCCB-TV | ONE TELEVISION PLACE | CHARLOTTE | NC | Charlotte |
| WCCO-TV | 90 SOUTH 11TH ST | MINNEAPOLIS | MN | Minneapolis-St. Paul |
| WCFN-TV | 509 S. NEIL ST. | CHAMPAIGN | IL | Champaign-Springfield-Decatur |
| WCFT-TV | P.O. BOX 360039 | BIRMINGHAM | AL | Birmingham |
| WCGV-TV | 4041 N 35TH ST. | MILWAUKEE | WI | Milwaukee |
| WCHS-TV | 1301 PIEDMONT RD | CHARLESTON | WV | Charleston-Huntington, WV |
| WCIA-TV | 509 SOUTH NEIL ST. | CHAMPAIGN | IL | Champaign-Springfield-Decatur |
| WCIV-TV | P O BOX 22165 | CHARLESTON | SC | Charleston, SC |
| WCJB-TV | 6220 N.W. 43rd ST. | GAINESVILLE | FL | Gainesville |
| WCLF-TV | PO BOX 6922 | CLEARWATER | FL | Tampa-St. Petersburg-Sarasota |
| WCLJ-TV | 2528 US 31 SOUTH | GREENWOOD | IN | Indianapolis |
| WCMH-TV | 3165 OLENTANGY RIVER RD. | COLUMBUS | OH | Columbus, OH |
| WCNC-TV | 1001 WOODRIDGE CT DR | CHARLOTTE | NC | Charlotte |
| WCOV-TV | ONE WCOV AVENUE | MONTGOMERY | AL | Montgomery |
| WCPO-TV | 500 CENTRAL AVE | CINCINNATI | OH | Cincinnati |
| WCPX-TV | 454 N COLUMBUS DR | CHICAGO | IL | Chicago |
| WCSC-TV | 2126 CHARLIE HALL BLVD. | CHARLESTON | SC | Charleston, SC |
| WCSH-TV | 1 CONGRESS SQ | PORTLAND | ME | Portland-Auburn, ME |
| WCTV-TV | 1801 HALSTEAD BLVD. | TALLAHASSEE | FL | Tallahassee-Thomasville |
| WCTX-TV | 8 ELM ST. | NEW HAVEN | CT | Hartford-New Haven |
| WCVB-TV | 5 TV PLACE | NEEDHAM | MA | Boston |
| WCVI-TV | P. O. BOX 24027 | ST. CROIX | VI | Virgin Islands |

EXHIBIT B

**Revised Television Music License Committee Methodology for ASCAP License Fee Allocation for the Period From December 1, 2004 through December 31, 2009**

The Industry-wide Blanket License fees for all commercial local television stations licensed under the ASCAP-Local Television Station Blanket License Agreements covering the period December 1, 2004 through December 31, 2009 (the "licensed television stations"), shall be allocated among the licensed television stations as follows (subject to revision pursuant to the provisions of Paragraph 10 below):

**STEP 1:  Allocation of Industry-Wide Fee Among DMA Markets**
For the period December 1, 2004 through December 31, 2005 and for each of the years 2006, 2007, 2008 and 2009 ("Contract Periods"), each Nielsen DMA television market is to be assigned its gross allocable share of the Industry-wide Blanket License fee (as set forth in Paragraph 2 of the November 16, 2004 letter agreement between the Television Music License Committee (the "Committee") and ASCAP) in proportion to its percentage of the total number of weighted Qualified Viewing Households throughout the US in an average quarter-hour during nine sweeps months over the course of the previous three years.

1.      The number of Qualified Viewing Households will be computed for each licensed television station based upon average quarter hour household viewing data, Sunday through Saturday, 9 a.m. through midnight, compiled by Nielsen during nine sweeps months over the previous three years.[1]  The Qualified Viewing Households attributable to each DMA market shall be calculated by multiplying the average quarter hour viewing households for all licensed stations in the market by 420 (the number of quarter hours between 9 a.m. and midnight in one week).

2.      For each of the Contract Periods, the number of Market Qualified Viewing Households in each of the roughly 210 DMA markets as measured by Nielsen[2] is to be "weighted" as follows:

---

[1] Qualified Viewing Households for the Contract Period December 1, 2004 through December 31, 2005 will be based upon data compiled by Nielsen for the nine November, February and May sweeps months between the period November 2001 and May 2004; for each subsequent year, Qualifying Viewing Households will be based upon data compiled by Nielsen for the nine November, February and May sweeps months prior to July 1 of the year preceding the Contract Period.

[2] The number of Market Qualified Viewing Households in Puerto Rico shall be determined based upon data provided by Media Fax, or some other comparable provider of household audience information.  The number of Market Qualified Viewing Households in the Virgin Islands and Guam (or in any other market or territory in which household audience information is unavailable) shall be determined by calculating the number of television households in the U.S. as a percentage of the total U.S. population; multiplying that percentage by the population of the market for which audience information is unavailable to derive the number of television households in the market; and multiplying the resulting number by a fraction the numerator of which is the number of licensed stations in the market and the denominator of which is the total number of stations in the market.  For purposes of assigning an allocable share of the industry-wide blanket license fee to television markets in the Virgin Islands, Guam and Puerto Rico, the number of

DMA Markets 1 – 10 Multiply by 1.21
DMA Markets 11 – 25 Multiply by 1.05
DMA Markets 26 – 50 Multiply by 0.92
DMA Markets 51 – 75 Multiply by 0.85
DMA Markets 76 – 100 Multiply by 0.85
DMA Markets 101 – 125 Multiply by 0.80
DMA Markets 126 plus Multiply by 0.75

The purpose of the weighting is to reflect, within broad parameters, that a household in a smaller market does not represent the same value as a household in a larger market.

3.        For each Contract Period, each market is to be assigned its share of the industry's overall blanket license fee by the following procedure:  The Market Qualified Viewing Households in the DMA market will be multiplied by the weight set forth in Paragraph 2 above for that DMA market to determine the weighted number of Market Qualified Viewing Households for the DMA market.  Thus, for example, the top ten markets in terms of three-year households average will receive a 1.21 multiple.  Each market's weighted Market Qualified Viewing Households number is to be divided by the total U.S. weighted market Qualified Viewing Households to derive a percentage of U.S. weighted Market Qualified Viewing Households for each market.  This weighted percentage is then applied to the industry-wide blanket license fee.  Thus, if the weighted percentage of total U.S. Market Qualified Viewing Households for DMA market "x" is one percent, DMA market x's share of the industry-wide $92,083,333 fee for the December 1, 2004 through the December 31, 2005 Contract Period would be $92,083,333 x 1%, or $920,833.33.

**STEP 2:  Allocation of Blanket License Fees to Stations Within Each Market**

4.        Each station's percentage share of the DMA market blanket license fee shall be calculated as follows: Station Qualified Viewing Households for stations affiliated with networks licensed by ASCAP (currently the ABC, CBS, NBC and Univision television networks) shall be calculated by multiplying the station's average quarter hour viewing households by 420 (the number of quarter hours between 9 a.m. and midnight in one week); and subtracting one hundred percent (100%) of the station's average prime-time DMA viewing households (which equals the station's average prime-time DMA quarter hour households times 88 (the number of quarter hour units in prime time in one week)).[3]  3  Station Qualified Viewing Households for stations not affiliated with networks licensed by ASCAP shall be calculated by multiplying the station's average quarter hour viewing households by 420.   A station's percentage share of the DMA market blanket fee shall be calculated by dividing its Station Qualified Viewing Households number by the total Station Qualified Viewing Households for all stations in that DMA market

---

Market Qualified Viewing Households in each of these markets is to be given the same weight as the Nielsen DMA that most closely approximates the number of Market Qualified Viewing Households in these markets.

[3] For example, on the East Coast, prime-time occupies Monday-Saturday, 8:00-11:00 p.m. and Sunday, 7:00-11:00 p.m.

and multiplying the resulting percentage by the DMA market blanket license fee (reduced by the amount of any minimum fees assigned to stations in the market pursuant to paragraph 5 below).[4]

5.      Stations whose ratings are not reported by Nielsen during the relevant period shall be assigned a minimum blanket license fee equal to the greater of 0.25 percent of the allocable blanket license fee for its market or an annual blanket license fee of $540 (or $45 per month for partial years) ("Minimum Blanket License Fee").  The fees assigned to a DMA market pursuant to Step 1 above shall be reduced by the amount of any Minimum Blanket License Fees assigned to stations in that DMA market, and the balance of that DMA market's share of the industry-wide fee shall be allocated among the remaining licensed stations in that DMA market based on the methodology set forth in Step 2 hereof.  If, by way of example, the blanket license fee allocated to market "k" is $300,000, and there are operating in market "k" two stations whose ratings are not reported by Nielsen, each of those stations would be assigned a blanket fee of $750 ($300,000 x .0025).  The remaining stations in market "k" would pay their appropriate percentages, not of $300,000, but of $298,500.

**STEP 3:  Adjustment to Reflect an Equitable Distribution of the Administrative Costs Incurred by the Television Music License Committee**

6.      For each Contract Year beginning in 2005, the Committee shall determine: a) the total contributions to be requested from the television industry for its costs of administering the ASCAP-Local Television Station Blanket and Per Program License Agreements (the "ASCAP Licenses") and the Committee's ongoing representation of the television industry in regard to music performance licenses; and b) the percentage (the "Contribution Percentage") and amount (the "Contribution Amount") of these total contributions to be requested from each station licensed under the ASCAP Licenses.  The contributions requested by the Committee for a given Contract Year shall be payable by stations between April 1 of the relevant Contract Year and March 31 of the subsequent Contract Year (the "Contribution Period").

7.      Upon the expiration of a Contribution Period, the Committee shall calculate a contribution credit for each ASCAP licensed station by: a) multiplying the station's Contribution Percentage for the relevant Contract Year by the total contributions actually received by the Committee during the Contribution Period (the "Adjusted Contribution Amount"); and b) calculating the difference between the actual amount paid by each station during the Contribution Period and the station's Adjusted Contribution Amount (the "Allocation Credit/Debit").  A station's Allocation Credit/Debit for a given Contract Year shall be applied against the station's blanket or per program license fees in the second Contract Year after the Contract Year for which the Allocation Credit/Debit was earned.  For example, a station's Allocation Credit/Debit for Contract Year 2005 shall be applied against the station's blanket or per program license fees during Contract Year 2007.

The result of this adjustment is that a station that pays to the Committee for any given Contract Year its full Contribution Amount (or any sum greater than its Adjusted Contribution Amount) will receive a credit against its ASCAP fees on a deferred basis, and any station that does not pay any portion of its Contribution Amount (or pays a sum less than its Adjusted

---

[4] The fees for each of the licensed stations in the Virgin Islands and Guam shall equal the amount of the industry-wide fee assigned to the market divided by the total number of licensed television stations in that market.

Contribution Amount) to the Committee for any given Contract Year will pay additional ASCAP fees on a deferred basis.

8.      If, during a given Contract Year, ASCAP enters into a license agreement with a television station that was not previously licensed (a "New Television Station"), such station shall pay the minimum monthly fee of forty-five dollars ($45.00) for the remainder of the Contract Year following the effective date of its license agreement.  The fees payable by all stations in the New Television Station's market in the following Contract Period shall be reallocated in the manner set forth above without any increase in the total fee amount otherwise allocable to the relevant market.

9.      Once a station's allocated fee has been calculated for a given Contract Period, there shall be no further adjustment to that station's fee for the duration of that Contract Period; provided however that if the station was assigned in error a blanket license fee that was higher or lower than it should have been assigned pursuant to the methodology set forth above, such over-allocation or under-allocation amount shall be factored into the fees allocated to the station for the subsequent Contract Period.

10.     If during the term of the ASCAP-Local Television Station Blanket and Per Program Licenses the Committee determines that there is good cause to revise the allocation methodology set forth above in any manner, the Committee may refer the matter to Magistrate Judge Michael H. Dolinger (or if such reference is not possible, to the judge with supervisory authority over the ASCAP consent decree) to request approval of any proposed revisions to this methodology.  The Committee shall make such a request at a public hearing (written notice of which will be provided to ASCAP and to all licensed television stations no less than thirty days in advance of the hearing) at which all interested parties will be given the opportunity to be heard in support of, or in opposition to, the proposed revisions.  Any decision by the Court approving or denying the proposed revisions shall be final and shall not be subject to appeal.



A S C A P

VINCENT CANDILORA
Senior Vice President
Director of Licensing

December 14, 2010

Charles Sennet, Esq.
Chairman
Television Music License Committee
9 East 53rd Street, 5th Floor
New York, NY 10022

Re:    ASCAP Local Television Station Blanket and
       Per Program Licenses

Dear Mr. Sennet:

The Television Music License Committee ("TMLC") having applied to the American Society of Composers, Authors and Publishers ("ASCAP") for blanket and per program licenses authorizing public performances of copyrighted musical works in the ASCAP repertory for the term beginning January 1, 2010 for the commercial television stations it represents  ("the Stations") pursuant to Section IX(A) of the Second Amended Final Judgment entered in *United States v. ASCAP*, 41 Civ. 1395 (S.D.N.Y. 2001) ("AFJ2"), this letter sets forth the terms and conditions we have agreed upon to continue in effect the interim license arrangements we agreed upon as set forth in our letter agreement dated December 15, 2009 and countersigned by you on February 17, 2010 ("Interim License Letter Agreement").

Specifically, ASCAP and the TMLC agree that (i) the terms and conditions of the Local Station Blanket Television License and the Local Station Per Program Television License in effect for the period April 1, 1999 – December 31, 2009 (collectively, "the Licenses"), and continued in effect pursuant to our Interim License Letter Agreement, shall continue in effect for the period January 1, 2011 – December 31, 2011 ("the Second Interim License Period"); (ii) the Stations shall report and pay license fees for the Second Interim License Period in accordance with the terms and conditions of the Licenses, subject to retroactive adjustment as determined by agreement of ASCAP and the TMLC, or by the Court in a proceeding under Section IX of AFJ2; (iii) for avoidance of doubt, the interim "Industry-wide Blanket License fee for all commercial local television stations licensed under the Licenses by ASCAP" for the Second Interim License Period shall be $94,344,842.00 (the "2011 Interim Industry-wide Blanket License Fee"); (iv) the 2011 Interim Industry-wide Blanket License Fee shall be allocated among stations in accordance with the Revised Television Music License Committee Methodology for ASCAP License Fee

AMERICAN SOCIETY OF COMPOSERS, AUTHORS & PUBLISHERS
Two Music Square West  Nashville  TN  37203
615.742.5080  Fax: 615.742.5060  E-Mail: VCandilora@ascap.com

Charles Sennet, Esq.                                                                    Page 2
December 14, 2010

Allocation for the Period from December 1, 2004 through December 31, 2009 attached to the
Interim License Letter Agreement; and (v) the sixty-day negotiating period provided for by
Section IX(A) of AFJ2 shall be deemed extended indefinitely, subject to the right of either
ASCAP or the TMLC to give a written, thirty-day notice of termination of such period.

     Pursuant to Section IX of AFJ2, the TMLC, on behalf of the Stations, has applied to
ASCAP for a broader scope of performance rights than the scope provided for by the Licenses,
including (i) through-to-the-viewer licenses covering stations' transmissions of programming on
a Video-On-Demand basis; and (ii) through-to-the-viewer licenses to transmit any "non-
network" video programming over the Internet and via any other digital platform capable of
displaying or disseminating such programming.  ASCAP acknowledges receipt of the TMLC's
license applications dated June 7, 2006 and August 13, 2007, and the parties agree that, with
respect to these license applications, the sixty-day negotiating period provided for by Section
IX((A) of AFJ2 shall be deemed extended in a manner coterminous with the extension described
in the preceding paragraph.

     ASCAP and the TMLC are entering into this agreement with respect to the Second
Interim License Period without prejudice to any arguments or positions they may assert in the
future as to what constitute appropriate interim license fees or reasonable blanket and per
program license fees and terms for the local television industry or, in ASCAP's case, as to any
other licensee, or, in the TMLC's case, as to any other licensor.

     Please confirm that the foregoing correctly states our agreement by dating and signing
the enclosed copy of this letter and returning it to me at the address indicated above.

Sincerely yours,

Vincent Candilora

Accepted and agreed to this

20 day of December , 2010

TELEVISION MUSIC LICENSE COMMITTEE

By: _____
     Charles Sennet, Chairman



A S C A P

Vincent Candilora
Senior Vice President
Director of Licensing

December 28, 2011

Charles Sennet, Esq.
Chairman
Television Music License Committee
9 East 53rd Street, 5th Floor
New York, NY 10022

       Re:    ASCAP Local Television Station Blanket and
             Per Program Licenses

Dear Mr. Sennet:

      The Television Music License Committee ("TMLC") having applied to the American Society of Composers, Authors and Publishers ("ASCAP") for blanket and per program licenses authorizing public performances of copyrighted musical works in the ASCAP repertory for the term beginning January 1, 2010 for the commercial television stations it represents  ("the Stations") pursuant to Section IX(A) of the Second Amended Final Judgment entered in *United States v. ASCAP*, 41 Civ. 1395 (S.D.N.Y. 2001) ("AFJ2"), this letter sets forth the terms and conditions we have agreed upon to continue in effect the interim license arrangements we agreed upon as set forth in our letter agreement dated December 15, 2009 and countersigned by you on February 17, 2010, and our letter agreement dated December 14, 2010 and countersigned by you on December 20, 2010 ("Interim License Letter Agreements") .

      Specifically, ASCAP and the TMLC agree that (i) for purposes of determining stations' interim blanket fees and the Monthly Blanket License Fee used to calculate stations' interim per program fees for the period January 1, 2012 – December 31, 2012 ("the Third Interim License Period"), the interim "Industry-wide Blanket License fee for all commercial local television stations licensed under the Licenses by ASCAP" shall be $94,361,278.00 (the "2012 Interim Industry-wide Blanket License Fee").(ii) except as modified by (i) above, the terms and conditions of the Local Station Blanket Television License and the Local Station Per Program Television License in effect for the period April 1, 1998 – December 31, 2009 (collectively, "the Licenses"), and continued in effect pursuant to our Interim License Letter Agreements, shall continue in effect on an interim basis for the Third Interim License Period; (iii) except as modified by (i) above, the Stations shall report and pay license fees for the Third Interim License Period in accordance with the terms and conditions of the Licenses, subject to retroactive

Charles Sennet, Esq.                                                                         Page 2
December 28, 2011

adjustment as determined by agreement of ASCAP and the TMLC, or by the Court in *In re Petition of Duhamel Broadcasting Enterprises*, 11 Civ. 9311 (S.D.N.Y.) (DLC) (MHD) ("*Duhamel Broadcasting*"); and (iv) the 2012 Interim Industry-wide Blanket License Fee shall be allocated among stations in accordance with the Revised Television Music License Committee Methodology for ASCAP License Fee Allocation for the Period from December 1, 2004 through December 31, 2009 attached to the first Interim License Letter Agreement referred to above.

        Pursuant to Section IX of AFJ2, the TMLC, on behalf of the Stations, has applied to ASCAP for a broader scope of performance rights than the scope provided for by the Licenses, including (i) through-to-the-viewer licenses covering stations' transmissions of programming on a Video-On-Demand basis; and (ii) through-to-the-viewer licenses to transmit any "non-network" video programming over the Internet and via any other digital platform capable of displaying or disseminating such programming.  ASCAP acknowledges receipt of the TMLC's prior license applications for such rights.  Nothing herein shall be deemed to be an admission by ASCAP that it has granted, or is obligated to grant, any license not required under AFJ2.

        ASCAP and the TMLC are entering into this agreement with respect to the Third Interim License Period without prejudice to any arguments or positions they may assert in *Duhamel Broadcasting* or otherwise as to what constitute appropriate interim license fees or reasonable blanket and per program license fees and terms for the local television industry or, in ASCAP's case, as to any other licensee, or, in the TMLC's case, as to any other licensor.

        Please confirm that the foregoing correctly states our agreement by dating and signing the enclosed copy of this letter and returning it to me at the address indicated above.

                                      Sincerely yours,

                                       Vincent Candilora

Accepted and agreed to this

**3rd** day of **January** , **2012**

TELEVISION MUSIC LICENSE COMMITTEE, LLC

By: _____

      Charles Sennet, Chairman