# MANDATE

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 22nd day of May, two thousand twelve.

Before:   JON O. NEWMAN
          GERARD E. LYNCH,
          *Circuit Judges,*
          JANE A. RESTANI*
          *Judge, U.S. Court of International Trade*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 14, 2012

AMERICAN SOCIETY OF COMPOSERS,
AUTHORS AND PUBLISHERS,

      Defendant - Appellant,

      v.

MOBITV, INCORPORATION, f/k/a/ IDETIC,
INCORPORATION,

      Appellee.

JUDGMENT

Docket No.: 10-3161 (L)
               10-3310 (Con)

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the District Court is AFFIRMED.

           For The Court:

           Catherine O'Hagan Wolfe,
           Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe*    *Catherine O'Hagan Wolfe*

---

\*     Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation.

# MANDATE ISSUED ON 06/14/2012

10-3161-cv(L)
ASCAP v. MobiTV, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2011

Heard: October 11, 2011          Decided: May 22, 2012

Docket Nos. 10-3161-cv(L), -3310-cv(CON)

- - - - - - - - - - - - - - - - - - - - - - - -

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND
PUBLISHERS,
     Defendant-Appellant,

                    v.

MOBITV, INCORPORATION, f/k/a/ IDETIC,
INCORPORATION,,
     Appellee.
- - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN and LYNCH, <u>Circuit Judges</u>, and RESTANI,[*] <u>Judge</u>, <u>U.S.</u>
        <u>Court of International Trade</u>.

     Appeal from the July 6, 2010, judgment of the United States

District Court for the Southern District of New York (Denise Cote,

District Judge), setting royalty for blanket public performance

license for music in the ASCAP repertory that is embodied in

television and radio content to be delivered to viewers and listeners

using mobile telephones. <u>In re Application of MobiTV, Inc.,</u> 712 F.

Supp. 2d 206 (S.D.N.Y. 2010).

_____

     [*]Honorable Jane A. Restani, of the United States Court of
International Trade, sitting by designation.

Affirmed.

> Ira M. Feinberg, Hogan Lovells US LLP, New York, N.Y. (Eleanor M. Lackman, Chava Brandriss, Hogan Lovells US LLP, New York, N.Y.; Catherine E. Stetson, Hogan Lovells US LLP, Washington, D.C.; Joan M. McGivern, Richard H. Reimer, Christine A. Pepe, ASCAP, New York, N.Y.; David Leichtman, Hillel I. Parness, Bryan J. Vogel, Oren D. Langer, Robins, Kaplan, Miller & Ciresi L.L.P., New York, N.Y., on the brief), for Defendant-Appellant.

> Kenneth L. Steinthal, Greenberg Traurig, LLP, San Francisco, Cal. (Joseph R. Wetzel, Harris L. Cohen, Matthew L. Reagan, Greenberg Traurig, LLP, San Francisco, Cal., on the brief), for Appellee.

> (Michael E. Salzman, Hughes Hubbard & Reed LLP, New York, N.Y.; Marvin L. Berenson, John Coletta, Joseph J. DiMona, Broadcast Music, Inc., New York, N.Y., for amicus curiae Broadcast Music, Inc., in support of Defendant-Appellant.)

> (Bruce G. Joseph, Andrew G. McBride, Wiley Rein LLP, Washington, D.C., for amicus curiae Cellco Partnership d/b/a Verizon Wireless, in support of Appellee.)

JON O. NEWMAN, Circuit Judge.

This appeal concerns determination of the proper royalty the Defendant-Appellant American Society of Composers, Authors and Publishers ("ASCAP") is entitled to receive for a blanket public

performance license for music in the ASCAP repertory that is embodied in television and radio content to be delivered to viewers and listeners using mobile telephones (sometimes called "handsets"). The applicant for the license is Plaintiff-Appellee MobiTV, Inc. ("Mobi"), which purchases programming from cable television networks and transmits it to the wireless carriers to which consumers subscribe to obtain wireless service on their handsets. When the parties could not agree on a price for the performance rights to the music component of Mobi's offerings, ASCAP sought a reasonable rate in the District Court for the Southern District of New York, acting as a rate court pursuant to a consent decree. Following a bench trial, the District Court (Denise Cote, District Judge) issued a judgment on July 7, 2010, establishing various royalty rates, depending on the nature of the programming, and designating the revenue bases to which those rates apply. See In re Application of MobiTV, Inc., 712 F. Supp. 2d 206 (S.D.N.Y. 2010) ("MobiTV"). ASCAP appeals, contending that the District Court's rate formulation should have been based on the retail revenues received by the wireless carriers from sales to their customers, rather than the content providers' wholesale revenues paid by Mobi. We affirm.

Background

A. ASCAP

-3-

ASCAP represents about half of the nation's composers and music publishers.  These composers grant to ASCAP the non-exclusive right to license public performances of their music.[1]  ASCAP has an estimated 8.5 million musical works in its repertoire.  Because of concerns that ASCAP's size grants it monopoly power in the performance-rights market, it is subject to a judicially-administered consent decree, the most recent version of which was entered into on June 11, 2001.[2]  United States v. ASCAP, No. 41-1395. 2001 WL 1589999, at *1 (S.D.N.Y. June 11, 2001).  Under this Second Amended Final Judgment ("AFJ2"), ASCAP is required to issue a "Through-to-the-Audience" ("TTTA") license to any operator "that transmits content to other music users with whom it has an economic relationship relating to that content."  AFJ2 § V.  A TTTA license effectively allows the licensee to pay a single fee in exchange for the right of the licensee, as well as any

---

[1]The bundle of rights created by American copyright law includes the "exclusive right[] to do and to authorize . . . perform[ance of] the copyrighted work publicly."  17 U.S.C. § 106.  Although most aspects of a copyright are typically owned by the studio or company commissioning the musical composition, it is customary to allow composers and music publishers to retain this "public performance" right.  In order for music to be legally performed, the prospective user must first acquire a license for this public performance right.

[2]Broadcast Music, Inc. ("BMI") represents most of the remaining composers in the American market.  It operates under a consent decree similar to ASCAP's.  See United States v. BMI (Application of Music Choice), 316 F.3d 189, 190 (2d Cir. 2003).

-4-

of its downstream partners, to perform any of the music in ASCAP's repertoire. Thus, for example, a radio broadcaster that transmits music to various independent stations around the country could request a TTTA license to cover the performances of any of the stations receiving and playing its programming. The consent decree provides that "[t]he fee for a [TTTA] license shall take into account the value of all performances made pursuant to the license." Id.

The AFJ2 obliges ASCAP to issue a TTTA license to any qualified applicant seeking to perform ASCAP music within the United States. Id. Upon request, ASCAP must quote a reasonable price for such a license and enter into negotiations with the applicant. AFJ2 § IX(A). If, following a predetermined negotiation period, the parties are unable to reach agreement, either one may request the District Court for the Southern District of New York, acting as "the rate court," to determine a reasonable rate.

B. Mobi

Mobi acts as a middleman between "content providers" – television networks, record labels, and radio broadcasters – and wireless phone carriers. To do that, Mobi aggregates content – television programs, music videos, and the like – into a number of "channels" (with themes such as "news," "music," and "comedy") that wireless carriers then offer to their customers as part of their phone subscription plans.

-5-

In addition to aggregating content, Mobi also provides the technology infrastructure for delivering this content directly to viewers.[3]

Mobi's primary offerings may be roughly divided into three types: television channels, radio channels, and music video channels.[4] Television channels consist of programs and clips acquired directly from the networks. Radio channels are acquired from audio-only content providers, such as National Public Radio, ESPN Radio, or DMX, Inc ("DMX"). Music video channels feature music videos that Mobi acquires from various record labels. In the case of television and radio channels, Mobi has little control over the content that is ultimately placed into the channel by the content provider. In the case of music videos, Mobi acts as a content provider itself by acquiring and assembling individual music videos into themed channels

---

[3]Mobi's technology infrastructure is directed to transferring large amounts of data quickly and fluidly over mobile phone networks. Mobi provides this "back-end" infrastructure to a number of carriers for whom it does not provide any content. In those cases, the wireless carrier acquires content directly from the networks, record labels, and other content providers and uses Mobi's infrastructure to the deliver that content.

[4]Depending on the type of content it provides, a given channel may be offered in a live, clip-linear, or video-on-demand ("VOD") format. Live content is streamed directly from the networks and is the most popular and expensive content available from Mobi. Clip-linear content delivers a repeating sequence, or "loop", of programming set by the content provider and refreshed periodically. VOD content allows the customer to select a particular program or clip and watch that piece of content immediately.

designed and marketed by Mobi.

Payments to Mobi from the wireless carriers. Television, radio, and music video content may be packaged for consumption in one of two ways. First, groups of channels may be packaged for "à la carte" selection, for which wireless phone customers pay a monthly fee, usually around $10. Second, content may be "bundled" with other types of non-Mobi products and services and sold to the customer as part of a larger offering. When Mobi's products are sold as part of a bundle, it receives a flat dollar figure per subscriber per month based on the relative value of the Mobi service to the bundle. In the latter case, Mobi does not know how much the carrier received for the sale. In both types of packaging, payments are not affected by whether subscribers actually use any of Mobi's content.[5]

In addition to the revenue from carriers for packaged content, Mobi also earns a small amount of income from advertising that it inserts into its channels. This revenue may be retained solely by Mobi or shared with the wireless carriers pursuant to license agreements.

Payments from Mobi to content providers. For the right to

---

[5]Mobi markets its services as a way to help drive demand for more expensive data plans, which are lucrative to the carriers.

distribute content to the wireless carriers, Mobi generally pays the networks and other content providers a per-subscriber fee. The size of the fee, which Mobi negotiates with each content provider, depends on the popularity of the channel. Although Mobi's revenue-to-cost ratio had been improving steadily in 2008, as of 2008 it had never made a profit.

C. Procedural History

In November 2003, Mobi applied to ASCAP for a TTTA license for a "service that allows mobile handset users to access television and other content by aggregating television and other audio-visual content for transmission over telecommunications networks." Failing to reach agreement over an appropriate rate, ASCAP applied to the District Court in May 2008 for "a reasonable fee retroactive to the date of the written request for a license."

In the proceedings in the District Court, ASCAP contended that it was entitled to over $41 million in fees for the period between 2003 and 2011.[6] Mobi contended that it owed only $301,257.99 for the period from November 2003 to July 2009.

When a party applies to the District Court to set a reasonable

---

[6]In its appellate brief, ASCAP contends that the portion of this fee attributable to the period from November 2003 to July 2009 was approximately $15.8 million.

-8-

rate for an ASCAP license, the AFJ2 requires that court to first assess the reasonableness of the fee quoted by ASCAP. AFJ2 § IX(B), (D). During this phase of the proceedings, ASCAP bears the burden of establishing the reasonableness of its proposed fee. <u>Id.</u> If ASCAP fails to meet its burden, the District Court must "determine a reasonable fee based upon all the evidence." AFJ2 § IX(D).

<u>The District Court's rejection of ASCAP's fee proposals.</u> Pursuant to the AFJ2, the District Court first considered, and rejected, ASCAP's fee proposals.[7] ASCAP had proposed a fee formula that used as a starting point the revenues wireless carriers received from their customers. In a thorough review, <u>Mobi</u>, 712 F. Supp. 2d at 236-244, the District Court identified a number of errors and deficiencies in that methodology. Among these were the unrealistic size of ASCAP's starting revenue base ($54 billion), <u>id.</u> at 239, the inclusion in that figure of large sums of revenues unrelated to the value of Mobi's products, including the revenues earned by the wireless carriers on their primary services of telephonic

---

[7]ASCAP made two different fee proposals in the court below. The same formula was employed in each proposal, the principal distinction being whether the wireless carriers would share some of the burden of paying for the resulting fee. <u>See</u> <u>Mobi</u>, 712 F. Supp. 2d at 243.

communications and Internet access, id. at 240-41, the use of faulty
calculations, id. at 240-41, the use of a high royalty rate (2.5
percent) based on an non-analogous benchmark, id. at 242, and the
large size of the resulting fee, id.  Notably, the District Court
implicitly rejected the proposition that wireless carrier retail
revenues from their customers could be used as a base for a rate
calculation:

> In sum, ASCAP has not carried its burden of showing that its
> proposed fee for a TTTA license for Mobi is reasonable.  It
> has not shown that it located a revenue base with a
> sufficient nexus to content "sourced" by Mobi within the
> wireless carriers' revenue base or that it is entitled to a
> fee built upon any broader revenue base.  Because ASCAP
> chose a vastly inflated revenue base it faced the Herculean
> task of contracting that base through a series of
> calculations.  Each of those layers of calculations was
> laden with unsupported and faulty assumptions.  The final
> fee request was a demonstrably unreasonable number. . . .
> And, of course, as the discussion of the complexity of the
> [ASCAP] calculations illustrates, the adoption of this vast
> revenue base, along with the layers of calculations required
> to reduce it to a fee proposal, imposes enormous transaction
> costs on the parties that are entirely out of line with the
> commercial realities faced by both ASCAP and all but perhaps
> the very largest communications companies in America.

Id. at 244.

The District Court's fee formula.  After rejecting ASCAP's fee
proposals, the District Court proceeded, as provided in the consent
decree, to "determine a reasonable fee based upon all the evidence."
AFJ2 § IX(D).  In setting a reasonable rate, the District Court

largely credited Mobi's fee expert and adopted Mobi's proposed fee structure. The District Court's formula differs from ASCAP's in several important respects.

First, the District Court declined to use the wireless carriers' retail revenue from their customers as the base for the royalty calculations. Instead, for programming obtained from television networks, it used Mobi's costs, i.e., the amount it pays to content providers for content, plus any revenue derived by Mobi from advertising inserted into that content. Mobi, 712 F. Supp. 2d at 246-47.[8] For programming obtained from record labels (music videos), the Court used Mobi's revenues, i.e., the amount it receives from wireless carriers for its services, again along with advertising income. See id. at 247.

Second, the District Court used ASCAP's suggested rate of 2.5 percent only for all-audio channels. See id. at 248. For audio-visual content, it applied the rates used in benchmark agreements between ASCAP and the cable television industry. See id. at 247-48. The District Court followed these benchmarks in applying rates of 0.9 percent to music-intensive programming (e.g., music video channels),

---

[8]One result of taking Mobi's costs as the revenue base, as the District Court recognized, was that ASCAP received no fee for some programming that content providers offered to Mobi for free. Mobi, 712 F. Supp. 2d at 250-51.

0.375 percent to general entertainment content, and 0.1375 percent to news and sports content. See id. at 255.

The result of these calculations was a judgment setting a fee of $405,000 for the period from November 2003 through March 2010, substantially less than ASCAP's proposed fee of $15.8 million for a somewhat shorter period.[9]

## Discussion

### A. Standard of Review

On an appeal from a rate determination, this Court reviews the District Court's factual findings for clear error and its conclusions of law de novo. See United States v. ASCAP (Applications of RealNetworks, Inc. and Yahoo! Inc.), 627 F.3d 64, 76 (2d Cir. 2010) ("In order to find that the rate set by the District Court is reasonable, we must find both that the rate is substantively reasonable (that it is not based on any clearly erroneous findings of fact) and that it is procedurally reasonable (that the setting of the rate, including the choice and adjustment of a benchmark, is not based on legal errors)."). We have likened this distinction to that between the admissibility of evidence (a question of law) and an evaluation of the persuasive force of that evidence (a question of fact). See ASCAP

---

[9]The District Court's fee structure was also intended to govern the parties' relationship through the end of the statutory contract period, i.e., through 2011.

v. Showtime/The Movie Channel, Inc., 912 F.2d 563, 569 (2d Cir. 1990).

When setting an appropriate rate, the District Court must attempt to approximate the "fair market value" of a license – what a license applicant would pay in an arm's length transaction. See United States v. BMI (Application of Music Choice), 316 F.3d 189, 194 (2d Cir. 2003) ("Music Choice II").  In many cases, "the appropriate royalty rate" – i.e., the fair market value of the license – "is determined by applying the appropriate percentage rate to the fair market value of the music."  Id. at 195 (emphasis supplied).  In so doing, the rate-setting court must take into account the fact that ASCAP, as a monopolist, exercises market-distorting power in negotiations for the use of its music. See RealNetworks, 627 F.3d at 76.

B. Rejection of ASCAP's proposal

ASCAP does not contend on appeal that the District Court erred in rejecting its royalty proposal.[10]  Instead it devotes its entire argument to claimed deficiencies in the District Court's own determination, pursuant to the AFJ2, of a reasonable royalty.  We therefore limit our discussion to those alleged deficiencies.

---

[10]Toward the end of its brief ASCAP asserts that the District Court "erred in rejecting ASCAP's proposed methodology outright as unreasonable," Brief for Appellant at 44, but this statement simply continues the argument that the District Court should not have based a royalty rate on wholesale revenues; it is not a claim that ASCAP's proposal should have been adopted.

C. Alleged Deficiencies in the District Court's Royalty Determination

The District Court's royalty determination began with selection of a revenue base to which the Court applied different percentage rates depending on the category of programming. ASCAP's primary contention on appeal is that the Court selected an incorrect revenue base.

1. The appropriate revenue base

The District Court used as a revenue base "the wholesale price for the musical content," MobiTV, 712 F. Supp. 2d at 247. At first glance, this phrase might seem to involve circular reasoning: the revenue base is being selected to determine what Mobi must pay ASCAP for the right to perform ASCAP music, but what Mobi must pay ASCAP might also be called "the wholesale price for the musical content." But, as used by the District Court, that is not what the phrase means. In fact, the phrase has two other meanings depending on whether Mobi is licensing content from content providers (typically television networks) or obtaining music videos from record labels. The Court explained its revenue base in these words:

> For the programming that Mobi licenses from content providers, aggregates, and conveys to wireless carriers, the revenue base shall be the amounts that Mobi pays to the cable television networks or other providers to license the content, plus any revenue from advertising Mobi inserts into that programming, including revenue that is shared with wireless carriers or potentially content suppliers. For the

music videos that Mobi obtains from record labels, programs
into music video channels, and then provides to the
carriers, the revenue base will be <u>the revenue that Mobi
receives from the wireless carriers</u> for this programming,
plus any revenue from advertising Mobi inserts into that
programming, including revenue that is shared with wireless
carriers or potentially content providers.

<u>Id.</u> (emphases added).

As can readily be seen, both revenue bases use wholesale revenue,
in one case the wholesale revenue that the cable television networks
receive from Mobi and in the other case the wholesale revenue that
Mobi receives from the wireless carriers.  In neither case is retail
revenue used, <u>i.e.</u>, the revenue the wireless carriers receive from the
handset customers.

At the outset, we can put aside one aspect of ASCAP's challenge,
which is merely a semantic quibble.  ASCAP repeatedly faults the
District Court for using Mobi's "cost" or "costs" to obtain rights,
<u>see</u> Brief for Appellants at 30, 33.  The District Court focused on
revenue, either the content providers' revenue from Mobi or Mobi's own
revenue from record labels.  Obviously, with respect to programming
from content providers, the providers' revenue <u>from</u> Mobi is the same
as Mobi's payment of costs <u>to</u> those providers.  The labeling is a
matter of perspective, not substance.

ASCAP's fundamental objection is that the revenue base should
have been retail revenue received downstream in the distribution chain

by the wireless carriers from their customers, rather than the
wholesale revenue received upstream by the content providers from
Mobi.  We consider first the adequacy of the District Court's reasons
for using the content providers' revenue and then ASCAP's complaint,
which is based primarily on this Court's decision in <u>Music Choice II</u>.

    <u>The District Court's reasons for using wholesale revenues.</u>  The
District Court expressed several reasons for using wholesale revenues
as "the appropriate revenue base from which to measure the value of
the public performance of the music at issue here." <u>MobiTV</u>, 712 F.
Supp. 2d at 246.  First, the Court explained that "[p]ricing the
public performance right at the time the content is first sold gives
direct and immediate feedback to content producers about the value of
a component of their product." <u>Id.</u>  Second, the Court accepted the
concept of what Mobi's expert, Professor Roger G. Noll, called
"derived demand":[11]

> Mobi has shown that the value of the public performance
> of the music at the retail level is indeed captured at the
> wholesale level, not just theoretically by the concept of
> derived demand, but also functionally from the fact that the
> cable television networks principally generate their
> revenues by measuring the number of subscribers for their
> programming.  To the extent that a channel's content becomes

---

[11]Noll explained in his 83 page declaration that "[t]he
relationship between final product markets and the demand for inputs
is called the theory of derived demand, and for the case of variable
factor proportions was first developed in John R. Hicks, <u>The Theory of
Wages</u>, MacMillan (1932)." Noll Declaration 47 n.40.

popular among consumers, the seller of content demands a
higher rate of compensation from advertisers and from
purchasers of the content. And, Mobi's payments to the
cable television networks for the programming it distributes
are driven by the subscriber data that Mobi tracks and
conveys to the networks.

Id.

Third, the District Court pointed out the administrative

advantages of using wholesale revenue:

> [T]he administrative advantages of basing a rate on
> wholesale revenue are amply illustrated in this case by the
> challenges that ASCAP's expert sought to surmount as she
> endeavored to construct calculations that might result in a
> reasonable fee and to justify those calculations. Fully
> appreciating that the retail revenue base vastly overstates
> the value of the public performance of the musical
> composition, since it reflects so many inputs that bear
> little or no relation to that content, she designed layers
> of formulae to reduce the retail revenue base. At each step
> of the process, those formulae raised a multitude of
> questions about their intellectual rigor, fairness, and the
> cost and burden associated with their implementation.

Id.

Fourth, the District Court relied on two factors that our Court

in Music Choice II had pointed out counsel against using retail

revenues as a revenue base:

> This is a case in which many of the retail customers pay a
> single fee for a bundle of programming, making it difficult
> to determine what part of the fees is paid for music. Music
> Choice II, 326 F.3d at 195 n.2. And the digital revolution,
> which has turned handsets into computers and permitted
> television programming to be included among the many
> innovative products to which a consumer has immediate and
> constant access, makes it an extremely complex task to tease

-17-

out one component of the retail price and identify the extent to which retail price is driven by the musical content of the television programming. Id. at 196 n.3.

MobiTV, 712 F. Supp. 2d at 246-47.

ASCAP challenges the District Court's reasons for using wholesale revenues as the royalty base by disputing the validity of Prof. Noll's use of the principle of derived demand. See Brief for Appellant at 33-36. Prof. Noll justified his use of that principle, which the District Court accepted, in these words:

> If consumers value musical performances more highly, they will increase their purchases of musical performances, which in turn will cause the derived demand for content that contains music to increase. The resulting increase in sales of content that contains music will lead to higher payments for rights holders even if the royalty rate is unchanged.

Noll Declaration 45. He gave three reasons for using wholesale revenue as the appropriate base:

> First, using the revenue of the channel supplier leads to royalties that are most closely connected to the intensity of music use. Second, basing royalties on the revenue of the channel supplier also avoids unreliable and expensive methods for allocating revenue among bundled products and services and to other inputs of retailers (here, the wireless carriers). Third, the revenue of channel suppliers includes sources of revenue that accrue to the channel but not to the retailer, such as advertising that is inserted by the channel supplier.

Id. at 48.

Despite cross-examining Prof. Noll in 120 pages of trial transcript, ASCAP failed to provide the District Court with any basis

-18-

for discounting, much less rejecting, his analysis.

ASCAP's challenge to wholesale revenues based on Music Choice II and IV. The Music Choice litigation, see Music Choice II, 316 F.3d 189, and United States v. Broadcast Music, Inc. (Application of Music Choice), 426 F.3d 91 (2d Cir. 2005) ("Music Choice IV"), concerned the appropriate royalty rate to be paid by Music Choice to Broadcast Music, Inc. ("BMI"), for a TTTA license for the performance rights to music in BMI's repertory. Music Choice is a partnership that transmits numerous music channels to listeners' television sets via cable and satellite and to their computers via the Internet. Like ASCAP, BMI is subject to a consent decree that designates the Southern District of New York as the rate court in the event of a royalty fee dispute. Music Choice II, 316 F.3d at 190. BMI urged the Court to follow an agreement between BMI and DMX, a competitor of Music Choice. Under that agreement, DMX paid BMI 3.75 percent (later 4 percent) of DMX's wholesale revenue, which in this context meant the money paid by the cable or satellite operators to DMX for music programming. See id. at 192. That rate was designed to be approximately double the rate previously applied to the retail revenues of the cable or satellite operators on the theory that these operators charged their retail customers approximately double what they were paying to the providers of the music programming. See id.

The District Court in the <u>Music Choice</u> litigation ruled that a 3.75 percent rate based on the wholesale revenues of Music Choice was not appropriate. <u>See</u> <u>id.</u> at 193. The District Court explained that this rate had been used in the DMX contracts to approximate the use in previous contracts of a 2 percent rate of DMX's wholesale revenues plus 2 percent of the cable or satellite operators' retail revenues. Then the District Court reasoned that retail revenues did not reflect the fair market value of music because the subscriber paying the retail price was paying for materials and services not provided by the author of the music. <u>See</u> <u>id.</u> at 194. The Court therefore deducted 2 percentage points (the retail rate) from the 3.75 percent that had been applied to wholesale revenues and set 1.75 percent of wholesale revenues as the appropriate rate. <u>See</u> <u>id.</u>

This Court reversed. We faulted the District Court for rejecting retail revenues in determining an appropriate rate. <u>See</u> <u>id.</u> at 195. In language embraced by ASCAP in the pending case, we said:

> As to the court's rejection of retail revenues, absent some valid reason for using a different measure, what retail customers pay to receive the product or service in question (in this case, the recorded music) seems to us to be an excellent indicator of its fair market value. While in some instances there may be reason to approximate fair market value on the basis of something other than the prices paid by consumers, in the absence of factors suggesting a different measure the price willing buyers and sellers agree upon in arm's length transactions appears to be the best measure.

-20-

It is true without doubt that to make the music available to its customers, the retail seller must incur expenses for various processes and services not provided by the owner of the music, such as the laying of cable, the establishment of satellite systems, etc. However, this is in no way incompatible with the proposition that retail revenues derived from the sale of music fairly measure the value of the music. The customer pays the retail price because the customer wants the music, not because the customer wants to finance the laying of cable or the launching of satellites.

Id. (citation and footnote omitted).

In the pending case, we are of course obliged to follow the holding of Music Choice II, which was that the District Court had erred by reducing a percentage rate that had been applied to wholesale revenues by the rate previously applied to retail revenues. Nothing of that sort occurred in our case. Of course, ASCAP urges us to heed not merely the holding of Music Choice II but its language, particularly the observation that "what retail customers pay to receive the product of service in question (in this case, the recorded music) seems to us to be an excellent indicator of its fair market value." For several reasons we conclude that the quoted words do not compel a reversal of the District Court's decision in this case.

First, the quoted words were preceded by the important qualifying phrase "absent some valid reason for using a different measure." In the pending case, the District Court had a very valid reason for using

-21-

a different measure: the unimpeached testimony of Prof. Noll explaining several reasons why wholesale revenue was far superior to retail revenue as a basis for a royalty rate in this case.

Second, in Music Choice II our Court added a significant footnote, observing that "where the customers pay a single fee for a package of audio and visual programming, which includes the music, it will be difficult to determine what part of the fees paid was for the music, as opposed to other programming." Id. at 195 n.2. That is precisely the sort of "bundling" that occurs with Mobi's transmission of programming to wireless carriers. The wireless carriers typically offer Mobi's television products as part of a bundle of services that also includes Internet access and text messaging, and then charge a single data plan fee for the whole bundle. As ASCAP's fee proposal to the District Court illustrated, separating out the relative value of each individual product is fraught with methodological difficulty. ASCAP's proposal was premised on the notion that the value of different products in the bundle could be determined based upon how much data each product used. As the District Court noted, this proposal made the essentially arbitrary assumption "that a consumer would pay the same amount of money to receive a kilobyte of text messaging as a kilobyte of television programming, even though a kilobyte might give a consumer several back-and-forth exchanges of

text messages but only the briefest glimpse of an image from a television program." MobiTV, 712 F. Supp. 2d at 241. ASCAP's failure to develop a rational formula for valuing the component parts in the bundle of products sold by the wireless carriers confirms the wisdom of the District Court's decision to reject the use of a retail base in this case. The products bundled by Mobi differed considerably from the programming channels in Music Choice II, which were essentially audio channels devoted exclusively to music.

Third, although not disagreeing with the holding of Music Choice II, we are not persuaded that its contention that "retail revenues derived from the sale of the music fairly measure the value of the music," id. at 195, is universally true. Indeed, an example offered in that opinion seems to undermine that assertion. The example concerned purchasers of music on a compact disc sold for $12. Music Choice II noted that the purchasers

> were not motivated to spend their money to pay the salaries of truck drivers, warehousemen, bookkeepers, office administrators, salespersons and executives, all of whom played necessary roles in bringing the record to market. What the customers wanted was a record of certain music, and they were willing to pay $12 to get it.

Id. (emphasis added).

At an earlier time, the customer who wanted to hear the music in that example had a choice between a then-novel compact disc and an

-23-

old-fashioned vinyl plastic record, which (unless it had value as a rarity) would have sold for considerably less than the $12 for the CD. True, the purchaser was not motivated to pay the salaries of all the personnel whose efforts made possible the production and delivery of the CD (or the vinyl record), but preference for a CD would have resulted in payment of a higher price than for a record, even though both contained the same music. The retail price of the CD was reflecting not just the value the purchaser assigned to the music but also the value assigned to the mode of delivery of that music. In another significant footnote, <u>Music Choice II</u> acknowledged this very fact:

> If it were demonstrated that retail purchasers were motivated to pay more because of advantages that resulted from a particular mode of delivery, such as better quality, better accessability or whatever, this might justify a conclusion that retail price of the service purchased by the customer exceeded the fair market value of the music.

<u>Id.</u> at 196 n.3. Whether or not in some contexts the retail price of a product containing music is a good measure of the fair market value of the music, the District Court in the pending case, on the record before it, did not err in concluding that the retail price paid by customers for a service that delivers video and audio channels containing music to their handsets is not a good measure of the value

-24-

of the music itself.[12]

　　ASCAP's challenge to wholesale revenues based on uncompensated rights.  ASCAP also faults the District Court's use of wholesale revenues because such use fails to provide any compensation to ASCAP in the few instances where Mobi acquired programming without paying anything to content providers.  Prof. Noll recognized that this would occur in some instances because a new channel trying to get established sometimes cannot command any price, and providers of such content would rather offer it for free in order to have it included in a package of bundled content.  He explained, however, that such a channel would either disappear for lack of an audience or achieve an audience, in which event the popularity of its programming would subsequently be reflected in the later revenues that content providers could demand, thereby increasing ASCAP's royalty for the benefit of the music composers.  See Trial Tr. 985-88.  Either way, the temporary use of free content would not undermine the overall reasonableness of the District Court's royalty determination.  As the District Court

--------------------

　　　　[12]Although our Court's decision in Music Choice IV noted that the District Court in that litigation "should not have rejected the retail price of music as an indication of its fair market value," 426 F.3d at 95, it also acknowledged that "in spite of our endorsement of retail price as generally a good marker for fair market value, we did not require it to be used in all circumstances, but only absent some valid reason for using a different measure," id. at 97 (internal quotation marks omitted).

explained, "The market for television content has spoken, and this content would receive no airing at all through a wireless distribution platform unless the content were provided for free and given the opportunity to build a base."  712 F. Supp. 2d at 251.

2. ASCAP's Remaining Objections

ASCAP's remaining objections were properly rejected by the District Court.  For clarification, we discuss briefly two such matters.

ASCAP contends that the District Court erred in failing to "test" the resulting fee for reasonableness.  Although the size of the fee is clearly relevant to its reasonableness, there is no requirement that the District Court explicitly engage in a testing of the fee resulting from its formula.  On the contrary, the AFJ2 requires only that the District Court "determine a reasonable fee."  AFJ2 § IX(D).

ASCAP also contends that the District Court erred by failing to include the value of licenses for content acquired by others but streamed to customers using Mobi's back-end technology infrastructure. Such content would include, for example, television programming acquired by Sprint directly from the networks, and then provided to its customers using Mobi's servers and patented technology.  ASCAP argues that Mobi is required to obtain a performance license for all unlicensed content that it streams, regardless of whether it has been

-26-

assured by its upstream partner that such a license has already been procured.  This objection also lacks merit.  If an upstream content provider has already acquired a TTTA license from ASCAP, it would be unfair to require Mobi to make a second payment for the same content.  See United States v. ASCAP (In re Application of AT&T Wireless), 607 F. Supp. 2d 562, 570-71 (S.D.N.Y. 2009).  Furthermore, Mobi is entitled to rely on its upstream partner's assurances that it is protected – and to manage the accompanying risk that the partner has not obtained the promised right.[13]  ASCAP, for its part, retains the power to protect its rights by bringing an infringement action against Mobi or any other party.  As a result, the District Court did not err by construing the license to exclude such content.

## Conclusion

For the foregoing reasons, the judgment of the District Court is affirmed.

---

[13]Mobi would, presumably, manage this risk through an indemnification agreement or similar arrangement with the upstream provider.

-27-