```
D1idpanc
                        Conference
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   IN RE PETITION OF PANDORA MEDIA, INC.   12 Civ. 8035 (DLC)(MHD)

4   ------------------------------------x

5   Related to

6   UNITED STATES OF AMERICA,

7                   Plaintiff,              New York, N.Y.

8              v.                           41 Civ. 1395 (DLC)(MHD)

9   AMERICAN SOCIETY OF COMPOSERS,
    AUTHORS AND PUBLISHERS,

10                  Defendant.

11  ------------------------------------x

12                                          January 18, 2013
13                                          12:03 p.m.

14  Before:

15                  HON. DENISE L. COTE,

16                                          District Judge

17                      APPEARANCES

18  GREENBERG TRAURIG, LLP
         Attorneys for Petitioner Pandora Media, Inc.
19  BY:  KENNETH L. STEINTHAL
              - and -
20       CHRISTOPHER HARRISON
            Pandora Assistant General Counsel
21
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP (NY)
22       Attorneys for Respondent ASCAP
    BY:  JAY COHEN
23       DARREN W. JOHNSON
              - and -
24       CHRISTINE A. PEPE
         RICHARD H. REIMER
25          In-House Counsel ASCAP
```

D1idpanc
                                 Conference

1          (Case called; all sides ready)

2          THE COURT:  This is our initial conference in this

3     case, and it is an opportunity for counsel to advise me about

4     what this case is about and for us to set the appropriate

5     schedule.

6          Mr. Steinthal.

7          MR. STEINTHAL:  Thank you, your Honor.

8          We at Pandora filed this petition for a rate-making

9     proceeding, as your Honor knows.  Pandora operated, as many

10    startups do as your Honor recalls from prior litigations, under

11    ASCAP's Experimental Internet License Form from its launch

12    until a period of time, December 31, 2010, when it terminated

13    that initial form license because it felt it was really

14    inappropriate for Pandora's emerging business, and it filed a

15    proceeding under the Consent Decree in order to get a license

16    thereunder and, if necessary, come to your Honor for rate

17    setting.

18         It's been two years now that Pandora has been

19    operating under an Interim Fee Agreement without any kind of

20    final fee.  During that period of time Pandora went public, and

21    as a public company, it is difficult for it to carry such a

22    long-term period without finality as to what its fees are.

23    That is one of the reasons that led us to file this petition.

24         There are actually, as we lay out in the petition, two

25    general circumstances that led us to the point of actually

D1idpanc

Conference

1    filing, two logjams, so to speak.  One was a logjam over fees,

2    and one was a logjam over a structural issue that I will

3    explain to you in a moment.

4            As to fees, during the course of the interim period,

5    your Honor is very familiar with the fact that the RMLC, which

6    was in litigation with ASCAP, entered into an agreement with

7    ASCAP.  It's public what the fee structure is of that deal.

8    And importantly, your Honor, that deal covered not just

9    broadcast transmissions but Internet transmissions of RMLC

10   members, including totally Internet-only services, like

11   iHeartRadio, which is the largest competitor of Pandora.

12           Under the RMLC deal, which your Honor, I think,

13   approved at some point, the rates for Internet streaming are

14   1.7 percent of the Internet streaming services' revenue with a

15   25 percent standard deduction from revenue.  So you have

16   effectively a net rate of 1.275 percent.

17           To put things in context, the Form ASCAP Internet

18   License --

19           THE COURT:  Excuse me.

20           MR. STEINTHAL:  OK.

21           THE COURT:  What's the 25 percent?  25 percent of

22   what?

23           MR. STEINTHAL:  It is a standard deduction.

24   Basically, it is like you may be familiar with the fact that

25   there is a advertising reduction of up to 15 percent under some

D1idpanc
                         Conference

1    ASCAP deals.  Under the RMLC deal, there is a 25 percent

2    deduction from revenue for Internet services, as opposed to a

3    12 percent reduction in revenue for broadcast.  And the reason

4    is, your Honor, it's much more expensive to sell ads on the

5    Internet, it's more of a struggle, and as a consequence, the

6    deduction associated with the cost of ad sales generally was

7    set at 25 percent under the RMLC deal.  So it is basically

8    1.7 percent headline rate, 25 percent deduction, with a net

9    effective rate of 1.275 percent.

10           If you go to ASCAP's website and you look up the Form

11   Internet Services License, it is a 1.85 percent rate.  So

12   basically it is almost 50 percent higher, because the deduction

13   under the Form Agreement is limited to outside agency

14   commissions.  And Pandora does its own ad sales; it doesn't

15   really rely on agency commissions.  So effectively there is a

16   50-percent markup between what Pandora would pay if it were

17   owned by an RMLC member as opposed what Pandora has to pay even

18   under the Form Agreement, which we don't think is reasonable

19   but it's there, the Form Agreement would be 50 percent higher.

20           So during --

21           THE COURT:  So when you say "50 percent higher," you

22   are comparing the 1.275 percent net rate with the 1.85 percent

23   Form Agreement rate?

24           MR. STEINTHAL:  Correct.  Because the net and the

25   gross is the same for Pandora under the Form Agreement because

D1idpanc
                              Conference

 1    the Form Agreement only allows for a deduction for outside

 2    agency sales, and we sell our own advertising internally.

 3              Under the RMLC agreement there is no distinction.  You

 4    get a 25 percent deduction, arguably, I think, in recognition

 5    of the fact that it costs so much more.  Internet ad sales is a

 6    challenge.  Companies hire their own people that are expert in

 7    it because it is much more challenging than the traditional

 8    broadcast ad sales market.  Why else would there be a

 9    25 percent standard deduction for Internet radio under the RMLC

10    deal while there is only a 12 percent deduction for broadcast

11    transmissions?

12              I mean, all of this would come out in discovery.  We

13    are quite confident that it will come out exactly as I said.

14    But the bottom line is during the course of this almost

15    two-year period of negotiation, Pandora is operating and had

16    been operating under the Form rate, which, without getting into

17    the details of the Interim Fee Arrangement, became the basis of

18    the Interim Fee Agreement when we went forward, and all of a

19    sudden in the middle of the negotiation we see that RMLC owned

20    Internet radio services, including our largest competitors --

21    and it doesn't matter who owns you, there are a lot Internet

22    radio services out there and they are in the same market we

23    are, but just by dint of the fact that some of them are

24    RMLC-owned, they get the benefit of this 1.7 minus 25 percent

25    rate.

D1idpanc
                    Conference

1           So we're in negotiations.  That happens.  And that

2    led, frankly, to a very difficult situation.  ASCAP was seeking

3    to increase the rate over the prior experimental rate.  We're

4    trying to get a rate that, as we put in our petition, we see no

5    reason as a matter of similarly-situated licensees why Pandora

6    should not get the benefit of that 1.7 minus 25 percent

7    standard deduction rate.  At a logjam, at some point we threw

8    up our hands.

9           The other thing that led us to throw up our hands --

10   and this is, your Honor, a rather unique situation in history.

11   In April of 2011, EMI, then arguably the single largest

12   publisher within ASCAP, withdrew from ASCAP the right to

13   license, quote, new media transmissions of EMI catalog.

14          Then late this past year SonyATV, which had acquired

15   EMI in the interval, announced that it was withdrawing its

16   catalog.  So we now have SonyATV owning EMI.  Collectively,

17   depending on who you talk to, 25 to 35, somewhere more than

18   25 percent of the market has withdrawn from ASCAP the right to

19   license transmissions for new media and, in particular, that

20   affects Pandora.  Interestingly, your Honor, it doesn't affect

21   the RMLC members.  So, once again, we have a rather unique

22   circumstance where Pandora and other Internet-only enterprises

23   that are not owned by an RMLC member have to now do direct

24   deals with SonyATV and EMI.

25          The thing that, again, created the impetus for the

D1idpanc
                        Conference

1    filing before your Honor, apart from the rate issue --

2              THE COURT:  Excuse me.  EMI and Sony, they didn't join

3    like BMI or some other organization; they just want to handle

4    those negotiations directly?

5              MR. STEINTHAL:  Let me clarify.

6              Every major music publisher has an ASCAP house and a

7    BMI house because the individual writers can only be a member

8    of either of ASCAP or BMI.  So, you know, there is a separate

9    subsidiary of EMI Music Publishing that owns the catalog of

10   writers who are ASCAP members and a separate subsidiary that

11   owns the catalog who are BMI members and a separate subsidiary

12   that owns the catalog of the SESAC writers.

13             Let's put BMI aside; they are not your Honor's

14   problem.

15             So when EMI announced its pullout, EMI controlled we

16   thought it was roughly 20 percent of ASCAP's share of Pandora

17   uses, the single largest music publisher that we were aware of.

18   That was April 2011.  At some point thereafter, it was actually

19   during the time when Pandora was negotiating with EMI a direct

20   license with EMI, because it had to, SonyATV began efforts to

21   acquire EMI.  That was obviously subject to antitrust scrutiny.

22   Pandora did a deal with EMI while the regulators were looking

23   at the merger.  Fast-forward to post-merger, 2012, SonyATV

24   announces that it's going to withdraw its catalog from ASCAP

25   effective 1/1/13.

D1idpanc
                          Conference

1          The struggle we were having, just directed at ASCAP,

2     was that clearly if 20 percent, then 30 percent in toto of the

3     uses Pandora is making are catalog that has been withdrawn from

4     ASCAP, we're not going to pay the same percentage of revenue

5     rate.  Let's assume we all had an agreement that X percent was

6     the right number.  Clearly, if 30 percent of the repertory has

7     been withdrawn and Pandora has to do a direct deal with EMI and

8     SonyATV, we need a carveout.

9          This is even a little bit different than the DMX case,

10    which your Honor is familiar with, where the licensee was the

11    one who initiated the direct licenses, and some degree of

12    administrative fee your Honor had to struggle with.  Here, we

13    didn't do anything.  This is just publishers withdrawing.  And

14    we clearly are entitled to a carveout.  We had no -- in the

15    negotiations that led to the filing, we were nowhere near a

16    meaningful agreement on how to deal with that carveout.

17         So you have two things that led to the filing:  Huge

18    rate disparity, RMLC deal -- 1.7 minus 25 -- ASCAP seeking more

19    than the Experimental Form Agreement, and for Pandora, which

20    has in the last couple of years had huge increases in

21    listenership, we're talking millions of dollars a year in the

22    delta between what the RMLC Internet streaming rate would be

23    and the Experimental Form Agreement that ASCAP has on its

24    website, and now ASCAP wants more than that.  So we're really

25    dealing with a very huge disparity.  That's what led Pandora to

D1idpanc
                              Conference

1    make the filing.

2            THE COURT:  It may not be relevant to this conference

3    and to, you know, me learning about the case and us setting a

4    schedule together, but I'm going to want counsel at some point

5    to help me perhaps remember, or perhaps learn, the chain of

6    rights from the artist for this new media and how those license

7    fees get paid when the publisher, as in this case, has made a

8    choice for an ASCAP artist, for the publisher to leave ASCAP

9    with respect to new media rights.

10           MR. STEINTHAL:  I think that's going to -- it will be

11   interesting because we want to learn, too.  This is brand new,

12   your Honor.  Their special new rules were published in a

13   compendium on ASCAP's website that discovery will reflect

14   exactly how it happened, because this has never happened

15   before.  Direct licenses have always happened, in time, where

16   an individual work is licensed by an ASCAP member without --

17   there is no withdrawal.  There is no catalog withdrawal.  It is

18   just I'm an ASCAP member.  DMX comes to me.  Offers me a

19   certain amount of money to do a direct deal.  You don't have to

20   withdraw from ASCAP.  That is just a direct license.  ASCAP

21   doesn't pay the publisher who does a direct license.  That's

22   been happening for decades.

23           This is totally new and it is kind of baffling.  There

24   is no -- your Honor, well, I'll bring you back to MobiTV.

25   There is no difference in the performing right between whether

D1idpanc
                              Conference

1    the performance occurs in radio or television or new media.

2    It's just the public performance right in the composition.

3    This notion that major publishers are withdrawing performing

4    rights from one kind of media while leaving the exact same

5    compositions in ASCAP for licensing, by ASCAP, even in the same

6    medium -- think about how crazy it is.  RMLC owns an Internet

7    radio service.  Let's call it iHeart.  It just happens to be

8    the name of one.  There is no -- the publisher withdrawal

9    doesn't apply to them; they're paying for all of the catalog

10   they use on a standalone Internet radio service to ASCAP at 1.7

11   minus 25 percent.

12         Pandora has got a double whammy here.  ASCAP is

13   seeking, because they are new media owned by Pandora instead of

14   new media owned by an RMLC member, they want a higher rate and

15   we've got to go outside of ASCAP to get direct licenses for

16   30 percent of the catalog that used to be licensed by ASCAP.

17   Obviously, among other things, we need to deal with an

18   appropriate carveout.

19         Our belief is -- you know, we know exactly what we

20   pled from a sound-recording perspective.  We can give ASCAP,

21   BMI and SonyATV a census report, this is what we played.  But

22   one of the most bizarre things, your Honor, is they can't even

23   tell us exactly how many of those works have been withdrawn.

24         We've asked ASCAP.  We've asked Sony.  We've asked

25   BMI.  They don't even know yet exactly what's withdrawn and

D11dpanc
Conference

 1    what isn't withdrawn.  And the irony of ironies is that

 2    currently, as we will pay in the fourth quarter of 2012 in Q1,

 3    when we pay our interim fees, we are still paying it all to

 4    ASCAP because they can't figure out how to process their own

 5    information.  And we're paying -- get this -- at three

 6    different rates to the same entity:  The ASCAP interim fee rate

 7    for stuff that hasn't been withdrawn; the direct deal with EMI,

 8    which we did in 2012 for the EMI withdrawn catalog; and then

 9    the new rate that Pandora, under absolute gun-to-the-head

10    circumstances at the end of last year, because it didn't do a

11    deal with SonyATV by January 1st since they had pulled out the

12    repertoire, they are at risk of infringement.

13            And isn't it funny, as you'll see later, there are two

14    articles, your Honor, that came out in the last two days.  This

15    hush, hush deal that we did with SonyATV, somebody out there

16    started talking to the press.  Article in the New York Post

17    yesterday, article in the Digital News today talks about how

18    SonyATV -- this is reported, I'm just reporting to you what's

19    reported.  I'm not reporting to you the deal.  They are all

20    reporting that SonyATV was able to get a 25 percent increase

21    because it pulled out of ASCAP, because it thought that it

22    could evade the oversight of a rate court.  This is what they

23    are talking about in the press.

24            So here we are.  And, interestingly enough, your

25    Honor, when the EMI/SonyATV deal was subject to antitrust

D1idpanc
                              Conference

1   regulation scrutiny, you will see later the difference between

2   the rate EMI agreed to before their merger was approved and the

3   rate they squeezed Pandora to pay at the very end of

4   December 2012.  It smells.  It just smells.

5              But we're here principally to get rate court rate set.

6              Your Honor, the delta between what we think we're

7   entitled to, even on an interim fee basis, and what ASCAP has

8   sought is millions per year.  We know your Honor's predilection

9   is not to have interim fee litigation.  We are prepared to

10  forgo interim fee litigation if we can get two things:  One is

11  an appropriate carveout for the now roughly 30 percent of

12  catalog that SonyATV and EMI account for; and if we can get to

13  trial fast.  We would like to get to trial by the end of this

14  year.

15             THE COURT:  That I can do for you.

16             MR. STEINTHAL:  So that's what this case is all about.

17             THE COURT:  OK.  Mr. Cohen.

18             MR. COHEN:  Your Honor, I disagree with almost

19  everything, but let me deal first with your question.

20             Here's what happened.  Sony and EMI have withdrawn

21  rights.  They have the right to do it.  ASCAP is a voluntary

22  association.  Members do not have to license through ASCAP.

23  And, frankly, what the record is going to show is that some of

24  the publishers have been unhappy with ASCAP's licensing rates

25  in this new media space.

D1idpanc
                       Conference

1            Now, the irony, to pick up on one of Mr. Steinthal's

2       words, is for 60 years the applicants have been saying ASCAP is

3       a monopolist and they don't engage in market deals.  And now

4       some members, who are not subject to the Consent Decree when

5       they license alone, have pulled out and done a market deal,

6       kind of like what Sony did in DMX, and they say, oh, it's very,

7       very high, it's smelly.  It's the market.  It's the market.

8       And the fact of the matter is no one has to license through

9       ASCAP.

10           Now, with respect to the artist, typically the artist

11      assigns copyright to the publisher.  The publisher typically

12      owns the copyright.  So the publisher is free to exploit the

13      works, and it has to account to the writer whether it licenses

14      through ASCAP or whether it licenses on its own.  And typically

15      in performing rights, as opposed to mechanical rights, it is

16      typically a 50/50 split.  So the expectation is that whether --

17      the expectation is whether Sony licenses through ASCAP or Sony

18      licenses directly, that it will split those performance fees

19      that it gets on the deal 50/50 with the writer.

20           So if Sony meets its obligations, one of the reasons

21      that the writers like ASCAP is that ASCAP accounts to writers

22      directly.  Instead of the money going back to the publisher,

23      there is a direct check cut to the writer.  But assuming that

24      Sony accounts properly, it won't make a difference with respect

25      to that split although the rate may be different.

D1idpanc
Conference

1          THE COURT:  Excuse me one second.

2          MR. COHEN:  Yes.

3          THE COURT:  I want to make some notes based on what

4    you have said.

5          MR. COHEN:  Of course.

6          (Pause)

7          THE COURT:  So you think that companies like Pandora

8    should be willing to pay higher rates to ASCAP in order to

9    prevent or to reduce the incentive for more publishers to

10   withdraw from ASCAP and charge even higher market rates?

11         MR. COHEN:  No, your Honor, I am not saying that.

12         THE COURT:  OK.

13         MR. COHEN:  I'm really not saying that.

14         THE COURT:  OK.

15         MR. COHEN:  What I'm saying is that -- let me deal

16   with this carveout question first and then come back to rates

17   because I think that is more complicated.

18         THE COURT:  OK.

19         MR. COHEN:  I didn't think we were negotiating interim

20   fees in this courtroom, we were having discussions.  But the

21   fact of the matter is, both on interim and on final, ASCAP

22   recognizes that there needs to be under the Mobi decision an

23   adjusted fee blanket license that deals with the fact that some

24   of the repertory has been directly licensed, and we will do

25   that.  I think we may have a disagreement with Mr. Steinthal

D1idpanc
                          Conference

 1   ultimately about how it is computed.  I don't think if you

 2   write a check for $100 you get a $100 reduction from your ASCAP

 3   fee.

 4            I think the question ultimately that has to be

 5   answered is what is the reduction in the value of the ASCAP

 6   license as a result of not licensing the entire repertory.

 7   And, in fact, we will work that out and I'm sure we will work

 8   something out in the interim, but I don't think Sony's share is

 9   anything like 30 percent of ASCAP but the numbers will be what

10   the numbers are.

11            And one of the reasons -- let me try to be clear, your

12   Honor, it is not in incompetence on the part of ASCAP as to why

13   this is complicated.  It is complicated because ASCAP

14   administers for Sony for domestic writers, for foreign writers,

15   and while Sony can withdraw with respect to domestic writers,

16   it actually cannot withdraw for foreign writers.  The PRS,

17   which is the British society, for example, has informed ASCAP

18   that under its rules, publishers may not license directly.

19            So parsing through the hundreds and hundreds of

20   thousands, if not millions, of compositions that are in the

21   Sony EMI repertory -- I don't know the number offhand but it is

22   a very large number -- and figuring out which are domestic and

23   which can be withdrawn and which are foreign and which can't be

24   withdrawn and how do you deal with the huge number of works

25   that copyrights are jointly owned, sometimes by Sony writers

D1idpanc
                            Conference

1   and sometimes not by Sony writers, this is all new territory.

2   We are trying to work that out with our members.

3           So, you know, ultimately this will all get worked out.

4   But both for interim -- and I've told that to Mr. Steinthal and

5   we will have some discussions hopefully within the next week --

6   and for final, ASCAP expects to present a blanket fee that will

7   take into account the fact that it doesn't license the entire

8   repertory.

9           So I don't think we have a huge dispute.  I think the

10  dispute will be how it gets done.  We'll either work it out or

11  we'll litigate it.  But ASCAP is not resisting in this court,

12  nor could we, since your Honor ruled and the Second Circuit has

13  ruled that we are obligated under the current Consent Decree to

14  give an adjusted fee blanket license, and we will do that.

15          So let me go to the fee point.  My point, your Honor,

16  is not that ASCAP is trying to hold anybody up.  It is that

17  your Honor has found that, for example, in DMX, that a direct

18  license rate is a comparable that should be taken into account

19  in setting the market rates.  And where I really disagree with

20  Mr. Steinthal is not only do I not think the radio rate is the

21  right comparable -- I'm going to come to that in a moment --

22  but there are a range of comparables that need to be taken into

23  account.

24          You know, the range of comparables that need to be

25  taken into account certainly include this new Sony deal.  He

D1idpanc

                         Conference

1    says they had a gun to their head.  I mean, they engaged in a

2    free-market transaction just like they do with the record

3    companies.  They don't have to, just like they do on the record

4    side.  And so they had a free-market transaction with Sony.

5    There was a prior transaction with EMI.  Your Honor set a rate

6    for audio only in <u>Mobi</u> which is considerably higher than the

7    rate that they are suggesting.  There is a music choice rate.

8    So there are -- and there is radio, which I'm going to deal

9    with in a moment.  So there are a range of comparables, and

10   what ASCAP is saying is that we should be paid commensurate

11   with the appropriate comparables.

12           The reason why we don't think the radio rate is the

13   right rate is several.  One -- and I don't know if your Honor

14   recalls my long discussions with Mr. Rich here, but, you know,

15   what the radio industry said to your Honor in open court and

16   what the record will show happened in the course of the

17   negotiation was -- and I this I Mr. Rich's words were tailing

18   and dog.

19           The huge dog in the radio industry that led to this

20   deal was terrestrial radio.  95 percent of the economics -- it

21   could be 98 percent but it is certainly no less than 95 percent

22   of the economics of the radio deal are on the terrestrial side.

23   And there was a complicated retroactive adjustment of the

24   interim fee in radio, because radio had gone off the percentage

25   of revenue, if you recall this.  Radio said we had gone up from

D1idpanc
                          Conference

1   1.6 to 2.8 percent as a result of going from percentage of

2   revenue to flat dollars, and we don't think that that was what

3   the parties intended.  So there was a very complicated deal

4   driven by dollars.

5          As part of that deal, the radio stations that agreed

6   to pay the new terrestrial rate were in fact given this online

7   rate, whether they are using it for music intensive or for more

8   mixed format.  But there is no standalone radio rate at

9   1.7 percent absent this deal.  It was done in the context of

10  this deal, and the parties essentially agreed not to litigate

11  over the online rate to get this deal done, which for this

12  five-year period will be 95 percent terrestrial.  So that is

13  one huge distinction.

14         There are other distinctions.  Pandora works

15  differently.  It is not just radio, it is not interactive under

16  the copyright law, but you get to kind of essentially create

17  your own playlist, your own radio stations, based on your

18  affinity, and it is wall-to-wall music.  There is more music

19  per hour in Pandora than there is on radio.  There is a degree

20  of I'll call it quasi-interactivity.  And all of those need to

21  be adjusted.

22         So with respect toward the Form License of ASCAP,

23  that's for startups, essentially, and it is a way to get this

24  thing going.  Pandora's revenues -- again, publicly

25  disclosed -- you know, it is in the many hundreds of millions

D1idpanc
                              Conference

1    of dollars.  We are not dealing, like we were in Mobi, with

2    some kind of struggling startup; we are dealing with a large

3    entity that's making very, very large payments to the record

4    companies for the sound recordings, about which they are

5    complaining loudly, and wants to make very, very tiny payments

6    to music publishers for the songs.

7           So what we have are a series of comparables, and

8    apparently we have disagreement as to where in this range of

9    comparables Pandora should lie.  We would say that's not a

10   radio rate that was negotiated outside the context of this

11   bundled deal, and in any case, we've got to deal with all of

12   these other deals.  And the fact of the matter is the Sony deal

13   was a market comparable in DMX and I don't understand why it

14   shouldn't be a market comparable here.

15          I don't know anything about their deal.  We will get

16   it in discovery.  I have no idea if The Post is right or wrong.

17   The one thing I know is I didn't leak it because I don't know

18   what the deal is.  So we will get the Sony deal.  Mr. Steinthal

19   has provided the EMI deal to us already in the course of what

20   turned out to be unsuccessful settlement discussions, and we

21   will have a discussion about where Pandora should be.

22          But I don't understand the argument that a deal that

23   was done at arm's length between a music publisher that's not

24   subject to a consent degree when it is licensing directly --

25   but that is all this is is a direct license, just like in

D1idpanc
                        Conference

1    DMX -- and a user is in a market comparable.  Now, I'm not

2    saying your Honor has to accept one or the other -- I mean,

3    there is time for that -- but there is a broad range here.  So

4    I think that is why we're here.

5          In terms of interim fee litigation, I don't think

6    we're going to need it.

7          And in terms of expedition, my only difference with

8    Mr. Steinthal is just kind of looking forward over a couple of

9    months.  You know, I have never appeared before your Honor

10   without an agreed-upon schedule.  I'm somewhat embarrassed we

11   couldn't agree upon one here.  It seems to me we should be able

12   to do that.

13         We had proposed a schedule to Mr. Steinthal that would

14   have basically had this ready in April, and I will explain why,

15   of '14.  He said that was too late.  So we came back with a

16   different schedule for February.  That has been rejected.  So

17   we have a two-month disagreement over the schedule.

18         My own experience -- I know your Honor's experience --

19   is these things tend to take longer than one would hope.  I

20   know your Honor does not like to adjust the trial date once

21   you've set it.  So all that we're looking for, and given that

22   the holidays are approaching, is I'm really looking for a trial

23   date kind of in the first part of February of '14 rather than

24   in December of '13.

25         THE COURT:  Excuse me one second.

D1idpanc
                          Conference

1          (Pause)

2          MR. COHEN:  And, your Honor, the argument that they

3    are a public company and they need certainty, virtually all the

4    large licensees of ASCAP are public companies.  Sometimes they

5    are open for a long time, sometimes they are not.  Accountants

6    know how to deal with this.  They reserve.  They take

7    appropriate provisions.  But, you know, Viacom, NBC, CBS, every

8    cable company, all the major radio companies with whom we were

9    on interim before we settled, almost all of the large licensees

10   of ASCAP are public companies.  So there is nothing unique

11   about Pandora's position.

12          I am just trying to be practical about the schedule.

13   I don't think the world turns on a few months.  And I don't

14   think we would benefit from having adequate time.  There are

15   some new issues to be explored here.  I do think for the first

16   time your Honor will hear economic testimony on the value of

17   the carveout which I think, you know, will be significant.  And

18   I think there will be reasonably extensive discovery not just

19   of ASCAP and Pandora but of Sony and BMI.  I don't know where

20   they are with BMI.  BMI was mentioned in their papers but only

21   with respect to the radio license.

22          So as a practical matter, I was looking for six months

23   of fact discovery, a couple of months of, you know, expert

24   reports and discovery and this is so expert-driven.  Of course,

25   your Honor wants written directs.  So I do have a proposed

D1idpanc
                        Conference

1   schedule at least, which I've shared with Mr. Steinthal, but

2   I've actually peeled this back a couple of more weeks and I

3   hope that you would agree to it.  And if I could hand that up

4   and you can look at that and mark it up as you see

5   appropriately and at least that will give us a chance, a place

6   to start.

7            THE COURT:  Sure.

8            MR. COHEN:  I think, Ken, this is the one I gave you.

9            (Handing)

10           MR. STEINTHAL:  OK.

11           MR. COHEN:  Your Honor, it does provide for seeing

12  Magistrate Judge Dolinger, which we would welcome here, at a

13  reasonably early date.

14           THE COURT:  I think this is a very thoughtful

15  proposal, written in a way that would permit the trial of this

16  case to be held in April of next year.

17           Just give me a second, counsel.  Thank you.

18           (Pause)

19           MR. STEINTHAL:  Your Honor, if I could be heard on the

20  schedule issue one more time?  I would appreciate it.

21           THE COURT:  Yes.  Absolutely.  I am not going to make

22  a decision without fully consulting with both counsel.

23           MR. STEINTHAL:  OK.

24           THE COURT:  I am just trying to get a handle on my own

25  calendar so I know what my flexibility is, depending on what

D1idpanc
                              Conference

1    year we are talking about.

2              (Pause)

3              THE COURT:  OK.  I think it is a little premature to

4    talk -- I'll hear from you Mr. Steinthal, but then I may have a

5    series of questions about what we want to accomplish before the

6    trial so I have a better understanding of the burden of the

7    fact discovery period from counsel.  OK?

8              MR. STEINTHAL:  OK.  The thing I wanted to say about

9    the schedule is, I mean, whatever time we have we always manage

10   to fill up and we always manage to try to get things done by

11   whatever the schedule is.  I mean, that is just the Murphy's

12   Law of court scheduling.  We deal with what we have to.

13             I think if, your Honor -- and I would be happy to send

14   you these two articles that were published, but one of the

15   really interesting things is they both talk about how Pandora

16   is going to get hit in, you know, financial reports and stuff

17   like that.  This is a quarter-by-quarter business where

18   financial analysts are looking at Pandora very closely.  And

19   just the SonyATV deal announcement, as recorded in the press,

20   is negative financial news to Pandora and it hurts Pandora.

21             That's why -- it may be that mega companies don't

22   care, but Pandora's financial scrutiny is palpable quarter by

23   quarter.  We have been operating interim for two years.  It

24   really matters to Pandora.  Another quarter matters in terms of

25   getting finality.

D1idpanc
                              Conference

1         And I can't -- that is what is driving Pandora to ask

2    me to ask you to get to a final result as soon as possible.

3    Obviously, we will abide by whatever your Honor rules as an

4    appropriate schedule, but that's the issue here from Pandora's

5    perspective.

6         THE COURT:  Now, you heard Mr. Cohen talk about the

7    fact that ASCAP admits there must be a carveout and the issue

8    is how much of a carveout and how it would be structured.

9         So let me assume that you are going to be able to

10   handle the interim fee aspect of this in further discussions

11   with each other.

12        MR. STEINTHAL:  OK.

13        THE COURT:  Are you taking the position that there

14   aren't a range of comparables here and that we don't need to

15   look at each of them, including the EMI and the Sony deal?

16        MR. STEINTHAL:  Your Honor, I think, as a matter of

17   jurisprudence there, it is incumbent upon you to look at

18   whatever the parties propose as comparables.  We believe that

19   the RMLC deal -- and Jay was focused on the terrestrial

20   broadcasters.  I'm focused on the Internet radio services that

21   are subject to the rate structure that I mentioned.  Standalone

22   Internet radio services with the exact same kinds of

23   functionality and, you know, exact same magnitude of music

24   usage paying 1.7 minus 25 percent.  So we do believe that is a

25   comparable.  And the tail wagging the dog, well, we'll see in

D1idpanc
                        Conference

1    discovery exactly what it shows, but that to us is a

2    comparable.

3          I mean, Mr. Cohen also --

4          THE COURT:  I understand that you believe that is the

5    best comparable.

6          MR. STEINTHAL:  Right.  But I've got to explain to

7    you -- and I Ann think discovery will show -- that the last

8    deal, the Sony deal at the last minute, I believe we will show

9    you in discovery why that is not a free-market deal that you

10   should deal to be a good comparable.

11         THE COURT:  OK.  But my questions are not really on

12   the merits but in terms of the scope of discovery.

13         MR. STEINTHAL:  Right.

14         THE COURT:  It sounds to me like everybody agrees that

15   each of you has to have a discovery period that permits you to

16   present to me a range of comparables and to be able to argue

17   from them which are the most persuasive.

18         MR. STEINTHAL:  I think that's right, and I think

19   that's a discovery period of a few months and we can get it

20   done.

21         THE COURT:  OK.  So what else is there that would

22   consume the fact discovery period?  I assume that there is no

23   dispute that the figures that Pandora could provide

24   electronically, and on a summary basis, with respect to their

25   revenue streams would be quickly produced and readily

D1idpanc
                           Conference

1   available.

2             MR. STEINTHAL:  This is a case, your Honor, where

3   revenues and music use will be discrete.  There will be no

4   allocation issues.  There will be no unbundling issues.  It is

5   going to be census reporting on music use.  It's pretty simple.

6   It is straightforward.

7             THE COURT:  Mr. Cohen.

8             MR. COHEN:  Well, maybe from his perspective, your

9   Honor.

10            Again, this is not the most complicated case in the

11  history of the world.  Right?  I think we are talking about a

12  difference of perspective of a few months, so I don't want to

13  totally disagree with what Mr. Steinthal is saying.  But the

14  music use is so vast, to actually process it and get it ready

15  for the experts and present it in a way that we can compare

16  music use on Pandora to other licensees like radio will be a

17  big job.  It will be a very, very big job.

18            The other part of it is, of course, that Mr. Steinthal

19  will undoubtedly seek from us discovery with respect to all of

20  our other new media licenses, which we haven't talked about.

21  He has talked about this Form license.  I don't think the Form

22  license is an appropriate comparable.

23            So, again, you know, I think we are talking about are

24  we going to finish the discovery in May or in June or July or

25  August.  We are not talking about a huge gap between the

D1idpanc
                         Conference

1    parties, but I do think it's complicated.  And we'll get

2    started right away.  You know, I'm happy to undertake Mr.

3    Steinthal's document requests within the next week.  I will be

4    stunned if I see any documents in 30 days.  That just hasn't

5    been the practice for all of the documents that we are asking

6    for.

7              So all we are trying to do is to allow a schedule that

8    has a locked-in trial date so that we don't have to come back

9    to your Honor.  I think Mr. Steinthal and I both agree that we

10   can work out interim dates.

11             MR. STEINTHAL:  Yes, I think that is right, your

12   Honor.  It is just when we get to trial.

13             THE COURT:  OK.  I am happy to choose an arbitrary

14   trial date.  It is not my practice to do that.  I try to and I

15   may not be very good at this, but understand what the parties

16   need to do an expedited but not ferociously aggressive period

17   for discovery.

18             Let's talk about depositions.  Assuming that for these

19   various third parties you might need one 30(b)(6) per party --

20   there aren't a host of them you would be doing; a handful, I

21   guess, if you need any third-party discovery -- so principally

22   for depositions I think -- you know, tell me if I am perceiving

23   this wrong -- that more of the depositions will be party

24   depositions here.  And have you talked about the number of

25   depositions per side?

D1idpanc
                        Conference

1          MR. COHEN:  We haven't, your Honor, although I think

2     the third-party discovery is more than a handful.  If I may?  I

3     think there will be discovery from BMI.  I think there will be

4     discovery of folks on the RMLC who engaged in the deal.  There

5     is going to be discovery from EMI with respect to their deal.

6     They are no longer at Sony.  Mr. Steinthal today said they

7     negotiated that deal in the context of antitrust.  I don't know

8     what arguments were made about the context.  There will be

9     discovery from Sony.  There may be discovery from third-party

10    licensees.

11         There will be some effort on our part, your Honor, to

12    put this license fee request in the context of what their

13    overall rights burden is.  And so, you know, I don't think

14    there is 50 third-party depositions, I think it may be

15    one-and-a-half to two handfuls.  I assume that they want

16    ASCAP -- I assume that the ASCAP depositions will be four or

17    five in number.  The same people tend to be deposed, the new

18    media licensing people who were responsible for distribution,

19    people who are licensed that are responsible for music use.

20         I think one twist here that Mr. Steinthal made

21    reference to -- and he can correct me if I am wrong -- is that

22    I am hearing -- and, you know, we have had some discussions --

23    I am hearing that he is going to undertake some amount of

24    discovery about the decision of these members to withdraw and

25    about the change in the compendium.  Now we are talking about

D1idpanc
                          Conference

1    ASCAP board members.

2           There are 24 ASCAP board members.  Obviously, I don't

3    think he needs all of them.  I don't know how many he is going

4    to want.  So I see maybe six or eight depositions for the ASCAP

5    side from their side.  I don't know enough about their

6    structure, but I assume that once we have discovery both from a

7    person responsible for licensing, you know, somebody with a

8    financial title, and then something that will allow us to

9    explore precisely what they do so we can draw the contrast and

10   parallels between radio on the one hand and Pandora on the

11   other, so, you know, I think certainly less -- you know, a

12   handful, you know, four or five.  I think we are now up to

13   about 20 depositions.

14          THE COURT:  That's what I am piecing from this, that

15   altogether the parties here for this litigation may take about

16   20 depositions.

17          So just give me one second.

18          (Pause)

19          THE COURT:  I'm thinking that this trial,

20   understanding that we will do direct by affidavit, might take a

21   week, might take two weeks, something like that.

22          Am I thinking in roughly the same terms as counsel?

23          MR. STEINTHAL:  That sounds right to me, your Honor.

24          MR. COHEN:  I believe it sounds right, your Honor.

25          (Pause)

D1idpanc
                        Conference

1        THE COURT:  So let's go off the record.

2        (Discussion off the record)

3        THE COURT:  Counsel and I have discussed the Court's

4   trial schedule, counsel's trial schedule, and some of our

5   expectations with respect to discovery in order to see if it is

6   at all feasible to accommodate Pandora's request for a 2013

7   trial.

8        The trial in this case will occur on either

9   October 28th or November 4th.  Counsel will provide me next

10  week with a proposed schedule based on a trial date of either

11  October 28th or November 4th at Mr. Cohen's discretion.

12       Both sides are, I think, quite familiar with my

13  practices concerning discovery disputes.  If there is any

14  dispute, get me a letter no longer than two pages.  I will get

15  you on the phone and hear you out and give you a ruling

16  promptly.

17       I don't know that there is anything else we need to

18  discuss.

19       Mr. Steinthal, anything from your point of view?

20       MR. STEINTHAL:  Nothing else, your Honor.

21       THE COURT:  Mr. Cohen?

22       MR. COHEN:  No, your Honor.

23       THE COURT:  Thank you.

24       Obviously, I think counsel are very experienced and

25  sophisticated with respect to these matters, but I just want to

D1idpanc
                        Conference

1    say that where sampling of financial data or any other data can

2    be used to get counsel the information they need and reduce the

3    burden on the producing party, I think you should explore that

4    with care, and if you can't reach agreement feel free to make

5    an application to me.

6              Thanks so much.

7              THE CLERK:  All rise.

8

9                              -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25