D5mdpanc
                              Conference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   IN RE PETITION OF PANDORA MEDIA, INC.   12 Civ. 8035 (DLC)(MHD)

 4   ------------------------------------x

 5   Related to

 6   UNITED STATES OF AMERICA,

 7                  Plaintiff,              New York, N.Y.

 8          v.                             41 Civ. 1395 (DLC)(MHD)

 9   AMERICAN SOCIETY OF COMPOSERS,
     AUTHORS AND PUBLISHERS,
10
                    Defendant.
11
     ------------------------------------x
12
                                          May 22, 2013
13                                        9:41 a.m.

14   Before:

15                      HON. DENISE L. COTE,

16                                        District Judge

17                          APPEARANCES

18   GREENBERG TRAURIG, LLP
          Attorneys for Petitioner Pandora Media, Inc.
19   BY:  KENNETH L. STEINTHAL
               – and –
20        CHRISTOPHER HARRISON
               Pandora Assistant General Counsel
21             – and –
     KING & SPALDING LLP
22   BY:  JOSEPH R. WETZEL

23

24

25

D5mdpanc

                              Conference

                        APPEARANCES CONTINUED


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP (NY)
      Attorneys for Respondent ASCAP
BY:   JAY COHEN
      DARREN W. JOHNSON
            – and –
      RICHARD H. REIMER
            In-House Counsel ASCAP


PRYOR CASHMAN LLP
      Attorneys for non-parties
      Sony/ATV Music Publishing and
      EMI Music Publishing
BY:   DONALD S. ZAKARIN
      FRANK P. SCIBILIA
      ERICH CAREY

                                        oOo

            THE CLERK:  In the matter of In Re Petition of Pandora

Media, Inc.

            Counsel for the petitioner, please state your name for

the record.

            MR. STEINTHAL:  Kenneth Steinthal, from King &

Spalding, and I have Joseph Wetzel from King & Spalding and

Chris Harrison from Pandora with me.

            THE COURT:  Thank you.

            THE CLERK:  And for ASCAP, please state your name for

the record.

            MR. COHEN:  Yes.  Jay Cohen, from Paul Weiss, for

ASCAP, with Mr. Johnson, and Mr. Reimer from ASCAP.

            THE CLERK:  And for the nonparties, could you please

state your name for the record and the party you represent.

D5mdpanc
                          Conference

1           MR. ZAKARIN:  Don Zakarin, your Honor, for EMI and

2    Sony/ATV Music Publishing, LLC.  With me is Frank Scibilia and

3    Erich Carey.

4           THE COURT:  Thank you.

5           Welcome all.  I have two letters of May 17th, one from

6    Mr. Steinthal and one from Mr. Zakarin.

7           So, Mr. Steinthal, Mr. Zakarin says we don't need this

8    conference.  And if we don't, I'm very sorry that all counsel

9    are here.  So why don't we address that issue first.

10          It sounds, from Mr. Zakarin's letter, like you are

11   getting everything you agreed to reduce your request to.

12          MR. STEINTHAL:  That is not accurate, your Honor.

13          THE COURT:  So what are you not receiving that you

14   would still like to receive?

15          MR. STEINTHAL:  Our letter actually ticks off nine

16   specific subject matters.  On page 2, after setting forth that

17   we have gone through a meet-and-confer process, which

18   successfully narrowed many of the objections -- we withdrew

19   some, we agreed on some narrowing -- but there were some

20   fundamental areas that we had requested documents we had

21   requested that they simply refused to produce.  That was their

22   position.

23          You know, they have their position.  It is either

24   irrelevant, burdensome, or whatever it is.  But we never agreed

25   as part of the process to forego our ability to move to compel

D5mdpanc
                        Conference

 1   responses there.  The meet-and-confer process worked in the

 2   sense that we narrowed a ton of objections down to a much

 3   narrower set of materials where we had a dispute.

 4        But the nine categories of materials on the first full

 5   paragraph of page 2, I was stunned when I read Mr. Zakarin's

 6   letter that we had no disputes, because he didn't address those

 7   nine particular subject matters that they continue to press

 8   objections on.

 9        THE COURT:  OK.  So let me interrupt you and ask

10   Mr. Zakarin.

11        So, Mr. Zakarin, if you could help me here?  Do you

12   think a further meet and confer on these nine issues would

13   resolve the dispute?  And I am happy to let you use my jury

14   room if you think it would.

15        MR. ZAKARIN:  Your Honor, first of all, our

16   understanding of the meet-and-confer process is somewhat

17   different than Mr. Steinthal's, obviously.  Our understanding

18   of the process was that we made compromises with the

19   anticipation and expectation that they were doing the same.  We

20   didn't embark upon it, engage in it, and make the compromises

21   we made with the understanding that whatever they didn't get at

22   the end of that process was fair game.

23        But so be it; I can deal with that as well.  Because

24   if you look at Mr. Steinthal's nine categories, as you look at

25   them, virtually all of them -- by the way, they way they are

D5mdpanc
                         Conference

1    presented is not quite the way they are presented as you might

2    expect in their requests.  Their requests, while there were 47

3    of them starting out, there were six or seven subparts to most

4    of the requests.  So we're talking about a subpoena on a

5    nonparty asking for 200-some-odd different categories of

6    documents.

7              THE COURT:  I am afraid the two-page limit rule puts a

8    burden on counsel.  So I understand your point.

9              MR. ZAKARIN:  Well, Mr. Steinthal has sort of dodged

10   the two-page limit with his attachments, I think, but --

11             THE COURT:  Everyone does.

12             MR. ZAKARIN:  Maybe that is the next rule.

13             THE COURT:  No.  I don't think so.

14             But, anyway, I appreciate the suggestion.

15             MR. ZAKARIN:  In any event, in turning to it, though,

16   most of the categories, plainly stated, if you look at them are

17   actually appropriate requests, if they are appropriate, of

18   ASCAP, not of us.  By way of example:  "Produce documents,

19   ASCAP's negotiations with the licensing of Pandora."

20             Well, Pandora has all of that material itself.  ASCAP

21   has that.  We're not parties to their negotiations.  So why --

22   and there are a host of requests made of us that are really

23   appropriately made to ASCAP.  And, indeed, it appears and we

24   understood that they were deferring -- not giving up but

25   deferring any requests of us with respect to requests that are

D5mdpanc
                              Conference

 1    more appropriately addressed to ASCAP.  So that's what's

 2    sitting there.

 3           Other publishers' negotiations with the licensing of

 4    Pandora, as we said to them, we're producing everything

 5    relating to our license to you, our withdrawal from ASCAP, our

 6    withdrawal of rights, we're giving you ours; both BMI and Sony

 7    are doing that.  If you are negotiating with other publishers

 8    or you believe there is information with other publishers,

 9    subpoena them, and indeed they have.  So this is still sitting

10    there despite the fact that they've issued subpoenas on

11    Warner/Chappell.  They have issued subpoenas on Universal Music

12    Publishing Group.

13           You turn to 3, ASCAP settlements with Greater Music

14    License Committee.  We are not a party to that settlement;

15    ASCAP is a party to that settlement.  And we've agreed,

16    actually, to produce whatever documents we have that pertain to

17    that we may have produced in connection with that litigation

18    and settlement, but that's an ASCAP matter.  So we are not even

19    a party to the settlement, as we told them.

20           The ASCAP compendium changes, again, ASCAP has the

21    compendium.  It is online.  It is publicly available, and they

22    can get that from ASCAP, as we've told them.

23           Sony's withdrawal or EMI's withdrawal of works.  Well,

24    we are producing all the documents that show our withdrawal,

25    our withdrawal agreement, and the compendium deals with

D5mdpanc
                              Conference

 1    everything else.  It is there.  We've already agreed to produce

 2    that.

 3           The administration of direct licenses.  They can get

 4    the administration agreement, assuming that it is germane, from

 5    ASCAP.  Sony and EMI, having withdrawn their rights, and after

 6    entering into a license with Pandora, subsequently negotiated

 7    an administration agreement with ASCAP to administer on Sony

 8    and EMI's behalf the collection of monies and the payment of

 9    monies -- not the licensing.  Now, to the extent that that

10    bears on the rate proceeding in the sense that maybe we have to

11    pay ASCAP some money for administration and that should be

12    deducted in some computation of the Sony or EMI license as a

13    metric, they have that information.  That is readily available

14    from ASCAP.  I don't know what it has to do with the rate

15    proceeding, but if it is a cost factor, they could have it and

16    they can get it.  They don't need it from us but it is just an

17    agreement.

18           Adjustable blanket licenses.  We've already advised

19    them in the lengthy meet and confer Sony and EMI don't grant

20    adjustable rate blanket licenses.  Where we've done blanket

21    licenses -- and most publishers have done blanket licenses of

22    their catalogs and direct licensing with various parties --

23    they usually charge a very substantial advance.  They license

24    their entire catalog and that's that.  It is not -- there is

25    nothing that I am aware of with non-interactive satellite or

D5mdpanc
                        Conference

1   streaming providers under 114.  But adjustable rate blanket

2   licenses, as far as we know, are done by PR Rose.  I am not

3   aware of any publisher that does that.

4           Market share data.  To the extent that market share

5   data bears upon streaming or is germane to Pandora, I think

6   that ASCAP would be a better source of that information,

7   because we don't have the information relating to other

8   publishers.  There is stuff that's published all the time in

9   Cashbox or Billboard, and I don't know how, you know,

10  significant or real that data is.  But I would think that the

11  PR Rose, who distribute money whether it is from terrestrial

12  radio or otherwise, have that information, to the extent that

13  anybody does, certainly more than we do -- you know, our

14  information -- we don't know what other publishers have, but

15  our information is largely anecdotal.

16          THE COURT:  So you don't track market share data?

17          MR. ZAKARIN:  Well, you track market share data in the

18  sense that, you know, you know roughly what your revenues are,

19  what the public -- what your performances are based upon what

20  ASCAP or BMI or SESAC give you.  But I think the market share,

21  there is, as far as I know, no hard empirical data that we have

22  that tells us in a specific genre do we have this share.  And I

23  think to the extent it exists, you may get it from radio, you

24  may get it from Billboard, they may track the magazines whose

25  songs are being played more at a given point in time, but I

D5mdpanc
                          Conference

1    don't know that it is anything more significant than that.

2          And I don't know how it would bear upon a specific

3    segment, which is 114 licenses and streaming, what our market

4    share is.  But to the extent that it's significant, to the

5    extent that it bears upon this license, you know, I suppose

6    they can get that information from ASCAP or, if they want to,

7    from BMI and, I assume, SESAC, and all of them would probably

8    have different market share because all of them, their catalogs

9    change from time to time.

10         The last piece of it, I don't have a clue what the

11   Sony/EMI merger has to do with this rate proceeding.  And there

12   is no Sony/EMI merger, by the way.  Sony Corporation -- not

13   Sony/ATV, but Sony Corporation of America is an investor along

14   with some sovereign, you know, foreign sovereign funds who put

15   up money and purchased EMI from Citigroup, which had foreclosed

16   upon Terra Firma, which was the acquirer of both the record

17   company known as Capitol Records now and EMI Music Publishing,

18   and there was a broad auction market and it was a long sale

19   process, and Sony Corporation America, with a bunch of

20   investors, was the successful bidder for EMI.  They filed, as

21   they are required to do in any significant acquisition or

22   takeover, they filed documents with the European Community.

23   They filed documents with the Justice Department and the FTC,

24   which conducts inquiries into whatever the competition issues

25   are.  And all of that was provided, hundreds upon hundreds of

D5mdpanc
                              Conference

 1   thousands of documents, to all of the governmental entities.

 2   The EC requires, condition of the acquisition, that there be a

 3   divestiture of certain limited number of catalogs, which were

 4   divested.  The FTC and DOJ agreed with that limited

 5   divestiture, and that was done.

 6          It has nothing, as near as we can tell, to do with EMI

 7   and Sony's individual direct licenses with Pandora.  And I

 8   think Mr. Steinthal knows that, but I think (a) perhaps it has

 9   some in terrorem pleasure for him or he wants to burden us by

10   actually having to reassemble hundreds of thousands of

11   documents that were turned over to the FTC and the DOJ for

12   purposes of a, you know, an acquisition which has to be

13   scrutinized by the government.

14          Now, if it were really important, I suppose -- and I

15   haven't, you know, dug into this -- I suppose he could do a

16   FOIA request of the DOJ or the FTC targeting what he thinks or

17   hopes may be there that's relevant, but he hasn't done that.

18   And to force us to go through that mass of material produced by

19   both EMI and Sony separately -- Sony Corp., not Sony/ATV but

20   I'm sure related to Sony/ATV -- to try to figure out where, if

21   anything, it touches upon this, it's hard for me to see that it

22   does.  Again, massively burdensome and not targeted at all.

23          So, yes, we objected to that.

24          THE COURT:  So for --

25          MR. ZAKARIN:  Those were nine categories, grossly

D5mdpanc
                        Conference

1   stated.

2              THE COURT:  Right.  I think for five of them you say

3   if you want this, go to ASCAP.  For one of them -- no, really,

4   two of them you have agreed, numbers 2 and 5, to make either

5   limited production or a full production.

6              Number 7, you have nothing to give.

7              MR. ZAKARIN:  We don't do adjustable rate licenses.

8              And, by the way, it is worth noting that as part of

9   the meet and confer, we have agreed to do a very broad ESI

10  search, which we are in the process of doing.  We've gone

11  through hard-copy documents.  There are twelve, quote-unquote,

12  requests, with multiple subparts, to which we are producing

13  documents.  They've agreed on at least eight that they should

14  go to ASCAP in the first instance, which is what we have said,

15  you know, on this sort of high-level identification

16  Mr. Steinthal has listed that they should put ASCAP on notice.

17  All eight requests were totally withdrawn as either duplicative

18  or really not relevant to begin with.

19             So the process had that  purpose.  What we thought was

20  left, as I said, of the -- you know, after the distillation of

21  lengthy discussions, was stuff that they accepted, you know,

22  our objections to and we were not moving forward on that.  They

23  weren't technically withdrawing it but they accepted our

24  objections, and we were in agreement that they were not

25  pursuing it.  But to the extent they are pursuing it, our

D5mdpanc
                              Conference

1    objections remain and they remain for many of the reasons that

2    I've articulated.

3            THE COURT:  Thank you very much.

4            Mr. Steinthal.

5            MR. STEINTHAL:  Your Honor, I think, to put this in

6    context, it would help if I could take a couple of minutes as

7    to why this material is relevant and important and how

8    Mr. Zakarin is not accurately characterizing what the materials

9    are we're looking for that we're not getting.

10           THE COURT:  I actually would appreciate that, but I

11   want you to start at a very high level, 40,000-foot level --

12           MR. STEINTHAL:  I will.

13           THE COURT:  -- which is where we are, and then before

14   we get down to the specifics.

15           MR. STEINTHAL:  OK.  So as we had a dialogue with you

16   briefly in January, this case has some fundamental issues that

17   are presented.  The petition that Pandora filed framed the

18   issues, I think, pretty well, and Mr. Cohen, on behalf of

19   ASCAP, framed ASCAP's position pretty well in January.  The

20   benchmarks that we, Pandora, have suggested to your Honor, as

21   set forth in the petition, we feel that we are entitled to the

22   rates established for new media online streaming, as set forth

23   in the Radio Music License Committee/ASCAP deal in 2012.

24           That rate structure is set forth in the petition.  You

25   may recall that that deal was publicly announced with

D5mdpanc
                              Conference

1    1.7 percent of revenue, with a deduction of 12 percent for

2    terrestrial broadcasting and a deduction of 25 percent for new

3    media transmission.  That is a straight, standard deduction.

4    And the reason, we suspect, for the higher deduction for new

5    media transmission is that the cost of ad sales on the Internet

6    is a lot higher than the cost of ad sales in established media

7    like broadcast.

8         But that deal explicitly provides for coverage not

9    only of radio stations, terrestrial broadcasts, but also

10   simulcasts over the Internet and, very importantly, any other

11   Internet-only radio transmissions that radio broadcasters make.

12   So Clear Channel is a good example.  They are one of the

13   largest if not the largest broadcaster they own.  Part of their

14   business is called iHeartRadio, which is devoted to Internet

15   radio streaming, and they have a part of that service that is

16   very much like the Pandora service, which is Internet only and

17   has some consumer influence features.

18        I don't know if you have ever used Pandora.  Pandora

19   is noninteractive radio but users can indicate what kind of

20   artists they like, what kind of genres they like, and they have

21   algorithms that create playlists -- again, it is not on demand

22   in any way, shape or form.  It is just a little bit more what

23   some people call smart radio.  You get to provide inputs, and

24   the algorithm that Pandora has developed ends up creating play

25   lists for their radio programming that hopefully users will

D5mdpanc
                          Conference

1    find more attractive.

2           But in any event the RMLC deal absolutely covers

3    Internet transmissions so that if Pandora, for example, was

4    owned by Clear Channel, it would be subject to that RMLC deal,

5    no question about it, paying 1.7 percent minus 25 percent

6    standard deduction for the streaming.  That's our model.  2012

7    covered the exact same kinds of features as we have, directly

8    comparable.

9           ASCAP's model is, as you heard in January, the

10   function of a new phenomenon that had started to occur as of

11   2011, which is a new kind of "direct license."  And I put

12   direct license in quotes because it is unlike the direct

13   licensing that your Honor is familiar with from the DMX case.

14   It is not where a licensee has the choice of taking an ASCAP

15   blanket license or seeking to do a direct license and the

16   publisher has the choice of saying, naw, I would rather license

17   through ASCAP or maybe if I do a direct license with you I can

18   encourage you to play my music more than my competitor's music

19   and maybe there is something in there for me.  That's not the

20   kind of direct license we have here.

21          What started to happen in 2011 was, through rule

22   changes that were required of ASCAP -- this is the compendium

23   and the rule changes that started to develop in 2011 --

24   selective withdrawals of catalog -- this is not a real

25   withdrawal of catalog at all, your Honor.  When Sony and EMI

D5mdpanc
                          Conference

 1   have withdrawn their catalog, it's only with respect to certain

 2   kinds of users and certain kinds of transmissions.

 3            The catalog is still part of the ASCAP repertory.  Any

 4   television broadcaster, any traditional radio broadcaster, any

 5   other licensee outside of this tiny little sliver of new media

 6   licensees can get all of Sony's catalog and EMI's catalog

 7   through an ASCAP license.  It's still part of the repertory.

 8   But for the single purpose, from what we can tell, of evading

 9   this process, evading judicial scrutiny of their rates, the

10   publishers have said to ASCAP I want to excise your ability to

11   license new media rights.  You can't license my new media

12   rights anymore.  Everything else you can license.

13            And not only that, your Honor, from everything we can

14   tell, these, quote, direct licenses that have issued as a

15   consequence of this selective withdrawal are actually licenses

16   being administered by ASCAP.  So it is as if nothing has

17   happened other than Pandora can't get ASCAP to license it for

18   its transmissions.

19            Now, why is all of this so relevant?  Well --

20            THE COURT:  So you have to negotiate with ASCAP for

21   everyone who hasn't withdrawn and then separately negotiate

22   with Sony, as an example, for --

23            MR. STEINTHAL:  Yes.

24            THE COURT:  -- those parties who have withdrawn?

25            MR. STEINTHAL:  Right.

Conference

1          THE COURT:  Now, the benchmark from 2012 was a

2     negotiated benchmark; am I right?

3          MR. STEINTHAL:  The RMLC deal that covered new media

4     transmissions, if you're owned by a radio broadcaster, yes,

5     negotiated deal.  Your Honor approved it in January 2012.

6          THE COURT:  So it was not after this Court's fact

7     finding or judicial determination?

8          MR. STEINTHAL:  No.  It was after I believe a fairly

9     prolonged pretrial proceeding.

10          THE COURT:  Yes.

11          MR. STEINTHAL:  Then a settlement.  Correct.

12          THE COURT:  So if ASCAP at that time was thinking

13     we're going to settle this dispute, we're unhappy with the

14     terms but we'll bite the bullet here, but we have a solution

15     going forward, this withdrawal rights for new media proposal,

16     then in some ways that might suggest the benchmark that you

17     love might be set too generously?

18          MR. STEINTHAL:  I've never known ASCAP to do a deal

19     that it did not believe was reasonable for it to do rather than

20     litigate to try to get something that it believed to be

21     reasonable.  They are not in the business of doing generous

22     deals for broadcasters.  I find that hard to believe.

23          I think the jurisprudence, as well, is that if after

24     years of pretrial litigation the parties agree to a bilateral

25     agreement, that's typically the kind of benchmark that your

D5mdpanc
                              Conference

1   Honor and other rate court judges have looked to in setting

2   fees.  I don't see why this case presents any different

3   situation in terms of the validity of that as a potential

4   benchmark.

5            THE COURT:  But as I understand it, from your point of

6   view, you're saying that essentially contemporaneously with

7   that settlement of the RMLC litigation, there was a withdrawal

8   of rights -- a massive withdrawal of rights of significant

9   ASCAP members, indeed, board members, that had affected a huge

10  percentage of the playlists that you want access to in your new

11  media environment.

12           MR. STEINTHAL:  It happened gradually; first the EMI

13  catalog, then the Sony catalog has been withdrawn and, again,

14  only as to certain kinds of uses that affect Pandora.  Those

15  withdrawals don't affect our primary competitors, for reasons

16  we don't really understand.  I mean, Clear Channel's

17  iHeartRadio is a major competitor to Pandora.  Yet because

18  iHeartRadio is owned by a broadcaster that is part of the RMLC,

19  they get to pay 1.7 percent minus 25 and they get the whole

20  catalog.  They're not affected by the withdrawal.  Why?  Beats

21  me.  We're trying to find that out, your Honor.  That's party

22  of the reason we need discovery.  Why has Pandora been singled

23  out?

24           Was this the result -- and going through a lot of

25  Mr. Zakarin's objections, we're asking for materials relating

D5mdpanc
                        Conference

1   to, for example, these rule changes and the withdrawals that

2   dramatically affect us.  Now, if EMI and Sony were on the

3   board, have notes of meetings either with other publishers,

4   maybe they were talking about, you know, the best idea here is

5   to pull our catalog, has there been any kind of that arguably

6   collusive behavior where publishers have said the solution is

7   to take our stuff out of ASCAP for this particular market?  And

8   then we can, you know, try to -- you know, we won't be subject

9   to rate court scrutiny with respect to that.  If he's got

10  documents on that, we're entitled to it.

11          THE COURT:  So you're subject to rate court scrutiny

12  to the extent that you have to negotiate with ASCAP for new

13  media usage that it still controls the licensing rights for.

14  But, obviously, the Consent Decree and the rate court

15  proceedings don't apply to the negotiations you all have to

16  undertake with Sony.

17          MR. STEINTHAL:  However, ASCAP is holding up as its

18  free market, competitive market benchmark those deals.  So we

19  need to find out whether those deals, which are the embodiment

20  of this process, are free market deals or are they really sham

21  deals?

22          THE COURT:  Those deals with whom?  Sony's deals with

23  whom?

24          MR. STEINTHAL:  With Pandora.  The Sony/Pandora deal

25  emanates, your Honor, from this withdrawal process.  It

D5mdpanc
                              Conference

1    couldn't have happened without this whole process whereby rules

2    were changed at ASCAP that permitted selective withdrawals and

3    then these licenses issued.

4              THE COURT:  So you have licenses with Pandora but you

5    don't want them to be used as a benchmark for your license with

6    ASCAP?

7              MR. STEINTHAL:  You mean, we have licenses with Sony,

8    which is what they're --

9              THE COURT:  I'm sorry.

10             MR. STEINTHAL:  Yes.  Right.

11             THE COURT:  Pandora has licenses with Sony.

12             MR. STEINTHAL:  Yes, and with EMI.

13             THE COURT:  And EMI.  And you do not want them to be

14   used as benchmarks for your license with ASCAP?

15             MR. STEINTHAL:  That is correct.

16             And it is interesting -- and this goes to the Sony/EMI

17   transaction, I won't call it merger and I explained this in

18   January -- the first withdrawal and the first set of rule

19   changes at ASCAP happened in 2011, and EMI was the one that

20   withdrew.  Then the Sony/EMI deal was subject to FTC scrutiny

21   and review.

22             Pandora negotiated with EMI while it was under review,

23   and a license agreement was entered into.  ASCAP doesn't want

24   to use that one as a benchmark.  Without getting into it, the

25   rate is different and they don't want to use it as a benchmark.

D5mdpanc

Conference

1   They want to use the benchmark of the Sony/Pandora deal, which

2   deal emanated from the following set of circumstances:

3          (A) It was post-FTC scrutiny.

4          (B) And very importantly, we, Pandora, had negotiated

5   with ASCAP a deal.  Sony had announced that it was withdrawing

6   effective January 1, 2013.  Part of these rules state that if

7   you have a license in effect with ASCAP --

8          MR. COHEN:  Your Honor, can I just interrupt?

9          You know, these were settlement discussions.  Your

10  Honor is going to decide this.  I find this highly

11  inappropriate.  We had settlement discussions, and if we are

12  going to blow the settlement discussions, we ought to talk

13  about all the settlement discussions, including the rates that

14  were offered by Pandora.  But I don't think any of this

15  appropriate before your Honor given that you are the fact

16  finder with respect ultimately to what's a reasonable rate.

17         THE COURT:  I'm sorry.  Is your objection that this

18  shouldn't be on the public record or that it's irrelevant to

19  the discovery dispute or it's ultimately undiscoverable and

20  irrelevant in this rate court proceeding?

21         MR. COHEN:  Two-and-a-half of the three, your Honor.

22         THE COURT:  OK.

23         MR. COHEN:  I think, one, it is very difficult to have

24  a meaningful discussion of this publicly.

25         Two, I do think that it is ultimately irrelevant as

D5mdpanc
                              Conference

1    introduction of evidence.

2              Whether it is discoverable is a different issue.  But

3    there were discussions that did not result in an agreement

4    between Pandora and ASCAP below the rate ASCAP is seeking and

5    above the rate Pandora is asking, and I don't think we should

6    be talking about those in this context.

7              MR. STEINTHAL:  I have no intention --

8              MR. COHEN:  And I have no idea what it has to do with

9    the discovery that he is seeking from EMI.

10             THE COURT:  OK.  I think this is an argument, as I

11   understand it fundamentally, that the benchmark that ASCAP is

12   suggesting should be used here is not the correct one.  So it

13   is an argument on the merits, but I think I probably invited it

14   so I could understand the context of the discovery disputes.

15             MR. STEINTHAL:  I won't get into the details of those

16   negotiations, your Honor.  It was just contextual that an

17   effort was made to secure a license from ASCAP at the end of

18   last year because ASCAP's own rules provide that if there is a

19   license in effect between ASCAP and a licensee, then these

20   withdrawals aren't effective against it.

21             So there was an effort made by Pandora to get a deal

22   done to avoid having to deal with another withdrawal like

23   Sony's.  That deal never happened.  I'm not going to get into

24   the specifics of it.  But it left Pandora with only a couple of

25   weeks to deal with the fact that there was an impending Sony

D5mdpanc
                         Conference

1    withdrawal.  And as you'll find out in discovery, we couldn't

2    even get from ASCAP or Sony an identification of the works that

3    were being withdrawn.  So we had, you know, when I say "gun to

4    the head," I mean it.  I mean, we either had to take down

5    content we didn't know what it was, or we were at risk of

6    infringement.  That's the context in which this Sony deal gets

7    done.

8              So our discovery requests are either in connection

9    with the RMLC deal, which we believe is the right benchmark --

10   and, your Honor, very importantly somehow or other the RMLC

11   deal got done after the EMI withdrawal in 2011, but, for

12   reasons we can't figure out, the RMLC is exempted from the

13   withdrawals.  So they get for their Internet transmissions the

14   entire ASCAP repertory, not subject to any withdrawals, and

15   poor Pandora is stuck dealing with these withdrawals and in a

16   context in which the benchmark that ASCAP is proposing we

17   believe is not a competitive market benchmark; it is not a free

18   market benchmark.

19             And going to the discovery requests, when you go one

20   by one through these, the first two --

21             MR. COHEN:  Your Honor, this is not the appropriate

22   time to deal with just the context and not the discovery,

23   because I do think there is a series of misstatements about

24   ASCAP's position.  And I don't want to interrupt Mr. Steinthal,

25   but I do think with respect to the individual requests as

D5mdpanc
                          Conference

1    between Mr. Steinthal and EMI, there are things said today to

2    set the context at 40,000 feet and going down which I

3    fundamentally disagree with; that if it is helpful to the

4    Court, I would like a chance to address it now or later.

5           THE COURT:  I will give you a chance to be heard.

6    Mr. Cohen.

7           Mr. Steinthal.

8           MR. STEINTHAL:  So, your Honor, the first two

9    requests, the request about ASCAP's negotiations with Pandora

10   and other publishers' negotiations or licensing of Pandora.  If

11   EMI or Sony has materials that reflect discussions with ASCAP

12   or discussions with other publishers about the licensing of

13   Pandora, that's directly relevant to our case.  We need to find

14   out whether there were discussions about whether ASCAP should

15   be licensing Pandora or whether individual publishers should

16   withdraw, or there -- you know, again, if publishers are

17   talking to each other about how Pandora should be licensed,

18   that's germane to whether or not this is a free market,

19   competitive market benchmark.

20          Now, Mr. Zakarin says, well, go to ASCAP.  Well, we

21   did go to ASCAP and we're presumably getting ASCAP's own

22   records.  And if EMI and Sony don't have anything, then so be

23   it.  If they tell us, look, we don't have any records of

24   ASCAP's negotiations with Pandora or discussions about it, we

25   don't have any records of discussions with other publishers, if

D5mdpanc
Conference

1    the answer is they don't have anything, they don't have

2    anything, but to say it is not relevant is -- I just don't

3    understand that.  It's plainly relevant.

4           Item number 3, ASCAP's settlement with the RMLC.

5    Again, Sony and EMI have been sitting on ASCAP's board.  They

6    then later withdrew catalog through these selective withdrawals

7    and had started to license Pandora differently than they

8    licensed the very same kind of new media transmissions made by

9    others.  If they got documents reflecting why it was that the

10   RMLC was exempted from these withdrawals, we're entitled to

11   that --

12          THE COURT:  Can you give me --

13          MR. STEINTHAL:  If he has no documents, he has no

14   documents.

15          THE COURT:  Can you just give me a second?

16          MR. STEINTHAL:  Yes.

17          (Pause)

18          THE COURT:  OK.

19          MR. STEINTHAL:  4, 5 and 6, your Honor, the compendium

20   changes and Sony's, EMI's or other publishers' withdrawals of

21   works and the administration of these so-called direct licenses

22   for works withdrawn, Mr. Zakarin says go to ASCAP.  We have.

23   We'll get whatever ASCAP has.  But, again, you have members --

24   or representatives of Sony and EMI sitting on ASCAP's board

25   that may have been very instrumental in the process by which

D5mdpanc
                    Conference

1    these rule changes were enacted, why they were enacted, were

2    they enacted for legitimate purposes or arguably illegitimate

3    purposes.  And if there were withdrawals, what were the

4    communications about the withdrawals?  Were there statements

5    made as to why this was happening and why Pandora was being

6    separated out from other entities like radio broadcasters that

7    have new media transmissions?

8            Again, if they have documents residing at Sony and EMI

9    bearing upon this, we're entitled to it.  For him to say, well,

10   go to ASCAP, fine, we did go to ASCAP.  But if you've got a

11   separate category of materials because you're on the board and

12   you may have been talking to other publishers, we're entitled

13   to that.

14           Number 7 is the adjustable fee blanket licenses.  This

15   goes, your Honor, to the whole notion of if we are stuck

16   dealing with this phenomenon, then obviously we don't want to

17   pay ASCAP for withdrawing catalog.  And part of it -- and we

18   lay this out in the petition.  Part of what led to our filing

19   last year was an inability to get an agreement with ASCAP about

20   how to take into consideration the withdrawals.  That's where

21   the adjustable fee blanket license comes in.  Were there

22   discussions about adjustable fee blanket licenses?  A term of

23   art now, obviously, after the DMX case.  We all know what they

24   are.  They are forms of blanket licenses that take into

25   consideration, through a carve out or other mechanism, catalog

D5mdpanc
                           Conference

 1    that ASCAP is not licensing to the licensee.

 2              If Sony or EMI has materials relating to the merits or

 3    demerits of AFBLs or how they construe the appropriate use of

 4    AFBLs, again, if they have nothing, they have nothing.  But if

 5    they have it, to say, well, we don't issue them generally, OK,

 6    I wouldn't expect a publisher to issue an AFBL.  I certainly

 7    would anticipate that a publisher might have strong views about

 8    how the deductions or carve outs would be calculated in a world

 9    in which ASCAP is issuing AFBLs, and if there are those

10    documents, we should get them.  They directly bear on the form

11    of the license that we're asking for from ASCAP.

12              The market share data bears on the same issue, your

13    Honor.  Because one of the ways in which there might be an

14    adjustment to the ASCAP blanket license might be based on the

15    market share of the publisher who is withdrawing.  It is as

16    simple as that.  It is hard for me to believe that Sony and EMI

17    don't track how they're doing from a market share perspective.

18              Yes, I can go to Billboard and, you know, every now

19    and then there will be some sort of reflection of market share,

20    not broken down by medium.  If Sony and EMI have data on what

21    they believe their market share to be with respect to radio or,

22    more specifically, Internet radio, again, either they have it

23    or they don't.  If they don't have it, let them -- they can

24    tell us they don't have it.  But to say that it's -- you know,

25    just go to ASCAP to get ASCAP's performance information, that's

D5mdpanc
                        Conference

1    not sufficient from my view.  I believe we are entitled, if

2    they're tracking market share themselves, to get their market

3    share information.

4            And lastly on the Sony/EMI transaction, I think it is

5    fair to say if it wasn't for this whole context, we wouldn't be

6    asking for materials relating to that.  And I think it is fair

7    to say that we would be happy to narrow that to just the

8    material submitted to the FTC.  In other words, if there is no

9    burden with that, if Sony and EMI made submissions to the FTC

10   seeking to get approval and justification and, you know,

11   providing their justification for the transaction, maybe they

12   made some statements about the market effect of this

13   transaction.  I am sure they did.  And if their conduct is

14   inconsistent with the statements they made, I think we're

15   entitled to that.  So I'm happy to narrow this to just what was

16   submitted to the FTC or other U.S. agencies to justify the

17   transaction.

18           THE COURT:  OK.  Well, with respect to -- I am going

19   to give Mr. Cohen a chance to be heard right now.  But just to

20   address number 9, I am not going to order the production of

21   everything submitted to a government agency.  OK?  Just because

22   it was once collected, it is not going to be discoverable.

23           So if you had a targeted, narrow request for a certain

24   kind of document or information that's related to the

25   acquisition or investment in EMI, you know, you should discuss

D5mdpanc
                    Conference

1    it.  But number 9, we are not going to have the production of

2    just everything submitted to a government agency that is doing

3    an antitrust review.

4             MR. STEINTHAL:  And I think, your Honor, if I wasn't

5    clear, I am sure there is some memorandum.  I don't want all of

6    the attachments.  But if there is a memorandum -- a

7    justificatory memorandum submitted to the FTC, we are prepared

8    to limit it to whatever justificatory memoranda were submitted

9    by Sony or EMI in support of the merger or the transaction, or

10   however you want to describe it, so we could dispense with

11   anything else.

12            THE COURT:  OK.  Thank you.

13            So, Mr. Cohen, do you want a chance to be heard?

14            And, yes, I know, Mr. Zakarin, you want to be heard,

15   but I want to give Mr. Cohen a chance first.

16            MR. ZAKARIN:  I will just ask to defer to Mr. Cohen

17   and then respond.

18            MR. COHEN:  Your Honor, I am not really attempting to

19   burden the record with respect to this discovery dispute.  It

20   is not our dispute.  We have a point of view, which is that

21   Pandora asked for a very expedited proceeding, and we are

22   engaged in now unbelievably protracted third-party discovery on

23   a theory of collusion that was not advanced in January with

24   your Honor.

25            What we heard in January was that the RMLC benchmark

D5mdpanc
Conference

1   should be the benchmark.  They always said that.  What I said

2   in January, and I think what Mr. Steinthal admitted today, is

3   ASCAP's position is not that it singled out Pandora.  Pandora

4   is not the only entity that is subject to the withdrawal of

5   works.  All similarly-situated entities are subject to that

6   withdrawal.  But that the RMLC deal was done, if your Honor

7   will recall from January -- we had a lot of matters between now

8   and then -- that 98 or 99 percent of the revenue in the radio

9   deal, which was a backwards and forwards deal -- and backwards

10   to a time in which iHeartRadio did not exist -- 98 or

11   99 percent was attributable to terrestrial radio, a business

12   Pandora is not in.

13          So if we want to know what ASCAP's argument is --

14   there is no secret -- it is that that benchmark which was

15   developed as this unified rate for 99 percent terrestrial and 1

16   percent Internet radio, most of which is just simulcast of

17   terrestrial radio, which, of course, again, is nothing like

18   Pandora, which is not simulcasted in any way, that that was the

19   deal.  And, you know, the cherry on the whipped cream on a

20   multi-layer cake was the rate that will be put in place for

21   Internet transmissions of these fundamentally terrestrial

22   deals.  So there is no singling out of Pandora.

23          The collusion argument, that's now being raised for

24   the first time, will lead to a dramatic expansion of discovery.

25   I said in January, and I'll say it again, that, you know, there

D5mdpanc
                           Conference

1    is no secret here.  ASCAP's members withdrew because they

2    thought the rates that ASCAP could achieve with respect to new

3    media transmissions, particularly by comparison to how the

4    record companies were doing with respect to the sound

5    recordings, they thought that those rates were not achievable

6    consistent with their view of the market.  There was no great

7    collusion here.

8         This matter -- and I want to state this now because it

9    is quite important -- this matter was brought by EMI and then

10   by ASCAP to the Justice Department to see if they had a problem

11   with the amendment of the compendium.  So the notion that this

12   is some kind of big antitrust price fix is inconsistent

13   completely with reality.

14        The fact of the matter is that ASCAP members want to

15   withdraw with respect to certain licensing rights.  There is

16   nothing in the decree that speaks to that.  ASCAP is a

17   voluntary membership organization.  Any one of the publishers

18   can withdraw their entire catalog for all purposes, and some

19   number of members -- at that point it was Sony -- said we want

20   to withdraw.  And ASCAP sought guidance from the Justice

21   Department.  EMI went to the Justice Department.  We're not

22   dealing with an antitrust collusion here to fix prices.

23        Now, ultimately whether each specific deal your Honor

24   will view as an appropriate benchmark, that's what we will have

25   a trial about.  But there will be additional deals, and that is

D5mdpanc
                        Conference

 1    what is part of what is going on here.  There are the --

 2    Universal and EMG have announced that they are withdrawing as

 3    of July 1.  Presumably, Pandora is having negotiations that we

 4    will see what the product is because ASCAP has no visibility

 5    into that.  So we will see what the product of it is.  And we

 6    will be arguing that those are market benchmarks, as well.  So

 7    there may be a series of market benchmarks.

 8            But our fundamental position is that rates negotiated

 9    by individual publishers in the marketplace are a benchmark.

10    And we have arguments as to why the radio benchmark is not the

11    radio benchmark, but it is not just about one purported

12    benchmark supposedly with a gun to its head.  But if we are

13    going to engage in this massive conspiracy discovery -- and

14    there are subpoenas outstanding from Pandora not just with

15    respect to Sony/EMI but Universal, Warner, EMG, and two small

16    publishers, we are talking about an expansion of discovery

17    that's far beyond what we contemplated when we had this

18    expedited schedule.

19            We will do our best, obviously, to deal with it, but

20    this case is expanding way beyond the way it was framed by

21    Pandora in January.

22            THE COURT:  I think we have a fact discovery cutoff

23    date of July 2nd.

24            MR. COHEN:  And I'll say, your Honor, that

25    Mr. Steinthal and I have discussed extending that without

D5mdpanc
                              Conference

1    extending any of the other dates and, you know, whether your

2    Honor wants us to come back for approval.  We understand that

3    the ultimate date for your Honor is the October 4th final

4    pretrial, and we may have to adjust some of those interim

5    dates.  And he and I have discussed that.

6              And if your Honor wants us to propose an amendment to

7    the scheduling order, we will be happy to do that, but we

8    actually discussed this as recently as this morning.

9              THE COURT:  As far as I'm concerned, on consent the

10   parties can adjust any interim dates.  Just get me a stip and I

11   will so order it so we have a record to docket.

12             And you are right, I only care about the

13   October 4th date --

14             MR. COHEN:  Right.

15             THE COURT:  -- at this point.

16             MR. COHEN:  I might have chosen my words badly, but we

17   thought that we would have some latitude as long as we met the

18   October 4th date.

19             Anyway, I yield to Mr. Zakarin.

20             MR. ZAKARIN:  I will try to be brief, your Honor.

21             With what Mr. Steinthal went through, I thought was

22   most compelling, at least to me, was he used the word "if" a

23   lot -- if this exists, if that exists.  Again, I'm starting at

24   a high level here.  He's not suggesting he has the slightest

25   knowledge that there are any such documents in existence or

D5mdpanc
                              Conference

1   that Sony or EMI colluded with anybody or did anything.  And

2   he's speculating and saying you, third party, go look for all

3   of these things that may exist, and if they exist and if you

4   find them, you've got to produce them.

5          That's not the way discovery should be.  There should

6   be some sort of a good faith basis, particularly with a

7   nonparty, for targeting documents that you know exist, not ones

8   that you're speculating may exist and you don't have a basis

9   for suggesting it.

10         And what I'm also focused on is a lot of what I think

11   Mr. Steinthal argument relates to -- you notice, I keep

12   switching, I can't see with my other glasses.

13         THE COURT:  There is this little line here.

14         MR. ZAKARIN:  You know what, I tried that.  I tried

15   that stuff and I found myself falling off of curbs, and I found

16   that my wrists were better served by doing it this way, except

17   when I am in court.

18         It almost sounds as if what Mr. Steinthal objects to

19   is the existence of direct licensing or consensual licensing,

20   and that's not an argument that necessarily belongs in this

21   court.  I think it belongs in another branch of the government.

22         He doesn't like that Sony, EMI, perhaps other

23   punishers who were dissatisfied, to begin with, with the

24   disparity between sound recordings being licensed for 13, 14

25   times what was being paid to the publishers and the writers.

D5mdpanc
                         Conference

1    That was the motivating force, that they felt they could do

2    better negotiating directly.  They have the right to do that

3    under the existing Consent Decree.

4           And as Mr. Cohen put it, we can withdraw rights in

5    toto or in part.  And the rights that were withdrawn were not

6    the rights to license Pandora and not even just the rights to

7    license Section 114 noninteractive streaming entities.  It was

8    a host of new media entities.  It includes cloud computing.  It

9    includes a host of non-Section 114 uses that are available for

10   those withdrawing publishers to license.

11          I get that Pandora doesn't want the Sony license

12   offered up as a metric.  That's between Sony and ASCAP.

13          THE COURT:  Pandora and ASCAP.

14          MR. ZAKARIN:  Correct.  I'm sorry.

15          Between Pandora and ASCAP.  That's not our lookout.

16   They know what the license is.  They know the conditions.  They

17   know the administration agreement.  All of that is available

18   and we are producing it.  We have no objection to producing

19   that.

20          When we hear about the RMLC, they have everything they

21   need about that, it appears to me.  We're not a party to the

22   RMLC.  We were not a party to the settlement; we are not on it.

23          And, by the way, when Mr. Steinthal talks about

24   getting to some of the executives of some of the major

25   publishers on the board of ASCAP, one of the things they've

D5mdpanc
                    Conference

1    requested -- and which we agreed to produce -- are notes taken

2    at ASCAP meetings by these board members that are either Sony

3    or EMI executives.  We've agreed to produce that.  So, you

4    know, that issue is already subsumed, and what Mr. Steinthal is

5    addressing is I'm not quite sure, actually.

6           THE COURT:  How many custodians are you searching?

7           MR. ZAKARIN:  The custodians that we are searching,

8    six or seven that were involved in dealing with, I think,

9    Pandora and other services as well and withdrawals.  These were

10   not heavily staffed companies, by the way.  They tend to be two

11   or three people from both companies who were involved who were

12   interfacing, and that's what we are looking at; those were the

13   executives.

14          And we've also agreed, by the way, your Honor, to go

15   back to, I believe, January 2010 -- that was also a compromise

16   that we agreed to -- because the first withdrawal, just so your

17   Honor knows, was by EMI, and I believe it was in or about May

18   of 2011.  So we're going back almost a year and a half earlier

19   than that date in terms of searches of materials.

20          THE COURT:  So do the six custodians include those

21   executives who sat on the ASCAP board?

22          MR. ZAKARIN:  I believe they do.  I believe they did.

23   Although they were not necessarily the ones who were involved

24   in the negotiations themselves with either Pandora or the

25   withdrawal with ASCAP.

D5mdpanc
                              Conference

 1          THE COURT:  I understand that.

 2          MR. ZAKARIN:  Yes.

 3          THE COURT:  But those are other custodians that are

 4    included in the six?

 5          MR. ZAKARIN:  Yes.

 6          THE COURT:  And the nine items here and I know that

 7    each one needs to be separately analyzed, but are you resisting

 8    for these six custodians running search terms that arise out of

 9    these nine categories?

10          MR. ZAKARIN:  Let me address the search terms because

11    it is useful.

12          We proposed search terms.  We went through a lengthy

13    process to try to figure out the broadest search terms that we

14    thought would pick up everything that relates to everything

15    that we've agreed to produce, which, by the way, in many ways

16    sort of overlays a lot of these requests because they are not

17    so narrowly drafted, and even the ones we've agreed to produce,

18    while we've narrowed them, they necessarily are going to bleed

19    into some of these areas.

20          We came up with a broad set of search terms that we

21    thought would cover and pick up and hit everything.  We sent

22    them to Mr. Steinthal.  They actually did not object to any of

23    the search terms.  They didn't suggest any alternative search

24    terms.  So it is our assumption at this point that they have

25    approved the search terms, and we are going to be running those

D5mdpanc
                         Conference

1    searches.  Then we are going to take the data, put it up in the

2    cloud, and then we're going to review it all to see whether it

3    is attorney-client privilege, whether it's responsive or not.

4           That process is about to commence, but we have not

5    heard boo that the search terms are inadequate to provide what

6    they need.

7           THE COURT:  So --

8           MR. ZAKARIN:  I can't tell you that they will (a) turn

9    up, you know, things in these objected-to categories; they may,

10   they may not.  But I can say that if they turned up something

11   in these objected-to categories that don't overlay the

12   categories in which we've agreed to produce, it would not be

13   our intent to produce it because of our objections.

14          THE COURT:  OK.  That's very helpful.

15          So since you haven't yet run this search and if I

16   required you to produce these nine categories of information,

17   to the extent that the searches you run produce material

18   encompassed by these nine categories, that would certainly sort

19   of eliminate a lot of the dispute here.

20          MR. ZAKARIN:  If the searches -- well, the nine

21   categories include the Justice Department.  If we put that to

22   the side.  If those searches produced hits that arguably are in

23   some of these categories and if your Honor directed us, you

24   know, as a result -- if it turns up hits in those categories,

25   you should produce it, I'm not about to disregard your Honor's

                           Conference

 1   order in that regard.

 2            THE COURT:  I appreciate that, and that was a poorly

 3   phrased question on my part.

 4            Again, we'll put aside the Department of Justice or

 5   FTC or EC submissions, No. 9, Item No. 9, so, Mr. Steinthal,

 6   why isn't an ESI search that is about to be conducted

 7   sufficient for your purposes?

 8            MR. STEINTHAL:  Your Honor, I think it probable is

 9   sufficient as long as they don't exclude from the production

10   the matters they've objected to.

11            THE COURT:  So you have no trouble with the search

12   terms they sent over?

13            MR. STEINTHAL:  We reviewed them briefly.  I think

14   that we would like to have an opportunity to -- you know, we

15   knew we were coming here.  I didn't realize that issue was

16   going to come up.  But I'm happy to deal with that today and

17   deal with Mr. Zakarin about that and let you know if there is

18   any kind of dispute about the scope of the ESI search.

19            THE COURT:  OK.  Mr. Zakarin, when did you provide the

20   search terms to Pandora?

21            MR. ZAKARIN:  I think it was around May 14, if I am

22   not mistaken, your Honor.

23            MR. STEINTHAL:  It was last week.

24            MR. ZAKARIN:  May 14, yes.

25            THE COURT:  OK.  We are not talking February?

D5mdpanc
                              Conference

 1          MR. STEINTHAL:  No.

 2          THE COURT:  No.  OK.

 3          So, fine, if you can let Mr. Zakarin know by the end

 4   of today whether or not you wish to modify or add to,

 5   supplement in a minor way -- minor way -- the search terms,

 6   fine.

 7          And so putting aside item 9, let me just quickly

 8   review.

 9          So for items 1 through 8, I will require Sony/EMI to

10   produce responsive material to the extent that its anticipated

11   search of the six custodians generates any such material.

12          Now, let's turn to item 9.  So it has been narrowed to

13   the memorandum justifying the investment/acquisition.  Let me

14   just think about this for one second.  I'll give everybody a

15   chance to be heard.

16          (Pause)

17          OK.  So, Mr. Steinthal, I appreciate that you've

18   dramatically narrowed this.  As I understand it, such a

19   memorandum would be addressed to the government's concerns

20   about antitrust violations.  Am I right?

21          MR. STEINTHAL:  Either antitrust violations or about

22   whether the transaction should be approved in the context of

23   any other regulatory concerns the government might have about

24   the effect on the market.  I'm not sure -- I mean, the first

25   thing that you would think about is an antitrust issue by

D5mdpanc
                        Conference

1    virtue of the consolidation of two large publishing catalogs.

2    So, yes, but there might be other issues addressed from a

3    regulatory standpoint.

4            And our concern is if there are statements about the

5    effect on the market, which is really what I suspect part of

6    that submission would be because we just -- I think it's fair

7    game to look at whether the conduct post-transaction mirrors

8    what was said about what the conduct would be or what the

9    effect on the market would be.

10           THE COURT:  Well, wait one minute.

11           I don't think a company binds its hands in any way if

12   its projections about market effect don't turn out to be

13   accurate.  The issue is you have a lawful duty to be honest

14   when you make your presentation to the government.  The

15   government has an opportunity to ask questions and do its own

16   inquiry and expects, I think, cooperation from the principals

17   involved, and then the government makes an informed decision

18   based on that record.  And then companies go forward into the

19   world in their new state, if it is approved, and the market is

20   as one projected, or not, ultimately.

21           MR. STEINTHAL:  Yes.  Your Honor, I don't know exactly

22   what was said, going to the point that Mr. Zakarin raised

23   about -- he kept on saying if this happened, if that happened,

24   that's all I'm saying.  That's not really true.  We know, as a

25   matter of fact, that Sony and EMI were part of the board that

D5mdpanc
Conference

 1    created new rules that permitted this new kind of withdrawal.

 2    We know, as a matter of fact, Sony and EMI have withdrawn

 3    catalog.  Our requests really go specifically to why.  What

 4    were the reasons and the effects associated with that, and do

 5    those -- does the conduct involve relating to it render the

 6    held up benchmark of the Sony/Pandora deal a legitimate or not

 7    legitimate benchmark.

 8            So we are not just fishing around.  We have specific

 9    facts.  We know these things have occurred.  We know there has

10    been a submission to the Justice Department or the FTC.  And we

11    have tried to be more targeted in what we are seeking.

12            THE COURT:  So I'd like, Mr. Zakarin, you and

13    Mr. Steinthal to talk about an extremely targeted request that

14    would require Sony -- I think it would have been Sony's

15    submission, but Sony/EMI's submission to the FTC.  To the

16    extent that that memorandum has a discussion about withdrawal

17    rights or the compendium -- and I wouldn't be surprised if it

18    does not -- that you would make a limited disclosure of that

19    passage but not the entire document.  I'm probably describing

20    it inartfully, so that's why I would like the two of you to

21    talk.  I'm not ordering that the entire document be turned

22    over.

23            MR. ZAKARIN:  Your Honor, I understood what the focus

24    was.  And what I don't know, and I speak candidly, I don't know

25    how readily searchable or identifiable material is to target

D5mdpanc
                              Conference

1    that specific item.  In other words --

2              THE COURT:  I'm looking at one document --

3              MR. ZAKARIN:  I understand that.  What I'm

4    suggesting --

5              THE COURT:  -- called a memorandum, which would have

6    been not the attachments, not responsive submissions after

7    further inquiry, the memorandum in which you made your first

8    request for approval.

9              MR. ZAKARIN:  Then I understand.  Then if that targets

10   it and if there is something in there that addresses the

11   withdrawal from ASCAP and/or direct licensing of new media, I

12   could see how that would bear on it, and that is an easier

13   target in that sense, yes.  I am willing to look for that, your

14   Honor.

15             THE COURT:  OK.  Counsel, is there anything else we

16   need to address today?  Mr. Steinthal?

17             MR. STEINTHAL:  Nothing else, your Honor, from our

18   end.

19             (Continued on next page)

20

21

22

23

24

25

D5mdpanc
                          Conference

1           THE COURT:  OK.  And Mr. Zakarin?

2           MR. ZAKARIN:  Nothing else, your Honor.

3           THE COURT:  OK.  Mr. Cohen?

4           MR. COHEN:  No, your Honor.

5           THE COURT:  Thank you, Mr. Cohen, for your presence

6    here even though -- I know you have an interest, I'm not

7    surprised you are here, but thank you.

8           Thank you, all.

9           THE LAW CLERK:  All rise.

10

11                              -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25