```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE PETITION OF PANDORA MEDIA, INC.   :      12 Civ. 8035 (DLC)
                                        :
----------------------------------------:
                                        :
Related to                              :
                                        :      41 Civ. 1395 (DLC)
UNITED STATES OF AMERICA,               :
                                        :
                     Plaintiff          :      OPINION & ORDER
          v.                            :
                                        :
AMERICAN SOCIETY OF COMPOSERS, AUTHORS, :
AND PUBLISHERS,                         :
                     Defendant.         :
                                        :
----------------------------------------X
```

For applicant Pandora Media, Inc.:

Kenneth L. Steinthal
Joseph R. Wetzel
King & Spalding, LLP
101 Second Street, Suite 2300
San Francisco, CA 94105


For ASCAP:

Jay Cohen
Lynn B. Bayard
Darren W. Johnson
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, New York 10019


DENISE COTE, District Judge:

Pandora Media, Inc. ("Pandora") provides internet radio

services.  In 2010, Pandora sought a blanket, through to the

audience, license from the American Society of Composers, Authors

& Publishers ("ASCAP") for a five year period beginning January 1, 2011.  Through this motion for summary judgment, Pandora argues that the antitrust consent decree under which ASCAP operates requires ASCAP to license Pandora to perform for five years all of the works in the ASCAP repertory as of January 1, 2011, even though certain music publishers beginning in January 2013 have purported to withdraw from ASCAP the right to license their compositions to "New Media" services such as Pandora. Because the language of the consent decree unambiguously requires ASCAP to provide Pandora with a license to perform all of the works in its repertory, and because ASCAP retains the works of "withdrawing" publishers in its repertory even if it purports to lack the right to license them to a subclass of New Media entities, Pandora's motion for summary judgment is granted.

BACKGROUND

The following facts are undisputed or taken in the light most favorable to ASCAP.  Pandora is company that provides streaming internet radio services using songs licensed from artists and their agents and licensees.  ASCAP is a "performing rights organization" ("PRO") composed of voluntary writer and publisher-members, which exists in part to facilitate licensing of artists' works to third parties.  ASCAP collects license fees on behalf of its 460,000 members from third parties.

2

The ASCAP Consent Decree

Since 1941, ASCAP has been operating under a consent decree stemming from a Department of Justice antitrust lawsuit that alleged monopolization of performance rights licenses.  Since then, ASCAP has been governed by this consent decree, which has been modified from time to time.  The most recent version of the consent decree was issued in 2001 and is known as the Second Amended Final Judgment ("AFJ2").  See United States v. Am. Soc'y of Composers, Authors & Publishers, Civ. No. 41-CV-1395, 2001 WL 1589999 (S.D.N.Y. June 11, 2001).

In an attempt to ameliorate the anti-competitive concerns raised by ASCAP's consolidation of music licenses, AFJ2 restricts how ASCAP may issue licenses in a variety of ways.  First, AFJ2 provides a mechanism whereby a judge on the United States District Court for the Southern District of New York (the "rate court") will determine a reasonable fee for ASCAP licenses when ASCAP and an applicant for a license cannot reach an agreement.  See AFJ2 § IX(D).

AFJ2 also sets out the characteristics of the licenses ASCAP issues.  "The AFJ2 defines four types of licenses: blanket licenses, per-program licenses, per-segment licenses, and through-to-the-audience licenses."  Broad. Music, Inc. v. DMX Inc., 683 F.3d 32, 36 (2d Cir. 2012) (citation omitted).  Three of the provisions create categories of licenses, which are

distinguished in how user fees to ASCAP are calculated.  See AFJ
§§ II(E), II(J), II(K).[1]  Importantly, these license categories
do not affect the scope of the ASCAP music repertory available to
a licensee.  All of the license types contemplate that the user
will have access to ASCAP's entire repertory.  See AJF2 §§ VI,
II(K); Columbia Broad. Sys., Inc. v. Am. Soc. of Composers,
Authors & Publishers, 620 F.2d 930, 933 (2d Cir. 1980) (noting,
in reference to the prior AFJ, which distinguished between
blanket and per-program licenses, that "both types of licenses
permit the user to perform any music in the ASCAP repertory").

     AFJ2 also contains a provision preventing ASCAP from
discriminating in pricing or with respect to other terms or
conditions between similarly situated licensees.  AFJ2 § IV(C).
And AFJ2 contains two provisions which prohibit ASCAP from
denying a blanket license of all of the musical compositions in
its repertory to any entity making a request therefor.  AFJ2 §§
VI, IX(E).  These last two provisions are at the center of the
parties' dispute and will govern the disposition of this motion.

---

[1] AFJ2 Section II(S) also creates a "Through-to-the-Audience
License" ("TTTA") category.  A TTTA license can be issued under
any of the three license payment structures, and is characterized
by the licensee's right "to distribute the copyrighted materials
to the cable and satellite [or other] companies (which
distribution is considered one performance for purposes of
copyright law) and further permits the cable and satellite [or
other] companies to distribute the music to the public (deemed a
separate performance)."  United States v. Broad. Music, Inc., 316
F.3d 189, 191 (2d Cir. 2003) (interpreting the same provision in
the BMI consent decree).

Pandora's Licensing History with ASCAP

On July 11, 2005, Pandora and ASCAP first entered into a license agreement to allow Pandora to stream music from ASCAP's repertory.  Five years later, on October 28, 2010, Pandora sent a letter to ASCAP terminating its 2005 license agreement and applying for a new license, pursuant to the terms of AFJ2, to run from January 1, 2011 through December 31, 2015.  Upon making a written request to ASCAP, Pandora obtained, pursuant to AFJ2 § V's requirement that "ASCAP is hereby ordered and directed to issue, upon request, a through-to the audience license to . . . [inter alia] an on-line user," the right to perform all of the compositions in ASCAP's repertory for that period, with only the proper payment rates to be determined, either through negotiation or by the rate court.  Unable to agree with ASCAP on the proper price for the license, on November 5, 2012, Pandora filed with this Court a petition for determination of reasonable licensing fees pursuant to AFJ2.  See AFJ2 § IX.  The litigation to determine the proper fee ("rate proceeding") is presently ongoing.  Trial is scheduled to occur on December 4, 2013.

ASCAP's April 2011 Compendium Rule Change

In September 2010, music publisher EMI advised ASCAP that it intended to withdraw from ASCAP for all purposes.  Before EMI's resignation took effect ASCAP began to explore a proposal to allow members to withdraw from ASCAP only the right to license

works to a class of "New Media" users.  In March 2011, ASCAP
notified the Department of Justice of its consideration of such a
proposal.  And in April 2011, ASCAP's board adopted a resolution
to amend the Compendium Rules ("Compendium Modification") to
allow members to withdraw from ASCAP its rights to license their
music to New Media outlets, while allowing ASCAP to retain the
right to license those works to other outlets.  ASCAP Compendium
Rule 1.12.1 provides that "[a]ny ASCAP Member may modify the
grant of rights made to ASCAP . . . by withdrawing from ASCAP the
right to license the right of public performance of certain New
[M]edia Transmissions."  The modified Compendium defines "New
Media Services" -- i.e., entities which make "New Media
Transmissions" and which would be purportedly subject to a
decrease in their ASCAP rights as the result of publisher
withdrawals -- as

> [A]ny standalone offering by a 'Music User' by which a New
> Media Transmission of musical compositions is made available
> or accessible (i) exclusively by means of the Internet, a
> wireless mobile telecommunications network, and/or a
> computer network and (ii) to the public, whether or not, in
> exchange for a subscription fee, other fee or charge.

In the Compendium Modification, ASCAP provided that it would
"continue to have the right to license works only to those New
Media Services which are licensed under Licenses-in-Effect on the
Effective Date of the Membership Modification, and only for the
duration of such Licenses-in-Effect."  ASCAP also provided that
ASCAP could still license to certain smaller New Media users the

works of withdrawing publishers under a so called "Standard Services" licensing agreement, so long as those users fit certain criteria and accepted ASCAP's terms.  And ASCAP also continues to perform administrative royalty distribution services even with respect to withdrawn rights for at least one of the withdrawing publishers on a contractual basis.

<u>Publisher Withdrawals of New Media Licensing Rights from ASCAP</u>

Subsequent to ASCAP's Compendium change, but after Pandora made its October 28, 2010 request for a blanket ASCAP license to begin on January 1, 2011, several music publishers withdrew their New Media licensing rights from ASCAP.  The first such publisher was EMI, which announced withdrawal of its New Media licensing rights from ASCAP in May 2011.

Upon learning of EMI's withdrawal of its new media licensing rights from ASCAP, Pandora began to negotiate separately with EMI for a license to its catalog.[2]  During the course of those negotiations, EMI's music catalog was purchased by Sony (hereinafter "Sony/EMI").  Pandora completed an agreement with Sony/EMI to license its catalog in June 2012.  Subsequently, other major publishers, including Warner Brothers Group, Universal Music Publishing Group, and BMG, announced their

---

[2] ASCAP argues that these negotiations provide evidence that Pandora understood that AFJ2 allows for narrowing of Pandora's consent decree license.  Pandora counters that it only entered into separate negotiations to avoid any potential claim for copyright infringement and "massive damages."  These arguments are addressed below.

intentions to withdraw their New Media licensing rights from
ASCAP as well.  Pandora then also engaged those publishers in
licensing negotiations.

On July 1, 2013, Pandora filed this motion for summary
judgment.  It seeks a determination that "ASCAP publisher
'withdrawals' [of New Media rights] during the term of Pandora's
consent decree license do not affect the scope of the ASCAP
repertory subject to that license."  On September 5, 2013 the
Court scheduled oral argument and set out seven questions for
counsel for Pandora and ASCAP to address.[3]  Oral argument was
held on September 11.

---

[3] The seven questions set out for oral argument were: 1) Whether
a musical composition which ASCAP has the right to license to
traditional media users, but not to new media users, constitutes
a "work[] in the ASCAP repertory" in the meaning of [AFJ2]; 2)
Whether, in the AFJ2 § (II)(C)'s definition of "ASCAP repertory"
as "those works the right of public performance of which ASCAP
has or hereafter shall have the right to license at the relevant
point in time," the phrase "right to license" means the right to
license to any user, or the right to license to a specific
applicant; 3) Whether the term "works" as used throughout the
AFJ2 means "compositions" or rights in compositions; 4) Whether
AFJ2 § VI prohibits ASCAP from accepting partial assignment of
public performance licensing rights in a composition, and
requires ASCAP to license either all public performance rights in
a composition or no rights in a composition; 5) Whether, to the
extent there is any ambiguity in the terms of the AFJ2, the Court
may look beyond the four corners of the consent decree to its
purpose; 6) Whether, if appropriate to look to the purpose of the
AFJ2, the AFJ2's purpose weighs in favor or against granting this
motion; and 7) How, if at all, any narrowing of the scope of
Pandora's rights to the ASCAP repertory would affect the Court's
rate determination for the period of January 1, 2011 through
December 31, 2015.

DISCUSSION

A motion for summary judgment may be granted only if the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding whether a party is entitled to summary judgment a court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000). The substantive law governing the case will identify those issues that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1987). Thus, in order to decide whether to grant summary judgment, a court must determine (1) whether a genuine factual dispute exists based on the admissible evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Consent decrees "reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable." Doe v. Pataki, 481 F.3d 69, 75 (2d Cir. 2007). "[D]eference is to be paid to the plain meaning of the language of a decree." United States v. Broadcast Music, Inc., 275 F.3d 168, 175 (2d Cir. 2001) (citation

omitted).  But "when faced with unclear language in a consent decree, a court of equity may, in construing the provision, consider the purpose of the provision in the overall context of the judgment at the time the judgment was entered."  Id.  "[A] consent decree is an order of the court and thus, by its very nature, vests the court with equitable discretion to enforce the obligations imposed on the parties."  United States v. Local 359, United Seafood Workers, 55 F.3d 64, 69 (2d Cir. 1995).

A. AFJ2 Provisions Relevant to this Motion

AFJ2 imposes restrictions on ASCAP's control over how it licenses the works in its repertory.  This motion is about whether any provisions of AFJ2 prevent ASCAP from withdrawing from Pandora the permission to use works whose New Media licensing rights have purportedly been withdrawn from ASCAP publishers pursuant to the Compendium Modification.  The core of the parties' briefing focuses on two AFJ2 provisions, and the Decree's definition of the "ASCAP repertory," and it is helpful to note those provisions, along with the definition of this key term, at the outset.

Section VI of AFJ2 ("Section VI") reads, in relevant part, as follows: "Licensing.  ASCAP is hereby ordered and directed to grant to any music user making a written request therefor a non-exclusive license to perform all of the works in the ASCAP repertory."  "Music user" is defined in Section II(G) of AFJ2 as

10

"any person that (1) owns or operates an establishment or enterprise where copyrighted musical compositions are performed publically, or (2) is otherwise directly engaged in giving public performances of copyrighted musical compositions."

Section IX(E) of AFJ2 ("Section IX(E)") provides in relevant part that "[p]ending the completion of any [rate] negotiations or proceedings, the music user shall have the right to perform any, some or all of the works in the ASCAP repertory to which its application pertains. . . ." And AFJ2 § II(C) ("Section II(C)") defines "ASCAP repertory" as "those works the right of public performance of which ASCAP has or hereafter shall have the right to license at the relevant point in time."

Pandora argues principally that Sections VI and IX(E) mandate that any publisher New Media licensing rights withdrawals from ASCAP do not affect the scope of its consent decree license because both Sections require ASCAP to grant a continuing license to perform "all of the works in the ASCAP repertory" pending rate proceedings or negotiations.  ASCAP disagrees.

B. The Meaning of "works in the ASCAP repertory" in AFJ2

Key to resolving this motion is determining the proper meaning of the term "works in the ASCAP repertory" in AFJ2. Section VI of AFJ2 is unambiguous in requiring ASCAP to grant to "any music user making a written request therefor a non-exclusive license to perform all of the <u>works in the ASCAP repertory</u>," AFJ2

§ VI (emphasis added).[4]  And Section IX(E) is likewise clear in requiring that "[p]ending the completion of any [rate] negotiations or proceedings" following a music user's application to ASCAP for a license, that music user "shall have the right to perform any, some or all of the works in the ASCAP repertory to which its application pertains."  AFJ2 § IX(E) (emphasis added). Stated more specifically, the question is whether AFJ2 conceives of the atomic unit of the "ASCAP repertory" in terms of musical compositions, or in terms of ASCAP's right to license musical compositions to particular types of purchasers.  The parties disagree on this question.

      ASCAP argues that "'ASCAP repertory' refers only to the rights in musical works that ASCAP has been granted by its members as of a particular moment in time."  Pandora argues that "ASCAP repertory" is a "defined term[] articulated in terms of 'works' or 'compositions,' as opposed to in terms of a gerrymandered parcel of 'rights.'"  Pandora is correct.

      A few principles guide the interpretation of the term "works in the ASCAP repertory" in AFJ2.  First, in interpreting the meaning of terms in a consent decree, plain meaning takes precedence over imputed purpose.  See, e.g., Broadcast Music, Inc., 275 F.3d at 175.  The Supreme Court has emphasized that courts should be reluctant to look beyond text to purpose,

_____

[4] It is undisputed that Pandora has made a proper written request for a license in the meaning of Section VI.

because a "decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." United States v. Armour & Co., 402 U.S. 673, 681-82 (1971).  At oral argument, counsel for ASCAP agreed that "[t]here's a lot of case law that says decrees don't have purposes.  Decrees are agreements.  They can't be stretched beyond their terms."  Consequently, determination of the meaning of the terms in AFJ2 must be discerned "within [AFJ2's] four corners, and not by reference to what might satisfy the purposes of the parties to it."  Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574 (1984).

Applying these principles to the question at hand, it is clear that the "ASCAP repertory" is defined in terms of "works" and not "individual rights" in works with respect to classes of potential licensees.  Section II(C) provides that "'ASCAP repertory' means those works the right of public performance of which ASCAP has or hereafter shall have the right to license at the relevant point in time." AFJ2 § II(C) (emphasis added).  See also United States v. Am. Soc. of Composers, Authors, Publishers, 627 F.3d 64, 68 (2d Cir. 2010) (In re Application of RealNetworks, Inc. et al.) ("A blanket license is a license that gives the licensee the right to perform all of the works in the

13

repertory"). Section II(C) does not define "ASCAP repertory" in terms of rights held by ASCAP to license works to particular classes of licensees. Rather, the natural reading of Section II(C)'s definition of "ASCAP repertory" as consisting of "works the right of performance ASCAP has . . . the right to license" is that it means that the ASCAP repertory consists of works the right to which ASCAP has the ability to license at all. See Broadcast Music, Inc., 275 F.3d at 175 ("deference is to be paid to . . . the normal usage of the terms selected").

This natural reading of the term "ASCAP repertory" is entirely consistent with Second Circuit ASCAP and Copyright caselaw. That caselaw has employed the term "repertory" in reference to compositions and not rights in compositions. See, e.g., Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 321 (2d Cir. 2008) ("users want . . . access to any and all of the repertory of compositions") (emphasis added)(citation omitted); United States v. Am. Soc. of Composers, Authors & Publishers, 32 F.3d 727, 728 (2d Cir. 1994) (In re Application of Karmen)("ASCAP, with three million songs in its repertory") (emphasis added); Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1160 (2d Cir. 1971) (discussing "musical compositions in the ASCAP repertory") (emphasis added).

A remaining question is whether the term "works," as used in

Section II(C), and in Sections VI's and IX(E)'s uses of the term "works in the ASCAP repertory," is susceptible of an interpretation defining it in terms of "rights" within compositions rather than the "compositions" themselves.  But Pandora is correct that "works" means musical compositions and not rights with respect to those compositions.

Section § II(U) of AFJ2 defines "work" as "any copyrighted musical composition."  This definition is express and conclusive. There is no reference to "rights in works" within the four corners of the consent decree.  The meaning of "works" in AFJ2 is not ambiguous and it is consequently unnecessary to look beyond the text to extrinsic evidence.  See E.E.O.C. v. Local 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 76 F.3d 76, 80 (2d Cir. 1996) ("Extrinsic evidence should only be considered when the decree itself is ambiguous").

The origin of this definition is not hard to discern.  In ordinary usage the word "work" in the musical context means a composition and not a right in a composition.  See e.g., Webster's II New Riverside Dictionary 1327 (1984) (defining "work" as "[s]omething that has been done, made, or performed as a result of one's occupation, effort, or activity").  The term "works" in AFJ2 has its origin in Copyright law, and it is clear from Copyright caselaw that works means "compositions" in that context.  And "where contracting parties use terms and concepts

15

that are firmly rooted in federal law, and where there are no explicit signals to the contrary, we can presume that the prevailing federal definition controls."  CGS Indus., Inc. v. Charter Oak Fire Ins. Co., 720 F.3d 71, 78 (2d Cir. 2013) (citation omitted).  Section 102 of the Copyright Act refers to "works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102(a).  This definition is inconsistent with a reading of works that defines the word in terms of "rights."  And the Supreme Court has referred to a "work" as the "translat[ion] [of] an idea into a fixed, tangible expression." Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989).  Compositions, but not rights in compositions, are able to be "fixed" in "tangible medium[s] of expression."  ASCAP conceded this definition of "works" at oral argument.

Because "works" in AFJ2 means "composition[s]" and not "rights in compositions", and because it is undisputed that the terms of ASCAP's Compendium Modification of April 2011 permit ASCAP to retain the right to license the works of the withdrawing publishers for non-New Media purposes, those compositions remain "works in the ASCAP repertory" within the meaning of Sections VI and IX(E) of AFJ2.  In fact, ASCAP retains the right under the "Standard Services" agreement to license the works of withdrawing

16

publishers even to certain smaller New Media licensees.  Thus,
the works remain in every facet of the ASCAP repertory.

C. Sections VI and IX(E) of AFJ2, and Pandora's Rights

Having determined that "works" in AFJ2 means musical
compositions, and that those musical compositions remain "in the
ASCAP repertory" so long as ASCAP retains any licensing rights
for them, it remains only to apply the clear language of Sections
VI and IX(E) of AFJ2 to decide this motion.  Section VI
establishes the scope of a music user's rights to works in the
ASCAP repertory following a "written request therefor" as
extending to "all of the works in the ASCAP repertory."  AFJ2 §
VI.  Section IX(E) is in accord with Section VI in providing that
"[p]ending the completion of any [rate] negotiations or
proceedings, the music user shall have the right to perform any,
some or all of the works in the ASCAP repertory to which its
application pertains."  AFJ2 § IX(E).  Sections VI and IX(E) of
AFJ2 consequently mandate that Pandora's license to perform ASCAP
compositions during the five year term of its license extends to
"all" of ASCAP's repertory and is unaffected by any new media
licensing rights withdrawals by ASCAP publishers.

It is worth noting that ASCAP has the continuing ability to
grant Pandora the right to use those musical compositions whose
New Media licensing rights were purportedly withdrawn from ASCAP.
Section 1.12.5 of the Compendium of ASCAP Rules and Regulations

provides that "ASCAP shall continue to have the right to license [works subject to New Media licensing rights withdrawals] only to those [N]ew [M]edia Services which are licensed under Licenses-in-Effect on the Effective Date of the Membership Modification." And whether ASCAP had negotiated this preservation of rights or not, under the terms of AFJ2 ASCAP did not have the right to permit the partial withdrawals of rights at issue and thereby acquiesce to a regime in which some music users could not obtain full public performance rights to works in the ASCAP repertory.

D. ASCAP's Arguments as to the Text of AFJ2

ASCAP argues that "the term 'ASCAP repertory' as used in Sections VI and IX(E) of the AFJ2 refers only to the rights in musical works that ASCAP has been granted by its members as of a particular moment in time" and that "[n]othing in the definition of 'ASCAP repertory' suggests otherwise."  But this interpretation is in direct conflict with AFJ2 Section II(C)'s definition of "ASCAP repertory."  Section II(C) does not refer to "rights in musical works" but rather to <u>works</u> the right of performance of which ASCAP has the right to license at the relevant point in time."  AFJ2 § II.C (emphasis added).  ASCAP undisputedly presently has the "right to license" any of the <u>works</u> in question to all non-New Media licensees and to some New Media licensees even following withdrawal of certain New Media licensing rights.  Therefore those works remain in the ASCAP

repertory and AFJ2 requires that ASCAP license them.

ASCAP's argument is predicated on the Copyright doctrine of "divisibility of rights" within a copyrighted work.  It is true that "[t]he Copyright Act confers upon the owner of a copyright a bundle of discrete exclusive rights, each of which may be transferred or retained separately by the copyright owner."[5] United States v. Am. Soc. of Composers, Authors, Publishers, 627 F.3d at 71.  But while the Copyright Act allows rights within works to be alienated separately in general, AFJ2 imposes restrictions beyond those imposed by the Copyright Act on ASCAP. AFJ2 Sections VI and IX(E) deny ASCAP the power to refuse to grant public performance rights to songs to particular users while, at the same time, retaining the songs in question in its repertory.

E. ASCAP's Argument as to the History of "Licenses-in-Effect" Provisions

ASCAP points to the fact that AFJ2 removed an express "licenses-in-effect" provision from the previous iteration of the ASCAP consent decree, known as the 1950 Amended Final Judgment. See Amended Final Judgment, United States v. American Society of

---

[5] The divisibility doctrine is codified throughout the copyright law.  See, e.g., 17 U.S.C. §§ 106, 201(d), 501(b).  For example, Section 106 enumerates a series of rights with respect to a work assignable by a copyright owner (including, inter alia, the right of reproduction and the right of performance).  And Section 201(d)(2) provides that "[a]ny of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred . . . and owned separately."  17 U.S.C. § 201(d)(2).

Composers, Authors and Publishers, Civ. No. 13-95, 1950 Tr. Cas.
¶ 62,595, § IV(G) (S.D.N.Y. 1950) (hereinafter "AFJ").  ASCAP
argues that this removal demonstrates that the parties to AFJ2 --
the Department of Justice and ASCAP -- intended for ASCAP to be
free to decrease the scope of a user's license even during the
pendency of a rate proceeding.  ASCAP also submits a 2001
memorandum from the Department of Justice ("2001 DOJ Memorandum")
submitted to the rate court prior to the entry of AFJ2 providing
its justification for the removal of the express licenses-in-
effect provision in AFJ.

     The history ASCAP presents does not prove what ASCAP would
like it to prove.  Rather, the 2001 DOJ Memorandum demonstrates
that the concern driving the removal of the express licenses-in-
effect provision from AFJ2 was that ASCAP members wishing to
withdraw from ASCAP entirely should not be subject to existing
licenses-in-effect.  The 2001 DOJ memorandum justifies the
removal of that provision by virtue of the fact "the provision
had the unforeseen consequence of preventing members who wanted
to leave ASCAP from being able to take their catalogs with them
when they joined a competing PRO."  An understanding that the
removal of the express license-in-effect provision was driven by
a concern that a publisher would be inhibited from joining a
competing PRO to ASCAP is compatible with the general pro-
competitive goal of the consent decrees governing ASCAP.  Here,

20

music publishers are attempting to withdraw licensing rights from ASCAP with respect to only some uses of their music while remaining in ASCAP, and the pro-competitive rationale of facilitating the ability of artists to move between different PROs that spurred the removal of the express license in effect provision from AFJ2 is inapposite.

ASCAP also makes the related argument that Pandora's consent decree license may be narrowed because of the inclusion in AFJ2 of § XI(B)(3)(c) ("Section XI(B)(3)(c)"), which provides that "for any member who resigns from ASCAP, ASCAP is enjoined and restrained from requiring that member to agree that the withdrawal of such works be subject to any rights or obligations existing between ASCAP and its licensees." AFJ2 at *10.  ASCAP argues that even though Section XI(B)(3)(c) is not yet operative because AFJ2 § XI(C) requires that a "substantially identical provision" be entered in the case of United States v. Broadcast Music, Inc., No. 64 Civ. 3787 (S.D.N.Y), and that such a provision has not yet been entered in that case, the other sections of AFJ2 should be read in the light of the Department of Justice's attempt to include Section XI(B)(3)(c) in AFJ2. ASCAP's argument, in effect, is that the inclusion of this provision in AFJ2, even if inoperative, evinces intent by DOJ and ASCAP to protect the freedom of copyright holders who are members of ASCAP to divide the rights in their works as they see fit.

21

This argument is misplaced.  First, the text of Section XI(B)(3)(c) restricts its application to "member[s] who resign from ASCAP."  None of the members who are withdrawing some of their New Media licensing rights from ASCAP are resigning from ASCAP.  Moreover, the 2001 DOJ Memorandum reinforces that Section XI(B)(3)(c) was inserted in AFJ2 for the same reason that the express licenses-in-effect provision of the prior AFJ was removed: in order to allow publishers who were leaving ASCAP entirely to take their catalogues with them to join competing PROs.  Further, this is also the only reading of the decision to remove the express license-in-effect provision from AFJ that is consistent with the "all works in the ASCAP repertory" language of Sections VI and IX of AFJ2.  To adopt ASCAP's position would be to endorse the untenable proposition that Section XI(B)(3)(c) was intended to allow publishers to deprive certain existing licensees of individually chosen works while keeping those works in the ASCAP repertory, even in the face of Sections VI's and IX's mandates that ASCAP license "all of the works in the ASCAP repertory" to any entity making a request therefor.

ASCAP also makes the argument that even if a license-in-effect provision did exist in AFJ2, such a provision would be irrelevant for purposes of this motion because, according to ASCAP, Pandora is merely an "applicant" for a license and not a "licensee."  For this reason, ASCAP objects to the use of the

term "consent decree license" to describe Pandora's AFJ2 rights.
But while ASCAP draws a semantic line between so called
"applicants" -- i.e., according to ASCAP, entities that have
applied for an ASCAP blanket license and who await rate court
adjudication -- and "licensees" -- i.e., according to ASCAP,
entities that have negotiated final licensing agreements -- ASCAP
does not provide any evidence of a substantive difference in the
rights of "applicants" and "licensees" under AFJ2 with respect to
ASCAP's repertory during the pendency of a rate court proceeding.

Section IX(E)'s requirement that "[p]ending the completion
of a [rate court proceeding], the music user shall have the right
to perform any, some or all of the works in the ASCAP repertory
to which its application pertains" makes clear that there could
be no substantive difference relevant to this motion.  "All"
means all.  So whether ASCAP purports to categorize Pandora as an
"applicant" or a "licensee," Pandora's right to perform the
compositions in the ASCAP repertory extends to all of ASCAP's
repertory and ASCAP may not narrow that right by denying Pandora
the right to play the songs of publishers who have withdrawn new
media licensing rights from certain songs while keeping the songs
in ASCAP's repertory to be licensed for performance by other
music users.

F. Pandora's Conduct

ASCAP also argues that Pandora's conduct in obtaining separate licenses from withdrawing publishers following the Compendium Rule change provides evidence for ASCAP's position that AFJ2 permits the withdrawal of publishers' new media rights from ASCAP to narrow the scope of Pandora's consent decree license.  This argument is without merit.  While courts will consider parties' conduct that occurs subsequent to the formation of a contract to guide interpretation of terms, only the conduct of <u>parties to the contract</u> is relevant.  <u>See, e.g.</u>, <u>IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.</u>, 26 F.3d 370, 374 (2d Cir. 1994)("courts have looked to the conduct of <u>the parties</u> in resolving ambiguities in contractual language") (emphasis added); 11 Williston on Contracts § 32:14 (4th ed.) ("<u>the parties</u>' own practical interpretation of the contract -- how they actually acted, thereby giving meaning to their contract during the course of performing it -- can be an important aid to the court) (emphasis added).  As a matter of logic it is unclear how the conduct of a non-party to a contract -- as Pandora is with respect to the AFJ2 consent decree -- could, on its own, bear on the proper interpretation of the terms negotiated by other parties.  In the one case ASCAP cites for the proposition that post-contract formation conduct may influence a court's interpretation of the contract terms the relevance of a non-

24

party's conduct was primarily predicated on the reaction to that
conduct by a party to the initial agreement.  See Wardair can.,
Inc. v. Fla. Dep't of Revenue, 477 U.S. 1, 12 (1986).  Pandora is
not a party to AFJ2 and its actions cannot guide the proper
interpretation of AFJ2's terms.[6]

   G. ASCAP's Argument as to AFJ2 Section IV

   At oral argument, ASCAP argued that AFJ2 § IV's ("Section
IV") prohibition on ASCAP acquiring exclusive rights in a
composition is the only place in AFJ2 speaking to "the scope of
the rights that have to be granted by an ASCAP member to ASCAP,"
and that the absence in Section IV of any express requirement
that ASCAP license to all applicants any song in its repertory
cuts against granting this motion.

   Before addressing this specific argument it is worth noting
that ASCAP's effort to define the question in this motion as
whether and in what provision AFJ2 restricts copyright holders is
misplaced.  AFJ2 only restricts ASCAP; it does not restrict
copyright holders directly.  Obviously, a restriction on ASCAP
has an ancillary impact on how copyright holders may use ASCAP,
but this is the case with respect to third parties any time an
entity is regulated by a consent decree.

   ASCAP's objection fails even if it is construed to contend
that Section IV would be the natural place for the licensing

---

[6] In any event, Pandora's argument that its actions were the
result of commercial necessity is plausible.

requirement at issue here because that is where the restrictions on ASCAP's freedom to make licensing decisions are found.  The argument fails because the requirements in Sections VI and IX(E) are affirmative requirements, and not prohibitions.  Section IV is entitled "Prohibited Conduct" and is consequently concerned with prohibiting conduct by ASCAP rather than with enforcing affirmative obligations.  The affirmative obligations imposed by AFJ2 are found in other sections.  See, e.g., Sections VI; VII; VIII; IX.  The requirement that ASCAP license "all of the works in the ASCAP repertory" would be out of place in Section IV.

It is also possible that the absence of any express provision is explained by the fact that ASCAP has never tried to accept only partial licensing rights before.  It is certainly imaginable that in 2001 DOJ and ASCAP simply did not contemplate the specific change in the Compendium Modification and consequently did not place an express prohibition in Section IV.  But even if DOJ and ASCAP failed in 2001 to contemplate the specific ASCAP rule change at issue here, such a failure is immaterial when the language of Sections VI and IX(E) so clearly forecloses ASCAP's ability to narrow Pandora's license here.

H. ASCAP's Argument as to Section II(1)(c) of the 1941 Consent Decree

At oral argument, ASCAP also pointed to Section II(1)(c) of the 1941 ASCAP consent decree (the version prior to AFJ) in support of its position.  That section provided in relevant part that "[n]othing herein contained shall be construed as preventing [ASCAP] from regulating the activities of its members . . . by prohibiting the members from issuing exclusive licenses to commercial users of music."  United States of America v. American Society of Composers, Authors and Publishers, No. 13-94 (March 4, 1941).  ASCAP contends that because this provision was removed at the entry of AFJ, ASCAP publisher-members are now free to issue exclusive licenses to commercial users and that this right is what ASCAP is recognizing with its Compendium Modification. This argument is unpersuasive.  The fact that ASCAP cannot prohibit its members from granting exclusive licenses to music users without going through ASCAP is irrelevant to the question of whether ASCAP must grant any music user a license to perform a work once that work is in its repertory.  Moreover, everybody agrees that a publisher-member of ASCAP may withdraw a composition from the ASCAP repertory entirely.  Any prohibition on ASCAP banning exclusive licensing is entirely consistent with AFJ2 permitting the total withdrawal of a song from ASCAP's repertory.

27

I. Request by ASCAP and Publishers for Department of Justice Participation

ASCAP and non-party publishers EMI, Sony, and Universal have asked that the Court invite the participation of the Department of Justice ("DOJ") before resolving this motion.[7]  But because consent decree interpretation is a matter of law for a court, and because AFJ2 §§ II(C), II(U), VI, and IX(E) are not ambiguous such that DOJ participation would be helpful to clarify the meaning of any terms, the Court has declined to solicit its participation.  "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation.  An unambiguous provision of the contract should be given its plain and ordinary meaning and the contract should be construed without reference to extrinsic evidence."  Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012) (citation omitted); see also Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) ("The court is not required to find the language ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning.") (citation omitted).  Even if DOJ were to "urge [a] different interpretation[] in the litigation" the unambiguous language of

---

[7] Participation by DOJ is permitted by AFJ § IX(I) ("Section IX(I)") which provides that "[p]ursuant to its responsibility to monitor and ensure compliance with [AFJ2] the United States may participate fully in any proceeding brought under this section IX."

AFJ2 would still control.   Olin Corp., 704 F.3d at 99.

   J. Pandora's Section IV.C Discrimination Argument

     Finally, Pandora argues that allowing ASCAP to deny Pandora
a continuing blanket license during the pendency of the rate
proceeding while granting such licenses to other entities, such
as terrestrial radio stations with online presences,
impermissibly "discriminates . . . between licensees similarly
situated" in violation of AFJ2 Section IV.C.  Pandora argues in
the alternative that even if the question of whether ASCAP is
actually discriminating against "similarly situated" entities
presents a genuine issue of material fact improper for resolution
on a summary judgment motion, that ASCAP is improperly
circumventing the Court's review of the question by
"prejudg[ing]" the "similarly situated" inquiry by allowing
withdrawing publishers to narrow the scope of Pandora's license
during the rate proceeding.  ASCAP disputes Pandora's claims and
presents in its briefing a detailed argument as to why the
entities in question are not similarly situated for purposes of
AFJ2 Section IV.C.  But having resolved this motion on the clear
text of AFJ2 Sections VI and IX(E) it is unnecessary to resolve
the fact-intensive question of whether Pandora is similarly
situated to any entities treated differently by ASCAP.  And it is
likewise unnecessary to resolve Pandora's "prejudging" argument.

CONCLUSION

Pandora's July 1, 2013 motion for summary judgment that ASCAP publisher withdrawals of New Media licensing rights during the term of Pandora's five year license beginning on January 1, 2011 do not affect the scope of the ASCAP repertory subject to that license is granted.

SO ORDERED:

Dated:    New York, New York
          September 17, 2013

_____
                DENISE COTE
        United States District Judge