UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
IN RE PETITION OF PANDORA MEDIA, INC. :      12 Civ. 8035 (DLC)
                                     :
------------------------------------ :
                                     :
Related to                           :
                                     :      41 Civ. 1395 (DLC)
UNITED STATES OF AMERICA,            :
                                     :
                    Plaintiff        :      OPINION & ORDER
         v.                          :
                                     :
AMERICAN SOCIETY OF COMPOSERS,       :
AUTHORS,                             :
AND PUBLISHERS,                      :
                    Defendant.       :
------------------------------------ X

For Pandora Media, Inc.:

Kenneth L. Steinthal
Joseph R. Wetzel
King & Spalding, LLP
101 Second Street, Suite 2300
San Francisco, CA 94105

For the movant Publishers Sony/ATV Music Publishing, LLC, and
the EMI Music Publishing Companies:

Donlad S. Zakarin
Frank P. Scibilia
Erich C. Carey
Pryor Cashman LLP
7 Times Square
New York, NY 10036


DENISE COTE, District Judge:

     On September 30, 2013 Sony/ATV Music Publishing LLC and the

EMI Music Publishing Companies filed a motion to intervene in

the above captioned matter nunc pro tunc to September 13, 2013.
For the reasons that follow, the motion is granted with the
restrictions described below.


BACKGROUND

    Sony/ATV Music Publishing LLC and the EMI Music Publishing
Companies (collectively, the "Publishers") are business entities
that own catalogues of copyrighted music compositions.  Pandora
is a company that provides streaming internet radio services
using songs licensed from artists and their agents and
licensees.  The Publishers are not parties to this underlying
rate court action, In Re Petition of Pandora Media Inc., 12 Civ.
8035 (DLC).  The parties to the action are Pandora and the
American Society of Authors and Composers ("ASCAP").  ASCAP is a
performing rights organization ("PRO") composed of voluntary
writer and publisher-members, which exists in part to facilitate
licensing of artists' works to third parties.  Since 1941, ASCAP
has been operating under a consent decree stemming from a
Department of Justice antitrust lawsuit that alleged
monopolization of performance rights licenses.  The most recent
iteration of the consent decree is called the Second Amended
Final Judgment ("AFJ2"), which restricts how ASCAP may issue
licenses in a variety of ways.  One such restraint is that AFJ2

provides a mechanism whereby a judge on the United States District Court for the Southern District of New York (the "rate court") will determine a reasonable fee for ASCAP licenses when ASCAP and an applicant for a license cannot reach an agreement. See AFJ2 § IX(D).  Trial to set a rate for Pandora's use of the ASCAP repertory is set for January 21, 2014.

AFJ2 also contains other restraints on ASCAP's freedom to license song rights.  This motion for intervention arises out of a summary judgment opinion issued on September 17, 2013 in which this Court held that AFJ2 prevented ASCAP from withholding from Pandora the rights to compositions in its repertory while licensing those compositions to other users.  In re Pandora Media, Inc., 12 Civ. 8035 (DLC), 2013 WL 5211927 (S.D.N.Y. Sept. 17, 2013) ("September 17 Opinion").  The summary judgment practice was precipitated by putative publisher partial withdrawals of rights from ASCAP.

In April 2011, ASCAP adopted a Compendium Modification which allowed music publisher members like the petitioners here to withdraw from ASCAP the right to license certain compositions in "New Media" outlets, while allowing ASCAP to retain the right to license those works to other outlets.  The modified Compendium defined "New Media" outlets as:

[A]ny standalone offering by a 'Music User' by which a New

3

> Media Transmission of musical compositions is made
> available or accessible (i) exclusively by means of the
> Internet, a wireless mobile telecommunications network,
> and/or a computer network and (ii) to the public, whether
> or not, in exchange for a subscription fee, other fee or
> charge.

In practice, New Media outlets include entities like Pandora.

Following the Compendium Modification, several publishers, including Sony/ATV and some EMI Music Publishing companies, purported to withdraw from ASCAP their rights to license their copyrighted compositions to New Media outlets like Pandora while allowing ASCAP to retain the right to license those same songs to other outlets.  Following the publisher withdrawal of rights from ASCAP, Pandora then entered into separate licensing agreements with some publishers.  On June 11, 2013, Pandora moved for summary judgment seeking a determination that the ASCAP Compendium Modification did not affect the scope of the ASCAP repertory of songs subject to Pandora's license.

The Publisher's Actions Subsequent to Pandora's June 11 Filing of its Summary Judgment Motion

After Pandora moved for summary judgment on June 11, the Publishers expressed concern that arguments in Pandora's briefing might implicate an anticipatory repudiation of the direct licenses that Pandora had negotiated following the Publishers' withdrawals from ASCAP.  Following email correspondence with counsel for Pandora, the Publishers wrote a

letter to the Court dated June 27 in which they indicated that
they were "gravely concerned because the motion appeared to
directly challenge our clients' rights, including the validity
of their direct licenses with Pandora and their withdrawal of
certain rights from ASCAP."  The Publishers asserted that
counsel for Pandora had refused to clearly answer whether its
motion implicated the Publishers' rights and they argued that
Pandora's motion constituted an anticipatory repudiation of the
direct licenses.  They further contended that

> We do not understand, as a matter of jurisdiction and
> procedure, in a rate proceeding in which our clients are
> not parties [how] Pandora can seek to invalidate direct
> licenses and adjudicate the consequences of our clients'
> withdrawal of rights from ASCAP. . . we do not believe it
> can be done in a proceeding in which our clients are not
> parties.

By letter also dated June 27, Pandora responded that it was
"not seeking here to repudiate or void the prior licenses
entered into with EMI or Sony."  And that "Pandora's motion does
not seek to 'secure a declaration that [the Publishers']
withdrawal of certain new media rights from ASCAP is a nullity .
. . .'  Rather . . . the relief requested by Pandora's motion is
limited to the scope of Pandora's Consent Decree License."

By letter to the Court dated June 28, the Publishers
replied that they "[did] not understand [Pandora's argument as
to]  . . . how [the Publishers'] catalogues can be subject to

5

[Pandora's] supposed Consent Decree License if, as [Pandora] states, Pandora is not seeking to repudiate or void the direct licenses with [the Publishers]."  The Publishers reiterated that "to the extent that Pandora is seeking relief that impacts our clients' rights and would adjudicate their rights in a proceeding in which they are not parties, we think it is improper."  Pandora replied to that letter, also on June 28, with an inquiry as to whether any further letters would be necessary in light of Pandora's view that there was "no ripe issue presented for [the Court's] determination."

In response to the above described letters, on July 1, the Court ordered Pandora, ASCAP and the Publishers to make submissions to the Court "regarding whether Sony/EMI should formally participate in the ongoing summary judgment motion practice between Pandora and [ASCAP], or in any other way in this litigation."  By letter of July 8 the Publishers stated that

> [B]ased on [Pandora's] representation that Pandora is not seeking to repudiate or disavow the direct licenses with [the Publishers] and is not challenging their withdrawal of certain rights from ASCAP, we accept [Pandora's] representation that the rate proceeding is not intended to and will not affect our clients' rights . . . as such, even assuming that [the Publishers] had the right to intervene (and we believe there are jurisdictional impediments to their doing so), it appears that their rights are not at risk in this rate proceeding and intervention or participation is inappropriate and unnecessary.

6

ASCAP's letter in response to the July 1 Order similarly stated
that it saw no reason for the Publishers to intervene,
explaining that:

> Because Pandora has now represented to the Court that it is
> not seeking to repudiate the prior licenses it entered into
> with [the Publishers] and is not challenging Sony/EMI's
> withdrawal of their new media rights from ASCAP, there does
> not appear to be any need for [the Publishers] to
> participate in the summary judgment motion.  Moreover, to
> the extent that Pandora attempts to change its position, we
> understand that [the Publishers] would seek to resolve such
> a dispute in a separate state court action, not in this
> proceeding.

The Publishers' Actions Subsequent to the September 11 Oral
Argument

On September 5, 2013, the Court issued an order scheduling
oral argument on Pandora's summary judgment motion and
certifying certain questions to be addressed at argument.  The
questions made clear that the Court was considering a ruling
that would prevent ASCAP from licensing works to certain
licensees but not others.  At oral argument on September 11, the
Court indicated that it found the text of AFJ2 clear in
prohibiting ASCAP's Compendium Modification.  On September 12,
the Publishers sent a letter to the Court which said that:

> [B]ased on yesterday's argument, contrary to [Pandora's]
> representations, it now appears that [the Court] is
> considering a decision that most dramatically would affect
> our clients' rights without our clients having any
> opportunity to be heard.  To be clear, our clients, not
> ASCAP are the copyright owners of the songs in question,

possessed of exclusive rights under Section 106 of the
Copyright Act, which include, under Section 106(4) the
exclusive right to publically perform the songs or to
authorize others to do so.

The Publishers did not, by that letter, request to intervene in
the summary judgment practice.  In response to the letter, the
Court issued a Memo Endorsement which read:

If counsel wish to be heard in connection with the pending
summary judgment motion, they should identify the relief
they seek no later than Friday, September 13, at noon.

On September 13, 2013, the Publishers responded by letter, in
which they argued that the order the Court was considering:

[W]ould deprive our clients of exclusive rights provided
them under Section 106 of the Copyright Act.  We therefore
seek to intervene for the limited purpose of addressing
those issues and also believe that the DOJ should be heard
on those issues.

That same day, the Court subsequently responded by Memo
Endorsement dated as follows:

[The Publishers] having requested the opportunity to
intervene in order for the Court to consider the argument
presented in this letter in connection with the pending
summary judgment motion, any opposition shall be filed by
Monday, September 16.

Also on September 13, music publisher Universal Music Publishing
Group ("Universal")[1] sent a letter requesting the Court to
consider the views of the Department of Justice and that "if the

---

[1] Universal has filed a parallel motion to intervene in this
action on substantially the same grounds as are invoked in this
motion.

Court is going to hold any further proceedings on this issue we respectfully request the opportunity to present our views."
That same day the Court responded to Universal's letter with the following Memo Endorsement:

> This letter is construed as an application to intervene for the purpose of making the two requests in this letter.  Any opposition to the application to intervene is due Monday, September 16, 2013.

In response to the September 13 Memo Endorsement setting a deadline for opposition to Universal and the Publishers' requests, Pandora then wrote a letter of September 16 in which it disputed the notion that any music publisher Section 106 rights were implicated by the summary judgment motion practice. Pandora also argued that the music publishers' requests to intervene were untimely.  For these reasons, Pandora argued that the music publishers lacked the right to intervene in this action under Federal Rule of Civil Procedure 24.

The Publishers responded to Pandora's letter on September 17.  In that response, they spent most of the letter making an argument to the Court as to why the pending summary judgment motion implicated their Section 106 rights.  They also explained that they did not understand themselves to have been ordered to fully brief a motion to intervene.  The Publishers stated that:

> [Pandora's] assertion that our letter fails to satisfy FRCP 24 . . . fails for two obvious reasons.  First our

> September 13, 2013 letter was written in response to Your
> Honor's direction to indentify the relief we sought.  We
> did not view Your Honor's direction as an invitation to
> submit a full blown motion to intervene . . . .

There was no response to this letter from Pandora because the summary judgment opinion was issued that same day.

<u>The September 17 Opinion</u>

On September 17, this Court granted Pandora's motion for summary judgment.  As is explained in greater detail in the September 17 Opinion, this Court held that AFJ2 prohibited ASCAP from withdrawing from Pandora the rights to perform any compositions over which ASCAP retained any licensing rights. That result was predicated principally on two provisions of AFJ2:  Section VI, which provides that: "ASCAP is hereby ordered and directed to grant to any music user making a written request therefor a non-exclusive license to perform all of the works in the ASCAP repertory," and Section II(C), which defines "ASCAP repertory" as "those <u>works</u> the right of public performance of which ASCAP has or hereafter shall have the right to license at the relevant point in time."  AFJ2 § II(C) (emphasis supplied). The Court reasoned that

> [B]ecause it is undisputed that the terms of ASCAP's
> Compendium Modification of April 2011 permit ASCAP to
> retain the right to license the works of the withdrawing
> publishers for non-New Media purposes, those compositions
> remain 'works in the ASCAP repertory' within the meaning of

Sections VI and IX(E) of AFJ2" and that ASCAP could not
withhold those works from Pandora while licensing them to
other applicants.

September 17 Opinion, 2013 WL 5211927, at *7.  In the Opinion,
the Court noted that "ASCAP and non-party publishers EMI, Sony,
and Universal have asked that the Court invite the participation
of the Department of Justice ("DOJ") before resolving this
motion," but rejected the suggestion given that the text of AFJ2
was unambiguous.  Id. at *11.

The Publishers' Actions Subsequent to the Summary Judgment
Opinion

After the Summary Judgment Opinion was issued, the
Publishers sent a letter dated September 25 in which they
indicated their belief that the Court had granted, sub silentio,
a motion for them to intervene, given the Court's consideration
and rejection of their request to solicit the input of the
Department of Justice.  The Court responded by Memo Endorsement
that same day that:

> The Court considered [the Publishers'] arguments in
> rendering the September 17 decision.  Any application to
> intervene in this lawsuit/proceeding must be made on
> consent or through formal motion.  If [the Publishers] seek
> to intervene through a motion, [they] should file such
> motion promptly.

The Publishers submitted their motion to intervene on September
30.  Pandora submitted its opposition on October 11, and the
motion was fully submitted on October 17.

DISCUSSION

Rule 24(a) of the Federal Rules of Civil Procedure provides that:

> On timely motion, the court must permit anyone to intervene who:
> (1) is given an unconditional right to intervene by a federal statute; or
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  The Second Circuit has explained that a party seeking to intervene as of right under Rule 24(a)(2) must fulfill the following requirements:

> (1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties.

MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 389 (2d Cir. 2006) (citation omitted).  "Failure to satisfy any one of these requirements is a sufficient ground to deny the application."  Farmland Dairies v. Comm'r of New York State Dep't of Agric. & Markets, 847 F.2d 1038, 1043 (2d Cir. 1988).  The task now is to apply the test.

A. Whether the Publishers' motion was timely

As made clear in the foregoing description of the factual

background underlying this motion, the timeliness issue here is

clouded by some confusion on the part of the Publishers as to

whether they perceived their rights to be implicated by the

summary judgment practice at issue, as well as a lack of clarity

on their part as to the relief they sought in the various

letters they sent to the Court.  The legal standard for

determining timeliness, however, is clear.  "Whether a motion to

intervene is timely is determined within the sound discretion of

the trial court from all the circumstances.  Timeliness defies

precise definition, although it certainly is not confined

strictly to chronology."  United States v. Pitney Bowes, Inc.,

25 F.3d 66, 70 (2d Cir. 1994).

> Factors to consider in determining timeliness include:  (a)
> the length of time the applicant knew or should have known
> of its interest before making the motion; (b) prejudice to
> existing parties resulting from the applicant's delay; (c)
> prejudice to the  applicant if the motion is denied; and (d)
> the presence of unusual circumstances militating for or
> against a finding of timeliness.

MasterCard Int'l Inc, 471 F.3d at 390 (citation omitted).

Applying the first factor -- the length of time that the

Publishers knew or should have known of their interest -- yields

mixed results.  On one hand, following the exchange of letters

described above, the Publishers expressed their belief that

13

their right to use ASCAP to license compositions to some, but
not other, purchasers was not implicated by the summary judgment
motion practice at issue.  Even if there were no reason to doubt
the sincerity of that belief, there is reason to doubt its
reasonableness.  The reasoning underlying this Court's September
17 Opinion was informed by many of the arguments from Pandora's
briefing submitted on June 11.  It is difficult to understand
how the Publishers did not know that the adoption of that
reasoning was a possibility, and that ASCAP's ability to accept
partial withdrawals of rights was implicated.  The risk existed
even if Pandora did not seek to terminate its license with the
Publishers and only sought the most narrow of rulings from the
Court.  Of course it is courts, not parties, that set the
parameters of rulings.

Application of the second factor -- prejudice to any
parties by allowing intervention -- cuts against denying
intervention on the ground of untimeliness.  There is no
prejudice to Pandora in allowing the Publishers to appeal so
long as the Publishers do not advance any arguments on appeal
that were not advanced by ASCAP in its summary judgment
practice.  The ASCAP-Pandora rate court trial schedule is not
implicated by an appeal that would be brought after its
conclusion.

Applying the third factor -- prejudice to the Publishers if their application is denied -- also weighs against finding the Publishers' motion to intervene untimely.  As is described below, the Publishers have a direct and substantial interest in this motion practice.

Finally, application of the fourth factor -- the presence of any unusual circumstances mitigating for or against a finding of timeliness -- counsels in favor of denying intervention on the basis of untimeliness.  After Pandora's summary judgment motion was filed, the Publishers wrote to the Court expressing concern about their rights being implicated.  They were invited at that time to seek to intervene, and they declined to do so. They were also aware from the written questions circulated by the Court in advance of oral argument that their interests might well be affected by the Court's decision, but again they took no steps to intervene.  Thus, one can criticize the Publishers for their delay in bringing this motion to intervene.

In sum, an examination of the timeliness of this motion yields mixed results.  Moreover, the Publishers' failure to intervene earlier deprived the Court of the ability to evaluate any new arguments they might bring so as to create a record for appeal.  Consequently, it would be unfair to Pandora and to the efficient administration of the judicial system to permit the

15

Publishers to raise new arguments on appeal which were not raised by ASCAP in this Court.[2]

B. Whether the Publishers possess an interest related to the subject of the action

For an interest in the underlying action to be cognizable by Rule 24(a)(2), "it must be direct, substantial, and legally protectable." Bridgeport Guardians v. Delmonte, 602 F.3d 469, 473 (2d Cir. 2010) (citation omitted). "An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule." Brennan v. N.Y.C. Bd. of Educ., 260 F.3d 123, 129 (2d Cir. 2001) (citation omitted).

1. The Publishers' argument that their Section 106 rights were impacted by the Opinion and Order is incorrect.

The Publishers frame their interest in this action as the protection of the "exclusive rights provided . . . under Section 106 of the Copyright Act" to divide their copyrights as they choose. They argue that the September 17 Opinion "ha[d] the

---

[2] The one exception is the Publishers' argument -- raised in this motion to intervene -- about the purported impact of the September 17 Opinion on their rights under Section 106 of the Copyright Act. Because that argument was also raised by the Publishers in the letters preceding the September 17 Opinion described in the foregoing, and because the Court considered those arguments in rendering the September 17 Opinion, the Publishers may make that argument on appeal.

effect of" "divest[ing] copyright owners of their exclusive
[Section 106] rights through an anti-trust regulation of ASCAP
to which they are not parties."  In support of the argument that
the September 17 Opinion infringes the Publishers' Section 106
rights, the Publishers construe the holding as "provid[ing]
that, under AFJ2, if a copyright owner grants ASCAP any rights
in any compositions, ASCAP has all rights in the compositions."
Pandora disputes that the Publishes' Section 106 rights are
implicated in any way by this motion practice.

Pandora is correct.  Nothing in the September 17 Opinion
reduced the Publishers' Section 106 rights in the slightest.
AFJ2 does not regulate publishers.  It only regulates ASCAP.  It
is true that AFJ2's restriction on ASCAP means that the
Publishers cannot use ASCAP to grant and withhold certain rights
selectively.  But an ancillary effect on third party's ability
to use an entity is present anytime an entity is restricted from
doing something.  As Pandora correctly notes, the Publishers'
decision to grant licensing rights to ASCAP is an exercise of
their Section 106 rights.  And in deciding to exercise those
rights by granting ASCAP licensing authority over compositions
the Publishers acknowledge that they are aware that AFJ2 places
restrictions on ASCAP's ability to license their music in
certain ways.

The restrictions AFJ2 imposes on ASCAP's ability to act as
a licensing agent to facilitate the division of the Publishers'
Section 106 copyright rights do not reduce the Section 106
rights of the Publishers themselves.  As an analogous example,
AFJ2 prohibits ASCAP from licensing publishers' copyrights to
movie theaters.  AFJ IV(G).  Yet the Publishers do not contend
that their Section 106 rights to divide their copyrights have
been infringed by this prohibition.  That is because the
Publishers are in fact free to license their copyright public
performance rights to movie theaters.  They just cannot do it
through ASCAP because ASCAP is regulated by AFJ2.  The same
principle holds here.

2. The Publishers' interest is their financial interest in
avoiding licensing fees to ASCAP in licensing works to
large New Media outlets.

Although the Publishers have no Section 106 interest
implicated by the September 17 Opinion, they do have a potential
financial interest.  The Publishers note that licensing
compositions to New Media entities through ASCAP leaves them
with less money than they would receive by licensing those works
independently -- even if the rates are the same -- because of
the administrative fees paid to ASCAP.  Here, the Publishers
have persuasively stated a direct and substantial interest.
Because the 2011 ASCAP Compendium Modification allowed the

18

Publishers to permit ASCAP to license their works to the
plethora of smaller New Media outlets under the "Standard
Services" agreement, the Publisher withdrawals only required
them to negotiate directly with large New Media services such
as, for example, Pandora or Spotify –– an administratively
manageable task, which might save the Publishers from paying
administration fees to ASCAP on those license agreements.  This
financial interest is certainly "direct" and "legally
cognizable."  It is not "contingent upon the occurrence of a
sequence of events before it becomes colorable" because the
Publishers would control whether to withdraw.  Brennan, 260 F.3d
at 129.  There is no reason to second guess the Publishers'
claim that partial withdrawal would provide administrative
savings.  It is also clear that withdrawing from ASCAP entirely,
in order to allow for direct licensing, may not be feasible
given the Publishers' half-century reliance on ASCAP as a
central licensing agent between them and the thousands of other
entities ranging from radio stations to jukebox owners.

　　A number of cases confirm that a financial interest, like
the Publishers' interest in avoiding ASCAP licensing fees with
respect to the large New Media users, with whom they are
administratively capable of engaging in direct licenses, is
"direct, substantial, and legally protectable" for purpose of

the Rule 24(a) analysis.  Bridgeport Guardians, 602 F.3d at 473.

In New York Pub. Interest Research Grp., Inc. v. Regents of

Univ. of State of N. Y., 516 F.2d 350 (2d Cir. 1975) (per

curium), the Second Circuit held that a group of pharmacists had

a sufficiently cognizable interest to intervene under Rule 24(a)

to challenge a state regulation that prohibited the advertising

of the price of prescription drugs.  The court emphasized that

the challenged regulation "affects the economic interests of

members of the pharmacy profession," which justified

intervention.  Id. at 351-52.  And in Brennan, 260 F.3d at 129,

a Second Circuit panel held cognizable under Rule 24(a) an

employee's interest in seniority rights, which is an interest

with financial considerations as a core element.  See also

Bridgeport Guardians, 602 F.3d at 474 (holding that an

employee's promotion and the attendant financial benefits was

cognizable under Rule 24(a)).

    c. The Publishers' ability to protect their interest would be
       impaired absent intervention.

    The Mastercard test next requires a court to determine

whether an applicant is "situated that without intervention,

disposition of the action may, as a practical matter, impair or

impede the applicant's ability to protect its interest."

MasterCard Int'l Inc, 471 F.3d at 389.  This inquiry heavily

overlaps with the "substantial interest" and the "adequate representation" prongs of the test.  A party whose interest is at stake in litigation and is not adequately represented is likely to suffer impairment in its ability to protect its interest.  Because the Publishers have a cognizable interest, as described above, and because it is not certain that they will be adequately represented by ASCAP on any appeal, as is described below, this prong of the Mastercard test is satisfied.

    D.   The adequacy of ASCAP's representation of the Publishers' interest on appeal is uncertain.

    "[T]he burden to demonstrate inadequacy of representation is generally speaking minimal." Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 179 (2d Cir. 2001) (citation omitted).  The Second Circuit has, however,

> demanded a more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective.  Where there is an identity of interest . . . the movant to intervene must rebut the presumption of adequate representation by the party already in the action.

Id. at 179-80.

    The parties disagree as to whether ASCAP and the Publishers have the same "ultimate objective" with respect to the question of allowing partial withdrawals of rights in compositions from ASCAP.  The Publishers contend, without any offer of supporting evidence, that the September 17 Opinion was

21

"cause for celebration" within ASCAP.  They posit that "it may be in ASCAP's interest to lose on Pandora's motion for summary judgment" because that might lead to a higher number of works in ASCAP's repertory to generate licensing and administrative fees. The crux of their argument is that ASCAP may therefore not appeal the summary judgment ruling and that the Publishers would consequently not have the vehicle of an appellate amicus brief available to them to protect their interests.  Pandora counters that the Publishers exert such a high level of control over ASCAP such that their interests are not divergent.  And it is true that the ASCAP board is full of Publisher members.  Pandora also notes ASCAP's vigorous opposition to the summary judgment motion and decry as speculative the notion that ASCAP would change course and cease to represent the Publishers' interest on appeal, or not appeal at all.

Whether ASCAP's interests are entirely convergent with those of the Publishers is a question of fact that requires more information about the inner workings of ASCAP vis à vis the Publishers than is available on the record.  On one hand, ASCAP did vigorously argue in favor of the position the Publishers urge here in its summary judgment practice.  On the other hand, the Publishers may well be correct that the increased ASCAP revenue stemming from works that are required to remain in the

22

ASCAP repertory to be licensed to all applicants means that the incentives of ASCAP and the Publishers are not perfectly aligned.  While it seems unlikely that ASCAP will not appeal, given its strenuous opposition to Pandora's summary judgment motion, it is impossible to predict the future.  After all, many rate court proceedings are settled before trial.  Because a party must carry only a "minimal" burden to demonstrate inadequate representation, the uncertainty here -- even if minor -- suggests that intervention is proper.


CONCLUSION

    The Publishers' September 30, 2013 motion to intervene for purpose of appeal <u>nunc pro tunc</u> to September 13, 2013 is granted on the following condition.  The Publishers may not raise new arguments on appeal that were not raised by ASCAP, with the exception of the Section 106 of the Copyright Act argument described in the foregoing.

    SO ORDERED:

Dated:    New York, New York
          December 13, 2013


          _____
                  DENISE COTE
          United States District Judge

23