EXHIBIT 1

# LOCAL STATION ALTERNATIVE BLANKET TELEVISION LICENSE

AGREEMENT made between AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS ("SOCIETY") and _____ ("LICENSEE") as follows:

1. **Term and Scope of License**

    A. SOCIETY grants to LICENSEE and LICENSEE accepts for a period commencing as of _____ (the "Effective Date") and ending December 31, 2016 (the "Term"), a Through-to-the-Audience License to perform publicly all musical works heretofore copyrighted, composed or written by the members of SOCIETY and now or hereafter during the term hereof in the repertory of SOCIETY, or hereafter during the term hereof copyrighted, composed or written by such members of SOCIETY, or of which SOCIETY shall have the right to license such performing rights:

    (1) by Television Broadcasting in the United States, and its territories, commonwealth and possessions, as part of LICENSEE's Non-Network Television Programs and Non-Network Announcements from television station _____ ("STATION"), Main Channel _____ ("Main Channel"), located at _____, ____, with FCC Facility ID _____; and including any associated digital multicast channel(s).

    (2) by streaming on STATION Web Sites.

    (3) by transmitting or causing to be transmitted, directly or indirectly, STATION-supplied programming via mobile, wireless, and any other digital platforms, regardless of the device through which viewers access the performances.

    B. In the event that STATION airs Locally-Produced Television Programs, and such Programs also appear on one or more additional stations (which Programs for purposes of this Agreement would not be considered Locally-Produced Television Programs for the additional station(s)), only the STATION may retransmit music in SOCIETY's repertory contained in such Programs in the manner described in Subparagraphs 1.A.(2) above, while the additional station(s) may not.

    C. The license granted herein does not cover transmissions on a STATION Web Site of music in SOCIETY's repertory where members of the public are charged a fee by STATION for the right to access such transmissions. Such transmissions shall be subject to appropriate separate licensing. Notwithstanding the foregoing, the fact that STATION may charge members of the public for access to discrete areas of a STATION Web Site other than those areas containing performances licensed hereunder shall not limit the scope of coverage of this license.

    D. (1) This license does not extend to or include the public performance by Television Broadcasting or otherwise of any rendition or performance of (a) any opera, operetta, musical comedy, play or like production, as such, in whole or in part, or (b) any composition from any opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion

picture form) in a manner which recreates the performance of such composition with substantially such distinctive scenery or costume as was used in the presentation of such opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form); provided, however, that the rights granted to LICENSEE under this Agreement shall be deemed to include a grant of the right to make non-dramatic performances of compositions licensed hereunder by Television Broadcasting or otherwise of a motion picture containing such compositions if the rights in such motion picture other than those licensed under this Agreement have been obtained from the parties in interest.

(2) Nothing herein contained shall be deemed to license the public performance by Television Broadcasting or otherwise of dramatic performances. Any performance of a separate musical composition that is not a dramatic performance, as defined herein, shall be deemed to be a non-dramatic performance. For purposes of this Agreement, a dramatic performance shall mean a performance of a musical composition as part of a television Program in which there is a definite plot depicted by action and where the performance of the musical composition is woven into and carries forward the plot and its accompanying action. The use of dialogue to establish a mere Program format or the use of any non-dramatic device merely to introduce a performance of a composition shall not be deemed to make such performance dramatic. For purposes of this Agreement, performances of compositions in music videos shall be construed as non-dramatic performances.

E. The performances licensed hereunder may originate at STATION or at any other place whether or not such other place is licensed to perform publicly the compositions licensed hereunder, regardless of the manner, means, or method of such origination; but nothing herein contained shall be deemed to grant a license to such place itself (or to the parties responsible for the performance therein) for the public performance in such place of any such compositions.

F. Except as expressly herein otherwise provided, nothing herein contained shall be construed as authorizing LICENSEE to grant to others any right to reproduce or perform publicly by any means, method or process whatsoever, any of the musical compositions licensed hereunder or as authorizing any receiver of any television broadcast to perform publicly or reproduce the same, by any means, method or process whatsoever.

G. This Agreement expressly incorporates, and SOCIETY and LICENSEE agree to be bound by, the provisions of the letter agreement, dated July 27, 2012, between SOCIETY and TELEVISION MUSIC LICENSE COMMITTEE ("COMMITTEE"), a copy of which is attached hereto as Exhibit A.

2. **Definitions**

For purposes of this Agreement only:

A. **"Affiliated Station"** means any Television Broadcasting station in the United States and its territories that regularly broadcasts Programs transmitted by a television network licensed by SOCIETY during the term hereof.

2

B.  **"Announcement"** means any commercial, promotional, or public service announcement (exclusive of program-length "infomercials" of greater duration than 120 seconds), or any producer's or distributor's logo.

C.  **"ASCAP Consent Decree"** means the Second Amended Final Judgment, or any successor decree, in <u>United States</u> v. <u>ASCAP</u>, S.D.N.Y. 41-1395 (WCC).

D.  **"Blanket License Fee"** means the blanket license fee for the STATION for an applicable License Year as determined by COMMITTEE and calculated pursuant to the methodology set forth in Exhibit B hereto.

E.  **"COMMITTEE"** means the Television Music License Committee, LLC, a limited liability corporation organized under the laws of the State of New York, which is duly authorized to represent local television stations in music licensing matters.

F.  **"Data Period"** means, for any applicable License Year, the twelve-month period commencing on July 1 and expiring on June 30 immediately preceding such License Year.

G.  **"Data Provider"** means Gracenote, Inc., the media monitoring subsidiary of Tribune Media Company, and any successor in interest to all or a controlling share of its equity or assets, or such other similar program reporting service as ASCAP and the TMLC may hereafter agree to use in place of Gracenote, Inc.

H.  **"Data Reports"** means the reports of Programs broadcast on STATION's Main Channel that are supplied by the Data Provider. "Data Reports" shall include information necessary to enable the calculation of the LNSPA Fraction (as defined below).

I.  **"License Year"** means each calendar year period during the Term. For purposes of this Agreement, the period commencing on the Effective Date and continuing through and including the following December 31 shall be deemed a License Year.

J.  **"LMA OPERATOR"** means any person, firm or corporation not under the same or substantially the same ownership, management or control as LICENSEE with whom LICENSEE has entered into a Local Marketing Agreement.

K.  **"LNSPA Fraction"** for any applicable License Year means a fraction, the numerator of which shall be fifty percent (50%) of the total minutes of LNSPA Programs that are broadcast on LICENSEE's Main Channel during the Data Period for such License Year and the denominator of which shall be the total minutes of Non-Network Television Programs broadcast on LICENSEE's Main Channel during such Data Period. For the avoidance of doubt, the LNSPA Fraction shall be determined by SOCIETY based on Data Reports.

L.  **"LNSPA Program"** means any Locally-Produced Television Program that is a News Program, Public Affairs Program or Sports Program (all as defined below).

M.  **"Local Marketing Agreement"** means any arrangement between LICENSEE and an LMA OPERATOR that:

3

(1) authorizes the resale by an LMA OPERATOR of the use of the Television Broadcasting facilities of STATION;

(2) permits an LMA OPERATOR to provide Programs for all or substantially all of the time STATION is on the air;

(3) provides for the sale by an LMA OPERATOR of all or substantially all Announcements broadcast on STATION; and

(4) provides that LMA OPERATOR will assume responsibility for the payment of license fees.

N. **"Locally-Produced Television Program"** means any Non-Network Television Program produced by, or expressly for, LICENSEE.

O. **"Monthly Blanket License Fee"** means LICENSEE's blanket license fee for the STATION for any calendar month during an applicable License Year, calculated as (1) one-twelfth (1/12) of the Blanket License Fee for such License Year or (2) $45.00, whichever is greater.

P. **"Network Announcement"** means any Announcement transmitted by a television network licensed by SOCIETY at the time such Announcement is broadcast on the network, and broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts (sometimes known as "rebroadcasts") over two or more Affiliated Stations of that network.

Q. **"Network Television Program"** means any Program, transmitted by a television network licensed by SOCIETY under a separate television network license at the time such Program is broadcast on the network, identified as a Program of the network, and broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts (sometimes known as "rebroadcasts") over two or more Affiliated Stations of that network.

R. **"News Program"** means any Non-Network Television Program that is categorized as a "news program" on Data Reports, or which otherwise consists solely of content similar to programming categorized as news programming by a Data Provider. For purposes of this Agreement, "News Program" shall not include any Program that primarily consists of, or focuses on, music.

S. **"Non-Network Announcement"** means any Announcement broadcast by STATION other than a Network Announcement.

T. **"Non-Network Television Program"** means any Program broadcast by STATION other than a Network Television Program.

U. **"Program"** means all material (visual or otherwise) broadcast by STATION other than Announcements.

V. **"Public Affairs Program"** means any Non-Network Television Program that is categorized as a "public affairs program" on Data Reports, or which otherwise consists

solely of content similar to programming categorized as public affairs programming by a Data Provider. For purposes of this Agreement, "Public Affairs Program" shall not include any Program that primarily consists of, or focuses on, music.

W.   **"Sports Program"** means any Non-Network Television Program that is categorized as a "sports program" on Data Reports, or which otherwise consists solely of content similar to programming categorized as sports programming by a Data Provider. For purposes of this Agreement, "Sports Program" shall not include any Program in the nature of non-competitive sports-related entertainment including, but not limited to, professional wrestling, cheerleading and marching band competitions, or ice skating exhibitions.

X.   **"STATION Web Site"** shall mean Web Site(s) operated by or for STATION as STATION-affiliated Web Site(s) and shall include any Web Site(s) that are shared between two or more television stations in the same market, or two or more television stations with a common owner.

Y.   **"Syndicated Television Program"** means: (i) any Non-Network Television Program supplied to LICENSEE and other television stations by a producer, distributor or television network not licensed by SOCIETY; or (ii) any other Non-Network Program that is not a Locally-Produced Television Program.

Z.   **"Television Broadcasting"** shall mean free, unscrambled, point-to-multipoint over-the-air broadcasting by means of television.

AA.   **"Through-to-the-Audience License"** means, in reference to the scope of the rights granted under this Agreement, a license that authorizes the transmission and retransmission of any licensed programming to viewers by the means described in Subparagraphs 1.A.(1)-(3) so long as each entity involved in the transmission or retransmission other than LICENSEE has an economic relationship to LICENSEE within the meaning of Section II.S of the ASCAP Consent Decree. For the avoidance of doubt, nothing in this license shall be construed as authorizing LICENSEE to grant to bars, restaurants, taverns, hotels, retail establishments, and other similar businesses or establishments, the right to perform publicly any of the musical compositions licensed under this Agreement by playing LICENSEE's over-the-air broadcasts on television sets within their physical locations to the public.

BB.   **"Web Site"** shall mean an Internet computer service comprising a series of interrelated web pages registered with a domain name registration service that STATION transmits or causes to be transmitted either directly or indirectly to persons who receive the service over the Internet by means of a personal computer or by means of another device capable of receiving Internet transmissions.

3.   **Right to Restrict**

A.   The members of SOCIETY shall have the right, at any time and from time to time, in good faith, to restrict the Television Broadcasting of compositions from musical comedies, operas, operettas and motion pictures, or any other composition being excessively broadcast, only for the purpose of preventing harmful effect upon such musical comedies, operas, operettas, motion pictures or compositions, in respect of other interests under the

5

copyrights thereof; provided, however, that the maximum number of compositions which may be at any time thus restricted shall not exceed 750 and moreover that limited licenses will be granted upon application to SOCIETY entirely free of additional charge as to restricted compositions, if and when the copyright owners thereof are unable to show reasonable hazards to their major interests likely to result from such Television Broadcasting; and provided further that such right to restrict any such composition shall not be exercised for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition; and provided further that in no case shall any charges, "free plugs," or other consideration be required in respect of any permission granted to perform a restricted composition; and provided further that in no event shall any composition, after the initial television broadcast thereof, be restricted for the purpose of confining further television broadcasts thereof to a particular artist, station, network or Program.

    B. SOCIETY reserves the further right, at any time and from time to time, in good faith, to restrict the Television Broadcasting of any compositions, over and above the number specified in Subparagraph 3.A., only as to which any suit has been brought or threatened on a claim that such composition infringes a composition not contained in the repertory of SOCIETY or on a claim by a non-member of SOCIETY or by a member not listed in any current list of SOCIETY's members, as the same may be augmented from time to time, that SOCIETY does not have the right to license the public performance of such composition by Television Broadcasting.

    C. Nothing in Subparagraphs 3.A. and 3.B. shall relieve SOCIETY of its obligation to indemnify LICENSEE, as reflected in Paragraph 8. below, with respect to the performances of any compositions in SOCIETY's repertory, the performance of which SOCIETY has restricted, prior to such time as LICENSEE receives notice from SOCIETY of any such restriction.

    4. **Music Use Information**

    A. Subject to the provisions of Subparagraphs 4.B. and 4.C. below, LICENSEE agrees to furnish to SOCIETY upon request during the term of this Agreement a list of all musical compositions broadcast from or through STATION on LICENSEE's Non-Network Television Programs, showing the title of each composition and the composer and author thereof, provided that LICENSEE shall not be obligated under this Paragraph 4. to furnish such a list covering a period of more than seven (7) consecutive days or periods aggregating more than four (4) weeks during any one calendar year. For purposes of this Paragraph 4., music cue sheets containing the aforesaid information shall be deemed to constitute such a list.

    B. With respect to Syndicated Television Programs broadcast from or through STATION, LICENSEE shall be deemed to have complied with its obligations under Subparagraph 4.A. if LICENSEE identifies the Program by its title, including episode title and/or number, the name of the producer where available, and the copyright notice contained therein where available. If SOCIETY does not have a music cue sheet for such Program, and LICENSEE does have such a cue sheet, LICENSEE shall provide a copy of such music cue sheet to SOCIETY at SOCIETY's request.

6

        C.    SOCIETY shall make requests pursuant to Subparagraph 4.A. only where reasonably necessary for its purposes and, except where the information is necessary with respect to SOCIETY's survey of past performances, shall give LICENSEE notice of any request under subparagraph 4.A. at least one (1) month prior to the commencement of the period covered by said request. The provisions of Subparagraph 4.B. shall not limit LICENSEE's obligation to cooperate with SOCIETY in connection with any claim or demand for action referred to in Paragraph 8 of this Agreement.

        5.    **Calculation of the LNSPA Fraction, Fees, Payments and Dispute Resolutions**

        A.    Calculation of the LNSPA Fraction. In advance of each License Year, SOCIETY shall calculate LICENSEE's LNSPA Fraction based on the information and Program classifications contained in the Data Reports for the Data Period.

        B.    Fees. In consideration of the license herein granted, LICENSEE agrees to pay SOCIETY for each calendar month beginning the Effective Date and for the remainder of the Term of this Agreement, (1) the sum of (a) fifteen percent (15%) of the Monthly Blanket License Fee (the "Monthly Base Fee") plus (b) an amount equal to eighty-five percent (85%) of the product of the Monthly Blanket License Fee multiplied by one minus the LNSPA Fraction applicable to such License Year (the "Monthly Adjustment Fee"); or (2) $45.00, whichever is greater (either of which shall be LICENSEE's "Alternative Monthly License Fee").

        B.    Payments.    SOCIETY shall determine LICENSEE's Alternative Monthly License Fee and invoice LICENSEE during the applicable month. LICENSEE shall remit payment of the Alternative Monthly License Fee to SOCIETY no later than the last day of each month during the Term. If any such Alternative Monthly License Fee due under the terms of this Paragraph 5 is not received by SOCIETY within twenty (20) days of when due, LICENSEE shall pay to SOCIETY a late-payment charge of one percent (1%) per month (simple interest) calculated from the date such payment was due and ASCAP may further assess LICENSEE for reasonable, documented, out-of-pocket costs (exclusive of attorneys' fees) incurred by ASCAP in connection with collecting such amounts. The late-payment charge provisions of this Subparagraph 5.B shall not apply in circumstances in which LICENSEE is unable to submit a payment within the specified time period due to a force majeure (e.g., earthquake, hurricane, fire, flood, terrorist activities).

        C.    Dispute Resolutions.

        (1)    In the event that either SOCIETY or LICENSEE disputes the accuracy of the information in the Data Reports used by SOCIETY to calculate the LNSPA Fraction, including but not limited to classification of Programs listed in the Data Reports, the disputing party shall provide notice to the COMMITTEE (and LICENSEE shall at such time provide SOCIETY with a copy of any such LICENSEE notice) of the nature of such dispute within ninety (90) days of SOCIETY's receipt of all Data Reports for the applicable Data Period for that License Year. Absent a timely challenge, the information in the Data Reports concerning LICENSEE's Programs shall be deemed accurate for purposes of calculating LICENSEE's LNSPA Fraction for that License Year.

(2) If LICENSEE disputes SOCIETY's calculation of LICENSEE's Alternative Monthly License Fee for reasons other than the accuracy of information in the Data Reports used to calculate the LNSPA Fraction, LICENSEE shall notify SOCIETY and the COMMITTEE and provide the basis for the dispute within thirty (30) days of its receipt of its first invoice from SOCIETY pursuant to Subparagraph 5.B for the applicable License Year. If LICENSEE fails to provide timely notice of a dispute pursuant to this Subparagraph 5.C.(2), and there are no outstanding disputes pursuant to Subparagraph 5.C.(1), LICENSEE shall be deemed to have consented to the applicable Alternative Monthly License Fee as determined by SOCIETY.

(3) SOCIETY and COMMITTEE shall resolve disputes timely raised pursuant to Subparagraphs 5.C.(1) and 5.C.(2), including any adjustments to LICENSEE's LNSPA Fraction or Alternative Monthly License Fee, in accordance with Paragraphs 9 and 11 of Exhibit A.

(4) Notwithstanding the submission of a dispute pursuant to this Paragraph 5.C., LICENSEE shall be obligated to submit to SOCIETY the full amount of LICENSEE's Alternative Monthly License Fee pursuant to Subparagraph 5.B, provided, however, that the resolution of such dispute may result in an adjustment to such Alternative Monthly License Fee and the issuance of a refund or a credit.

6. **Local Marketing Agreement**

A. If LICENSEE is, or becomes, a party to a Local Marketing Agreement, LICENSEE and the LMA OPERATOR shall execute a letter to SOCIETY, in the form attached as Exhibit C and made a part of this Agreement, requesting amendment of this License Agreement to add the LMA OPERATOR as a party. When such a letter has been fully executed by LICENSEE, the LMA OPERATOR and SOCIETY, this Agreement shall be deemed amended accordingly. By signing Exhibit C, the LMA Operator becomes a party to this Agreement and shall assume, with LICENSEE, all of the rights and obligations set forth in this Agreement for the full period for which the Local Marketing Agreement is in effect.

B. In the event LICENSEE is a party to a Local Marketing Agreement, and a dispute arises between SOCIETY and either the LMA OPERATOR or LICENSEE as to whether LICENSEE or the LMA OPERATOR is responsible for the performance of any of the obligations arising under this Agreement, SOCIETY shall be entitled to receive, upon request, a copy of the portion of such agreement as sets forth the respective obligations of LICENSEE and the LMA OPERATOR regarding the payment of fees, accountings, recordkeeping and administrative responsibilities, or, if LICENSEE so elects, a copy of the entire Local Marketing Agreement.

7. **Breach or Default**

Upon LICENSEE's breach or default of any payment, accounting or substantive reporting obligations required under the terms of this Agreement, SOCIETY may give LICENSEE thirty (30) days' notice in writing to cure such breach or default, and in the event

8

that such breach or default has not been cured within thirty (30) days of said notice, SOCIETY may then terminate this license.

8. **Indemnity Clause**

SOCIETY agrees to indemnify, save and hold harmless, and to defend LICENSEE, its sponsors and their advertising agencies, and its and their officers, employees, and artists, and each of them, from and against any claims, demands, or suits that may be made or brought against them or any of them with respect to the performances under this Agreement of any compositions in SOCIETY's repertory that are written or copyrighted by members of SOCIETY. LICENSEE agrees to give SOCIETY immediate notice of any such claim, demand, or suit and agrees immediately to deliver to SOCIETY all papers pertaining thereto. SOCIETY shall have full charge of the defense of any such claim, demand, or suit and LICENSEE shall cooperate fully with SOCIETY in such defense. LICENSEE, however, shall have the right to engage counsel of its own at its own expense who may participate in the defense of any such action. SOCIETY agrees, at the request of LICENSEE, to cooperate with and assist LICENSEE, its advertisers and their advertising agencies and its and their officers, employees, and artists in the defense of any action or proceeding brought against them or any of them with respect to the performance of any musical compositions contained in SOCIETY's repertory, but not copyrighted or written by members of SOCIETY. This Paragraph 8. shall not apply to performances of any works that have been designated as restricted under Paragraph 3. of this Agreement.

9. **Rights of Termination**

A. In the event of the termination or suspension of the governmental licenses covering STATION or any substantial alteration or variation of the terms and conditions thereof, or any major interference with the operations of STATION due to governmental measures or restrictions, LICENSEE shall have the right to terminate this Agreement upon seven (7) days' notice. Upon termination, this Agreement shall no longer remain in effect and the parties shall be relieved of all obligations arising hereunder from the date of termination.

B. In the event of:

(1) any major interference with the operations of SOCIETY in the state, territory, dependency, possession or political subdivision in which STATION is located, by reason of any law of such state, territory, dependency, possession or political subdivision; or

(2) any substantial increase in the cost to SOCIETY of operating in such state, territory, dependency, possession or political subdivision, by reason of any law of such state, territory, dependency, possession or political subdivision, which is applicable to the licensing of performing rights

SOCIETY shall have the right, upon notice to COMMITTEE and upon a showing that the matters referred to in Subparagraphs 9.B.(1) and 9.B.(2) above affect the licensing of performing rights under this Agreement, to apply to the judge with supervisory authority over the ASCAP Consent Decree for whatever relief SOCIETY deems appropriate.

10. **Successors and Assigns**

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns, but no assignment shall relieve the parties hereto of their respective obligations hereunder as to performances broadcast, acts done and obligations incurred prior to the effective date of the assignment.

11. **Notices**

Any notice filed under this Agreement shall be in written form or in a form mutually agreed upon by SOCIETY and COMMITTEE and shall be sent to LICENSEE (or a designated agent of LICENSEE). All notices required or permitted to be given by either of the parties to the other hereunder shall be duly and properly given if: (a) mailed to the other party by registered or certified United States mail; (b) sent by generally recognized same-day or overnight delivery service; (c) mailed by first class United States mail; or (d) sent by electronic transmission (i.e., electronic mail, facsimile or similar transmission), provided that the electronic transmission is followed by a hard copy and receipt of the notice is acknowledged.

12. **License Election and Eligibility**

(A)   LICENSEE may elect to enter this Agreement retroactive to January 1, 2015 by giving to SOCIETY written notice of such request by January 31, 2015.

(B)   LICENSEE having previously been offered an ASCAP Local Station Blanket Television License ("Blanket License") and an ASCAP Local Station Per Program Television License ("Per Program License"), and having elected to operate under one or the other of such licenses, during the Term of this Agreement, LICENSEE may, if eligible, elect to switch to either the Blanket License or the Per Program License as of the first day of a month, prospectively on thirty (30) days' written notice to SOCIETY. LICENSEE may exercise such election no more than two times during any License Year during the Term of this Agreement.

(C)   LICENSEE shall not be eligible to switch to this Alternative Blanket License, and SOCIETY may reject any attempt to elect to switch made by LICENSEE, in the event LICENSEE is at the time of such purported election delinquent for a period of ninety (90) days in the payment of any reasonably undisputed fees due and owing under any existing or prior license agreement with SOCIETY. In the event of any such lack of eligibility, LICENSEE's eligibility to elect to switch to this Alternative Blanket License as set forth in the preceding subparagraphs shall be immediately restored upon LICENSEE's curing any default in payment of reasonably undisputed fees due and owing under an existing or prior license agreement with SOCIETY.

13. **Without Prejudice**

The parties are entering into this Agreement without prejudice to any arguments or positions they may assert in any future rate proceeding or other litigation concerning what constitutes reasonable blanket, alternative blanket, and per program license fees and terms for the local television industry or, in SOCIETY's case, as to any other licensee.

14. **Applicable Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.

IN WITNESS WHEREOF, this Agreement has been duly executed by SOCIETY and LICENSEE this _____ day of _____, 201__, as of the day of _____ 201__.

| _____ | AMERICAN SOCIETY OF COMPOSERS |
| LICENSEE | AUTHORS AND PUBLISHERS |

By: _____    By: _____

Title: _____    Title: _____