## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA |
| Plaintiff, |
| v. |
| AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, |
| Defendant. |

Supplemental to Case No. 41-1395 (DLC)

## MEMORANDUM IN SUPPORT OF UNITED STATES' UNOPPOSED MOTION TO ENTER PROPOSED SETTLEMENT AGREEMENT AND ORDER

# Table of Contents

I.   Introduction .................................................................................................................. 1

II.  ASCAP and the Consent Decree .............................................................................. 2

III. ASCAP Violated AFJ2 by Entering Into 150 Exclusive Licensing Agreements .................. 3

IV.  ASCAP and the United States Have Agreed to Remedies for ASCAP's Contemptuous Conduct .................................................................................................................... 6

V.   ASCAP Has Agreed to Additional Reforms to Improve Corporate Governance in Response to Concerns the United States Raised ........................................................... 8

VI.  Conclusion ................................................................................................................ 10

The United States has concurrently filed a Petition to Show Cause Why Respondent the American Society of Composers, Authors and Publishers ("ASCAP") Should Not Be Held in Contempt for violations of the Second Amended Final Judgment in *United States v. American Society of Composers, Authors and Publishers*, Civ. Action No. 41-1395 (June 11, 2001) ("AFJ2"), and a Proposed Settlement Agreement and Order.  In this memorandum, the United States describes the contemptuous conduct, additional concerns raised during the United States' investigation, and the remedies provided by the Proposed Settlement Agreement and Order.  The United States respectfully requests that the Court enter the Proposed Order, which ASCAP does not oppose.

## I.      Introduction

ASCAP repeatedly violated core provisions of its consent decree, which is a Court order that has bound the organization for 70 years.  ASCAP obtained exclusive licensing rights from dozens of members in the face of express and unambiguous prohibitions on such exclusivity in AFJ2.  These exclusives by their terms restrict the ability of ASCAP members to license their music directly to music users, also squarely in violation of this Court's order.  While ASCAP has rescinded the existing agreements at the United States' insistence, that does not eliminate the possibility that such conduct could recur.  Thus, the accompanying Proposed Settlement Agreement and Order requires ASCAP to abide by provisions in AFJ2 prohibiting interference with direct licensing, and it specifically bars ASCAP from entering into exclusive licensing agreements.  The Proposed Settlement Agreement and Order also requires ASCAP to make a $1.75 million civil payment to the United States.

The United States also raised serious concerns with ASCAP during the course of its investigation that additional conduct surrounding members' direct licensing as well as the

structure of its Board of Directors threatened to undermine important aspects of AFJ2. To address those concerns, ASCAP voluntarily undertook several steps to improve its corporate governance and has agreed, as part of the Proposed Settlement Agreement and Order, to insulate licensing decisions from the influence of publishers and to implement improved compliance policies.

Taken together, these remedies will ensure that ASCAP in the future makes licensing decisions that comply with AFJ2, are adequately supervised, and are free of conflicts of interest.

## II.   ASCAP and the Consent Decree

ASCAP is a membership organization of music copyright holders consisting of both writers/composers and publishers. ASCAP collectively licenses these rightholders' works to music users, predominantly through a form of license known as the blanket license. The blanket license entitles a licensee to publicly perform music within the ASCAP repertory. A second large performing rights society, Broadcast Music Inc. ("BMI"), also offers blanket licenses under a consent decree, as do smaller organizations (such as SESAC) that have not entered into a consent decree with the United States.

Because ASCAP is a collection of competitors jointly selling at agreed prices and controls a collection of musical works regarded to be essential to many music licensees, it has long raised competitive concerns. The United States first charged ASCAP and its board for criminal price fixing more than 80 years ago, and in 1941 the United States and ASCAP agreed to a civil consent decree that has since been significantly amended twice. The current version of the consent decree, AFJ2, was entered by this Court in 2001. Particularly relevant here are Sections IV(A) and IV(B) of AFJ2. Section IV(A) prohibits ASCAP from "[h]olding, acquiring, licensing, enforcing, or negotiating concerning any foreign or domestic rights in copyrighted

2

musical compositions other than rights of public performance on a non-exclusive basis . . . ."
Section IV(B) bars ASCAP from "[l]imiting, restricting, or interfering with the right of any
member to issue, directly or through an agent other than a performing rights organization, non-
exclusive licenses to music users for rights of public performance."

These provisions are at the heart of the relief AFJ2 provides.  They are designed to
provide users with an alternative to licensing from ASCAP, namely "direct licensing," where a
writer or publisher sells a license directly to a user.  If a music user believes that ASCAP's
asking price is too high, the music user should be able to work around ASCAP by seeking
individual licenses directly from particular ASCAP members.  *See Broadcast Music Inc. v. DMX
Inc.*, 683 F.3d 32, 48 (2d Cir. 2012) ("Direct licenses, and their incorporation into licensing fee
structures, foster fair pricing and competition within the music licensing market, thereby
advancing the very purpose of the AFJ2 and the BMI Decree.").  In fact, the Supreme Court
pointed to protections in the consent decree aimed at preventing ASCAP from interfering with
direct licensing when it determined that ASCAP's blanket licensing did not constitute per se
unlawful price fixing.  *Broadcast Music Inc. v. CBS*, 441 U.S. 1, 23-24 (1979) (holding that
ASCAP's blanket license was not a per se unlawful price-fixing scheme because "[t]he
individual composers and authors have [not] agreed not to sell individually in any other market"
and the consent decree placed "substantial restraints [] on ASCAP and its members" such that
"[t]he District Court found that there was no legal, practical, or conspiratorial impediment to
CBS's obtaining individual licenses").

III.    **ASCAP Violated AFJ2 by Entering Into 150 Exclusive Licensing Agreements**

ASCAP violated the consent decree by entering into approximately 150 exclusive
contracts with its composer, songwriter, and publisher members.  Under each contract, the

relevant terms of which are essentially identical, the member granted to ASCAP "the exclusive right" to license his or her works for the length of the contract.  *See* Shannon Decl. ¶ 3.

ASCAP has form membership agreements that each of its tens of thousands of members signs when joining ASCAP.  These agreements do not contain any exclusivity requirement. Instead, the membership agreements expressly provide that they convey the "non-exclusive right of public performance."  *See* Declaration of Kelsey W. Shannon, Exh. A § 1(b) (ASCAP Writer Membership Agreement).  However, many members who have particularly valuable collections of works negotiate separate agreements with ASCAP.  These agreements often call for ASCAP's payment of "advances" – upfront payments by ASCAP to be recouped over a period of years – or "guarantees" – where ASCAP promises that payouts to the particular member will exceed some threshold.  Some agreements contain elements of both advances and guarantees.  ASCAP also sometimes provides loans to members, which may come with conditions.  ASCAP offers advances, guarantees, and loans as part of its efforts to convince valuable rightsholders to affiliate with it, rather than competing performing rights organizations such as BMI or SESAC.

Beginning in approximately 2008, ASCAP inserted language into many loan side letters and advance and guarantee agreements providing that ASCAP would be the exclusive licensor of the members' rights.  In other words, by the terms of these contracts, the members were prohibited from directly licensing their music to a music user.  The length of exclusivity varied from contract to contract.  One common form was for the exclusivity to last until an advance payment had been fully recouped.  There is no dispute that these agreements included an exclusive grant of rights to ASCAP – indeed, the contracts expressly provided that ASCAP will be the "exclusive" provider of licenses.  Though the ASCAP Board of Directors was required to

approve at least some of these advances and guarantees, it never objected to the inclusion of exclusivity language.

      To prove civil contempt, "a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 142 (2d Cir. 2014); *see also S. New England Tel. Co. v. Global Naps Inc.*, 624 F.3d 123, 145 (2d Cir. 2010) (similar); *New York v. Local 28*, 170 F.3d 279, 282-83 (2d Cir. 1999).  In a civil contempt case, the movant need not prove that the defendant acted willfully.  *See, e.g., Local 28*, 170 F.3d at 282-83 ("The violation need not be willful . . . ."); *In re Lehman Bros. Holdings, Inc.*, 526 B.R. 481, 496 (S.D.N.Y. 2014).

      The elements of contempt are met here.  AFJ2 unambiguously prohibits ASCAP from "[h]olding, acquiring, licensing, enforcing, or negotiating concerning any foreign or domestic rights in copyrighted musical compositions other than rights of public performance on a non-exclusive basis . . . ."  AFJ2 § IV(A).  There can be no dispute that this language clearly and unambiguously prohibits acquiring rights of public performance on an *exclusive* basis.  And the challenged agreements do, in fact, include explicit exclusivity provisions.  Moreover, AFJ2 bars ASCAP from "[l]imiting, restricting, or interfering with the right of any member to issue, directly or through an agent other than a performing rights organization, non-exclusive licenses to music users for rights of public performance."  AFJ2 § IV(B).  The exclusivity provisions by their nature interfere with ASCAP members' abilities to directly license their works.   By delegating to ASCAP the exclusive right to license the members' works, the exclusivity provisions remove the right of any member who has signed such an exclusive to license his or

her music directly.  The exclusivity provisions therefore clearly and convincingly violate two separate provisions of AFJ2.  Finally, ASCAP was well aware of AFJ2's prohibitions on exclusive licensing, and so it is beyond dispute that ASCAP was not diligent in complying with AFJ2 when, over a period of several years, it entered into these agreements in clear violation of those prohibitions, rescinding them only after the United States discovered them and specifically requested that ASCAP rescind them.

In its defense, ASCAP has argued that the exclusivity provisions had no effect.  Specifically, ASCAP has claimed that neither it nor its members believed the "exclusive" contracts were actually exclusive.  Even if true, the agreement to act as an exclusive licensor violates the consent decree.  *See* AFJ2 § IV(A) (prohibiting the "acquiring" or "negotiating" of public performance rights on anything but a non-exclusive basis).  In any event, "[t]he fact that the prohibited act was done inadvertently or in good faith . . . does not preclude a citation for civil contempt, for the sanction is remedial in nature."  *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 128 n.2 (2d Cir. 1979).  ASCAP has also contended that it needed to enter into advances and guarantees to compete with BMI, SESAC, and other licensing agents.  But to the extent ASCAP believed the terms of the decree prevented it from adequately responding to competitive pressures, its remedy was to seek modification of AFJ2, not to violate this Court's order.

## IV.   ASCAP and the United States Have Agreed to Remedies for ASCAP's Contemptuous Conduct

ASCAP has taken voluntary actions in response to the United States' identification of the exclusives and has agreed, under the Proposed Settlement Agreement, not to enter into such exclusives in the future and to make a civil payment.

When the United States brought the exclusivity provisions to the attention of ASCAP counsel in the spring of 2015, ASCAP took steps to address these concerns.  *First,* ASCAP rescinded the exclusivity provisions in its contracts, although only after the United States expressly asked it do so.  Of the approximately 150 contracts containing exclusivity provisions, about 100 had terminated of their own accord by late 2015.  In September 2015, ASCAP wrote a letter to each of the members with an outstanding exclusivity agreement rescinding provisions that appointed ASCAP as the sole licensor of the member's works.  *Second*, ASCAP changed the process by which advances and guarantees are provided.  The exclusive agreements were executed by ASCAP's Membership Department.  Today, all exclusives and guarantees must be approved by the General Counsel's office, which has the express duty to ensure compliance with the consent decree (and any other applicable laws).  *Third*, ASCAP has agreed in the accompanying Proposed Settlement Agreement and Order to abide by AFJ2 and not enter into such exclusive agreements in the future.

ASCAP has also agreed to make a $1.75 million civil payment to the United States.  The Court has the authority to order payments as a contempt remedy.  *See, e.g., FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 243 (2d Cir. 2014); *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996); *FTC v. Kuykendall*, 371 F.3d 745, 763-64 (10th Cir. 2004) (en banc); *McGregor v. Chierico*, 206 F.3d 1378, 1386-87 (11th Cir. 2000).  These payments can include the costs needed to reimburse the United States for its investigation and prosecution of the violation.  *See, e.g.*, *Weitzman*, 98 F.3d  at 719.  The agreed figure of $1.75 million compensates the United States for the time of its attorneys, economists, and paralegals and reflects the seriousness of ASCAP's repeated violations of AFJ2.

**V.     ASCAP Has Agreed to Additional Reforms to Improve Corporate Governance in Response to Concerns the United States Raised**

During the course of its investigation, the United States obtained information that raised suspicions about further efforts by ASCAP to interfere with its members' direct licensing, potentially in violation of Section IV(B) of AFJ2.  The United States' investigation also included a thorough examination of the behavior of ASCAP and some music publishers that this Court described as "troubling coordination" during the brief period of partial withdrawal in 2012.  *In re Petition of Pandora Media, Inc.*, 6 F. Supp. 3d 317, 357 (S.D.N.Y. 2014).  The United States and ASCAP had extended discussions about these issues.  Following these discussions, ASCAP took voluntary steps to improve corporate governance and also agreed, under the Proposed Settlement Agreement and Order, to exclude entirely ASCAP's publisher board members from licensing decisions and to implement improved compliance policies.

*First*, ASCAP has implemented improved policies and training for its Board of Directors concerning potential conflicts of interest.  ASCAP has adopted a new Code of Business Conduct and Ethics for Directors (attached as Shannon Decl. Exh. B).  The Code of Conduct sets out specific responsibilities regarding, for example, recusal requirements during Board meetings.  ASCAP has held multiple training sessions regarding the Code of Conduct requirements.  The Code of Conduct, if in place and adhered to during ASCAP's 2012 negotiations with Pandora, would have barred many of the communications by conflicted publishers this Court and the United States found most troubling.  *See id.* at 5 (requiring directors to "abstain from both participating in discussing and voting" on a matter in which he or she has "a financial or other interest").

*Second*, ASCAP has made significant changes to its corporate leadership.  In 2015, ASCAP replaced its Chief Executive Officer, its Chief Operating Officer, and its Chief Strategy

and Development Officer.  The Membership Department head responsible for the exclusive

agreements is also no longer with ASCAP.

In addition, under the Proposed Settlement Agreement and Order, ASCAP has agreed to

remove publisher board members from any involvement in licensing activities, to bar any

publishers from overseeing or supervising licensing decisions, and to implement extensive

compliance reforms, including training its directors, officers, and other key employees annually

on the requirements of AFJ2.  The Court has authority under AFJ2 to make "such further orders

and directions as may be necessary or appropriate in relation to the construction of or carrying

out of this Second Amended Final Judgment . . . ."  AFJ2 § XIV.  By requiring that publishers be

excluded from ASCAP licensing decisions, the Court will ensure that a core foundation of AFJ2

– that users have available a competitive option to ASCAP – will be preserved.

ASCAP's actions, in particular its agreement under the Proposed Settlement Agreement

and Order to end publisher board members' involvement in ASCAP's licensing decisions,

responds directly to the concerns the United States raised with respect to ASCAP's conduct.

These issues arose from conflicting priorities regarding ASCAP (and its Board of Directors) vis à

vis its publisher members.  ASCAP is both an agent of and competitor to the publishers.  It is an

agent because it sells rights on behalf of its members.  But it is also a competitor when publishers

are selling their own direct licenses, which gives publishers an incentive to interfere with

ASCAP's licensing.  ASCAP's voluntary reforms and its removal of publisher directors from

ASCAP's licensing activities will end any conflict created by the publishers' dual roles and

prevent a recurrence of the troubling conduct that the Court and the United States observed.

## VI.     Conclusion

For the reasons set forth above, the United States respectfully requests that the Court

enter the Proposed Settlement Agreement and Order.


Dated:  May 12, 2016

Respectfully submitted,

FOR PLAINTIFF UNITED STATES

 /s/Kelsey W. Shannon
KELSEY W. SHANNON
DAVID C. KULLY
JEFFREY G. VERNON
Attorneys for the United States
Litigation III Section
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 4000
Washington, D.C., 20530
Telephone:  (202) 598-2854
Facsimile:  (202) 514-7308
kelsey.shannon@usdoj.gov
david.kully@usdoj.gov
jeffrey.verson@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 12, 2016, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record in this matter who are registered with the Court's ECF system.  I also served an electronic copy of the forgoing on the following counsel for Defendant American Society of Composers, Authors and Publishers, who have agreed to accept electronic service pursuant to Fed. R. Civ. P. 5(b)(2)(E):

Jay Cohen
Andrew Finch
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064
jaycohen@paulweiss.com
afinch@paulweiss.com

  /s/ Kelsey W. Shannon
Kelsey W. Shannon