```
G6GTASCC
```

```
  1   UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
  2   ------------------------------------x
      UNITED STATES OF AMERICA,
  3
                   Plaintiff,
  4         v.                                    16 CV 3565 (DLC)

  5   AMERICAN SOCIETY OF COMPOSERS,
      AUTHORS AND PUBLISHERS,
  6
                   Defendant.
  7   ------------------------------------x
      Related to
  8   UNITED STATES OF AMERICA,

  9              Plaintiff,
            v.                                    41 CV 1395 (DLC)
 10
      AMERICAN SOCIETY OF COMPOSERS,
 11   AUTHORS AND PUBLISHERS,

 12              Defendant.
      ------------------------------------x
 13                                               New York, N.Y.
                                                  June 16, 2016
 14                                               5:00 p.m.
      Before:
 15
                         HON. DENISE L. COTE,
 16
                                                  District Judge
 17
                         APPEARANCES (Telephonic)
 18
      UNITED STATES DEPARTMENT OF JUSTICE
 19   ANTITRUST DIVISION
      BY:  KELSEY SHANNON
 20        DAVID KULLY

 21   PAUL, WEISS, RIFKIND, WHARTON & GARRISON
           Attorneys for ASCAP
 22   BY:  JAY COHEN
           ANDREW FINCH
 23        HALLIE GOLDBLATT

 24   RICHARD REIMER
      CLARA KIM
 25        ASCAP General Counsel
```

1               (In chambers)

2               THE COURT:  Good afternoon, counsel.

3               MR. SHANNON:  Good afternoon, your Honor.

4               THE COURT:  I have you on the speaker phone because my

5      law clerk and a court reporter are with me.  We'll briefly take

6      appearances.

7               For the United States?

8               MR. SHANNON:  This is Kelsey Shannon for the United

9      States, with me is David Kully.

10              THE COURT:  And for ASCAP?

11              MR. COHEN:  Yes, your Honor, Jay Cohen, Andrew Finch

12     and Hallie Goldblatt of Paul, Weiss.

13              Mr. Reimer is on the phone, as well as Ms. Kim,

14     general counsel of ASCAP.

15              THE COURT:  Thank you.  And I believe we have other

16     people who are participating by telephone.  Sadly, this

17     conference isn't being taken in the courtroom, and so we have

18     certainly allowed others who wish to participate to be on the

19     line with us.  I understand Mr. Steinthal is on the line, and

20     there may be members of the press also listening in.

21              I want to just personally express my appreciation to

22     counsel for your flexibility.  As I know my chambers told you,

23     I have been selected to serve as a juror in a state court

24     proceeding and wasn't available to conduct this conference

25     today in my courtroom during the ordinary trial day.  So thank

you very much for your flexibility and cooperation with my schedule.

I have an application for an approval of a settlement agreement and issuance of an order.  It arises out of a civil contempt proceeding brought by the Department of Justice against ASCAP.  And I will briefly describe what I understand its principal components to be and the history behind this, and then give both the Department of Justice and ASCAP an opportunity to be heard, and certainly to correct any misunderstanding that I might have gathered even though I have tried to read their papers with care.

As I understand it, after proceeding before me in the ASCAP Rate Court litigation that involved Pandora, and in particular a decision I issued in 2014, the Department of Justice at some point thereafter began an investigation about coordination that appeared to have occurred and is described in my opinion, that is, coordination between ASCAP and some of its publisher members.

And as a result, among other things, the Department of the Justice learned that ASCAP had issued roughly 150 contracts beginning in the year 2008 that violate the terms of the governing consent decree here in which they took for themselves through side letters exclusive licensing rights, thereby restricting the signator's rights to negotiate and execute direct licensing agreement.

1        At the request of the Department of Justice in 2015,
2   ASCAP rescinded any such side agreements that remained
3   outstanding and has agreed to pay or perhaps already has paid
4   $1.75 million as a result and entered into certain agreements
5   that are contained in this proposed order.
6        Also, as part of this order and changes that have been
7   made internally within ASCAP, any future such side agreements
8   or agreements issued in connection with advances that are given
9   to members has agreed that the general counsel's office will be
10  involved in final approval of any such contracts.  So that's
11  one component of what I understand has happened here.
12       A second component has to do with the very fact of the
13  coordination that was described in the Pandora decision, and as
14  a result, a code of conduct or revised code of conduct has been
15  executed or put into place by ASCAP.  It includes recognition
16  of the duty for certain board members to recuse themselves in
17  appropriate circumstances from board actions when the actions,
18  particularly approval of licensing agreements or rates, might
19  present a conflict of interest with the publisher's separate
20  business activities.  I focused in particular in that regard on
21  Sections 2A and 4A of the code of conduct, and I'm happy to
22  have counsel point me to any other sections they would like me
23  to particularly review in that regard.
24       And as part of that overall concern and pattern and
25  practice, ASCAP has undertaken a training program and other

activities which are designed to make sure that issues of conflict of interest are at the forefront of the mind of its executives and significant publisher members, particularly members of the board. And the Department of Justice points out there's been a change in executive leadership, at least in some positions at ASCAP, which will provide an opportunity to have a fresh look at all these matters and have a newly trained staff with significant authority.

And then there's a third component, as I understand it, and that is a host of remedial measures that have been put in place for approximately ten years. However, ASCAP has been given the right to petition this Court within five years to have those remedial measures removed, and the parties will, of course, I expect, be discussing that on an ongoing basis as we get close to the five-year mark.

So that's what I understand to be the principal components of what I'm asked to review and approve in connection with this civil contempt proceeding. And let me now turn it over first to the Department of Justice, you, Mr. Shannon, and then Mr. Cohen for any further comment or explication that you might wish to share with me.

Mr. Shannon.

MR. SHANNON: Thank you, your Honor.

I think that is a very good description of what brought us here. I think there's only one piece that may be

1    slightly incorrect, which is the last piece you said regarding
2    the termination after five years rather than ten.  The
3    provision that sunsets the decree after ten years allows ASCAP
4    to approach the Department of Justice and request that we
5    consider moving the Court to end the decree after five years
6    but doesn't provide ASCAP with its own ability to move.  So the
7    obligation is on us -- or the opportunity is to us rather than
8    to ASCAP.
9             Just broadly speaking, I think the history that you
10   described is correct and gets at what brought us here.  We
11   opened an investigation into conduct that started with the
12   Pandora conduct but was somewhat broader than that.  We had
13   concerns about inference with the ability of ASCAP members to
14   directly license.  We looked at a broad array of conduct and a
15   broad swath of kind of ASCAP's relationships with its members.
16            In the course of that investigation, we discovered the
17   existence of these exclusive licensing arrangements between
18   ASCAP and many of its members.  We engaged ASCAP throughout
19   this process, told them what our concerns were, both with the
20   exclusives with the Pandora conduct, more broadly with the
21   importance of direct licensing in the context of ASCAP, and
22   had, over the period of several months or maybe even more than
23   that, many, many discussions with ASCAP about what our concerns
24   were, how they might be addressed, and what ASCAP might do.
25            I think one thing that is a little bit tricky, and I

think you have got it when you divided the world into three pieces, is that there are some steps that ASCAP has taken already that are not part of the proposed settlement agreement and order but were voluntary steps. The code of conduct is not incorporated into the settlement agreement and order, although one important piece of it, which is the conflict of interest rule, is in Section 4C of the proposed settlement.

Additionally, as you noted, ASCAP has had personnel turnover over the last year, has changed certain policies, importantly including the process by which exclusives -- sorry, the process by which advances and guarantees are entered into by the company.

And then what you described as the third component are the injunctive provisions of the proposed settlement agreement and order, most notably and most importantly, I think the restrictions on publisher involvement in ASCAP's licensing decisions. Many of the concerns described in your Honor's Pandora decision and that we saw in our investigation related to the relationship between ASCAP's board members and ASCAP as a licensing agent.

The proposed settlement agreement and order will prohibit any of these publisher board members from having any involvement in ASCAP's licensing decision going forward. So what we saw or what was described in your Honor's decision of negotiations happening between Pandora and ASCAP and the

1    publisher board members weighing in and getting involved in

2    those negotiations should not happen under the proposed

3    settlement agreement and order.

4         Even publishers who are not board members, and

5    therefore do not present exactly the situation that we saw in

6    Pandora, are prohibited under the proposed settlement agreement

7    from having responsibility for overseeing or approving

8    licensing activities.

9         THE COURT:  Thank you.

10        Mr. Cohen.

11        MR. COHEN:  Yes, good afternoon, your Honor.

12        So I don't really have a lot to add.  We put a

13   submission in last Friday.  We think that this is a reasonable

14   resolution of this investigation from ASCAP's standpoint.  As

15   the Court noted and as Mr. Shannon noted, ASCAP had taken a

16   number of steps proactively prior to entry into the proposed

17   settlement, and we have committed to fulfilling of all of the

18   mandates of the settlement.

19        THE COURT:  Thank you very much, Mr. Cohen.  And I

20   want to commend you and ASCAP on cooperating with the

21   Department of Justice and reacting responsibly in this

22   connection.

23        I have reviewed the terms of the proposed settlement,

24   and based on this review, the review of the submissions by the

25   Department of Justice and by ASCAP and what I have learned this

G6GTASCC

1    afternoon through this conference call, I'm prepared to sign
2    the order and will be doing that this afternoon.
3            Thank you very much.  Is there anything else anyone
4    wishes to add before we conclude this conference?
5            Mr. Shannon?
6            MR. SHANNON:  No, your Honor.  Thank you.
7            THE COURT:  Mr. Cohen?
8            MR. COHEN:  No, your Honor.
9            THE COURT:  Thank you so much.
10                              o0o