# DEPARTMENT OF JUSTICE

**Statement of the Department of Justice
on the Closing of the Antitrust Division's Review
of the ASCAP and BMI Consent Decrees**

**Washington, D.C.**

**August 4, 2016**

The American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI) are "performing rights organizations" (PROs).  PROs provide licenses to users such as bar owners, television and radio stations, and internet music distributors that allow them to publicly perform the musical works of the PROs' thousands of songwriter and music publisher members.  These "blanket licenses" enable music users to immediately obtain access to millions of songs without resorting to individualized licensing determinations or negotiations.  But because a blanket license provides at a single price the rights to play many separately owned and competing songs – a practice that risks lessening competition – ASCAP and BMI have long raised antitrust concerns.

ASCAP and BMI are subject to consent decrees that resolved antitrust lawsuits brought by the United States in 1941 alleging that each organization had unlawfully exercised market power acquired through the aggregation of public performance rights in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The consent decrees seek to prevent the anticompetitive exercise of market power while preserving the transformative benefits of blanket licensing.  In the decades since the ASCAP and BMI consent decrees were entered, industry participants have benefited from the "unplanned, rapid and indemnified access" to the vast repertories of songs that each PRO's blanket licenses make available.  *Broadcast Music, Inc. v. CBS*, *Inc.*, 441 U.S. 1, 20 (1979).

At the request of ASCAP and BMI, in 2014 the Antitrust Division of the U.S. Department of Justice opened an inquiry into the operation and effectiveness of the consent decrees.  In the course of the Division's investigation, the Division solicited two rounds of public comments regarding the consent decrees and met with dozens of industry stakeholders.  The Division evaluated during its investigation whether various modifications to the consent decrees

requested by stakeholders were necessary to account for changes in how music is consumed today.  During the discussions surrounding these requested modifications, it became apparent that industry participants had differing understandings of whether the PROs' licenses provide licensees the ability to publicly perform, without risk of copyright infringement, all of the works in each of the PROs' repertories.  The requests for modifications therefore required the Division to examine the question of whether the consent decrees obligate ASCAP and BMI to offer "full-work" licenses.

The Division has now concluded its investigation and has decided not to seek to modify the consent decrees.  As discussed in detail below, the consent decrees, which describe the PROs' licenses as providing the ability to perform "works" or "compositions," require ASCAP and BMI to offer full-work licenses.  The Division reaches this determination based not only on the language of the consent decrees and its assessment of historical practices, but also because only full-work licensing can yield the substantial procompetitive benefits associated with blanket licenses that distinguish ASCAP's and BMI's activities from other agreements among competitors that present serious issues under the antitrust laws.  Moreover, the Division has determined not to support modifying the consent decrees to allow ASCAP and BMI to offer "fractional" licenses that convey only rights to fractional shares and require additional licenses to perform works.  Although stakeholders on all sides have raised some concerns with the status quo, the Division's investigation confirmed that the current system has well served music creators and music users for decades and should remain intact.  The Division's confirmation that the consent decrees require full-work licensing is fully consistent with preserving the significant licensing and payment benefits that the PROs have provided music creators and music users for decades.

The Division recognizes that its views of the consent decrees' requirements and the nature of the PROs' licenses are not shared or supported by all industry participants. This statement seeks to explain the bases for the Division's determination and describe why an express recognition that ASCAP and BMI do currently and must continue to offer full-work licenses should not meaningfully disrupt the status quo in the licensing of public performance rights. As discussed below, the Division encourages the industry to use the next year, during which the Division will forgo enforcement of the full-work licensing requirement, to transition to a common understanding regarding the scope of the ASCAP and BMI licenses. This period should allow stakeholders to resolve any practical challenges relating to complying with the full-work licensing requirement, including the identification of songs that can no longer be included in ASCAP's or BMI's repertories because they cannot be offered on a full-work basis or the voluntary renegotiation of contractual agreements between co-owners to allow ASCAP or BMI to provide a full-work license to the song.

The Division has also decided that it will not at this time support other proposed decree modifications. The most significant of the proposed modifications was a proposal supported by ASCAP, BMI, and music publishers to allow music publishers to "partially withdraw" from ASCAP and BMI, thereby prohibiting the PROs from licensing the withdrawing publishers' music to digital services such as Pandora or Spotify. The lack of industry consensus as to whether the PROs offer full-work licenses creates too much uncertainty to properly evaluate the competitive impact of allowing partial withdrawal, a necessary predicate to a determination that a decree modification to allow partial withdrawal would be in the public interest.

This statement proceeds as follows. Section I outlines important features of the PROs, music licensing in the United States, and the history of antitrust enforcement with respect to the

PROs.  Section II briefly describes significant areas of agreement regarding the important role ASCAP and BMI play in the U.S. music ecosystem, focusing in particular on the procompetitive benefits that industry participants recognize the PROs offer.  Section III explains the Division's conclusion that the consent decrees require full-work licensing, and Section IV discusses the Division's determination that the decrees should not be modified to allow fractional licensing. Section V provides the Division's views regarding other proposed modifications to the consent decrees proposed by stakeholders.  Section VI discusses the Division's decision to provide an opportunity over the next year for ASCAP, BMI, and other stakeholders to develop a shared understanding that ASCAP's and BMI's licenses provide the ability to perform all of the works in their respective repertories.  Section VII identifies practices industry participants may find useful in complying with the consent decrees' full-work licensing requirements while maintaining most current licensing practices.  Finally, Section VIII concludes by addressing the possibility of broader legislative reform of public performance licensing.

I.   **Background**

*Purpose and Operations of ASCAP and BMI.*  In order to publicly perform musical works, businesses must obtain permission from copyright holders.  Every day, hundreds of thousands of restaurants, radio stations, online services, television stations, performance venues, and countless other establishments publicly perform musical works.  These music users have historically relied in large part on PROs to provide licenses to perform these works.  PROs pool the copyrights held by their composer, songwriter, and publisher members or affiliates and collectively license those rights to music users.  In the United States, ASCAP and BMI are the largest PROs and are responsible for licensing an overwhelming majority of works.  A third PRO, SESAC, has historically also controlled a significant but much smaller repertory.  In recent years, a fourth PRO called Global Music Rights, also controlling a collection of songs

considerably smaller than ASCAP's or BMI's, entered the marketplace.  ASCAP and BMI, as well as the smaller PROs, license music predominantly through "blanket licenses," which provide access to each organization's entire repertory without regard for what specific songs are used or how often the songs are played.

Individual songwriters, composers, and publishers that participate in a PRO execute an agreement with that PRO to do so.  Today, a songwriter joins ASCAP by executing a membership agreement in which it grants to ASCAP the right to license any work that "may be written, composed, acquired, owned, published, or copyrighted by the owner, alone, jointly or in collaboration with others . . . ."  ASCAP Writer Agreement, *available at* http://www.ascap.com/~/media/files/pdf/join/ascap-writer-agreement.pdf.  The ASACP writer further warrants "that there are no existing assignments or licenses, direct or indirect, of non-dramatic performing rights in my musical works, except to or with the publisher(s)" that would restrict ASCAP's ability to license under the terms of the grant of rights.  *Id.*  Similarly, a songwriter affiliating with BMI grants to BMI the right to license non-dramatic public performances of "all musical compositions . . . composed by [the member] alone or with one or more co-writers" and promises that "no performing rights in [these compositions] have been granted to or reserved by others except as specifically set forth therein in connection with Works heretofore written or co-written by [the author]."  BMI Writer Agreement, *available at* http://www.bmi.com/forms/affiliation/bmi_writer_kit.pdf.

*The ASCAP and BMI Consent Decrees.*  The United States first brought price-fixing charges against ASCAP more than 80 years ago and, in 1941, the United States resolved its civil antitrust lawsuits when it and ASCAP agreed to a civil consent decree that has twice been significantly amended, most recently in 2001.  The United States and BMI entered into a consent

decree in 1941 to resolve similar concerns, and most recently amended the decree in 1994.  Both

organizations have also been subject to numerous private antitrust lawsuits, one of which

resulted in an important Supreme Court decision, *Broadcast Music, Inc. v. CBS*, *Inc.*  In *BMI*, the

Supreme Court acknowledged that ASCAP's and BMI's blanket licenses raised significant

antitrust concerns because they pool works that in some circumstances would be substitutes (and

thus competitors) for some music users.  441 U.S. at 10.  The court emphasized, however, that

the blanket licenses also provided valuable benefits that no individual rightsholder could match,

including the "immediate use of covered compositions, without the delay of prior individual

negotiations." *Id.* at 21-22.  In light of these benefits, and recognizing the value of the consent

decrees that restrained the ability of ASCAP and BMI to exercise their market power, the Court

concluded that the PROs' blanket licensing practices did not constitute per se illegal price fixing.

*Id.* at 16-24.

Consistent with the Supreme Court's guidance, the consent decrees seek to preserve the

transformative benefits of blanket licensing, including the "immediate use" of the works within

the PROs' repertories.  To this end, the ASCAP consent decree requires ASCAP to offer users a

"license to perform *all the works in the ASCAP repertory*."  ASCAP Consent Decree § VI

(emphasis added).  The BMI consent decree similarly requires BMI's licenses to provide music

users with access to its "repertory," which includes "those compositions, the right of public

performance of which [BMI] has or hereafter shall have the right to license or sublicense."  BMI

Consent Decree § II(C).  The decrees also provide for the creation of two separate "rate courts,"

to which either music users or the PROs may resort if the two sides are unable to reach a

mutually agreeable price for a license.  *See* ASCAP Consent Decree § IX; BMI Consent Decree

§ XIV.

*Existence of Multi-Owner Works.*  Many musical works have multiple authors.  Under the copyright law, joint authors of a single work are treated as tenants-in-common, so "[e]ach co-owner may thus grant a nonexclusive license to use the entire work without the consent of other co-owners, provided that the licensor accounts for and pays over to his or her co-owners their pro-rata shares of the proceeds."  UNITED STATES COPYRIGHT OFFICE, VIEWS OF THE UNITED STATES COPYRIGHT OFFICE CONCERNING PRO LICENSING OF JOINTLY OWNED WORKS (2016), at 6, *available at* http://www.copyright.gov/policy/pro-licensing.pdf.  Copyright holders may, however, depart from the default rules under the Copyright Act.  *See generally id.* ("[T]he default rules are only a 'starting point,' with collaborators . . . free to alter this statutory allocation of rights and liabilities by contract.") (citations and quotations omitted).  There are therefore at least two possible frameworks under which PROs may license works with multiple owners belonging to multiple PROs.  Under a "full-work" license, each PRO would offer non-exclusive licenses to the work entitling the user to perform the work without risk of infringement liability.  Under a "fractional" license, each PRO would offer a license only to the interests it holds in a work, and require that the licensee obtain additional licenses from the PROs representing other co-owners before performing the work.

*Division Review of the Consent Decrees.*  In 2014, the Antitrust Division opened an investigation into potential modifications of the consent decrees requested by various stakeholders.  The Division issued a public request for comments and received more than 200 responses, primarily from industry stakeholders such as composers, publishers, and music licensees, as well as from advocacy groups.  (The solicitation and responses are available here: https://www.justice.gov/atr/ascap-bmi-decree-review.)  The PROs proposed three significant modifications:  first, to allow publishers to partially withdraw works from the PROs, thereby

preventing the PROs from licensing such works to digital music users; second, to streamline the process by which fee disputes are resolved; and, third, to permit the PROs to offer licenses to rights other than the public performance right, particularly for users who also need a performance license.  Music users proposed additional changes, in particular to promote increased transparency and clarify rules surrounding "licenses-in-effect," *i.e.*, how withdrawals from a repertory affect the scope of licenses granted by the PROs.

As the Division considered the implications of these proposed changes, particularly partial withdrawal, stakeholders on all sides raised questions about the treatment of multi-owner works.  Music users claimed that the PROs had always offered licenses to perform all works in their repertories, whether partially or fully owned, and urged modifications to confirm their view.  Rightsholders, by contrast, claimed that the PROs had never offered full licenses to perform fractionally owned works, and also urged modifications to confirm their view.  ASCAP and BMI did not concede that the existing consent decrees prohibited fractional licensing, but proposed that their consent decrees be modified to explicitly allow them to offer fractional licenses.  Historically, the industry has largely avoided a definitive determination of whether ASCAP and BMI offered full-work or fractional licenses because the vast majority of music users obtain a license from ASCAP, BMI, and SESAC and pay those PROs based on fractional market shares.  These practices made it unnecessary, from both the user and rightsholders perspective, to sort out whether the ASCAP and BMI licenses are full-work or fractional; users have held licenses that collectively cover all works and rightsholders have been paid for their works by their own PROs without having to worry about accounting.  However, recent events, including the Division's review, have made it necessary to confront the question.

The question of whether ASCAP and BMI licenses are or should be fractional or full-

work has significant implications for the PROs, their members, and their licensees.  If PROs

offer fractional licenses, a music user, before performing any multi-owner work in a PRO's

repertory, would need a license to the fractional interests held by each of the work's co-owners.

A full-work license from a PRO, on the other hand, would provide infringement protection to a

music user seeking to perform any work in the repertory of the PRO.

In light of the industry's conflicting understandings and the implications for any potential

modification, the Division solicited a second round of public comments in 2015 and received

more than 130 responses. (The solicitation and responses are available here:

https://www.justice.gov/atr/antitrust-consent-decree-review-ascap-and-bmi-2015.)  The Division

subsequently met and spoke with dozens of industry stakeholders.

II.   **There is broad consensus that ASCAP and BMI as currently constituted fill important and procompetitive roles in the music licensing industry.**

Despite strong areas of disagreement among industry stakeholders as to issues raised in

the Division's solicitations of public comments, there is broad consensus that ASCAP and BMI

provide a valuable service to both music users and PRO members.  The PROs allow music users

to obtain immediate access through licenses that protect them from copyright infringement risk

to millions of works controlled by the hundreds of thousands of songwriters, composers, and

publishers that have contributed songs to the PROs.

Music creators also benefit from the PROs' licensing practices.  For many songwriters

and composers, affiliating with a PRO and contributing their works to the PRO's repertory

provides the only practical way of licensing their works.  While direct licensing to individual

music users always remains available as an alternative for music creators, individual music

creators would often find it infeasible to themselves enter into licenses with all of the bars,

restaurants, radio stations, television stations, and other music users to which ASCAP and BMI

license.  Even where direct negotiations are possible, users and creators may find PRO licenses

more efficient.  Moreover, the PROs have developed valuable expertise in distributing revenues

among the hundreds of thousands of copyright holders, and creators generally trust that ASCAP

and BMI will fairly distribute licensing proceeds.

There is also significant agreement that aspects of the manner in which ASCAP and BMI

have historically fulfilled their licensing responsibilities benefit both creators and music users.

Upon request, ASCAP and BMI have offered users immediate licenses to perform the works in

their repertories.  (As discussed elsewhere, there is dispute about exactly what these licenses

mean for partially owned works.)  Most large music users have obtained licenses from ASCAP,

BMI, and SESAC.  ASCAP and BMI have charged fees based roughly on their respective market

share accounting for partial interests in the songs in their repertories.  ASCAP and BMI have

then distributed these fees to their own members, again based on the ownership each member has

in particular songs.  Many music creators, who often affiliate with the PRO of their choice early

in their careers, value their relationship with their PRO and like receiving payments for the

public performance of their works directly from their chosen PRO.

III.   **The consent decrees require full-work licensing.**

The Division's review has made clear that the consent decrees require ASCAP's and

BMI's licenses to provide users with the ability to publicly perform, without risk of infringement

liability, any of the songs in the respective PRO's repertory.  This determination is compelled by

the language and intent of the decrees and years of interpretations by federal courts.  First, the

plain text of the decrees cannot be squared with an interpretation that allows fractional licensing:

the consent decrees require ASCAP to offer users the ability to perform all "works" in its

repertory and BMI's licenses to offer users the ability to perform all "compositions" in its

repertory.  ASCAP's and BMI's licenses have for decades purported to do exactly that.  *See, e.g.*,

BMI Music License for Eating & Drinking Establishments, *available at* http://www.bmi.com/forms/licensing/gl/ede.pdf ("BMI grants you a non-exclusive license to publicly perform at the Licensed Premises *all of the musical works* of which BMI controls the rights to grant public performances during the terms.") (emphasis added).

Moreover, only full-work licensing achieves the benefits that underlie the courts' descriptions and understandings of ASCAP's and BMI's licenses. For example, the Supreme Court explained that the ASCAP and BMI blanket license "allows the licensee *immediate use* of covered compositions, *without the delay of prior individual negotiations*, and great flexibility in the choice of musical material." *BMI*, 441 U.S. at 21-22 (emphasis added). In so doing, they provide "unplanned, rapid, and indemnified access" to the works in ASCAP's and BMI's repertories. *Id.* at 20. If the licenses were fractional, they would not provide *immediate* use of covered compositions; users would need to obtain additional licenses before using many of the covered compositions. And such fractional licenses would *not* avoid the delay of additional negotiations, because users would need to clear rights from additional owners of fractional interests in songs before performing the works in the ASCAP and BMI repertories. Similarly, the Second Circuit has held that ASCAP is "required to license its entire repertory to all eligible users," and that the repertory includes "all works contained in the ASCAP repertory." *Pandora Media, Inc. v. ASCAP*, 785 F.3d 73, 77-78 (2d Cir. 2015) (emphasis removed). The Second Circuit rejected arguments that this decree requirement conflicted with copyright law, noting that "[i]ndividual copyright holders remain free to choose whether to license their works through ASCAP." *Id.* at 78. The logic of the Second Circuit's decision applies to BMI as well.

Accordingly, the consent decrees must be read as requiring full-work licensing. ASCAP and BMI can include in their repertories only those songs they can license on such a basis.

These songs include works written by a single songwriter who is a member of the PRO; works

written by multiple writers, all of whom are members of the PRO; and works written by multiple

writers, one or more of whom are members of the PRO and possess the right under the default

tenancy in common or pursuant to other arrangements among the songwriters to grant a full-

work license.  Moreover, nothing in this interpretation contradicts copyright law.  To the extent

allowed by copyright law, co-owners of a song remain free to impose limitations on one

another's ability to license the song.  Such an action may, however, make it impossible for

ASCAP or BMI – consistent with the full-work licensing requirement of the antitrust consent

decrees – to include that song in their blanket licenses.

IV.    **The Division has determined that modification of the consent decrees to permit fractional licensing by ASCAP and BMI would not be in the public interest.**

The Division also considered ASCAP's and BMI's requests to modify the decrees to

permit fractional licensing.  Based on the public comments and meetings and communications

with stakeholders, the Division has concluded that it would not be in the public interest to

modify the ASCAP and BMI consent decrees to permit ASCAP and BMI to offer fractional

licenses.

Modifying the consent decrees to permit fractional licensing would undermine the

traditional role of the ASCAP and BMI licenses in providing protection from unintended

copyright infringement liability and immediate access to the works in the organizations'

repertories, which the Division and the courts have viewed as key procompetitive benefits of the

PROs preserved by the consent decrees.

Allowing fractional licensing would also impair the functioning of the market for public

performance licensing and potentially reduce the playing of music.  If ASCAP and BMI were

permitted to offer fractional licenses, music users seeking to avoid potential infringement

liability would need to meticulously track song ownership before playing music. As the experience of ASCAP and BMI themselves shows, this would be no easy task. Today, in the context of compensating song owners, ASCAP, BMI, and other PROs must track and rely on song ownership information they possess to determine to whom to distribute funds collected from music users. But even with their years of experience in finding and compensating song owners and their established relationships with music creators, the PROs often do not make distributions until weeks or months *after* a song is played, and even then do so imperfectly. The difficulties, delays, and imperfections that are tolerated in the context of PRO payments would prove fatal to the businesses of music users, who need to resolve ownership questions *before* playing music to avoid infringement exposure.

A comparison between the licensing of public performance rights and the licensing of synchronization rights further illustrates the problem faced by music users who rely on PRO licenses. Producers of movies or television programming have traditionally entered separate synchronization licenses with each owner of a fractional interest in a song the producer seeks to include in his or her television show or movie, generally on a song-by-song basis. Unlike many ASCAP and BMI licensees, the producer can identify a song before it is used and has the ability to substitute to a different song if the producer cannot reach agreements for the synchronization rights with each of the song's fractional owners. Indeed, it is not uncommon for a producer to fail to obtain synchronization licenses from all of a song's fractional owners and to turn instead to a different song. In contrast, music users publicly performing music are often using music selected by others – for example, by the producer who placed a song in a television show or the disk jockey selecting songs for the radio (which may be played in a bar or restaurant that cannot control the music chosen). These users rely on blanket licenses to allow them to perform music

14

without first determining whether they have cleared the rights in a work. Unlike a movie or television producer, these music users cannot switch to a different song if they lack the rights to publicly perform a song. Their only recourse under a fractional licensing regime, under which their PRO blanket licenses leave them exposed to infringement liability, might be to simply turn off the music.

The problems inherent in allowing ASCAP and BMI to engage in fractional licensing would be exacerbated by the absence of a reliable source of data on song ownership to which music users could turn to identify whether they possess rights to perform a song or from whom they could seek a license. The Division's investigation uncovered that no such authoritative information source exists today, even for existing works, and, further, that songwriting credits for new releases may not be fully established until after the songs have been released. If music users cannot rely on ASCAP and BMI blanket licenses to avoid infringement exposure, they are likely to avoid playing songs – including new releases – that they are not confident they possess the right to perform. Nor are music users positioned to lead the creation of a comprehensive and reliable database of song ownership information. To the extent such a database could be created, songwriters, music publishers, and PROs have much greater access to the information necessary to do so.

Finally, allowing fractional licensing might also impede the licensed performance of many songs by incentivizing owners of fractional interests in songs to withhold their partial interests from the PROs. A user with a license from ASCAP or BMI would then be unable to play that song unless it acceded to the hold-out owner's demands, providing the hold-out owner substantial bargaining leverage to extract significant returns. The result would be a further reduction in the benefits of the ASCAP and BMI licenses and the creation of additional

impediments to the public performance of music.

For all of these reasons, the Division believes that modifying the consent decrees to permit fractional licensing would not be in the public interest.  Although PROs, songwriters, and publishers suggested there are problems associated with full-work licensing, especially the creation of works that would be unlicensable by the PROs, the Division believes that the potential costs associated with these concerns are far outweighed by the benefits of full-work licensing.  In particular, the Division believes, as further detailed in Section VII below, that songwriters possess several options that would allow PROs to continue to license their works as well as allow those songwriters to continue to be paid by the PRO of their choice.

V.   **The Division has also determined that other modifications to the consent decrees would not be appropriate at this time.**

Industry stakeholders also proposed to the Division that the consent decrees be modified in other ways.  The most significant of the proposed modifications, and the one that received the greatest attention among industry stakeholders, was that the consent decrees be modified to allow PRO members to "partially withdraw" rights and thereby prevent the PROs from granting licenses that include those rights to certain users (in particular, digital music services) but not to other music users.  The impact of such partial withdrawal by music publishers turns significantly on the question of whether the PROs offer full-work or fractional licenses.  If the PROs were to offer fractional licenses, then a digital user would be unable to rely on a license from the PRO to perform any work in which a partially withdrawing publisher owned any fractional interest.  If the PROs were to offer full-work licenses, the effect of the partial withdrawal would be more modest because the PRO could continue to license many songs in which members that did not partially withdraw controlled an interest (and possessed the ability to allow the PRO to license the song on a full-work basis).  Although the Division interprets the consent decrees to require

full-work licensing, the Division recognizes that some rightsholders have not shared this interpretation, making a determination of the effect of partial withdrawal sufficiently speculative at this point that the Division cannot determine whether modification to permit partial withdrawal would be in the public interest.

Moreover, as discussed immediately below, the Division recognizes that the sharply conflicting views that many industry stakeholders have had on the question of whether the PROs do or must offer full-work licenses will necessitate some period of adjustment in the industry as it moves to a common understanding of the scope of the PRO licenses.  The Division believes that seeking modifications to the consent decrees – to permit partial withdrawal or in other ways suggested by some in the industry – during this uncertain period could complicate the industry's move to a shared approach with full clarity for all industry participants as to the rights conveyed by the PROs' licenses.  For this reason as well, the Division has determined that it would not be in the public interest to modify the consent decrees at this time, but remains open to considering these modifications at a later date.

VI.     **Assuming ASCAP and BMI proceed in good faith, the Division will forbear for one year from any enforcement action based on any purported fractional licensing by ASCAP or BMI.**

With the clarification provided by this statement, the Division believes it is essential that the industry now move towards a shared understanding that ASCAP and BMI offer full-work licenses that entitle music users to perform, without risk of infringement, all of the works in each PRO's repertory.  In light of the different views expressed by stakeholders about existing practices, the Division is cognizant that any move to this common understanding will require adjustment by some market participants.  To facilitate this adjustment and ease the transition to a common understanding, the Division will not take any enforcement action based on any purported fractional licensing by ASCAP and BMI for one year, as long as ASCAP and BMI

proceed in good faith to ensure compliance with the requirements of the consent decrees.  During

this year, to the extent doubt exists about the PROs' ability to license specific works, the

Division expects that ASCAP and BMI will take the steps necessary to eliminate such

uncertainty, including obtaining from songwriter and publisher members the assurances they

need and, to the extent necessary, removing works from their licenses if they cannot be offered

on a full-work basis.  In order to facilitate this transition, the Division strongly urges industry

stakeholders to explore means of further promoting transparency, including transparency

regarding the identity of rightsholders from which music users may license any works they

cannot obtain from ASCAP and BMI.

VII.    **While industry participants will and should continue a long history of devising**
       **creative solutions, the Division has identified certain guidelines and practices that**
       **may be useful as the industry moves towards such a shared understanding on full-**
       **work licensing.**

        The Division is confident that the transition to a common understanding need not disrupt

the significant efficiencies in both licensing and payment that ASCAP and BMI have provided

for years.  To help ensure this result, the Division discusses below certain practices that would

permit both rightsholders and users to benefit from the continued use of the licenses offered by

ASCAP and BMI in a manner that is not markedly different from the status quo.  However, these

examples are not intended to be exhaustive, and industry participants will undoubtedly identify

additional ways to accomplish this transition without meaningful disruption or movement away

from current practices.  The Division remains open to additional solutions and, to the extent that

there is uncertainty about alternative proposals, the Division is committed to working with

stakeholders to review them and provide feedback, especially during the next year of transition.

- *Co-owners of a song who are members of different PROs can continue to have*
  *their songs included in one or more PROs' full-work licenses and continue to be*

*paid based on their fractional ownership.*  Co-owners can do so in at least two ways.  Each co-owner can grant his or her PRO a non-exclusive right to license public performances of the song (as is the default for a joint work), but can agree that each owner will collect through his or her own PRO.  For example, if an ASCAP member co-writes a song with a BMI member, each writer may continue to license the work through his or her chosen PRO and receive payments from that PRO.  The Division believes this approach is consistent with historical practice.  Alternatively, if co-writers have a contract that prevents each co-owner from licensing the song on a full-work basis and those co-owners are members of different PROs, the co-owners may amend their contract either to revert to the default rule or to choose a single PRO as the licensing agent for the song, and agree on a manner to distribute revenue from that work.  For example, for a song co-written by one ASCAP member and one BMI member, the co-writers might designate the ASCAP member to collect all revenues from the licensing of public performance rights to the song and require that the ASCAP member distribute a share of the revenues to the BMI member.  Under these circumstances, the song would not be included in BMI's repertory.  Of course, the obligation under the consent decrees that ASCAP and BMI offer full-work licenses binds only the two PROs and not any individual songwriter.  Co-writers of songs remain free to split up their joint rights by contract in a way that makes their songs unlicensable by ASCAP or BMI.  This discussion merely seeks to illuminate what rightsholders can do if they wish to facilitate the PROs' ability to license their songs consistent with the requirements of the consent decrees.  If co-owners decline to grant

ASCAP and/or BMI the right to license the song on a full-work basis, the PROs will not be able to license that song. Co-owners of such works can use the next year to determine whether they want their songs available for licensing on a full-work basis by ASCAP and BMI and, if so, whether their songwriting arrangement will need to be modified to accommodate that goal.

- *ASCAP's and BMI's full-work licenses include songs granted to them on that basis by members and those licensable by other agreement.* In the process of clarifying the works that ASCAP and BMI are able to continue to license under a full-work licensing requirement, the PROs may remind their members that the members made grants of rights to their PRO to license all works of which a member is a partial or complete owner and warranted that there were no other agreements that would prevent licensing on the basis described in the grant of rights. The PROs' members can work with co-writers over the next year to make a specific determination whether they want their works to continue to be available to music users under multiple PROs' licenses, a single PRO's license, or through other vehicles. Additionally, ASCAP and BMI may consider the possibility of entering into reciprocal agreements with each other confirming that each PRO may license on a non-exclusive basis songs jointly owned by members of the other PRO and confirming that in the ordinary course members will continue to be paid by their chosen PRO.

- *Full-work licensing and fractional payments are not incompatible.* Fractional payments within the context of full-work licensing benefit creators by removing impediments to commercial and artistic choice. The requirement to offer full-

work licenses need not require a departure from fractional payments both to and from ASCAP and BMI.  For example, co-owners of a work who are members of different PROs may each offer non-exclusive licenses through their respective PROs while relying on payments from their own PRO in lieu of any obligation to account to one another.  In this example, the user might be said to have multiple, full licenses to the same song, but to have paid only a portion of the full value for each of these licenses.  A system of fractional payments, therefore, also benefits users by assuring they are not overpaying for buying multiple full-work licenses for co-owned songs.

- *Flexible fee structures may promote efficient licensing and payments.*  Users who have historically obtained licenses from multiple PROs and who paid each of those PROs based in part on each organization's ownership-weighted market share should continue to do so.  In the unlikely event that a user sought to depart from this practice by relying on a single PRO license as a basis to perform all co-owned works, the Division anticipates that the user would see an increase in the license fee corresponding to that portion of the works it is no longer paying for through a different PRO, as well as an additional administrative fee to cover the PRO's costs associated with the license (which may include the cost of contracting with other PROs to make payments to those PROs' members).  ASCAP and BMI may offer pricing that explicitly adjusts based on the other PRO licenses obtained (or not obtained) by a particular user.  (Existing licenses, in contrast, should generally not need to be re-priced.)  Some songwriters have expressed concern about full-work licensing leading to lower payments or to

payments being made by a PRO of which they are not a member.  However, the
Division expects that in most if not all circumstances the higher price a user
would face for a single license to play music it previously cleared through
multiple PROs will deter users from deviating from current licensing practices
and producing the results that concern songwriters.

VIII.   **The consent decrees remain vital to an industry that has grown up in reliance on them.  But the consent decrees are inherently limited in scope, and a more comprehensive legislative solution may be possible and preferable.**

During the course of its review, the Division considered whether the ASCAP and BMI
consent decrees continue to serve the purposes for which they were put in place in 1941.  After
carefully considering the information obtained during its investigation, the Division has
concluded that the industry has developed in the context of, and in reliance on, these consent
decrees and that they therefore should remain in place.  However, the Division recognizes the
incongruity in the oversight over the licensing of performance rights and other copyrights in
compositions and sound recordings and believes that the protections provided by the consent
decrees could be addressed through a legislative solution that brings performance rights licensing
under a similar regulatory umbrella as other rights.  The Division encourages the development of
a comprehensive legislative solution that ensures a competitive marketplace and obviates the
need for continued Division oversight of the PROs.